UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

AHMED ASHOUR, individually and on behalf of all others similarly situated,

Plaintiff,

v.

ARIZONA BEVERAGES USA, LLC, *et al.*,

Defendants.

------------------------------x

New York, N.Y.

19 Civ. 7081 (AT)(OTW)

Remote Conference

March 17, 2021
12:00 p.m.

Before:

HON. ONA T. WANG,

District Judge

APPEARANCES

REESE, LLP
Attorneys for Plaintiff
BY: CARLOS F. RAMIREZ

PEARSON SIMON & WARSHAW, LLP
Attorneys for Plaintiff
BY: MELISSA S. WEINER

STEVENS & LEE, P.C.
Attorneys for Defendants
BY: ROBERT P. DONOVAN

(Case called)

THE DEPUTY CLERK: Counsel, please state your name for the record.

MR. RAMIREZ: Carlos Ramirez, for plaintiff, Ahmed Ashour.

MS. WEINER: Good morning. Melissa Weiner, Pearson Simon & Warshaw, also for the plaintiff.

MR. DONOVAN: Good morning, your Honor. Robert Donovan for the defendants.

THE COURT: All right. Good afternoon, everyone. It is two minutes after noon, so I guess it is the afternoon.

All right. We are here for a discovery conference. We are proceeding by telephone due to the COVID-19 pandemic.

This is a public line and should be treated like my virtual courtroom. I expect the same decorum and manners on the line that I expect in my courtroom.

And because this is a public line, we should all expect that members of the press or public may be on the line on a listen-only basis.

We do have a court reporter on the line, as you have heard. Recording or rebroadcasting by anyone else on this line is strictly prohibited.

If the court reporter hasn't told you already, I will say it now and say it again, in order for our transcript to be clear, please stay on mute when you are not talking, please say

your name when you start speaking. Please don't interrupt each other.

I do encourage younger or less experienced attorneys to speak, as well. As stated in my individual practices, I have no limit on the number of attorneys who may speak, so long as they comport themselves appropriately as officers of the Court.

And failure to follow these ground rules may result in muting or expulsion from the conference and, in egregious cases, sanctions.

All right. It looks like we have a lot of issues to deal with today. I am inclined to -- let's address the motion to amend first, because I think that there may be -- some issues may drop out if we can resolve all of this.

So I would like to see this case move forward and, with that in mind, I would like to consider and ask defendants if you would rather just move forward with a motion to dismiss the second amended complaint, since I understand that your opposition to the amendment largely takes the form of arguing that the new claims are futile. If that's the case, then you may as well make them in a motion to dismiss and have the opportunity of a reply.

So I would be inclined to just get through that logjam and put you on a motion to dismiss briefing schedule if you are amenable to that.

MR. DONOVAN: Your Honor, this is Robert Donovan.

The opposition was based on futility, but also prejudice. So if the ruling of the Court is they are going to permit the amendment of the scheduling order, the modification of the scheduling order, so as to allow two new plaintiffs into the case, we argued, you know, notwithstanding any -- we argued there wasn't good cause for that, but even if there was some proffer of that, there would be prejudice as a result of the enormity of the new claims and the discovery.

If the Court is nevertheless going to allow that amendment, then of course it would make sense to just proceed, and we would be making a motion to dismiss with regard to that if the amendment was permitted.

THE COURT: Yes, of course, if amendment is allowed you can make your motion to dismiss. There is certainly nothing wrong with that. I think I was -- so let me understand. I was -- and of course if there is going to be amendment allowed --

MR. DONOVAN: Hello.

THE COURT: Just a minute.

(Court and court reporter confer)

THE COURT: Now I think we might have lost Mr. Donovan, so -- no, did we lose --

MR. DONOVAN: No. I'm here, your Honor.

THE COURT: Okay. We lost Mr. Ramirez, I think. Hold

on a sec. Let's wait for him to dial in.

(Pause)

MR. RAMIREZ: This is Carlos Ramirez. I got dropped off for some reason.

THE COURT: All right. Welcome back, Mr. Ramirez. You didn't miss anything.

MR. RAMIREZ: Thank you, Judge.

THE COURT: I stopped as soon as I saw that you had dropped off.

MR. RAMIREZ: Thank you.

THE COURT: All right. So I think I was inclined to allow amendment as to the new parties anyway. So if I am hearing you correctly, Mr. Donovan, if we are going to do that and we are going to allow -- obviously allow an expansion of the discovery schedule, as well, then we may -- it might be more efficient and expedient to just move on to the amended complaint and a motion to dismiss.

Is that what I am hearing?

MR. DONOVAN: Yes, that would make sense if that's what your Honor's order is on granting the amendment.

THE COURT: I think so. So if that's the case, since plaintiffs have already filed their proposed second amended complaint as an attachment, I'm just going to ask that you refile it -- refile it as a second amended complaint, okay?

MR. RAMIREZ: Yes, your Honor.

THE COURT: I will enter a text-only order after this conference so that it doesn't get bounced by the clerk, so don't file it until you see the text-only order hit the --

MR. RAMIREZ: Okay.

THE COURT: -- docket. Okay.

So then, Mr. Donovan, you get to pick when you would like your -- what you would like for your briefing schedule on your motion to dismiss.

MR. DONOVAN: Your Honor, I suppose that that motion could be filed within 30 days.

THE COURT: Okay. That nicely ends up on a Friday, which is April 16. Does that work for you?

MR. DONOVAN: The day after tax day.

THE COURT: I know. That's a concern.

(Indiscernible crosstalk)

MR. DONOVAN: Yeah.

(Indiscernible crosstalk)

THE COURT: Because it helps you to have like a free weekend to look forward to, to get that final push and get it done and get it filed?

MR. DONOVAN: I appreciate that --

THE COURT: But --

MR. DONOVAN: -- April 19 --

THE COURT: -- the 15th is the day before.

MR. DONOVAN: Yes.

THE COURT: So what are your thoughts? is --

MR. DONOVAN: April 19, in light of where that's filing.

THE COURT: Well, that puts you on a Monday, though. You are going to work through the weekend, then. How about April 23?

MR. DONOVAN: That's fine.

THE COURT: Okay. April 23.

All right. Opposition briefing?

MR. RAMIREZ: Yes, your Honor. Whatever the Court suggests, we will make it work.

And, your Honor, I'm going to ask maybe a silly question or maybe not, but will defendants be moving to dismiss the California claims as well, being that they were already upheld by the Court? I understand it is a new plaintiff, but I ask, in any event, out of curiosity.

MR. DONOVAN: Well, your Honor, I don't know the answer to that. I will have to wait until the complaint is filed. It's a new complaint, so the defendant reserves all rights to dismiss the complaint in toto.

THE COURT: Okay. Opposition brief, do you want May 14 or May 21? Those are the dates that I was looking at. Or is there something else that works better for you?

MR. RAMIREZ: Your Honor, either one is fine. We will -- let's take May 14. This way we will get through it

quicker.

THE COURT: Okay. And then defendants' reply, two weeks, which is what I would normally suggest, I usually suggest one to two weeks, would be May 28, which puts you right before Memorial Day weekend, which might be a nice way to head into the weekend, as well. Is that okay with you?

MR. DONOVAN: Your Honor, my experience is that that day is almost a *de facto* holiday in some respects. Is there any way I could ask the Court for -- then it runs into June. The 28th is fine, Judge. That's fine.

THE COURT: You can always file it a day earlier.

MR. DONOVAN: That's true.

THE COURT: I mean, you are going to be limiting it to whatever is in the opposition anyway, so, you know, sometimes it is easier to just have at that date and just be done with it.

So with that in mind, now we get to the discovery.

I'm not going to tie the discovery deadline to any briefing on a conditional cert. motion -- or a class cert. motion, I mean.

The other -- I mean, here is my general idea. As a normal practice, discovery is not stayed during the pendency of a motion to dismiss. That said, I think plaintiffs still need to establish relevance and proportionality, and I'm certainly not inclined to just sort of make it wide open.

I offer a couple of thoughts:

One possibility, if the parties agree -- and you certainly can have time to think about this. We don't need to decide any of this today. I can also ask you to meet and confer and see if there is something you come up with that addresses your needs. One possibility is to bifurcate liability and damages.

Another possibility, which is not exclusive to bifurcation, is coming up with a -- coming up with a way to stage discovery. Even if you are not clearly staging discovery, it is possible, and I would tend to be inclined to stage discovery to be primarily addressed to the case as filed, again, keeping in mind proportionality concerns.

Now, since we just basically agreed to allow amendments and then set a briefing schedule that takes us into the summer, what are your thoughts on how discovery should proceed going forward? I am obviously going to extend time since we have got this briefing going on as well. But would you like some time to meet and confer on this and maybe make your own proposal? It seems like this might moot some of the specific issues that were pending from your last filing.

MR. RAMIREZ: Your Honor, this is Carlos Ramirez.

We did try to meet and confer, and it didn't get anywhere. Although I believe now, in light of the Court's decision to allow for leave to file an amended complaint, I

believe that in defendant's letter to the Court, they did state that if there was in fact an amendment to the complaint, that they would be inclined to agree to a 12-month extension, although plaintiffs believe -- plaintiff, excuse me, believes that that is probably longer than necessary. Certainly, if it is more than -- if it is around six months or even a couple of months after that, I think that plaintiff would be amenable to that.

MR. DONOVAN: Your Honor, this is Robert Donovan.

In light of what your Honor has stated by way of inclinations, I do think a meet-and-confer with opposing counsel would make sense on the scheduling. And in light of the amendment, leave to amend, you know, I think that, as I sit here, bifurcation on liability and damages would make sense on a proportionality side of the equation, obviously subject to what the plaintiff feels on that. If we can reach some type of agreement or staging discovery, I think that makes perfect sense. So I do think a meet-and-confer would make sense on those issues.

MR. RAMIREZ: Your Honor, this is Carlos Ramirez again.

There are a couple of other discovery matters that have been raised now with the Court that I think would necessitate some type of resolution in order for us to be able to meet and confer and do so in a way that would be productive.

Presently there are a number of outstanding objections that defendants have raised that I think would -- it would be helpful if the Court could rule on those before we proceed to a meet-and-confer.

THE COURT: Okay. We can do that. But I do think that you should meet and confer, and then what I would like is a joint status letter with the results of your meet-and-confer due in a week, so March 24. Specific issues to consider are whether you think bifurcation or staging of discovery -- bifurcation and/or staging of discovery would be helpful, and also some discussion about the scope of discovery and a potential schedule.

Now, I am not inclined to enter immediately a 12-month extension, because that seems to be putting the cart before the horse, because that seems to be assuming that you are going to file a motion for class certification and it's going to be granted, and I am not -- you know, right now, I want you to look at this case -- until a motion for class cert. has been filed, I want you to look at this case as a case with three plaintiffs and prioritize the discovery relating to those three plaintiffs and their claims, okay? This is without prejudice to later expanding or extending discovery should a motion for class cert. be filed.

But right now, let's take the easy stuff first. And the reason why I say that is, I just, in the prior conference,

said that I have this theory about discovery, which is similar to I think it's Boyle's law, which is -- it's Boyle's law? That -- maybe not. But gases tend to expand to fill all available volume. Discovery kind of takes that same approach. So if I give you a deadline that's twelve months out, not a whole lot is going to happen right now, because everybody will think about, you know, either -- think about that you have a year to get everything done. And there also won't be a huge incentive to -- a huge incentive to prioritize or stage discovery, because you have the luxury of all this time. I think it also sends this message that -- correctly or incorrectly -- assumes that a motion for class cert. will be granted, and we haven't even gotten to a filing of a motion for class cert.

So that's what I would like to see in the March 24 letter, okay, is something more moderate in terms of a discovery schedule with the understanding that if a motion for class cert. is filed and granted, that there may be modifications to that schedule. And even if not, there may be modifications to that schedule.

As you may recall, I think it might have been 2019, in the companion case that has since been dismissed, defendants had a ransomware attack that basically locked up their ability to produce anything for a significant amount of time. So as we all know from this case already, things can happen that can

make the best laid plans have to be extended. Okay?

All right. So Mr. Ramirez, with that in mind and with the general understanding of how I would like to see this case proceed, what are the discovery issues that you think need some resolution so that you can meet and confer?

MR. RAMIREZ: Yes, your Honor.

The first couple of issues which we have now brought to the Court's attention by a letter dated March 5, there are certain objections to plaintiffs' requests for the production of documents, as well as a 30(b)(6) deposition of defendants that are, despite our best efforts to try to negotiate these, are right now at an impasse.

THE COURT: Okay. All right. All right. Let's stop. Let's start with the RFPs. Which numbers are they?

MR. RAMIREZ: Yes, your Honor.

Request 23 and 24 to start, and this is a nationwide sales data that we are requesting, in light of the fact that the Court has sustained plaintiffs' claim of unjust enrichment on a nationwide basis. Defendants have objected to this production and are limiting the data to California sales only.

THE COURT: What about California and New York sales, Mr. Donovan? Is that doable?

MR. DONOVAN: I believe so. After -- your Honor, this is Robert Donovan. We have provided California sales information, and I think New York can be provide as well, your

Honor.

MR. RAMIREZ: Your Honor, this is Carlos Ramirez.

The only way that the plaintiff can prove a nationwide damages claim is by obtaining data relating to nationwide sales. If we can't prove that with the information that defendants have, it severely hampers our ability to prove that claim, which is brought on a nationwide basis.

MR. DONOVAN: Your Honor, this is Robert Donovan.

This is -- this really goes to the core of what your Honor had been mentioning about the proportionality. This is -- one plaintiff now wants the amendment filed. Three plaintiffs, the particular plaintiff has been deposed. He only purchased products in California, requiring the -- you know, I rely on our letter of March 10, your Honor, as to the proportionality arguments, and this is just widely disproportionate to the needs of this case.

There hasn't been a sustaining of the unjust enrichment claim. There was a motion to strike the nationwide class allegations, and that -- there is a high burden on motions to strike, and that motion was denied, and that was before the record has now shown that this plaintiff has alleged only purchases of three products in California and California only. And based on those allegations, the plaintiff is now seeking nationwide sales information.

We have provided California sales invoices and have

offered California sales invoices for further inspection. New York invoices can also be furnished, your Honor. As a matter of common sense and proportionality, defendants feel that that's sufficient and proportional for the needs of this case.

MR. RAMIREZ: Your Honor, this is Carlos Ramirez.

Regarding proportionality, based on my decades of experience litigating these types of cases, the information is as easy as pressing a button on a computer, and we routinely have other defendants in cases where we have alleged nationwide claims produce us that information. It is exclusively in their possession.

Like I said, this is information that is readily available by any defendant, especially one as sophisticated as Arizona. And, again, it's really just a matter of pressing a button and downloading it on to an Excel spreadsheet. For that reason, I doubt that the proportionality arguments that defendants raise here are with any merit.

MR. DONOVAN: Your Honor, Robert Donovan.

I do not want to belabor the point. This is not about pressing a button. This is seeking sales information for over six years in 49 other states. It would be immensely disruptive to defendants' business. The document request requires production of business records. It doesn't require the defendants to create any documentation for the plaintiff.

These are sales invoices. The plaintiff is aware of them. The plaintiff has received sales invoices, volumes of them, and has been offered others for inspection, and it is widely disproportionate based on one plaintiff and three beverages in one state.

THE COURT: Okay. I think I am trying to understand why and how you get to nationwide sales data and what specifically is the data that you need. I don't think anybody is arguing that Arizona iced tea is only sold in New York and California. So I guess what I am trying to understand what it is that -- why you need nationwide data now and whether the nationwide data that you are seeking is still at this point in time overbroad.

MR. RAMIREZ: Your Honor, this is Carlos Ramirez.

We will most likely have anywhere between one to two experts that will opine on the damages in this case, and those experts will require several pieces of information. One would be margin costs or costs of goods sold, and the other one would be the price or the profit. And those are needed because that is the only way we can prove damages. And what they will do is they will take that information from the sale price, they will back out the price of goods sold, and then, from their analysis, they will be able to determine whether that profit, or a portion of that, is attributable to the misleading statements and, accordingly, that would be the damages to the

class.

Now, if we get that information for California and New York only, anyone who purchased any Arizona beverages outside of those two states, we will not be able to prove damages for those individuals.

THE COURT: Why not? Why not? I mean, are we saying that Arizona iced tea -- that the defendants use a completely different model for making money on these beverages in the other states? I'm trying to understand --

MR. RAMIREZ: Well, no. Sure, your Honor. The problem will be that -- so we take that premium and we times it by the number of units sold. So if we don't have the number of units sold for those other states, we will never be able to prove damages. So the damages formula is premium times units sold.

If we limit it to California and New York, we will only have units sold information for those two states, leaving the other 48 states out of the computation, and thereby effectively dismissing those claims as to damages for all of those non-New York and California states.

And, again, your Honor, this is very, very easily obtained information that every single corporation keeps and they use it in their modeling and in their forecast, and it's really just a matter of pressing a button. It's really as simple as that. It's proportional, and that's the only way we

can get that information from defendants. And under Rule 26, the defendant does have a duty to provide any evidence that may help us establish our claims, and that is clearly one of them.

MS. WEINER: Judge, this is Melissa Weiner, if I may just add one point on behalf of plaintiffs.

It is the plaintiffs' burden at class certification that I think we are operating on under that basic premise. And at this stage in the litigation, we are in the process of making important strategic decisions in terms of how we will present our case at class certification to the Court. And in order to do that and to prepare our experts and prepare our case, we need certain information.

Now, this can come to the Court in several fashions at class certification, either as a complete and final package that says this is what we, in dollars and sense, allege the premium price to be, and here is what we allege the aggregate damage on behalf of the class, or we can proffer a model for calculating damages on a classwide basis.

Now, if we propose a model and, again, we have nationwide claims, so we will be moving for both state and nationwide certification of these claims, there is always the "and we can get this data later" if the Court thinks that it is relevant and important for the calculation of damages.

I think what we feel nervous in not obtaining the

information now is that we will somehow be prejudiced in two ways, either in response to class certification by saying we didn't uphold our obligation to provide the Court with a feasible method of calculating damages. If we don't have the benefit of the information, we just won't ever know exactly the questions that your Honor posed. Do we know that they calculate price differently? Is it all uniform? Those are the sorts of questions that we would ask in a 30(b)(6) deposition just to ensure that we can say this is all uniform nationwide. Without the benefit of either the actual numbers and the availability of the information as to the nationwide claims, we just simply can't say with testimony under oath one way or the other.

Now, if what we are required to do is proceed without that information, then we would simply ask that it not be used against us if it is being held in, perhaps, abeyance for later request, depending on the Court's ultimate determination of class cert.

So I think if the Court isn't inclined to provide it -- and I echo my colleague's -- you know, I have experience in class certification and have been appointed to lead many consumer cases across the country, where I have never had nationwide claims at issue and not been provided nationwide data, if we are going to proceed in that way, that we simply not be prejudiced in response because we don't have it.

MR. DONOVAN: Your Honor, this is --

MR. RAMIREZ: Your Honor --

THE COURT: No, stop. Stop. Stop. Now it's my turn to talk.

All right. Thank you, Ms. Weiner that clears it up a lot.

I am assuming that the motion for class cert. is going to be before me. So, by all means, you should remind me of this, because I would not intend to prejudice you in that way.

My question now is for Mr. Donovan.

Is there some high-level information, whether it is nationwide or broken up by state or geographic region, that is -- that gives pricing information and the number of units sold? Because I think, from there, plaintiffs can certainly show not only the model but can make perhaps strategic determinations on whether they want a nationwide class, whether they want a New York and California class, or just a California class.

The reason why I say this is I am not pushing plaintiffs to limit their class in any way, but I had seen a case where there were nationwide class claims, but I think the plaintiffs ultimately decided that New York and California were the largest states, with the most numerous plaintiffs, and that trying to include, for example, some states with lower population and the like was not going to be worth the effort

after they made a cost-benefit analysis.

So I am wondering if defendant has this information fairly readily available, broken out by some either geographic region or state or however you normally keep it, that you could present the pricing information and the number of units sold. Because then I think that would give the plaintiffs at least some handle on whether they want to pursue a nationwide class or whether it just doesn't -- whether it might not make sense to do that. Okay?

MR. DONOVAN: Yes, your Honor. This is Robert Donovan.

Before I answer your Honor's question or give a response, in our letter, there is reference to the fact that the plaintiffs' claims are for restitution. The request for, quote, profit information and cost information is not relevant to that, and we have also addressed the fact that none of the document requests that are at issue here. None of them have sought cost information. And we have responded to request number 23.

But to respond to your Honor's question, I do think it is going to be a laborious task to go through 50 states and have to do a sales by unit summary, and the best evidence of what the prices are of what defendants sell their products are the invoices. But I do think that a summary -- and, again, it would be a summary based on the business records -- of the

sales by unit or by container or by case for California and for New York could be organized, but the other 48 states, to have to do that is just burdensome and, again, disruptive because it will have to go through the records of the business to make sure there is going -- there is going to be a representation, you know, in these records that they are accurate and, again, they are going to be a summary of business records. And I presume there will be discovery about that, who created the summary? How was it created?

So I don't know whether I answered your question or not, your Honor, but I do think, with regard to California and New York, there could be a sales by unit summary by container or by case, and the invoices would show what the prices are that they sell to their various customers.

MS. WEINER: Your Honor, if I may? This is Melissa Weiner, if I might respond to Mr. Donovan.

A couple of issues:

The first is, Mr. Donovan is speaking in terms of Arizona's records and its sale of cartons, and we are talking in wholesale prices. And he has raised restitution and, again, I highlight, this is plaintiffs' burden at class certification to demonstrate to the Court that there has been a premium price charged or a willingness to pay a certain price that they wouldn't otherwise have paid had they known the deception, very simple consumer class-action allegations here.

And Mr. Donovan, respectfully, is telling us what we need and don't need in order to do that, and I have personally spoken with our expert, because we are trying to front -- we are trying to give as much information, which, by the way, is, I think, a little bit challenging for the plaintiff to disclose some of our strategies and why we think we need what is otherwise in our experience very, very typical information that is produced, we have explained why we need these things.

Now if we don't get them, we do have alternative ways that we can, you know, proceed with a damages calculation. But what Mr. Donovan is talking about is information that in 99 percent of the cases that I prosecute is provided in a chart simply in a rog response. We are not asking for thousands of pages of internal records showing every carton or every sale made.

But, regardless, the information Mr. Donovan is talking about is with regard to wholesale Arizona sales of the products to third-party distributors who then put it on the shelf, right? So we have two different buckets. We have that information, and then we have end user data, and we haven't right on this conference today talked about the end user. The consumer buys the product off the shelf, and there are third party aggregators of all of this data, IRI, Nielsen, the Court is probably familiar with these either from prior cases or just, you know, from the news, where they go out and they

take -- you know, they calculate -- they are counting all the transactions, and they essentially average across all of the nation the average sales price. There is all sorts of information that exists out there by third-party aggregator sales data.

And I think the Court can appreciate, we are really trying to come up with ways that are less burdensome. We don't agree with the -- we think that proportionality is being overly used here. This is, without question, relevant information at the core of this case.

But again, even taking that to heart, we are trying to pivot here and find different avenues. Okay, fine, don't give us every internal business document. Let's get a summary. We really are trying to be reasonable. Third-party aggregator data was just produced to me in a very similar case literally by one-page attachment with a chart.

So I want to highlight for the Court that this case is not different than all of the consumer cases where this information is very easily and readily available, and I have just never seen this become such a huge issue, again, to a core component of our burden at class certification. And I don't want to belabor it, Judge, but this is why we are not just giving in. If Mr. Donovan is going to tell us that costs of goods sold are not relevant to our damages calculation, then, you know, just to forewarn the Court that you will be hearing

from us if there are any arguments that undercut our damages expert analysis because we weren't given that information and here we are, you know, crying for help, if you will.

THE COURT: Okay.

MR. DONOVAN: Judge, this is -- your Honor? Your Honor?

THE COURT: No, no.

MR. RAMIREZ: Your Honor --

MR. DONOVAN: Your Honor --

(Indiscernible crosstalk)

MR. RAMIREZ: Your Honor --

THE COURT: No.

MR. RAMIREZ: Can I please -- I'm --

THE COURT: No.

MR. RAMIREZ: Okay. I just wanted to clarify something for the record.

THE COURT: No. No. Should I mute you? I can mute you right now if you'd like.

MR. RAMIREZ: No. No, your Honor.

THE COURT: All right.

I want to follow up on something that Ms. Weiner just said about cost of goods sold. Why is the cost of goods sold not the same across states?

MS. WEINER: Judge, are you asking me?

MR. DONOVAN: Your Honor, this is Robert Donovan. Is

that question directed to me?

THE COURT: No. That was a question directed to Ms. Weiner.

MS. WEINER: Maybe it is, Judge. We think it is. And we don't think that this is information that is terribly difficult to identify or produce.

I think the Court is right that the cost of goods sold is likely the same across, and that's why this nationwide sales data isn't in fact so overly complicated. We just don't have any information one way or the other in terms of the uniformity from state to state.

So that's kind of -- those are our issues. We can make assumptions. And, Judge, that's what we would do if we can't get the data. But that, in my experience, will be met with opposition that we just are making assumptions with no record or foundation.

THE COURT: Yeah. And understand that I have a science background. I am fully capable of understanding how a model would work and how assumptions going into a model would work or not work, okay? So you have got to trust me a little bit on this. Okay?

Ms. Weiner, because you are doing the best job explaining this to me, what, if anything, or how, if anything, would a top line sort of nationwide, here is the number of units sold and here is the average price, average pricing

information nationwide, setting aside, Mr. Donovan, whether or how you would get it, but how would that impact your model or how would that affect your briefing on a model for damages calculations? Does that matter?

MS. WEINER: Sure. So I can just honestly, Judge, because we haven't fully retained all of the experts and have the opinions in this case, I will speak in terms of generalities of my experience in other similar cases.

So what we would typically do in a case like this would be have a -- either set up and provide the judge with a model or actually go through and run a conjoint survey. And to do that we would have underlying, you know, baseline assumptions where the conjoint survey is set up around an assumption that a reasonable consumer has been misled by whatever the allegations in the case are, and we use real market pricing in order to do that. There are criticisms that are just typical of these types of damages analyses, and I'm sure the Court will enjoy reading all of the progeny of cases on this point.

But we use actual, real numbers, average purchase prices, units sold, to understand how to create and craft the survey to -- which then underlies both of the damages analyses. How do I identify first if there is a price premium in the case? What is that actual percentage of the price that the defendants were able to sell a product on the market bearing a

higher price than they otherwise would have had the deception not existed?

So we use actual real numbers in order to do that, to show, one, across product lines that the pricing is X, Y, Z. They do actual input of this real data which is why that -- we utilize either the wholesale data with basic assumptions or end user IRI or Nielsen data which shows actual average prices across certain regions and periods of time.

So it is the -- so we can put together a model, if you will, that just takes into account all assumptions when we don't get -- I mean, I have never not had basic unit numbers and volume, because the first thing we do is figure out what that aggregate -- or, I'm sorry, what that classwide model of damage is.

And then, as Mr. Ramirez was explaining, in order to do the aggregate calculation, which is what we demonstrate at a class certification motion, is that we can do this and assess it across an entire universe of consumers. So it is that unit number or that nationwide number or California number, if it's a California class, that allows us to give the Court real data.

Now, again, I can use ABC123 and come up with a model that measures damages, but just, in my experience -- and I just literally took the deposition of an expert on this very subject last week -- if we don't have the real data and we can't show

the Court and demonstrate through our expert how this actually works in economics, we just get, you know, hammered by the other side that what we have done is insufficient.

So, from my perspective, understanding the Court's background and how we can proffer a model and a methodology, certainly we would take that into account in how much information we really need to offer to demonstrate that classwide damages can be calculated.

But, again, just the standard, you know, just like my visceral reaction to kind of bifurcation is that it always ends up prejudicing the plaintiff in the end if we don't get the information, because then we have to respond to the argument that we just haven't done enough to demonstrate the model works.

THE COURT: Okay. Ms. Weiner, you said basic unit numbers and volume. What do you mean by basic unit numbers?

MS. WEINER: Units sold. You know, so this case is about -- I know Mr. Donovan says that there are three products at issue. The case is about all of the products at issue based on the Court's order, units sold, so basic unit numbers, X number sold in 2017.

And, you know, again, we could break it out state by state. We could break it out California/New York/nationwide numbers, just literally 327,516 sold in 2017, and then we would need to know the volume in terms of if Mr. Donovan has it and

retail. So it's basically the unit number times the price that it was sold at equals the gross volume or, you know -- I mean, we can figure out the units. We just add it up. But for the dollars, we need to know the purchase price, the average price that the units were sold at.

THE COURT: Okay. And none of this is stuff that you can get from the third-party aggregators.

MS. WEINER: So, I will let Mr. Ramirez, if he has anything to add on the IRI or Nielsen data. So the way that the IRI -- and I honestly don't know if Mr. Donovan has agreed to provide it or if he has even told us yet whether he has it, but IRI and Nielsen data exist. They go out and they collect it. Now, certain companies, quote, subscribe to the data, so they actually get reports from these -- I think there are like three or four of them -- IRI, Nielsen, and NPD -- and they all collect it a little bit differently, but it's kind of the same end. It is an overall view at the actual consumer purchases, so like if you go To target and you buy this off the shelf, versus Mr. Donovan's clients' wholesale price, they go out and they can -- they basically estimate it across certain regions, and they tell you average purchase price during particular years for particular products.

And if I go to Nielsen or IRI and try to get the data, the first thing that I am told is that it is proprietary and confidential and I can't get it. So then we have to come and

get a court order. Sometimes we can subpoena it and we can get it, and then we have to pay Nielsen or IRI for the data.

In, again, the majority of the cases, especially consumer cases of this nature, it gets produced, again via court order, under a confidentiality protective order by the defendant, who typically in these cases just has the data in its possession, and they produce it.

Again, I have seen this provided, Judge, this is not overly complicated. I just got it a couple of weeks ago in an e-mail, and it was dropped into an e-mail of "here is the data." I have gotten it as a single page PDF. This is not like thousands of -- of like a printout of an Excel spreadsheet. It is far more simplified than that.

MR. RAMIREZ: Your Honor, may I please speak? This is Carlos Ramirez.

THE COURT: Go ahead, and then after that --

MR. RAMIREZ: Thank you, your Honor. I will make it very simple and quick.

We need marginal costs or the costs of goods sold, because we need to back that information out of the price. And defendants should want to give that over because it basically caps our damages.

And just recently, your Honor -- well, a couple of years ago, the Ninth Circuit ruled in a case called *Zakaria v. Gerber* that failure by plaintiffs to provide any supply side

factors, *i.e.*, cost of goods sold, profits, was a problem, and they decertified a class based on the fact that they didn't consider supply side factors, which is effectively what defendants will probably argue if we get to that stage.

So for that reason, we do -- we do need -- we also do need the marginal costs or whatever it is it costs them to make the product, so we can back that out of the damages calculation.

THE COURT: All right. And so the cost of goods sold -- this is for Mr. Donovan. The cost of goods sold has already been provided for California, no?

MR. DONOVAN: Your Honor, it was never even requested and, no, it hasn't been provided. It is not relevant to the plaintiffs' damage claims.

THE COURT: All right.

MR. DONOVAN: There is --

(Indiscernible crosstalk)

MR. RAMIREZ: Your Honor, it was requested --

THE COURT: Stop it. I'm muting all of you if you don't stop it right now.

So, defendants, here is how I am going to rule, all right? You are going to provide the California and New York data and nationwide as a whole. How you get that information doesn't really matter to me. Okay? It sounds like you might be able to get that information through a third-party

aggregator if you don't already subscribe to that information. And if you are going to continue to fight about this, I will allow -- I encourage you not to continue to fight about this, but I have already told plaintiffs that I will consider a model. It seems to me that if you have essentially the same types of numbers for California, New York, and nationwide, you can put together something pretty robust.

To the extent that there -- that what you get you feel is insufficient for you to make your -- to show how you would prove damages, I would like to defer that. That's a fancy court term for kick the can down the road. And I would like to see a motion if you need more granular data than that, but then a motion will have to explain to me why the data that you have is insufficient. Okay? But I also encourage you to try to work together on this.

One final question for Ms. Weiner, since you were the one who brought up and explained to me how the third-party aggregators work in terms of providing data, is if there is -- if there are -- I understand this is a very broad ruling. If there are details that you cannot work out among each other, I would like a joint letter explaining to me what the problem is, okay? But let's see what you get from California, New York, and nationwide on this fairly high-level data.

Mr. Donovan, I don't care how your client gets it, whether they do it themselves or whether they, in fact,

subscribe to a third-party aggregator, in which case it should actually be fairly simple, because it sounds like the cost of goods sold is probably something that wouldn't be available from a third-party aggregator and would only be available through your client, and it sounds like the cost of goods sold is necessary for calculating the premiums. Is that right?

MS. WEINER: So, Judge --

MR. RAMIREZ: Yes, your Honor. This is Carlos Ramirez.

MS. WEINER: Well, so I guess I -- at class certification, what we are required to do is show the Court that there is a feasible model for calculating damages classwide. Now, if I don't know the exact number for cost of goods sold, we will make, again, certain assumptions regarding maximization of profit, things that are just obvious in a CPG world.

So I don't want to represent to the Court that without it we are just hamstrung, because I think we make assumptions all the time. There are plenty of cases where I am told "we don't know," which, of course, to our economic expert seems crazy, but if it is what it is, then there are things that we do in economics to make assumptions based upon maximization of profit.

So I guess, and I agree with the Court that a joint letter, you know, explaining if we have any remaining issues on

especially this issue on sales data, which is pretty cut and dry, you either have it or you don't, you are willing to produce it or you are not. Request 23 is really simple, it is just average wholesale prices and average retail prices.

Again, the two buckets. The wholesale prices are what did Arizona sell it to third-party distributors? How many of those did you sell? And then the retail is how many of those were sold off the shelf. The third-party aggregator comes in in bucket B.

So I think that at least if we can get to or have commitment leaving here today, Judge, because we have, admittedly, have had some struggles in meet-and-confers, that we can at least get to the bottom of do you have it and are you willing to produce it, then we can come back to the Court -- hopefully not, but if need be -- with an understanding like we just don't have it or here are the three reasons why we just don't think you get it.

MR. DONOVAN: Your Honor, if I may? This is Robert Donovan.

I understand your Honor's ruling to be that the California, New York, and nationwide aggregate data, which I understand to be the IRI and/or Nielsen data, to the extent that it is responsive to request number 23, would be produced. Am I correct that that's what the information means, your Honor?

THE COURT: Yes.

MR. DONOVAN: And with respect to cost of goods sold, I do not understand the Court ruling on that. That is -- there hasn't been any -- respectfully, your Honor, just argument of counsel as to what cost of goods sold, how it was relevant, what it means.

THE COURT: Okay.

MR. DONOVAN: It's not in request 23, but I don't understand the Court's ruling to --

THE COURT: My ruling on that is that you are going to meet and confer and decide whether you need this now or whether, as Ms. Weiner said, it is possible to show a feasible model for calculating nationwide damages without it, or if you don't actually have it -- and, by the way, cost of goods sold is something that most companies do estimate in some way or they collect some data that makes it possible to estimate it, okay? So I also don't want to hear from defendants' side that you are completely hamstrung and you have no idea what this term means, okay?

But on the cost of goods sold issue, I want you to meet and confer and see if you can resolve it among yourselves.

All right. I have another thing at 1:00, so I am really trying to get through this quickly.

I think -- I definitely encourage you to review the transcript and review what we have talked about and process it

and internalize it a little bit because I would like you to try to work in the spirit of what I have suggested about getting what you need and finding something in between, okay? And I will leave it at that.

As for the 30(b)(6) deposition, what are your thoughts? You have got motion to dismiss briefing going on. Was it your understanding that you would be prepping a 30(b)(6) witness during this time as well or is that something that may be able to wait until a little bit later?

MS. WEINER: Judge, I think one of the problems is we just don't have any documents or information yet. And so while I am sure we can take a 30(b)(6) witness cold and get a bunch of relevant information, it's a little hard to do that before we really even know the scope of, you know, whether -- and what the objections extend to, because of course we will be asking the witnesses questions about some of the issues we are trying to resolve here today.

So I certainly don't think that the 30(b)(6) witness is like a yesterday's problem, given that the motion briefing will commence soon and then go through and into the summer. Hopefully we have some of these issues resolved and we can get some documents and understand how many corporate witnesses will be testifying. Maybe we could even break it up into a couple of categories, where some of them we can take sooner than others. Where it takes Mr. Donovan's client a little bit more

time to collect and produce information, maybe those can be grouped and dealt with a little bit later, so that we preserve resources while we are briefing. Certainly we are open to that. You know, as in my experience, it's not usually one person who knows everything. But, again, I just think we have been a little stuck on some of these issues with no information.

MR. RAMIREZ: Your Honor, this is Carlos Ramirez.

Just to follow on Ms. Weiner's comments, presently there are 14 objections that defendants have interposed in connection with the 30(b)(6) deposition which further cripples our ability to take the depositions.

THE COURT: Well, I don't think anybody is taking any depositions in the next couple of months anyway, and you have a March 24 joint status letter, okay? So your March 24 joint status letter, again, I said it once, I'm going to say it again, talk about bifurcation, talk about staging discovery, talk about the scope of discovery, and tell me what your thoughts are now that we have allowed amendments, set a motion to dismiss briefing schedule, and you understand where I am going with all of this, okay?

I want you to try to work together. Taking these stands and being inflexible with each other is not productive. It wastes your time, it wastes your client's money, it wastes my time. And soon enough we will not be doing these on the

phone. Once we get a good rate of vaccinations, you are going to have to be taking significant parts of time out of your day to come and explain to me in person what is going on and why you can't agree. So I really suggest you try to do a little bit more of the heavy lifting yourselves before bringing these issues. Okay?

(Indiscernible crosstalk)

MR. DONOVAN: Your Honor, this is Robert Donovan. There was an order from the Court for joint status letter for the 19th, I believe, so I think that is -- am I correct, your Honor, that will be dispensed with and replaced with the one on the 24th?

THE COURT: That's right. Unless you can manage to somehow resolve all of your disputes in the next two days, yes. Okay.

MR. DONOVAN: Thank you, your Honor.

THE COURT: All right.

MR. RAMIREZ: Thank you, your Honor.

THE COURT: Anything else?

MS. WEINER: Thank you, Judge.

THE COURT: All right. Thank you.

MS. WEINER: We hope to see you in person in better days. Thank you.

THE COURT: Yes.

MR. DONOVAN: Thank you, your Honor. Be well.

THE COURT: That is actually something I am looking forward to, but please get a copy of the transcript and share the cost, because I think it will be very helpful for all of us. All right?

MS. WEINER: We will.

MR. DONOVAN: Thank you, your Honor.

THE COURT: Thank you. All right. Thank you. We are adjourned.

oOo