UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------:

AHMED ASHOUR,                     : Case No.: 19-CV-7081

                 Plaintiff, :

     v.                           :

ARIZONA BEVERAGES USA LLC,        : New York, New York

                 Defendant. : May 2, 2023

------------------------------:


TRANSCRIPT OF STATUS CONFERENCE HEARING

BEFORE THE HONORABLE ONA T. WANG

UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:          REESE LLP
                        BY:  Carlos F. Ramirez, Esq.
                        121 King Street - Ste 8
                        Chappaqua, New York 10514


                        PEARSON WARSHAW, LLP
                        BY:  Benjamin E. Shiftan, Esq.
                        555 Montgomery Street-Ste 1205
                        San Francisco, CA 94111


For Defendant:          STEVENS & LEE, PC
                        BY:  Robert P. Donovan, Esq.
                             Nicholas Eliades, Esq.
                        669 River Drive - Ste 201
                        Englewood Park, NJ 07407


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

     AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

1            THE DEPUTY CLERK:  This is 19-cv-7081;

2     Ahmed Ashour v. Arizona Beverages, USA, LLC, et al.,

3     before the Honorable Ona T. Wang.

4            Please state your appearances for the

5     record.

6            MR. RAMIREZ:  Carlos Ramirez, Reese LLP,

7     for plaintiffs.

8            MR. SHIFTAN:  Good afternoon, Your Honor.

9     Ben Shiftan from Pearson Warshaw, for plaintiffs.

10            MR. DONOVAN:  Good afternoon, Your Honor.

11     Robert Donovan on behalf of the defendants.

12            MR. ELIADES:  As well as Nicholas

13     Eliades, also on behalf of the defendants.

14            THE COURT:  All right.  Good afternoon.

15            Well, I was just looking over my notes,

16     and it's been a while since we've seen you in

17     person.  This might actually be the first time since

18     the pandemic that we're here without masks and I can

19     actually see your faces.  So, welcome, it's good to

20     see you all.

21            All right.  We -- let's get right down

22     the brass tacks here.  The first thing I am

23     addressing is the status of defendants' document

24     review and projected completion.

25            I understand, Mr. Ramirez, you may have a

AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

1    lot to say, but I'm going to actually ask defense

2    counsel to talk to me about the process and when you

3    anticipate being complete and why.

4              MR. DONOVAN:  Thank you, Your Honor.

5              So just to give a little history to this,

6    Your Honor, we started a subsequent e-mail search

7    and didn't get those results until February.  I did

8    not receive them until February.  And there were --

9    when we're talking about the subsequent e-mail

10   search, separate and apart from the local computer

11   search, that's about 21 gigabytes of data that we've

12   been reviewing.

13             THE COURT:  Okay.  So let me start -- so

14   you started -- when did you start the subsequent

15   e-mail search?  What did that encompass?  I got the

16   gigabytes number, but you can tell --

17             MR. DONOVAN:  Yeah.  Feel free --

18             THE COURT:  Please tell me again.

19             MR. DONOVAN:  Sure.

20             THE COURT:  And you didn't get the

21   results until February of this year?

22             MR. DONOVAN:  Correct, Your Honor.

23             THE COURT:  Okay.  So when was that

24   search started?

25             MR. DONOVAN:  So -- okay.  So what

PROCEEDINGS

1    happened, Your Honor, was that we did a search of
2    initially agreed-upon search terms back in 2021,
3    2022, and there was a production based on --
4            THE COURT:  And that was only on the
5    local computers?
6            MR. DONOVAN:  No.  That was based on a
7    search based upon agreed-upon search terms, not the
8    local computer.
9            THE COURT:  Okay.
10           MR. DONOVAN:  That was based upon a
11   search of their custodians' e-mails, and also an
12   M: drive and a local U: drive.
13           THE COURT:  An M: drive and --
14           MR. DONOVAN:  A local -- a U: drive.
15   M: drive is a company drive.
16           So that production was done on a rolling
17   basis and was completed in August of 2022.  In the
18   meantime, counsel and I were in communications, and
19   we agreed to do another search.  Four new -- this is
20   based on my rough recollection, Judge -- based on
21   four additional custodians and expanding the time
22   period.  That took longer than expected, Your Honor.
23   This is a -- you know, we're going back -- some of
24   these productions go back to 2013, 2012.  I don't
25   want to belabor the point of -- you know, from our

PROCEEDINGS

1   side of the bench -- our side of the table, rather,

2   it is a -- it is a rather -- a big undertaking.

3              THE COURT:  Yep.  No, that's one of the

4   reasons why I'm glad I'm on this side of the bench

5   now.  I've done that.  I've been on your side.  I'm

6   thankful to be here now.  But okay.

7              MR. DONOVAN:  So lo and behold, Your

8   Honor, I -- there were -- the 21 gigabytes came

9   forward.  We received them in February this year.

10  Now, some of them, I believe -- I don't know what

11  the number is.  Some of them may have already been

12  previously produced under the first search, but a

13  vast majority that have been produced to date,

14  obviously, were not previously produced.  So that's,

15  you know --

16             THE COURT:  Okay.  So let me stop you

17  again just -- because I haven't actually been in the

18  weeds practicing like this for over five years.  I

19  need to catch up on, you know, how things have

20  changed, or how things might have changed.

21             So when you did the search of the four

22  additional custodians with the expanded time

23  period -- and the 21 gigs is the total volume that

24  was searched, or the initial -- you know, initial

25  batch?

PROCEEDINGS

1          MR. DONOVAN:  That's the initial batch,

2    Your Honor.

3          THE COURT:  Okay.

4          MR. DONOVAN:  And then there are -- as a

5    local drive, we've been asked to look at the local

6    hard computers of the custodians, and that's the

7    batch that I've received three results from.

8    There's about 1,900 documents there.  And then I

9    don't have the results of the other nine queries,

10   but I have an idea from the client how big that

11   database will be.  But it's, you know, a rough

12   estimate because, again, there may be documents in

13   there we already produced.  I don't want to, you

14   know, mislead the Court.  Maybe it ends up not

15   requiring that much time, but certainly the laboring

16   war was on and has been on this 21 gigabytes of

17   data, which we've done five rolling productions.  We

18   did another one today of about 1,800 --

19          1,800 documents, Nick?

20          MR. ELIADES:  Yes.

21          MR. DONOVAN:  You know, in broad strokes,

22   that's what happened, Your Honor, and that's what --

23   and I've been candid to the -- to opposing counsel.

24   I said, you know, if I knew this was out there,

25   this -- you know, I didn't -- that this process

PROCEEDINGS

```
 1    would continue -- I had an idea that there would be
 2    more because of the expanded number of custodians
 3    and the additional period.
 4             THE COURT:  So -- okay.  So talk to me a
 5    little bit about what's -- like, how the 21 gigs is
 6    being winnowed down.  How is it being -- how is it
 7    being reviewed?  What technology or protocols, if
 8    any, are you using to reduce or try to remove
 9    duplicates, whether they're actual duplicates of the
10    actual document, or whether they're just, you know,
11    in essence, another copy of the same thing, or
12    substantially the same.
13             What are you doing, and how are you doing
14    it to reduce the volume for review?  How much of the
15    review is actually human review, and at what point
16    does that come in?
17             MR. DONOVAN:  And Mr. Eliades may have to
18    interject here, Your Honor.  We --
19             THE COURT:  I -- look, I welcome -- as
20    you know, in my individual practices, I welcome
21    younger, less -- and more junior attorneys to speak,
22    so, you know, go right ahead.  You can feel free to
23    jump in whenever, okay.
24             MR. DONOVAN:  I'm sure he'll have to jump
25    in at some point, Your Honor.  We use CS -- we use a
```

PROCEEDINGS

```
1    DISCO Ediscovery platform, Your Honor, and that
2    allows you to search by -- in any means, by way of
3    custodian names, by way of word searches.  So
4    these -- the documents that have been produced have
5    been produced pursuant to search-term results, as we
6    agreed upon, based upon, just an example, give us
7    all documents regarding labeling, or give us all
8    documents regarding pricing, so that the search
9    would go through the DISCO process by saying, okay,
10   we have the agreed-upon custodians, let's search
11   their names, or -- and/or we'll search these search
12   terms.  What do you receive?  What -- you know,
13   you'll get, you know, 500 documents or 300
14   documents.  Then you have to look through them, Your
15   Honor.
16              To answer your question, these -- this is
17   done by the attorneys.  After you get that prompt,
18   you look at those documents.
19              THE COURT:  Okay.  So somebody is doing
20   either a search or a custodian or other tailored
21   search on that 21 gigs.
22              MR. DONOVAN:  Correct.
23              THE COURT:  And then whatever the results
24   of that search then get reviewed by a human?
25              MR. DONOVAN:  Correct.
```

PROCEEDINGS

1              THE COURT:  There's no process for either
2    de-duping or pulling out?  I see Mr. Eliades moving
3    along, so feel free to -- feel free -- yeah, I'm
4    just trying to understand where that comes in
5    because human review of targeted searches takes a
6    long time.

7              MR. ELIADES:  It does take a long time.

8              THE COURT:  So -- okay.

9              MR. ELIADES:  The -- at the ingestion
10   stage -- so all the prior production had been
11   uploaded to DISCO, and it kept a record of all those
12   documents.

13             THE COURT:  Okay.

14             MR. ELIADES:  And at the ingestion stage,
15   everything was de-duped, you know.  It tried to
16   cross, you know, collate the documents and so forth.

17             THE COURT:  Okay.

18             MR. ELIADES:  But once the search was
19   conducted, the de-duping had already occurred.

20             THE COURT:  Okay.  So the 21 gigs in the
21   first batch is already de-duped.  That's a huge
22   amount of data.

23             MR. DONOVAN:  It's fair to say that
24   there -- I don't know whether they have been
25   de-duped, but they have been, for the -- for the

PROCEEDINGS

1  most part, we have reviewed most of the 21
2  gigabytes, and we'll be able to make a determination
3  through C -- through the DISCO platform what has
4  been produced before and what hasn't been produced.
5                    Right?
6                    MR. ELIADES:  Yes.  Yes.
7                    MR. DONOVAN:  Hypothetically, Your
8  Honor -- and it's more than hypothetically.  Out of
9  the 21 gigabytes, there would be a reduction of that
10 based on the fact that we'd know that some of them
11 are duplicates, or some of them have been previously
12 produced.
13                   Is that correct, Nick?
14                   MR. ELIADES:  Yes.
15                   THE COURT:  I'm less concerned about
16 that.  I'm less concerned because I'm more concerned
17 about what might be the rate-limiting step.  And
18 I'll ask -- you know, and I'll ask plaintiff's
19 counsel to just -- to speak up as well if you have
20 suggestions on how to move the process along more
21 expediently.
22                   Is -- my concern is, I want to know what
23 the rate-limiting step is when you're going from
24 21 gigs to production.  To my less experienced, less
25 trained eye now, it seems to be that you're running

PROCEEDINGS

1    iterative searches using search terms on this
2    21 gigs.  I'm wondering -- and, you know, I'm
3    wondering what kind of interactive process you're
4    having with plaintiff's counsel to -- so that they
5    all understand how -- either how time consuming it
6    is, or maybe there can be ideas about how to refine
7    how you're searching the 21 gigs to get the
8    documents that you think are more appropriate.
9            There can also be other ways to produce
10   documents that essentially would allow plaintiffs in
11   the first instance to go in and do those searches,
12   or do some form of searches with, you know,
13   appropriate protections for privilege.  And, you
14   know, other -- if there's particular other
15   sensitivities, you can either remove certain of
16   those documents or you can build into a protocol
17   some -- you know, basically, like a 502(d) clawback.
18           Okay.  So I just want to hear, sort of,
19   what -- how the searches are being done on the
20   21 gigs, and then how the review is being done and,
21   like, what the volume of ESI is that has to be
22   reviewed by a human each time before you can produce
23   documents.  That was a very long, compound question,
24   but go ahead and -- yeah.
25           MR. DONOVAN:  Judge, our approach has

PROCEEDINGS

1   been after receiving the 21 gigabytes, after the

2   de-duping is, because there are these e-mails and

3   related documents are responsive to document

4   requests, in order to move the process along, we

5   thought it would be best to use those prompts so we

6   can make an educated deduction that a document would

7   be responsive to a particular request so that a

8   label or the term "citric acid" or the term

9   "preservative" would be used as a prompt.  And those

10  prompts would be used, and then we would already

11  have a view as to, well, if there's an -- if there

12  are documents responsive to that, we have to review

13  them, Judge.

14          Your Honor, there -- Arizona sells more

15  than just these beverages.  They sell beverages that

16  have alcohol in them.  They sell fruit snacks.  They

17  sell products overseas.  So that -- I am -- to

18  answer Your Honor's question, I am absolutely

19  willing -- and we have communicated to each other, I

20  think, in my view, about the process, and I'm

21  willing to try to streamline it.  And if it -- if

22  counsel wants to make suggestions on how to do it,

23  I'm all ears there.

24          THE COURT:  So, if I'm hearing correctly,

25  when you say -- when you say "prompts," are you

PROCEEDINGS

1    using the technology to create the search, or are

2    you -- when you use the word "prompts," are you

3    saying that those are, sort of, narrower search

4    terms on the 21 gigs, or is it something else?  I'm

5    not sure I understand.

6                MR. DONOVAN:  Out of the 21 gigabytes we

7    received, Judge, they are responsive to the search

8    terms.  And then in order to determine whether a

9    particular document is responsive to a document

10   request, we would use a prompt like -- that come

11   within the search terms "preservative," for

12   instance; "citric acid," for instance, or refer to a

13   particular custodian and look at those, and then

14   make the determination as to which document request

15   it's responsive to.

16                THE COURT:  So a human lays eyes on every

17   hit and then has to make a determination which

18   document request it may or may not be responsive to?

19                MR. DONOVAN:  Well, yeah.  I mean, Judge,

20   part of the problem is we have to do --

21                THE COURT:  That's --

22                MR. DONOVAN:  Okay.

23                THE COURT:  This is not how things should

24   be done anymore because that is the bottleneck.

25   That is the bottleneck.  And, you know, I mean, you

PROCEEDINGS

1  could break it down mathematically.  I mean, if you
2  say -- you assume that, very quickly, a trained
3  human can take -- takes a minute to review a
4  document and then figure out if it's responsive to
5  one or more document requests and potentially tag it
6  in the system somehow before it's produced, if you
7  assume -- and that's assuming a very fast human
8  takes a minute per document.  You can easily do the
9  math.  You know, you can figure out, based on, you
10  know, estimating how many gigabytes you're reviewing
11  and how many gigabytes are per document, how many
12  minutes it's -- how many human minutes it's going to
13  take.  And then if you have one person doing it, or
14  two or three people doing it, it's going to take
15  years.  That can't be -- that can't be the process
16  now in 2023 with 21 gigs of data.
17           MR. DONOVAN:  Your Honor, I understand.
18  I think we made progress.
19           I -- how much data is left out of the 21?
20           In terms of production, Your Honor, I
21  think we've produced --
22           MR. ELIADES:  About a third of it, I
23  believe.
24           MR. DONOVAN:  Approximately a third.  And
25  I think another one is coming forward, should be.  I

PROCEEDINGS

1    understand Your Honor's view, but, you know, part of

2    the -- part of the issue, Your Honor, is that we're

3    going back and --

4              THE COURT:  No, no, no.  I -- look, 20 --

5    you had me at 21 gigs, okay?  Here's what I'm

6    saying, if you're saying a third has been processed

7    since February 2023, that's quite good.  So you've

8    managed to get -- let's assume you had all of

9    February.  When did you get the stuff in February

10   '23?  Early?

11             MR. DONOVAN:  Like, maybe February 10,

12   February 11.

13             THE COURT:  March, April.  Okay.  So

14   let's assume it's taken you ten weeks to process a

15   third of the 21 gigs.  That means that, assuming all

16   else is equal, by your process, it would take

17   another 20 weeks to finish the review.

18             Now, is that acceptable?  Do we think

19   that's acceptable?  Are there ways to streamline it

20   and make it go faster?

21             MR. DONOVAN:  I imagine there are ways to

22   streamline it, Your Honor, to make it go faster.  I

23   also think there's, you know, frankly, as we move

24   along, probably going to be a little bit more

25   efficiencies in being able to do this.

PROCEEDINGS

```
1              But what I was going to say, Your Honor,
2    is we -- now, the production goes to the end of
3    2021.  This case was filed in '19.  There is an
4    issue about making -- I understand there would be a
5    clawback and an issue as to what Your Honor is
6    contemplating about trying to move matters along by
7    having, you know, counsel suggest what prompts to
8    use and to look, but there's a -- we have to make
9    sure that there's no attorney work product or
10   privilege documents in there, Your Honor.  And so
11   that's --
12             THE COURT:  You can -- there are ways to
13   work around that.  I suggest you look at much of
14   what has been published, either by -- you know, as
15   white papers, or even in decisions even by my
16   predecessor about, you know, procedures you can
17   agree to so that you maintain the protection, the
18   attorney-client and work product protection, but you
19   don't have to have a human laying eyes on every
20   single document.
21             Which, by the way, there is a tech way to
22   filter out many of them, right?  Just by either
23   looking at custodians or address fields and having a
24   list of attorneys and people in the legal
25   department.  That's on a first instance.  And then,
```

PROCEEDINGS

```
 1    in any event, there should be things -- you should
 2    be able to accomplish a broader review that
 3    acknowledges and accepts that not -- a human need
 4    not lay eyes on every single document in order for
 5    it to be produced and the world will not end, okay?
 6    And the privilege will be protected.
 7              MR. DONOVAN:  That sounds --
 8              THE COURT:  Okay.
 9              MR. DONOVAN:  That sounds -- something
10    we'd be amenable to, Your Honor, and would move
11    matters along.  But what I was going to say was, you
12    know, part of the -- and this is real-world, you
13    know, issues, because there's e-mails there as to --
14    even though they're not in the stream between a
15    lawyer and a client, there may be an e-mail from a
16    lawyer to a client, and then a follow-up saying,
17    counsel needs this, so they actually have to be
18    looked at.  So --
19              THE COURT:  No.  No, not anymore.  I --
20    actually, I invite plaintiff's counsel to talk to me
21    about what other ways you could accomplish a
22    speedier review.  I mean, I -- it's easy enough to
23    sit here and complain about how long it takes.
24    You've heard a little bit more, and I assume -- I
25    hope that you've been hearing this all along about
```

PROCEEDINGS

1   the volume and the processes.  So talk to me about

2   how -- how are some ways to get the documents to you

3   faster?

4            MR. RAMIREZ:  Well, I -- Your Honor,

5   aside from privilege, which the plaintiffs would

6   agree is a necessary review, and as the Court just

7   mentioned, there are ways to search for documents

8   that have certain attorneys' names.  I think that

9   when a search is run, except for privilege, all of

10  those documents should be reviewed.  It should not

11  be up to defense counsel to weed documents out for

12  relevance, for responsiveness.  It's really up to

13  the plaintiff's counsel to pull the non-responsive,

14  non-relevant documents out, and focus on those that

15  are relevant, hot, et cetera.  Other than that, I --

16           THE COURT:  Wait.  You said it's the

17  plaintiff's counsel's responsibility, or the

18  producing party's?

19           MR. RAMIREZ:  Well, after the producing

20  party gives us everything based on the search terms

21  that we've agreed on, then plaintiffs, now, are the

22  ones that have to go through and see what documents,

23  if any, help them prove their case.  It shouldn't be

24  the defendants' counsel that should go through

25  documents and determine relevance or responsiveness,

PROCEEDINGS

 1   especially since it's our job to prove the case, not
 2   theirs.
 3           And, Your Honor, again, between my
 4   colleague, Mr. Shiftan and I, we have decades of
 5   experience.  We've received tens of thousands of
 6   thousands of documents.  We've never had an issue.
 7   We've had them produced within a reasonable period
 8   of time.  And not everything is relevant.  Not
 9   everything's hot, okay.  And the onus is on us to do
10   that.
11           THE COURT:  I really wanted you to talk
12   to me about some trends in e-discovery in the last
13   10 to 15 years, about how technology-assisted review
14   might speed things along and how, you know, it is no
15   longer in -- especially in large cases where there's
16   volumes of ESI, it is no longer the standard that a
17   human needs to lay eyes on every single document
18   before it's produced.  It's -- the volumes of data
19   that are retained in cases that are heavy in ESI
20   just don't allow for that.
21           I remember once as -- I actually can't
22   remember if I was an associate or a partner, but
23   talking to -- trying to have one of my -- help one
24   of my senior colleagues wrap his head around the
25   review and production.  And I said, look, if you --

PROCEEDINGS

1   it takes one minute to review a page -- you know,

2   ten pages, right, and we have -- I had to put it

3   into pages instead of gigabytes or terabytes in

4   order to, you know, help people understand the

5   volumes we're talking about.

6          I said, look, if you have -- if each

7   attorney -- and you have a contract attorney or, you

8   know, associate -- reviews at a rate of, say, 50

9   pages an hour, and we have this many million pages,

10  it would require this many attorney hours to get

11  this done.  One attorney would not be able to do it

12  in their lifetime, right.  20 attorneys probably

13  couldn't do it in the lifetime of this case.  So

14  we've got to find other ways to reduce the volume

15  that a human needs to manage, or try other -- try

16  other processes.

17         For example, creation of an e-data room.

18  This may be too late in this case to be doing this

19  because it sounds like you have about 14 gigs left.

20  I mean, maybe.  Maybe not.  But consider whether

21  that might save time.  And it might also save money

22  in terms of, you know, attorneys' fees for the

23  client to find a way that can streamline this and

24  move this along faster.

25         MR. RAMIREZ:  Your Honor, since the Court

PROCEEDINGS

1  did ask for ideas, and -- respectfully, had
2  Mr. Donovan reached out to us and tried to come up
3  with something, I -- we would have gladly spoken
4  about it.  But presently, in many of our cases,
5  we're using AI.  And what you typically do is, the
6  program basically learns from the process by which
7  you put in search terms, by which you code for
8  certain things, and it saves hundreds, if not
9  thousands of hours, and it's what's typically done.
10        We have a case right now against Big
11  Tobacco, hundreds of thousands of documents, and
12  other parties that are very famous household names.
13  Again, they're using AI.  And we would -- we are
14  happy to recommend some of the vendors we use.  And
15  the pricing that you pay for the AI is substantially
16  less than pay for an associate or junior partner to
17  review the documents.
18        THE COURT:  Yeah.  Right.  Okay.  I don't
19  know.  I mean, I guess, what's 20 weeks from now?
20        MR. RAMIREZ:  Five months.  So that puts
21  us out, what is it, April, May -- around October,
22  late September.
23        MR. DONOVAN:  Your Honor, Nick Eliades
24  has something to add to this AI issue.
25        THE COURT:  Well, go ahead.

PROCEEDINGS

1          MR. ELIADES:  So, Your Honor, we actually

2     transitioned to DISCO from a prior platform.  The

3     prior platform didn't have as many features, so

4     we're still fairly new to DISCO.  But one of the

5     features that do have -- and I know I'm -- I've just

6     begun to use it in a separate case -- is an

7     AI-assisted tag prediction.  It's not exactly TAR

8     assisted review in that it's going to go ahead and

9     do all of them, but it will at least speed up the

10    process by telling you there's a, you know,

11    80 percent likelihood this is responsive.  There's a

12    10 percent, you know, likelihood it's responsive to

13    X and Y or whatever.  So that is something we can

14    certainly investigate.  And I --

15          THE COURT:  Yeah.  I think I would really

16    like you to do that because -- and I would also

17    suggest -- you know, again, this was just being

18    explored in, sort of, my final years before I took

19    the bench.  But in addition to teaching the AI what

20    is responsive and -- I am sensitive to the unspoken,

21    so I'm just going to probably make it worse -- make

22    it sound worse than it is.  But I am sensitive to

23    the fact that defendants are likely -- you know, may

24    have some sensitivities about plaintiff's counsel

25    seeing, for example, how citric acid might be being

PROCEEDINGS

1    used in other products that are not a subject of

2    this lawsuit, okay.  That there could be business

3    reasons and other, you know, trade secret or other

4    reasons that you would be -- you know, you would be

5    concerned about just, sort of, over disclosure in

6    cases where, you know, that -- where that might not

7    otherwise be the case.

8         Suggest perhaps you also train the AI on

9    segregating out the documents that you really don't

10   think plaintiff's counsel should see, like the

11   highly not relevant, as well as the highly relevant

12   documents, right -- these are clearly not

13   relevant -- so that it can learn on both ends, okay.

14   That might also help, and that might help assuage

15   your client's concerns, to the extent they have

16   them, about what they're doing with other products

17   and how they're doing it, okay?

18        All right.  So -- let's see.  What was

19   five months from now?

20        MR. RAMIREZ:  September 19th, Your Honor.

21        THE COURT:  Oh, so it's better than I

22   thought.  Or 20 weeks from now, September 19th.

23   Okay.

24        Why don't -- so we could do a couple of

25   different things.  I could send you back to meet and

PROCEEDINGS

1   confer and figure out whether there's a way to make
2   it go faster, and then propose a new -- a date by
3   which, you know, defendants anticipate substantial,
4   if not complete, document productions.  Or I could
5   set, you know, based on the representation that it
6   took about ten weeks to get through the first third,
7   if you're going to use -- if you're going to use
8   some AI assist, we hope that the next 20 weeks
9   will -- that the next two-thirds will go a little
10   bit faster.  That puts us at about 20 weeks.  And
11   then I could just order that it be completed by
12   then.  And if it's not completed by then, then I
13   guess we'll have another tougher conversation, but I
14   really, kind of, leave it up to the parties, and
15   particularly to defendants, I think, how you wish to
16   proceed.
17           MR. DONOVAN:  Your Honor, I think the
18   20 weeks ought to provide sufficient time.  And I
19   think we could -- if there are issues, we'll meet
20   and confer with the other side, and maybe they can
21   assist in -- on this rolling production.  They'll be
22   receiving documents and...
23           MR. RAMIREZ:  And, Your Honor,
24   respectfully, plaintiffs would like an additional
25   60 days to take depositions after receiving a

PROCEEDINGS

1   substantial completion of the document production.
2          THE COURT:  Okay.  How about this then,
3   if -- let's set September 15, 2023, a substantial
4   completion of document production.  And so,
5   obviously, the fact discovery deadline will go
6   beyond that.  Let's look at -- let's set the fact
7   discovery end date of November 17, 2023.
8          Okay.  Let's set that for now.  As we
9   talk about interrogatory -- the interrogatories, we
10  may revisit this, but we can set that for now.
11         All right.  Talk to me about the -- Joy
12  Brown's contention interrogatories and Crystal
13  Towns' interrogatories.  I think...
14         All right.  Well, how about Crystal
15  Towns, because you were supposed to be meeting and
16  conferring on this last week.
17         MR. RAMIREZ:  Yeah.
18         THE COURT:  Have you reached some
19  resolution on that?
20         MR. RAMIREZ:  Your Honor, we have not.
21  We will meet and confer.  We waited, respectfully,
22  to get the Court's input on what I -- what appeared
23  to be pretty straightforward interrogatories about
24  undebatable, non-controversial scientific data that
25  defendants are required to maintain pursuant to FDA

PROCEEDINGS

1   regulations.  We, out of courtesy, after the 30 days
2   were over, provided defendants with a ten-day
3   extension.  And, again, on basic, non-controversial
4   interrogatories, we received a host of what we would
5   argue are conclusory and irrelevant objections under
6   the circumstances.
7           Again, federal law requires that
8   defendants keep this data handy.  It should be
9   produced fairly quickly.  So, again, we're -- after
10  a ten-day extension, we're left wondering what the
11  issue is.
12          THE COURT:  Why is this a ripe issue?
13  Why are we talking about this now?  That's actually,
14  kind of, a question for defense counsel.
15          MR. RAMIREZ:  Okay.
16          THE COURT:  So --
17          MR. DONOVAN:  Your Honor, I -- with
18  respect to the interrogatories, what I anticipate is
19  after meeting and conferring, most of this
20  information that's responsive, you know, subject to
21  any objections, would be -- it's going to be in
22  documents, and, in fact, are in documents, I think,
23  that we've already produced in this case.  So I
24  don't think it is ripe.
25          I -- my initial -- what -- we did have an

PROCEEDINGS

 1    initial, kind of, a meet and confer.  I don't
 2    remember if it was by phone, but by e-mail.  And my
 3    reaction to these interrogatories was that they are
 4    premature.  They're, like Your Honor had ruled with
 5    respect to the Joy Brown interrogatories, that,
 6    listen, just, you know, wait until document
 7    discovery is over, or near over, and, you know,
 8    that'll trigger the point in which you have to
 9    respond to these, and that's what I proposed.
10          And so my assessment is it is premature.
11    You know, I'm willing to meet and confer, Your
12    Honor, on this.  I think there's a pathway to
13    resolve it.  I don't want to belabor the point of
14    all the objections.  They're not boilerplate
15    objections.  The Local Civil Rule says that
16    interrogatories are subject to limitations and is
17    subject to the issue of whether it's better to -- or
18    whether they're more conducive to responses through
19    documents or deposition.  Many of these questions
20    are.  They have more than 40 co-packers, Your Honor,
21    and we're going to be obliged to answer
22    interrogatories as to each time what the pH level of
23    each product was on thousands of instances of
24    manufacturing?
25          Again, documents have been produced

PROCEEDINGS

1    already in the case.  I think -- I anticipate most
2    of those documents that have been produced will be
3    responsive to many of the interrogatories.  So it
4    is -- may, in fact, be a moot point.  Thank you.
5              MR. RAMIREZ:  Your Honor, putting aside
6    the fact that there is no objection in here that has
7    to do with these interrogatories being premature,
8    the fact is that at the end of the day the
9    defendants are going to allege that the citric acid
10   that they were using was for flavoring-enhancement
11   purposes.  Plaintiffs are going to prove that the
12   citric acid is being used to acidify the product in
13   order to maintain it shelf stable; i.e., a
14   preservative.  The only way that plaintiffs can
15   prove that is by establishing that the pH level is
16   at a certain level that would require them to
17   acidify.  Again, it's pursuant to federal law.  This
18   is not irrelevant.  And I can go into the science
19   and bore you, Your Honor.
20             THE COURT:  Talk to me a little bit about
21   the science.
22             MR. RAMIREZ:  Okay.  Sure.  Okay, Your
23   Honor.  The average water, around --
24             THE COURT:  Seven.
25             MR. RAMIREZ:  Seven.  Thank you.  The

PROCEEDINGS

1    federal government says, hey, if you're going to
2    package something that is not refrigerated, you need
3    to have it hit a certain acidic level, because if
4    you don't, if you keep it at seven, it's going to
5    become -- it's going to spoil very quickly.
6              THE COURT:  Okay.
7              MR. RAMIREZ:  The citric acid, Your
8    Honor --
9              THE COURT:  Is an acid.
10             MR. RAMIREZ:  Yes, it's an acid.  It's
11   called an acidified food.  That is a shelf-stable
12   food that is not refrigerated or requiring shelf
13   stability.  If the plaintiffs can establish that the
14   water levels around here are seven -- because let's
15   face it, these beverages are 99.9 percent water, and
16   they have to now add citric acid to get it below
17   3.8, then the plaintiffs, arguably to a jury, can
18   establish that it's being used as an acidifier to
19   preserve versus as a flavor enhancement.
20             THE COURT:  Okay.  So let me get this
21   right.  So 3.8 is the level?
22             MR. RAMIREZ:  It depends, but 3.8 is what
23   the -- that is what the federal government says,
24   yes.
25             THE COURT:  Okay.  So hypothetically -- I

AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

1    know we're getting into the merits, but this is,

2    kind of, interesting to me.  So hypothetically water

3    is always a seven, okay?  That's neutral.

4            MR. RAMIREZ:  Yes.

5            THE COURT:  Right?  So I guess what

6    you're saying is that if the records indicated

7    that -- the documents indicated that defendants

8    added citric acid to a level such that the pH was

9    always below four, always below 3.8, your -- you

10   would assert that that shows that they were adding

11   it as a preservative and not as a flavoring

12   because -- you know, I -- or, conversely, I guess,

13   if defendants are adding citric acid to the beverage

14   and they don't care what the pH is, or they only

15   test it and it's like, oh, maybe it's only five, or

16   it's four and a half, good enough, fine, then that

17   would tend to suggest -- support their position that

18   the citric acid is just for flavoring, right,

19   because they're not so focused on the pH level?

20           MR. RAMIREZ:  Right.

21           THE COURT:  Is that what you're saying?

22           MR. RAMIREZ:  That's what we're saying.

23           THE COURT:  Okay.

24           MR. RAMIREZ:  In fact, Your Honor, by

25   law, they cannot.

PROCEEDINGS

1               THE COURT:  Okay.

2               MR. RAMIREZ:  If they were to keep it at

3    five, they would be in violation of federal law on

4    the issue because anything that is not refrigerated,

5    Your Honor, has to be --

6               THE COURT:  Okay.  So doesn't this -- I

7    mean, doesn't that just, sort of, all collapse into

8    are they shipping these packages refrigerated or

9    non-refrigerated?

10              MR. RAMIREZ:  Your Honor, these

11   packages -- these beverages are non-refrigerated.

12              THE COURT:  Okay.

13              MR. RAMIREZ:  Our clients buy them off

14   the shelf.

15              THE COURT:  Okay.  So -- but then --

16   but --

17              MR. RAMIREZ:  And, Your Honor, the reason

18   why we need this information now is because we would

19   need to depose the individuals that are making this

20   product, the scientists.  Every company that we've

21   ever litigated against will typically have a food

22   scientist on board that can confirm all of this.

23   For us to not be allowed to do this now would

24   basically make it impossible for us to verify --

25   excuse me -- authenticate these documents.  Our

PROCEEDINGS

1    experts -- our food scientist experts who will

2    testify that this is an acidified product cannot

3    verify documents.

4           And by the way, Your Honor, except for

5    some recipes, we have never seen -- to date, we have

6    not seen any documents relating to pH levels of

7    water used, the sources of water, and a bunch of

8    other scientific stuff that I won't bore the Court

9    with, that is required in order for us to prove the

10   claims.  We need these documents now to authenticate

11   them.

12          THE COURT:  To authenticate?

13          MR. RAMIREZ:  Well, Your Honor, to the

14   extent that we're going to now present documents to

15   an expert witness that the expert witness would need

16   to review and confirm that our theories are correct,

17   they would have to know that it was authenticated by

18   one of the officers.

19          Now, if -- and I've come across this

20   issue in the past, Your Honor, with respect to

21   financials, where, if I don't put the financials in

22   front of the CFO or the accountant, I'm stuck as far

23   as -- as for discovery.

24          THE COURT:  Yeah, this seems a little

25   bit -- this seems to be a little bit of the cart

PROCEEDINGS

1   before the horse right now, especially since we just

2   said September 15, 2023, substantial completion of

3   doc production.  You know, you can get that

4   information and get the documents either

5   authenticated or have them adopted, have the

6   information in the documents adopted through

7   deposition, no?

8           MR. RAMIREZ:  Well, we would --

9           THE COURT:  Through 30(b)(6) deposition,

10  no?

11          MR. RAMIREZ:  We would need that.

12          THE COURT:  You could meet and confer

13  with the defendants --

14          MR. RAMIREZ:  We would need that.

15          THE COURT:  -- to see what -- if there

16  was a range of pH that you could agree to, right?

17  You could -- there are many other things you could

18  do on your own, right?  I'm not going to tell you

19  how to litigate your case, but there are many ways

20  to -- if your issue is to understand the pH level or

21  the acceptable pH range for each product according

22  to what defendants say, that seems to me to be

23  something perfectly amenable to a 30(b)(6).

24          MR. RAMIREZ:  Your Honor, to the extent

25  that Don Vultaggio, the CEO, is aware that the water

PROCEEDINGS

 1    levels --

 2                THE COURT:  No, no, no, no.  What's a

 3    30(b)(6)?  It binds the company.  You don't have to

 4    depose the CEO to bind the company, right?

 5                MR. RAMIREZ:  Right.  But, Your Honor, I

 6    need to put a document -- as you know as a former

 7    litigator, I need to put a document in front of

 8    someone because there's amnesia.  There's all kinds

 9    of stuff that happens.  By the way --

10                THE COURT:  You might not need to if they

11    agree.

12                MR. RAMIREZ:  Well, Your Honor, so far,

13    we have not agreed to anything in this case.

14                THE COURT:  Yes, I see.

15                MR. RAMIREZ:  The is the most frustrating

16    case, Your Honor, that I've ever litigated, and I

17    can attest for my colleague --

18                THE COURT:  Okay.  All right.  Stop.

19    Stop.  Stop.  Turn down the heat in the room.  Turn

20    down the heat.  I want to go back just -- again,

21    just because this interests me a little bit.

22                I mean, isn't it possible that citric

23    acid -- because of what it is, it does also add

24    flavor -- that if you add it to a certain degree to

25    get to a flavor, the pH may -- will end up below 3.8

PROCEEDINGS

1    anyway, and, therefore -- and then Arizona Iced Tea
2    says, oh, great.  You know, it happens to be that
3    the pH is low enough that we don't have to
4    refrigerate.  Yay.  Let's save costs, right, isn't
5    that what -- I mean -- so --
6                MR. RAMIREZ:  Well, Your Honor --
7                THE COURT:  I guess I'm not -- you know,
8    you're -- you've taken me from A to Z, and I'm still
9    somewhere in between.
10               MR. RAMIREZ:  Okay.  I think I could give
11   you a perfect example.  To the extent that a
12   lemon-flavored drink does use a certain amount of
13   citric acid to get to that level, that's perfectly
14   plausible.  To the extent that the green tea -- and
15   I'm talking hypothetically -- to the extent that the
16   green tea here that has no lemon flavoring in it
17   does have citric acid -- and by the way, they both
18   tried to reach this federally mandated level -- I
19   think the argument becomes weaker for defendants.
20               THE COURT:  Okay.  Be that as it may, I
21   don't think it changes what -- how we approached
22   this issue back in, I think, ECF 249.  I'm trying to
23   figure out when that was.
24               MR. RAMIREZ:  Your Honor, I recall that.
25               THE COURT:  That wasn't too long ago.

PROCEEDINGS

1          MR. RAMIREZ:  And I guess the problem I'm

2    having, and the Court, as a former litigator, likely

3    ran into the fact that when you ask people questions

4    and you don't stick a document in front of them --

5    first of all, in fairness to them, they may not

6    recollect, so they need to have their memory

7    refreshed, and/or they may not want to recollect.

8          So, again, I think we need these

9    documents to place in front of a person, the food

10   scientist, for example.  To the extent that one of

11   the defendants -- excuse me -- well, one of the

12   CEOs, one of the decision-makers is aware of this,

13   we need to be able to confirm this and authenticate

14   it and have them, perhaps, make certain admissions.

15         THE COURT:  So is this essentially a

16   motion for me to reconsider ECF 249?

17         MR. RAMIREZ:  Your Honor, this is a set

18   of interrogatories, respectfully.

19         THE COURT:  Right.  As my clerk has so

20   helpfully given me the language in ECF 249, "The

21   Court resolves the parties' dispute as follows:

22   Plaintiff may withdraw the current interrogatories

23   referenced in ECF 245 and propound new

24   interrogatories at a later date.  If plaintiff

25   chooses not to withdraw her current interrogatories,

PROCEEDINGS

1    defendants' responses to those interrogatories is
2    due after the completion of document discovery in
3    this case."
4              MR. RAMIREZ:  Well, Your Honor, this is a
5    different set of interrogatories that we're speaking
6    of here.  The other interrogatories, the objection
7    was that there were contention interrogatories,
8    which typically would come after fact of discovery,
9    at least one might argue.  These are not contention
10   interrogatories.
11             THE COURT:  Okay.
12             MR. RAMIREZ:  Your Honor, this is data
13   that they're required to keep by law, easily
14   producible, and --
15             THE COURT:  Wait.  So you're talking
16   about document production then, not interrogatories?
17             MR. RAMIREZ:  Well, there would be --
18   Your Honor, it would be produced in -- it could be
19   produced either in an interrogatory -- obviously, it
20   could be produced in document form as well, but it
21   would be, I think, easier for plaintiffs to obtain
22   this information, which could easily be added.
23             The answer would be this, we use New York
24   City water.  It has a 7.0 pH level.  Maybe it has
25   7.1.  We don't know.  These are our sources of

PROCEEDINGS

1   water.

2          THE COURT:  Do you want a date certain

3   for production of documents?  You already got it.

4   So I don't understand what the dispute is here.

5          MR. RAMIREZ:  Well, I think the

6   dispute --

7          THE COURT:  We just spent the last

8   40 minutes talking about defendants' review of a

9   remaining, give or take, 14 gigs of data.  So you're

10  trying -- you want a response to an interrogatory

11  before they've had a chance to review all the data?

12         MR. RAMIREZ:  We were allowed to -- they

13  propounded interrogatories that we had to answer

14  before the end of fact discovery.  You know, who

15  knows if we'll ever see this data.

16         THE COURT:  All right.  Anything to add,

17  defense counsel?

18         MR. DONOVAN:  Your Honor, not really,

19  other than to say that we -- I am relatively sure,

20  based on my review of the documents, that there are

21  documents that talk about water sources in the

22  documents either that have been produced or that

23  will be produced.  And in a document sent -- in a

24  letter sent last week, we did produce documents on

25  this issue of acidification.

PROCEEDINGS

1            So my suggestion is counsel look at that,
2    and maybe we can meet and confer as to whatever else
3    they're looking for because, manifestly, in -- the
4    interrogatories are responsive through document
5    demands, they really are, in my view.
6            THE COURT:  All right.  When's your next
7    joint status letter due?
8            MR. DONOVAN:  I think at the end of this
9    month, Your Honor.
10           MR. RAMIREZ:  The last Friday of the
11   month, Your Honor.
12           THE COURT:  Okay.  You're going to
13   address this issue.  You're going to meet and confer
14   and talk to me about how -- in the next joint status
15   letter, tell me how you've resolved it.
16           This is the Crystal Towns
17   interrogatories; is that right?
18           MR. RAMIREZ:  Yes.
19           MR. DONOVAN:  Yes, Your Honor.
20           THE COURT:  Okay.  What about the Joy
21   Brown contention interrogatories?  That seems to
22   have been addressed by -- that one seems to have
23   been addressed by ECF 249.  Is that resolved now
24   that we've set a discovery end date, or do you want
25   to meet and confer and talk about it at the next

PROCEEDINGS

1    joint status letter?

2            MR. RAMIREZ:  Your Honor, my colleague,

3    Mr. Shiftan, can address that issue.

4            MR. SHIFTAN:  Thank you.

5            That one was ruled upon in ECF 249.  I

6    think the only remaining issue is the timing for

7    those responses.  We propose that they be due

8    shortly after, I believe, the substantial completion

9    date.  And I think that the only -- yeah, 30 days

10    after substantial completion.  So that would put us

11    in October 2023.  That would be fine with us.

12            I thought Mr. Donovan might have had a

13    different interpretation of what completion of

14    document discovery means and that it might mean

15    after completion of expert discovery, but I will

16    leave it to him to ascertain whether he's

17    comfortable with an October response date for those.

18            MR. DONOVAN:  It's fine, Your Honor.

19            THE COURT:  Okay.  So Joy Brown's

20    contention interrogatories issue is resolved.

21            All right.  The fact discovery deadline

22    is currently set -- is now set then for

23    November 17th.  Given what we talked about with the

24    interrogatory responses and the likelihood that

25    there will be a fair number of depositions, and as I

PROCEEDINGS

1  foresee from the progress of this case to date,

2  probably some disputes about depositions, I am not

3  going to hold you hard and fast to the November 17th

4  fact discovery end date, just because I suspect

5  there could be some issues coming down the pike.

6           That said, I -- hope springs eternal,

7  especially in the spring, so let's see how far we

8  get by September 15th and by November 17th.

9           All right.  Are there other issues we

10  should be addressing at this time?  Are there things

11  brewing that we may need to set a conference date

12  for or reporting date for?

13           MR. RAMIREZ:  No.  As far as the

14  plaintiffs are concerned, there are no other issues.

15           THE COURT:  Okay.  What about defendants?

16           MR. DONOVAN:  No, Your Honor.

17           MR. SHIFTAN:  And I would just add to

18  Mr. Ramirez, I think there are some things we're

19  still discussing for certain, but I don't think

20  anything that's ripe for Your Honor's intervention

21  today.

22           MR. RAMIREZ:  Thank you.

23           THE COURT:  Okay.  Any chance you can get

24  started on any depositions before September 15th?

25           MR. SHIFTAN:  Yeah, I think it's

PROCEEDINGS

1   possible.  We --

2              THE COURT:  Okay.

3              MR. SHIFTAN:  That would certainly be, I

4   think, in everyone's best interest not to wait until

5   the very end.

6              THE COURT:  Okay.  I mean, look, I know

7   that -- well, I said before September 15th, which is

8   before defendants are completely done with the

9   document production, but it's possible there may be

10  some witnesses that you can get out of the way.

11  Maybe.  Maybe not.  I don't know.  But given how

12  we've managed to move this case so far, you know,

13  the more you can do to -- on your own to streamline

14  these things, the better it will go and the more

15  smoothly it will go.  Come the fall, if there are

16  significant slowdowns, I am going to be a lot less

17  flexible with the deadlines, okay?

18              And so this also goes to -- as a caution

19  to defense counsel.  If you come across an issue

20  that is going to make it impossible for you to

21  complete production or substantial production by

22  September 15th, talk to opposing counsel first,

23  okay.  Do not not talk to each other and only talk

24  to me about it because you all will have more

25  knowledge about what processes, methodologies, what

PROCEEDINGS

1    other ways -- processes you may be able to implement
2    that will get you close to substantial production,
3    substantial completion of production.
4         Maybe plaintiff's counsel will decide
5    that, you know, you -- look, it's in your interest
6    to tell them, we would like, you know, more of this
7    first up front and less of this on the back end.
8    And it would be helpful to all of you to work
9    iteratively that way.  That way, you may get to the
10   end and find that while you didn't get every single
11   document that you may have been entitled to in your
12   document request, that you've got enough to keep
13   moving.  And if there's, you know, a few dribs and
14   drabs of documents that come in, they're not going
15   to be a surprise because, you know, you've gotten,
16   you know, the most important 90 percent in earlier.
17   And while there may be new documents that hadn't
18   been produced before, they're not saying anything
19   different from what you already have.
20        Okay.  Mr. Donovan, yeah?
21        MR. DONOVAN:  On reflection, Your Honor,
22   I do think there is an issue that I'd like to
23   address.
24        THE COURT:  Okay.
25        MR. DONOVAN:  And it deals with the

PROCEEDINGS

1    30(b)(6) deposition.

2              MR. RAMIREZ:  Okay.

3              MR. DONOVAN:  Obviously, the objections

4    were overruled by the Court, but we -- from

5    defendants' view -- and there has already been some

6    of a dispute about this on interpreting Your Honor's

7    order.  Your Honor had ordered that the disputed

8    topics overlapped with the undisputed ones and when

9    ruling on the protective order.  This is the

10   February 3 order.

11             THE COURT:  Do you have an ECF number?

12             MR. DONOVAN:  Yes, Your Honor.  Bear with

13   me.  It's ECF 230, Your Honor.

14             THE COURT:  Oh, right.  To construe the

15   disputed topics as potential follow-up.

16             MR. DONOVAN:  So the rub, Your Honor,

17   is -- there's potential follow-up questions or

18   subtopics.  Is the defendant obliged to prepare and

19   designate a witness on those subtopics, and -- (A).

20   And, (B), if the answer is yes, then what topics

21   overlap?  Because what -- if the answer -- in other

22   words, from our perspective, Your Honor, the five

23   or -- one, two, three, four -- five undisputed

24   topics -- 1, 2, 3, 4, 5, 7, 12, 13, 14, 15 and 29,

25   obviously, defendants will have to produce a witness

PROCEEDINGS

1    and prepare a witness on those designated topics.

2                     As to the disputed topics that are

3    follow-up questions, we -- I guess, from our view,

4    we want clarification, but that means we have to

5    produce a witness and prepare a witness on those

6    follow-up questions on subtopics, or simply the --

7    obviously, even if it's outside the scope of a

8    30(b)(6) on the undisputed topics, we're subject to

9    objection.  We're not going to prevent a witness

10   from answering it, but it deals with the issue of

11   who we have to prepare on those disputed topics.

12                   MR. SHIFTAN:  And, Your Honor --

13                   MR. DONOVAN:  That's, in essence, Your

14   Honor, the conundrum that we face, at least in terms

15   of the interpretation of Your Honor's order.

16                   MR. SHIFTAN:  And if it's okay, may I be

17   heard on this, Your Honor?

18                   THE COURT:  Yeah.

19                   MR. SHIFTAN:  So this was quite heavily

20   briefed, you might recall, and --

21                   THE COURT:  Yeah.  And I'm looking at my

22   order right now.  I'm -- how are you not able to

23   work this out?

24                   MR. SHIFTAN:  Well, Your Honor,

25   respectfully, first of all, this was not in the

PROCEEDINGS

1   joint letter, so I'm doing --

2            THE COURT:  Yeah, that's okay.

3            MR. SHIFTAN:  I'm going by memory here.

4            THE COURT:  Okay.  I'm looking at 226-1,

5   which has -- I had you all -- look, part of the

6   reason why I direct you to make a chart and talk

7   about your objections and the legal authority and

8   the response is so -- is part of that process is to

9   get you both thinking about where the dispute lies

10  and what the actual dispute might be.  And I'm a

11  little disappointed that it seems like that has not

12  happened.

13           Again, it feels a little bit like I ask

14  you to engage -- I direct you to engage in a process

15  that's supposed to be cooperative, and I get you

16  each talking to me without looking at each other.

17  So let's --

18           MR. DONOVAN:  Your Honor --

19           THE COURT:  Rather than talking about

20  this very broadly, talk to me about -- give --

21  Mr. Donovan, you seem to have some in mind.

22           MR. DONOVAN:  Yeah.

23           THE COURT:  Talk -- let's talk about --

24  let's talk about this as if I were not in the room,

25  okay, and you were in the room together.  Talk to me

PROCEEDINGS

1    about one that seems confusing or problematic.

2              MR. DONOVAN:  So, Your Honor, the

3    confusing -- or the need for clarity is that, with

4    respect to the topics that are in dispute --

5              THE COURT:  Tell me one.  Tell me one of

6    them.  Give me a topic number for one of them.

7              MR. DONOVAN:  Sure.  It would be, for

8    instance, topic number 9 --

9              THE COURT:  Okay.

10              MR. DONOVAN:  The characteristics and

11    qualities and effects of citric acid.

12              THE COURT:  Okay.  So defendants'

13    objection is largely duplicative of topic 13.

14              MR. SHIFTAN:  Right.

15              MR. DONOVAN:  That's probably not a good

16    example because that would -- from our perspective,

17    by designating someone on 13, you would be

18    designating someone on 9.

19              THE COURT:  Right.  Okay.  So let's talk

20    about a different one.

21              MR. DONOVAN:  Okay.  I'm sorry, Your

22    Honor.  Topic 21.  That's any and all businesses and

23    persons in the chain of distribution.

24              THE COURT:  All right.  So what -- let's

25    see.  What's a non-disputed topic that that might

AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

1    fit under?

2              I mean, look, that one on its face and

3    outside of all -- seeing all the other topics does

4    seem kind of broad.

5              MR. DONOVAN:  Your Honor, if I may --

6              THE COURT:  Whoa.  No.  You might be

7    winning this one.

8              MR. DONOVAN:  Okay.

9              THE COURT:  So just -- when you might be

10   winning, you should not be talking.  No.

11             So seeing this in a vacuum after -- you

12   know, three months after I looked at it in the first

13   instance, it does seem a little overbroad.  So --

14   and, you know, in this one, which is different from

15   the one that Mr. Donovan just raised -- in this one,

16   the plaintiff's responses are -- or plaintiff's

17   response to the objection doesn't really help me

18   much.

19             What is the -- how does that -- how does

20   that -- why do you need all of everybody, all of

21   everybody in the chain of distribution?  What does

22   that mean?  And why do you need every single name?

23             MR. RAMIREZ:  I'm sorry, Your Honor, but,

24   respectfully, Mr. Donovan keeps re-litigating issues

25   that have been already decided two, three times.

PROCEEDINGS

1    And I think it's unfair that we're now being asked
2    to come in to discuss --
3            THE COURT:  Well, I'm asking you now
4    because this one -- you know, I mean, I think I
5    broadly -- if you want me to go through this, I wish
6    I could bill you all for this because this is stuff
7    that you should have been doing.  But, you know,
8    when I looked at these the first time, you know,
9    that one, I might have been like, that's a little
10   overbroad, but it's largely contained under another
11   undisputed topic.
12           But, unfortunately, I don't have the
13   benefit of all the topics in this attachment, so I
14   can go through.  I can go through PACER and look and
15   compare the documents and see if I can find that --
16   find the, you know, broader 30(b)(6) topic that
17   wasn't in dispute that might cover this one, but,
18   frankly, that's probably something that you should
19   have done in the first place.
20           MR. RAMIREZ:  Well, Your Honor,
21   respectfully, when we typically serve these
22   deposition notices, we don't often litigate them.
23   Either the person knows the answer or they don't.
24           Putting that aside, we are --
25           THE COURT:  That's not the case in a

PROCEEDINGS

1  30(b)(6).  You would be -- if I had a dollar for

2  every 30(b)(6) topics dispute that I see -- yeah, a

3  lot.

4            MR. RAMIREZ:  Okay.  That's fine.  I

5  won't argue with the Court on that.  But, Your

6  Honor, again, we're being asked to defend a position

7  that we litigated, that was decided.  We weren't

8  prepared for it.  We don't have the documents in

9  front of us.

10           Again, Mr. Donovan, I -- we would love to

11 re-litigate some of the issues that we've lost here,

12 and hopefully at one point we will win.  But I think

13 it puts the plaintiffs at a disadvantage to ask us

14 to now address issues that we weren't prepared to

15 address.

16           MR. SHIFTAN:  And I would just add, Your

17 Honor, procedurally, Your Honor ruled on these, and

18 then this was subject to a Rule 72(a) objection that

19 was briefed, and Judge Torres also ruled.  But if

20 you would like us to go back --

21           THE COURT:  Well, I was really actually

22 just asking you to help me out because this -- while

23 21 itself seems to be overbroad, I was not in any

24 way suggesting that you wouldn't get any discovery

25 on the distribution chain.  That seems senseless,

PROCEEDINGS

1   given the nature of this case.  All I was asking was

2   for you to help me find the 30(b)(6) -- the

3   undisputed 30(b)(6) topic that this question would

4   have fallen under and we would be done, but I will

5   look at -- I will look at the 30(b)(6) notice.

6           MR. SHIFTAN:  If Mr. Donovan can provide

7   us a copy of it, we'd be happy to take a look at it

8   right now.

9           MR. DONOVAN:  All right.  We have more

10  copies.  You can take that.  I can replace it.

11          MR. SHIFTAN:  Yeah, so I think in terms

12  of the relevance, topic 21 to me seems like it's

13  plainly relevant for a variety of reasons.

14          THE COURT:  No, I didn't -- I'm not

15  challenging you on that.

16          MR. SHIFTAN:  Okay.

17          THE COURT:  I'm just challenging you

18  on -- there's two parts, okay, and you're only

19  hearing the part that seems to go against you, and

20  you're not hearing the part that I'm trying to find

21  for you and support and let the previous ruling

22  stand.

23          MR. SHIFTAN:  Sure.

24          THE COURT:  What I'm saying to you is, 21

25  on its face, standing alone, seems kind of overbroad

PROCEEDINGS

```
1    because you want the names of every individual and
2    entity in the entire chain of distribution.  If you
3    put yourself in defendants' shoes trying to prepare
4    for a 30(b)(6) deposition, you don't want to be
5    facing, like, oh, I think it was this -- these
6    people at this time, but, you know, the documents
7    and the preparation, these are the best -- this is
8    the best I can do for you.  And then suddenly, you
9    know, you get another name and, you know, they're
10   accused of not preparing their witness
11   appropriately, right?
12              MR. SHIFTAN:  Right.
13              THE COURT:  That's what I don't want to
14   have happen.  Now, the part that is in your favor is
15   my previous ruling, which apparently was upheld, was
16   that many of these topics, the information or
17   sufficient information or information sufficient to
18   show is subsumed under one of the other topics.
19              I have now found the original 30(b)(6)
20   notice.  It's at 112-3, unless you've served new
21   ones.  That was filed March 5, 2021, so this is a
22   dispute that I thought had been resolved.
23              MR. SHIFTAN:  The one that I'm looking
24   at, I believe an amended notice was served a month
25   later, in April 2021.  So I think we did -- and I --
```

PROCEEDINGS

1            THE COURT:  Okay.

2            MR. SHIFTAN:  I see that a lot of topics

3    are withdrawn here, so we --

4            THE COURT:  So where would the amended

5    notice -- because the amended notice, I'm guessing,

6    is the one that ended up being challenged --

7            MR. SHIFTAN:  Correct.

8            THE COURT:  -- and briefed.  Okay.

9            Where is the amended notice?

10           MR. SHIFTAN:  That would be, I presume,

11   attached to your motion for protective order.

12           MR. DONOVAN:  When we filed a letter,

13   Your Honor, there was initial letter motion that was

14   filed as an exhibit to that letter motion.

15           THE COURT:  Okay.  Approximately when

16   would that be?  I love sorting through several

17   hundred ECF entries.

18           MR. DONOVAN:  I think January 13ish.

19   That rings a bell.

20           THE COURT:  Okay.  January 13ish, 2023?

21           MR. DONOVAN:  Yes, Your Honor.

22           THE COURT:  ECF 217.  Okay.  Would that

23   be -- Exhibit A would be the --

24           MR. DONOVAN:  Yes, Your Honor.

25           THE COURT:  Okay.  All right.  You have

AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

1    not scheduled a 30(b)(6) deposition yet, right,

2    because you're not anticipating doing that until the

3    discovery is substantially complete?

4            MR. SHIFTAN:  That's correct.

5            THE COURT:  Okay.

6            MR. SHIFTAN:  At least as to the majority

7    of the topics.  There might be a few isolated ones.

8            THE COURT:  Okay.  All right.  Your -- I

9    would expect the ruling on this prior notice stands;

10    however, I would think that once you've had a chance

11    to review the document production and review the

12    defendant's document production, that you may have a

13    better sense of how you may want to refine or revise

14    the 30(b)(6) notice.

15            So the ruling -- the prior ruling stands,

16    but it's without prejudice to you trying to serve a

17    renewed 30(b)(6) notice that tries to give

18    defendants some better understanding so that they

19    can prepare their witnesses accordingly.  All right.

20            I hear what you're saying about the

21    distribution chain.  It's not necessarily explicitly

22    in the prior notice, but it's also -- but, you know,

23    the identity of every business or person who was in

24    the distribution chain for Arizona Iced Tea over a

25    period of seven years -- I -- all I'm asking is, put

PROCEEDINGS

1    yourselves in the shoes of defense counsel trying to
2    prepare a witness or trying to respond to that
3    topic.  That may not be an appropriate topic for
4    30(b)(6).  That may be something that you can glean
5    from documents, or that may be something that you
6    can work with opposing counsel to find a way to
7    limit, for example, first level distribution or
8    second level or the biggest ones by whatever
9    parameter seems, you know, to be something that you
10   can -- that you can get your arms around, given what
11   you see in the production.  Okay.  That should all
12   be things that do not need Court intervention.  And
13   instead, you brought this initially in 2021, when
14   document production wasn't even complete.  Okay.  It
15   wasn't even close to completion.
16            I think that just brings me to an issue
17   here, is -- which is -- I love to see you guys,
18   okay.  I love to help you work through your
19   discovery disputes, but, as you can see, I also take
20   these discovery disputes with -- wearing, like, a
21   settlement lens, which is each discovery dispute is
22   an opportunity for you to exercise some tiny, little
23   bit of settlement discussions to see if there's some
24   resolution that you can find that you both can live
25   with, okay, instead of drawing your lines in the

PROCEEDINGS

1     sand very far apart from each other, and then

2     spending a lot of time briefing and arguing about a

3     lot of these issues.  All right.

4             Mr. Donovan, thank you for fronting the

5     issue, but it is a little premature, given that you

6     have now another 20 weeks to complete your document

7     review and production.  So I hope that this

8     conversation at least gives you some guidance about

9     what I'd like to see you do when you are getting

10    down to brass tacks about trying to formulate and

11    prepare for 30(b)(6) deposition, okay?

12            MR. DONOVAN:  Thank you, Your Honor.

13            THE COURT:  All right Mr. Donovan, you're

14    standing up.  You have something to say?

15            MR. DONOVAN:  No, Your Honor.  I want to

16    thank you.

17            THE COURT:  All right.  So I'm not

18    reconsidering prior orders on 30(b)(6).  I

19    understand, and I hear what you were saying.  The --

20    you know, you may both come to decide that you would

21    prefer to, you know, have a better -- have better,

22    almost jointly drafted topics that you agree on so

23    that you understand where you're going into the

24    30(b)(6) deposition.  It does not help anybody to

25    have topics that you're not necessarily seeing eye

PROCEEDINGS

 1   to eye on, having defendants go to a lot of trouble
 2   to prepare a 30(b)(6) witness and then have, you
 3   know, post deposition briefing over whether the
 4   30(b)(6) witness was sufficiently prepared,
 5   sufficiently on notice for what they were going to
 6   be asked, okay.

 7           That's -- I see that a lot too, and it's
 8   really unfortunate because, after the deposition has
 9   happened, you know, there's not a whole lot of
10   routes that go, and they all involve costs on both
11   sides.  It's rare that somebody is found to have
12   actually produced a witness in bad faith or not in
13   good faith.  So then it ends up being, you know, an
14   assessment of, like, did you get most of what you
15   needed to get?  What's really missing?  You know,
16   how do you get that information, and who's going to
17   bear the cost?  And either way, the briefing alone
18   costs money.  So it's in everybody's interest to,
19   kind of, get those disputes out of the way earlier
20   and in advance.  And I think that -- you know, I
21   hope that your perspective and your formulation of
22   those topics may change as you start to see the
23   documents coming in and you've had a chance to, kind
24   of, really review and internalize them, okay.

25           Mr. Shiftan, did you have something you

PROCEEDINGS

1    wanted to say?

2              MR. SHIFTAN:  No.  Understood.

3              THE COURT:  All right.  So I'm going to

4    keep you on your joint status report schedule.  The

5    next status letter will address the Towns

6    interrogatories.

7              I encourage you to continue to have

8    conversations with each other.  Treat each potential

9    discovery dispute as a practice settlement

10   conference, okay.  Try to settle those disputes

11   before bringing them to me.  I'm happy to hear them,

12   but, you know, sometimes, you know -- sometimes that

13   comes with a risk, as you can see, and it comes at

14   some cost as well.

15             All right.  Anything else we need to do

16   at this time?

17             MR. DONOVAN:  No, Your Honor.  Thank you.

18             MR. RAMIREZ:  No, Your Honor.  Thank you.

19             THE COURT:  All right.  Thank you very

20   much.  We are adjourned.  I request the parties

21   order a copy of the transcript, share the cost

22   50/50.  Thank you.

23

24                       0o0

25

```
 1                    C E R T I F I C A T E

 2

 3        I, Adrienne M. Mignano, certify that the

 4   foregoing transcript of proceedings in the case of

 5   Ahmed Ashour v. Arizona Beverages USA LLC, Docket

 6   #19CV7081 was prepared using digital transcription

 7   software and is a true and accurate record of the

 8   proceedings.

 9

10

11   Signature  _____
                   Adrienne M. Mignano
12              ADRIENNE M. MIGNANO, RPR

13

14   Date:      May 18, 2023

15

16

17

18

19

20

21

22

23

24

25
```