THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AHMED ASHOUR, JOY BROWN and CRYSTAL TOWNES, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ARIZONA BEVERAGES USA LLC, HORNELL BREWING CO., INC., BEVERAGE MARKETING USA, INC., ARIZONA BEVERAGES HOLDINGS LLC, and ARIZONA BEVERAGES HOLDINGS 2 LLC,<br><br>Defendants. | Civil Action No.<br>1:19-CV-07081-AT-OTW |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' *DAUBERT MOTION* TO PRECLUDE**
**DR. JOSEPH CRONIN JR.'S REPORT AND ANTICIPATED TESTIMONY**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....... 1

II. RELEVANT FACTUAL BACKGROUND ....... 2

A. Cronin's Retention and Background ....... 2

B. Dr. Cronin's Limited Prior Expert Witness Experience ....... 3

C. Cronin's Opinions ....... 4

D. Cronin's Methodology ....... 4

III. LEGAL STANDARD ....... 5

IV. ARGUMENT ....... 6

A. Cronin is Not Qualified to Offer the Opinions He Proffers ....... 6

B. In Addition, Cronin's Purported "Methodology" is Unreliable. ....... 9

i. Cronin Conducted No Original Research, Survey, or Empirical Analysis ....... 9

ii. Cronin's "Literature Review" Methodology Does Not Reliably Support His Conclusions About Defendants' Products. ....... 12

iii. Cronin Can't Even Identify or Explain the Literature He Claims to Rely Upon.. 15

C. Cronin Failed to Reliably Apply Any Methodology to the Facts of This Case ....... 16

i. Unsupported Assertions about the Relative Importance of Label Elements ....... 17

ii. The "Emotional Stimuli" Opinion Is Speculative ....... 19

iii. The "Deflection" Opinion Is Pure Speculation ....... 19

iv. Equating "All Natural" with "No Preservatives" without Support ....... 20

v. Cronin's "Choice Architecture" Analysis Is Untested and Speculative ....... 20

D. Cronin's Testimony Would Not Assist the Trier of Fact ....... 21

i. Cronin's Opinions Do Not Require Expert Testimony ....... 21

ii. Cronin Offers No Case-Specific Empirical Findings ....... 22

E. Cronin Improperly Attempts to Tell the Fact-Finder What Result to Reach ................22

V. CONCLUSION ..........................................................................................................23

CERTIFICATE OF COMPLIANCE ...............................................................................25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Amorgianos v. Nat'l R.R.Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)....6, 9, 16

*Arista Recs. LLC v. Usenet.com, Inc.*,
608 F. Supp. 2d 409 (S.D.N.Y. 2009)....11

*Bustamante v. KIND,*
LLC, 100 F.4th 419 (2d Cir. 2024)....6, 22

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
769 F. Supp. 2d 269 (S.D.N.Y. 2011)....12

*Daniels-Feasel v. Forest Pharms., Inc.*,
No. 17 CV 4188-LTS-JLC....13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).... *passim*

*Donnelly v. Ford Motor Co.*,
80 F. Supp. 2d 45, 49 (E.D.N.Y. 1999)....11

*Dreyer v. Ryder Auto. Carrier Grp.*, Inc.,
No. 98-CV-82A(F), 2005 WL 1074320 (W.D.N.Y. Feb. 9, 2005)....7

*Fernandez v. Cent. Mine Equip. Co.*,
670 F. Supp. 2d 178 (E.D.N.Y. 2009)....6

*FUJIFILM N. Am. Corp. v. Big Value Inc.*,
No. 16-CV-5677 (BMC), 2018 WL 4210132 (E.D.N.Y. Sept. 4, 2018)....5

*Guerrero v. Loiacono*,
769 F. Supp. 3d 158 (E.D.N.Y. 2024)....12

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 at 146....5, 12, 21, 24

*Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*,
No. 06 Civ 550 (FK), 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007)....5

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....16

*Malletier v. Dooney & Bourke, Inc.*,
525 F.Supp.2d 558 (S.D.N.Y.2007)....9, 21

*Mancuso v. Consol. Edison Co. of N.Y.*,
967 F. Supp. 1437 (S.D.N.Y. 1997)....................11

*McCullock v. H.B. Fuller Co.*,
981 F.2d 656 (2d Cir. 1992)....................7

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig.*
(No. II) ....................12

*Nimely v. City of New York*,
414 F.3d 381, 397 (2d Cir. 2005)....................12, 17, 22, 23

*Prohaska v. Sofamor, S.N.C.*,
138 F. Supp. 2d 422 (W.D.N.Y. 2001) ....................7

*Quintanilla v. Komori Am. Corp.*,
No. CV 04-5227 (ETB), 2007 WL 1309539 (E.D.N.Y. May 4, 2007) ....................7

*Restivo v. Hessemann*,
846 F.3d 547 (2d Cir. 2017)....................6

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)....................16, 17

*In re Rezulin Prods. Liab. Litig.*,
369 F. Supp. 2d 398 (S.D.N.Y. 2005)....................13

*Tolentino v. City of Yonkers*,
No. 15....................11

*Trumps v. Toastmaster, Inc.*,
969 F. Supp. 247 (S.D.N.Y. 1997) ....................7

*United States v. Duncan*,
42 F.3d 97, 101 (2d Cir. 1994)....................23

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
571 F.3d 206 (2d Cir. 2009)....................6

**Authorities**

Fed. R. Evid. 702 .................... *passim*

Local Civil Rule 7.1(c) ....................25

Fed. R. Evid. 403 ....................6, 22

Defendants, Arizona Beverages USA LLC (individually, "ABUSA"), Hornell Brewing Co., Inc. (individually, "Hornell"), Beverage Marketing USA, Inc. (individually, "BMU"), Arizona Beverages Holdings LLC (individually ("ABH"), and Arizona Beverages Holdings 2 LLC (individually, "ABH2") (collectively, "Defendants"), respectfully submit this Memorandum in support of their Motion to Preclude Plaintiffs' Ahmed Ashour and Crystal Townes (collectively, "Plaintiffs") proffered expert witness, J. Joseph Cronin, Jr. ("Cronin") from testifying in this matter.

## I. INTRODUCTION

Plaintiffs retained Cronin to opine on whether the "no preservatives" labeling on Defendants' AriZona beverage products influences consumer purchasing behavior. Cronin's opinions, however, amount to nothing more than a recitation of general literature he read that was authored by other individuals, completely untethered to the facts of this case. In his report, Cronin purports to offer opinions on three subjects: "1) the impact of product label statements, generally, 2) the impact of a "no preservatives" label on consumers' perceptions of, and demand for, food products and 3) the prominence of the "no preservatives" label on the Products." (Cronin Report, ECF No. 379, Ex. 5 ¶ 2). His report and anticipated testimony should be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), because: (1) Cronin lacks the qualifications necessary to opine on consumer packaged goods labeling; (2) his "methodology"—which consists entirely of reading published journal articles, and extrapolating their general conclusions to Defendants' products—is not a reliable methodology under *Daubert*; (3) he performed no original research, conducted no surveys, and reviewed no empirical data concerning Defendants' products or their consumers; and (4) his opinions amount to nothing more than *ipse dixit*—the very thing *Daubert* forbids.

Dr. Cronin's own deposition testimony lays bare the fundamental inadequacy of his work. Cronin readily admitted he had never previously opined on labels for consumer packaged goods. (A copy of Cronin's deposition transcript ("Cronin Tr.") is Exhibit "A" to the accompanying Declaration of Andrew N. Krinsky ("Krinsky Dec.") dated August 31, 2026; *see* at (Tr. 14:25; 15:1-2). Cronin admitted he conducted no surveys. (Tr. 39:13-16). He admitted he reviewed no empirical data concerning Defendants' products. He admitted that none of the articles he reviewed involved AriZona products as part of any sample. (Tr. 39:23-25; 40:1). And when pressed on which specific literature supports his conclusions, Cronin repeatedly testified that he could not recall, would need to re-read the articles, or simply did not know. (Tr. 70:1-14).

In short, Cronin asks this Court and the jury to accept his opinions solely on his say-so. That is precisely the type of testimony that Rule 702 and *Daubert* require this Court to exclude.

## II. RELEVANT FACTUAL BACKGROUND

### A. Cronin's Retention and Background

Plaintiffs' counsel retained Cronin to "provide [his] expert opinion as to the use of the 'no preservatives' label, and specifically 1) the impact of product label statements, generally, 2) the impact of a 'no preservatives' label on consumers' perceptions of, and demand for, food products and 3) the prominence of the 'no preservatives' label on the Products." (Cronin Report, ECF No. 379, Ex. 5 ¶ 2). While Cronin describes himself as "recognized worldwide as a leading service marketing scholar, particularly in the conceptualization and measurement of service quality, service value, and customer satisfaction" (*id.* ¶ 8), Cronin's expertise lies in service marketing — not consumer packaged goods labeling. His publication record confirms this. His most cited work, a 1992 *Journal of Marketing* article, concerns "Measuring Service Quality: A Reexamination and Extension." (*Id.* ¶ 9.) His courses include "Sports, Recreation, & Entertainment Marketing," "Strategic Sports Marketing," and "Seminar in Services Marketing." *Id.* ¶ 10. At his deposition, he

confirmed that he currently teaches "two undergraduate classes… in sports marketing." (Tr. 18:1-2).

Importantly, Cronin admitted that prior to this case, he had never issued an opinion on labels on consumer packaged goods. (Tr. 14:24-25; 15:1-2). His only pre-academic industry experience was as a "customer service manager in the flexible packaging industry," serving as "the liaison between our sales force and our customers, people who purchase flexible packaging from us." *Id*. at 20:8-22.

**B. Dr. Cronin's Limited Prior Expert Witness Experience**

Cronin's report states only that he "ha[s] been deposed as an expert legal witness for both plaintiffs and defendants, however not within the last four years." (Cronin Report, ECF No. 379, Ex. 5 ¶ 6). His deposition revealed a far more concerning picture: his last expert engagement was more than ten years ago. (Tr. 28:24-25; 29-1-3).

Specifically, Cronin testified he served as an expert in *State v. Florida Gill d/b/a Florida Internet*, which he described as involving "the evaluation of a wide variety of products", which included "children's toys to household decorative items" (Tr. 23:20-25) with no mention of consumer packaged goods. He could not recall whether he actually issued a report in that case. (Tr. 23:14-15). He also testified about a second case involving the same defendant, *State of Florida versus John Gill*, and that he could not even " recall whether either of these cases were criminal or civil cases." *Id*. at 25:19-23.

And regarding a third case, *Worldwide Medical Technologies v. Florida Pharmacy*, Cronin – who appears to have a problem recalling his past work -- could not recall which party he testified for, where the case was situated, whether he had been deposed in that case and whether he provided any trial testimony." (*Id*. at 26:16-25; 27:1-17.)

Taken together, these matters share a telling common thread: as to each, Cronin could not

recall which party he served, where the case was situated, or whether he issued a report, was deposed, or testified at trial—underscoring that his limited prior expert experience is stale, wholly unrelated to the issues in this action and, by his own account, barely remembered.

**C. Cronin’s Opinions**

Cronin's report offers the following opinions: First, that "product labels generally have a substantial and significant effect on consumers' attitudes and behaviors relative to brands and products and have a significant and substantial effect on consumer decision making relating to whether to buy a product." (Cronin Report, ECF No. 379, Ex. 5 ¶ 3). Second, that "the use of 'no preservatives' on a label signal[s] that a product that does not contain preservatives, information which informs food and beverage decision making." (*Id.* ¶ 4.) Third, that "the phrase 'No Preservatives' is consistently positioned on labels using a type size and font that is easily visible to consumers" and "the perception of a consumer that an AriZona product does not contain preservatives increases the likelihood of purchasing the product." (*Id.* ¶ 14.) Fourth, that "the prominence, uniformity and longevity of the 'no preservatives' phrase confirms the Defendants know this phrase is important to consumers and impacts their purchasing decisions." (*Id.* ¶ 13.)

**D. Cronin’s Methodology**

Cronin's report states that his "opinions are based on my experience and training as well as the materials I have reviewed." (Cronin Report, ECF No. 379, Ex. 5 ¶ 5). He further claims that "[t]he process by which I have reviewed and analyzed the marketing and labeling of the products, and their impact on consumer perception and purchasing behavior, is consistent with the methodology and analyses that I have used in my professional work." (*Id.* ¶ 8.) At his deposition, however, when asked what “methodology” he was referring to, Cronin could not identify any, and instead responded: "[m]ethodology of looking at the research, the theory, the research methods, and the conclusions reached in published research." (Tr. 38:11-14). In short,

Cronin read a collection of articles. Cronin confirmed he conducted no survey in connection with this case (*id*. 39:13-16), reviewed no empirical data concerning Defendants' products, (*id*. 39:19-22); and that "[n]one of the AriZona products were part of the sample of any of the articles that I reviewed." (*Id*. 39:24-25; 40:1.) When asked whether he sought to do a survey, he answered "No" (*id*. 40:2-3), explaining that he decided he "did not need to do a survey to complete the task that I was hired to do." (*Id*. at 40:4-6.)

## III. LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: . . .
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702

The proponent of the expert testimony bears the burden of establishing admissibility under Rule 702 by a preponderance of the evidence. *FUJIFILM N. Am. Corp. v. Big Value Inc.*, No. 16-CV-5677 (BMC), 2018 WL 4210132, at *4 (E.D.N.Y. Sept. 4, 2018) (citing *Daubert*, 509 U.S. at 592 n.10). "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997). Simply put, "[t]o be admissible, expert testimony must be both relevant and reliable." *Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*, No. 06 Civ 550 (FK), 2007 WL 2258688, at *6 (S.D.N.Y. Aug. 6, 2007). "If the evidence is relevant, a district court 'must next determine whether the proffered testimony has a sufficiently reliable

foundation to permit it to be considered.'" *Bustamante v. KIND*, LLC, 100 F.4th 419, 427 (2d Cir. 2024) (quoting *Amorgianos*, 303 F.3d at 265). "The reviewing court must also consider Rule 403: 'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" *Id.*, citing *Daubert*, 509 U.S. at 587.

In assessing reliability, the court considers whether: "(1) the testimony is grounded on sufficient facts or data; (2) the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R.Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (citing Fed. R. Evid. 702). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id*. at 266.

Expert testimony should be excluded as unreliable where it is "speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or [is] in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (internal quotations omitted).

## IV. ARGUMENT

### A. Cronin is Not Qualified to Offer the Opinions He Proffers

An expert must possess qualifications relevant to the specific subject matter at issue. *See Restivo v. Hessemann*, 846 F.3d 547, 578 (2d Cir. 2017); *Fernandez v. Cent. Mine Equip. Co.*, 670 F. Supp. 2d 178 (E.D.N.Y. 2009) (excluding engineer as unqualified to testify regarding geotechnical and water well drilling equipment where he had never operated or designed such equipment, consulted a drilling company, or held himself out as an expert in the field);

*McCullock v. H.B. Fuller Co.*, 981 F.2d 656, 657 (2d Cir. 1992) (affirming exclusion of engineer's testimony regarding the adequacy of warning labels where, although his engineering training and safety experience might have qualified him to testify about the need for a ventilation system, he lacked training or experience in chemical engineering, toxicology, environmental engineering, or warning-label design); *Quintanilla v. Komori Am. Corp.*, No. CV 04-5227 (ETB), 2007 WL 1309539, at *6 (E.D.N.Y. May 4, 2007), aff'd, No. 07-2375-CV, 2009 WL 320186 (2d Cir. Feb. 10, 2009) (excluding mechanical engineer's testimony concerning printing presses where he had no experience whatsoever in the printing industry or with printing presses, notwithstanding his general engineering credentials); *see also Dreyer v. Ryder Auto. Carrier Grp.*, Inc., No. 98-CV-82A(F), 2005 WL 1074320 (W.D.N.Y. Feb. 9, 2005); *Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247, 251 (S.D.N.Y. 1997); *Prohaska v. Sofamor, S.N.C.*, 138 F. Supp. 2d 422, 437 (W.D.N.Y. 2001).

Here, Cronin is offered to opine on how "no preservatives" labeling on consumer packaged beverages affects consumer perception and purchasing behavior. Yet, by his own direct admission, he has never previously issued an opinion on labels on consumer packaged goods. (Tr. 14:24-25; 15:1-2). That is unsurprising, given that he is not qualified to render such an opinion, nor has he ever been qualified as an expert in this field.

Cronin's report touts his credentials as a "leading service marketing scholar, particularly in the conceptualization and measurement of service quality, service value, and customer satisfaction" (Cronin Report, ECF No. 379, Ex. 5 ¶ 8)—but service marketing and consumer packaged goods labeling are distinct disciplines, as his publication record confirms. His most cited work, a 1992 *Journal of Marketing* article, concerns "Measuring Service Quality: A Reexamination and Extension."( Cronin Report, ECF No. 379, Ex. 5 ¶ 9). His other highly cited

articles address topics such as "Assessing the Effects of Quality, Value, and Customer Satisfaction on Consumer Behavioral Intentions in Service Environments" (*id.*) and "Some New Thoughts on Perceived Service Quality: A Hierarchical Approach. *Id.* His courses include "Sports, Recreation, & Entertainment Marketing," "Strategic Sports Marketing," and "Seminar in Services Marketing." *Id.* ¶ 10. At his deposition, he confirmed that he currently teaches "two undergraduate courses…in sports marketing." (Tr. 17:24-25; 18:1-2). He has neither published any scholarly articles nor taught any courses on how labeling on consumer packages goods/beverages affects consumer perception and purchasing behavior.

Cronin's report also claims prior consulting experience with firms such as "AT&T, Southwest Bell, Delta Airlines, MARTA, Knoxville Area Transit, the US Army MWR Command," and others. (Cronin Report, ECF No. 379, Ex. 5 ¶ 8). His only industry experience before entering academia was as a "Customer Service Manager in the flexible packaging industry" (*id.*)—a role he described at deposition as being "the liaison between our sales force and our customers, people who purchase flexible packaging from us." (Tr. 20:20-22). This role involved selling packaging materials, not analyzing how labels affect consumer behavior. (Cronin Report, ECF No. 379, Ex. 5 ¶ 8).

Cronin's report also claims he "has also served as an expert witness in eminent domain and business practices cases." (Cronin Report, ECF No. 379, Ex. 5 ¶ 8). But his deposition revealed that his last expert engagement was more than ten years ago, (tr. 28:24-25; 29:1-3) and his prior engagements involved evaluating "children's toys to household decorative items" (*id.* 23:24-25)—not food and beverage labeling. He could not recall basic facts about these prior cases, including whether they were civil or criminal, whether he submitted reports, or which party retained him. *Id.* 25-27. The only thing clear about these engagements is that they had

absolutely nothing to do with how labeling on consumer packaged goods affects consumer perception and purchasing decisions.

Cronin also conceded he has no relevant experience analyzing price premiums for beverages such as Defendants' products. He testified: "I certainly have the experience…that is related to premium beverages, but not as related to iced tea.... Beverages, particularly things like sodas, iced teas, lemonades are considered convenience goods. And they would sell them if ever, in my experience, never me — I shouldn't say never — seldom if ever to be considered potential premium products." (Tr. 126:8-19).

In sum, Cronin is a service marketing academic who has, significantly, never previously opined on consumer packaged goods labels. His credentials in service quality measurement do not translate into qualifications to offer opinions about how "no preservatives" claims on beverage labels affect consumer purchasing behavior. He clearly lacks the qualifications and experience to opine on these issues, which is precisely why he has never done so previously.

**B. In Addition, Cronin's Purported "Methodology" is Unreliable.**

"[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; *Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 664 (S.D.N.Y.2007) ("[T]he expert witness must in the end be giving his *own* opinion. He cannot simply be a conduit for an unproduced expert").

**i. Cronin Conducted No Original Research, Survey, or Empirical Analysis**

The most glaring deficiency in Cronin's report is what he did not do. Cronin:

- Conducted no survey of consumers of Defendants' products (Tr. 39:13-16: "Dr. Cronin, in connection with your methodology, did you do any survey in this case with regard to defendants' products? A. No.");

- Did not seek to conduct a survey (Tr. 40:2-3: "Did you seek to do a survey? A. No.");
- Reviewed no empirical data concerning Defendants' products (Tr. 39:19-25; 40:1: "In connection with your report, did you review any empirical data concerning defendants' products? A: Only empirical data that was published in journal articles.... About defendant's products? ... No. None of the AriZona products were part of the sample of any of the articles that I reviewed.");
- Performed no studies of the perceptions of consumers of AriZona products (Tr. 61:25; 62:1-7: "Did you do any studies of the perceptions of consumers of an AriZona product?... That statement is based upon my examination of the scientific literature...");
- Performed no survey to determine how consumers understand the phrase "no preservatives" (Tr. 64:6-12: "Did you perform a survey to determine how consumers understand the phrase no preservatives?... I conducted no surveys as part of my responsibility in developing the expert report.");
- Performed no survey to determine what consumers understand preservatives to mean (Tr. 64: 14-20: "Did you perform a survey to determine what consumers understand preservatives to mean?... I performed no surveys in the exercise of my responsibilities to complete the expert report for the client."); and
- Created no notes in connection with generating his report (Tr. 68:24-25; 69:1-2: "Did you create notes in connection with generating your report? I did not create notes. I basically underlined and highlighted things from articles.").

When asked why he did not conduct a survey, he testified: "I was not asked to." (Tr. 39:18). When pressed further, he stated he "did not need to do a survey to complete the task that I was hired to do." (Tr. 40:5-6). And when asked whether he intends to do a survey in the future, he stated: "No, I was not asked to perform a survey, nor do I think a survey is necessary to gather the information that I was tasked to gather." *Id.* at 77:20-22.

A selective review of literature cannot substitute for a reliable methodology. *See Mancuso v. Consol. Edison Co. of N.Y.*, 967 F. Supp. 1437, 1443 (S.D.N.Y. 1997) ("We cannot help but conclude that [the plaintiffs' expert] was not in fact an expert when he was hired by plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such by a selective review of the relevant literature"). Nor may an expert substitute general literature for original research or testing without explaining the reasoning that connects the literature to the case. *Arista Recs. LLC v. Usenet.com, Inc*., 608 F. Supp. 2d 409, 428 (S.D.N.Y. 2009) (excluding expert's testimony where expert "d[id] not simply rely on erroneous data; his opinions are merely a restatement of [Defendant's] views and are not the product of independent analysis). *Tolentino v. City of Yonkers*, No. 15 CV 5894 (VB), 2017 WL 4402570, at *3-4 (S.D.N.Y. Oct. 2, 2017) (to avoid mere *ipse dixit*, an expert must "explain[] the reasoning or methodology" used; excluding testimony where expert conducted no original research or testing and relied solely on "general knowledge" and "practical experience") (quoting *Donnelly v. Ford Motor Co*., 80 F. Supp. 2d 45, 49 (E.D.N.Y. 1999)).

Cronin's "methodology" consisted entirely of reading articles other people published and asserting that their general, yet unrelated, conclusions somehow apply to Defendants' products. Based upon nothing more than reading those general articles, Cronin's report purports to reach case-specific conclusions about Defendants' products and their consumers. For example, his

report claims that "a review of the set of AriZona product labels suggests that the labels were designed to maximize the impact of the 'No Preservatives' product attribute in accordance with scientific research findings as to how to maximize the effects on consumers' purchase decisions." (Cronin Report, ECF No. 379, Ex. 5 ¶ 13). Further he opines that "the perception of a consumer that an AriZona product does not contain preservatives increases the likelihood of purchasing the product." (*Id.* ¶ 14.) These case-specific conclusions cannot possibly follow from nothing more than reading articles that did not study AriZona products or the consumers who purchase them.

The law is clear that an expert cannot simply rely on general academic literature to reach case-specific conclusions without any empirical bridge connecting the two. *See Joiner*, 522 U.S. at 137 (testimony connected to data "only by the *ipse dixit* of the expert" must be excluded).

**ii. Cronin's "Literature Review" Methodology Does Not Reliably Support His Conclusions About Defendants' Products.**

Reliability "requires a sufficiently rigorous analytical connection between the methodology and the expert's conclusions." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered). *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 282 (S.D.N.Y. 2011) (quoting *Joiner*, 522 U.S. 136 at 146). *See also Guerrero v. Loiacono*, 769 F. Supp. 3d 158, 167 (E.D.N.Y. 2024) (explaining that there must be "a sufficiently reliable connection between the methodology and the expert's conclusions.")

Cronin's report claims his methodology "is consistent with the methodology and analyses that I have used in my professional work." (Cronin Report ¶ 8). But his "professional work" is publishing academic articles in service marketing journals — not opining in litigation about whether specific product labels influence specific consumers or their purchasing decisions. At

his deposition, Cronin described his methodology as: “looking at the research, the theory, the research methods, and the conclusions reached in published research." (Tr. 38:12-14). This is not a “methodology” — it is repeating what he read in an article. *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig.* (No. II), 341 F. Supp. 3d 213, 287 (S.D.N.Y. 2018), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020) (affirming exclusion of expert testimony where experts relied on scientific literature but failed to reliably explain how the studies supported their ultimate conclusions, instead concatenating scientific propositions and drawing unsupported inferences from the literature); *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 437-438 (S.D.N.Y. 2005) (excluding expert testimony where experts relied on a “set of studies” that did not “fit” the opinions they purported to support and left “empirically unbridgeable analytical gaps” between the studies and their conclusions); *Daniels-Feasel v. Forest Pharms., Inc.*, No. 17 CV 4188-LTS-JLC, 2021 WL 4037820, at *17 (S.D.N.Y. Sept. 3, 2021), *aff'd sub nom. Daniels-Feasel v. Forest Pharms*., Inc., No. 22-146, 2023 WL 4837521 (2d Cir. July 28, 2023) (excluding expert, explaining “her references to such evidence are bare-bones, often in the form of string cites, and entirely omit any analysis, much less a thorough one, of the strengths and weaknesses of the underlying conclusions.”)

The analytical gap between the general literature Cronin reviewed and his case-specific conclusions is exposed by his own testimony. When asked whether he performed studies of whether consumers of AriZona products purchase them because of the "no preservatives" label, he testified: "It was not necessary for me to do studies of AriZona to reach the opinion that I was asked to consider, which whether or not the presence or absence of a statement or a label suggesting a product didn't have preservatives affected the purchase behavior of consumers." (Tr. 63:16-21).

When asked why it was not necessary, he stated: "It wasn't necessary because that question has been considered across a wide range of products, not specifically AriZona iced tea, but across a wide range of products. And there were consistent findings that no matter the product, the absence of preservatives led to higher purchase intentions and purchase behavior." (Tr. 63:25; 64:1-5).

And when challenged as to whether any of the literature specifically refers to Defendants' products, he confirmed: "No." (Tr. 157:1-6).

Cronin attempted to justify this gap by asserting: "My expertise in research, my long history as a publisher, my extensive publication record, my work as a reviewer, and my work as an editor of prominent marketing journals suggests that where the sampling is drawn from is not important in terms of developing generalized ability to the theory at issue that's investigated, which in this case is how do consumers perceive food labeling." (Tr. 169:4-11).

But this assertion — offered without any supporting citation or methodological justification — is itself *ipse dixit*. The question in this case is not whether academic literature in the abstract suggests that "no preservatives" claims *generally* influence *some* consumers for *some* products. The question is whether Defendants' specific labeling actually influenced the specific consumers who purchased Defendants' specific products. Cronin did nothing to analyze or answer that key question.

What Plaintiffs are really attempting to do is to use Cronin to usurp the role of fact evidence to prove how the labeling affected consumers. Proof of the impact of a label on consumers' perceptions and purchasing decisions is a factual determination that cannot be answered in a conclusory expert report based on nothing more than reading some articles,

particularly where the purported expert has performed no testing or inquiry whatsoever and has no experience opining on the specific issues in this matter.

**iii. Cronin Can't Even Identify or Explain the Literature He Claims to Rely Upon**

Throughout his deposition, when pressed on the factual or scientific basis for his opinions, Cronin reflexively deflected to "the scientific literature" without being able to identify specific sources or recall their contents. (Tr. 47:5-10; 52:10-15; 53:11-15; 55:15-18; 60:11-13; 62:4-7; 69: 24-25; 71:3-15; 121:11-17).

Cronin's report asserts that "Health claims, such as no preservatives, can influence consumers at the POS [point of service] where final decisions regarding the purchase of products are made," citing Chandon and Wansink (2007). (Cronin Report, ECF No. 379, Ex. 5 ¶ 15). At his deposition, however, when asked whether he knew whether the Chandon article references preservatives, Cronin answered: "No." (Tr. 70:10-14).

When asked the basis for his assertion that "no preservatives" constitutes a "health claim," Cronin testified: "It is suggested in the scientific literature that preservatives and additives are a health claim." (Tr. 69:24-25). When asked "Suggested by whom, what literature?" he responded: "I'd have to — the literature that's referenced in the expert report I submitted." (Tr. 70:1-3).

When asked what effect preservatives have that is detrimental to people's health — a foundational premise of his "health claim" characterization — Cronin stated: "Again, without referring to the literature, I cannot be specific, but I recall mention in the literature of scientific representations between preservatives and cancer and other allergies and other ailments of humans. But again, this is a convenient memory of the scientific literature. I'd have to refer back to the actual articles to give you an answer to that." (Tr. 67:17-24).

Cronin's report cites Shim et al. (2011) for the proposition that "as many as 91% of consumers express a desire for knowledge and information as to product additives." (Cronin Report ¶ 17). At his deposition, however, when asked whether the Shim article involved a survey, Cronin testified: "I don't recall." (Tr. 96:6). When asked about another cited article (Masis), he likewise responded: "Don't recall either." (Tr. 96:9). When challenged about his inability to recall the articles, he responded defensively: "It's 51 articles. You want me to remember every one of them that I don't remember specifically?" (Tr. 96:14-15).

Most troubling, Cronin's report cites Orquin et al. (2016) in Paragraph 21 for the proposition that "[a] reduced set size increases the probability that consumers pay attention to nutrition information." (Cronin Report, ECF No. 379, Ex. 5 ¶ 21). At deposition, however, he admitted he could not read this article because it is in a foreign language. When asked about its contents, he testified: "No. But its cited in 2018 by the same lead author." (Tr. 111:11-12). He explained he "included this report for completeness, in case anybody wanted to have it translated." (Tr. 111:5-6).

An expert who cannot recall whether his cited sources actually support his propositions has not employed "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

**C. Cronin Failed to Reliably Apply Any Methodology to the Facts of This Case**

Leaving aside that Cronin's literature review could constitute a valid methodology, he also failed to reliably apply it to the facts of this case. Even where an expert's general methodology is sound, Rule 702 independently requires that the expert reliably apply the principles and methods to the facts of the case and that "any step that renders the analysis unreliable…renders the expert's testimony inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). As this Court has recognized in *In re Rezulin Prods.*

*Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004), Rule 702's requirement that expert testimony constitute "knowledge" serves to guard against the admission of opinions based merely on subjective belief or speculation. Thus, an expert may not simply offer a factual narrative or interpret the parties' conduct without bringing specialized knowledge of a reliable methodology to bear, as the Court explained:

> Certain principles that are especially pertinent to the task at hand flow from the requirement that expert testimony be "scientific, technical, or other specialized knowledge." First, the requirement of "knowledge" guards against the admission of subjective or speculative opinions. Second, in requiring that expert testimony be directed to "scientific, technical or specialized" knowledge, Rule 702 ensures that expert witnesses will not testify about "lay matters which a jury is capable of understanding and deciding without the expert's help." In other words, experts should not be permitted to "supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence." Examples of "expert" testimony that courts have excluded on this basis include factual narratives and interpretations of conduct or views as to the motivation of parties.
>
> *Id*. at 541 (internal citations omitted).

Cronin's purported opinions cannot satisfy that standard. They reveal a pattern of extrapolating general purported propositions to Defendants' specific products without any analytical justification—precisely the "ipse dixit of the expert" that neither *Daubert* nor the Federal Rules of Evidence permit. *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005).

**i. Unsupported Assertions about the Relative Importance of Label Elements**

Cronin's report opines that the "No Preservatives" panel on AriZona labels is designed to "maximize the impact" on consumers through "visual salience," "set size," "surface size," "position effects," and "emotional stimuli," relying on Orquin, Perkovic, and Grunert (2018). (Cronin Report, ECF No. 379, Ex. 5 ¶ 19). But at deposition, Cronin demonstrated that his opinions about the relative prominence of label elements are driven entirely by what happens to

appear in the academic literature — not by any actual analysis by him or anyone else of how consumers interact with Defendants' labels.

When asked whether the "99 cents" price statement on a label is less prominent than the "no preservatives" statement, Cronin responded: "My answer is yes, because if you look at the type of — the scientific literature suggests that the preservative and the additive information is a more important piece of information for consumers' decision making than price." (Tr. 51:8-13). This reveals that his opinion about "prominence" is not based on any visual analysis of the labels, but on a literalist application of general academic findings about attribute rankings.

Similarly, when asked about the relative prominence of "diet" and "American" label attributes, he testified: "Nowhere in that scientific literature is American made or diet identified as an important attribute in consumer decision making." (Tr. 60:11-13). And regarding "real brewed," he testified: "Real brewed is not a characteristic that has been investigated or ha[s] been found to be anything that consumers consider a decision-making attribute." (Tr. 150:12-15).

Cronin claims that "the typical order is healthfulness, preservatives, additives, price number three," and at deposition he confirmed this ordering. (Tr. 95:7-9). But he offered no basis for applying this general academic ranking to Defendants' consumers — many of whom may be purchasing 99-cent beverages as convenience goods precisely because of price.

This approach turns expert analysis on its head: rather than examining what consumers of these specific products actually notice and rely upon, as opposed to consumers of more expensive products, Cronin simply declares that whatever he believes the literature he looked at identifies as important *must* be what matters here — and whatever it does not address is irrelevant.

**ii. The "Emotional Stimuli" Opinion Is Speculative**

Cronin's report claims that "The use of 'No Preservatives' on the AriZona labels represents the use of a strong emotion to communicate a nutritional message" and that "No is a strong negative emotion word." (Cronin Report, ECF No. 379, Ex. 5 ¶ 24). At deposition, however, when asked what "emotional stimuli" he was referring to on the label, he testified: "The word no.... That would be it. It's emotional. It's an emotional word that conjures up negative effect as opposed to positive effect. Negative effect is more impactful on consumers' behavior as explained in quite great detail in the behavioral economics literature." (Tr. 110:1-8).

The assertion that the word "no" — a word that appears ubiquitously on food labels (e.g., "no sugar added," "no artificial flavors," "no high fructose corn syrup") — is a "strong negative emotion word" that functions as an "emotional stimulus" to "nudge" consumer behavior is speculative and unsupported by any case-specific analysis.

**iii. The "Deflection" Opinion Is Pure Speculation**

Cronin's report states that the "no preservatives" claim is "located adjacent to the full nutritional panel" and suggests it "simplifies and expedites consumer decision making by generating relevant attribute-specific thoughts related to product purchase." (Cronin Report ¶ 15). At deposition, when asked why it would matter that the claim is adjacent to the nutritional panel, he testified: "My opinion would be that it is a shortcut to create information for the consumer that would deflect their attention away from the nutrition panel." (Tr. 84:2-4). When asked the basis for this opinion, he stated it was "[b]ased on the general scientific evidence that's produced in the marketing literature." (Tr. 84:6-7).

This is rank speculation masquerading as expert opinion. Cronin did not study whether any consumer of Defendants' products was actually "deflected" from reading the nutrition panel. He has no empirical basis for this conclusion as applied to Defendants' products and consumers.

**iv. Equating “All Natural” with “No Preservatives” without Support**

When shown AriZona product labels that did not bear a "no preservatives" statement but instead stated "all natural," Cronin testified: "I do not see a no preservatives label there. I see the words, all natural, which the marketing literature, scientific literature have often equated with all natural and also another term called clean labels which is used prominently in Europe being a substitution or equal to suggesting that there are no preservatives, additives, et cetera." (Tr. 121:11-17).

When asked whether that statement was in his report, he admitted: "I'd have to read the whole report to answer that question directly." (Tr. 122:4-6). Yet he nonetheless opined that "all natural is a substitutable phrase for no additives based on the scientific marketing literature” (*id*. at 122:7-9)—an opinion not contained in his report, not disclosed to Defendants, and untethered to any case-specific analysis.

**v. Cronin's "Choice Architecture" Analysis Is Untested and Speculative**

Cronin’s report devotes extensive discussion to the theory of "choice architecture" and "nudges," asserting that "the AriZona product labels clearly attempt to establish 'no preservatives' as the anchor for the evaluations of decision markers in designing a choice architecture that 'nudges' decision maker towards the purchase of 'no preservative' AriZona products." (Cronin Report ¶ 25). He cites Thaler and Sunstein (2008; 2021) for the general proposition that firms can design "choice architectures" that "nudge" consumers (*id*. ¶ 19) and applies this framework to Defendants' labels through an analysis of "visual salience," "set size," "surface size," "position effects," and "emotional stimuli." *Id*. ¶¶ 20-24.

But this conclusion — that Defendants intentionally designed a "choice architecture" — is premised entirely on Cronin's subjective reading of labels through the lens of academic theory. He conducted no study, no experiment, and no survey to test whether any consumer was actually

"nudged" by the label design to purchase the Products at issue. He did not interview any label designer or consumer of AriZona products. His report's assertion that "[m]y review of the AriZona internal communication provided by counsel confirms the firm's understanding of the significant effect of AriZona product labels on the decision making (i.e., purchase behaviors) of consumers" (Cronin Report, ECF No. 379, Ex. 5 ¶ 15) is nothing more than his personal interpretation of documents — not the product of any expert or reliable methodology.

In sum, there is an unbridgeable “analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. Cronin reviewed general literature about general consumers and general products, and then leapt to conclusions about Defendants’ specific products and specific consumers without any analytical bridge. This is precisely the type of unreliable extrapolation that *Daubert* prohibits.

### D. Cronin’s Testimony Would Not Assist the Trier of Fact

Expert testimony is admissible only if it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Cronin's testimony fails this threshold requirement for multiple reasons.

#### i. Cronin's Opinions Do Not Require Expert Testimony

Cronin's core opinions are that "labels are widely identified in the scientific literature as an important information source commonly, frequently, and widely used by consumers to inform their purchase decisions" (Cronin Report, ECF No. 379, Ex. 5 ¶ 11) and that "[s]tatements on packaging or item labels are an asset when consumers purchase products and represent an important and last chance to communicate with consumers." (*Id.* ¶ 12.) A jury does not need an expert charging hundreds per hour to tell them that consumers read labels or that people prefer products they perceive as healthier. These are matters of common sense, not specialized knowledge.

**ii. Cronin Offers No Case-Specific Empirical Findings**

Cronin's testimony carries a significant danger of unfair prejudice because "a purported expert's opinion often carries special weight with the jury even when unwarranted." *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 562 (S.D.N.Y. 2007). Allowing Cronin to testify — cloaked in the authority of his academic credentials in other fields —that "the scientific literature" proves Defendants' labels influence purchasing behavior would mislead the jury into believing that case-specific empirical proof exists when it does not.

Cronin's own testimony underscores this danger. He frequently testified in absolute terms about what "the scientific literature" establishes, including that "somewhere between 80 and 94 percent of people consider preservatives to be unhealthful." (Tr. 55:15-18). These statistics derive from studies of other products in other markets — not from any study of consumers of Defendants' beverages. Yet a jury hearing Cronin present these numbers alongside his opinions about Defendants' labels would inevitably and incorrectly conclude that these statistics describe Defendants' actual consumers.

Cronin's opinions should be excluded under Rule 403 because the danger of unfair prejudice, confusion of the issues, and misleading the jury substantially outweighs whatever probative value, if any, his general literature summary might provide. *See Bustamante v. KIND,* LLC, 100 F.4th 419, 430 (2d Cir. 2024), quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (excluding expert testimony on the purported meaning of "all natural" because "'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'")

**E. Cronin Improperly Attempts to Tell the Fact-Finder What Result to Reach**

Cronin's report repeatedly states that "there is strong support within a reasonable degree of scientific certainty that 'No Preservatives' claims increase the likelihood that consumers will

buy a food or beverage product." (Cronin Report ¶ 32). At deposition, he doubled down: "Almost every article — I can't think of any article in here that doesn't in some way support that statement." (Tr. 171:22-24).

Dr. Cronin does not merely opine on general principles — he draws ultimate factual conclusions about Defendants' products. He opines that "the perception of a consumer that an AriZona product does not contain preservatives increases the likelihood of purchasing the product" (Cronin Report, ECF No. 379, Ex. 5 ¶ 14) and that Defendants' labels were designed to "maximize the impact of the 'No Preservatives' product attribute." *Id*. ¶13. He further opines that "the prominence, uniformity and longevity of the 'no preservatives' phrase confirms the Defendants know this phrase is important to consumers and impacts their purchasing decisions." *Id*. These are his own subjective factual conclusions that usurp the role of the jury. *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005), quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("[E]xpert testimony that ... undertakes to tell the jury what result to reach ... attempts to substitute the expert's judgment for the jury's."). That these ultimate factual conclusions are being dressed up in the guise of an opinion by an expert who did absolutely nothing other than read articles, graphically illustrates how improper and prejudicial this would be if allowed.

## V. CONCLUSION

Cronin's report and anticipated testimony fail every requirement of Rule 702. He is not qualified to opine on consumer packaged goods labeling — a subject he has never before studied, addressed, opined on, or been qualified as an expert. (Tr. 14:24-25; 15:1-2). His "methodology" of reading general literature and declaring it applicable to Defendants' products is not a methodology at all, let alone a reliable methodology; it is *ipse dixit*. He conducted no surveys (tr. 39: 13-16), performed no empirical analysis, and reviewed no data specific to Defendants' products

or consumers. (Tr. 39:19-25). He cannot even recall the contents of the literature he cites and supposedly read. (Tr. 96:5-17). And his personal, subjective conclusions — that Defendants' labels were "designed to maximize…impact" (Cronin Report, ECF No. 379, Ex. 5 ¶ 13), that the "no preservatives" claim "increases the likelihood of purchasing" (Cronin Report, ECF No. 379, Ex. 5 ¶ 14), that the word "no" is an emotional stimulus (*id.* ¶ 24)—are wholly speculative, connected to the facts of this case solely by his own say-so.

As the Supreme Court has made clear, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 137. That is precisely what Cronin's testimony represents.

For the reasons discussed above, Defendants respectfully requests that the Court grant the present motion and exclude Cronin as an expert.

Respectfully submitted,

Dated: August 31, 2026

By: *s/ Howard Wolfson*

Howard Wolfson
Andrew N. Krinsky
TARTER KRINSKY & DROGIN LLP
1350 Broadway
New York, NY 10018
Tel.: (212) 216-8000
Fax: (212) 216-8001
E-mail: hwolfson@tarterkrinsky.com
akrinsky@tarterkrinsky.com

***Attorneys for Defendants***

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), I hereby certify that the foregoing document complies with the word-count limitations in Local Civil Rule 7.1(c). According to the word count feature of Microsoft Word, the motion contains 7,244 words, excluding the exempted parts under Local Civil Rule 7.1(c).

Dated: August 31, 2026

*s/ Howard Wolfson*
Howard Wolfson