THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AHMED ASHOUR, JOY BROWN and CRYSTAL TOWNES, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ARIZONA BEVERAGES USA LLC, HORNELL BREWING CO., INC., BEVERAGE MARKETING USA, INC., ARIZONA BEVERAGES HOLDINGS LLC, and ARIZONA BEVERAGES HOLDINGS 2 LLC,<br><br>Defendants. | Civil Action No.<br>1:19-CV-07081-AT-OTW |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' *DAUBERT MOTION* TO PRECLUDE**
**DR. JEAN-PIERRE DUBÉ'S REPORT AND ANTICIPATED TESTIMONY**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....................................................................................1

II. RELEVANT FACTUAL BACKGROUND ....................................................................2

A. Dubé's Retention and Assignment ....................................................................2

B. Dubé Has Not Performed Any Analysis ....................................................................3

C. Dubé Cannot Describe What His Survey Will Look Like ....................................................................4

D. Dubé's Data Does Not Correspond to the Relevant Classes ....................................................................4

E. Dubé's Prior Exclusions ....................................................................5

F. Dubé Did Not Review Key Case Materials ....................................................................6

G. Dr. Kivetz's Evaluation of the Dubé Proposed Conjoint Survey Confirms Its Fundamental Unreliability ....................................................................6

III. LEGAL STANDARD ....................................................................8

IV. ARGUMENT ....................................................................9

A. Dubé Has Not Applied Any Methodology to the Facts of This Case ....................................................................9

B. Dubé's Testimony is not Based on Sufficient Facts or Data ....................................................................11

i. Dubé Used Inapplicable National-Level Data for State-Specific Classes .... 11

ii. Dubé Used Data from Outside the Class Period .................................... 12

iii. Dubé Failed to Verify Whether the IRI Data Included Key Retailers .......... 12

iv. Dubé Does Not Know Defendants' Costs or Wholesale Prices .................... 13

C. Dubé's Proposed Methodology is Unreliable as Applied to this Case ....................................................................14

i. Dubé Cannot Describe the Most Basic Elements of this Proposed Survey .. 14

ii. Dr. Kivetz's Expert Evaluation Confirms the Proposed Survey Is Fatally Flawed .................................... 15

iii. Dubé's Prior Exclusions Demonstrate the Risk of His Approach ................ 17

iv. Dubé Failed to Consider Relevant Facts and Alternative Explanations ....... 17

v. Dubé's Conjoint Analysis is Unreliable Because He Refuses to Use Actual Retail Prices. .......... 19

V. DUBÉ'S FINANCIAL ARRANGEMENT RAISES ADDITIONAL RELIABILITY CONCERNS .......... 20

VI. CONCLUSION .......... 20

CERTIFICATE OF COMPLIANCE .......... 22

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Amorgianos v. Nat'l Railroad Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)....8, 9, 17

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 11–CV–01846–LHK, 2014 WL 976898 (N.D. Cal. Mar. 6, 2014)....19

*Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*,
910 F. Supp.2d 629 (S.D.N.Y. 2012)....13

*Capri Sun GmbH v. Am. Beverage Corp.*,
595 F. Supp. 3d 83 (S.D.N.Y. 2022)....17

*Cumberland Packing Corp. v. Monsanto Co.*,
32 F. Supp. 2d 561 (E.D.N.Y. 1999)....13

*Doe v. Am. Med. Sys., Inc.*,
96 F. App'x 758 (2d Cir. 2004)....9, 18

*Dreyer v. Ryder Auto. Carrier Grp., Inc.*,
367 F. Supp. 2d 413 (W.D.N.Y. 2005)....15

*Faulkner v. Arista Recs.*
LLC, 46 F. Supp. 3d 365 (S.D.N.Y. 2014)....18

*FUJIFILM N. Am. Corp. v. Big Value Inc.*,
No. 16-CV-5677, 2018 WL 4210132 (E.D.N.Y. Sept. 4, 2018)....8

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....1

*Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*,
No. 06 CIV 550 (JFK), 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007)....1

*Kass v. W. Bend Co.*,
No. 02-CV-3719(NGG), 2004 WL 2475606 (E.D.N.Y. Nov. 4, 2004)....9

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....8, 15

*Louis Vuitton Malletier v. Dooney & Bourke*,
Inc., 525 F. Supp. 2d 558, 565 (S.D.N.Y. 2007)....8, 14

*Mier v. CVS Health, No. 22-55665*,
2023 WL 4837851 (9th Cir. July 28, 2023)....18

*Moncayo v. United Parcel Serv., Inc.*,
No. 23-161-CV, 2024 WL 461694 (2d Cir. Feb. 7, 2024) ...............................................11, 18

*Price v. L'Oreal USA, Inc.*,
No. 17 CIV. 614 (LGS), 2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020)................................19

*Saavedra v. Eli Lilly & Co.*,
No. 2:12-CV-9366-SVW, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014)..............................19

*Zakaria v. Gerber Prods.*
Co., 755 F. App'x 623, 624 (9th Cir. 2018) .................................................................18

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,*
571 F.3d 206 (2d Cir. 2009).........................................................................................9

**Authorities**

Fed. R. Evid. 403 .........................................................................................1, 14

Fed. R. Evid. 702 ......................................................................................... passim

Fed. R. Evid. 702(a) .....................................................................................14

Fed. R. Evid. 702(b) ..................................................................................... 10

Fed. R. Evid. 702(c) .....................................................................................13

Fed. R. Evid. 702(d) . ...................................................................................9, 13

Local Civil Rule 7.1(c) .................................................................................22

Defendants, Arizona Beverages USA LLC (individually, "ABUSA"), Hornell Brewing Co., Inc. (individually, "Hornell"), Beverage Marketing USA, Inc. (individually, "BMU"), Arizona Beverages Holdings LLC (individually ("ABH"), and Arizona Beverages Holdings 2 LLC (individually, "ABH2") (collectively, "Defendants"), respectfully submit this Memorandum of Law in support of their Motion to Preclude Plaintiffs' Ahmed Ahour and Crystal Townes (collectively, "Plaintiffs") proffered expert witness, Jean-Pierre Dubé ("Dubé") from testifying in this matter.

## I. INTRODUCTION

Dr. Jean-Pierre Dubé was retained by Plaintiffs to provide an expert opinion on whether economic damages can be calculated on a class-wide basis. His "principal conclusion" is that it is "feasible"—meaning "doable"—to calculate damages using a conjoint analysis; the Dubé" report ("Dubé Report) is filed at ECF No. 379, Ex. 6, and a copy of his deposition testimony is annexed as Exhibit "A" to the accompanying Declaration of Andrew N. Krinsky. (Dubé Report, ECF No. 379, Ex. 6, ¶ 22; Dubé Tr. 91:1.) But Dr. Dubé has done nothing substantive beyond merely stating that conclusion. He has conducted no conjoint survey, programmed no survey instrument, run no market simulation, calculated no damages, and cannot describe even the basic parameters of the analysis he proposes.

"Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Expert testimony "must be both relevant and reliable." *Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*, No. 06 CIV 550 (JFK), 2007 WL 2258688, at *6 (S.D.N.Y. Aug. 6, 2007). Dubé's testimony should be excluded pursuant to Rules

702 and 403 because it rests on no data, applies no methodology to the facts, and will not assist the trier of fact.

Moreover, Defendants' expert, Dr. Ran Kivetz—a tenured, chaired Professor of Marketing at Columbia University Business School, has evaluated the Dubé Proposed Conjoint Survey and concluded that it is fatally flawed in its design and methodology—suffering from severe focalism biases, demand effects, and deviations from marketplace conditions that render any price premium estimate derived from it unreliable and invalid. Dubé's proposed methodology thus fails not only because it has never been applied, but because its very design—to the extent it has been disclosed—is fundamentally incapable of producing reliable results.

Dubé's proposed conjoint methodology is itself improper and unreliable. It would measure only consumers' willingness to pay ("WTP"), divorced from the actual retail prices at which the Products were sold, while his willingness-to-pay construct measures restitution—a remedy Plaintiffs can no longer receive.

## II. RELEVANT FACTUAL BACKGROUND

### A. Dubé's Retention and Assignment

Dubé was retained pursuant to a Retainer Agreement dated September 18, 2025. (Dubé Tr. 54:4-12.) He has an "exclusivity arrangement" with Econic giving them "a right of first refusal" for "litigation matters requiring staff support." (Dubé Tr. 32:10-15). He also received a "signing bonus" when he switched his exclusivity from Compass Lexecon to Econic Partners. (Dubé Tr. 33:17-20.)

Dubé "ha[s] been asked to offer an opinion as to whether economic damages can be calculated on a Class-wide basis, using a methodology that uses common evidence and analysis." (Dubé Report, ECF No. 379, Ex. 6, ¶ 14). He confirmed at deposition that his "principal

conclusion" is that calculating damages is "feasible," which he defined as "doable." (Dubé Tr. 90:6-24; 91:1.)

**B. Dubé Has Not Performed Any Analysis**

Dubé confirmed repeatedly at deposition that he has not performed the analysis he proposes or any work related to it:

- **He has not conducted a conjoint survey:** "I've been asked to offer an opinion as to whether economic damages can be calculated on a class-wide basis. Since the survey is a component of this . . . methodology for calculating damages, then it follows that I have not yet implemented the method, I have proposed a method." (Dubé Tr. 87:4-10.)
- **He has not performed a market simulation:** "at this time I have not been asked to do these calculations or collect those data. I'm ready to do so as soon as counsel gives me the green light." (Dubé Tr. 88:11-13.)
- **He has not calculated damages:** "I have not yet conducted the damages calculations." (Dubé Tr. 81:10-11.)
- **He has not determined the incidence or magnitude of damages:** His report states: "I have yet to determine the incidence or magnitude of damages; although I am confident that I will be able to do so." (Dubé Report ¶ 83).
- **He has not programmed the survey:** "I have not yet programmed the survey." (Dubé Tr. 198:13-14; 257: 9-10).
- **He has not piloted the survey:** his "task…for this report at this stage" was only "to propose a method and establish that it was feasible," not "to program a survey or do any of the analysis at this time." (Dubé Tr. 173:2-5.)

### C. Dubé Cannot Describe What His Survey Will Look Like

When pressed at deposition on basic design elements of his proposed survey, Dubé could not answer:

- How brands will be presented: "I haven't programmed the survey instrument at this time" (Dubé Tr. 166:22-23) and "I have not yet decided whether I will include labels." (*Id*. at 168:15-20.)
- What prices will be tested: "there is no one specific price. We will vary the prices in the — across the survey tasks." (Dubé Tr. 187:1-2.)
- Whether products will be shown side by side: "I have not yet programmed the survey. Once I've programmed the survey . . . whether these are oriented vertically or oriented horizontally, a lot of this will depend on whether or not the respondents in the pilot stage understand." (Dubé Tr. 198:13-22.)
- How package size will be communicated: "That's — this is, again, a question about details as opposed to feasibility . . . The exact way we'll do it will ultimately depend on the piloting." (Dubé Tr. 172:9-23.)
- What "diet" means in the survey: He testified he is "not a hundred percent sure that diet always means zero calories" and that whether to use "diet" or "no calories" would be "straightforward to modify." (Dubé Tr. 178:20-25; 179:1-15.)

### D. Dubé's Data Does Not Correspond to the Relevant Classes

Dubé's report relies on IRI retail point-of-sale data. However:

- He used national-level data for his pricing analysis (Table 9) rather than state-specific data for California and New York — despite the fact that both proposed classes are state-specific. (Dubé Report, ECF No. 379, Ex. 6 ¶ 12). When asked why, he testified: "that information wasn't necessary for forming an opinion about whether or not I can devise a feasible method." (Dubé Tr. 137:11-13.)
- His price distribution was based on 2023 data ("2023 reflects sales throughout March" (Dubé Report, ECF No. 379, Ex. 6 ¶ 58, Table 9)—outside the class period ending January 1, 2023. He justified this by stating: "the actual prices we included in the survey are — don't need to be based on the prices that were charged during the class period." (Dubé Tr. 142:19-21).
- He could not verify whether the IRI data includes Costco sales — a top-eight retailer for Defendants (Dubé Report, ECF No. 379, Ex. 6 ¶ 48)—after being shown an IRI document stating Costco is "not included in multi-outlet reporting." (Dubé Tr. 219:18.) He admitted he did not "independently verify" this and that "it wasn't necessary" for his report. (Dubé Tr. 220:21-24.)
- He selected the top six national brands for his proposed survey (Dubé Report, ECF No. 379, Ex. 6 ¶ 68) without accounting for the fact that leading brands differ significantly by state. For example, Guayaki Yerba Mate is the third-leading brand in California (Dubé Report, Appendix G, Table G-1) but does not appear in Dubé's Table 9 or proposed survey).

**E. Dubé's Prior Exclusions**

Dubé's opinions have been excluded in at least two cases:

- The L'Oréal matter: The court "did not accept the apportionment method to calculate total number of bottles" sold in class states and therefore excluded his class-wide damages calculation. (Dubé Tr. 24:14-25:2.)
- The "pink slime" case (*Beef Products, Inc. v. American Broadcasting Companies, Inc*.): The court "felt that . . . the conjoint analysis should have had actual recordings of news footage" and excluded his opinion because his methodology did not adequately replicate the real-world stimulus. (Dubé Tr. 25:6-13.)

**F. Dubé Did Not Review Key Case Materials**

Dr. Dubé admitted that he did not read Plaintiffs' deposition transcripts, did not review their interrogatory answers, and does not recall reading the summary judgment decision in this case. (Dubé Tr. 263:10-19.)

**G. Dr. Kivetz's Evaluation of the Dubé Proposed Conjoint Survey Confirms Its Fundamental Unreliability**

Dr. Kivetz evaluated the Dubé Proposed Conjoint Survey and identified fatal methodological flaws that would produce inflated and invalid price premium estimates. (Kivetz Report ¶¶ 82–129; a copy of the Kivetz report is Exhibit “B” to the accompanying Declaration of Andrew N. Krinsky). First, the Dubé Proposed Conjoint Survey is dramatically underspecified, omitting crucial design and analysis details. Dr. Dubé fails to specify the number of choice tasks, the number of product "profiles" per choice task, the sample size, the exact set of brands, and—most critically—how the product attributes will actually be presented, displayed, or explained to participants. (*Id*. ¶¶ 91–97). It is one thing to not have yet done the analysis, but the lack of disclosure and numerous flaws in what is being proposed, renders Dubé’s proposal of no weight or reliability in support of class certification.

Second, the proposed survey deviates sharply from marketplace conditions through its artificial display of attributes. Dubé will not show participants any product packaging. Instead, participants will see only plain-text product "profiles" that bear no resemblance to how consumers encounter iced tea and juice drink products at the store. (*Id*. ¶¶ 104–108). This is particularly problematic given that the visual appeal of AriZona's packaging—with its bold, bright, high-contrast colors and artwork—is a prominent factor likely driving many consumers' purchase decisions. (*Id*. ¶¶ 105–106). The survey will misrepresent the appearance and prominence of the challenged claim. In reality, the "No Preservatives" claim never appeared on the front of the Products' packaging but rather on the back or side panels, in relatively small font and frequently less conspicuous locations. (*Id*. ¶ 111). By presenting all attribute levels in the same format and prominence, the survey will artificially equalize the challenged claim with more prominent product elements and lead all participants to pay attention to it, effectively presuming the very exposure and attention that Plaintiffs must prove. (*Id*. ¶¶ 111–115). Indeed, the proposed survey would illogically estimate the same price premium regardless of where, how prominently, or how many times the claim appeared on the package. (*Id*. ¶ 115). The survey omits numerous relevant attributes and claims that consumers rely on in the real world, including the visual packaging appearance, the flavor/product identity statement, the Nutrition Facts panel, the ingredients list, the "ANTIOX VITAMIN C FORTIFIED" statement, the "Real Brewed" statement, and numerous other prominent label representations. (*Id*. ¶¶ 116–122). Omitting such information from the conjoint task will severely distort marketplace conditions and invalidate any price premium estimates. (*Id*. ¶ 122). Moreover, Dubé's assertion that the "brand" effect will control for omitted attributes is unfounded because (i) brand cannot serve as a direct measure of specific omitted product characteristics; (ii) some attributes affect preferences independently of

brand; (iii) consumers vary in what they associate with a given brand; and (iv) first-time purchasers are less likely to have formed specific brand associations. (*Id*. ¶ 123).

Third, the proposed survey's repeated-stimuli, within-subjects design will exacerbate its leading nature. Because participants will be exposed to both profiles with and without the challenged claim across multiple choice tasks, the survey will overly sensitize participants to the "No Preservatives" claim, rendering the survey's purpose and hypotheses transparent and guaranteeing inflated WTP estimates. (*Id*. ¶¶ 127–128).

## III. LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that an expert may testify if: (a) the expert's knowledge will help the trier of fact; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The proponent of the expert testimony bears the burden of establishing admissibility under Rule 702 by a preponderance of the evidence. *FUJIFILM N. Am. Corp. v. Big Value Inc.*, No. 16-CV-5677, 2018 WL 4210132, at *4 (E.D.N.Y. Sept. 4, 2018) (citing *Daubert*, 509 U.S. at 592-593 n. 10).

Given that "a purported expert's opinion often carries special weight with the jury even when unwarranted," trial courts are charged with acting as "gatekeepers" to ensure admitted expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Louis Vuitton Malletier v. Dooney & Bourke*, Inc., 525 F. Supp. 2d 558, 565 (S.D.N.Y. 2007).

In assessing reliability, the ultimate inquiry is "to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). In this inquiry, the court may consider "(1) that the testimony is grounded on sufficient facts or data; (2) that the

testimony is the product of reliable principles and methods; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l Railroad Passenger Corp*., 303 F.3d 256, 265 (2d Cir. 2002). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id*. at 266. Expert testimony should be excluded as unreliable if it "is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009).

## IV. ARGUMENT

### A. Dubé Has Not Applied Any Methodology to the Facts of This Case

Rule 702 requires that an expert have "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(d). A proposed methodology that has never been applied is no methodology at all. Courts "have repeatedly rejected expert testimony where a proposed theory or alternative design was not properly tested." *Kass v. W. Bend Co.*, No. 02-CV-3719(NGG), 2004 WL 2475606, at *6 (E.D.N.Y. Nov. 4, 2004). *See Doe v. Am. Med. Sys., Inc*., 96 F. App'x 758, 759 (2d Cir. 2004) (affirming exclusion where expert "reached [his] conclusions through examination and extrapolation unsupported by expert qualifications and by ignoring alternative explanations").

Dubé's report proposes a conjoint analysis combined with a market simulation to compute damages in two ways: the "Price Premium" approach and the "Willingness-to-Pay" approach. (Dubé Report, ECF No. 379, Ex. 6 ¶ 23). His report acknowledges: "I have not yet been asked at this juncture to conduct a Conjoint Analysis. Therefore, I have yet to determine the incidence or magnitude of damages; although I am confident that I will be able to do so." (Dubé Report, ECF No. 379, Ex. 6 ¶ 83).

Dubé's report should be precluded, or afforded no weight on the class certification motion.

At his Deposition and in his report, Dubé confirmed:

- He has not conducted a conjoint survey. (Dubé Tr. 87:7-10.)
- He has not programmed a survey instrument. (Dubé Tr. 166:22-23, 167:12; 176:10-11, 192:17.)
- He has not piloted or pre-tested any survey. (Dubé Tr. 176:13-14).
- He has not run a market simulation. (Dubé Tr. 88:10-12.)
- He has not calculated any damages. (Dubé Tr. 84:3-4, 85:10-12.)
- He has not determined the "incidence or magnitude of damages." (Dubé Report, ECF No. 379, Ex. 6 ¶ 83.)
- He cannot describe how brands, claims, or prices would be presented to respondents. (Dubé Tr. at 168:15-20; Dubé Tr. 187:1-2.)
- He cannot state how "diet" would be defined or communicated. (Dubé Tr. 178:20-25; 179:1-15.)
- He does not know whether the survey will show labels, logos, or text. (*Id*. at 168:15-20.)

The stark contrast with Defendants' expert, Dr. Kivetz, is instructive. Dr. Kivetz has actually conducted two rigorous empirical surveys applying well-established survey methodology to the specific facts of this case—testing the very products at issue, using participants drawn from the class states, and presenting realistic, three-dimensional images of the actual product packaging. (Kivetz Report, ECF No. 379, Ex. 6 ¶¶ 25–42). His surveys yield

concrete, quantified results (*Id.* ¶¶ 61–63, 77–79). Dubé, by contrast, has done nothing besides propose a methodology littered with flaws that does not comport with the applicable law.

### B. Dubé’s Testimony is not Based on Sufficient Facts or Data

Rule 702(b) requires that expert testimony be "based on sufficient facts or data." Dr. Dubé's opinions fail this requirement in multiple respects.

#### i. Dubé Used Inapplicable National-Level Data for State-Specific Classes

The proposed classes in this case are limited to California (January 1, 2017 to January 1, 2023) and New York (January 1, 2019 to January 1, 2023). (Dubé Report, ECF No. 379, Ex. 6 ¶ 12). Yet Dubé's pricing analysis (Table 9) and brand selection rely on national-level IRI data. His own report acknowledges "slight variations" in the exact rank orders across the three markets, including national, New York, and California (Dubé Report, ECF No. 379, Ex. 6 ¶ 46).

Indeed, his own Tables G-1 and G-2 demonstrate significant differences. In California, Guayaki Yerba Mate is the third-leading brand with $343 million in sales (Dubé Report, Appendix G, Table G-1)—yet it does not appear in Dubé's proposed survey brands or Table 9. In New York, Snapple is the second-leading brand with $425 million in sales (Dubé Report, Appendix G, Table G-2)—nearly matching AriZona—Dubé did not conduct any state-specific pricing analysis for this brand.

When asked why he did not perform a California-specific price distribution analysis, Dubé responded: "that information wasn't necessary for forming an opinion about whether or not I can devise a feasible method." (Dubé Tr. 137:11-13.) And when shown that the average retail price of AriZona products in California during 2020-2021 was 79 cents — not the $1.06 national average in his Table 9 — he again insisted “it wouldn’t have changed any of [his] opinions." (Dubé Tr. 146:22-24; 147:1-5).

Dubé dismissed these differences, stating they do not affect "feasibility." (Dubé Tr. 158:16-22.) But an expert who disregards relevant geographic market and pricing data has failed to base his opinion on "sufficient facts or data." *See Moncayo v. United Parcel Serv., Inc.*, No. 23-161-CV, 2024 WL 461694, at *1 (2d Cir. Feb. 7, 2024) (affirming exclusion of expert who "did not rest on sufficient facts or data” because he failed to consider relevant facts.”

By contrast, Dr. Kivetz's California Survey recruited a representative sample of California consumers, and the Juice Drink New York Survey recruited a representative sample of New York consumers, with screening quotas based on California-specific and New York-specific age and gender distributions according to the U.S. census. (Kivetz Report ¶¶ 33–34). Dubé's failure to use state-specific data for state-specific classes renders his proposed methodology wholly unreliable from the outset.

**ii. Dubé Used Data from Outside the Class Period**

Dubé's Table 9 reports price distributions based on 2023 IRI data. The note beneath the table states: "2023 reflects sales throughout March." Yet the class period for both classes ends on January 1, 2023. When confronted with this discrepancy, Dubé testified: "I'm trying to select prices for the survey component of this. . . . I'm going to try and use prices that would be more familiar to consumers when the time they're filling in the surveys, but as I already indicated, the actual prices we included in the survey are — don't need to be based on the prices that were charged during the class period." (Dubé Tr. 142:14-21).

**iii. Dubé Failed to Verify Whether the IRI Data Included Key Retailers**

Dubé's report states: "I understand from counsel that the IRI data produced in this case are specific to the 'Multi-Outlet + Convenience' retailer category, which includes these eight retailers" — including Costco. (Dubé Report, ECF No. 379, Ex. 6 ¶ 48). But when shown an IRI document stating "the following retailers are not included in multi-outlet reporting, Costco,

Dollar Tree, 99 Cent Only Stores” (Dubé Tr. 219:15-19), Dubé could not reconcile this with his report. He testified: "it wasn't necessary because in this report I'm proposing a damages methodology, so I'm not actually using the sales data specifically, so it doesn't really change my opinions about the feasibility of the methods." (Dubé Tr. 220:23-24; 221: 1-3).

"Where the record indicates that the expert failed to consider necessary factors or that his analysis rests on faulty assumptions, the trial court has discretion to exclude his proffered testimony for lack of probative value." *Bank of N.Y. Mellon Tr. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp.2d 629, 640 (S.D.N.Y. 2012).

**iv. Dubé Does Not Know Defendants' Costs or Wholesale Prices**

Dubé admitted he does not know Defendants' marginal costs (Dubé Tr. 122:12-14) or wholesale prices (Dubé Tr. 95:12-15). His report acknowledges that marginal costs are "necessary" for the market simulation and proposes to *infer* them using profit-maximization assumptions. (Dubé Report, ECF No. 379, Ex. 6 ¶ 35). But he does not propose to actually perform this inference. An opinion based on data the expert does not possess and inferences the expert has not drawn is not "based on sufficient facts or data."

In sum, Dubé's opinions fail under both Rule 702(c) and 702(d). He has proposed a methodology; he has identified data he claims to need but never verified or analyzed it; and where his own report reveals discrepancies—between national and state-level markets, between class-period and post-class-period pricing, and between his assumptions about data coverage and the actual IRI documentation—he dismisses each gap as irrelevant to "feasibility." But an expert cannot insulate his opinions from scrutiny by defining his task so narrowly that no factual deficiency matters. *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 571 (E.D.N.Y. 1999) (survey results were "untrustworthy and unreliable" where the underlying methodology suffered from fundamental defects in its basic inputs and design). Dubé's proposed

analysis is built on a foundation of unverified assumptions, inapplicable data, and acknowledged gaps that render his opinions inadmissible under Rule 702. An expert who cannot confirm what data he possesses, cannot reconcile contradictions in that data, and has never applied his proposed method to any version of the facts has offered nothing that will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

### C. Dubé's Proposed Methodology is Unreliable as Applied to this Case

Even if a conjoint analysis could be a reliable methodology in some circumstances, Dubé has provided no basis for concluding that his particular proposed implementation will produce reliable results in this case. "The bottom line is that if the [analysis] suffers from substantial methodological flaws, it will be excluded under both Rule 403 and Rule 702." *Louis Vuitton, 525 F. Supp. 2d at 581*.

#### i. Dubé Cannot Describe the Most Basic Elements of this Proposed Survey

Dubé cannot describe the most basic elements of his proposed survey. His report states that the survey will test six brand names (Pure Leaf, AriZona, Lipton, Gold Peak, Snapple, and Brisk), package size, diet or non-diet, shelf price ranging from $0.88 to $2.40, and "Distractor Claims" (no artificial color, no artificial flavor, or no claim). (Dubé Report, ECF No. 379, Ex. 6 ¶ 68).

At his deposition, he could not commit to how *any* of these features would actually be presented to respondents:

- **Brand presentation:** "I haven't programmed the survey yet" (Dubé Tr. 167:12) and decisions about whether logos will be included "will be contingent on how things go during the pilot study." (Dubé Tr. 169:23-24; 170:1).

- **Claim presentation:** He explained that he has not yet programmed the survey and that "[m]ost conjoints don't use visuals, most conjoints might just state that…this product represents itself as having no preservatives." (Dubé Tr. 192:17-193:7-12).
- **Product layout:** Whether products appear "side by side" will "depend on whether or not the respondents in the pilot stage understand and also are — find it, find it easy to complete the tasks…" (Dubé Tr. 198:5-23).

The Court cannot evaluate whether a survey produces reliable results when the expert himself cannot adequately describe what the survey will contain. *See Kumho Tire*, 526 U.S. at 152; *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 416-17 (W.D.N.Y. 2005) ("An otherwise well-credentialed expert's opinion may be subject to disqualification if he fails to employ investigative techniques and cannot explain the technical basis for his opinion.")

**ii. Dr. Kivetz's Expert Evaluation Confirms the Proposed Survey Is Fatally Flawed**

Independent of Dubé's failure to perform the analysis, Dr. Kivetz's evaluation shows that the proposed survey is affirmatively unreliable by design. The proposal is dramatically underspecified: Dubé does not commit to a nationwide or state-specific sampling plan, disclose a sample size, identify the number of choice tasks or product profiles per task, fix the set of brands and other levels, or explain how the attributes at their levels will be presented or described—including whether participants will see any imagery. (Kivetz Report ¶¶ 91–97.) These are not immaterial implementation details; without them, the Court and Defendants cannot evaluate the survey's stimuli, procedures, susceptibility to bias, or validity, much less meaningfully challenge the resulting analysis. A method whose essential design choice remains open cannot satisfy Rule 702's requirement that the methodology be reliably applied to the facts of this case.

The survey design departs from the marketplace in ways that would manufacture the challenged claim's apparent importance. Rather than showing the actual products, the proposed survey would present plain-text profiles, without packaging or any other realistic imagery. (*Id.* ¶¶ 104–109.) That strips away AriZona's bold, high-contrast packaging and artwork—a prominent purchase driver—and treats the claim as if it appeared in the same format and with the same prominence as every other attribute. (*Id.* ¶ 106). In reality, "No Preservatives" appeared on the back or side of the package, often in relatively small font; and giving it equal billing in every profile would unfairly lead participants to notice it and presume the very exposure and attention Plaintiffs must prove. (*Id.* ¶ 111-115). The resulting model would, illogically, assign the same premium whether the claim appeared prominently three times on the front or once in small type on the back. (*Id.* ¶ 115.)

The proposed survey would also not allow consumers to make the tradeoffs they make in the real world. It omits the packaging's visual appearance, flavor or product identity, the Nutrition Facts panel, the ingredients list, the "ANTIOX VITAMIN C FORTIFIED" and "Real Brewed" statements, and other prominent label representations. (*Id.* ¶ 121). By narrowing the choice set to a few text attributes, the design induces focalism and demand effects—the survey becomes a "cupholder" exercise in which respondents assign value to a feature simply because the task makes them consider it. (*Id.* ¶¶ 98 - 103; 116–126). Dubé's claim that brand will control for the omissions does not cure the problem: brand is not a direct measure of each omitted characteristic, some characteristics operate independently of brand, consumers form different brand associations, and first-time purchasers may have none. (*Id.* ¶ 123).

Finally, the proposed within-subjects design would compound those defects. Showing each participant profiles both with and without the challenged claim across multiple choice tasks

would oversensitize participants to "No Preservatives," reveal the survey's purpose and hypotheses, and invite them to supply the expected lay answer that a product labeled "No Preservatives" is better. (*Id.* ¶¶ 127-128). That leading structure would inflate the claim's measured WTP rather than isolate its real-world effect. (*Id.* ¶ 128). The survey therefore cannot even test whether the challenged claim was material, much less yield a reliable price-premium or class-wide damages estimate. (*Id.* ¶ 129). Because its essential design is both decontextualized and leading, the proposed survey is not based on scientific methodologies reasonably relied upon in the field. *Amorgianos v. Nat'l Railroad Passenger Corp.*, 303 F.3d 256, 265–66 (2d Cir. 2002).

#### iii. Dubé's Prior Exclusions Demonstrate the Risk of His Approach

Significantly, Dubé's conjoint methodology has been excluded previously in other matters. In the "pink slime" case, the court excluded his opinion because the conjoint analysis did not adequately replicate real-world conditions. (Dubé Tr. 25:6-13.) In the L'Oréal matter, the court rejected his apportionment methodology for calculating class-wide damages. (Dubé Tr. 24:14-25:1.)

These prior exclusions demonstrate that Dr. Dubé's proposed methodology — conjoint analysis combined with market simulation — has been found unreliable when specific design choices fail to adequately account for real-world conditions. Here, Dr. Dubé cannot even describe what his design choices *will be*, making it impossible for this Court or Defendants to determine whether his methodology will be reliable or afford any weight in support of class certification.

#### iv. Dubé Failed to Consider Relevant Facts and Alternative Explanations

An expert opinion is unreliable when the expert fails to consider necessary factors or relevant alternatives. *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 120

(S.D.N.Y. 2022) (*citations and* internal quotations omitted) (explaining that "even where an expert's method is reliable, her testimony may fail Daubert's fit requirement where (1) her data 'is materially different from the data relevant to the facts of the case,' (2) the expert has failed to consider the necessary factors or based the analysis upon a faulty assumption, or (3) the expert's methodology [was] transposed from one area to a completely different context, and there is no independent research supporting the transposition.")

Dubé acknowledged that AriZona engages in "line pricing" — offering products at different container sizes and different prices. (Dubé Tr. 119:1-12). He is also aware that AriZona reduced can size from 23 to 22 ounces to maintain a 99-cent price point during inflation — what he called "shrinkflation." (Dubé Tr. 241:9-18.) Yet he testified he does not need to review invoices to distributors to perform his analysis (Dubé Tr. 119:13-17) and that his "task in this case is to determine the incremental component of the price that they charge that's due to the challenged claims" and not "to figure out how they set prices in different scenarios." (Dubé Tr. 119:20-24.) Dubé further admitted he did not read the plaintiffs' deposition transcripts, did not review their interrogatory answers, and does not recall reading the summary judgment decision. (Dubé Tr. 263:10-19.)

Dubé's "disregard of such relevant records . . . indicate[s] that his methodology was aimed at achieving one result." *Faulkner v. Arista Recs*. LLC, 46 F. Supp. 3d 365, 381 (S.D.N.Y. 2014). "Such analysis is unreliable, and therefore [his] opinion . . . must be excluded." *Id. See Doe*, 96 F. App'x at 759 (affirming exclusion of expert who "reached [his] conclusions . . . by ignoring alternative explanations"); *Moncayo*, 2024 WL 461694, at *1 (affirming exclusion where expert "failed to consider" relevant facts).

**v. Dubé's Conjoint Analysis is Unreliable Because He Refuses to Use Actual Retail Prices.**

To establish a price premium, a conjoint study must be based on the actual prices paid for comparable products, and when available, account for the prices of competing products. *See Zakaria v. Gerber Prods*. Co., 755 F. App'x 623, 624 (9th Cir. 2018); *Mier v. CVS Health, No. 22-55665,* 2023 WL 4837851, at *1 (9th Cir. July 28, 2023). Dubé's proposal does neither.

His report says that testing the exact point-of-sale price is unnecessary (Dubé Report, ECF No. 379, Ex. 6 ¶ 68(d) & n.74), and he testified that "you don't use sales data for a conjoint analysis," that he does not use sales data to calculate a price premium, and that he will simply tell respondents a price (Dubé Tr. 185:23-186:16). He also drew the proposed survey prices from outside the class period and disclaimed any need to tie them to class-period prices. (Dubé Tr. 142:19-21). Courts reject this kind of untethered exercise. In *Price v. L'Oreal USA, Inc*., No. 17 CIV. 614 (LGS), 2020 WL 4937464, at *5 (S.D.N.Y. Aug. 24, 2020), the court excluded Dubé's choice-based conjoint in part because he substituted the low end of manufacturer suggested retail prices for actual prices paid. *Apple, Inc. v. Samsung Elecs. Co*., No. 11–CV–01846–LHK, 2014 WL 976898, at *11 (N.D. Cal. Mar. 6, 2014), likewise explained that willingness to pay measured "in a vacuum" cannot be compared with market price when it omits actual prices and competitor products. *Saavedra v. Eli Lilly & Co*., No. 2:12-CV-9366-SVW, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014), rejected a demand-only valuation divorced from a functioning market. Because Dubé's proposed survey substitutes survey-assigned prices for actual retail prices and omits market comparators, it cannot reliably measure any price premium attributable to the "No Preservatives" claim.

The record indisputably demonstrates that the retail prices of Defendants' products vary from store to store. Don Vultaggio testified that, other than the pre-printed 99 cents on the 23-

ounce can, there was no "Manufactured Suggested Retail Price" and that such prices "depend[] on the market. The account. Who they are. What their needs are from a margin point of view." (ECF No. 379, Ex. 8, T. 212:14-213:2). He further testified that Defendants do not set price with retailers—"we suggest"—and that "a retailer comes to what he wants to earn from a markup point of view." (*Id*. T. 195:20-196:2). He cited an example where, when selling to Publix in Florida on a buy-one-get-one-free basis, Defendants "lose one gallon for every gallon we sell." (*Id*. T. 195:20-196:23). Because there is no set retail price and prices vary by store, account, and promotion, the survey-assigned prices Dubé intends to use cannot reflect the actual prices class members paid, confirming that his proposed conjoint analysis cannot reliably measure a price premium.

## V. DUBÉ'S FINANCIAL ARRANGEMENT RAISES ADDITIONAL RELIABILITY CONCERNS

While financial bias alone may not warrant exclusion, it is relevant to the reliability assessment. Dr. Dubé charges $1,350 per hour (Dubé Report, ECF No. 379, Ex. 6 ¶ 20) and has an "exclusivity arrangement" with Econic Partners (Dubé Tr. 32:10-15), receives 20% of staff billings (Dubé Tr. 59:1), and received a "signing bonus" to switch his exclusivity to Econic (Dubé Tr. 33:17-19). Total invoices marked at deposition exceeded $500,000. (Dubé Tr. 58-69.)

Despite this substantial financial interest, Dubé testified that he was "not aware" that other experts (Dr. Meyers and Dr. Cronin) were even involved in the case (Dubé Tr. 67:22-24; 68: 1-4) and could not explain an invoice entry referring to a "call with experts" (Dubé Tr. 67:9-15). This either reflects a troubling lack of coordination or a lack of candor — neither of which inspires confidence in the independence of his opinions.

## VI. CONCLUSION

Dubé's report and anticipated testimony fail every requirement of Rule 702. He has <u>not</u>

applied any methodology to the facts of this case. He has not conducted a conjoint survey, has not performed a market simulation, has not calculated damages, and cannot describe even the basic design elements of the survey he proposes. His data does not correspond to the relevant states or class period. He has not verified key assumptions. He did not review Plaintiffs' own testimony. And his "feasibility" opinion does not address any fact at issue in this case.

Moreover, as a matter of law, Dube's proposed conjoint analysis is improper because it disregards the actual market prices of the Products and measures an unavailable remedy rather than actual damages.

For the foregoing reasons, Defendants respectfully request that the Court grant this Motion and exclude the report and anticipated testimony of Dr. Jean-Pierre Dubé in its entirety.

Respectfully submitted,

Dated: August 31, 2026

By: */s/ Howard Wolfson*

Howard Wolfson
Andrew N. Krinsky
TARTER KRINSKY & DROGIN LLP
1350 Broadway
New York, NY 10018
Tel.: (212) 216-8000
Fax: (212) 216-8001
E-mail: hwolfson@tarterkrinsky.com
akrinsky@tarterkrinsky.com

***Attorneys for Defendants***

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), I hereby certify that the foregoing document complies with the word-count limitations in Local Civil Rule 7.1(c). According to the word count feature of Microsoft Word, the motion contains 5,979 words, excluding the exempted parts under Local Civil Rule 7.1(c).

Dated: August 31, 2026

*s/ Howard Wolfson*
Howard Wolfson