# EXHIBIT B

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

AHMED ASHOUR, JOY BROWN and CRYSTAL TOWNES, individually and on behalf of all others similarly situated,

Plaintiffs,

-vs-

No. 1:19-CV-07081 AT-OTW

ARIZONA BEVERAGES USA, LLC, HORNELL BREWING CO., INC., BEVERAGE MARKETING USA, INC., ARIZONA BEVERAGES HOLDINGS, LLC, and ARIZONA BEVERAGES HOLDINGS 2, LLC,

Defendants.

VIDEOTAPED DEPOSITION OF JEAN-PIERRE DUBÉ, Ph.D.

APPEARING REMOTELY VIA ZOOM

February 19, 2026

9:03 o'clock a.m.

REPORTED BY:

Nancy DeCola Eatinger, C.S.R.

CSR No. 084-003451

APPEARING REMOTELY FROM WILL COUNTY, ILLINOIS

REMOTE APPEARANCES:

PEARSON WARSHAW, LLP
By MS. MELISSA S. WEINER,
(Appeared via Zoom)
MR. RYAN T. GOTT,
(Appeared via Zoom)
328 Barry Avenue South
Suite 200
Wayzata, Minnesota 55391
(612) 389-0600
mweiner@pwfirm.com
rgott@pwfirm.com

and

REESE, LLP
By MR. CARLOS F. RAMIREZ,
(Appeared via Zoom)
100 West 93rd Street
16th Floor
New York, New York 10025
(212) 643-0500
cramirez@reesellp.com

appeared on behalf of the Plaintiffs;

STEVENS & LEE
By MR. ROBERT P. DONOVAN,
(Appeared via Zoom)
MR. JOHN N. VISCONI,
(Appeared via Zoom)
669 River Drive
Suite 201
Elmwood Park, New Jersey 07407
(201) 857-6778
robert.donovan@stevenslee.com
john.visconi@stevenslee.com

appeared on behalf of the Defendants.

ALSO PRESENT: Travis Jewel, Legal Videographer.

DEPOSITION OF

JEAN-PIERRE DUBÉ, Ph.D.

TAKEN THURSDAY, FEBRUARY 19, 2026


EXAMINATION BY PAGE

Mr. Donovan 7

Ms. Weiner 264


EXHIBITS


Exhibit JPD 1 Page 25
(Notice to Take the Oral Deposition of Jean Pierre Dubé, Ph.D. - Provided electronically to the Court Reporter)

Exhibit JPD 2 Page 48
(Defendants' Supplemental Request for the Production of Documents to Plaintiffs Concerning Report from Jean Pierre Dubé, Ph.D. - Provided electronically to the Court Reporter)

Exhibit JPD 3 Page 51
(Plaintiffs' Responses and Objections to Defendants' Supplemental Request for the Production of Documents to Plaintiffs Concerning Report from Jean-Pierre Dubé, Ph.D. - Provided electronically to the Court Reporter)

Exhibit JPD 4 Page 53
(September 18, 2025 letter - Provided electronically to the Court Reporter)

Exhibit JPD 5 Page 57
(Invoice - Provided electronically to the Court Reporter)

Exhibit JPD 5a Page 60
(Invoice - Provided electronically to the Court Reporter)

Exhibit JPD 5b Page 66
(Invoice - Provided electronically to the Court Reporter)

Exhibit JPD 6 Page 69
(Expert Report of Jean-Pierre Dubé, Ph.D. - November 14, 2025 - Provided electronically to the Court Reporter)

Exhibit JPD 7 Page 74
(Exhibit 3 - Document not titled - Provided electronically to the Court Reporter)

Exhibit JPD 8 Page 123
(Memorandum of Law in Support of Plaintiffs' Motion for Class Certification - Provided electronically to the Court Reporter)

Exhibit JPD 9 Page 127
(Excel Spreadsheet - Provided electronically to the Court Reporter)

Exhibit JPD 10 Page 208
(Second Amended Class Action Complaint - Provided electronically to the Court Reporter)

Exhibit JPD 11 Page 217
(Table - IRI Total U.S. Multi-Outlet (MULO) Market Coverage - Provided electronically to the Court Reporter)

Exhibit JPD 12 Page 217
(Pages Bates stamped DUBE007494 - DUBE007497 - Provided electronically to the Court Reporter)

Exhibit JPD 13 Page 221
(Label - Provided electronically to the Court Reporter)

Exhibit JPD 14 Page 228
(Label - Provided electronically to the Court Reporter)

Exhibit JPD 15 Page 229
(Label - Provided electronically to the Court Reporter)

Exhibit JPD 16 Page 231
(Label - Provided electronically to the Court Reporter)

Exhibit JPD 17 Page 232
(Label - Provided electronically to the Court Reporter)

Exhibit JPD 37 - REMARKED EXHIBIT JPD 18 Page 253
(New York Times article - Provided electronically to the Court Reporter)

REPORTED REMOTELY FROM WILL COUNTY, ILLINOIS
THURSDAY, FEBRUARY 19, 2026, 9:03 A.M.

THE VIDEOGRAPHER: We are now on the record at 15:03 UTC on February 19th, 2026. Audio and video recording will continue to take place until all parties agree to go off the record. Please note that microphones are sensitive and may pick up whispering and private conversations.

This is the video recorded deposition of Jean-Pierre Dubé. My name is Travis Jewel. I'm the videographer on behalf of U.S. Legal Support. I am not related to any party in this action, nor am I financially interested in the outcome.

At this time, would counsel state their appearances for the record after which the court reporter will swear in the witness.

MR. DONOVAN: Good morning. Robert Donovan on behalf of the defendants. I also have John Visconi here.

MS. WEINER: Good morning. Melissa Weiner on behalf of the plaintiffs and representing the expert this morning.

MR. DONOVAN: Dr. Dubé, can you hear me, sir?

THE WITNESS: I can, although it's a little, it's

a little muffled.

MR. DONOVAN: Okay. Can you hear me now a little better?

THE WITNESS: It's a little better, yes.

MR. DONOVAN: Okay. Is that how you pronounce your name, Dubé, am I saying that correctly, sir?

THE WITNESS: That is indeed.

MR. DONOVAN: Okay. So my name is Bob Donovan, and I'm an attorney --

THE COURT REPORTER: Excuse me, Mr. Donovan, I just have to quick swear him in.

MR. DONOVAN: Oh, sorry.

* * * * * * *

(Witness sworn)

JEAN PIERRE DUBÉ, Ph.D.,

called as a witness herein, having been first duly sworn, was examined upon oral interrogatories and testified as follows:

EXAMINATION

By Mr. Donovan:

Q I'll start all over. Good morning, Doctor. My name is Bob Donovan. I'm an attorney for the defendants in this case, and you're here for your deposition.

And you've been deposed before, I suppose, right?

A I have.

Q So I'll try to be brief in terms of the instructions.

When was the last time you were deposed?

A It would have been in the fall.

Q Do you have a month?

A I can't recall. I was involved in a -- it was actually in a hearing, it wasn't a deposition. So the actual deposition would have been last year earlier in the year.

Q What was the name of the case?

A It was a -- the royalties matter, Web6, which was the determination of royalty rates in the, in the terrestrial -- excuse me, the digital music, the streaming music market.

Q And where was that venued?

A New York.

Q Okay. So let me just go through some basic instructions, and because we're audio and video remote, if there comes a point in time where you don't hear my question, just tell me. I'll try to be louder, okay?

A Sure, okay.
Q And with respect to any question, if you don't know the answer, I'm not looking for guesses. I'm looking for what you know in this case, okay?
A Okay.
Q And I need you to verbally answer. Non-verbal gestures don't come off clearly, at least on the transcript, maybe on an audio it would, but I just ask you to do that verbal answering, okay?
A Okay.
Q And if there comes a time counsel objects, I ask for you to wait for that objection before you answer. That way the record is not muddled, okay?
A Okay.
Q And I may be asking -- I probably will be asking for numbers and quantities if -- and dates. I'm always interested in reasonable estimates, but not guessing, okay? Understand?
A Okay. Understood.
Q And wait -- please wait until I finish a question before you answer. That way the record is not muddled, all right?
A All right.
Q Do you understand that?

A I do.
Q Did you do anything to prepare for this deposition, sir?
A I did.
Q What did you do?
A I reviewed the materials in my report, and I spoke briefly last week with my support staff, and I met briefly yesterday with counsel.
Q And with the support staff, who did you meet with?
A I met with Ryan Dorow and Tom Stemwedel.
Q Anybody else?
A I don't recall. Yes, I apologize, yes. Sophie, but I don't recall Sophie's last name off the top of my head.
Q Anyone else that you, that you refer to as the staff that you consulted or spoke to to prepare?
A No.
Q Was counsel present during those discussions when you were preparing with your staff?
A I'm sorry, are you asking if counsel was present during my meeting with counsel?
Q No. I'm asking whether counsel was present with your meeting with the staff when you prepared

for this deposition?
    A   No.  As I indicated in my response earlier, I met with my staff briefly a week ago, and yesterday I met with counsel, but my apologies because in my meeting with counsel yesterday, Tom Stemwedel of the staff was present in the meeting with counsel.
    Q   And what did you speak to about your staff -- with your staff to prepare for the deposition?
    MS. WEINER:  Objection.  I'm not sure where you're going with this Bob, but we have exchanged multiple e-mails, and I've objected to your discovery of conversations related to Dr. Dubé's communications with staff, so what's the basis for your questions here?
    MR. DONOVAN:  Are you directing him not to answer the question?
    MS. WEINER:  What's your basis for asking, for asking these based on our agreement that you weren't going to seek discovery into this topic?
    MR. DONOVAN:  Q   There's no such agreement about -- in that regard.  This witness has now testified that he spoke to his staff to prepare for this deposition without counsel present.  I'm entitled to ask what they talked -- what they spoke about.

Sir, if you could please answer the question?

A Sure. I spoke with my staff about the contents of my report.

Q Anything else?

A We spoke about the contents of the report, and then we spoke about the data that are summarized in the report.

Q Anything else?

A Not to my recollection.

Q And how long was that meeting?

A Maybe an hour or two.

Q And how long was your meeting with counsel? I'm not asking what you discussed. I just want to know how long the meeting was, please, sir.

A I believe it was also about an hour or two yesterday.

Q And the meeting with staff, with staff alone that you said is about an hour or two, was that in person?

A It was on Zoom.

Q And the meeting with counsel, how was that conducted?

A It was also -- sorry.

Q That's okay.
A It was also on Zoom.
Q Now, you have, would it be fair to say, prior experience as being an expert witness in class action matters, would that be fair to say?
MS. WEINER: Objection, form.
MR. DONOVAN: Q I'll rephrase it.
Do you have any prior experience other than this case in class action matters?
MS. WEINER: Objection, form.
MR. DONOVAN: Q You can answer if you understand the question, sir.
A Have I -- if you're asking if I've served as an expert in past class action cases, I have served as an expert.
Q Can you give me an estimate, if you can, how many?
A On class action specifically?
Q Yes.
A I don't recall off the top of my head. I've been an expert in about a dozen or -- about two dozen cases. Many of those were class actions, so I would probably guess about a dozen or more class actions.
Q I'm not looking for a guess.

You can't give me an estimate?
MS. WEINER: Objection, form.
THE WITNESS: I'm sure you can --
MR. DONOVAN: Q Can you give me an estimate?
A What you -- sorry, could you please clarify the distinct -- your distinction between an estimate and a guess?
Q Yeah, an estimate would be I know something's within a number, but I'm not sure of a specific number. A reasonable estimate of a number.
MS. WEINER: Asked and answered.
THE WITNESS: I'm afraid I find your distinction a little confusing. I'm not sure what, I'm not sure what this characterization means.
MR. DONOVAN: Q Okay.
A I just want to make sure I answer correctly.
Q Okay. All right. I totally understand that.
You said guess, okay. That means you don't know, right?
MS. WEINER: Objection, form.
THE WITNESS: I'm confused because if I was to provide an estimate, that would also mean I don't know.
MR. DONOVAN: Q Okay. And in these class

action cases where you were an expert, did any of them concern conjoint analysis?
MS. WEINER: Objection, form.
THE WITNESS: Could you be -- can you clarify what you mean by a class action concerning conjoint?
MR. DONOVAN: Q Did you ever offer an opinion on conjoint analysis in any other case prior to this case?
A I have offered opinions about conjoint analysis in other class action matters, yes.
Q Can you identify what matters?
A Well, we can go to my testimony history if you'd like, and we could go through them. Would you like, would you like to turn to my testimony history?
Q No, we can do that later. I'm wondering whether you know off -- without looking at your report.
Do you need to look at your report to answer that question, is that fair to say?
A For an exhaustive list of every class action matter in which I've offered an opinion about conjoint analysis, that would probably be a good idea to review the testimony history to ensure I don't inadvertently miss one.

Q And now I'm looking for a reasonable estimate, if you know.

MS. WEINER: Objection, form.

MR. DONOVAN: Q No, no, I haven't finished my question yet. I'm now asking for a reasonable estimate, if you know.

Out of the prior class action cases involving a conjoint analysis, how many have involved you providing services for a plaintiff?

A I'm afraid your -- I'm really confused now because I'm not sure what you mean by your distinction of a guess versus an estimate, and now you've added the word "reasonable", and I apologize, I don't recall if it's a reasonable estimate or reasonable guess. I don't want to, I don't want to give you an inaccurate answer, but I'm afraid I don't understand your distinct -- your distinction.

Q Do you know how many class action cases you've been involved with involving a conjoint analysis where you provide an opinion on behalf of the plaintiff?

MS. WEINER: Objection, form.

THE WITNESS: As I indicated earlier, I'd be happy to turn to my testimony history and provide you

with an accurate count of the class action matters in which I've offered an opinion about conjoint.

MR. DONOVAN: Q Are you, are you finished, sir?

A I am.

Q You would need to do that to answer that question?

A To give you the precise number of cases in which I offered an opinion about conjoint, specifically cases that were class action, I would probably want to consult my testimony history in case I inadvertently overlooked one or two matters.

Q How many years have you been providing expert opinions and testimony?

A More than a decade.

MS. WEINER: Objection, form.

THE WITNESS: More than a decade.

MR. DONOVAN: Q More than two decades?

MS. WEINER: Objection, form.

THE WITNESS: On -- your question was specifically about class action?

MR. DONOVAN: Q Yes.

A Class action I'm relatively sure that's been about a decade, about a decade.

Q Do you recall ever providing an opinion

concerning conjoint analysis on behalf of a defendant?

A I have.

Q Do you remember the case?

A It was the case on the -- I'm trying to remember the name of the case, but it involved the news team with Diane Sawyer, the pink, the pink slime case.

Q Any other case?

A I'm sorry, could you, could you -- any other case with which condition?

Q I'm sorry, the other case where you testified on behalf of the defendant concerning conjoint analysis.

MS. WEINER: Objection, form.

THE WITNESS: While I've represented, while I've represented defendants in other matters, I don't think -- I don't believe I've ever had formed an opinion about conjoint analysis for a dependent -- a defendant other than in that particular case.

MR. DONOVAN: Q And when was that case with the pink slime, when did you provide that opinion, if you remember?

MS. WEINER: Objection, form. You asked about

testimony, and now you're asking about an opinion, so just that's my objection.

THE WITNESS: Sorry, could we repeat the question, please?

MR. DONOVAN: Q You said you offered an opinion -- well, did you offer an opinion in the pink slime case?

MS. WEINER: Objection, form.

THE WITNESS: I offered an opinion.

MR. DONOVAN: Q And do you remember if you were deposed in that case?

A I was.

Q My question is when?

A I don't remember the exact date of the deposition, but it was about a decade ago.

Q Do you remember what your report said in the pink slime case in general?

MS. WEINER: Objection. To the extent that your opinions were confidential subject to a protective order, I don't know anything about those opinions, Dr. Dubé, I would instruct you not to testify to anything that is confidential in another matter.

THE WITNESS: I'm not sure, I'm not sure what would be confidential and what would not. Perhaps

you could ask a more precise question, and then we'll -- we can then discern whether or not this is something I should be able to -- I should be permitted to answer.

MR. DONOVAN: Q Well, do you remember the conclusions that you drew in that case about conjoint analysis?

MS. WEINER: Same objection.

THE WITNESS: Can you, can you be a little more specific about what kind of conclusions you have in mind?

MR. DONOVAN: Q No, because I don't know what they are.

I'm asking you if you know what your conclusions were in that case?

MS. WEINER: Same objection.

THE WITNESS: I'm afraid I'm not understanding your question because you began asking me about my conclusions about conjoint analysis, which sounds like a methodological opinion, and now you're asking me about my conclusions in that case. I'm just trying to understand your question, I'm sorry.

MR. DONOVAN: Q Do you remember what your assignment was in the pink slime case?

MS. WEINER: Objection to the extent that any information was exchanged between you and counsel in that case, and to the extent it is confidential, I would instruct you not to answer. I don't know whether it is or isn't. I'm just putting that objection on the record.

THE WITNESS: Okay. Then I -- it sounds like I should not answer this question.

MR. DONOVAN: Q Why?

A I'm sorry, I didn't understand your -- what did you just say?

Q Why?

A I'm sorry, why what?

Q Why aren't you answering the question?

A Unless I misunderstood, counsel just advised me not to answer the question.

MS. WEINER: To the extent that anything is confidential in that matter, you should not disclose it. I don't know whether it is or isn't confidential. If you know generally what that litigation was about, but I don't know whether your testimony was confidential, so if it was confidential, then I would instruct you not to answer.

THE WITNESS: I really don't know if it was confidential or not, so I'm not sure what I'm authorized to respond for this particular question.

MR. DONOVAN: Q I asked you do you remember what your assignment was in the pink slime case as an expert?

A Counsel's instructed me to be cautious about inadvertently disclosing confidential mat -- issues related to that case. Since I don't know at this time what was confidential and what was not, I'm just hesitating about inadvertently speaking out of place.

Q So you're not going to answer the question?

A At this time, I'm not sure which aspect of the question I'm actually allowed to answer.

Q But you're not going to answer the question? We're going to be here all day, Doctor.

The question is so you're not going to answer the question, correct?

A I don't think I can answer this question.

MS. WEINER: Bob, if you know that this case was or wasn't under seal or you have any information about it and you want to provide that, you're welcome to to help inform, but you're asking Dr. Dubé to remember something from ten years ago, and he

shouldn't be disclosing confidential information from another case.

I'm not trying to be difficult. I don't want him to inadvertently disclose something that is confidential, so if you know or you have a Complaint or something that you can assist him with his memory, then we can get somewhere here, but he's not going to answer something on memory that he doesn't know is or isn't confidential.

MR. DONOVAN: Q Have you ever had an opinion in any case that you offered -- in any matter that you off -- strike that.

Have you ever offered an opinion in a case that's been excluded by the Court?

A I have.

MS. WEINER: Objection to form.

THE WITNESS: I have.

MR. DONOVAN: Q What case or cases that you remember?

A The L'Oréal matter.

Q Any other case that you can remember?

MS. WEINER: Objection, form.

THE WITNESS: The pink -- the same, the pink slime case we were discussing a moment ago.

MR. DONOVAN: Q Any other case?
A Those -- just those two.
Q Do you recall why your opinion was excluded in the -- what did you call it, the Price -- did you call it the Price L'Oréal case, is that what that is?
MS. WEINER: Objection, form.
THE WITNESS: The L'Oréal matter, yes.
MR. DONOVAN: Q Yes.
Do you recall why that happened?
MS. WEINER: Objection, form.
THE WITNESS: I do.
MR. DONOVAN: Q Okay. Can you tell me your understanding?
A Sure. The class-wide damages calculation required a multiplication of a price premium, and the total number of bottles of the challenged product that were sold, in that calculation, the bottles were not directly observed and were inferred through national sales.
There was a matter -- an issue of apportioning national sales to the two states in which the class had been certified, and the Courts did not accept the apportionment method to calculate total number of bottles, and, therefore, in turn, the

multiplication of the price premium and the number of bottles to determine class-wide economic damages.

Q The exclusion in the pink slime case, do you remember why?

MS. WEINER: Objection, form.

THE WITNESS: The Courts felt that because the matter involved a news broadcast on television, that the conjoint analysis should have had actual recordings of news footage but for the challenged aspects of the as-is broadcast that actually was broadcast on TV. In short, they felt that we needed to reassemble the entire news team and rerecord the news broadcast using different kinds of language.

MR. DONOVAN: Q Do you still have a file concerning the pink slime case?

MS. WEINER: Objection, form.

THE WITNESS: I have no idea. Probably not.

MR. DONOVAN: Q Why not?

MS. WEINER: Objection, form.

THE WITNESS: Confidential documents would have been deleted once the matter was resolved.

MR. DONOVAN: We're going to mark a document, sir. Bear with us.

(Whereupon, Exhibit JPD 1, remotely

introduced and provided electronically to the Court Reporter.)

MR. VISCONI: It's appearing in the chat now.

THE WITNESS: Okay.

MR. DONOVAN: Q You have to, you have to open it, sir.

A I'm trying. For some reason, it's requiring me to save it to disk instead of opening it.

MS. WEINER: Yeah, it's doing that for me as well.

THE WITNESS: I'm unable to open it. It will only allow me to download it and not open it.

THE VIDEOGRAPHER: This is Travis, the videographer. You have to download it to your computer before you can open it.

THE WITNESS: Okay. Before we go any further, are there going to be any large files that I'm going to need to download? I don't want this to interfere with either connection speed, but more importantly, I don't want to overload my computer. I don't know if you -- I doubt it, but I'm just checking, you're not going to have any massive file that I need to download?

MR. DONOVAN: Well, the IRI data we will, sir.

MS. WEINER: It's an Excel file. It should be fine.

THE WITNESS: Okay. Oh, if it's Excel, I'll be fine. Okay, that's not massive.

MR. VISCONI: Yeah, we're talking megabytes, not gigabytes for any of the documents we may have.

THE WITNESS: That shouldn't be a problem. You're going to have to bear with me. I don't -- I hope this is not a problem. I mean, I have to go onto the files of my computer. Okay, it would appear the file is now open. Okay, I've got it.

MR. DONOVAN: Q Okay. I'm showing you JPD 1. Do you see that, sir?

A I do.

Q Okay. Have you ever seen that document before?

A If you'll give me a moment, I'm going to review this. I believe I have.

Q Let me know after you're done, please.

A Okay. Yes. I believe it's dated February 9th. Yes, I believe I received this file.

Q Okay. And do you have any -- I'll turn your attention to Exhibit A. It's on Page 4.

A Got it.

Q Do you have any documents with you today responsive to those requests?
MS. WEINER: I'm going to just object. We responded to this deposition notice with objections and responses, so.
THE WITNESS: Sorry, could you ask --
MS. WEINER: You can answer.
THE WITNESS: Could you ask the question again?
MR. DONOVAN: Q With respect to Exhibit A, sir, did you bring any documents with you today responsive to any of those requests?
A I have.
Q Okay. What documents have you brought?
A I have it right in front of me here. It's my report, which I submitted in November of 2025 which summarizes all of my opinions in this matter to date.
Q Have you brought anything else with you responsive to Exhibit A?
A There's -- I'm not aware of any other document besides my report that contains either things I've considered or the opinions I've formed for this matter to date.
MS. WEINER: I'll just pause. We have produced documents in response to your document request.

Dr. Dubé did not bring any of that with him today.
MR. DONOVAN: Q Who is Econic Partners, LLC?
A Econic Partners provided -- provides the support staff. This was the team that I directed to assist me with some of the analysis that was, that was in my report.
Q And who are the members of Econic Partners, LLC?
MS. WEINER: Objection, form.
THE WITNESS: I couldn't tell you all of the team. It's an extremely large global organization even though it's only about a year old. The founder's name is Jon Orszag.
MR. DONOVAN: Q How do you spell that, sir?
A J-o-n, that's Jon. And then the last name is Orszag, O-r-s-z-a-g.
Q Do you know of any other -- when I say members, I mean owners of Econic Partners, LLC.
Do you know who the owners of Econic Partners, LLC are?
A There are quite a few people who are involved with the formation of the company. I could not tell you an exhaustive list. The easiest would be to go to their website, and then I could make a distinction

between who's a consultant, who works for them, and who's an actual owner. This is all disclosed on their website I would think.

Q Do you know as you sit here who the owners of Econic Partners, LLC are?

MS. WEINER: Asked and answered.

THE WITNESS: Sorry, I didn't -- which part of my previous answer didn't provide the full answer?

MR. DONOVAN: Q I asked you do you know who all the partners of Econic Part -- sorry, strike that.

I'm asking you who, if you know, who all the owners are of Econic Partners, LLC?

MS. WEINER: Asked and answered.

THE WITNESS: I thought I answered this question, so I'm just clarifying it. Should we go back and have the -- ask them to reread my response so that I can make sure I'm clear on what it is I failed to answer?

MR. DONOVAN: Q No, no.

A Okay.

Q We're not going back, okay, because I'm going to take the position you didn't answer the question. You told me to go to a website.

I'm asking you as you sit here, do you know

who the Econ -- who are the owners of Econic Partners, LLC?

MS. WEINER: Asked and answered.

THE WITNESS: I'm sorry, but can we please reread my previous answer so that I can understand in what way I failed to answer the question?

MR. DONOVAN: Q We'll just proceed.

Are you an owner of Econic Partners, LLC?

A I actually don't know in what capacity that -- I'm not actually sure what you mean by an owner.

Q Well, are you employed by Econic Partners, LLC?

MS. WEINER: Objection, form.

THE WITNESS: I'm -- I work with them as a consultant, but I don't receive a W-2 from them.

MR. DONOVAN: Q Do you receive any profits from Econic Partners, LLC?

MS. WEINER: Objection, form.

THE WITNESS: I do receive a portion of the staff support billing.

MR. DONOVAN: Q What portion?

A I receive 20 percent.

Q Do you have a Partnership Agreement that you entered into with Econic Partners, LLC?

MS. WEINER: Objection, form.

THE WITNESS: I do, but I haven't --

MS. WEINER: Also --

THE WITNESS: Oh, go ahead.

MS. WEINER: Sorry. I'm just also going to object to the extent that anything is confidential, which I don't know the answer to. You can answer.

THE WITNESS: So as is common for economic consultants or many economic consultants, I have an exclusivity arrangement with Econic, which gives them a right of first refusal.

MR. DONOVAN: Q Right of first refusal for what?

A For matters, litigation matters requiring staff support.

Q Would you know whether you ever entered into a Membership Agreement with Econic Partners, LLC?

MS. WEINER: Objection, form.

THE WITNESS: I'm afraid I don't under -- I don't know what the, what the meaning would be. I just don't know if I can -- it's not that I don't want to, I'm not sure I'm able to answer that question accurately.

MR. DONOVAN: Q Other than the Consulting

Agreement that you mentioned about the right of first refusal, have you had -- do you have any other agreements with Econic Partners, LLC?

MS. WEINER: Objection, form.

THE WITNESS: What kind -- I'm not sure I follow. What kind of agreements do you have in mind?

MR. DONOVAN: Q Any agreement.

A I guess I'm not sure what you mean by an agreement. I just -- if you could just give me an example, maybe then I can answer.

MR. DONOVAN: Q Do you know what a contract is?

A I do.

Q Okay. Same thing as an agreement, sir.

So do you have any agreements with Econic Partners, LLC other than the Consulting Agreement that you referenced?

A I have a contract with a signing bonus when I switched my exclusivity from Compass Lexecon to Econic Partners at the beginning of last year.

Q How much was that signing bonus?

MS. WEINER: I'm going to object to the extent that this is confidential and entirely irrelevant.

MR. DONOVAN: Q You can answer, sir.

A I actually don't remember the exact amount,

but this is something if it's not breaking -- violating a Confidentiality Agreement I can easily look up and provide you with that information.

Q Please do so, sir.

Who is Tom Swedell?

A I'm sorry, do you mean Tom Stemwedel.

Q Sorry, I mispronounced his name, you're right.

Who is Tom Stemwedel? Sorry.

A Tom Stemwedel is an employee of Econic Partners who was my main point of contact for the staff I directed in this matter.

Q And how long has he been with Econic Partners -- strike that.

He's with Econic Partners, LLC, correct?

A He's with Econic --

MS. WEINER: Objection, form.

THE WITNESS: He's with Econic Partners.

MR. DONOVAN: Q And how long has he been there?

MS. WEINER: Objection, form. If you know.

THE WITNESS: Approximately one year.

MR. DONOVAN: Q And do you know his educational background?

MS. WEINER: Objection, form.

THE WITNESS: He has a graduate degree from the University of Chicago, but I don't remember the exact degree that he attained -- that he obtained.

MR. DONOVAN: Q And how old is he?

A I actually --

MS. WEINER: If you know.

THE WITNESS: I don't know.

MR. DONOVAN: Q Have you ever met him in person?

A I have.

Q Did you receive any communications from Mr. Stemwedel pertaining to any data or facts that you considered in forming your opinions set forth in the report that you issued in this case?

MS. WEINER: I'm going to put an objection on the record that the only testimony or information that Dr. Dubé will be providing per our agreement relates to facts or data that Dr. Dubé received and considered in forming his opinions.

MR. DONOVAN: Q I'll ask the question again. Do you want me to ask it again?

A Yes, please.

Q Did you receive communications from Mr. Stemwedel containing any data or facts that you

considered in forming the opinions set forth in the report that you issued in this case?

A So Tom, so Tom Stemwedel was working under my direction to assist me primarily with the processing of the data that was used and reported in this case, and so we had communications, I don't remember how many, about the preparation of this report.

Q Did those communications contain data or facts that you considered in forming your opinions in the report?

A To the extent --

MS. WEINER: Same objection.

THE WITNESS: To the extent that it pertained to data, it would have been about the drafting of the tables and conducting the analyses that I requested, which are summarized in the report.

MR. DONOVAN: Q How did you make those communications with Mr. Stemwedel, in what mode or manner?

A Mostly it was by Zoom, so I would have a meeting with Tom on Zoom, and then I would ask him to conduct specific analyses for me. They also assisted me with the formatting of the report, so like making sure the footnotes on the references and things were

all formatted consistently. Those would have been via e-mail.

Q Other than that reference to e-mails on formatting, would your communications with Mr. Stemwedel create any other communications via e-mail --

MS. WEINER: Object.

MR. DONOVAN: Q -- that contain data or facts that you used to form any opinions in your report?

MS. WEINER: I'm just going to object. Any communication that related to the draft report are not discoverable, and I would instruct Dr. Dubé not to answer regarding communications that related to the draft report.

MR. DONOVAN: Okay. We understand that. I didn't ask that.

MS. WEINER: You didn't clarify, and Dr. Dubé testified that his communications related to the drafting of the report, and I'm going to instruct him not to answer regarding the contents of communications related to the draft report.

THE WITNESS: I'm sorry, sir, did you wish -- did you want to ask the question again?

MR. DONOVAN: Madam Reporter, can you repeat the

question before there was an objection, please?

THE COURT REPORTER: Can you just repeat the question.

MR. DONOVAN: Q I'll repeat the question.

Other than e-mails concerning tables and formatting that you mentioned, were there any other communications with Mr. Stemwedel by e-mail containing data or facts that you considered in forming your opinions in this case?

MS. WEINER: Same objection regarding draft reports.

THE WITNESS: So our communications were always regarding the drafting of the report, so to the extent data or facts were mentioned, and this was all with respect to the drafting of the report and are in the report.

MR. DONOVAN: Q Who is Sophie Yang, Doctor?

A I'm sorry, was there a question?

Q Yeah. Do you know a Sophie Yang?

A I do.

Q Okay. Who is she?

A Sophie Yang is a staff member at Econic.

Q Did she do work in this case?

A She assisted Tom Stemwedel as part of his

team in the -- my understanding is working with the IRI data to create the analyses and tables I requested for my report.

Q Do you know her educational background, sir?

A So, again, back to the guess versus estimate distinction, I think she has a Ph.D., but I'm not a hundred percent sure. She has an economics background.

Q And how long has she been working with you?

MS. WEINER: Objection, form.

MR. DONOVAN: Q I'll strike it.

How long has she -- I'll strike the question, I'm sorry.

How long has she been at Econic Partners, if you know?

A I don't know.

Q How long has Econic Partners been in existence, do you know that?

MS. WEINER: Objection, asked and answered.

THE WITNESS: I believe, I believe I indicated earlier that the company was formed early last year.

MR. DONOVAN: Q Did you have any communications with her, from Ms. Yang, containing any data or facts that you considered in forming your opinions in this

case?

MS. WEINER: Same objection regarding communications related to the draft report.

THE WITNESS: She was present on several of my meetings with Tom and CCed on some of the correspondences.

MR. DONOVAN: Q Did you ever have any direct communications with Ms. Yang about any data or facts that you considered in forming your opinions in this report?

MS. WEINER: Objection, form.

THE WITNESS: Could you clarify what you mean by direct communication distinct from what -- my previous answer.

MR. DONOVAN: Q Sure. Did you ever speak to her on the telephone?

A I have spoken to her on Zoom calls.

Q Did you ever directly e-mail her?

MS. WEINER: Objection, form.

MR. DONOVAN: Q Not CC, not copied, but did you ever directly e-mail her?

A I don't believe so, no.

Q Who is Ryan Dorow, sir?

A Ryan Dorow is also a staff member at Econic.

Q And what did he do in this case, if anything?
A He also assisted with the data analysis that was part of my report.
Q Do you know how he assisted?
A I don't know the exact allocation of labor that Tom used when delegating some of these tasks to his team.
Q Were there any communications between you and Mr. Dorow containing any data and/or facts that you considered in forming your opinions in the report?
MS. WEINER: Same ob --
THE WITNESS: I spoke --
MS. WEINER: Sorry. Same objection regarding communications in the drafting of the report. It's not discoverable. You can answer.
THE WITNESS: I spoke to Ryan during some of those Zoom calls, and Ryan would have been CCed on several of the communications with Tom. I just don't recall off the top of my head whether any of those e-mails were to Ryan as opposed to Tom, but anything -- any communication with Ryan would have been with respect to the drafting of my report.
MR. DONOVAN: Q I understand in connection with drafting your report. The question is whether that

communication contained any data or facts that you considered in forming your opinions.

Did you receive such a communication or exchange one with Mr. Dorow?

MS. WEINER: Objection, form. Dr. Dubé is not going to testify regarding communications if it concerned data that related to the drafting of the report. If they provided him with facts or data that he utilized in forming his opinions, that's different, so I want to be clear what he is not testifying to.

MR. DONOVAN: Q And that's exactly what the question was, what data or facts. I'm not looking for draft reports.

You can answer it, sir, please.

A Sorry, I believe I've already answered this. I mentioned that my communications with Ryan, whether via e-mail or on Zoom, regarded the drafting of this report, so there would have been discussion of data and analysis insofar as I had requested and directed them to do specific analyses of the data and to help me with the preparation of the tables that are in the report.

Q I have to apologize in advance. I may not

pronounce this person's name correctly.
Do you know who Yulu Gu is? Am I pronouncing that correct? Wait.
A I believe Yulu Gu may be an employee also of Econic.
Q Do you know Yulu Gu's role or involvement what Yulu Gu did?
A I don't recall any direct communication with Yulu Gu, but she may have been on the team that Tom assembled to complete the tasks that I assigned to them.
Q So as you sit here, you don't know what Yulu Gu actually did in connection with this case?
A Besides being part of the team that helped provide the support for the drafting of my report. As I indicated earlier, I'm not entirely sure how Tom Stemwedel allocated or delegated all of the components of the tasks. No, I don't know who did exactly what.
Q Did you have any commun -- were there any communications by and between you and Yulu Gu containing data or facts that you considered in forming your opinions in your report?
MS. WEINER: Same objection.

THE WITNESS: As I thought I indicated earlier, I may have -- I may be misremembering, I had no direct communication with Yulu Gu.

MR. DONOVAN: Q Did you have any written communications with Yulu Gu?

MS. WEINER: Same objection.

THE WITNESS: I'm sorry, could you clarify what would be distinct from what I called the direct communication and what you're referring to as a written communication?

MR. DONOVAN: Q Well, what do you mean by direct communication?

A I was referring to your earlier -- your definition. We can go back and ask the -- ask this to be reread, which were I believe you said e-mails or communications that I sent directly to, and it might have been with respect to Sophie Yang, I don't recall, but I just mentioned a moment ago I did not directly communicate with Yulu Gu.

Q Do you know whether she was on any e-mails that you copied Yulu Gu on?

A Yulu Gu may have been CCed on some of the e-mails. I don't recall.

Q Now, with respect to the pricing information

in Number 6, Doctor, did you bring any pricing information with you to this deposition that you considered in forming your opinions?

MS. WEINER: Objection to the extent that Dr. Dubé did not bring with him all of the materials that were provided in response to the request for production, but those are certainly -- and there are responses to each of these that you did not provide in Exhibit 1.

THE WITNESS: I have, as I indicated earlier, I have with me a physical copy of my report, and in the report, there is discussion about pricing information I relied on.

MR. DONOVAN: Q Did you bring with you all product labels and containers that you considered in forming your opinions in the report in this action?

MS. WEINER: Asked and answered.

THE WITNESS: I have my report with me, so any information, including images related to labels, that's in my report I have with me. There's, of course, other information that was in the backup that I provided, but I have not brought my back-up materials or at least I don't have physical copies of my back-up materials.

MR. DONOVAN: Q In your staff meeting that you testified earlier about to prepare for this deposition, did you make notes?
A Could you, could you clarify what you mean by notes?
Q Did you write something down on paper or computer that -- during the meeting the staff made to prepare for this deposition?
A I might have written stuff on paper.
Q Why did you do that?
A I'm a tactile learner.
Q And those notes, did you rely on them to prepare for this deposition?
MS. WEINER: Objection, --
THE WITNESS: I did not.
MS. WEINER: -- form. You can answer.
THE WITNESS: I did not.
MR. DONOVAN: Q Do you recall what the notes say?
MS. WEINER: Objection. I'm not sure where you're going, but if he just said he didn't rely on them for this testimony, then there's no basis to discover his mental impressions.
MR. DONOVAN: So you're directing him not to

answer?

MS. WEINER: Do you want to provide a basis why you're entitled to his mental impressions that he didn't rely on in preparing for -- in providing testimony today?

MR. DONOVAN: Q Did you bring those notes with you to this deposition, sir?

A I do not have notes with me at this deposition. The document that I brought with me today is a physical copy of my report. That's the only thing I brought with me today.

Q You say you're a tactile learner.

What does that mean?

A It means when I read documents, I sometimes write things down as I read. It helps me keep focused.

Q Okay. Sir, before we proceed, if there comes a -- I apologize. If there comes a point in time you need to take a break, as long as there's not a question pending, just let me know, Doctor, okay?

A Okay.

Q I want -- and where are you physically now?

A I'm in Winnetka, Illinois.

Q Are you at a business office or a residence?

A I'm in my home office.
Q I've sent, I've sent you another document. Please upload that. Let me know when you've done so.
A May I close the deposition notice or would you like me to keep it open?
Q Yeah, you can close that, please. Thank you.
(Whereupon, Exhibit JPD 2, remotely introduced and provided electronically to the Court Reporter.)
THE WITNESS: Okay.
MR. DONOVAN: Q I show you JP 2 -- I'm sorry JPD 2.
Have you ever seen that document before?
A If you will give me one moment, I'll quickly review to verify. Yes, I have seen this document before.
Q Can you tell me what you understand it to be?
A It's a request --
MS. WEINER: Objection, form.
THE WITNESS: It's a request for materials.
MR. DONOVAN: Q Did you respond to this document request, sir?
MS. WEINER: Objection, form.
THE WITNESS: Could you clarify your -- what you

mean by respond?

MR. DONOVAN: Q Did you -- well, when was the first time you remember reviewing JPD 2?

A It would have been last fall shortly after the submission of my report.

Q And in reviewing this report, did you respond to the document request?

MS. WEINER: Objection, form.

THE WITNESS: My understanding was that my team, I directed them to make backups of all documents that I relied on in the forming of my opinions as stated in my draft and that those back-up materials were provided to you, but I did not directly provide them to you. I assume that counsel probably ultimately officially responded to you with those back-up materials. This is why I was clarifying the definition of respond.

MR. DONOVAN: Q Understood. Who on your team was involved in responding?

A I, again, I don't know who actually sent you the back-up materials, but I instructed Tom Stemwedel to have his team assemble all documents considered and to make sure these were included in the back-up materials for you.

Q Is there anything else that you remember with respect to your involvement in responding to JPD 2?

A I'm sorry, is your question did I include anything I didn't consider?

Q No, I didn't say that.

I asked other than what you've testified to in terms of your involvement in responding by contacting Mr. Stemwedel to deliver the materials considered, is there any other involvement in responding to JPD 2, your involvement, that you can remember?

A I'm afraid your question is confusing. I asked -- I told you everything I considered was included in the backups, and then I asked you to clarify whether your new question was whether I included anything I didn't consider, and you said no, so I'm not following what else I could have included other than everything I considered, and I already answered I included everything I considered.

MR. DONOVAN: Okay. I think we got to take a break, if that's okay, for five minutes. We're having a technical issue uploading a document. So maybe take a five-minute break, Melissa, if that's okay?

MS. WEINER: Yep, five minutes.

THE WITNESS: Five minutes, okay. Can I close the other one?

MR. DONOVAN: Yeah, you can close that, sir.

THE VIDEOGRAPHER: Going off video record. The time is now 16:12 UTC.

(Brief recess taken.)

THE VIDEOGRAPHER: Back on the video record. The time is now 16:20 UTC.

MR. DONOVAN: Melissa, I wanted to let you know that we're having a technical issue here. Sometimes our screen goes blank on our side, so hopefully that won't happen again, but I just want to alert you to that. I'm trying to get some technical people to help us.

MS. WEINER: Okay. Just let us know if you need to take a break.

MR. DONOVAN: Yeah, thank you. Thank you, Doctor.

(Whereupon, Exhibit JPD 3, remotely introduced and provided electronically to the Court Reporter.)

MR. DONOVAN: Q So you have, yeah, coming your way JPD 3. Let me know when you have that, sir.

A Okay.
Q Do you have JPD 3 in front of you, sir?
A I do.
Q Have you ever seen that document before?
A I don't recall.
MS. WEINER: Bob, can we pause for one second? Dr. Dubé, can you turn your camera off and back on? You're a little blurry on my end. I don't know, do you guys see that a little blurry as well?
Much better. Sorry, proceed.
MR. DONOVAN: Q Do you recall reviewing written responses to document demands that were served with regard to your report in this case?
A I'm sorry, I'm not understanding. Are you asking me if I've seen this document or is this a different document about which you're asking?
Q I'm asking if you recall receiving or reviewing written responses to document demands that were served with respect to your report in this case, and if JPD 3 refreshes your memory, you can tell me that?
A I don't recall whether or not I've seen JPD 3. I might have, and I just don't remember.
Q You can turn that aside if you'd like,

Doctor.

A Okay.

(Whereupon, Exhibit JPD 4, remotely introduced and provided electronically to the Court Reporter.)

MR. DONOVAN: Q We've now sent JPD 4. Please let me know if you seen that -- if you're seeing that, sir.

A I don't know that I've seen this particular document.

Q Can I ask that question, have you ever seen JPD 4, sir?

A As I, as I indicated, I don't recall seeing this.

Q Do you know who Robert Paul is?

A I do not.

Q Sorry, you do not?

A I do not.

Q Do you recall the first time you started to do work on behalf of the plaintiffs in this case?

A It was sometime last year, but I don't recall the initial date, no.

Q Do you recall the month?

MS. WEINER: Objection, form.

THE WITNESS: Not off the, not off the top of my head, no.

MR. DONOVAN: Q I can tell you that this has been represented, JPD 4, as the Retainer Agreement retaining your services in this case, sir, and that's dated September 18, 2025.

Did you provide any services in this case prior to September 18, 2025?

MS. WEINER: Objection, form.

THE WITNESS: Probably, probably not. It's -- normally I don't provide services until after the contract has been signed.

MR. DONOVAN: Q Now, prior to working for Econic or with or for as a consultant with Econic Partners, what other consulting firms did you work -- well, I'll strike that.

Immediately prior to Econic Partners, were you providing -- strike that.

Prior to September 18, 2025, were you retained in any manner by the plaintiffs or the plaintiffs' lawyers to provide expert services in this case?

MS. WEINER: Objection. Sorry, did you say in this case?

MR. DONOVAN: Q Yes.
A I don't recall any re -- a preliminary -- are you asking me if there was more than one round of retainers?
MR. DONOVAN: Repeat the question, Madam Reporter, please.
(From the record above, the reporter read the following:
"Q Prior to September 18, 2025, were you retained in any manner by the plaintiffs or the plaintiffs' lawyers to provide expert services in this case?")
THE WITNESS: I may have read the Complaint and looked, and looked -- I may have reviewed the Complaint and the facts of the case as per the Complaint prior to this retainer, but I was not re -- I was not retained twice, if that's what you're asking.
MR. DONOVAN: That's not what I'm asking. Please repeat the question, Madam Reporter, again.
(From the record above, the reporter read the following:
"Q Prior to September 18, 2025, were you retained in any manner by the plaintiffs or

the plaintiffs' lawyers to provide expert
services in this case?")
MS. WEINER: Objection, form.
THE WITNESS: I'm sorry, I must be misunderstanding your question because I feel like I've answered this, but --
MR. DONOVAN: Q Well, you may, you may have. The more I read that question, sir, you're right I think. I'll rephrase it.
Prior to September 18, 2025, did you provide services for the plaintiffs or the plaintiffs' counsel with regard to expert services in this case?
MS. WEINER: Asked and answered.
THE WITNESS: The only thing I might have done would have been to review the actual Complaint. I would typically look at a Complaint before agreeing to work on a case, and so I may have spent some time reviewing the Complaint and thinking about the feasibility of an economic damages measure for the particular case in question, so I may have re -- I may have reviewed the Complaint prior to the retainer.
MR. DONOVAN: Q Anything other than that?
MS. WEINER: Objection, asked and answered.

THE WITNESS: I would not have received any materials, like the discovery materials, et cetera, until after I had been retained most likely, so other than reviewing the Complaint, I can't think of anything that I might have done prior to the date of the retainer.

MR. DONOVAN: You can put that aside, sir, if you'd like.

(Whereupon, Exhibit JPD 5, remotely introduced and provided electronically to the Court Reporter.)

THE WITNESS: JPD 5 is open.

MR. DONOVAN: Q Okay. Have you ever seen that document before?

A I would not have seen this particular document, no.

Q This has been represented to be an invoice from Econic Partners for the services rendered in this case.

A Okay.

Q Do you review customarily the invoices that you -- that are issued in matters that you're retained as an expert?

A I do not.

Q This invoice has Bates stamp 7, sir, DUBE 7.
It says total, $29,497.50. Do you see that?
A Sorry, where -- I'm sorry, where is this Bates stamp? Oh, there, okay, you're referring to the page, Page 3.
MR. DONOVAN: Q Page 3. Sorry about that.
A I do see that, yes.
Q Okay.
A Okay.
Q Do I understand you to mean that the, that the 20 -- you would get 20 percent of that if -- once paid, you're entitled to 20 percent?
A I don't think I get 20 percent of that total, but I -- actually, that's a good question. I don't know the answer about what's included and excluded --
Q You get a percentage --
A -- for the 20 percent.
Q Sorry, sorry to interrupt.
But you do get a percentage of that charge, correct?
A I don't know if I'm eligible for a percentage of the total charge that you're referring to.
Q So when you said you get 20 percent, what did you mean?

A I'm -- I get 20 percent of staff billings, but there may be certain staff billings that don't qualify. So, for example, a partner, I don't know if I actually get staff billings for a partner.

It would be -- my understanding, my recollection, but I would have to go review this because, to be honest, I haven't thought about this for a while, is that it's more for the team members that are billed, so that would be, according to this, would be Ryan and Yulu, but I may be mistaken. I honestly just don't recall.

Q If Ryan and Yulu are staff members, you get 20 percent of whatever portion of the fee is for those services?

MS. WEINER: Objection, form, asked and answered. He said he doesn't know.

THE WITNESS: I don't recall which portion I get, but if it does include Ryan and Yulu, then yes, I would get 20 percent of about 15,000, which would be like $3,000.

MR. DONOVAN: You could put that aside, Doctor, please.

THE WITNESS: Okay.

MR. DONOVAN: If you'd like.

MR. VISCONI: Uploading a new document now.
THE WITNESS: Okay.
(Whereupon, Exhibit JPD 5a, remotely introduced and provided electronically to the Court Reporter.)
THE WITNESS: 5a is now open.
MR. DONOVAN: Q Sir?
A I'm sorry, do you have a question?
Q Yeah. I asked you can you tell me what JPD 5a is, please?
MS. WEINER: Objection, form.
THE WITNESS: I have not seen this document before. Are you asking me to form a guess?
MR. DONOVAN: Q No, I'm not asking you to form a guess. I'm asking you to answer the question.
Do you know what this JPD 5a represents?
MS. WEINER: Objection, form.
THE WITNESS: I'm sorry, I don't -- like I said, I have not seen this document before, so if you, if you would like me to look at it and tell you what I'm, what I'm guessing or estimating it is, I can do that.
MR. DONOVAN: Q I can tell you it's been represented to be an invoice for the services

rendered in this case by you and others.
A I'm sorry, where have I represented this?
Q I didn't say you represented it. Counsel represented it. They produced it yesterday.
A I'm sorry, in your previous statement, you said by you and others, which --
Q Okay.
A -- would suggest that I represented something, and I want to make sure that we're not misrepresenting my opinions.
Q Understood. I stand corrected. If I said that, I apologize. I'm just representing it to you that, I'm trying to move matters along, sir, that this has been represented to be an invoice for services with regard to your --
A Okay.
Q Okay? And is this the first time you remember seeing JPD 5a?
A Your question is confusing. I have indicated I've never seen this before, so when you ask me is this the first time, I'm wondering if I'm misunderstanding your question.
Q Do you understand the question?
Is this the first time you saw JPD 5a?

A Could you clarify how this question hasn't been answered if I say I haven't seen this before?

Q I stand corrected again. I thought you said I don't remember seeing it. There's a difference if that was your testimony.

Okay. Could you go to, please, the second page, 7499.

A Okay.

Q It says computer charge, $3,971.63.

Do you know what that's for?

A I do not.

Q Does Econic Partners allow the sharing of computer systems with others outside of Econic Partners?

MS. WEINER: Objection, form.

THE WITNESS: I don't, I don't actually even know what that question means, and I don't know what their computer policy is. I do not have an Econic computer.

MR. DONOVAN: Q If you go to Page 4 of JPD 5a, sir, it's at 7 -- Bates stamp 7501.

A Okay.

Q Under Sophie Yang, November 14, 2025, it says: Finalize report; fact check; reviewed MCU

list. Do you see that?
A I do.
Q What is an MCU list?
A I don't actually know.
Q If you go to Page 6, sir, please. It's Bates stamped 7503.
A Okay.
Q Under Yulu Gu November 3, 2025, it says: Checking MC; purchasing missing materials. Do you see that?
A I do.
Q Do you know what checking MC means?
A I do not.
Q Do you know what missing materials were being purchased?
A I do not.
Q And on November 9, 2025, Yulu Gu says: Comparing updated IRI list. Do you see that?
A I do.
Q Do you know what that means?
A I mean, I can, I can formulate a guess.
Q I don't want a guess, I want knowledge, what you know.
A Well, as I indicated, I've never -- I don't

believe I've seen this document before, so no, I don't know what these elements are.

Q And then November 11th, 2025 from Yulu Gu states, quote, "updated Table 1, comma, Table 2, comma, and added Appendix H, comma, modified Appendix G2 and G -- I'm sorry, G1 and G2 in the report; cite checking review; standardizing MC." Do you see that?

A I do.

Q Do you know what that refers to?

A Which portion?

Q We'll go updated Table 1, Table 2, and added Appendix H.

A I presume at that time I had requested some modification to Table 1 and Table 2 and that I likely requested the addition of materials put into an appendix, which I labeled as H.

Q That modified Appendix G1 and G2 in the report, what does that mean?

MS. WEINER: Objection, form.

THE WITNESS: It would appear to indicate that Appendices G1 and G2 in my report were modified.

MR. DONOVAN: Q Do you remember why?

A I do not.

Q Standardizing MC, what does that mean, do you

know?

MS. WEINER: Objection, form.

THE WITNESS: I do not.

MR. DONOVAN: Q November 13, 2025 refers to MC list.

Do you know what that means?

MS. WEINER: Objection, form.

THE WITNESS: I do not. Sorry. I do not.

MR. DONOVAN: Q So if you go to the last page of this exhibit, JPD 5a, it has $343,976.63. Do you see that as total due?

A I do.

Q Depending on whose -- a staff member you provide in here, you're entitled to 20 percent of those billings, is that fair to say?

MS. WEINER: Objection, form.

THE WITNESS: That is incorrect.

MR. DONOVAN: Q Okay. Any work in JPD 5a that you would be entitled to 20 percent of?

MS. WEINER: Objection, form.

THE WITNESS: Some portion.

MR. DONOVAN: Q As you sit here right now, you don't know what the portion is, is that correct to say?

A It would be -- whatever it would be it would be considerably less than the total due, that I can tell you.

Q Why?

A Because the list of expenses includes my billable hours, and I don't take a percentage of my own work.

Q Any other reason it would be considerably less?

A That there may be other billable hours on this for which I'm not eligible, such as my partners. I would need to go back to Econic and have them remind me which portions I'm eligible -- for which portions I'm eligible to a percentage.

MR. DONOVAN. You can put that aside if you'd like, sir, please.

MR. VISCONI: I'm uploading a new document.

(Whereupon, Exhibit JPD 5b, remotely introduced and provided electronically to the Court Reporter.)

THE WITNESS: Okay.

MR. DONOVAN: Q Do you have that in front of you, sir, JPD 5b, sir?

A I do.

Q Have you ever seen this document before?
A I don't believe so.
Q I can tell you it's been represented to us through counsel that this is an invoice issued by Econic Partners for services rendered in this case.
If you could turn to Page 5, Bates stamped 7509, sir.
A Got it.
Q On the entry October 23, 2025, it says: Assisted with drafting -- by Sophie Yang. Assisted with drafting report, data analysis, call with experts, supervised data analysis. Do you see that?
A I do.
Q Do you know what call with experts means?
A I do not.
Q Well, did Econic Partners or you consult with any other experts in connection with providing the opinion in this case?
A Not to the -- not to my knowledge. They were certainly not instructed to reach out to any other experts.
Q There's two other experts that point to some profit in this case, a Dr. Meyers and a Dr. Cronin.

Have you ever had any communications with Dr. Meyers in connection with this case?

A I was not even aware such a person was involved in the case, but no, I have not.

Q Do you know if anybody at Econic Partners has communicated with Dr. Meyers?

MS. WEINER: Objection, form.

THE WITNESS: It was never represented to me that he was contacted -- or he or she.

MR. DONOVAN: Q Did you ever have any communication with Dr. Cronin with respect to this matter?

A Once again, I was not aware that somebody named Dr. Cronin was involved in this matter, but no, I did not have any communication with a Dr. Cronin.

Q Do you know if anybody at Econic Partners had any communication with Dr. Cronin?

A As I indicated before, I did not instruct Econic to speak to any other so-called experts besides with me, and they certainly never represented it to me that they had, so to the best of my knowledge, the answer is no, Econic did not, but -- or at least I'm not aware of it if they did.

Q So this bill, JPD 5b, correct me if I'm

wrong, I'm looking at the last page, 751 -- 11. That's the Bates stamp.

A Okay.

Q It says current period, 156,382 -- well, strike -- well, I'll say it again.

The amount is $156,382.85. Do you see that?

A I do.

Q Okay. And it's fair to say that depending on the amount of work done by staff here, you would be entitled to 20 percent of some number based on the work set forth in JPD 5b?

A I believe that is true.

MS. WEINER: Object to form.

MR. DONOVAN: You can set that aside, sir.

THE WITNESS: Okay.

MR. VISCONI: I'm uploading another document, JPD 6.

(Whereupon, Exhibit JPD 6, remotely introduced and provided electronically to the Court Reporter.)

THE WITNESS: Okay.

MR. DONOVAN: Q This is JPD 6, sir.

Sir, sorry, what is JPD 6?

A It would appear to be my report.

Q And you testified that you brought a report with you, correct, to this deposition?
A I have a physical copy in front of me, yes.
Q Okay. I'm going to ask you to physically mark that as JPD 6a, okay?
A Shall I do it right now?
Q Sure. Can you put it on -- you can put it, you know, in handwriting because we're going to be marking that and using that for this deposition at some point more than likely, but it's an -- but for our purposes, we'll look at JPD 6, okay?
A Okay.
Q Go to Paragraph 11, sir.
A Okay.
Q There's a reference there, it starts off with, "in particular, plaintiffs claim that AriZona products -- it represents that its products" in Footnote 2. Do you see that?
A I do.
Q And then it says: 16 iced tea and juice drinks sold by AriZona, and then you define that as class products. Do you see that?
A I do.
Q Footnote 2 says: I understand the class

products consist of 56 UPCs, which are listed in Appendix H. Do you see that?

A I do.

Q What is a UPC?

A That is -- the term "UPC" is an acronym. It stands for Universal Product Code, and the UPC is usually associated with the bar code. It uniquely identifies a product.

Q What is -- have you ever heard of a SKU, S-K-U?

A I have.

Q And what is that?

A It is also an identifier of a product.

Q Is there a difference between a SKU and a UPC?

A There can be.

Q Do you know if there's one in this case?

A I don't recall off the top of my head.

Q Have you ever done a report concerning products based upon UPCs?

MS. WEINER: Objection, form.

THE WITNESS: I'm afraid I don't understand your question.

MR. DONOVAN: Q Well, Footnote 2 says: I

understand the class products consist of 56 UPCs.
You wrote that, right?
A I did.
Q Well, what does that mean?
A It means my understanding is that the class products consist of 56, 56 distinct products each uniquely identified by its UPC, and that there's -- the list of them is provided in Appendix H.
Q My question to you, have you ever provided a report where the class products consisted of UPCs?
MS. WEINER: Objection, form. It's not what his report says.
THE WITNESS: I mean, I'm afraid I don't understand what it means for a product to consist of a UPC.
MR. DONOVAN: Q Okay. Do you know why these 56 UPCs were selected?
A My understanding is these are the at-issue products.
Q Any other reason?
A You mean other than being challenged products in this case?
Q Yes.
A I'm confused. These are the class products,

so these are the products that are at issue. Are you asking me if there's any products in here that are not at issue, and, therefore, would not be a class product?

Q No, I'm asking you -- I'll go back.

A Okay.

Q Doctor -- editorialize. Things would move along a little quicker if you stopped fencing.

Do you know why these 56 UPCs were selected?

MS. WEINER: Asked and answered.

THE WITNESS: My understanding is the 56 UPCs indicate the products that are at issue in this matter.

MR. DONOVAN: Q I asked you any other reason?

MS. WEINER: Asked and answered.

THE WITNESS: I'm afraid your question is -- doesn't make sense. Are you asking me if these -- if they are not class products, therefore, not at issue?

MR. DONOVAN: Q No. I'm asking you is there any other reason other than what you've testified to as to why these 56 UPCs were selected?

A I'm afraid I don't understand your question. You're asking me if there could be a reason why something would be at issue other than it being at

issue in this case? I don't understand.

Q I'm not asking you that, sir. You're evading the question.

Do you know who selected these 56 UPCs?

A I do not know who selected them. It was represented to me these are the 56 challenged products in this matter.

Q Represented by whom?

A By counsel.

Q Do you know when these 56 UPCs were selected?

MS. WEINER: Objection, form.

THE WITNESS: I was made aware of them once I started working on the case.

MR. DONOVAN: Q And when did you start working on the case?

MS. WEINER: Asked and answered.

THE WITNESS: I believe I answered that I don't recall exactly when last year.

MR. DONOVAN: You can leave -- don't discard, please, JPD 6, please.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Uploading JPD 7.

(Whereupon, Exhibit JPD 7, remotely introduced and provided electronically to

the Court Reporter.)

THE WITNESS: Okay.

MR. DONOVAN: Q This is -- document is I can represent to you attached filed with the class certification motion. It attaches Exhibit 3, counsel certification.

Have you ever seen JPD 7 before?

A I don't recall it, no.

Q These are what has been defined as -- or rather has been referred to as the 56 UPCs and the class products in the case, and you could crosscheck if you'd like, and tell me if the UPC codes -- well, strike that.

These have, these have been represented as to being the same UPC codes that are referenced in your report, and these have the flavor and product size there, do you see that in JPD 7, sir?

MS. WEINER: Objection, form.

THE WITNESS: I'm looking at the doc -- at the exhibit, yes.

MR. DONOVAN: Q Do you know whether anybody at Econic Partners had any involvement in generating Exhibit 3 -- rather, strike that, JPD 7?

MS. WEINER: Objection, form.

THE WITNESS: I don't know the provenance of this, of this file, so I don't know who created it.

MR. DONOVAN: Q And you'll see under the class product flavor on Exhibit 3, sir, do you see that -- I'm sorry, on JPD 7?

A I'm sorry, what is it you wish me to see?

Q Under class product flavor, do you see that?

A I do.

Q Do you know why these flavors were chosen as being the class products?

MS. WEINER: Objection, form.

THE WITNESS: Well, my understanding, since I didn't come up with this list, is that these were the products that are at issue in the case.

MR. DONOVAN: Q Did you have any involvement in choosing the product flavors reflected in JPD 7?

A I did not.

Q Now, product size under JPD 7, do you see that?

A I do.

Q Do you, do you know why these product sizes were selected as being the class products?

MS. WEINER: Objection, --

THE WITNESS: I do not.

MS. WEINER: -- form.
THE WITNESS: I do not.
MR. DONOVAN: Q And then under type, still looking at JPD 7, can, bottle, do you know why those particular types of containers were chosen?
MS. WEINER: Objection, form.
THE WITNESS: Besides being allegedly at issue, I do not.
MR. DONOVAN: Q Have you ever been involved in any other case involving a claim that a beverage contains a preservative?
A I don't recall specifically being in a case over a preservative claim with regards to a beverage.
Q Does JPD 6 comprise all your opinions and conclusions in this case?
A I'm sorry, JPD 6 is my report?
Q Right.
A JPD 6 summarizes all of my opinions in this case to date.
Q Do you recall whether in this case there were efforts to -- well, put it this way.
Did you seek to obtain information necessary to form your opinions that you did not receive?
MS. WEINER: Objection, form.

THE WITNESS: I'm sorry, I lost track of your question there.

MR. DONOVAN: Q I'll explain then.

Is there information that you sought to form your opinions that you did not receive?

MS. WEINER: Objection, form.

THE WITNESS: I can't recall off the top of my head. I may have requested specific kinds of documents, and these may not have existed or -- I just don't recall.

MR. DONOVAN: Q Paragraph 12, please. We're on JPD 6.

A Okay.

Q And looking at -- really, you can read, you can read 12-A and B to yourself, but you wrote about the relevant time period for the California class spans January 1, 2017 to January 1, 2023. Do you see that?

A I do.

Q Why did you choose or why was that chosen as --

MS. WEINER: Objection, form.

THE WITNESS: Sorry. As explained in my report, Paragraph A -- 12-A, I understand from counsel that

the relevant time period for the California class spans January 1st, 2017 to January 1st, 2023.

MR. DONOVAN: Q The -- well, do you know why that was chosen as the period for the California class?

A I do not.

Q And with respect to the New York class, January 1, 2019 to January 1, 2023, do you see that?

A I do.

Q Do you know why that period was selected?

A As I wrote in my report --

MS. WEINER: Objection, form.

THE WITNESS: -- in 12-B, I understand from counsel that the relevant time period for the New York class spans January 1, 2019 to January 1, 2023.

MR. DONOVAN: Q Were you involved in deciding that period of time?

A I was not.

Q Do you know why that period of time was chosen?

MS. WEINER: Objection, form.

THE WITNESS: I do not.

MR. DONOVAN: Q Would you please go to Assignment that's under Subparagraph C, Paragraph 14,

please?

A I'm sorry, I don't -- what's assignment?

Q It's your heading. It says Assignment, Paragraph C on Page 5.

A Oh, within the report, I'm sorry. I thought you were directing me to a new document.

Q No.

A Okay.

Q You say here you were asked to analyze certain issues. Do you see that?

A I do.

Q What issues were you asked to analyzed?

A As I write in Paragraph 14, in particular, I have been asked to offer an opinion as to whether economic damages can be calculated on a class-wide basis using a methodology that uses common evidence and analysis.

Q Any other issues you were asked to analyze?

A I elaborate in Paragraph 15. I tell you what I don't do, but I don't clarify. My proposed analysis presumes that the no preservatives claim is false and misleading to a reasonable consumer, as plaintiffs allege, and I will attempt to -- I'm sorry, I inserted the "I". That was not in the

paragraph. And will attempt to isolate the effect of such a claim on the demand and price of the class products.

Q What other issues were you asked to analyze?

A These were the two issues, as I've explained in my report.

Q Did you perform such an analysis?

MS. WEINER: Objection, form.

THE WITNESS: As I indicate in my report, I'll have to find the place where, I have not yet conducted the damages calculations, but when counsel informs me that the class has been certified or whatever time they tell me to -- they give me the green light, I will go ahead and conduct the proposed analysis.

MR. DONOVAN: Q What analysis have you performed?

MS. WEINER: Objection, form.

THE WITNESS: Well, if we go later -- if we go to later in the report, if you give me one moment here, I'll direct you to the appropriate spot. So if you go to -- what section is this?

Par -- starting Paragraph 47, the section Determination of Product Features: Analysis of

Point-of-Sale Data, in this section, I outline the analysis of the IRI Circana data.

This was an analysis that was done. I directed this to the support team at Econic, and under my direction, the team then analyzed the data to summarize the data, and then eventually, these data and these analyses were used in the subsequent section, which is Section C, starting Paragraph 59, where I talk about the features that I will include in the survey once I program it up.

MR. DONOVAN: Q Are you done with your answer, sir?

A I am.

Q If you go back to 14.

A Okay.

Q You refer to economic damages. Do you see that?

A Sorry, could you repeat, where am I looking?

Q 14, second sentence. Paragraph 14, sorry. Did I say page?

A Okay. Okay.

Q Do you see economic damages there?

A I do.

Q What do you, what do you mean by that?

A I mean the economic damages that class members would have exper -- would have experienced, under the assumption that the challenged claims were misleading or false on the labels of the challenged products.

Q And how do you define economic damages in this case?

MS. WEINER: Objection, form.

THE WITNESS: I mean, as I've actually demonstrate -- as I actually talk about the dollar harm to the consumers, this is -- you know, think of economic damages as a rec -- compensation to consumers to compensate them for the harms that they experienced as a result of being misled.

MR. DONOVAN: Q Later on you say common evidence. Do you see that?

A I do.

Q What do you mean by that?

A I mean by the data, the data and the analytics that will support my calculations of damages that are common across class members.

Q Are you aware of whether there's any such common evidence?

MS. WEINER: Objection, form.

THE WITNESS: At this stage, I've been asked to prefer a method that I believe I am confident is feasible, but I have not yet implemented the method or calculated the damages, and so at this time I don't have an opinion about the magnitude of those damages.

MR. DONOVAN: Q I didn't ask you about the magnitude of the damages, I asked you whether you knew whether there's common evidence that can prove that?

A Sorry, I'm not going to be creating -- I'm not going to be forming an opinion about whether or not people are misled, if that's what you're asking me, but I will -- I have in here offered a method to calculate the common damages across class members, and it describes the evidence base I would rely on to do this calculation.

Q All right. You used the term "common evidence" in your report.

What evidence are you referring to in your report that's common?

A Well, the data that I intend to collect. For example, the Conjoint Survey Analysis and the analysis of the conjoint survey data, and then

eventually the market simulation.

Q Anything else you can identify as common evidence?

A The common evidence will be the damages that I calculate.

Q Have you calculated those damages?

MS. WEINER: Asked and answered.

THE WITNESS: I'm sorry, pardon me? I did not hear --

MR. DONOVAN: Q Have you calculated the damages?

A No. As I indicate in Paragraph 14, I've been asked to form an opinion as to whether damages can be calculated. I have not yet done those calculations, but I'm ready to do so once counsel gives me the green light.

Q How do you know the damages you calculate would constitute common evidence?

MS. WEINER: Objection, form.

THE WITNESS: Well, I can give you an example.

MR. DONOVAN: Q Sure.

A If, in fact, it is determined by the Courts that class members were misled and that defendants, for example, inflated their prices based on this

misleading allegation, the claims that are issue on the labels, then every class member would have overpaid.

The price they paid is higher than the price that would have prevailed in a fully-functioning market but for those challenged claims, which means everybody who bought the product experienced the same price premium on said product.

Q How do you determine whether or not there's a price premium associated with this product or these products?

A I'm sorry, since I think I answered this question already, I'm going to claim that your question is a little confusing, but I'll just repeat Paragraph 14, I have been asked to offer an opinion as to whether economic damages can be calculated on a class-wide basis, and my report goes into detail on the methodology, which includes the data I would collect and the equations that I would use to implement the analysis and calculate those damages, but I think I've already indicated that I have not yet calculated these damages or done that analysis, but I'm ready to do so when counsel gives me the green light.

Q Have you done an actual conjoint survey in this case?

MS. WEINER: Objection, form.

THE WITNESS: Once again, I've been asked to offer an opinion as to whether economic damages can be calculated on a class-wide basis. Since the survey is a component of this cal -- of this methodology for calculating damages, then it follows that I have not yet implemented the method, I have proposed a method.

Having said that, I'm ready to go. When I get the green light, I will do the survey. I will, I will have it programmed up, I will field it and collect the data and do the analysis.

MR. DONOVAN: Q Have you done an analysis of any survey data?

MS. WEINER: Objection, form.

THE WITNESS: I would have to take a moment to rethink through the internal documents that I reviewed that were provided by defendants through discovery, but I believe that several of the documents that were provided to you in the back-up materials, and some of them may or may not be cited in my report, did have opinions that were based on

surveys that were conducted by defendants and/or their trade partners.

MR. DONOVAN: Q Have you done any market simulation in connection with your report?

MS. WEINER: Objection, form.

THE WITNESS: So just to repeat, at this time I've been asked to offer an opinion as to whether economic damages can be calculated on a class-wide basis, and I've sketched out all the equations and data needed to perform that market simulation, but at this time I have not been asked to do these calculations or collect those data. I'm ready to do so as soon as counsel gives me the green light.

MR. DONOVAN: Q And what is a market simulation?

A This would be an analysis of the -- of a competitive marketplace between defendants and their key competitors to determine pricing and how the prices emerge from that marketplace.

Q How would you define a key competitor?

A Their closest substitutes.

Q Closest substitutes with regard to what?

A To their products.

Q Go to Paragraph 21, please.

A Okay.
Q It starts with "my analysis is ongoing"?
A That's correct.
Q What analysis is ongoing?
A Well, presumably, I may be jumping to a conclusion here, but usually in a matter like this, defendants will provide responses to my opinions, and at that time I would review those responses, and in some instances, the responses may or may not warrant additional analysis.
Q Is there any, anything else you're referencing with regard to your analysis being ongoing?
A I'm not conducting any analysis at this time, if that's what you're asking.
Q Why are you reserving the right to modify your analysis in light of new materials?
A Sorry, I thought I just answered that, but the -- my expectation, and I apologize if I'm jumping the gun or assuming too much, but usually in a matter like this, defendants provide rebuttals and counter opinions to the ones that I express in my report, and I'm reserving the right to review the opposing opinions, and potentially should there be sufficient

evidence to counter one of my opinions, I would reserve the right to potentially modify my opinion accordingly.

Q Go to Paragraph 22, please, sir.

A Okay.

Q The first sentence refers to your principal conclusion in this matter is that it's -- it is feasible to calculate class-wide economic damages using a common methodology. Do you see that?

A I do.

Q What do you mean by feasible?

A Are you asking me for the dictionary definition of the word "feasible"?

Q No. I'm asking what you meant by it?

MS. WEINER: Objection, form.

THE WITNESS: So this -- you'll forgive me here, this seems a little, seems a little -- I feel like there's a hidden question here. I've proposed a method in my report, and my key conclusion is that the method is feasible. Are you asking me for -- to provide a synonym?

MR. DONOVAN: Q Yes, provide what you understand feasible to mean.

MS. WEINER: Objection, form.

THE WITNESS: Doable.

MR. DONOVAN: Q Common methodology, what does that mean?

A Would you like me to repeat my explanation of the price premium?

Q Well, I'm asking you -- you can answer it any way you want.

A Sure.

Q Truthful.

A Well, of course, but it seems like we -- you already asked me about this same point, but I'm happy to repeat it.

The example I gave earlier was that under the assumption that the challenged claims are deemed by the Courts to be false or misleading and that defendants as a result were able to inflate their prices, i.e., charge a price premium because of these challenged claims, these misleading claims, then the price premium damages, the surcharge, would be experienced by everybody who bought the products, that if the prices would have been lower, but for the challenged claims, then every class member experienced a common damage, which is the incremental price due to the challenged claim.

Q Correct me if I'm wrong, okay?

To a great degree, to a great degree, I'm not saying exclusively, just to a great degree, your analysis in this report is based on IRI data, would that be fair to say?

MS. WEINER: Objection, --

THE WITNESS: It would not.

MS. WEINER: -- form.

THE WITNESS: It would not.

MR. DONOVAN: Q Do you rely on IRI data in connection with this report?

A I rely to in my opinions about the features that I propose to test and include in my conjoint analysis, I rely on the IRI data, yes.

Q And you're familiar with IRI data, you've seen it in other cases, I suppose, correct?

MS. WEINER: Objection, form.

THE WITNESS: I've used IRI data in my research as well.

MR. DONOVAN: Q And the IRI data in this case, correct me if I'm wrong, concerns the -- or provides information about sales on a retail level, right?

MS. WEINER: Objection, form.

THE WITNESS: Sometimes these data refer to as

point of sale data.

MR. DONOVAN: Q So is it retail level?

A It is.

Q So please explain to me why. Well, I'll ask you another question.

So in that, in that instance on the point of sale, that's a, that's a information about sales to consumers by retail stores, right?

A Sorry, I didn't -- right, but I don't know what the question is.

Q Okay. So with respect to the IRI data, -- I lost your camera, okay?

A I was just making it clearer then for you.

Q That reflects sales on a retail level to consumers, right?

MS. WEINER: Asked and answered.

THE WITNESS: The IRI data collected at the point of sale, yes.

MR. DONOVAN: Q So do you know whether they reflect sales by the defendants to their customers?

MS. WEINER: Objection, form.

THE WITNESS: In principle, unless there's a black market, which I'm not aware of in this category, but they can exist in other categories,

unless there's a black market, the retailers would typically obtain the merchandise they sell at the point of sale from the manufacturers or from the manufacturers' distributors.

MR. DONOVAN: Q Do you know what the price is that the defendants sell to their distributors?

A I do not, but it's not necessary for the price premium calculation.

Q Why?

A Because I can calculate the incremental price using shelf data from the stores, and this would be the same incremental price that would have been charged to manufacturers.

Q What do you mean same incremental price charged to manufacturers?

A It's just a matter of math, but it's a fairly straightforward calculation to show that since retail prices are generally the wholesale price with an additional markup, that the price premium damages that I've proposed to calculate in my appendix using retail data would be the same price premium at the wholesale level. I don't provide that equation, but I'd be happy to do so if that's requested.

Q Do you agree that just generally speaking

that the retailers control what the price is they charge their customers?

MS. WEINER: Objection, form.

THE WITNESS: Only partially. Remember, retailers have to acquire the merchandise from the manufacturer, and therefore, retail prices need to cover the wholesale price, which is the retailer's costs, so it follows that the wholesale price does steer in part the final end user price, the shelf price, so I don't agree that the price is entirely determined by the retailer.

MR. DONOVAN: Q And do you know what in this case what the retailers paid defendants for the products?

A I don't, I don't, and it's not necessary for me to calculate the appropriate price premium.

Q Why not?

A I believe I answered that question already. It's a matter of math. It's very easy to show that the equations that I provided in the appendix to calculate the price premium in this case would be exactly the same. If we want to formally include the role of the wholesale price, it works out to exactly the same math. I didn't provide all these equations

at this time, but it would be no problem for me to do so if that's requested.

Q Why didn't you do that?

A Well, at this time it's purely necessary for me to demonstrate that it's feasible to calculate price premium damages, and the equations I've provided do compute those price premium damages, and you're asking me could you also prove that that same equation would be the same price premium experienced upstream at the wholesale level, and my answer is yes.

So the equation I've provided is correct. It does calculate price premium damages and would be the same equation to calculate the price -- the incremental wholesale price, if you will, associated with the challenged claims even though I'm going to implement it with retail prices. That's just a matter of math.

Q So when -- at the retail level, the consumer -- and correct me if I'm wrong, I know, you know, maybe I'm being over simplistic, but on a retail level, someone goes into a store and buys the product, they pay the retailer, right?

MS. WEINER: Objection, form.

THE WITNESS: I mean, assuming they don't steal the product, yes.

MR. DONOVAN: Q And they pay whatever the retailer charged, right?

A Right.

Q So why should the defendants be responsible for whatever price the retailer has charged?

A They're not. As I've already indicated in my earlier response, the equation provided in the appendix would exact -- be exactly the same to determine the price premium at the wholesale level. This is a matter of math.

And just to clarify, this is exactly why merger cases in antitrust between manufacturers of CPG companies are frequently litigated on the basis of IRI-type data. It's exactly the same problem. We have the retail data, but we're interested in the merger between two manufacturers.

It's very standard to use retail data to understand pricing decisions made upstream by manufacturers. This is not something uncommon at all. There's well-established economic literature for doing this.

Q So where in your report do you deal with this

wholesale price premium?

A So I'm pretty sure I've already answered that. I've told -- I've already answered that it is straightforward to show. I'd be happy to demonstrate it if this is something that's requested, but at this time, I simply included the equation for the price premium.

That equation is correct, but it's -- what's straightforward to demonstrate is that's actually the equation that would determine wholesale -- the wholesale price premium associated with the challenged claims, same way we can do merger analysis between say Coke and Pepsi using point-of-sale data collected at retail.

Q What data would you need to calculate the wholesale price premium?

A As in the, as in the antitrust literature, we would be using retail data, but as a matter of math, it is quite straightforward and well established in the peer-reviewed academic literature how to use retail data to reach empirical and quantitative conclusions about manufacturer pricing. This is -- there's an entire literature on this. I've actually published some papers on this.

Q Is that referenced in your report, those papers?

A You have my entire c.v. with all my publications, yes.

Q Go to Paragraph 23, please.

A Okay.

Q Strike that. I'm going to go back to 22, I'm sorry.

You said: The conjoint analysis will control for the marketplace realities of competitors to the class products with different product features and different prices. Do you see that?

A I do.

Q What does that mean, you will control for marketplace realities of competitors?

A That in the -- that means that in the conjoint survey, consumers will be asked to make -- to state their purchase decisions when exposed not only to the defendants' products, but also to their competitors' products, which may be different.

I'm going to allow for product differentiation and even price differences to capture the marketplace reality of shopping in a store where there's typically an assortment of substitutable,

admittedly differentiated, but substitutable products available not necessarily at the same price.

Q The last sentence: Therefore the analysis will control for the supply side of the market.

What does that mean?

A This means that I will not be studying the defendants in isolation. I will be accounting for the fact that there's a market with competition and that I will be allowing for that competition to the substitution to competing products, that is.

Q In Paragraph 23, you say you're going to -- that the results of a conjoint analysis can then be used to compute economic damages in two different ways, do you see that?

A I do.

Q Okay. The price premium method, do you see that?

A I do.

Q What is that?

A That's what I explained earlier. It's a method that uses the conjoint data to learn about demand, and economics in the market simulation to determine the but -- the prices defendants would have charged but for the challenged claims, and that, in

turn, is used to determine the price premium, the incremental price due to the challenged claim.

Q What is the willingness-to-pay method?

A The willingness-to-pay method is described in detail later on in the report, but this is an alternative method that has been proposed by the academic literature in economics that would calculate the exact compensation to the class to make the entire class whole but for the challenged claims. It's like a retrospective payment, if you will, to make people whole.

Q Make people whole for what?

A For not receiving the full benefits of the bargain.

Q And you say here in two different ways.

Is the price premium method and the willingness-to-pay method two alternative ways to compute economic damages that you're proposing?

A Well, both methods --

MS. WEINER: Objection, form, objection, form.

THE WITNESS: Both methods use the conjoint, I mean this is their -- they're common in that regard, they both use the conjoint analysis and the conjoint data, but they're based on different assumptions, and

different Courts have seen things differently about which assumptions are appropriate, so at this time I merely want to demonstrate to the Court that depending on the assumptions they deem to be appropriate, the method I'm proposing would be amenable.

MR. DONOVAN: Q If you computed the economic damages in price premium and computed economic damages in willingness to pay, would they be cumulative damages, or would they be alternative damage models?

MS. WEINER: Objection, form.

THE WITNESS: In my report, I'm representing that these are alternative. The -- if I was to calculate willingness to pay damages, that would actually make the entire class whole, so at the class level, there -- that would fully compensate the class of consumers, the people who bought the challenged products, but some Courts have formed the opinion that from -- this is a legal opinion, and I'm not a legal expert, that class members are only entitled to the surcharge component of damages, and that's what the price premium is, that the part where everybody overpaid if the price was inflated due to the

challenged claims.

So I'm offering both methods. At this time, since my opinion is merely to show that it is feasible to calculate damages, I'm showing that damages can be calculated under either set of assumptions.

MR. DONOVAN: Q Does the willingness-to-pay method peg a value on -- you called this the -- well, strike that.

Does the peg of -- does the willingness-to-pay method peg a value on what was the difference between what was paid and what was received?

MS. WEINER: Objection, form.

THE WITNESS: So it might be useful to go to Section B that starts Paragraph 36 on Page 13 of my report, and there I explain in detail how I would go about calculating the willingness to pay, but in Paragraph 39 specifically, I write: Conceptually, it measures the retrospective total dollar compensation to the entire class of consumers to make them whole for the undelivered benefits associated with the challenged claim they believed they were receiving at the time of purchase.

MR. DONOVAN: Q I think we're going to have to take -- I'll try to make it a quick lunch break because I know we moved this up to 9:00 o'clock, but before we break for a quick lunch break, I have to, I have to -- you know, I'm probably going to get -- well, it's the dreaded hypothetical, Doctor, okay? And I'll -- I'm going to try to make it brief, okay, and obviously with a hypothetical, I'm going to have to ask you to accept, you know, what I'm saying, okay? I have two hypotheticals in my mind, I'll figure out which one it is, okay.

And I know you're going to say, you're going to try and distinguish it or whatever, and you can (indiscernible) you can, but I'm struggling to figure this out.

Let's say you were going to get gasoline, and the gasoline says -- see if I get this analogy right. It says premium gasoline, right, and it's $2 a gallon, and you look across, directly across the street, and regular gas is $3 a gallon, and it turns out when you get the premium that it's not premium, it's regular, okay?

In that instance, are you, are you -- it was misrepresented, you know, but the market value for

regular is higher than what you pay the -- for the premium gas at that station.

In that hypothetical, would there be a price premium that you paid if the value of the product was actually below what the other people in the market charge?

MS. WEINER: Objection, form.

THE WITNESS: It's really -- it's not a very complete hypothetical here. You're asking if a competitor. So this is a different gas station, different direction of traffic, different brand or chain, potentially different payment methods, different cue -- I mean, this is, this is not a very -- this is a lot of, a lot of odd factors in this, not least of which is you're asking me to compare two different competing firms' products, which I haven't really formed an opinion in this matter about price differences between competitors, so I don't know how to answer your hypothetical.

MR. DONOVAN: Q Okay. How about this, how about this one. I figured I'd lie flat on that one. Maybe you'll get this one.

Monet, you know who he is?

A Yes.

Q The arts.
A Thank you.
Q Let's say you go to an auction, and you're going to have to -- just follow this analogy. And you want to buy a Monet, and you spend I'm going to get out $10 million, okay, my hypothetical, but you find out that you didn't buy a Monet, you bought a Picasso, and it's worth $20 million.
Did you pay a premium for the Monet?
MS. WEINER: Objection, form.
THE WITNESS: So I'm not sure what you mean by a premium in your -- my world, in my report, there is a market, and prices are determined by that market. Anytime we use an auction, you've already established that it's not possible for the market to determine a price, and so we completely abandon pricing theory, and we use a price discovery mechanism.
The mechanism is the screening device to try and figure out how to get a demand to reveal itself. I don't even know how to make a parallel here. So this is -- this would require me to form an opinion about auction outcomes in a market with a scarce resource, and this has nothing to do with the market we're interested in in my report where there is lots

of supply available, there's a well-established demand, and to the best of my understanding, the plaintiff -- the defendants at least, if not probably also their competitors, set a price. In an auction, you don't set a price, so I don't know what a premium would mean in your hypothetical.

MR. DONOVAN: Q I didn't say an auction, okay? I just said you bought, you bought a product -- well, it doesn't matter what the product is. Let's assume it's a penny -- it's a widget, and you thought it was -- you were represented that the widget had some value, had some feature that it didn't have, but that widget is priced on average below every other widget in the market.

Assuming it's the same market that is present in this case, if the average price is below the other competitors, why is there a price premium associated with that widget when you didn't, you didn't suffer any difference in value?

MS. WEINER: Objection, form.

THE WITNESS: Sorry, you inserted a statement at the beginning of this long hypothetical, which I'm not even sure I could follow. Your first thing you said, you didn't say it was an auction. I'd like to

clarify that my understanding was your previous hypothetical was an auction. I don't -- I would just like the record to show clearly that my answer was appropriate and that I didn't misrepresent your previous hypothetical. Could we just confirm that you did say I bid in an auction?

MR. DONOVAN: Q Okay. I'll just go back to it wasn't an auction. I'll restate the -- I get the -- you know, whatever it's worth, you know, I get it. Maybe you heard me say auction. I don't think I did.

If it wasn't an auction in my Monet example and you thought you were buying a Monet and you paid $10 times whatever and it turns out to be a Picasso, and in my hypothetical it's worth twice as much, in that hypothetical, did you pay a price premium for the Monet if you got better value?

MS. WEINER: Objection, form.

THE WITNESS: A Monet and a, a Monet and a Picasso, they're not the same thing but for a claim. These are totally different products. There's only one in this situation, which means I can't use the economics that I'm relying on in my report to assess this, and, frankly, the value when you're buying art may not be entirely driven by its price.

I mean, an art investor may be, but somebody might have actually really liked Picasso and hate Monet, and so the resale value is irrelevant, they got harmed because they got a painting from somebody they don't like.

It's really hard to make -- to really make a parallel between your scenarios where the market is not well defined, and there's no standard pricing in the market that I've been tasked with analyzing, which is the one for your, for your client.

MR. DONOVAN: Fair enough. Let's take a break.

THE WITNESS: Okay.

MR. DONOVAN: Try to get back at 1:30.

MR. VISCONI: 12:30 central.

MR. DONOVAN: 12:30.

MS. WEINER: 30 minutes?

THE WITNESS: 30 minutes, okay.

MR. DONOVAN: 30 minutes, yeah, you know. If you got -- listen, if you want more time, do you want to make it 35 minutes?

THE WITNESS: 30 is plenty.

MS. WEINER: 30 is good.

MR. DONOVAN: 30 is good. Thank you.

THE VIDEOGRAPHER: Going off video record. The

time is now 18:03 UTC.
(Brief recess taken.)
THE VIDEOGRAPHER: Back on the video record. The time is now 18:33 UTC.
MR. DONOVAN: Q Okay. Doctor, I just want to go back for a moment to Paragraph 15 of your report, JPD 6.
A Okay.
Q You refer to assumptions in 15. Do you see that?
A I do.
Q Why do you make the assumption that's referenced there?
A Well, I have not been asked in this matter to form an opinion about whether or not the class members were misled or deceived, and so what I've been instead asked to do is to prefer a damages measure to calculate the economic damages associated with the challenged claims in the event that they were misled or deceived.
Q So in order to do your -- in order to attend to your report, you had to assume that the allegations in the Complaint were true?
A Well, there would be no, there would be no

damages if people were not deceived.

Q Are there any other -- and then you refer to a presumption at the last sentence, do you see that there?

A I do.

Q Why did you have to make that presumption?

A I'm sorry, would there -- the statement is in the event that people were damaged, I will calculate damages.

Q I'm looking at the last sentence of 15.

A Yep.

Q My question is why do you make the presumption there? There's a presumption there, right?

MS. WEINER: Objection, form.

THE WITNESS: Sorry, this sounds like the same point as a moment ago. I have not been asked in this case. If you, if you -- the previous statement, I've offered no opinion as to whether the inclusion of citric acid in AriZona's products is inconsistent with the representation on the labels of those products as containing no preservatives, and then it follows here there that I'm merely going to propose a method at this stage to calculate the damages in the

event that people were misled.

So since I'm not forming an opinion about whether or not people were deceived or misled, I'm instead proposing how you would calculate damages in the event that they were.

MR. DONOVAN: Q I understand that, but your last sentence of Paragraph 15 says: Rather, my proposed analysis presumes that the no preservatives claim is false and misleading to a reasonable consumer as plaintiffs allege.

And my question is why did you make that presumption?

A I'm afraid you've lost me. I'm trying to understand what a damages calculation would mean if people were misled.

Q Well, what do you mean by "we'll attempt to isolate the effect of such a claim on the demand and price of the class products"?

A That I will attempt to determine the incremental component of the price that would be due to the challenged claim.

Q Let's revisit -- I think you referenced earlier Paragraph 39 talking about the willingness to pay.

A Okay.
Q And you have a sentence there, the last sentence, it talks about to "make them whole", it's in italics.
A Correct.
Q You put it in italics.
Was that a -- was it a point of emphasis for you or what's the reason why?
A That the point was that if you paid the entire class the willingness-to-pay damages, the class would be fully compensated.
Q And to make them whole for the undelivered benefits associated with the challenged claim, do you see that?
A I do.
Q Okay. Is it fair to say that the class members would include folks who bought the product and consumed it entirely, right?
MS. WEINER: Objection, form.
THE WITNESS: That's people who bought the product.
MR. DONOVAN: Q And it would include people who consumed the product entirely?
A It's people who --

MS. WEINER: Objection, form.

THE WITNESS: It's people who -- anyone who purchased the product.

MR. DONOVAN: Q Right, and that would include people who consumed the product entirely, no?

A I'm sorry, a moment ago it sounded like you were saying only people who would consume the product. It would definitely -- it would include people who consumed the product.

Q Okay. And the persons, the persons who consume the product, I didn't mean to limit it, includes persons who consumed the product entirely, those persons got value from the product?

MS. WEINER: Objection, form.

MR. DONOVAN: Q Separate and apart, separate and apart from the challenged claim, would you agree with that or no?

MS. WEINER: Objection, form.

THE WITNESS: Well that's an empir --

MR. WEINER: JP, let me object. Pause. Objection, form to that question. Now you can answer.

THE WITNESS: Sorry, can you ask the question again, please?

MR. DONOVAN: Q People who consumed the product, they would have gotten the nutritional value of the product, correct?

MS. WEINER: Objection, form.

THE WITNESS: That's an empirical question. It's testable potentially, but at this time I don't have an opinion as to whether or not people get value from other aspects of the product. I haven't collected the data to test that.

MR. DONOVAN: Q So to make them whole, we're back to 39, are you looking to refund them money?

MS. WEINER: Objection, form.

THE WITNESS: This is a retrospective compensation. I would write a check. If you were to write -- if the defendants wrote a check in the amount of willingness to pay for the entire class, then the entire class of consumers would be fully compensated.

They should be indifferent between the as-is world where they, where they, where they got -- where the products were delivered they thought they were getting and the actual -- sorry, the but for world where they -- I'm sorry, I'm confusing myself here.

They should be indifferent between the

scenario where they actually receive what they thought they were getting and then the actual world where it turns out they didn't get entirely what they thought they were getting, but there's this check. That check should be suf -- be exactly calculated to make the class, which is a collection of buyers, indifferent between those two scenarios.

MR. DONOVAN: Q Have you ever heard of the term "line pricing"?

A Sure.

Q What does it mean?

MS. WEINER: Objection, form.

THE WITNESS: It can mean quite a few different things. It's a generic term that's used to mean a number of different potential things.

MR. DONOVAN: Q Like?

A Well, it can involve having a line of products and figuring out how to price the different products in your product line. That would be product line pricing.

Q Any other definition?

A Of product line pricing?

Q Yes.

A Well, product line pricing, typically it's a

term we use, we use to denote what economists would call second-degree price discrimination. This is where you have an assortment of differentiated products, and the purpose of having this assortment of differentiated products is to differentially serve different types of consumers.

So I might have a premium and a basic version of my product, that's the product line, and at the premium level, there's a high-end product, which has a very high price, and at the low end, I might have a low-end product which would have a lower price, but these different qualities of product would be priced differentially, and then consumers would come to the store and look at the menu of products, and they would sell select.

If you design this properly, you would achieve differential pricing serving the low end of your market with the low-end stuff and serving the high end of the market with the high-end stuff. That would be how I would think of product line pricing.

Q If the defendants sold their product at wholesale the same price to the distributors regardless of the labeling, whether or not it contained a no preservative label, could there still

be a price premium associated with those sales?

MS. WEINER: Objection, form.

THE WITNESS: So that wouldn't, that wouldn't be likely in the event that the challenged claim has value. It wouldn't make economic sense for them to degrade the product taking away a feature that has value and then they continue to charge the same price.

They wouldn't be able to get the same demand that they would have had when they initially charged that price. They would have to respond. So like, for example, in somewhere around 2020, my understanding was that the costs were going up, maybe it was since -- it was during inflation.

Costs have gone up for defendants, and at some point, they reduced the can size from 23 ounces to 22 ounces to make it feasible to sustain the manufacturer suggested retail price of 99 cents, although we all can see, as I show in my report, prices other than 99 cents.

So defendants, for example, would have to make other adjustments in order to maintain the line price in that scenario after the product is degraded in some hypothetical way.

MR. DONOVAN: Q Do you know whether the defendants line price their products?

A Well, you would have to tell me how you define line pricing for me to answer that. I gave you a definition of line pricing earlier, product line pricing, and as far as I can tell, defendants have different versions of their products.

Some come in very large bottles, some come in individual -- small individual cans, and these have different prices, which means that they charge a price premium for the quantity you get, so that does sound like a form of product line pricing.

Q In order to determine whether they line price or not to their wholesalers and distributors, wouldn't you need to look at their invoices to the distributors and suppliers?

A No, it's not --

MS. WEINER: Objection, objection, form. Go ahead.

THE WITNESS: It's not, it's not necessary. My task in this case is to determine the incremental component of the price that they charge that's due to the challenged claims. My job isn't to figure out how they set prices in different scenarios.

MR. DONOVAN: Q Can we go to 34, please, Paragraph 34, please?
A Okay.
Q What's an oligopoly market?
A This would be a mar -- a competitive marketplace with a relatively small number of firms that have pricing power.
Q Is your opinion that the market for the beverages you are opining upon concern an oligopoly market?
A It is.
Q Why?
A Because the defendants compete with other brands. This is discussed in some of their internal documents, and also we can see in the IRI data, and the defendants and their rivals make profit, so if they're making profit from the sale of goods, that would indicate they have pricing power. That's textbook oligopoly.
Q The second sentence has an assumption: I will assume that each company in the market sets its prices to maximize the profits from the sale of its brands in this competitive marketplace. Do you see that?

A I do.
Q Why did you have to make that assumption?
A There's a methodology in the back of the -- in the appendix for inferring the marginal costs, and I will use this assumption to infer the marginal costs, but having said that, in CPG categories like this one, I've got fairly extensive experience working with large oligopoly firms, and profit maximization is a very standard -- not just a standard assumption, it's common practice.
It would be strange for defendants not to want to make money from selling their stuff. As far as I know, they're not a nonprofit, and while they're not publicly listed, if -- their competitors who are publicly listed would have a fiduciary duty to set prices to maximize profits.
Q Paragraph 35 you have "determine profits", do you see that?
A Yes.
Q Why do you have to do that?
A For the market simulation.
Q Now, did you determine profits?
A I'm sorry, I didn't understand if there was a question.

Q Have you determined defendants 'profits?
A Well, as I've already indicated several times today, I have proposed a method. I have not yet implemented the method, but I'm ready to go, and when counsel gives me the green light, I will conduct the analysis, which, amongst other things, includes the marketplace simulation.
Q What are marginal costs?
A This is the incremental or avoidable cost associated with the sale of each unit of the defendants' products.
Q Do you know what defendants' marginal costs are?
A I do not.
Q Do you need to know that to run your anal -- your conjoint analysis?
A The marginal costs are not necessary for the conjoint analysis.
Q Is it necessary for something else?
A It would be necessary for the -- it would be necessary for the market, the market simulation.
Q And in order to complete the market -- in order to complete the conjoint analysis, you would have to do a market simulation?

MS. WEINER: Objection, form.
THE WITNESS: That's incorrect.
MR. DONOVAN: Q Okay. I thought you said earlier that you -- part of the conjoint analysis was a market simulation?
A I did not.
MR. DONOVAN: Okay.
(Whereupon, Exhibit JPD 8, remotely introduced and provided electronically to the Court Reporter.)
MR. DONOVAN: Q Sharing JPD 8.
A Okay.
Q I show you JPD 8, sir, and tell -- asking you, excuse me, have you ever seen that document before?
A Let me go through this. No, I don't think so. I thought this was the Complaint at first. No, I don't think so.
Q This I can represent to you is the unredacted brief submitted in support of the motion for class certification filed by the plaintiffs in this case.
I direct your attention to Page 1 under Introduction.
A Okay.

Q So the second sentence of this -- the last sentence of the second full paragraph, it says: Plaintiffs seek compensation for the classes for economic injuries arising out of their purchases of defendants' products, including a refund of the price premium paid as a result of defendants' misleading labeling. Do you see that?

A I do.

Q Is that what your conjoint analysis proposal intends to do, provide a refund of the price premium?

A The conjoint analysis would constitute one component of the methodology.

Q What's the other component, if any?

A The marketplace simulation.

Q What's the difference between a marketplace simulation and a conjoint?

MS. WEINER: Objection, form.

THE WITNESS: So a conjoint analysis is a methodology to learn about consumer demand, in this case for the products in the category at issue, and a marketplace simulation is an economic simulation to determine the prices and quantities that would emerge in that marketplace.

MR. DONOVAN: Q Does your methodology propose

to provide a refund of the price premium paid as a result of defendants' misleading labeling?

MS. WEINER: Objection, form.

THE WITNESS: If we go back to my report, you can see that as part of the methodology I proposed, I calculate price premium, price premium damages. The willingness to pay is also an alternative. Both of these involve a refund to the class.

MR. DONOVAN: Q Is it -- would it be a refund of the entire price paid or a partial price paid?

MS. WEINER: Objection, asked and answered.

THE WITNESS: That's an empirical question, the empirical question relating to the magnitude of the damages. If nobody would buy the challenged products but for the challenged claim, then that would mean they would probably get a full refund. If they -- some people would continue -- would buy it, then they would get the component of the price premium.

MR. DONOVAN: Q To get -- are you done with your answer?

A Sure.

MR. DONOVAN: Can you read that back, please, the answer?

(Record read.)

MR. DONOVAN: Q I may be misunderstanding your answer.

So I understand, does that mean that there's a scenario where someone doesn't buy the product and nevertheless he's going to get a refund?

A No.

Q How does that go to the report?

Madam Reporter, please just read that answer again?

(From the record above, the reporter read the following:

"That's an empirical question, the empirical question relating to the magnitude of the damages. If nobody would buy the challenged products but for the challenged claim, then that would mean they would probably get a full refund. If they -- some people would continue -- would buy it, then they would get the component of the price premium.")

MR. DONOVAN: Q With respect to the retail price paid, does this -- this model isn't proposing to give them a full refund of what they paid?

MS. WEINER: Objection, form.

THE WITNESS: The -- as I, as I indicated before, the magnitude of the refund is an empirical question. It's an empirical question about the magnitude of the value consumers obtain from the challenged claim.

(Whereupon, Exhibit JPD 9, remotely introduced and provided electronically to the Court Reporter.)

MR. VISCONI: Moving to JPD 9, this is an Excel spreadsheet.

THE WITNESS: Okay.

MR. DONOVAN: Q Now, that's been marked JPD 9. Do you see, do you se that, sir?

A I'm looking at the spreadsheet. I don't see JPD 9 anywhere on the spreadsheet.

Q We have to mark -- look on top. We can't -- it's an Excel spreadsheet, so we can't physically mark it, sir. So do you see on top, it says JPD 9?

A The file name, is that what you're referring to?

Q Yes.

A Yes, the file name is JPD 9.

Q Okay. So have you ever seen that document before?

A This looks -- I can't recall if I saw this one specifically. This doesn't have the time series data that I'm, that I'm familiar with in the IRI data, which would be the weekly sales and prices. This looks like an aggregation. I may have looked at it, and I just don't recall.

Q I can represent to you, sir, that it's the IRI-001 Excel, which is represented -- or referenced in your report and produced in this case.

Well, with respect to your report, JPD 6, that -- there's tables in that report?

A Correct.

Q And the source, the source is for the D-IRI-001, is that correct?

A For some of them. Okay. Yep, right now -- sorry, now I'm remembering. The -- because I had data set which actually had time series as well, it was more desegregated, and this is just the -- this has just collapsed the time period to the -- to one single observation per product, and I just, to be totally honest, had forgotten. I looked at this spreadsheet back in the fall.

Q Understood. So I'm not techy at all, so -- but there's ways to navigate through this Excel

spreadsheet to get information that you are looking for with regard to sales, is that fair to say?

A It is.

Q Okay. So just if we could for a minute go back to the tables on your report, I don't know if we can minimize this or would it be a pain?

MR. VISCONI: He's not seeing this right now.

MR. DONOVAN: Oh, I thought he's seeing --

MR. VISCONI: He's opened to the one that he has. I haven't shared this one.

MR. DONOVAN: Q Oh, I'm sorry. I apologize, I thought you did.

Doctor, do you have J --

MR. VISCONI: Go ahead.

MR. DONOVAN: Q Do you have JPD 9 now in front of you, sir?

A I do.

MR. VISCONI: That's his report, 6.

MR. DONOVAN: Q So that's the same IR -- is it fair to say that's the same IRI data that's referenced in your report?

A It is.

MS. WEINER: Objection, form.

MR. DONOVAN: Q Sorry, sir?

A It is.

(Discussion had off of the record.)

MR. DONOVAN: Q Got it. Sorry, Doctor. I misunderstood where technically we were.

A Okay.

Q So if you go back to your report, Paragraph 54.

A Okay.

Q You say: However, single packs are by far the most common and account for roughly 71 percent of iced tea sold in the U.S. Do you see that?

A I do.

Q Okay. And then it's got Table 5 referenced. Do you see that?

A I do.

Q What did you mean by most common?

A That it's the -- that buying a single pack is the most -- represents the highest share of dollars.

Q And account roughly for 71 percent of iced tea sold in the U.S. Do you see that?

A Correct.

Q Why is that relevant for your report?

A Because in my conjoint study, I'm not going to include for the purposes of learning people's

preferences, I'm not going to learn or test people's values for large commodity bundles.

Q Why not?

A Because it's not necessary.

Q Why isn't it necessary?

A Because there's been no discussion anywhere in the defendant's internal documents about their -- the value and benefits of their hot-fill method and their claims about no preservatives that's dependent on the size of the pack or the number of packs somebody buys at a given moment, so it wouldn't be necessary to study the pack-size choice, the bundling versus not bundling.

Q When you say bundling, what do you mean?

A I mean a commodity bundle.

Q Sold in multiples, like in a case?

A A case would be an example of a commodity bundle, yes.

Q Or a 12-pack or a 6-backpack, would that be a bundle?

A Those would also be examples of bundles, yes.

Q And when you say single packs, what are you referring to?

A Not bundles.

Q One container?

A Sure, that would be an example.

Q Give me another one.

A A single can.

Q Anything else?

A A single bottle.

Q Anything else?

A I would -- my recollection, but I could be wrong here in memory, is that these are -- the iced teas and juices are sold exclusively in bottles and cans. The subcategory field only indicates cans and bottles of tea versus juice versus lemonade, so I don't think so.

Q All right. We're going to go to -- we're going to share a document with you, JPD 9.

MR. VISCONI: In addition to just sending it to you, I'm going to share my screen to show.

THE WITNESS: Okay. Should I close my incarnation of it or just minimize it?

MR. DONOVAN: If it's easier to close.

THE WITNESS: Okay. I'm closing, all right.

MR. DONOVAN: Q Okay. So we're going to ask some questions about Table 9 and -- so that it's going to be an exercise of maybe having to go back

and forth, but.
So the reason we're presenting this to you right now, we're going to re-present it, is to show you that JPD 9 -- I guess we should go to Table 9 in the report. Can we minimize this and go back, and I'll ask --
MR. VISCONI: He still has it in front of him.
MR. DONOVAN: Q Do you have Table 9 in front of you? It might be easier to do it this way.
MR. VISCONI: He has a hard copy.
MR. DONOVAN: He has a hard copy of the report. I'm looking at Page 25.
THE WITNESS: Sorry, can you -- so you're both speaking at the same time with the instruction.
MR. DONOVAN: Q Sure. Sorry about that. If you look at your report, JPD 6, right?
A Okay.
Q Page 25.
A Okay. Just for the record, I'm looking at 6a because I'm going to look at my physical copy. If I open JPD 6, which you instructed me to do, that will block the view of the spreadsheet you have shared on the screen.
Q 6a is fine, sir, 6a is fine.

A Okay. And what is it you want me to find on 6a?
Q Table 9, which is on Page 25.
A Okay. One moment. Okay.
Q So this is a table that is in your report.
Did you review this table, and were you involved in its formulation?
A I certainly reviewed the table. The table was created by my staff under my supervision. I requested this table.
Q Why did you request this table?
A To understand the price distribution.
Q What do you mean by price distribution?
A The distribution of prices.
Q I have a question. Among what?
A The distribution of prices --
MS. WEINER: Objection, form.
THE WITNESS: The distribution of prices for each of the brands.
MR. DONOVAN: Q Why were these brands chosen other than AriZona?
A These -- this is explained -- I'm trying to find the place where I explained. I picked these are the top selling brands, but.

So these are the brands that I -- that later in Paragraph 68 I indicate that I'm going to include in my conjoint survey, meaning I will vary these brands and test them, test their value on demand, so I use them -- I include them here, and so for each of these brands and in their respective top-selling pack size, I've reputed -- I'm reporting in Table 9 the price distribution.

Q Now, in your report you refer to the challenged claim as the no preservatives claim, correct?

A In -- if we go back to Paragraph -- one moment, let me look for you. We define the challenged claims in Paragraph 11, and the sentence where I specifically define it for you, make sure I have the right spot here so we have the precise answer.

Yes, so at the end there, it's: I refer to the label claim no preservatives as the challenged claim. This is the end of Paragraph 11, yes.

Q Do you know whether any of those products listed on Table 9 other than AriZona contain a challenged claim?

A I don't recall. My recollection is that none

of these are hot filled, but I might be mistaken, maybe one of them is, so to the best of my knowledge, they would not contain -- they would, they would con -- they would not contain this claim.

Q Why are you including them in a price distribution analysis if they don't contain the challenged claim?

MS. WEINER: Objection, form.

THE WITNESS: For the marketplace simulation and for the conjoint analysis.

MR. DONOVAN: Q And are these comparative -- are these competitors, are they ranked, are they placed here because they're -- I mean, why not another competitor other than Brisk, Gold Peak, Lipton, Pure Leaf, or Snapple, why are they being chosen?

A My recollection is these are the largest competitors.

Q Where?

A In the IRI data.

Q No, in what region?

A At the national level.

Q Why did you choose national level?

A Because that was -- this is an analysis of

the distribution of prices nationally for the product -- the challenged products and some of the other key brands in the category.

Q Why didn't you choose on a state-wide basis what the top-selling brands were?

A I could. That would be straightforward to create the analogous table by state. If that's something that you would find useful to see, I'd be happy to provide it to you.

Q I asked why didn't you?

A Because that information wasn't necessary for forming an opinion about whether or not I can devise a feasible method.

Q Okay. I'm going to go back to JPD 9 that we're sharing with you.

A Okay.

Q And you're going to have to cross-reference Table 9 just the AriZona line.

A Okay.

Q And we're going to, we're going to ask you if you remember if this is how you got to your number, okay?

A Okay.

Q Table 9 says price distribution of top six

U.S. iced tea brands, and then you have source 2020 -- and underneath you say 2023, and in your notes you say 2023 reflects sales throughout March on Table 9. Am I reading that right?

A You appear to be.

Q So we go to -- just follow what we do here, and tell us if this jives with how you got the number for AriZona in terms of the price distribution. We're going to 2020 -- 2023 to 3-26-23. Do you see that?

A I do.

Q Okay. And we're only going to do canned and bottled tea. Do you see that?

A I see stuff on the screen, but I don't know what that specifically is referring to.

Q Do you see canned and bottled tea there?

A I do.

Q And we're going to do singles. Do you see that?

A I do.

Q And we're hitting AriZona as the brand. Do you see that?

A You keep saying "that". Which part didn't you want me to see?

Q I'm sorry, you see AriZona?
A You highlighted the word "AriZona", yes.
Q Okay. And now we clicked the 23-ounce can. Do you see that?
A Do I see which?
Q 23, the Number 23.
A I do. Okay, yes.
Q All right. Does this refresh your memory as to how you got to the numbers for AriZona's price distribution?
A I don't recall, I don't recall the exact steps that were went through in the fall, but something along these lines was likely done.
Q Can you go down, please?
We're going to go all the way over to -- it says the average retail price is a dollar-O-six. Do you see that?
A I do.
Q And so do you know whether or not that's how you got to that figure?
MS. WEINER: Objection, form.
THE WITNESS: I would have to go review the back-up plan materials for the exact methodology, but it appears you've replicated the -- one of the cells

in my table, if I'm not mistaken.

MR. DONOVAN: Q Okay. Now we've removed the -- yeah, with the no information, I think we can refer to your report. I think that there's a reference in your report that in your table that you removed items with no information. It still says a dollar-O-six. Do you see that?

A Okay. I see $1.06 in your cell.

Q Okay. So why didn't you do an analysis of the price distribution in California?

A I thought I answered this already. It wasn't necessary.

Q Why not?

A It would not, it would not add to the opinion that it's feasible to conduct the methodology that I've proposed.

Q Do you know whether the average price of these products is the same in California during this time period?

A It actually doesn't matter for the proposed analysis.

Q Why?

A Because a conjoint analysis varies prices. All that matters is that I vary prices. It doesn't

matter if the price I use in the conjoint analysis is the actual price charged in the market.

The whole purpose of a conjoint is to learn how sensitive people are to prices, hence the need to vary them, and so whatever price I put in there is actually not that important, but I look at the national average. I actually didn't look at the average, I looked at the national distribution to try to make sure that the kinds of prices I tested were pretty in line with the kinds of prices that are charged in the field.

But it's actually not relevant whether or not they match exactly with one state or another, but if you deem that to be important, it would be very easy for me to modify the section on pricing and have the conjoint analysis be calibrated, if you will, against California results. My opinions wouldn't change.

Q And why didn't you do an average retail price for AriZona and New York?

MS. WEINER: Objection, form, asked and answered.

THE WITNESS: So it's the same answer. It's not necessary. It wouldn't have changed my opinions about the feasibility of conducting the proposed

analysis.

MR. DONOVAN: Q Why -- this -- you can go to Table 9. Your notes say reflect sales through March, 2023. So the table that's -- or this, you know, analysis that's in front of you is usually the information from IRI in 2023 only.

Why were you using 2023's information and IRI for this Table 9?

A That's actually in -- that's the most recent data, the recent period of the data.

Q The class period I showed you is proposed to be at the end of 2022, so why are you using 2023 average retail price information?

A Because I'm trying to select prices for the survey component of this. This is where we do the choice-based conjoint. I'm going to try and use prices that would be more familiar to consumers when the time they're filling in the surveys, but as I already indicated, the actual prices we included in the survey are -- don't need to be based on the prices that were charged during the class period.

The important thing is that through the variation of prices in the survey, we can see how consumers potentially change their choice behavior in

response to the price changing and also in response to other attributes changing, but as any -- if you read any textbook on conjoint analysis, it will tell you the main thing is you vary the prices.

I selected 2023, it was the most recent data available, to make sure that at this time I'm proposing prices that are somewhat tagged with the empirical reality of what people are used to seeing. I didn't want some -- I didn't want to test $100, for example. That might be way out of line with what people would be accustomed to paying for a can, a can of iced tea.

But the actual numbers we got here, I could have used California, I could have used New York, I could have used 2022. None of this would change my opinions about the feasibility of the method.

Q Look at the -- what's in front of your screen on this evaluation. I'm going to put it on mute for a moment. Sorry.

MS. WEINER: Bob, you can't just talk off the record, so if you want to take a break, but we're on the record. I can't hear you.

MR. DONOVAN: We're going to take a -- well, we'll take a two-minute break, okay? Please.

THE VIDEOGRAPHER: Going off the video record. Time is now 19:35 UTC.

(Brief recess taken.)

THE VIDEOGRAPHER: Back on the video record. The time is now 19:38 UTC.

MR. DONOVAN: Q Okay. Doctor, we're sharing the screen again of JPD 9. Do you see that?

A I do.

Q Okay. So this is the distribution, Table 9, of AriZona for that time period in 2023 with a -- mean price means average price, right?

A Correct.

Q And there's a product list there, you see it's under rank product, see where the arrow is?

A I do.

Q And then there's a listing of the products.

If you go down to Number 12, there's a SKU there 59591. Do you see that?

A I do.

Q That SKU does not seem to correspond with the UPC code in part of the class of products.

Do you know whether or not that's the case?

A I don't recall what exactly is here, but as we established earlier this morning, that a SKU need

not be the same as a UPC. These can be different identifiers of a product.

Q The -- Number 17, please.

See Line 17, AriZona Black and White, do you see that?

A I do.

Q Okay. There's no AriZona Black and White that's part of the class of products, so why would that be included in determining the average price?

A Again, the price distribution we're reporting here was merely to give a sense of what the typical kinds of prices people pay when they buy AriZona products, not to mention the others, and that in turn was going to be used to partially inform the set of prices we would test in the conjoint survey.

It doesn't matter if the price in the conjoint survey matches with a specific class product. That would, that would misunderstand the purpose of the conjoint survey. The conjoint survey is used for me to learn how sensitive consumers are to prices.

What really matters in the conjoint is not what I test, the level of price, but rather that I expose people to different prices to see how it

affects their behavior. In short, it really doesn't matter.

Now, if you wanted to change the distribution of prices and only report it for the subset of challenged products in the 23-ounce size, very easy to do, happy to provide you with that table, I'm sure your team could do it as well, but it wouldn't change any of my conclusions about conjoint analysis, its feasibility, or how I would, or how I would implement it.

Q Well, let's go to the average price of this product, the average price of the green tea -- strike that, the average price of a can and bottle of tea of AriZona we'll say in 2020.

A Okay.

Q We'll just do California. Do you see that, sir? I kept everything the same except we put California.

MR. VISCONI: And the year.

MR. DONOVAN: Q And the year. We did 2020 to 2021.

Do you see that, sir, that the average retail price is 79 cents?

A I do.

Q Why didn't you evaluate that as the average retail price in your report for a particular year during the class period?

A I suppose we could have, but it wouldn't have changed any of my opinions.

Q So in your opinion, the average retail price in California of the AriZona 23-ounce can is not relevant for purposes of your report?

A Well, I think it probably would have helped for you to first think about where I rely on this table in my report, and the place where I rely on this table in my report is to inform what range of prices I want to test in the conjoint survey, and as I've already indicated earlier, it's not necessary for the prices in the conjoint survey to exactly match with what people paid in the real world.

In fact, conjoint is used quite regularly. I've used it with companies myself to show -- to elicit people's choices for products with features or prices they haven't yet before seen because the purpose of a conjoint analysis is to learn people's preferences.

In order for peop -- for me to learn people's preferences, what matters is not what I

charge -- what I tell them is the price in the survey, but rather that I vary that price, and it's only by varying the price in the survey, this range of prices I've indicated is informed by the table, but the key is there is a range of prices, and by varying the price, the hope is to get the consumer or respondents to the survey to change their choices so I can figure out how important prices are to them when they make a purchase relative to other attributes that I test.

So the -- for the purposes of how I rely on Table 9, it really doesn't matter very much, if at all, which year I did. It was mostly just to say it's possible for me to test a range of prices that match with what people are kind of used to seeing. I don't intend to baffle people and test a hundred-dollar can of iced tea.

But other than that, really the feasibility of conjoint and my opinions will be unchanged if we used a different year, if we used a different geographic location. Again, this is about how I relied on Table 9 for this, for this part of my opinion.

Q California -- New York, please.

This is the same time period for New York, and the average retail price of the products is 95 cents. Do you see that?

A I do.

Q Did your, did your report evaluate the average retail prices of the class products in New York?

MS. WEINER: Objection, asked and answered.

THE WITNESS: Just to be clear, I have no doubt that you can show me any number of cuts of the data which will have a different average price, and my answer will remain unchanged that my opinions and the way in which I rely on Table 9 would not be affected by which location or which time period you use because the purposes of Table 9 was to demonstrate that it's possible to make sure the range of prices that are used in the conjoint survey for the choice tasks that respondents will see is realistic in the sense that the prices are con -- are similar to the kinds of prices people see in practice, but it's not necessary, as pretty much any conjoint textbook would likely say, would explain, for me to test the exact prices that were charged in a particular location or in a particular class period. This was merely a

demonstration that it's feasible for me to do a conjoint.

MR. DONOVAN: Q Would your conjoint use the average price during the class period of the AriZona product in New York?

A So I feel like this question's been answered. A conjoint analysis will test many different price levels. If you didn't do that, the conjoint wouldn't work. You need to vary the prices in order to see at what point prices change enough to change somebody's choice behavior, but I could include, for example, the average price in New York.

In fact, if -- depending on how many class periods -- if we look, think about how many years and how -- and the two locations, I could pick the average of each location if I wanted to and make that the prices I test so that I only test prices that are the averages from different class locations and different class periods, but that wouldn't be necessary for a successful implementation of a conjoint that would then be used as part of my damages analysis.

Q You haven't proposed to evaluate the average price of the AriZona product in the 23-ounce can in

California during the class period?

A I missed the beginning there, so I'm not sure if this was a question or a statement.

Q Is that fair to say that you have -- your model doesn't propose to evaluate the average price of the AriZona 23-ounce product in California during the class period?

MS. WEINER: Objection, form, asked and answered.

THE WITNESS: Actually, I'm not sure what you mean by model. You said my model, and I thought we were talking about the conjoint analysis.

MR. DONOVAN: Q That's what I meant. I'll rephrase it.

Your con -- does your conjoint analysis propose to evaluate -- strike that.

Does your conjoint analysis propose to evaluate the average price of the AriZona product, the 23-ounce cans, sold in California during the class period?

MS. WEINER: Objection, form.

THE WITNESS: I -- it sounds to me with your question you're not understanding what a conjoint analysis actually is or how it's used.

You would not use a conjoint analysis to

determine a price. The conjoint analysis is used to determine demand. It's to learn consumers' preferences for the different features we test and the features we control for, including the price, and that's how we learn about preferences and demand.

A conjoint analysis doesn't determine a price, nor would a conjoint analysis be based solely on one single price. Neither of those things would make any sense.

MR. DONOVAN: Q Does your report propose to evaluate the average price of the AriZona product in 23-ounce cans sold in California during the class period?

MS. WEINER: Objection, form, asked and answered.

THE WITNESS: My -- once I implement the damages analysis, it's quite likely that I will calculate average prices across class locations and across class periods, but I -- for the purposes of my current report, that particular calculation is not necessary for my opinions.

Since I believe this questioning is all directed to Table 9, my reliance on Table 9, which seems to be at issue, is purely for the purposes of discussing how I calibrate the different prices

tested during the, during the -- in the survey.
Sorry, I can't hear you. I don't know if you're asking me a question.
MR. DONOVAN: Q No, I'm talking -- no, I'm sorry.
A Okay. I saw your lips moving. I couldn't hear anything.
Q If you go to JPD 6, maybe your JPD 6a.
A Okay.
Q If you go to Table G-1?
A Okay.
Q It's on Page -- it's Table G-1. It's at the end of your report. It's called California and New York Top Brands. Do you see that?
MS. WEINER: Can you give me a page number, please, Bob?
MR. DONOVAN: It says G-1. It's the second to last -- third to the last page of the report, Table G-1.
MS. WEINER: Got it.
MR. DONOVAN: It doesn't have --
MS. WEINER: I got it, I got it. It's in the appendices, got it.
MR. DONOVAN: Q All right. Do you see that,

sir?

A I do.

Q Okay. What does this table represent?

A It's showing the top 20 California iced tea brands according to the IRI data in California over the class period -- or at least over the data period, 2017 to '23.

Q My question is why is that relevant, this table?

A It's just breaking down some of the stuff that's reported at the, at the national level and just disclosing it at the two state levels.

Q Any other reason why it's relevant?

A Off the top of my head, I don't recall that I actually relied on these two tables in any substantial way, but if you give me a moment, I would -- I'll review my report and make sure that I'm not misspeaking.

This is just a replication of Table 4, and so I just want to make sure I have the right table numbers. It's just a replication of Table 4.

So that I indicated in Paragraph 53 the analysis of the top 20 U.S. brands at the I -- at the U.S. level, and then I just repeat these at the state

level, as I explain in Footnote 46.

And then in Footnote 46, as you can see, I qualify that there are slight variations in the exact rank orders across the three markets, the three markets being national, New York, and California, but qualitatively the competitive set is kind of -- is fairly similar, and, of course, I then also indicate that if it's deemed necessary to do a separate analysis at each of the two state levels, this would be very straightforward to do. So in short, I included them just to -- for comparison purposes with Table 4.

MR. DONOVAN: Can you read that answer, please, Madam Reporter?

(Record read.)

MR. DONOVAN: Q So as you could see, if we go to G-1, sir, Guayaki Yerba Mate is the third leading brand that's reported by you between 2017 and 2023 in California, correct?

A Correct.

Q And in Table 9, that company's not listed, right?

A Right.

Q Because you're only using national for Table

9, right?

A For the purposes of illustrating how I could, I could calibrate my survey design to reflect prices that are in the range of what people are used to, you're right that I used the national level. As I've already indicated multiple times, I could just as easily have done this at the state level. It wouldn't have changed my opinions.

Q Do you know if Guayaki Yerba Mate uses the challenged claim on any of its products?

A At this point I don't recall, but again, that doesn't affect my opinions in this report.

Q Why?

A Because at this point I haven't been asked to isolate the economic damages or any alleged damages associated with Guayaki Yerba Mate.

Q Is it relevant whether or not the brand name that you're comparing AriZona with in any study uses the challenged claim?

MS. WEINER: Objection, asked and answered.

THE WITNESS: I'm sorry, ask the question again, is it material what?

MR. DONOVAN: Madam Reporter?

(Record read.)

THE WITNESS: It doesn't matter whether it does or doesn't. In other words, for purposes of the feasibility of the method, it's not necessary for another brand per se to use the challenged claim.

MR. DONOVAN: Q Why not?

MS. WEINER: Objection, asked and answered.

THE WITNESS: Because it's not my -- my job is to isolate the value of the challenged claim for the defendants' brands, not for competitors' brands.

MR. DONOVAN: Q If you look at G-2, you would concede that that -- the leading brands in New York are different than the ones on a national basis, correct?

A Sure.

Q Go to Paragraph 68, please.

A If we're moving on, I just want to clarify that on your last question with regards to the New York, that when I said sure, I was expecting a follow-up question.

I want to make sure we're clear that that doesn't change any of my opinions in this report regarding the feasibility of the conjoint analysis. I didn't realize you were going to move on. I was waiting for your follow-up.

Q Would you like to -- well, since you've offered that answer, why is that the case?

A The second reason I've answered several times in a row, that the goal -- the fact that the -- well, sorry, what's your question?

Q You say that it wouldn't change your analysis with respect to New York.

A I didn't say that.

Q Why would it --

A I said it doesn't --

Q Go ahead.

A Go ahead. I said it does not change my opinions. It would --

Q Okay. It wouldn't change your opinions.

A Sir, you didn't let me finish.

It doesn't affect the feasibility of conducting this analysis. We have to remember that my report states opinions about the feasibility, something we spent some time debating how to define. The feasibility of a methodology and the G-1 and G-2 tables don't affect or change my opinions about the feasibility of the method.

Q Go to Paragraph 68, please.

A Okay.

Q What do you mean I will use the analysis of the IRI data in Section III above to determine which brands an additional product features to test in my survey?

A Well, first of all, to -- you need to think of the purpose of Paragraph 68. Paragraph 68 is going to summarize the different features that at this stage I've decided I'm going to include in the survey and test. Some of these features are essential, like the challenged claim and the price.

The other features are included to make the choice task for a respondent more realistic and also to ensure that I don't focalize the challenged claim, that I have some well-known important parts of what a person's choice process would typically look like when buying an iced tea product like the ones in this case, and so since this is a CPG category, obviously we want to include brands because, as I indicated -- explain later in this paragraph, brand is typically the most important thing to people when they're making a purchase decision in grocery aisles, at least for bar coded prepackaged things, like iced teas.

And so now to answer your question, when I'm

deciding which of these feature levels to include as the so-called distractors in my, in my, in my survey and to make the survey more realistic and to include things that are important, one of the things I've included are brands that in my earlier analysis in Section III.B using IRI I demonstrated tend to be pretty prevalent.

So I don't need to include all brands, that wouldn't be necessary, but I want to make sure I include a bunch of brands so that when consumers are answering the survey, one of the things they have to trade off in their stated choices would be which brand they choose. So these are the brands that for now I've chosen to include and test in the survey.

Q These are the national brands referenced in Table 9, correct?

A These are brands that are -- that appear to be in the top 20 both at the, at the national level, but also in the state level, so they tend to be brands that as you move around the United States, at least based on the data sets that were made available to me, seems like brands people would regularly encounter when going shopping for iced teas.

Q So are you saying the selection of A, the

selection of the brand under Sub A, is that based on Table 9 or not?

A Yeah, Table 9 shows that these brands are -- these -- Table 9 is the prices, no, Table 9 is pricing. Sorry, I was thinking -- Section III.B we've established, and that was the tables we were just looking at a moment ago in Table 4, that these are fairly high-performing brands. They tend to sell a lot, and therefore, that follows the consumers are accustomed to seeing them on the shelves.

Q Why didn't you use Guayaki Yerba Mate? That's third in, that's third in California?

MS. WEINER: Objection, asked and answered.

THE WITNESS: So first of all, I could. If this was deemed to be very -- a critical thing to include in the survey, it would be very straightforward to use it -- to include it instead of one of these others or in addition, but it's just not necessary.

The purpose of the brand variable in the conjoint survey is to make the purchase task realistic, and so obviously what we're really interested in is people's preference for AriZona and how that -- and more importantly, the underlying importance of the challenged claim and price when

purchasing AriZona.

But to make for -- you know, this is textbook conjoint. To make the purchase tasks more realistic and to ensure the custum -- the respondent doesn't figure out the purpose of the survey, I included several other important brands, commonly-seen brands, to make this feel like a more natural task. The exact identity of the brand doesn't matter. The key is I picked brands that are observed frequently in the data.

Sorry, I'm not sure if you're -- I see you both talking, but I can't hear you.

MR. VISCONI: We're not --

MR. DONOVAN: Q We're not talking.

A Oh, okay. No, it looked like you -- I just wanted to make sure I wasn't speaking over you.

Q Same question as to Monster, why didn't you include Monster in the brand name feature on 68?

MS. WEINER: Objection, form.

MR. DONOVAN: Q That's one of the top six in New York.

MS. WEINER: Objection, form, asked and answered.

THE WITNESS: It's not necessary. If you read any conjoint textbook, it is not necessary to include

every single brand or every single feature that people would normally encounter at the point of sale. The key is that you have things that are important to the -- important and realistic.

So I've included a list of brands. According to the IRI data, these brands sell a lot both nationally and in the two class states, and so I've included them there to make the choice tasks in the survey more realistic and natural for a customer.

If you wanted to substitute one brand on this list for Monster or the other one that you mentioned, this would be very straightforward to do, although I doubt that this would have a huge impact on the final, the final, the final results.

And at this point, it's irrelevant since this report is simply stating an opinion of feasibility, so changing those brands doesn't change the feasibility of this method.

MR. DONOVAN: Q Why do you think it wouldn't have an impact on the results?

A Because I'm trying to isolate the economic damages associated with AriZona's use of the challenged claim, not some other brand's use of the challenged claim.

Q Do you know whether or not Monster uses the challenged claim?

A Once again -- oh, sorry, was there a question?

Q Yes. Do you know whether or not Monster uses the challenged claim?

A Off the top of my head, I don't, but that's not important for my opinions in this, in this survey. The feasibility of this method is not contingent on a specific other brand that's not at issue in this case using a challenged claim.

Q In your sentence where you start with -- the second sentence under 68: These are the top six selling brands according to the IRI data. Do you see that?

A I do.

Q Why is that important?

A Because I wanted to make sure that the brands that I included in the survey would be ones that customers would -- and respondents in the survey would be accustomed to seeing when they go shopping to make sure that the choice sets I exposed them to in the survey look realistic.

Q CPG means consumer packaged goods, right?

A Sorry, CPG, yes, it's defined in Paragraph 68. If you look on the third line below the list of brands, you'll see consumer packaged goods at the end of the line, in brackets, CPG.

Q Experience with CPG firms, brand is routinely viewed as the primary determinant of consumer choices. Do you see that?

A Yes.

Q What does that mean?

A That brand -- the brand name is typically the most important feature when people are picking between -- picking in a, in a bar-coded packaged goods category like this one.

Q Are you, are you familiar with the AriZona product having the price 99 cents preprinted on the 23-ounce can and 22-ounce can, are you familiar with that?

A I'm aware that at times --

MS. WEINER: Objection, objection, form.

THE WITNESS: I'm aware that at times that it was printed on the can, but it's my understanding it's not always printed on the can, and one of the reasons is because the defendants allow the retailers the opportunity to charge prices other than 90 cents. As

we've seen in the analysis of the IRI data, they don't always charge 99 cents.

MR. DONOVAN: Q Do you know of any other of these brand names that you're referring to in your report that preprint the price of 99 cents on any product that they sell?

A I'm not aware of these brands, but that does occasionally happen in other CPG categories. It's not the first time I hear of this.

Q Okay. Who else?

A I don't recall off the top of my head, but as I indicated, it's certainly not the first time I've heard of this.

Q So in 68 you have brand name.

Is -- how is the brand name going to be presented to survey participants?

A I will tell them the brand name.

Q How?

A Well, I'm not going to be speaking with them. It would be in the survey instrument.

Q Okay. And how will it be displayed to them?

A Well, I haven't programmed the survey instrument at this time, so -- but I -- it will be -- the name is -- the name of the brand would be

included as part of the information for respondent in a choice task.

Q Will they be presented with a label that has the brand name of the product?

A You could do that. That's -- I have -- I've seen conjoints that have done them on occasion. It's not necessary, but you could, for example, use the logo of the product, and when presenting the brand name, that would be -- that wouldn't be -- that would be possible.

Q I understand it's possible, but will you?

A I haven't programmed the survey yet.

MS. WEINER: Objection form, asked and answered.

MR. DONOVAN: Q So you don't know one --

THE WITNESS: I haven't --

MR. VISCONI: Let him answer. (Indiscernible.)

MR. DONOVAN: Q Are you finished with your answer?

MS. WEINER: John, John, you can't instruct the -- Bob on how to ask a question. Please refrain from speaking while we're on the record.

MR. VISCONI: Oh, please, I'm trying to make a clear record, Melissa.

MS. WEINER: I don't care, you're not -- nope,

you are not -- you can either leave the room or stop talking on the record.

MR. VISCONI: Are you asking me to leave?

MS. WEINER: I'm asking you to stop speaking on the record. This is not your deposition.

MR. VISCONI: Thank you, very much.

MR. DONOVAN: Q He can speak on the record. I have a vague recollection that you did during many depositions that you weren't asking any questions.

So --

MS. WEINER: Continue.

MR. DONOVAN: Q -- will you be showing labels with the brand name to the folks that are going to receive the survey, yes or no?

A I have not yet decided whether I will include labels, but remember, this has no impact on feasibility. It would be very straightforward, as I already indicated, when programming the survey to use visuals of the logos themselves when presenting the brands, but that speaks to details, that doesn't speak to feasibility. It's feasible whether I do or I don't, so the opinions in my current report are unchanged.

Q I'm not asking about whether your opinions

have been unchanged, sir.

I'm asking a straightforward question about what the survey will look like, and do you know what the sur -- as you sit here now, do you know what the survey will look like with regard to how it's going to be presented to -- how the brand name is going to be presented to the participants in the survey, yes or no?

A This wouldn't be possible to answer at this time and would be irresponsible to answer at this time as it's well known that a big step in implementing a survey like a conjoint involves pilot testing, and one of the things that happens during the pilot rounds is that we take drafts of the survey and show it to a small convenient sample.

This is not to collect data on damages, it's simply to make sure that people understand the survey and they understand the tasks, and it's fairly standard if people are having a hard time understanding the tasks that are being asked that the survey instrument gets amended in response.

So questions like will you show the logo or are you just going to type out the brand, this will be contingent on how things go during the pilot

study, and if respondents are sufficiently familiar with the iced tea products we're testing, that these things are necessary or not.

So at this time, no, it's not possible to answer your question. And what will the survey look like, that will depend in part on the results of our pilot testing.

Fortunately, this doesn't have any impact on the opinions in my current report, which is purely to establish that a conjoint analysis is feasible, and as I already indicated, including images of the logos is definitely feasible.

Q If you go to Paragraph -- Page 30, B, sir.

A Okay.

Q You have package size.

A Okay.

Q Package size you're proposing is to be a feature of a conjoint survey? Do you have the question, sir?

A That didn't sound -- that sounded like a statement, I'm sorry. Was there a question?

Q I thought I ended it with an inflection.

Is it fair to say that package size is a feature that you're going to test in a conjoint

survey?
A As it's listed in my set of features, yes, but with the qualification I'm going to control for package size, but I don't intend to isolate the incremental value to consumers of package size. So it will be controlled for.
As I indicate, different products tend to be sold in different package sizes, like when we look across the key brands, and so I will control for that. I just won't, I won't be testing it, and I won't be isolating its effect.
Q How will you be able to do that?
A By indicating to respondents in the survey the pack size of a given product in a choice test.
Q How will those pack sizes be presented to them, in a container, replica?
A Sorry, what was the second thing you mentioned?
Q I'll strike the question.
How will they contain -- how is the package size going to be communicated to the respondents in the survey?
A By telling them.
Q Will you be presenting them with the actual

package size so they see it?

A Sorry, if I, if I tell them the package size, am I not presenting it to them?

Q I'm asking how it's going to be presented to them.

Will you show them by way of a container that has -- that indicates the quantity or will you just simply tell them in a, in a survey?

A That's -- this is, again, a question about details as opposed to feasibility. You could show someone an image or you could describe in detail the container type and its size. These are all things that would ultimately be determined after the piloting stage in the event that people are confused or don't understand the task that we might provide visuals or other aids to assist them in understanding the choice task.

But again, this doesn't speak to feasibility. It's straightforward to do -- to present things like package size information in different ways, and so, therefore, it's feasible to control for it. The exact way we'll do it will ultimately depend on the piloting.

Q Why wasn't the piloting done already?

A Because the report at this stage -- excuse me, the task I had been given for this report at this stage was to propose a method and establish that it was feasible. I wasn't actually asked to program a survey or do any of the analysis at this time. I can do so as soon as I'm given the green light.

Q Perhaps you can explain to me the last sentence: By indicating each brand's package size, I will control for its effect on demand even though I do not intend to isolate the impact of pack size on choices separately from the brand effect.

A I'm still looking -- oh, I'm sorry, you started at the beginning.

Q Yeah, I'm sorry. I just read your sentence the best I could anyway.

A I just didn't know which sentence, where we are. You said the last sentence, and the last sentence is the important --

Q I'm sorry, the last sentence under package size, sir, I'm sorry.

A In the second part, okay, okay. By indicating to respondents each brand's package size, I control for it's effect on demand even though I do not intend to isolate its impact on choices

separately from the brand effect, that's correct.

Q Why are you controlling for something when you don't want to isolate the impact?

A As I indicated earlier, in order for the conjoint analysis data to be reliable, you want to make the choice tasks as realistic as possible, and the main -- the typical way to do so is to make sure that respondents are considering features that would normally be deemed important to purchase behavior.

And even though I don't need to quantify the economic value or economic damage associated with these other features, we include them for -- to make sure we have good quality conjoint data, and so what I have indicated in this paragraph -- or in the previous paragraph, excuse me, is that pack size is often deemed to be an important factor when people make choices, so I'll include the pack size information and control for it even though I don't need to isolate its effect for the purposes of the damages in this matter.

Q If the pack size presented change, would you show an AriZona in an 18-ounce or a Brisk in a 23-ounce?

A I will probably -- for each -- as I currently

already -- I currently indicated, I will, I will present each of the brands I test in their most -- in their top-selling pack size, and that differs from brand to brand, but my intention is not to vary the pack sizes within a brand. So I control for its effect on demand, but I can't isolate the impact of size separately from other factors.

Q Now, diet or non-diet, do you see that? Is that a feature that you'll be testing for in your conjoint survey?

A You're asking about C?

Q Yes, please.

A Yes, I will have this one in my features whether or not something is a diet, a diet beverage.

Q What do you define as a diet beverage?

A Well, at this stage, the diet beverage would be a label claim. It's one that appears on -- it's a label claim, but the IRI data has a classification of diet.

It's actually -- it was a little bit -- a little confusing because the field is called calories, and calories is equal to -- is either equal to diet or it's equal to zero, and zero indicates not diet, as in regular, so I will make a distinction

between a diet and regular version of a specific tea product.

Q Will these terms "diet" or "non-diet" be presented to the, to the survey participants on a label or a container?

A That's one way we could do it.

Q No, I'm asking what will be done, not what could be done, what will be done?

A I feel like we're going in circles here. I've indicated already that the survey instrument has not been programmed, and it's not possible for me to commit to exactly how the instrument will look when I haven't yet done, A, programming; and B, I haven't yet done the piloting.

So at this stage, it is feasible to control for diet or non-diet. You provided an example of a way that we could potentially include this in the survey, but whether that's the ideal way to do it or not in this matter will depend on what we learn during the pilot phase.

Q Is the pilot phase meant to test the reliability of the survey?

A No. The pilot phase -- sorry, you seem to want to ask another question. Go ahead.

Q I'm sorry I interrupted you.
What's the purpose of it then?
A That's okay, I'm used to being interrupted.
The pilot phase is to take the program survey and make sure the information that we've presented to people is properly understood. This is very standard.
If you read any manual on how to do surveys, even not conjoint, it is pretty standard to pilot a survey and go through a pre-testing stage just to make sure that the way you programmed up the instrument is -- makes sense to respondents and that they can complete the tasks that are asked of them, but this is not a speak to the feasibility of doing such a survey, this is a, this is a generic CPG-type category.
Conjoint analysis is used ubiquitously in the CPG industry. It's -- there's really nothing about the facts of this case that would make conjoint infeasible for iced teas.
Q Does diet include a product that is labeled zero calorie?
A At this stage, I have not made -- I have not planned to show people the nutrition labels on --

nutrition labels.

That said, it's quite common for people in CPG categories to see products where the word "diet" is represented and that this is separate from a nutrition label, so diet will mean whatever -- diet will mean diet, figure out the economic value of the claim "diet" on the label of the product.

Q Does diet mean -- does it include a product that's labeled zero calorie?

MS. WEINER: Objection, form.

THE WITNESS: It could. I would have, I would have to --

MR. DONOVAN: Q Does it?

A Well, again, we would have to go and see how consumers, the respondents, interpret the diet field. My understanding is that there are products represented as diet that sometimes have a few calories in them.

I'd have to, have to go and confirm this. I'm not a hundred percent sure that diet always means zero calories, but again, I have not made a de -- I do not at this point propose to put the nutrition labels into the conjoint survey, and given how ubiquitous conjoint is on packaged foods, unless an

analyst was interested in studying the role of nutrition, it would be very unusual for the nutrition content and the nutrition labels to be included in a conjoint study of packaged foods.

Q Does diet include a product that's labeled on the label, not on the nutrition panel, on the front label separate from the nutrition panel, no calorie?

A Again, I am going to use the term "diet". If for whatever reason if someone chooses to provide a response to my opinions and feels that the term "no calories" would be more appropriate than the term "diet", or alternatively, that the "diet" versus "non-diet" should be modified to be "diet" and "no calories", it would be very straightforward to do that.

This doesn't speak to the feasibility of a survey, this gets into the details of exactly what to, what to put into the survey instrument. This is like programming-type details.

Q Would you consider a product labeled no calorie to be the same as a product that's labeled diet?

MS. WEINER: Objection, asked and answered.

THE WITNESS: At this point, I don't have an

opinion about the various, the various ways something could be labeled as diet, but there are certainly products that have zero calories that are not diet, they just may have no sweetening at all. Like a bottle of water, for example, has zero calories, but wouldn't be represented as diet water.

MR. DONOVAN: Q How many calories would you consider to constitute, per serving, to constitute a diet product?

MS. WEINER: Objection, form.

THE WITNESS: I don't have an opinion at this time about what should be the calorie content to determine diet, but as I indicated before, there -- I've seen products represented as diet that have zero calories and sometimes with a few calories, a very small number. I've also seen products with zero calories that are not represented as diet, such as bottled water.

MR. DONOVAN: Q Go to D, shelf price, please.

A Okay.

Q What do you mean by shelf price?

A Price at the shelf.

Q On the retail level you mean?

A Yes.

Q Footnote 74 says: The IRI data does not -- do not track prices.

What does that mean?

A It means the IRI data that defendants provided to us was aggregated up over time, and the prices that they provided is the average prices, which is, which is going to be total revenues divided by quantities, which is exactly the same as a volume-weighted average of the prices that were charged for a given product.

Q The IRI data from your view doesn't provide the actual sales price on a retail level, is that what you're saying, or no?

MS. WEINER: Objection, form, mischaracterizes testimony.

THE WITNESS: Except the IRI data that was provided gives -- provides information about the distribution of prices, but it's aggregated up. The spreadsheets you showed us were aggregated up. They collapsed data over time, which is quite common in CPG.

CPG firms routinely use IRI and sometimes Nielsen data of this type, and to assess their price, they look at the -- they look -- they use what

exactly I've described here, you divide revenues by quantities sold, and that would be the price that, for example, a CPG firm would insert in a marketing mixed model if they were to use an econometric approach to estimate demand.

I'm not. I'm going to be using conjoint analysis, which is a different method, which is also used by the CPG, but for a CPG firm using IRI data, this is how they would calculate the price that they would include in their demand analysis.

MR. DONOVAN: Q The next sentence says: It is not necessary to test the exact prices charged at point of sale since the goal of a conjoint survey is to collect data with which to measure consumers' preferences and price sensitivities. Did I read that correctly? I think I did.

A Looks like it.

Q When you say exact prices, what do you mean?

A We're reiterating the long conversation we had about a half hour ago.

Q We're not reiterating --

MS. WEINER: Bob, don't interrupt, don't interrupt the witness. Let him finish.

MR. DONOVAN: He's made a statement, he's made a

statement --

THE WITNESS: I think I'd like to finish what I'm saying first.

MR. DONOVAN: I'm sorry to interrupt, but you're making a statement that's not correct. I'll let you answer.

THE WITNESS: It is correct.

MR. DONOVAN: I'll let you answer, okay?

MS. WEINER: Hold on.

MR. DONOVAN: Q I asked a simple question as to what do you mean by exact prices, okay, that's what I asked. Go ahead, you can answer.

MS. WEINER: No, you can hold on. You instructed the witness at the beginning of this deposition that we cannot talk over each other or madam court reporter cannot get the words down on the transcript, and now you've interrupted the witness multiple times. When you ask a question, if you don't like his answer, he still gets to finish, you don't get to interrupt him. So let's repeat the question, and let Dr. Dubé answer.

MR. DONOVAN: Q What do you mean by exact prices, Doctor?

A It means the specific price that I, that I

test in a conjoint analysis doesn't matter. I could test any price I want in a conjoint, and this speaks to a point we made earlier in the conversation that it is common for conjoint analysis to test features and prices that people have never seen before because the goal of a conjoint is to learn how people respond to these variables. So there's no specific price that needs to be the one that's included in the survey component of my method.

In theory, you could put whatever prices you want. In practice, as we determined earlier, I'm going to try and make sure the prices that I do include in the survey don't baffle people and are within the realm of what they're experienced with seeing when they go shopping.

Q Your second paragraph says: Nevertheless, to avoid confusion, I will likely use the IRI data. Do you see that?

A I do.

Q What do you mean you will likely use? Are you committed to using it or you may not use it?

A As I --

MS. WEINER: Objection to form.

THE WITNESS: Once again, this is something we've

discussed already. This is that I've already indicated that I will -- I currently would likely use, meaning I intend to use the IRI data just to get a sense of what the distribution of prices are -- is. That was Table 9, which we discussed earlier.

But the extent to which I would rely on IRI data is largely to make sure I don't have prices that are way outside the realm of plausibility. For example, about an hour ago, I indicated I wouldn't test a $100 can of AriZona. That would be way outside the range that someone's used to and would probably baffle a respondent.

But, so in other words, to avoid confusion, to avoid baffling a respondent, I would rely on the IRI data to get a sense of the realm of prices people are used to and to try and keep my prices within that realm, but going back to the beginning of the paragraph, as I indicated in the second sentence, which you read for us very eloquently, that it's not necessary to include any specific price in the survey. You could theoretically include any price you wanted or prices you wanted.

MR. DONOVAN: Q For purposes of your -- or running the analysis when you get the green light, as

you've said, do you have sufficient sales information on the products to do so?

A Sorry, sufficient sales --

MS. WEINER: Objection, objection, form.

THE WITNESS: Sales information to do what?

MR. DONOVAN: Q To run the conjoint analysis when you're given the green light?

A You're, I'm sorry, you're -- that doesn't make any sense. You don't use sales data for a conjoint analysis.

Q Do you use sales data to calculate price premium?

MS. WEINER: Objection, form, asked and answered.

THE WITNESS: No, I don't use the sales data to calculate a price premium. Well, let me -- no, I don't.

MR. DONOVAN: Q How will these prices be presented to target participants in a survey?

MS. WEINER: Objection, asked and answered.

THE WITNESS: I will tell them a price.

MR. DONOVAN: Q Would it be one specific price for each product shown?

MS. WEINER: Objection, asked and answered.

THE WITNESS: As I've already gone over, I will

-- there is no one specific price. We will vary the prices in the -- across the survey tasks.

MR. DONOVAN: Q Are you done with your answer?

A I am.

Q Okay. So would your survey show an AriZona 23-ounce at $2.40?

A It could be --

MS. WEINER: Objection, form.

THE WITNESS: It could. A conjoint survey question would put someone into a purchase decision with different brands to choose from with different features and different prices and then would ask them to make a pur -- state which one they would purchase, and the key for this in order to get the data that's necessary from the conjoint, the whole purpose of the conjoint, would be to vary both the prices and features of these different products that we present to them so that in turn I can learn how sensitive or how sensitive people are or how much importance they assign to things, like the price versus different features, one of which is the challenged claim.

MR. DONOVAN: Q Conversely, the competitors that you list here, Brisk, Gold Peak, the targets could be shown a product in their packet sizes, say

the 33-ounce for the Brisk at 99 cents?

A I'm sorry, I don't know if the thing cut out. I had a hard time understanding your question.

Q Will the survey show target participants a Brisk in the 33-ounce for 99 cents?

MS. WEINER: Objection, form.

THE WITNESS: What do you mean by target participant?

MR. DONOVAN: Q People participating in the survey.

A Okay, the respondents. The respondents will be exposed to choice tasks, but the attributes of the products in those choice tasks are randomized.

This is like an experiment. Maybe that's where the confusion is. A conjoint analysis is like an experiment where we randomize features, and the purpose of that experiment is so that I can in turn learn the, quote, unquote, "treatment effect" of these different features and the treatment effect of the price on people's purchase behaviors.

Q Do you know what price the respondents are going to be shown for an AriZona product in the survey?

A Well, your question already --

MS. WEINER: Object to form.

THE WITNESS: Sorry. It can't be right since I've already indicated it would be prices, I'm going to vary prices, so there isn't a specific price for a specific product I will show.

Instead, you should think of this like an experiment, and in the experiment, I'm going to be randomizing the features and prices of different products so that in turn I can learn their treatment effect on demand. This is how I'm going to be able to say something about demand and the impact of the challenged claim on demand for the challenged products.

MR. DONOVAN: Q And if you go to Table 9 on your distribution, you have -- if you just use the AriZona product, you have -- for in 2023, you have the 25th percentile 97 cents, and then the 75th percentile $1.18.

Why would you show respondents a 23-ounce price anywhere near $2 when the, when the market shows that the average price is $1.06?

MS. WEINER: Objection, form, asked and answered.

THE WITNESS: So once again, I feel like there seems to be some confusion here about what a conjoint

analysis is. This may be because your client doesn't use it, but this is a very standard methodology for most CPG firms, especially CPG firms of your client's size.

The conjoint analysis is like an experiment, and as you can imagine, an experiment wouldn't be very useful if we didn't vary the thing of interest.

So in this particular experiment, we're interested in price, we're interested in the challenged claim, and then we have some other features which we're going to include and test as well just to make this realistic, and in order for me to learn the treatment effects of each of these different things we're going to -- we're studying, I would have to vary them.

And so this is why I think we're having a hard time with the questioning, because there is no one single price. I would put I need to vary the price, and your question was why would I want to show someone a $2 23-ounce AriZona, well, for some people, they may really like the product, and they might be willing to buy it even if it was $10.

The idea is to test higher and higher prices so that I can figure out where is your pain point,

for a given configuration of AriZona, what is the price so high that you would no longer buy it, and that teaches me something about how much value you get from the AriZona product.

And then I can look and see how would that change with versus without the challenged claim, and that teaches me how much value somebody gets for the challenged claim and how that moderates the value of the overall AriZona product. So these are experiments.

MR. DONOVAN: Q And you have the challenged claim under E, sir, no preservatives --

A Where? I'm sorry, we're at Table 9?

Q No, I'm sorry, I jumped ahead, sorry. Back to Page 31 again.

A Okay. Okay.

Q So under challenged claim, no preservatives, no claim, what does it mean no claim?

A Well, for purposes of testing and measuring the incremental value to consumers of the no preservatives claim, I would need to show them packaging that has the claim and packaging that doesn't have the claim.

Q And how will that be presented to the

respondents?
A I will either indicate to them that a product has a no preservatives claim on the label or that it does not.
Q Will you show them actual labels?
A That's one way you could do it. It's certainly feasible to do it that way. You could also just indicate to them.
Q Which way is it going to be done here?
A I'm sorry, I can't hear you, you're facing the other way.
Q Sorry. Which way will it be done here?
A Which way will what be done here?
Q The presentation of the note of the challenged claim.
A Well, we're back in the same realm as before. I have not programmed the survey. The key is to -- will be to run -- before I have -- I can tell you exactly how it will be presented, will be to run a pre-test, a pilot.
This is, again, is a generic part of implementing and fielding a survey. Before you field it to everyone, you first field it to a convenient sample, and during that pre-testing stage of fielding

the survey, you would collect information on how well respondents understand things, and the exact way to represent -- that we'll end up representing the no preservatives claim will depend on what I learn from respondents as they're going through draft versions of the survey.

But, you know, you indicated one way that this could be done with a visual, that's feasible certainly, but it may not be necessary. Most conjoints don't use visuals, most conjoints might just state that this is a no -- this product represents itself as having no preservatives.

Q Now to distractor claims.

Before I get there, I noticed in the formatting here on your report, there have been every feature, right, you got pack -- the brand name, package size, diet, non-diet, shelf price, and then challenged claim.

Challenged claim is a feature, right?

A It is.

Q Okay. Why isn't there any explanation under that Sub E as to that issue or that feature?

MS. WEINER: Objection, form.

THE WITNESS: I'm not exactly understanding what

it is you wanted me to -- what it is you're looking for.

MR. DONOVAN: Q Well, will you concede that under every other feature you have an explanation and under E you don't.

A The challenged claim, if we could go back to the beginning of my report, one moment. It's in Paragraph -- here we go, it's Paragraph B. In Paragraph -- it's Section B, Paragraph 11. I've already defined the challenged claim here.

I refer to the label claim no preservatives as the, as the challenged claim, and early in that paragraph, I had a discussion about what this means, so it would have been redundant. This particular fea -- this particular thing had already been defined.

The discussion on the other, the other features was included because I hadn't defined them in the Section B of my report, so it's just to make sure everything else was clear, was clear to the reader.

If you're asking for -- if you're requesting that I repeat some of the material or some of the stuff in the spirit of Paragraph 11, it would be very straightforward for me to copy and paste or to write

it in different terms and include it in a revision of the draft if that would make the draft clearer.

Q Distractor claims, why did you choose no artificial color and no artificial flavor?

A So as I explain in my report, first of all, the impacts of the distractor claims are not actually critical for my damages, right, I'm -- remember, they're including -- I'm including other distractor claims so that people don't hone in on the no preservatives claim, again, to make sure people don't think this is a survey that was designed to learn and isolate the effect of the no preservatives claim, so I just included these as a distraction.

But, again, these are claims that we, that we found are -- that I saw used similarly on labels of products in this category, so when a respondent is taking the survey, it would seem, it would seem very natural to them to have some products in these experiments we're going to put them in that represent themselves as having no artificial color and/or no artificial flavor.

Q Are they going to be put on labels shown to target participants?

A So that would be one way you could do it.

That would certainly be feasible, but I haven't programmed up the survey as of yet, and it's only once I program up the survey, pre-tested it with a pilot stage, maybe multiple pilot stages, that I will commit to the exact way that I will represent it, but yes, can -- respondents will be, will be, will be made aware of whether or not a product has these claims in the same way they'd be made aware of whether or not there's a no preservatives claim.

Q I didn't ask whether they'd be made aware, I asked whether it's going to be put on a label.

I understand, correct me if I'm wrong, you don't know one way or the other how it's going to be presented to the consumer -- or rather to the respondents?

MS. WEINER: Objection, form, mischaracterizes the testimony.

THE WITNESS: That's incorrect. No, the respondents will be made aware that these are claims on the labels of the packages.

MR. DONOVAN: Q How?

A Well, as I already indicated, you could use images, as you proposed, although that would be a little unstandard and not, per se, necessary.

You could also just communicate to them, tell them that on the package of this particular product, there is an indication that the product has no artificial color. That would be another way you could do it.

Q But you don't know one way or the other how it's going to be done?

A At this stage, --

MS. WEINER: Objection, form, objection, form, misstates the testimony.

THE WITNESS: At this stage, I've been asked to show that a method is feasible. None of these questions speak to the feasibility of a conjoint. These are details about the actual -- these just the way we're going to design the instrument.

It would be feasible to use an image. It would also be feasible to use text. So for the purposes of establishing that a method exists, this is a method I've used in other matters like this one. It's been accepted by the Courts. I haven't yet heard any facts in this case that would change my opinion about feasibility.

MR. DONOVAN: Q You do -- sorry. You do the --

MS. WEINER: Bob, when you're moving on to the

next group of questions, we should take a break.

MR. DONOVAN: Yeah, yeah, I -- just give me one more question or two maybe, if that's okay?

MS. WEINER: Fine for me.

MR. DONOVAN: Q In the survey, will products be shown side by side to the consumer for purpose -- sorry, to the respondents for purposes of choice?

A That's one layout you could use in the survey instrument, yes.

Q I didn't ask whether it's a layout, I asked will it be done?

MS. WEINER: Objection, form, asked and answered.

THE WITNESS: So I have not yet programmed the survey. Once I've programmed the survey, if I'm given the green light to do so, I will program something up, and I will test in field through a pre-test with a pilot sample ways of presenting the choices, the specific products that people choose between, and whether these are oriented vertically or oriented horizontally, a lot of this will depend on whether or not the respondents in the pilot stage understand and also are -- find it, find it easy to complete the tasks that are asked of them.

But again, you're asking me about what will

the survey look like. At this stage, I've only been asked to establish that a survey is feasible, and none of these things speak to the feasibility. It would be very straightforward to have a vertical or horizontal orientation of the choices in a choice task.

MR. DONOVAN: Q Do you concede that the survey as best as it can simulate marketplace realities.

A This -- I'm going to design the survey to capture the realities of buying products in these -- in this particular category, yes.

Q And is it fair to say that when people go shopping, they don't just look for -- they don't just see one product, they're usually -- if they're comparison shopping, they're looking at a shelf, and there's a bunch of different similar products, that often happens, right? Isn't that a marketplace reality?

MS. WEINER: Objection, form.

THE WITNESS: That's part of the reason why the choice-based conjoint has become one of the most popular marketing research techniques in the industry.

Ten years ago, Bryan Orme indicated more

than 10,000 of these being commercially each year by companies across a wide array of industries, and one of the appeals of choice-based conjoint is exactly as you indicated, that it captures the reality that consumers usually make a choice from a choice set, and so instead of just presenting them with one single product, as I explain in my report, you present them with a choice set.

MR. DONOVAN: Q And I'm asking whether it's going to be done simultaneously. That means you're going to have three products, and you got to choose one in the survey, or four you got to choose one?

MS. WEINER: Objection, form.

MR. DONOVAN: Q Do you know, yes or no? Do you know whether that's going to happen?

MS. WEINER: Objection, form, asked and answered.

THE WITNESS: So this is actually already -- your question was already answered in my report, so I'll turn you to the appropriate part of the report where I explain exactly how these tasks are going to be set up here. Just one moment here because this is -- methodology -- here we go.

Right in -- it's getting a little dark. I'm having a little trouble reading this.

So at Paragraph 70 --

MR. DONOVAN: Why don't we take a break, why don't we take a break, and you can answer that.

MS. WEINER: No, he gets to answer the question. There's a pending question.

MR. DONOVAN: That's fine. I'm not making him not answer the question.

THE WITNESS: Okay. If you turn to Paragraph --

MR. DONOVAN: I'm sorry.

THE WITNESS: Sorry, were you still completing your question?

MR. DONOVAN: Q No, no, I'm sorry, I'm waiting for your answer, I'm sorry.

A Okay. Okay. I started, and you spoke.

Paragraph 70 in my report, starting with "choice alternatives in the survey", I explain to -- I explain here that: The choice alternatives in the survey can have different levels of these features. The levels of these features will be varied in the survey to create product configurations, and consistent with the marketplace reality of making a purchase decision in a retail environment, several different product profiles will be presented at a time to survey response -- respondents in the form of

a choice task. In each choice task, respondents will first be asked to indicate their preferred product in the available set. Then respondents will be asked whether they would purchase that preferred product at the price indicated. I believe this answers your question.

Q Products will be presented to survey participants simultaneously?

A There will be in each choice task, as I explain here, in each choice task, the respondents will be shown a set of products and asked to make a choice from that choice set.

Q On what set of products, the very same brand or different brands?

MS. WEINER: Objection, form, asked and answered.

THE WITNESS: This is an experiment, so it would be randomizing the attributes of the different products shown to them, and by randomizing the attributes of the, of the products shown to them across the different choice tasks, we then in turn learn the treatment effect of the tested features, including price, including challenged claim, on demand.

MR. DONOVAN: Q Got it. One more. I'll give

it the last shot, and we'll take a break.

Do you know whether your survey to respondents will show the respondent at the same time an AriZona product, a Brisk product, or any other competitor product to choose from?

MS. WEINER: Objection, form, asked and answered.

THE WITNESS: So I thought that -- I thought I had already answered that. I told you that I would show multiple products in a choice set and that the products in that choice set would have randomized attributes.

One of the attributes is brands, so sort of mechanically, that means people will be trading off in their choice the brand name or the brand of the product, as well as other features.

MR. DONOVAN: Okay. We'll take a five-minute break, okay? Do you want a longer time, ten minutes?

THE WITNESS: Five is fine with me.

MR. DONOVAN: Five. What do you want, Melissa, ten or five?

MS. WEINER: Five is fine.

MR. DONOVAN: Okay. Thank you.

THE VIDEOGRAPHER: Going off video record. Time is now 21:10 UTC.

(Brief recess taken.)

THE VIDEOGRAPHER: Back on the video record. The time is now 21:20 UTC.

MR. DONOVAN: Q Doctor, does Paragraph 68 constitute the sum and substance of the conjoint survey that you designed?

A Sorry, I have not, I have not actually programmed up the survey. Paragraph 68 summarizes the features and feature levels that I intend to test as part of the conjoint survey.

Q Do you, do you have enough sales data in your opinion to calculate damages in this case?

MS. WEINER: Objection, form.

THE WITNESS: You asked me this question earlier. What -- in what stage are you referring to for the sales data?

MR. DONOVAN: Q The sales data that you have at your disposal that you reviewed, is that sufficient for you to calculate damages in this case?

A I believe so.

Q Or do you need more information? You believe so, I'm sorry?

A But perhaps if you could give me a specific aspect on which the sales data would be used, it

would be easier to answer.

MR. DONOVAN: Can I have that question read back. I apologize for interrupting.

(From the record above, the reporter read the following:

"Q The sales data that you have at your disposal that you reviewed, is that sufficient for you to calculate damages in this case?

A I believe so.

Q Or do you need more information?")

THE WITNESS: I could change that answer. What I meant was do you want to give me a specific scenario so that I can determine whether or not I have the right information.

MR. DONOVAN: Q Do you know whether or not you have enough sales data at your disposal that you reviewed that are sufficient for you to calculate damages in the case?

A I believe so.

Q Now, just to go back for a moment, we were talking about line pricing, do you remember that testimony?

A I remember talking about line pricing.

Q If the defendants sell their products at the same price to their customers, whether or not they have the challenged claim, how would that impact or would it impact any calculation of damages in this case?

MS. WEINER: Asked and answered.

THE WITNESS: We -- first of all, we don't know. That's why we're doing the conjoint. I'm not aware of the challenged products not having these claims. Certainly no data has been provided to me indicating a period where they didn't use the challenged claims, so we really just don't know.

That's part of what the methodology will determine then, is to determine what the incremental portion of the price that's typically charged or the price that's charged that's associated with these claims.

MR. DONOVAN: Q In your opinion, will the price premium that you're calculating for single, singles or single packs, individual containers, can that be correlated to apply to products sold in multi packs?

A So you invoked --

MS. WEINER: Objection, form.

THE WITNESS: You invoked a correlation. Could

you be more specific about what it is I'm correlating with what?

MR. DONOVAN: Q Core respondents. Can it, can it apply? You find a price premium -- correct me if I'm wrong.

You're proposing to calculate a price premium intended to single individual units of defendants' products, yes or no?

MS. WEINER: Objection, form.

THE WITNESS: I didn't understand the question. In correlation?

MR. DONOVAN: Q I'm not -- I didn't ask a correlation. I'll with -- I'll withdraw that question, okay?

A Okay.

Q I'm asking whether it's true that you're proposing to calculate a price premium associated with defendants' products sold in single containers, is that true or not?

MS. WEINER: Objection, form.

THE WITNESS: It is true that I'm going to do a conjoint analysis on the single con -- on the single containers pack size. That will be for the defendants.

And then I also mentioned the pack sizes I would use for the competitors, but the price premium I calculate after the market simulation will tell me what proportion of the price is due to challenged claims, or another way of saying what's the incremental price that's due to the challenged claims, and having reviewed the documents from defendants, the internal documents, as well as some of the ways they market themselves to trades downstream, as well as to consumers, I have not seen any evidence that would suggest that they believe that the price premium; that is, the incremental price due to challenged claims, would vary with pack size, and so at this time, therefore, it means that I should be able to figure out the price premium for all products from the prosed -- proposed methodology.

(Whereupon, Exhibit JPD 10, remotely introduced and provided electronically to the Court Reporter.)

MR. DONOVAN: Q I show you JPD 10, sir.

Did you have a chance to see that? Do you see that?

A It's still downloading.

Q I'm sorry.
A Okay. It's open now.
Q Do you see, do you see the document, sir?
A Yes, I indicated that I could see it now.
Q Okay. Do you know what it is?
A If would appear to be the Second Amended Class Action Complaint.
Q Have you seen that Complaint before, JPD 10?
A I believe so.
Q Could you go to Exhibit A, please?
A I'm sorry, where is it? I don't have a hard copy of this. If you could tell me where I'll find it.
Q Just a minute. I'm sorry, it's at the very end.
A Okay. Exhibit A, okay.
Q Okay. Did your -- these are photos attached to the complaint in the case by the plaintiffs. Do you see that?
A I do.
Q These are actual containers. Do you see that?
A I do.
Q Do you agree with me that the no preservative

label appears on the back of the product, the
products depicted there?

MS. WEINER: Objection, form.

THE WITNESS: I'm going to work on the assumption
that what we're looking at is a 180-degree turn of
the bottle, so in that case, yes.

MR. DONOVAN: Q Wouldn't it be better to show
in your survey the actual real-world market container
when you're conducting the survey?

A Not necessarily, no.

Q Why not?

A Because the conjoint analysis can work just
fine without it.

Q You don't think there's an element of
focalism bias when you show someone just a statement
as opposed to showing a label and where it is -- it
appears on the label?

A Okay. So first of --

MS. WEINER: Objection, form.

THE WITNESS: First of all, it sounds, it sounds
like you're misunderstanding what a focalism bias is,
but no, I disagree.

It is -- this -- if you, if you actually
look at conjoint analysis in practice, the -- it's

very uncommon, it's actually relatively uncommon to use images.

There have been studies that have been done where images are deemed important. So, for example, when you're studying a new product that the respondents wouldn't -- would have never seen before with a new feature that they wouldn't have heard of before, in those cases it can, but it's not necessarily, but it can be useful to show an image if that helps the respondents understand and envision what would be the value to them of that feature, but in this particular matter, we're only testing features that are -- have been around for a while, and the people who are filling in these surveys are going to be experienced buyers of these products.

So no, I disagree, A, that it's not necessary to provide them with visual information like this with which they would already be familiar having already purchased iced teas in practice, and no, I disagree that the fact that you don't show an image does not create a focalism bias.

We've, as explained in my report, have taken many measures to avoid focalism bias, but the mere fact that the challenged claim is so important for

this particular product already more or less
eliminates any concerns about focalism bias.
MR. DONOVAN: Q Page 31 of 38 and 32 of 38 in
Exhibit A.
A Sorry, we're using the document that's online
still, and you want Page 32?
Q Yes. So in other words, Exhibit A, right,
you have Exhibit A?
A I do, okay, I see.
Q Upper right-hand corner has the page numbers.
A Got it. Yep, all set.
Q 31 and 30 -- 32 and 38 I'm directing -- and
I'll ask questions of each page here. I'll represent
to you that that decaf zero green tea with ginseng
isn't one of the 56 UPC products.
Do you know why that's the case? It's not
part of the class products. Do you know why?
A Is your question finished?
Q Yes. Why?
A I don't have an opinion about which products
are at issue. My opinion is in regard whether or not
in the event that the challenged products used
labeling that was misleading or deceptive, I've
proposed how to design -- how to implement a damages

methodology to calculate the economic damages.

Q Same question. I'll represent to you that the AriZona Zero Green Tea With Ginseng can, that's not one of the class products you're evaluating in your report.

Do you know why that's the case when it's in the Complaint?

A I'm sorry, I'm confused. Was that not the one we just looked at a moment ago?

Q No, the other one was de -- it says decaf zero. This says zero calorie.

A Sorry, that -- sorry, these are two different products, this is the one below?

Q Right.

A Okay. And your question about this product?

Q Do you know why it's not included?

MS. WEINER: Objection, form, asked and answered.

THE WITNESS: I have not formed an opinion about which products have misled respondent -- excuse me, misled class members. I have not formed an opinion about whether they were misled or deceived.

My report has an opinion about how to calculate damages for the challenged products in the event that they are -- the Courts find that people

were misled.

MR. DONOVAN: Q You know, in this case, one of the plaintiffs continued to buy the product after they sued the defendants, meaning after they formed the belief that the no preservatives statement was false, but they continued to buy the product because they like the product.

Is that, is that person -- did that person pay a prem -- a price premium?

MS. WEINER: Objection, form, and that actually mischaracterizes the record. So now you are asking a question that is actually false, so I'll let you rephrase.

MR. DONOVAN: I'm not rephrasing it.

MS. WEINER: Well, objection, form, mischaracterizes the record in this case.

THE WITNESS: You asked me if I was aware? I'm not aware of what the, what the, what the plaintiff did after suing, but.

MR. DONOVAN: Q If someone purchases the product with the belief that it has a preservative in it but doesn't care because they like the product, they like the value, did that person pay a price premium?

MS. WEINER: Objection, form, objection, form.
THE WITNESS: If, if using the proposed methodology we can establish that the market price for the challenged products would have been lower but for the challenged claims, then anybody who bought these products was harmed, they were charged an inflated price. They overpaid.
In other words, the defendants wouldn't have been able to sustain the as-is price in the market had respondents been aware of the fact -- respondents, excuse me, class members been aware of the, of the deceptive claim.
MR. DONOVAN: Q With my, with my hypothetical, the person is aware of the deceptive claim and bought the product anyway.
Did that person pay a price premium?
MS. WEINER: Objection, form, asked and answered.
THE WITNESS: And I believe I answered that question. If the market price for this product would have been lower, if the deception had been -- if the claim wasn't made on the label, then yes, somebody who buys the product in the as-is world overpaid because had the defendant not used this challenged claim, their price would have been lower, and the

consumer in this particular example would have bought this product at a lower price, so they were surcharged. They paid an inflated price that wouldn't have been sustained by a market with a dis -- with disclosure without the misleading information.

MR. DONOVAN: Q Do you know whether the IRI data captures sales at Costco?

A I believe the -- I talk about the channels that are represented by IRI are discussed in the -- in my report. One moment. Here we go.

So in Paragraph, Paragraph 48, if we go to Page 19, at the top of Page 19, there's a sentence starting: The defendants identified their top eight retailers in discovery, which include Wal-Mart, Kroger, Albertsons, Walgreens, Circle K, 7-Eleven, Sam's Club, and Costco.

I then go on to say: I understand from counsel that the IRI data produced in this case are specific to the multi-outlet and convenience retailer category, which includes these eight retailers.

Q What if that's not the case? What if one of those retailers' sales are not reported on IRI, how would that impact your report?

MS. WEINER: Objection, form.

THE WITNESS: So if you're saying -- I don't understand the hypothetical. At this time my understanding is that these chain -- these channels are included in the IRI data, and as a result -- sorry, I guess I'm not understanding your question.

(Whereupon, Exhibit JPD 11, remotely introduced and provided electronically to the Court Reporter.)

MR. DONOVAN: Q Showing you JPD 11, sir. This is referenced in your report. Do you see that?

A One moment. I'm downloading it.

Q Do you see that, sir?

A Just one moment. And what is it I'm, what is it I'm looking for?

Q JPD 11.

A Yes, but I'm asking -- I've seen the document, yes.

Q Okay. So it's referred to in your report. Why?

A Okay. This defines the multi-outlet coverage.

(Whereupon, Exhibit JPD 12, remotely

introduced and provided electronically to
the Court Reporter.)

MR. DONOVAN: Q I'm uploading another document, sir. Tell me when you have that, please.

A Okay.

Q Okay. This is JPD 12, Bates stamped 7494, 7497.

A Okay.

Q Why do you refer to JPD 12 in your report?

A So you would need to point me to the specific place in the report you have in mind.

Q Materials considered, C-15.

A I'm sorry, you --

Q Okay. Sorry.

A I also, I also have the same question about the previous one, if these are things that you're referring to in the context of my opinions in the report, or were both these documents merely in documents relied on list at the end of the report in the appendices?

Q I believe they were produced in discovery as relied upon by you, and they're referenced in the appendices.

A Okay. That's what I was making sure. I

misunderstood your previous question, and I thought -- unfortunately, closed my report and made the mistake of not reopening it, that the insinuation with the paragraph where I was talking about multi-outlet, that I had relied on one or both of these documents, but that seems not to be the case.

If these documents were simply in the materials relied upon in the end, that just means these are amongst the various documents that were made available to me most likely through counsel in their discovery, but it means that I considered them, but if they aren't referenced in the body of my report, that means I didn't directly rely on these documents to form my opinions.

Q Okay. But this was produced by you, and it says at the bottom of the first page, 7494, this is from IRI: Please note that the following retailers are not included in multi-outlet reporting, Costco, Dollar Tree, 99 Cent Only Stores. Do you see that?

A Which document are we looking at right now?

Q JPD 12.

A 12, I'm sorry. I thought we were back to 11, okay. I see the, I see the passage.

Q So IRI doesn't record Costco sales according

to this, at least as of June, 2021?
A So just to be careful here, the -- this particular multi-outlet data may not track Cost -- may not track Costco, but that doesn't mean that IRI doesn't have access to Costco data.
Q Well, do you know one way or the other whether the IRI data that you relied upon in this case, which I believe is marked JPD 9, contains sales at Costco?
A It was -- as I indicate in my report, I'm going to have to go back to the appropriate paragraph, one moment, that my understanding from counsel is that IRI data produced in this case are inclusive of these eight retailers, so that's -- that was what was made -- that was what was represented to me.
Q What paragraph number?
A I'm sorry?
Q What paragraph number is that?
A That's Paragraph 48.
Q Did you ever independently verify whether that was the case or not?
A Well, for the purposes of this report, it wasn't necessary because in this report I'm proposing

a damages methodology, so I'm not actually using the sales data specifically, so it doesn't really change my opinions about the feasibility of the methods.

Q But if Costco is not in the sales data, would it be fair to say that you would need that information in order to calculate damages in this case?

A No. I would be able to calculate the -- I can conduct the conjoint analysis, I can determine the price premium. Neither of these would require Costco data.

Q Why not?

A Because I don't use sales data for either of those two components of the analysis.

Q Going back to your report -- strike that.

(Whereupon, Exhibit JPD 13, remotely introduced and provided electronically to the Court Reporter.)

MR. DONOVAN: Q Showing you JPD 13, please. Let me know when you see that, sir.

A Yep, still downloading. Okay, I've got it now.

Q Okay. I'll represent to you this is a label

referenced in your report as being reviewed.
Do you see the label says An American Company, do you see that, left-hand corner?
A Could you point me to the place -- I'm sorry, could you point me to the place in my report where I rely on this particular image?
Q I can refer to your report. You have to look at the labels listed in C-6.
A Okay. So just to clarify, this is another example of a document that I considered in the sense that it was made available to me, but I did not rely on anywhere in the body of my report when forming an opinion about the feasibility of a damages measure in this case. I just want to make sure we're -- this is clarified.
Q Sure.
A Okay.
Q It says on this label An American Company, do you see that?
A I don't.
Q In the upper left-hand corner.
A Upper left-hand -- oh, yeah. It's really hard to see, I'm sorry.
Q Okay.

A Okay.

Q Isn't that a feature that consumers may have value to?

A That -- it's -- that's an empirical question whether or not people get value from that.

Q Well, you've already put in features or proposed to put in features, diet and non-diet.

Why didn't you say American Company?

A Well, I based my opinions on the features to include on mostly on academic research that has shown features like brand name. Pack size are important fairly ubiquitously in CPG. Iron -- same with labeling claims, I provided academic references showing the importance of labeling claims, including specifically the no preservatives claim, but I'm not aware of an academic literature that would say that the prove -- the domestic provenance of a product is important to CPG consumers.

In fact, if anything, there's a lot of doubt about whether or not American consumers for the most part care. I mean, I remember a case study of True Religion jeans. True Religion jeans was very proud of the fact they had an American flag on the inseam of their jeans, and it was later determined that most

people didn't care where the jeans came from, they just liked the fact that they were fashionable.

So I mean, you're right that it says this on the label, but notice An American Company is really difficult, it's blended in with the cosmetics, which means defendants don't seem very keen on making this visible in the same way as some of the other ones where they used colors.

Like the word "diet" is in a much larger font than "American", and it's in red and white, so it stands out.

No preservatives also in a -- the "no", and then the list here also with different colors versus American Company, remember, you had to point this out to me because it's hidden in the color scheme. This seems like a very subtle point they're making and definitely not one of the first things a reader of this package is meant to notice.

So at any rate, I consider it an empirical question whether this is important. My prior answer, it probably isn't given how hidden it is, but ultimately, it could be included in a conjoint if that was important, and it could be tested whether or not it's important, but I doubt that this would be as

important as brand or the things that are in big letters and colors here, like "diet" and "no preservatives", and then the brand name AriZona, which is big.

It substantiates your question kind of highlights that we've done a good job finding the things that are important.

Q How about if the American Company is stated twice on the label as opposed to once in color in an American -- with a flag shaped like the country?

A So you're referring to the -- sorry, is your question finished?

Q Yes. Don't you think that if it's repeated twice that it's a feature that should be on a survey if it's on the actual label?

A Not necessarily.

MS. WEINER: Objection, form.

THE WITNESS: Not necessarily. Lots of clothing items say made in whatever country on -- in the inseam. This is at the very bottom of the bottle, and the print is extremely small, so I have no reason at this time to think this is the, this is the important -- the most important attribute.

But just to make sure we're clear, if it is

important, it doesn't matter for the conjoint survey.

MR. DONOVAN: Q Do you consider this product to be a co-branded product since it refers to Arnold Palmer?

A Well, this particular one does appear to be co-branded. It's I believe the -- I don't know if I would use the word "co-branded", but there's a celebrity endorsement. This may be just a semantic issue.

Q What impact should that have on a survey when a product is co-branded?

MS. WEINER: Objection, form.

THE WITNESS: You're asking me what do I think will be the estimate? I wouldn't know. It's an empirical question what its impact would be if we included this in a conjoint.

MR. DONOVAN: Q You'll notice that it says no synthetic color on this label.

Why did you choose no artificial color as a distractor claim?

A So I'm trying to look for the passage in my report that will help answer all of these questions as a batch, but the point is that you don't need to include every feature of a product in a conjoint.

That's well-accepted practice, and I actually provided some references for you to the, to the literature on conjoint analysis, so it would be very unusual.

And frankly, not only would it be taxing for a respondent to evaluate dozens of attributes, we also already know from past research on the psychology of the consumer that when consumers go shopping and they make choices in grocery categories, they don't consider the potentially dozens or more of things that could appear on a label.

So the bottom line is the important thing for a conjoint is that we have included features that are important to the purchase process. You don't need to include them all.

This is why it's used in automobiles, for example, it's how it's used in CPG categories. As long as we have some -- at least some of the most important features for purchase, then our conjoint analysis should be capable of isolating the effect of the, in this case, challenged claim and price.

Q Okay. So we're getting, we're getting close to the bewitching hour, so I'm going to ask that -- I'm going to show you some labels, sir, okay, and all

I'm going to ask is whether you considered them for purposes of your report.

I don't need an explanation as to why unless I ask for one, okay? I appreciate you volunteering one, but it's, you know, not necessary for the next series of questions, okay, so we can just move along.

14, please.

(Whereupon, Exhibit JPD 14, remotely introduced and provided electronically to the Court Reporter.)

MR. DONOVAN: Q Tell me if you see JPD 14.

A It's going to take a few minutes for this because each file needs to be downloaded.

Q That's fine.

A Okay. Okay.

Q JPD 14, did you consider this as part and rely upon this as part of your report, this label?

A So considered and relied upon are two different things. As you can see, this is --

Q Okay. Sorry. You're right, I'll rephrase the question and try another thing.

Did you rely upon JPD 14 in connection with your report?

MS. WEINER: Objection, form.

THE WITNESS: I mean, I didn't rely on one specific label per se. What I did was reviewed the collection of labels to see which kinds of things tended to be prominently displayed, and that partially informed which additional features we included, in particular, as the distractors.

As I already indicated, for the -- the most important features for choice, brand, price, pack size, those are already there. There's a long academic precedent in CPG for including those. Those are typically the key drivers.

And then we included some additional ones, which were informed in part by looking at the labels of these products and also looking at the frequency of specific things appearing in the IRI data.

MR. DONOVAN: I'm going to ask you again, please just answer yes or no, okay? These questions about the labels are just going to be yes or no questions. I don't need an explanation, okay?

(Whereupon, Exhibit JPD 15, remotely introduced and provided electronically to the Court Reporter.)

MR. DONOVAN: Q JPD 15. And I'm not asking for an explanation. Please let me know if you see JPD

15. Yes or no, have you seen it yet, sir?
A Nope. Still waiting for it to upload -- or download, excuse me. Okay, yes.
Q Did you rely on JPD 15 in your report, yes or no?
MS. WEINER: Objection, form, asked and answered.
THE WITNESS: I'm going -- I'm just going to defer to my previous answer for the last question since it's exactly the same, and the previous answer wasn't customized to the specific label.
MR. DONOVAN: Q Did you rely on this label in connection with your report, JPD 15, yes or no?
MS. WEINER: Objection, form, asked and answered.
THE WITNESS: So I'm going to refer to the previous answer. I'm happy to repeat it again. If you want me to have it repeated, we could have the court reporter to kindly repeat my answer to the previous one, but since the previous answer wasn't customized to that specific label, it's the same answer that you'll get, I suspect, on all of these labels.
MR. DONOVAN: Q Can you answer the question yes or no, can you, sir?
MS. WEINER: Objection, form.

THE WITNESS: The question merits context. As I said, I've already answered it with context, and I'd be happy to do so again.

(Whereupon, Exhibit JPD 16, remotely introduced and provided electronically to the Court Reporter.)

MR. DONOVAN: Q Please let me know if you see JPD 16.

A Okay.

Q Yes or no, did you rely on JPD 16 in connection with your report?

MS. WEINER: Objection, form.

THE WITNESS: Once again, this is something I've already answered. This is a question that merits context to the word "rely", and I'd be happy to answer this with appropriate context for what it means to the scope and con -- the ways in which I relied on it, I'd be happy to answer this, but I don't think my answer would be different from the one I gave earlier.

MR. DONOVAN: Q Do you know whether or not you relied upon JPD 16?

MS. WEINER: Objection, form, asked and answered.

THE WITNESS: So to the extent that my analysis

with the -- was looking at frequently-used labeling claims by the defendants, I looked at these, the collection of these ones.

I didn't rely on any specific label per se, it was more the collection of the labels to get a sense of which kinds of claims tend to be featured prominently on the labels of the products. That in conjunction with the IRI data and the reported frequencies with which other features tended to appear in the data ultimately were relied upon, those different things were relied upon, in me deciding which features to include in the survey.

(Whereupon, Exhibit JPD 17, remotely introduced and provided electronically to the Court Reporter.)

MR. DONOVAN: Q JPD 17.

JPD 17, please let me know if you have that in front of you, sir.

A Okay.

Q Did you rely on JPD 17 in rendering your report?

A I will kind --

MS. WEINER: Objection, form.

THE WITNESS: I will kindly ask the court

reporter to repeat my answer to the previous incarnation of this same question but with respect to the previous label.

MS. WEINER: Bob, are you --

MR. DONOVAN: Q That's not permiss --

MS. WEINER: Are these documents like listed in Dr. Dubé's Materials Considered List?

MR. DONOVAN: Yes.

MS. WEINER: Okay. I just wanted to know.

THE WITNESS: So I'm going to just ask the court reporter then just to repeat it because --

MR. DONOVAN: No, that's not permissible, sir. You have to answer the question. You can't have a court reporter repeat an answer as your answer.

MS. WEINER: Objection, form, asked and answered. We can do this for all the labels, Bob. Let's do it. He's asked -- he's answered the question five times.

You can go ahead and answer it again, Dr. Dubé.

MR. DONOVAN: Q No, that's okay. I'll withdraw, I'll withdraw the question, that's fine.

Sir, is it fair to say that if you omit a major feature in a survey, that can inflate the value of minor features that are included in the survey?

A That's incorrect.
Q Have you ever offered an opinion in a case where the challenged claim appears to be exclusively used by a defendant?
A I'd have to think back. The answer is probably, but I'm not a hundred percent sure. We would have to go through my testimony record, and then I would have to re -- try and remember from -- I'd have to try and go through memory whether or not the defendant in that case was the exclusive user.
Q What's the --
A Sometimes the -- actually, I can, I'm sorry, I can answer. Sometimes the defendants, their challenged claim is part of the brand. So the Natural American Spirit would be an example of a defendant whose challenged language at the time I was forming my opinions was exclusively on their labels.
Q What significance, if any, arises from that with respect to --
A None.
Q Do you recall opining in the Lytle case? You were the expert in the Lytle case, correct, yes or no?
A I'm sorry, which libel case are you referring

to?

Q Not libel, Lytle v. Nutramax.

Were you an expert in that case, yes or no?

A I was an expert in more than one Nutramax case.

Q Lytle v. Nutramax.

A Oh, I'm sorry. I was -- it's really hard to hear you when you don't -- unless you're close to the thing, so I heard libel.

Okay, yes. I thought it was pronounced Lytle, Ly-dell. Okay. Yes, I was involved in that case.

Q Do you recall opining there that, quote, "Since the four-challenge claims appear to be exclusively used by defendants, there is no way to use such market data alone to isolate the effects of the challenged claims on demand for the challenged products or to determine the price premium associated with the challenged claims," do you remember saying that in that case?

A In that case, I recall that what's called a hedonic analysis, which is sometimes used in cases --

Q I asked, I asked whether you remembered, sir.

A I'm sorry, you interrupted.

MS. WEINER: Don't --

THE WITNESS: I'm sorry, I wasn't finished.

MS. WEINER: Bob, nope, don't interrupt the witness. The court reporter cannot take the testimony down. Do not interrupt him.

MR. DONOVAN: Q I'll strike the question.

Do you remember saying in a report that, quote, "Since the four-challenge claims appear to be exclusively used by the defendants, there is no way to use such market data alone to isolate the effects of the challenged claims on demand for the challenged products or to determine the price premium associated with the challenged claims", end quote, do you remember making that statement?

MS. WEINER: Objection.

MR. DONOVAN: Q Yes or no?

MS. WEINER: Objection, form.

THE WITNESS: So, again, there is a methodology that is sometimes used in class matters like these called hedonic analysis, and the hedonic analysis takes field data, like similar to the IRI data, to try and es -- to try and estimate the price premium from the field, and in the case of the Nutramax, because the defendant was the only one who ever used

the challenged claim, if I was to do an econometric analysis of sales and price, et cetera, type data, field data, I would never be able to disentangle the impact of the brand, the brand name, and the impact of the challenged claim.

That was exactly why instead, as in this case, we proposed to use a conjoint analysis as conjoint analysis by its very nature is designed to help isolate different features.

So you can think of the conjoint as a solution to the imperfections of field data, and the conjoint is partly why it's accepted so frequently in class actions.

MR. DONOVAN: Q Will your methodology calculate the difference between what the consumer paid for the product and what the product's market value would have been but for the challenged claim, yes or no?

MS. WEINER: Objection, form.

THE WITNESS: It will not be the market value of the product but for the claim, I'm not sure what you meant by that.

MR. DONOVAN: Q Will you be evaluating the difference between what the consumer paid for the product and what the product's market value would

have been but for the challenged claim?
A You will need to define market value for me. I suspect the answer is no, but I don't know what you mean by market value.
Q What's your definition of market value?
A There is many different ways you can assess a market value, but the most common one we would use would be to say how valuable is something to a market, would be to look at something like the compensating differential. This would be like John Hicks's work. You could calculate surplus measures, those would be other ways to do it. I'm not -- I'm just not sure what you have in mind when you say market value.
Q Well, we'll use your definition, your first one, the John Hicks's one.
Will your model or methodology calculate the difference between what the consumer paid for the product and what the product's market value would have been but for the challenged claim?
A No, it would not make sense for me to calculate a difference between an as-is price, which I think is what your first part was asking about, and then the Hicksian compensating differential in the

but for world, no, that would not make sense.
Q Would your methodology calculate the difference between what the consumer paid for the product and what the product's fair market value would have been but for the challenged claim?
MS. WEINER: Objection, form.
THE WITNESS: I just need you to define what you think is a fair market value.
MR. DONOVAN: Q You define it. What's -- you're an economist. What's the, what's the generally-accepted definition? There's a generally-accepted definition of what a tort is. Is there a generally-accepted definition of what fair market value is? Use that.
A It sounds like a legal term to me, not an economic term.
Q So do you know whether or not your methodology will calculate the difference between what the consumer paid for the product and what the product's fair market value would be but for the challenged claim, do you know?
A You have not defined the fair market value for me, so this is an unanswerable question. This -- perhaps you have a legal term in mind. That is not a

term we normally use in economics.
Q Do you know whether or not there were any issues that the defendants encountered during the class period concerning cost of packaging?
MS. WEINER: Objection, form.
THE WITNESS: Sorry, I don't know what cross of packaging means.
MR. DONOVAN: Q Cost of packaging.
MS. WEINER: Objection, form.
THE WITNESS: I'm sorry, I still don't know what cross of packaging is.
MR. DONOVAN: Q Cost, cost.
A Oh, costs.
Q You know, what costs more. Yeah.
A I'm sorry, you understand, it's very hard to hear you. You don't articulate well, and you're far from the microphone.
Q I'm sorry I'm not articulating well. Please let me know when you don't understand a question.
Do you know whether there are any issues that the defendants encountered during the class period concerning cost of packaging?
MS. WEINER: Objection, form.
THE WITNESS: I don't recall problems about costs

of packaging. It doesn't seem relevant to the feasibility of my method as I didn't rely on any documents about their costs of packaging in formulating my method.

MR. DONOVAN: Q Do you know whether there were any issues encountered by the defendants during the class period concerning the cost of ingredients?

MS. WEINER: Objection, form.

THE WITNESS: I am aware of the fact that during inflation, the defendants in order to maintain a 99 cent price or MSRP, because that's not what's always charged, chose to reduce the pack size to 22-ounce for the can.

This is often called shrinkflation. It's a form of deception to try and fool consumers into thinking that they're getting the same size packaging as the price and the overall look of the product still looks the same. So that would be an example of how to sustain the MSRP they are interested in.

They had to, they had to actually reduce or degrade the quality of the product in order for it to be -- and presumably to be less costly to supply. Presumably, had they not done that, they would have had to raise their price, and I do recall materials I

relied on where Mr. Vultaggio said that he was probably going to have to increase the MSRP. Those may or may not have been cost driven.

MR. DONOVAN: Q Do you know whether the market supply in California of the defendants' products fluctuated during the class period?

A What do you mean by the market supply fluctuated?

Q Went up and down, went down, changed.

A Sorry, I just want to know what you mean by supply. What fluctuated?

Q Do you know what a supply curve is?

A I do.

Q What is it?

A In a perfectly --

MS. WEINER: Objection, form.

MR. DONOVAN: Q What is a supply curve?

A Sorry, are you finished with your question?

Q Yes. I'm responding to the objection, sorry.

What is a supply curve?

A In a perfectly competitive market, which would be a market where everyone is selling a pure commodity with no differentiation, i.e., consumers would be abso -- would be entirely indifferent

between the commodity sold by one firm versus another firm, in that particular kind of market, this is a hypo -- this is a theoretical market as such markets really don't exist, but in a perfectly competitive market, a supply curve would indicate the total quantity of all products by all firms in the market that gets sold at the current prevailing market price, and the supply curve can exist precisely because everyone charges the same price precisely because their products are undifferentiated.

Q Does your model calculate the supply curve?

A There would --

MS. WEINER: Objection, form. Sorry.

THE WITNESS: There wouldn't be -- sorry. There wouldn't be -- the fact that we have a differentiated product oligopoly means that theoretically there's no such thing as a supply curve in this market.

As I answered earlier, the concept of a supply curve is something that applies to markets in perfect competition with commoditized goods, and as a result of their commoditization, there is one single market price for every firm, in other words, firms are price takers, and the supply curve measures the total volume of all firms' outputs. That wouldn't

actually make any sense. That object isn't really defined in a differentiated product market.

MR. DONOVAN: Q Does your model -- I'm sorry, does your methodology analyze where the supply curve intersects with market demand?

A Sorry, your question is confusing in light of my previous response. There's no supply curve in a differentiated product market. You're asking whether my methodology would calculate a point of intersection in a market where everyone is selling an identical product, and I don't think defendants or their competitors would agree with your characterization of such a market, and therefore, if I was to use a method looking for the intersection of a demand curve and a supply curve, I would almost surely have the wrong model for this industry.

Q Does your report propose to isolate the value in price associated with the challenged statement alone?

A I'm afraid I'm not familiar with the term "value in price". It might. Could you please define that term for me?

Q Well, does your report propose to evaluate what consumers -- or how consumers value -- well,

strike that.

Have you ever heard of the term of the "marginal consumer"?

A I have heard the term "marginal consumer", yes.

Q What does that mean?

A You would have to define a setting for me so that I could explain what the marginal consumer is.

Q In this case, what's the marginal consumer?

A Again, there is --

MS. WEINER: Objection, form.

THE WITNESS: Sorry. There is no person who is just the marginal consumer. A marginal consume -- when you talk about marginal analysis, you're talking about a response to an infinitesimally small change. This is a -- it's borrowed from the language of calculus.

So you would need to define a scenario for me, and in that scenario, with a specific change, I can then tell you who would be marginal, who would be at the margin for that particular change. Short of that, the question you asked isn't -- is not well-founded.

MR. DONOVAN: Q Back to your report, please.

59.

A Okay.

Q You have this one, two, three, four, fifth sentence, starts with "sometimes"?

A Okay.

Q Sometimes a no-purchase alternative is included in the set -- in the choice set. Excuse me. Do you see that?

A I do.

Q Why?

A Why do I see this?

Q No. Why is, why is a no-purchase alternative included in the choice set?

A To ensure that consumers have the opportunity not to buy. This is important for learning the value they assign to different features.

Q Okay. And you have sometimes.

Is it going to be always -- does that mean that sometimes there will not be a no-purchase alternative and sometimes that there will?

A There can be settings where what's called forced choice that requires somebody to select one of the products in the list or one of the choices in the list, can be an appropriate design, but for a matter

like this one, that would be inappropriate.

You would want to include the no-purchase option since, recall, the conjoint is like an experiment, we're randomizing features, and it's possible that some of the profiles, the product profiles, that you show to respondent might not be desirable, and as a result, they might actually prefer not to purchase anything if those profiles are sufficiently undesirable. Forcing them to buy it would overinflate the value that we infer about those attributes.

Q I get that.

So would it be fair to say that that sentence to be accurate should say "in every instance a purchase alternative is going to be included in the choice set"? My issue is with the words "sometimes", Doctor. That's all.

MS. WEINER: Objection, form.

THE WITNESS: I think this is a matter of context. I mean, sometimes, meaning in some conjoint analyses no-purchase alternative is included, and I believe that later on in my report, I confirm that I do intend not only to include a no-purchase, but I think I also clarify that I will be using this sort

of -- using a dual-response formulation as the way I implement the no-purchase.

MR. DONOVAN: Q For purposes of designing the survey, will the respondents always have the choice not to buy the product?

MS. WEINER: Objection, form.

THE WITNESS: So just Paragraph 59 is describing choice-based conjoint in general, and I talk about what happens in choice-based conjoints in general, and then I indicate sometimes, a no-purchase alternative is included in the choice set for conjoints -- for choice-based conjoints in general, but later in my report, when I finish discussing the features I plan to use in the conjoint I will implement, I also then explain exactly how I will include the no-purchase, and amongst other things, I say I will have -- this is Footnote 76 on Page 32. Let's make sure we have the sentence.

It says -- I clarify: In each choice task, respondents will first be asked to indicate their preferred product in the available set. I think I read this to you earlier: Then respondents will be asked whether they would purchase that preferred product at the price indicated. And then I provide

some nuance in Footnote 76.

MR. DONOVAN: Q Doctor, I'm not trying to put words in your mouth, okay, I just want to kind of streamline, and you tell me if I'm wrong.

Are you saying Footnote 76 means that in every instance a respondent will be given the option not to buy the product?

A No. I said that --

MS. WEINER: Objection, objection, asked and answered.

THE WITNESS: I indicated in the last sentence of Paragraph 70: Then respondents will be asked whether they would purchase that preferred product at the price indicated.

MR. DONOVAN: Q Okay. So will there be an option in all instances for the person, the respondent, to say no, I won't buy the product at all?

A I believe my reading of Paragraph 70 already answered that question, but as I already indicated in Paragraph 70, in each of their task -- in each choice task, respondents will first be asked to indicate their preferred product in the available set. Then respondents will be asked whether they would purchase

that preferred product at the price indicated. Which would be a yes or a no product -- question, i.e., they could say I would not purchase even the thing I like the best.

Q Now I understand. Thank you.

Go to Page 17 of your report.

A Okay.

Q This deals with the sample of the respondents. A and B I'm concentrating on.

A Sorry, which paragraph are you looking at?

Q 45.

A Paragraph 45.

Q I'm sorry, I'm mistaken. 46, Page 17, A and B.

A Okay. So Paragraph 46, yes.

Q So why, why are you -- your sample would include -- the sample members to be qualified to the study have to say that they purchased the product within the last 12 months or shopped or purchased.

Why does it have to be the last 12 months?

A Well, as you look at the sentence immediately after B, it says: Note that I used a 12-month time horizon for illustrative purposes.

But typically we don't try and get people to

remember a behavior that would have applied to many, many years in the past.

Q Why?

A Because we don't. It would be harder for someone to remember. We want somebody -- the whole point of this survey is to get people who are familiar with the products that we're testing and that have thought recently about purchase, maybe they're considered or actually purchased in the category, so when they fill in the survey, they would be able to give meaningful responses. Somebody who hadn't thought about iced teas for, you know, seven or eight years might not recall what their likely purchase behavior would be.

Q According to this report, anybody who didn't shop or purchase the class products or one of the competing brands or within the next 12 months didn't have the plan to make that purchase, that person could not participate in the survey?

A The fact that somebody is already considering the category tells me that they've already thought about these products.

Q If someone has not within the last 12 months shopped for or purchased the class products on one of

the contained brands and/or states within the next 12 months they plan to do so, would they be allowed or qualified to participate in the research study?

MS. WEINER: Objection, asked and answered.

THE WITNESS: So just to, just to reiterate, the 12 months was an illustration of a time horizon. It doesn't have to be 12 months, but in general, people who have purchased relatively recently and people who know that they intend to purchase relatively soon, that's sort of the way we're thinking about this.

That would be a screening question, and I would screen out people who neither anticipate buying or -- nor have recently purchased to make sure that the responses to the survey are from people who are familiar with the products and familiar with the purchase context. This is a very -- fairly standard in conjoint analysis.

MR. DONOVAN: I'm going to jump ahead. I'm skipping exhibits. So this is JPD 37.

MS. WEINER: Bob, I know it says JPD 37, but do you want to just mark it for purposes of the deposition 18 or no?

MR. DONOVAN: If that's where I'm at, sure, that makes sense. You can --

MS. WEINER: The court reporter, the court reporter can just note that.

MR. DONOVAN: Yeah, because it's going to say it on what's shown to the witness, but yeah, we can just say subject to remarking. We'll call it JPD 37 subject to remarking JPD 18. Does that make sense?

MS. WEINER: Yep.

(Whereupon, Exhibit JPD 37 - Remarked Exhibit JPD 18 - remotely introduced and provided electronically to the Court Reporter.)

MR. DONOVAN: Q Okay. I'm going to show you JPD 37, Doctor.

A Okay. I've got it.

Q I'm really going to try to move matters along, okay?

A Okay.

Q Is JPD 18 the New York Times article that you mentioned earlier?

A That could be, yes. Yeah, it looks like it.

Q Do you subscribe to New York Times?

A Sadly, but only the Sunday Times. I read the Wall Street Journal otherwise.

Q So the article says -- it says a lot of

things, but I'm focusing in on one, two, three, the fifth paragraph. It starts, "If the price of a tallboy of AriZona Iced Tea had kept pace with inflation". Do you see that?

A I do.

Q Do you agree with that paragraph?

MS. WEINER: Objection, form.

THE WITNESS: I have not got the data at this time to determine what their optimal price would be had they -- and I also don't know what they mean by "kept pace with inflation". I don't know if I agree with this or not.

MR. DONOVAN: Q What about the second sentence, would you agree that the 99 cent price remains so central to the company's identity that the numbers are displayed on the can boldly and prominently, would you agree with that assessment?

A Well, for starters, we already know --

MS. WEINER: Hold on. Objection, form.

THE WITNESS: We already know from our discussion earlier that the price frequently isn't 99 cents. We saw that there's variants in the price.

We also saw early-year labels that didn't have the 99 cents on this, so I don't, I don't know

what you, what you mean when you ask whether or not I agree with this, but we know that -- we've seen counter evidence already today.

MR. DONOVAN: Can we take a five-minute break? Subject to talking to John, I may be close to done. That's okay?

MS. WEINER: Sure. Let's hold on one second. Let's go off the record.

THE VIDEOGRAPHER: Going off video record. The time is now 22:36 UTC.

(Brief recess taken.)

THE VIDEOGRAPHER: Back on the video record. The time is now 22:44 UTC.

MR. DONOVAN: Q Doctor, do you know -- we were talking about the IRI data that you looked at, which is JPD 9.

Do you know whether or not that data records online sales at grocery stores and outlets, meaning, you know, sales order on a computer?

A I'm just going back to my Paragraph 48. I know that the top, the top retail outlets are largely offline, and it includes that, Wal-Mart, Kroger, Albertsons, Walgreens, Circle K, 7-Eleven, Sam's Club, and Costco. I don't recall off the top of my

head whether or not it includes online sales, I just don't remember. Sorry, late in the day.
Q Understood.
A It seems -- I think you showed me a document that listed Amazon, which would suggest it does.
Q Go to Paragraph 83, which is the end of your report, please, sir.
A I'm sorry, Paragraph 83 of which?
Q Your report, JPD 6. Yeah, 6, right?
A Okay. Paragraph -- oh, the conclusion, yes.
Q Yes.
A Okay.
Q You say here in the third, fourth sentence: Therefore, I have not -- I have yet to determine the incidence or magnitude of damages, although I am confident I will be able to do so. Do you see that?
A I do.
Q Well, wouldn't it also be fair to say that you don't -- you have yet to determine the existence of damages?
A Well, isn't --
MS. WEINER: Objection, objection, form.
THE WITNESS: Sorry, I'm trying to understand the question. If the existence of damages is defined by

a number bigger than zero, and I don't know the magnitude of the damages, I think we know the answer to that.

My report, as I explain at the beginning, is preferring a method, and my opinions are about the feasibility of that method, and my conclusions here are saying that I feel confident that I can implement that method, but as we've already established early throughout the day, I have not yet programmed the survey or collected the survey data or done the market simulation, so I think it follows obviously. I just want to make sure I'm not misunderstanding your question.

MR. DONOVAN: Q Fair enough. I look at incidence, you said incidence.

What does that mean?

A Well, isn't the incidence mean the occurrence of?

Q If that's what you mean by it, okay.

The next sentence says: The data necessary to conduct my analysis and damage calculations are available from several sources. Defendant's own business records.

What records are you referring to there?

A I would look at their internal documents.
Q What internal documents?
A The ones that were made available to me during discovery.
Q And the ones that -- are they comprised of everything you referred to in your report?
A You -- the back-up materials you received should include any document that was made available to me and that I considered even if I didn't rely on it explicitly for this stage of the analysis, which is the methods, the preferring of method.
Q Industry resources, what does that refer to?
A Resources from the industry.
Q Can you be more specific?
A A company's website.
Q Anything else?
A It could be an industry association, a trade journal.
Q Do you know?
A Do I know if there's a trade journal?
Q No, do you know the -- can you be more specific -- well, strike that.
And what do you mean by potentially, independent market researchers (e.g., IRI)?

A Of the IRI data.
Q Why did you say potentially?
A Because there's a potential I will rely upon the IRI data for my damages calculations.
Q There's a potential that you won't?
A I suppose.
Q Do you believe there would be a corresponding realignment of prices by other competitors referenced in your report in the event that the defendants' products were sold without the challenged claim?
MS. WEINER: Objection, form.
THE WITNESS: I'm not sure I understand the question. If you could -- I think I know what you're asking, but if you could just restate it, please?
MR. DONOVAN: Q Sure. Do you think that competitors would change their prices in response to the defendant removing the challenged claim from their product?
MS. WEINER: Objection, form.
THE WITNESS: That's a, that's a possibility, but there would be a supply side response by competitors that if the defendants take the label -- change their labels and adjust their prices, that that could change demand.

It could potentially draw demand away from rivals, it could potentially push demand towards rivals, and they in turn would potentially adjust their prices in response to this. That's a possibility.

Whether the, whether the market simulation ultimately predicts a realignment, as you put it, of competitors' prices and the magnitude of such a realignment of the curves is an empirical question, and once we implement the damages methodology, we'll see, but that's certainly allowed for by the methodology I proposed.

MR. DONOVAN: Q Why compare cans to bottles?

MS. WEINER: Objection, form.

THE WITNESS: I don't know if I've explicitly said I will compare cans to bottles, but it's certainly if that's the reality of the market, then that would be, that would be something that could be included in the conjoint, the consideration of whether you're buying a bottle or a can.

MR. DONOVAN: Q Just generally speaking, I'm trying to get to the finish line here, would you consider that bottles have more value to consumers generally than a, than a can because they can seal it

where usually a can, you know, it doesn't have a sealing ability?

MS. WEINER: Objection --

MR. DONOVAN: Q I'll strike the question.

Are you, are you, are you aware of -- did you read the plaintiffs' testimony in this case?

A I'm not sure I know which plaintiffs' testimony. I read their depositions.

Q It's not referenced in your report.

A I think I definitely quoted a deposition. I talk about Vultaggio's quote of the CMO --

Q That's fine. I'm not saying that.

A Well, hold on. You have to let me finish.

Q I'm sorry to interrupt. I'm trying to finish.

A Hold on, if I could finish my answer just to --

Q Sure.

A -- make sure the record is correct, --

Q Sorry.

A -- and you claim that I didn't -- can I finish?

Q Sure.

A I want to -- let me finish. So I want to

make sure the record is correct.

You allege that I did not, I did not indicate that I relied on deposition transcripts, and I did indicate I did rely on a deposition in the body of my report, one of the depositions by Mr. Vultaggio and his reference to an e-mail to a CMO talking about, talking about the importance, the importance of the no, the no preservatives claim and the fact that they view themselves -- the product as trailblazing on -- trailblazing in the healthcare -- amongst healthcare con -- excuse me, health-conscious consumers.

Q I was talking about the plaintiffs' deposition, not the defendants. I'll concede that you referred to referring that.

You didn't -- you don't refer to reviewing the plaintiffs' depositions, and I want to know why?

MS. WEINER: Objection to form.

THE WITNESS: My apologies.

MS. WEINER: Are you asking if he reviewed them or if he put the -- if he considered them? You asked the first time whether he considered them, and now you're asking if he reviewed them.

THE WITNESS: Actually, I think I can clarify

here. It's my -- I'm sorry, because it's late in the day.

MR. DONOVAN: Q Sure.

A You said plaintiff, and I heard defendant.

Q That's fine.

A So that's -- yeah.

Q I'll start from the beginning. It's totally okay. I know it's been long. You've been great, Doctor, you know, your patience. I understand.

With respect to the plaintiffs, did you ever read their deposition transcripts?

A I did not.

Q Did you ever read any of their interrogatory answers?

A I did not.

Q And there's a, there's a summary judgment decision in this case.

Did you read that?

A I don't, I don't recall reading that, no.

MR. DONOVAN: Just give me one second, please. I think I'm done. I'm done. I have nothing further. Thank you for your patience, Doctor.

THE WITNESS: Thank you.

MS. WEINER: I'm going to have a couple

questions, but I'd like just five minutes to use the restroom and gather myself.

THE VIDEOGRAPHER: Going off video record. The time is now 22:56 UTC.

(Brief recess taken.)

THE VIDEOGRAPHER: Back on the video record. Time is now 23:01 UTC.

EXAMINATION

By Mr. Weiner:

Q Dr. Dubé, I have just a couple of follow-up questions for you. I know it's been a long day. I will be brief.

A Thanks.

Q How did you receive the facts and data you considered in forming your opinions in your report, Exhibit 6?

A Are we talking about Table 6?

Q No. Well, how did you receive the materials that you considered, what was the method of transmission?

A My -- I don't one-hundred percent remember, but I'm going to guess that I dropped something like a shared fold -- a secured share folder on Box, was probably used.

Q Are there any facts or data you considered that you obtained from a source outside the documents that were provided to you?

A Not that I -- if I did, it would be mentioned in my report.

Q Outside of the materials that you considered, which is an exhibit to your report, are there any facts or data you received from any other source?

A I mean, there's the academic papers and things that I relied on. Those would be outside of what was provided to me from counsel and through the discovery.

Q Did Ryan Dorow provide you with facts or data that you considered here independent of what you received in your Materials Considered List?

MR. DONOVAN: Objection to form.

THE WITNESS: I'm -- Ryan's main job was to conduct the data analyses that I requested, and he and his team -- or he and the team that he was on performed that analysis for me.

I don't recall if Ryan provided me any document or fact. If it would, if it would be, it would be cited here, as I've put everything I've relied on in here, but I don't recall getting any

document from Ryan as opposed to from counsel.
MS. WEINER: Q Did Ryan author any of the opinions in your report?
A No. I wrote the report myself.
Q To the extent that Ryan did any data analysis, was that done at your direction?
MR. DONOVAN: Objection, form.
THE WITNESS: The work that was done -- I'm sorry.
MS. WEINER: Q Was the work that was done by Ryan or any of the data analysts in this case done at your direction?
MR. DONOVAN: Objection, form.
THE WITNESS: That's my -- that's the way in which Econic normally provides support to me. So I write my own reports. I often share drafts of the report with the team so that they can do formatting, like, you know, they're getting the footnotes and the references and whatever all in order, and then to insert the tables that I request from them. So the team was definitely in charge of doing analysis and formatting of the IRI to create the tables I requested.
MS. WEINER: Q Did you confirm the reliability

of the data work that was conducted by the Econic staff?

A Most of it. I don't go through -- I didn't go through at this time because the data work was pretty basic. It was just playing around with the spreadsheet and calculating, as we just went through in detail today, moments of the distribution, mostly of prices, and then some other -- some ranking data and so forth. This was not very complex data analysis.

Q Are you confident that it was -- that the data work is accurate?

MR. DONOVAN: Objection, form.

THE WITNESS: I have not seen any reason to think the data work was done incorrectly, no.

MS. WEINER: Q Are all of the opinions contained in Exhibit 6 your opinions?

A These are my opinions, yes.

Q Do you know whether other point-of-sale data, like Costco or 7-Eleven, was produced in this case?

A As I indicate in Paragraph, I believe it's 49 -- in Paragraph 48, excuse me, it was my understanding -- it's my understanding that the data, the data include those channels, include those trade

channels.

Q You said that you didn't need Costco data in authoring the opinions in your report, but is it possible you might consider additional point-of-sale data at a -- at the merits phase in authoring your opinion?

MR. DONOVAN: Objection, form.

THE WITNESS: I could, yes.

MS. WEINER: Q If there is -- so the list of data you considered in authoring this report doesn't necessarily include the universe of data you might utilize in actually executing the conjoint survey and market simulation?

MR. DONOVAN: Objection, form.

THE WITNESS: Yeah, as I indicated, there may be other data sources that were in the discovery documents that are listed right now as considered, but weren't necessary to form the opinions at this point with the -- about the feasibility of the method.

MS. WEINER: Q Have you worked with this -- any number of the staff at Econic on other cases?

A I have.

Q Do you trust that they are qualified to

conduct the work that you directed them to do here?

MR. DONOVAN: Objection, form.

THE WITNESS: Well, actually, I signed an exclusivity arrangement with Compass Lexecon several years ago after working with Tom Stemwedel and others on the, on the airbags case. That was fantastic. They're the best.

And so when John Orszag formed Econic and Tom let me know that he was going to be switching, I immediately said I would switch too because I wanted to be able to continue to work with Tom Stemwedel and his team.

I'm trying to remember if -- I've worked on matters since I've joined -- affiliated with Econic that involve Ryan as well. I don't recall if I worked with Ryan while he was -- while we were at Compass or not, I just don't remember, but we've worked on several matters through Econic.

I take it back, I did work with Ryan as well at Compass, now I'm remembering, in the Meta Supernatural case merger.

MS. WEINER: Q Would you, and correct me if I'm wrong, but would you classify the work they did here as analyst work?

MR. DONOVAN: Objection to form.

THE WITNESS: That's primarily the role they played in this particular matter, was to analyze the data under my direction, yes.

MS. WEINER: I don't have any further questions. Thank you.

MR. DONOVAN: I have nothing. Thank you, Doctor.

THE WITNESS: Thank you. Thank you, everyone.

THE VIDEOGRAPHER: Going off the video record. The time is now 23:10 UTC.

MS. WEINER: We'll review the transcript.

MR. DONOVAN: You reserve to sign.

MS. WEINER: Yeah, I'm going to review and reserve.

STATE OF ILLINOIS )
) ss:
COUNTY OF W I L L )

I, NANCY DECOLA EATINGER, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken remotely before me at the time and places therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting;

I further certify that I am neither counsel for, nor related to, any party to said proceedings and not in any way interested in the outcome thereof.

The signature of the witness was not waived, and the deposition was submitted, pursuant to the Rules of the United States District Court for the Southern District of New York, to the deponent per copy of the attached letter.

In witness whereof, I have hereunto subscribed my name.

Dated: February 26, 2026



_________________________

Nancy DeCola Eatinger, C.S.R.
CSR No. 084-003451

C O R R E C T I O N P A G E

I made the following changes for the following reasons:

PAGE LINE ERRATA SHEET

____ ____ CHANGE: ______________________________
____ ____ REASON: ______________________________

____ ____ CHANGE: ______________________________
____ ____ REASON: ______________________________

____ ____ CHANGE: ______________________________
____ ____ REASON: ______________________________

____ ____ CHANGE: ______________________________
____ ____ REASON: ______________________________

____ ____ CHANGE: ______________________________
____ ____ REASON: ______________________________

____ ____ CHANGE: ______________________________
____ ____ REASON: ______________________________

____ ____ CHANGE: ______________________________
____ ____ REASON: ______________________________

____ ____ CHANGE: ______________________________
____ ____ REASON: ______________________________

____ ____ CHANGE: ______________________________
____ ____ REASON: ______________________________

____ ____ CHANGE: ______________________________
____ ____ REASON: ______________________________

____ ____ CHANGE: ______________________________
____ ____ REASON: ______________________________

____ ____ CHANGE: ______________________________
____ ____ REASON: ______________________________

(signed) ______________________________ DATE ____________

Reporter: NANCY DECOLA EATINGER

## Exhibits

**EX 0001 Jean-Pierre Dube, Ph.D. 021926** 45:9
**EX 0002 Jean-Pierre Dube, Ph.D. 021926**
**EX 0003 Jean-Pierre Dube, Ph.D. 021926** 4:10 75:5,23 76:4
**EX 0004 Jean-Pierre Dube, Ph.D. 021926**
**EX 0005 Jean-Pierre Dube, Ph.D. 021926**
**EX 5A Jean-Pierre Dube, Ph.D. 021926**
**EX 5B Jean-Pierre Dube, Ph.D. 021926**
**EX 0006 Jean-Pierre Dube, Ph.D. 021926** 264:16 267:17
**EX 0007 Jean-Pierre Dube, Ph.D. 021926**
**EX 0008 Jean-Pierre Dube, Ph.D. 021926**
**EX 0009 Jean-Pierre Dube, Ph.D. 021926 Cover page**
**EX 0010 Jean-Pierre Dube, Ph.D. 021926**
**EX 0011 Jean-Pierre Dube, Ph.D. 021926**
**EX 0012 Jean-Pierre Dube, Ph.D. 021926**
**EX 0013 Jean-Pierre Dube, Ph.D. 021926**
**EX 0014 Jean-Pierre Dube, Ph.D. 021926**
**EX 0015 Jean-Pierre Dube, Ph.D. 021926**
**EX 0016 Jean-Pierre Dube, Ph.D. 021926**
**EX 0017 Jean-Pierre Dube, Ph.D. 021926**
**EX 0018 Jean-Pierre Dube, Ph.D. 021926**

## $

**$1.06** 140:8 189:21
**$1.18** 189:18
**$10** 106:6 108:13 190:22
**$100** 143:9 185:10
**$156,382.85** 69:6
**$2** 104:18 189:20 190:20
**$2.40** 187:6
**$20** 106:8
**$29,497.50** 58:2
**$3** 104:20
**$3,000** 59:20
**$3,971.63** 62:9
**$343,976.63** 65:10

## 1

**1** 25:24 27:12 45:9 64:4,11,14 78:17 79:8,15 123:22
**10** 208:18,21 209:8
**10,000** 200:1
**11** 69:1 70:13 135:14,20 194:9,23 217:8,11,17 219:22
**11th** 64:3
**12** 78:11 144:17 217:24 218:6,9 219:21,22 250:19,20 251:17,23 252:1,6,7
**12-A** 78:15,24
**12-B** 79:13
**12-month** 250:22
**12-pack** 131:19
**12:30** 109:14,15
**13** 65:4 103:16 221:17,20
**14** 62:23 79:24 80:13 82:14,19 85:12 86:15 228:7,8,11,16,22
**15** 80:19 110:6,9 111:10 112:7 229:20,23 230:1,4,12
**15,000** 59:19
**156,382** 69:4
**15:03** 6:4
**16** 70:20 231:4,8,10,22
**16:12** 51:6
**16:20** 51:9
**17** 145:3,4 232:13,16,17,20 250:6,13
**18** 54:6,8,19 55:9,23 56:10 252:22 253:6,9,18
**18-ounce** 174:22
**180-degree** 210:5

**18:03**
110:1
**18:33**
110:4
**19**
6:2 216:13
**19:35**
144:2
**19:38**
144:5
**19th**
6:4
**1:30**
109:13
**1st**
79:2

## 2

**2**
48:7,11,12 49:3 50:2,10 64:4,11,14 70:18,24 71:24
**20**
31:22 58:11, 12,13,17,23 59:1,13,19 65:14,19 69:10 154:4, 23 160:18
**2017**
78:17 79:2 154:7 155:18
**2019**
79:8,15
**2020**
118:12 138:1,9 146:14,20
**2021**
146:21 220:1
**2022**
142:12 143:15
**2023**
78:17 79:2, 8,15 138:2, 3,9 142:4,6, 12 143:5 144:10 155:18 189:16
**2023's**
142:7
**2025**
28:15 54:6, 8,19 55:9,23 56:10 62:23 63:8,17 64:3 65:4 67:9
**2026**
6:2,4
**21**
88:24
**21:10**
203:24
**21:20**
204:3
**22**
90:4 99:7 118:17
**22-ounce**
165:16 241:12
**22:36**
255:10
**22:44**
255:13
**22:56**
264:4
**23**
67:9 99:5 100:11 118:16 139:6 154:7
**23-ounce**
139:3 146:5 147:7 150:24 151:6,18 152:12 165:16 174:23 187:6 189:19 190:20
**23:01**
264:7
**23:10**
270:10
**25**
133:12,18 134:3
**25th**
189:17

## 3

**3**
51:20,24 52:2,20,23 58:5,6 63:8 75:5,23 76:4
**3-26-23**
138:9
**30**
109:16,17, 18,21,22,23 170:13 212:12
**31**
191:15 212:3,12
**32**
212:3,6,12 248:17
**33-ounce**
188:1,5
**34**
120:1,2
**35**
109:20 121:17
**36**
103:16
**37**
252:19,20 253:5,8,13
**38**
212:3,12
**39**
103:19 112:23 115:11

## 4

**4**
27:23 53:3, 6,12 54:4 62:20 154:19,21 155:12 161:7
**45**
250:11,12
**46**
155:1,2 250:13,15
**47**
81:23
**48**
216:12 220:20 255:20 267:22
**49**
267:22

## 5

**5**
57:9,12 67:6 80:4 130:13
**53**
154:22
**54**
130:7
**56**
71:1 72:1,6, 16 73:9,11, 21 74:4,6,10 75:10 212:15
**59**
82:8 246:1 248:7
**59591**
144:18

**5a**
60:3,6,10,16 61:18,24 62:20 65:10, 18
**5b**
66:18,23 68:24 69:11

**6**

**6**
45:1 63:5 69:17,18,22, 23 70:11 74:20 77:14, 16,18 78:12 110:7 128:10 129:18 133:16,21 153:8 256:9 264:16,17 267:17
**6-backpack**
131:19
**68**
135:2 157:15 158:23 159:6 162:18 164:13 165:2 166:14 204:4,8
**6a**
70:5 133:19, 24 134:2 153:8

**7**

**7**
58:1 62:21 74:22,23 75:7,17,23 76:5,16,18 77:4
**7-eleven**
216:16
255:23 267:20
**70**
201:1,15 249:12,19,21
**71**
130:10,19
**74**
181:1
**7494**
218:6 219:16
**7497**
218:7
**7499**
62:7
**7501**
62:21
**7503**
63:6
**7509**
67:7
**751**
69:1
**75th**
189:17
**76**
248:17 249:1,5
**79**
146:23

**8**

**8**
123:8,11,13
**83**
256:6,8

**9**

**9**
63:17 127:6, 9,12,15,18, 22 129:15 132:15,23 133:4,8 134:3 135:7, 22 137:14, 18,24 138:3 142:3,8 144:7,9 148:12,22 149:13,15 152:22 155:21 156:1 160:16 161:2,3,4 185:5 189:14 191:13 220:8 255:16
**90**
165:24
**95**
149:2
**97**
189:17
**99**
118:18,20 165:15 166:2,5 188:1,5 219:19 241:10 254:14,21,24
**9:00**
104:3
**9:03**
6:2
**9th**
27:21

**A**

**A.M.**
6:2
**abandon**
106:16
**ability**
261:2
**able**
20:3 32:22 91:16 118:9 171:12 189:10 208:15 215:9 221:8 237:3 251:11 256:16 269:11
**above**
55:7,21 126:10 159:2 205:4
**abso**
242:24
**academic**
98:20 101:7 223:10,13,16 229:10 265:9
**accept**
24:23 104:9
**accepted**
197:20 237:12
**access**
220:5
**account**
130:10,19
**accounting**
100:7
**accurate**
17:1 247:14 267:12
**accurately**
32:23
**accustomed**
143:11 161:10 164:21
**achieve**
117:17
**acid**
111:20
**acquire**
95:5
**acronym**
71:5
**across**
83:21 84:15 104:19

152:17 155:4 171:9 187:2 200:2 202:20
**action** 6:12 13:4,9, 14,18 15:1, 5,10,20 16:7,18 17:1,9,20,22 45:16 209:7
**actions** 13:22,23 237:13
**actual** 8:11 25:8 30:2 56:15 87:1 115:22 116:2 141:2 142:19 143:13 171:24 181:12 192:5 197:14 209:21 210:8 225:15
**add** 140:14
**added** 16:13 64:5, 11
**addition** 64:15 132:16 161:18
**additional** 89:10 94:19 159:3 229:5, 12 268:4
**adjust** 259:23 260:3
**adjustments** 118:22
**admittedly** 100:1
**advance** 42:24
**advised** 21:15
**affect** 156:12 158:16,21
**affected** 149:13
**affects** 146:1
**affiliated** 269:14
**afraid** 14:12 16:10, 16 20:17 32:19 50:12 71:22 72:13 73:16,22 112:13 244:20
**aggregated** 181:5,18,19
**aggregation** 128:5
**ago** 11:3 19:15 22:24 23:24 44:18 111:17 114:6 161:7 182:20 185:9 199:24 213:9 269:5
**agree** 6:6 94:24 95:10 114:16 209:24 244:12 254:6,11,14, 17 255:2
**agreeing** 56:16
**agreement** 11:18,20 31:23 32:17 33:1,7,9,13, 15 34:2 35:17 54:4
**agreements** 33:3,6,14
**ahead** 32:4 81:14 119:19 129:14 158:11,12 176:24 183:12 191:14 233:18 252:18
**aids** 172:16
**airbags** 269:6
**aisles** 159:21
**Albertsons** 216:16 255:23
**alert** 51:13
**allegation** 86:1
**allegations** 110:23
**allege** 80:23 112:10 262:2
**alleged** 156:15
**allegedly** 77:7
**allocated** 43:17
**allocation** 41:5
**allow** 26:12 62:12 99:21 165:23
**allowed** 22:14 252:2 260:11
**allowing** 100:9
**alternative** 101:6,17 102:10,14
125:7 246:6, 12,20 247:15,21 248:11
**alternatively** 179:12
**alternatives** 201:16,17
**Amazon** 256:5
**amenable** 102:6
**amended** 169:21 209:6
**American** 222:2,18 223:8,20,23 224:4,10,14 225:8,10 234:15
**amount** 33:24 69:6,9 115:16
**anal** 122:15
**analogous** 137:7
**analogy** 104:17 106:4
**analyses** 36:15,22 39:2 42:21 82:7 247:21 265:18
**analysis** 15:2,7,10,22 16:8,20 18:1,14,19 20:7,19 25:8 29:5 41:2 42:20 67:11, 12 80:17,21 81:7,15,16, 24 82:2,3 84:23,24 86:20,22 87:14,15

88:16 89:2, 4,10,12,14, 17 92:4,14 98:12 99:9 100:3,12 101:23 112:8 122:6,16,18, 23 123:4 124:9,11,18 136:6,10,24 140:9,21,23 141:1,16 142:1,5 143:3 146:9 147:21 150:7,22 151:11,14, 16,23,24 152:1,6,7,16 154:23 155:9 157:22 158:6,17 159:1 160:5 166:1 170:10 173:5 174:5 177:17 182:7,10 184:1,4 185:24 186:6,10 188:15 190:1,5 207:22 210:12,24 221:9,14 227:3,20 231:24 235:22 236:20 237:2,7,8 245:14 252:17 257:21 258:10 265:20 266:6,21 267:10

**analyst**
179:1 269:24

**analysts**
266:11

**analytics**
83:20

**analyze**
80:9,18 81:4 244:4 270:3

**analyzed**
80:12 82:5

**analyzing**
109:9

**and/or**
41:9 88:1 195:20 252:1

**answer**
9:3,6,13,21 11:15 12:1 13:11 14:16 15:18 16:16 17:5 20:4 21:4,8,16,24 22:12,14,15, 18,19 23:8 28:7 30:8, 18,22 31:5,6 32:7,22 33:10,23 37:13,20 40:14 41:15 42:15 46:16 47:1 58:15 60:15 68:22 82:11 91:6 96:10 105:19 108:3 114:22 119:4 125:20,23 126:2,8 135:17 141:22 149:12 155:13 158:2 159:24 167:16,18 169:9,10 170:5 183:6, 8,12,19,21 187:3 201:3, 4,7,13 205:1,12 224:20 226:22 229:17 230:8,9,15, 17,18,20,22 231:16,18,19 233:1,13,14, 18 234:5,13 238:3 257:2 261:16

**answered**
14:11 30:6, 13,14 31:3 39:19 42:16 45:17 50:19 56:6,13,24 59:15 62:2 73:10,15 74:16,17 85:7 86:12 89:18 93:16 95:18 98:2,3 125:11 140:11 141:21 149:8 150:6 151:8 152:14 156:20 157:6 158:3 161:13 162:22 167:13 179:23 186:13,19,23 189:22 198:12 200:16,18 202:15 203:6,8 206:6 213:17 215:17,18 230:6,13 231:2,14,23 233:15,17 243:18 249:10,20 252:4

**answering**
9:9 21:14 160:11

**answers**
202:5 263:14

**anticipate**
252:12

**antitrust**
97:14 98:17

**anybody**
10:12 68:5, 16 75:21 215:5 251:15

**anyone**
10:16 114:2

**Anytime**
106:14

**apart**
114:15,16

**apologies**
11:4 262:19

**apologize**
10:13 16:13 42:24 47:18 61:12 89:19 129:11 205:3

**appeals**
200:3

**appearances**
6:15

**appearing**
26:3 229:15

**appears**
139:24 175:17 210:1,17 234:3

**appendices**
64:21 153:23 218:20,23

**appendix**
64:5,12,16, 17 71:2 72:8 94:20 95:20 97:10 121:4

**applied**
251:1

**applies**
243:19
**apply**
206:21 207:4
**apportioning**
24:21
**apportionment**
24:23
**appreciate**
228:4
**approach**
182:5
**appropriate**
81:21 95:16
102:2,5
108:4 179:11
200:19
220:11
231:16
246:24
**Approximately**
34:21
**arises**
234:18
**arising**
124:4
**Arizona**
70:16,21
134:21
135:22
137:18
138:8,21
139:1,2
141:20
144:10
145:4,7,12
146:14 147:7
150:4,24
151:6,17
152:11
156:18
161:22 162:1
165:14
174:22
185:10 187:5
188:22
189:16
190:20
191:1,4,9
203:4 213:3
225:3 254:3
**Arizona's**
111:20 139:9
163:22
**Arnold**
226:3
**around**
118:12
160:20
211:13 267:5
**arrangement**
32:10 269:4
**array**
200:2
**arrow**
144:14
**art**
108:23 109:1
**article**
253:18,24
**articulate**
240:16
**articulating**
240:18
**artificial**
195:4,20,21
197:4 226:19
**arts**
106:1
**as-is**
25:10 115:19
215:9,22
238:22
**asked**
14:11 18:24
22:4 30:6,9,
13 31:3
39:19 45:17
50:6,13,14
56:13,24
59:15 60:9
73:10,14,15
74:16 80:9,
12,14,18
81:4 84:1,8
85:7,13
86:15 87:4
88:7,11
91:11 93:16
99:17
110:14,17
111:17
125:11
137:10
141:21 149:8
151:8 152:14
156:14,20
157:6 161:13
162:22
167:13
169:20 173:4
177:13
179:23
183:10,12
186:13,19,23
189:22
196:11
197:11
198:10,12,23
199:2 200:16
202:2,3,11,
15 203:6
204:14 206:6
213:17
214:17
215:17
230:6,13
231:23
233:15,17
235:23
245:22
248:20,23
249:9,12,22,
24 252:4
262:21
**asking**
9:15,16
10:21,23
11:17,18
12:14 13:13
16:5 19:1
20:14,18,20
22:23 30:11,
24 52:15,16,
17 55:3,18,
19 60:13,14,
15 73:2,5,
17,19,23
74:2 84:13
89:15 90:12,
14,20 91:6
96:8 105:9,
15 123:13
153:3 168:3,
4,9,24 169:2
172:4 175:11
176:7 194:21
198:24 200:9
207:16
214:11
217:18
226:13
229:23
238:23 244:8
259:14
262:20,23
**aspect**
22:13 204:24
**aspects**
25:10 115:8
**assemble**
49:22
**assembled**
43:10
**assess**
108:22
181:23 238:6
**assessment**
254:17
**assign**
187:20
246:16
**assigned**
43:10
**assignment**
20:24 22:5
79:24 80:2,3
**assist**
23:6 29:5
36:4 172:16
**assisted**

36:22 38:24 41:2,4 67:10
**associated** 71:7 86:10 96:15 98:11 103:22 107:18 110:18 113:13 118:1 122:10 156:16 163:22 174:11 206:16 207:17 235:18 236:12 244:18
**association** 258:17
**assortment** 99:24 117:3, 4
**assume** 49:14 107:9 110:22 120:21
**assuming** 89:20 97:1 107:15
**assumption** 83:3 91:14 110:12 120:20 121:2,5,10 210:4
**assumptions** 101:24 102:2,4 103:6 110:9
**at-issue** 72:18
**attached** 75:4 209:17
**attaches** 75:5
**attained** 35:3
**attempt** 80:23 81:1 112:16,19
**attend** 110:21
**attention** 27:23 123:22
**attorney** 7:9,22
**attribute** 225:23
**attributes** 143:2 148:10 188:12 202:17,19 203:11,12 227:6 247:11
**auction** 106:3,14,22 107:4,7,24 108:2,6,8, 10,11
**audio** 6:4 8:21 9:8
**author** 266:2
**authoring** 268:3,5,10
**authorized** 22:3
**automobiles** 227:16
**available** 100:2 107:1 143:6 160:21 202:3 219:10 222:11 248:21 249:23 257:22 258:3,8
**average** 107:13,16 139:16 140:17 141:7,8,19 142:13 144:11 145:9 146:11,12, 13,22 147:1, 6 149:2,6,11 150:4,12,16, 23 151:5,17 152:11,17 181:6,9 189:21
**averages** 150:18
**avoid** 184:17 185:13,14 211:23
**avoidable** 122:9
**aware** 28:19 68:3, 13,23 74:12 83:22 93:23 165:18,20 166:7 196:7, 8,10,19 206:8 214:17,18 215:10,11,14 223:16 241:9 261:5

**B**

**back** 30:15,21 39:5 44:14 51:8 52:7 66:12 73:5 82:14 99:7 108:7 109:13 110:3,6 115:11 121:3 125:4,22 128:22 129:5 130:6 132:24 133:5 135:12 137:14 144:4 185:17 191:14 192:16 194:6 204:2 205:2, 21 210:1 219:22 220:11 221:15 234:5 245:24 255:12,20 264:6 269:19
**back-up** 45:22,24 49:12,15,21, 23 87:22 139:23 258:7
**background** 34:23 39:4,8
**backup** 45:21
**backups** 49:10 50:14
**baffle** 148:16 184:13 185:12
**baffling** 185:14
**bar** 71:7 159:22
**bar-coded** 165:12
**bargain** 101:14
**base** 84:16
**based** 11:18 69:10 71:20 85:24 87:24 92:4 101:24 142:20 152:7 160:21 161:1 223:9
**basic** 8:20 117:7 267:5

**basis**
11:13,17 46:22 47:2 80:16 86:17 87:6 88:9 97:15 137:4 157:12
**batch**
226:23
**Bates**
58:1,4 62:21 63:5 67:6 69:2 218:6
**bear**
25:23 27:8
**began**
20:18
**beginning**
33:19 107:22 151:2 173:13 183:14 185:17 194:7 257:4 263:7
**behalf**
6:11,18,21 16:20 18:1, 13 53:20
**behavior**
142:24 146:1 150:11 174:9 251:1,14
**behaviors**
188:20
**belief**
214:5,21
**believe**
12:16 18:18 27:18,20,21 39:20 40:22 42:16 43:4 44:15 64:1 67:2 69:12 74:17 84:2 87:21 95:18 152:21 202:5 204:20,21 205:10,20 208:11 209:9 215:18 216:9 218:21 220:8 226:6 247:22 249:19 259:7 267:21
**believed**
103:23
**below**
105:5 107:13,16 165:2 213:13
**benefits**
101:13 103:22 113:13 131:8
**besides**
28:20 43:14 68:20 77:7
**best**
68:21 107:2 136:2 173:15 199:8 250:4 269:7
**better**
7:3,4 52:10 108:16 210:7
**beverage**
77:10,13 175:14,15,16
**beverages**
120:9
**bewitching**
227:23
**bias**
210:15,21 211:21,23 212:2
**bid**
108:6
**big**
169:11 225:1,4
**bigger**
257:1
**bill**
68:24
**billable**
66:6,10
**billed**
59:9
**billing**
31:20
**billings**
59:1,2,4 65:15
**bit**
175:20
**black**
93:23 94:1 145:4,7
**blank**
51:12
**blended**
224:5
**block**
133:22
**blurry**
52:8,9
**Bob**
7:8,22 11:10 22:20 52:6 143:20 153:16 167:20 182:22 197:24 233:4,16 236:3 252:20
**body**
219:12 222:12 262:4
**boldly**
254:16
**bonus**
33:17,20
**borrowed**
245:16
**bottle**
77:4 132:6 146:13 180:5 210:6 225:20 260:20
**bottled**
138:13,16 180:18
**bottles**
24:16,17,24 25:2 119:8 132:10,12 260:13,16,23
**bottom**
219:16 225:20 227:12
**bought**
86:7 91:20 102:18 106:7 107:8 113:17,20 215:5,14 216:1
**Box**
264:23
**brackets**
165:4
**brand**
105:11 138:21 155:18 156:17 157:4 159:19 160:13 161:1,19 162:8,18 163:1,10 164:10 165:5,10 166:4,14,15, 17,24 167:4, 8 168:13 169:6,23 173:11 174:1 175:4,5 193:16 202:13 203:14 223:11 225:1,3 229:8 234:14 237:4

**brand's**
163:23
173:8,22
**brands**
120:14,23
134:19,20,24
135:1,4,6
137:3,5
138:1 153:14
154:5,23
157:9,11
159:3,18
160:5,8,10,
13,15,17,20,
22 161:3,8
162:6,7,9
163:5,6,17
164:14,18
165:3 166:7
168:20 171:9
175:2 187:11
202:14
203:12
251:17 252:1
**break**
47:19 50:21,
23 51:17
104:2,4
109:11
143:21,24
198:1 201:2,
3 203:1,17
255:4
**breaking**
34:1 154:10
**brief**
8:4 51:7
104:7 110:2
123:20 144:3
204:1 255:11
264:5,12
**briefly**
10:7,8 11:3
**bring**
28:10 29:1
45:1,5,14
47:6
**Brisk**
136:14
174:22
187:23
188:1,5
203:4
**broadcast**
25:7,10,11,
13
**brought**
28:13,17
45:22 47:9,
11 70:1
**Bryan**
199:24
**bunch**
160:10
199:16
**bundle**
131:15,18,20
**bundles**
131:2,21,24
**bundling**
131:12,13,14
**business**
47:24 257:23
**buy**
106:5,7
125:14,17
126:4,15,18
145:12
190:22 191:2
214:3,6
246:15 247:9
248:5 249:7,
17
**buyers**
116:6 211:15
**buying**
108:12,23
130:17
159:16
199:10
252:12
260:20
**buys**
96:22 131:11
215:22

**C**

**C-15**
218:12
**C-6**
222:8
**c.v.**
99:3
**cal**
87:7
**calculate**
24:23 84:15
85:5,17
86:20 90:8
94:10,20
95:16,21
96:5,13,14
98:15 101:7
102:14 103:4
110:18
111:8,24
112:4 125:6
152:16 182:9
186:11,15
204:12,19
205:8,18
207:6,17
208:3 213:1,
23 221:6,8
237:14
238:11,17,22
239:2,18
243:11 244:9
**calculated**
80:15 84:4
85:6,10,14
86:16,22
87:6 88:8
103:5 116:5
**calculating**
87:8 103:18
206:19 267:6
**calculation**
24:14,17
84:17 94:8,
17 112:14
152:19 206:4
**calculations**
81:11 83:20
85:14 88:12
257:21 259:4
**calculus**
245:17
**calibrate**
152:24 156:3
**calibrated**
141:16
**California**
78:16 79:1,4
140:10,18
141:17
143:14
146:16,18
147:7 148:24
151:1,6,18
152:12
153:13
154:4,5
155:5,19
161:12 242:5
**call**
24:4,5
67:11,14
117:2 253:5
**called**
7:16 44:8
103:8 153:13
175:21
235:21
236:20
241:14
246:21
**calls**
40:17 41:17
**calorie**
177:22 178:9
179:7,21
180:12
213:11
**calories**
175:22
178:18,21
179:11,14

180:3,5,7, 15,17
**camera**
52:7 93:12
**canned**
138:12,16
**cans**
119:9 132:11 151:18 152:12 260:13,16
**capable**
227:20
**capacity**
31:9
**capture**
99:22 199:10
**captures**
200:4 216:8
**care**
167:24 214:22 223:21 224:1
**careful**
220:2
**case**
7:23 8:13 9:4 13:9 15:7,8 17:10 18:4,5,6,8, 9,11,12,20, 21 19:7,11, 17 20:6,15, 21,24 21:3 22:5,9,20 23:2,11,13, 18,21,24 24:1,5 25:3, 15 35:14 36:2,5 38:9, 23 40:1 41:1 43:13 52:13, 19 53:20 54:5,7,22,24 55:12,15 56:2,12,17, 20 57:19 61:1 67:5, 18,23 68:2,4 71:17 72:22 74:1,13,15 75:11 76:14 77:10,12,15, 19,20 83:7 87:2 92:20 95:13,21 107:16 111:18 119:21 123:21 124:20 128:9 131:16,17 144:22 158:2 159:17 164:11 177:19 197:21 204:12,19 205:9,19 206:5 209:18 210:6 212:16 213:6 214:2, 16 216:19,22 219:6 220:8, 13,22 221:7 222:14 223:21 227:21 234:2,10,21, 22,24 235:3, 5,12,20,21 236:23 237:7 245:9 261:6 263:17 266:11 267:20 269:6,21
**cases**
13:14,22 15:1 16:7,18 17:7,9 23:18 92:16 97:14 211:8 235:22 268:22
**categories**
93:24 121:6 166:8 178:3 227:9,17
**category**
93:24 124:20 137:3 159:17 165:13 177:16 195:16 199:11 216:21 251:10,21
**cautious**
22:7
**CC**
40:20
**CCED**
40:5 41:17 44:22
**celebrity**
226:8
**cell**
140:8
**cells**
139:24
**cent**
219:19 241:11 254:14
**central**
109:14 254:15
**cents**
118:18,20 146:23 149:3 165:15,24 166:2,5 188:1,5 189:17 254:21,24
**certain**
59:2 80:10
**certainly**
45:7 67:20 68:20 134:8 166:12 180:2 192:7 193:9 196:1 206:10 260:11,17
**certification**
75:5,6 123:21
**certified**
24:22 81:12
**cetera**
57:2 237:2
**chain**
105:12 217:4
**challenged**
24:16 25:9 72:21 74:6 83:3,4 86:6 91:14,18,22, 24 96:16 98:12 100:24 101:2,9 102:18 103:1,23 110:19 112:21 113:13 114:16 118:4 119:23 125:14,15 126:15,16 127:4 135:10,14, 19,23 136:7 137:2 146:5 156:10,19 157:4,8 159:10,13 161:24 163:23,24 164:2,6,11 187:21 189:12 190:10 191:6,8,11, 17 192:15 193:18,19 194:6,10,12 202:22 206:3,9,11 208:4,6,13 211:24

212:22
213:23
215:4,5,23
227:21
234:3,14,16
235:17,19
236:11,13
237:1,5,17
238:1,20
239:5,21
244:18
259:10,17
**chance**
208:22
**change**
141:18
142:24
143:15
146:3,8
148:7 150:10
157:21
158:6,12,14,
21 163:17
174:21 191:6
197:21
205:12 221:2
245:15,19,21
259:16,22,24
**changed**
141:23 147:5
156:8 242:9
**changing**
143:1,2
163:17
**channels**
216:9 217:4
267:24 268:1
**characterizat ion**
14:14 244:13
**charge**
58:19,22
62:9 91:17
95:2 105:6
118:7
119:10,22
148:1 165:24
166:2 266:21
**charged**
94:13,15
97:4,7
100:24
118:10
141:2,11
142:21
149:23
181:10
182:12
206:15,16
215:6 241:12
**charges**
243:9
**chat**
26:3
**check**
62:24
115:14,15
116:4,5
**checking**
26:21 63:9,
12 64:7
**Chicago**
35:2
**choice**
131:12
142:24
149:17
150:11
159:12,15
163:8 164:22
167:2 171:14
172:17 174:6
188:12,13
198:7 199:5
200:5,8
201:16,17
202:1,9,10,
12,20 203:9,
10,14 229:8
246:7,13,22
247:16
248:4,11,19
249:21
**choice-based**
142:16
199:21 200:3
248:8,9,12
**choices**
147:19 148:7
160:12 165:7
173:11,24
174:17
198:18 199:5
227:9 246:23
**choose**
78:20 136:23
137:4 160:13
187:11 195:3
198:18
200:11,12
203:5 226:19
**chooses**
179:9
**choosing**
76:16
**chose**
241:12
**chosen**
76:9 77:5
78:20 79:4,
20 134:20
136:16
160:14
**Circana**
82:2
**Circle**
216:16
255:23
**circles**
176:9
**cite**
64:6
**cited**
87:23 265:23
**citric**
111:20
**claim**
70:16 77:10,
13 80:21
81:2 86:13
91:24 101:2
103:23
108:19
112:9,17,21
113:13
114:16 118:4
125:15
126:16 127:5
135:10,19,
20,23 136:4,
7 156:10,19
157:4,8
159:10,13
161:24
163:23,24
164:2,6,11
175:17,18
178:7 187:21
189:12
190:10
191:6,8,12,
17,18,21,22,
23 192:3,15
193:4,18,19
194:6,10,11,
12 195:10,12
196:9 202:22
206:3 211:24
215:12,14,
21,24 223:15
226:20
227:21
234:3,14
237:1,5,17,
20 238:1,20
239:5,21
259:10,17
261:21 262:8
**claims**
83:3 86:1,6
91:14,18,22
96:16 98:12
100:24 101:9
103:1 110:19
119:23 131:9
135:14
193:13
195:3,6,9,14
196:8,19
206:9,11,17
208:5,7,13
215:5

223:13,14 232:2,6 235:14,17,19 236:8,11,13
**clarified** 222:15
**clarify** 14:5 15:4 37:17 40:12 44:7 46:4 48:24 50:15 62:1 80:20 97:13 108:1 157:16 222:9 247:24 248:19 262:24
**clarifying** 30:15 49:16
**class** 13:4,9,14, 18,22,23 14:24 15:5, 10,20 16:7, 18 17:1,9, 20,22 24:22 70:22,24 72:1,5,10,24 73:3,18 75:4,11 76:3,7,10,22 78:16 79:1, 5,7,15 81:2, 12 83:1,21 84:15 85:23 86:2 91:22 99:11 101:8, 9 102:16,17, 21 103:21 110:15 112:18 113:10,11,16 115:16,17 116:6 123:20 125:8 142:11,21 144:21 145:8,17 147:3 149:6, 24 150:4,13, 18,19 151:1, 7,19 152:12, 17,18 154:6 163:7 209:7 212:17 213:4,20 215:11 236:19 237:13 240:4,21 241:7 242:6 251:16,24
**class-wide** 24:14 25:2 80:15 86:17 87:6 88:8 90:8
**classes** 124:3
**classification** 175:18
**classify** 269:23
**clear** 30:17 42:10 149:9 157:20 167:23 194:19 225:24
**clearer** 93:13 195:2
**clearly** 9:7 108:3
**clicked** 139:3
**client** 109:10 190:1
**client's** 190:3
**close** 48:4,6 51:2, 4 132:18,20 227:22 235:8 255:5
**closed** 219:2
**closest** 88:21,22
**closing** 132:21
**clothing** 225:18
**Club** 216:17 255:24
**CMO** 261:11 262:6
**co-branded** 226:3,6,7,11
**code** 71:6,7 144:21
**coded** 159:22
**codes** 75:12,15
**Coke** 98:13
**collapsed** 128:19 181:20
**collect** 84:22 86:19 87:14 88:12 169:16 182:14 193:1
**collected** 93:17 98:14 115:8 257:10
**collection** 116:6 229:3 232:3,5
**color** 195:4,20 197:4 224:15 225:9 226:18,19
**colors** 224:8,13 225:2
**come** 9:7 76:13 117:14 119:8
**comes** 8:22 9:11 47:17,18
**comma** 64:4,5
**commercially** 200:1
**commit** 176:12 196:5
**committed** 184:21
**commoditization** 243:21
**commoditized** 243:20
**commodity** 131:2,15,17 242:23 243:1
**common** 32:8 80:16 83:15,21,23 84:9,15,18, 21 85:2,4,18 90:9 91:2,23 101:22 121:10 130:10,16 178:2 181:20 184:4 238:7
**commonly-seen** 162:7
**commun** 43:20
**communicate** 44:19 197:1
**communicated** 68:6 171:21
**communication** 37:11 40:13 41:21 42:1,3 43:8 44:3,9, 10,12 68:11, 15,17

**communications**
11:12 35:11, 23 36:6,8,18 37:4,5,13, 18,21 38:7, 12 39:22 40:3,8 41:8, 14,18 42:6, 17 43:21 44:5,16 68:1
**companies**
97:15 147:18 200:2
**company**
29:22 39:21 120:21 222:3,18 223:8 224:4, 14 225:8
**company's**
155:21 254:15 258:15
**comparative**
136:11
**compare**
105:15 260:13,16
**comparing**
63:18 156:18
**comparison**
155:11 199:15
**Compass**
33:18 269:4, 17,20
**compensate**
83:13 102:17
**compensated**
113:11 115:18
**compensating**
238:10,24
**compensation**
83:12 101:8 103:20 115:14 124:3
**compete**
120:13
**competing**
100:10 105:16 251:17
**competition**
100:8,9 243:20
**competitive**
88:17 120:5, 23 155:6 242:21 243:4
**competitor**
88:20 105:10 136:14 203:5
**competitors**
88:18 99:10, 15 105:18 107:4,17 121:14 136:12,18 187:22 208:2 244:12 259:8,16,21
**competitors'**
99:20 157:9 260:8
**complaint**
23:5 55:13, 15,16 56:15, 16,18,21 57:4 110:23 123:17 209:7,8,18 213:7
**complete**
43:10 105:9 122:22,23 177:13 198:23
**completely**
106:16
**completing**
201:10
**complex**
267:9
**component**
87:7 102:22 112:20 119:22 124:12,13 125:18 126:19 142:15 184:9
**components**
43:18 221:14
**comprise**
77:14
**comprised**
258:5
**compute**
96:7 100:13 101:18
**computed**
102:7,8
**computer**
26:15,20 27:10 46:7 62:9,13,18, 19 255:19
**con**
136:3 149:19 151:14 207:22 231:17 262:11
**concede**
157:11 194:3 199:7 262:14
**concentrating**
250:9
**concept**
243:18
**Conceptually**
103:19
**concern**
15:2 120:9
**concerned**
42:7
**concerns**
92:21 212:2
**conclusion**
89:6 90:7,19 256:10
**conclusions**
20:6,10,15, 19,21 77:15 98:22 146:8 257:6
**condition**
18:11
**conduct**
36:22 81:14 122:5 140:15 221:9 257:21 265:18 269:1
**conducted**
12:23 81:11 88:1 267:1
**conducting**
36:15 89:14 141:24 158:17 210:9
**confident**
84:2 256:16 257:7 267:11
**confidential**
19:19,22,24 21:3,18,20, 22,23 22:2, 8,10 23:1,5, 9 25:20 32:6 33:22
**Confidentiality**
34:2
**configuration**
191:1
**configurations**
201:20
**confirm**
108:5 178:19 247:22 266:24
**confused**
14:21 16:10 72:24 172:14

213:8
**confusing**
14:13 50:12 61:19 86:14 115:23 175:21 244:6
**confusion**
184:17 185:13 188:15 189:24
**conjoint**
15:2,5,7,9, 22 16:8,19 17:2,8 18:1, 13,19 20:6, 19 25:8 84:23,24 87:1 92:13 99:9,17 100:12,21 101:21,23 122:16,18,23 123:4 124:9, 11,16,18 130:23 135:3 136:10 140:23 141:1,3,16 142:16 143:3 145:15,17, 19,22 146:8 147:13,15, 17,21 148:19 149:17,21 150:2,3,7,8, 21 151:11, 14,16,22,24 152:1,6,7 157:22 161:20 162:3,24 169:12 170:10,18,24 174:5,13 175:10 177:9,17,19 178:23,24 179:4 182:6, 13 184:1,2, 4,6 186:6,10 187:9,15,16 188:15 189:24 190:5 197:13 199:21 200:3 204:5,10 206:8 207:22 210:12,24 221:9 224:22 226:1,16,24 227:3,13,19 237:7,8,10, 12 247:3,20 248:8,14 252:17 260:19 268:12
**conjoints**
167:6 193:10 248:9,12
**conjunction**
232:8
**connection**
26:19 41:23 43:13 67:17 68:2 88:4 92:11 228:22 230:12 231:11
**consider**
50:4,16 179:20 180:8 224:19 226:2 227:10 228:16 260:23 268:4
**considerably**
66:2,8
**consideration**
260:19
**considered**
28:21 35:13, 19 36:1,9 38:8 39:24 40:9 41:10 42:2 43:22 45:3,15 49:22 50:9, 13,18,19 218:12 219:11 222:10 228:1,18 233:7 251:9 258:9 262:21,22 264:15,19 265:1,6,14, 15 268:10,17
**considering**
174:8 251:20
**consist**
71:1 72:1,6, 14
**consisted**
72:10
**consistent**
201:21
**consistently**
37:1
**constitute**
85:18 124:11 180:8 204:5
**consult**
17:10 67:16
**consultant**
30:1 31:15 54:14
**consultants**
32:9
**consulted**
10:17
**consulting**
32:24 33:15 54:15
**consume**
114:7,11 245:13
**consumed**
113:18,23 114:5,9,12 115:1
**consumer**
80:22 96:19 112:10 124:19 148:6 164:24 165:3,6 196:14 198:6 216:1 227:8 237:15,23 238:18 239:3,19 245:3,4,8,9, 13
**consumers**
83:11,13 93:8,15 99:17 102:18 103:21 115:17 117:6,13 127:4 142:17,24 145:20 160:10 161:9 171:5 178:15 191:20 200:5 208:10 223:2,18,20 227:8 241:15 242:23 244:24 246:14 260:23 262:12
**consumers'**
152:2 182:14
**contact**
34:11
**contacted**
68:9
**contacting**
50:8
**contained**
42:1 117:24 252:1 267:17
**container**
132:1 171:16 172:6,12

176:5 210:8
**containers** 45:15 77:5 206:20 207:18,23 209:21
**contains** 28:20 77:11 220:8
**content** 179:3 180:12
**contents** 12:4,6 37:20
**context** 218:17 231:1,2,15, 16 247:20 252:16
**contingent** 164:10 169:24
**continue** 6:5 118:7 125:17 126:18 168:11 269:11
**continued** 214:3,6
**contract** 33:11,17 54:12
**control** 95:1 99:10, 14 100:4 152:4 171:3, 9 172:22 173:9,23 174:18 175:5 176:15
**controlled** 171:6
**controlling** 174:2
**convenience** 216:20
**convenient** 169:15 192:23
**conversation** 182:19 184:3
**conversations** 6:8 11:12
**Conversely** 187:22
**copied** 40:20 44:21
**copies** 45:23
**copy** 45:11 47:10 70:3 133:10, 11,20 194:24 209:12
**Core** 207:3
**corner** 212:10 222:3,21
**correct** 22:18 34:15 43:3 58:20 65:23 68:24 70:2 89:3 92:1,16,21 96:12,20 98:8 113:5 115:3 128:12,14 130:21 135:11 144:12 155:19,20 157:13 160:16 174:1 183:5,7 196:12 207:4 234:22 261:19 262:1 269:22
**corrected** 61:11 62:3
**correctly** 7:6 14:16 43:1 182:16
**correlated** 206:21
**correlating** 207:1
**correlation** 206:24 207:11,13
**correspond** 144:20
**correspondences** 40:6
**corresponding** 259:7
**cosmetics** 224:5
**cost** 122:9 220:3 240:4,8,12, 22 241:7 242:3
**Costco** 216:8,17 219:18,24 220:4,5,9 221:4,11 255:24 267:20 268:2
**costly** 241:22
**costs** 95:8 118:13, 15 121:4,6 122:8,12,17 240:13,14,24 241:3
**counsel** 6:14 9:11 10:8,19,21, 22,23 11:4, 5,6,23 12:13,22 21:2,15 49:14 56:12 61:3 67:4 74:9 75:5 78:24 79:14 81:11 85:15 86:23 88:13 122:5 216:19 219:10 220:13 265:11 266:1
**Counsel's** 22:7
**count** 17:1
**counter** 89:21 90:1 255:3
**country** 225:10,19
**COUNTY** 6:1
**couple** 263:24 264:10
**course** 45:21 91:10 155:7
**court** 6:15 7:10 23:14 26:2 38:2 48:9 51:22 53:5 57:11 60:5 66:20 69:20 75:1 102:3 123:10 127:8 183:15 208:20 217:10 218:2 221:19 228:10 229:22 230:17 231:6 232:15,24 233:10,14 236:4 253:1, 10
**Courts** 24:22 25:6 85:22 91:15

102:1,19 197:20 213:24
**cover** 95:7
**coverage** 217:23
**CPG** 97:15 121:6 159:17 164:24 165:1,4,5 166:8 177:18 178:3 181:21,22 182:3,8 190:3 223:12,18 227:17 229:10
**CPG-TYPE** 177:15
**create** 37:5 39:2 137:7 201:20 211:21 266:22
**created** 76:2 134:9
**creating** 84:11
**critical** 161:15 195:7
**Cronin** 67:24 68:11, 14,15,17
**cross** 240:6,11
**cross-reference** 137:17
**crosscheck** 75:11
**cue** 105:13
**cumulative** 102:10
**current** 69:4 152:19 168:22 170:9 243:7
**curve** 242:12,17,20 243:5,8,11, 17,19,23 244:4,7,15
**curves** 260:9
**customarily** 57:21
**customer** 163:9
**customers** 93:20 95:2 164:20 206:2
**customized** 230:10,19
**custum** 162:4
**cut** 188:2
**cuts** 149:10

**D**

**D-IRI-001** 128:14
**damage** 91:23 102:11 174:11 257:21
**damaged** 111:8
**damages** 24:14 25:2 56:19 80:15 81:11 82:16, 22 83:1,6, 12,21 84:4, 6,8,15 85:4, 6,11,13,17 86:16,20,22 87:5,8 88:8 90:8 91:19 94:19 96:6, 7,13 100:13 101:18 102:8,9,10, 15,22 103:4, 5 110:17,18 111:1,9,24 112:4,14 113:10 125:6,14 126:14 150:22 152:15 156:15 163:22 169:16 174:20 195:7 204:12,19 205:8,19 206:4 212:24 213:1,23 221:1,6 222:13 256:15,20,24 257:2 259:4 260:10
**dark** 200:23
**data** 12:7 26:24 35:12,18,24 36:5,8,14 37:8 38:8,14 39:2,23 40:8 41:2,9 42:1, 7,8,13,19,21 43:22 67:11, 12 82:1,2,5, 6,7 83:19 84:22,24 86:18 87:14, 16 88:10,12 92:4,10,14, 15,18,20,24 93:1,11,17 94:11,21 97:16,17,19 98:13,15,18, 21 100:21 101:24 115:9 120:15 128:3,4,17 129:20 136:20 142:10 143:5 149:10 154:5,6 159:2 160:21 162:10 163:6 164:14 166:1 169:16 174:5,13 175:18 181:1,4,11, 16,20,23 182:8,14 184:17 185:3,7,15 186:9,11,14 187:14 204:11,16, 17,24 205:6, 17 206:10 216:8,19 217:5 220:3, 5,7,13 221:2,4,11, 13 229:15 232:8,10 235:16 236:10,21 237:2,3,11 254:8 255:15,17 257:10,20 259:1,4 264:14 265:1,8,13, 18 266:5,11 267:1,4,8,9, 12,15,19,23, 24 268:2,5, 10,11,16 270:4
**date** 19:14 28:16,

22 53:22 57:5 77:19
**dated** 27:20 54:6
**dates** 9:16
**day** 22:16 256:2 257:9 263:2 264:11
**de** 178:21 213:10
**deal** 97:24
**deals** 250:8
**debating** 158:19
**decade** 17:14,16,23 19:15
**decades** 17:17
**decaf** 212:14 213:10
**deceived** 110:16,20 111:1 112:3 213:21
**deception** 215:20 241:15
**deceptive** 212:23 215:12,14
**decided** 159:8 168:15
**deciding** 79:16 160:1 232:11
**decision** 159:21 187:10 201:22 263:17
**decisions** 97:20 99:18
**deem** 102:4 141:14
**deemed** 91:14 155:8 161:15 174:9,16 211:4
**defendant** 18:2,13,20 215:23 234:4,10,16 236:24 259:17 263:4
**defendant's** 131:7 257:22
**defendants** 6:18 7:23 18:17 85:23 87:20 88:1, 17 89:7,21 91:16 93:20 94:6 95:13 97:6 100:7, 23 107:3 115:15 117:21 118:15,21 119:2,6 120:13,16 121:11 122:1 165:23 181:4 206:1 207:24 208:8 214:4 215:8 216:14 224:6 232:2 234:13 235:15 236:9 240:3,21 241:6,10 244:11 259:22 262:14
**defendants'** 99:19 122:11,12 124:5,6 125:2 157:9 207:8,18 242:5 259:9
**defer** 230:8
**define** 70:21 83:6 88:20 119:4 135:13,15 158:19 175:15 238:2 239:7,9 244:21 245:7,18
**defined** 75:9 109:8 165:1 194:10,15,17 239:22 244:2 256:24
**defines** 217:22
**definitely** 114:8 170:12 224:17 261:10 266:21
**definition** 44:14 49:17 90:13 116:21 119:5 238:5, 15 239:11, 12,13
**degrade** 118:6 241:21
**degraded** 118:23
**degree** 35:1,3 92:2, 3
**delegated** 43:17
**delegating** 41:6
**deleted** 25:21
**deliver** 50:8
**delivered** 115:21
**demand** 81:2 100:22 106:19 107:2 112:17 118:9 124:19 135:4 152:2,5 173:9,23 175:6 182:5, 10 189:10, 11,12 202:23 235:17 236:11 244:5,15 259:24 260:1,2
**demands** 52:12,18
**demonstrate** 83:10 96:5 98:4,9 102:3 149:15
**demonstrated** 160:6
**demonstration** 150:1
**denote** 117:1
**depend** 170:6 172:23 176:19 193:4 198:20
**dependent** 18:19 131:9
**depending** 65:13 69:8 102:4 150:13
**depicted** 210:2
**deposed** 8:1,6 19:11
**deposition** 6:9 7:24 8:10,11 10:3

11:1,8,23 19:15 28:4 45:2 46:3,8, 13 47:7,9 48:4 70:2,9 168:5 183:14 252:22 261:10 262:3,4,14 263:11
**depositions** 168:9 261:8 262:5,17
**describe** 172:11
**described** 101:4 182:1
**describes** 84:16
**describing** 248:7
**desegregated** 128:18
**design** 117:16 156:3 197:15 199:9 212:24 246:24
**designed** 195:11 204:6 237:8
**designing** 248:3
**desirable** 247:7
**detail** 86:17 101:5 103:17 172:11 267:7
**details** 168:20 172:10 179:17,19 197:14
**determinant** 165:6
**determination** 8:15 81:24
**determine** 25:2 86:9 88:18 97:11 98:10 100:23 101:1 106:15 112:19 119:13,21 121:17,22 124:22 152:1,2,6 159:2 180:13 205:14 206:14 221:9 235:18 236:12 254:9 256:14,19
**determined** 85:22 95:11 106:13 122:1 172:13 184:11 223:24
**determining** 145:9
**device** 106:18
**devise** 137:12
**Diane** 18:7
**dictionary** 90:12
**diet** 175:8,14,15, 16,19,23,24 176:1,3,16 177:21 178:3,5,6,7, 8,15,17 179:5,8,12, 13,22 180:2, 3,6,9,13,14, 17 193:17 223:7 224:9 225:2
**diet always** 178:20
**difference** 62:4 71:14 103:12 107:19 124:15 237:15,23 238:18,22 239:3,18
**differences** 99:22 105:18
**different** 25:13 42:10 52:16 99:11, 12,20 100:13 101:15,24 102:1 105:10,11, 12,13,16 108:20 116:13,15,18 117:6,12 119:7,10,24 145:1,24 148:20 149:11 150:7,18,19 152:3,24 157:12 159:7 171:7,8 172:21 182:7 187:11,12, 17,20 188:19 189:8 190:14 195:1 199:16 201:18,23 202:14,17,20 213:12 224:13 228:19 231:19 232:11 237:9 238:6 246:16
**differential** 117:17 238:10,24
**differentially** 117:5,13
**differentiated** 100:1 117:3, 5 243:15 244:2,8
**differentiation** 99:22 242:23
**differently** 102:1
**differs** 175:3
**difficult** 23:3 224:5
**digital** 8:16
**direct** 40:7,13 43:8 44:2,8,12 81:21 123:22
**directed** 29:4 34:12 42:20 49:10 82:4 152:22 269:1
**directing** 11:15 46:24 80:6 212:12
**direction** 36:4 82:5 105:11 266:6,12 270:4
**directly** 24:18 40:18, 21 44:16,19 49:13 104:19 219:13
**dis** 216:4
**disagree** 210:22 211:16,20

**discard**
74:19
**discern**
20:2
**disclose**
21:18 23:4
**disclosed**
30:2
**disclosing**
22:8 23:1
154:12
**disclosure**
216:5
**discover**
46:23
**discoverable**
37:12 41:15
**discovery**
11:11,19
57:2 87:21
106:17
216:15
218:21
219:11 258:4
265:12
268:16
**discriminatio
n**
117:2
**discussed**
12:14 120:14
185:1,5
216:10
**discussing**
23:24 152:24
248:13
**discussion**
42:19 45:12
130:2 131:6
194:13,16
254:20
**discussions**
10:19
**disentangle**
237:3
**disk**
26:8
**displayed**
166:21 229:4
254:16
**disposal**
204:18
205:7,17
**distinct**
14:6 16:17
40:13 44:8
72:6
**distinction**
14:6,12
16:12,17
29:24 39:6
175:24
**distinguish**
104:13
**distraction**
195:13
**distractor**
193:13
195:3,6,8
226:20
**distractors**
160:2 229:6
**distribution**
134:12,13,
14,16,18
135:8 136:6
137:1,24
138:8 139:10
140:10 141:8
144:9 145:10
146:4 181:18
185:4 189:15
267:7
**distributors**
94:4,6
117:22
119:14,16
**divide**
182:1
**divided**
181:7
**Doable**
91:1
**doc**
75:19
**Doctor**
7:21 22:16
38:17 45:1
47:20 51:19
53:1 59:21
73:7 104:6
110:5 129:13
130:3 144:6
183:23 204:4
247:17 249:2
253:13
255:14
263:9,22
270:7
**document**
25:22 27:15
28:20,24
47:9 48:2,
13,15,22
49:7 50:22
52:4,12,15,
16,18 53:10
57:14,16
60:1,12,19
64:1 66:17
67:1 69:16
75:3 80:6
123:14
127:23
132:15 209:3
212:5 217:19
218:3 219:20
222:10 256:4
258:8 265:22
266:1
**documents**
25:20 27:6
28:1,10,13,
24 47:14
49:10,22
78:9 87:19,
22 120:15
131:7 208:7,
8 218:18,19
219:6,7,9,14
233:6 241:3
258:1,2
265:2 268:17
**doing**
26:9 97:23
177:14 206:8
266:21
**dollar**
83:10 103:20
219:19
**dollar-o-six**
139:16 140:6
**dollars**
130:18
**domestic**
223:17
**Donovan**
6:17,23 7:2,
5,8,10,12,
20,22 11:15,
20 13:7,11
14:4,15,24
15:6 16:4
17:3,17,21
18:21 19:5,
10 20:5,12,
23 21:9 22:4
23:10,18
24:1,8,12
25:14,18,22
26:5,24
27:12 28:9
29:2,14
30:9,19
31:7,16,21
32:12,24
33:7,11,23
34:19,22
35:4,8,20
36:17 37:8,
15,24 38:4,
17 39:11,22
40:7,15,20
41:23 42:12
44:4,11
45:14 46:1,
18,24 47:6
48:11,21
49:2,18

50:20 51:4, 10,18,23 52:11 53:6 54:3,13 55:1,5,19 56:7,23 57:7,13 58:6 59:21,24 60:7,14,23 62:20 64:22 65:4,9,18,22 66:15,22 68:10 69:14, 22 71:24 72:16 73:14, 19 74:14,19 75:3,21 76:3,15 77:3,9 78:3, 11 79:3,16, 23 81:16 82:11 83:15 84:7 85:10, 21 87:15 88:3,14 90:22 91:2 92:10,20 93:2,19 94:5 95:12 97:3 102:7 103:7 104:1 105:20 107:7 108:7 109:11,13, 15,18,23 110:5 112:6 113:22 114:4,15 115:1,10 116:8,16 119:1 120:1 123:3,7,11 124:24 125:9,19,22 126:1,21 127:12 129:8,11,15, 19,24 130:3 132:20,22 133:8,11,15 134:20 136:11 140:2 142:2 143:23 144:6 146:20 150:3 151:12 152:10 153:4,17,21, 24 155:13,16 156:23 157:5,10 162:14,20 163:19 166:3 167:14,17 168:7,12 178:13 180:7,19 182:11,24 183:4,8,10, 22 185:23 186:6,17,21 187:3,22 188:9 189:14 191:11 194:3 196:21 197:23 198:2,5 199:7 200:9, 14 201:2,6, 9,12 202:24 203:16,19,22 204:4,17 205:2,16 206:18 207:3,12 208:21 210:7 212:3 214:2, 14,20 215:13 216:7 217:11 218:3 221:20 226:2,17 228:11 229:16,23 230:11,22 231:7,21 232:16 233:5,8,12, 20 236:6,16 237:14,22 239:9 240:8, 12 241:5 242:4,17 244:3 245:24 248:3 249:2, 15 252:18,23 253:3,12 254:13 255:4,14 257:14 259:15 260:13,21 261:4 263:3, 20 265:16 266:7,13 267:13 268:7,14 269:2 270:1, 7,12

**Dorow**
10:11 40:23, 24 41:9 42:4 265:13

**doubt**
26:21 149:9 163:13 223:19 224:24

**download**
26:12,14,18, 23 230:3

**downloaded**
228:13

**downloading**
208:24 217:13 221:22

**downstream**
208:10

**dozen**
13:21,23

**dozens**
227:6,10

**draft**
37:11,14,21 38:10 40:3 42:14 49:12 193:5 195:2

**drafting**
36:14 37:19 38:13,15 41:14,22,24 42:7,18 43:15 67:10, 11

**drafts**
169:14 266:16

**draw**
260:1

**dreaded**
104:6

**drew**
20:6

**drinks**
70:21

**driven**
108:24 242:3

**drivers**
229:11

**dropped**
264:22

**dual-response**
248:1

**DUBE**
58:1

**Dubé**
6:10,23 7:6, 15 19:21 22:23 29:1 35:17,18 37:12,17 42:5 45:5 52:7 183:21 233:19 264:10

**Dubé's**
11:12 233:7

**due**
65:11 66:2 91:24 101:2 102:24 112:20 119:22 208:4,6,13

**duly**
7:16
**duty**
121:15

### E

**e-mail**
37:2,6 38:7 40:18,21 42:18 262:6
**e-mails**
11:11 37:3 38:5 41:20 44:15,20,23
**e.g**
258:24
**earlier**
8:12 11:2 16:23 39:21 43:16 44:1, 13 45:10 46:2 91:13 97:9 100:20 112:23 119:5 123:4 144:24 147:14 160:5 174:4 184:3, 11 185:5 204:14 231:20 243:18 248:22 253:19 254:21
**early**
39:21 194:12 257:8
**early-year**
254:23
**easier**
132:20 133:9 205:1
**easiest**
29:23
**easily**
34:2 156:7
**easy**
95:19 141:15 146:6 198:22
**Econ**
31:1
**Econic**
29:2,3,7,18, 19 30:5,10, 12 31:1,8, 11,17,24 32:10,17 33:3,14,19 34:10,13,15, 16,18 38:22 39:14,17 40:24 43:5 54:14,17 57:18 62:12, 13,18 66:12 67:5,16 68:5,16,19, 22 75:22 82:4 266:15 267:1 268:22 269:8,14,18
**econometric**
182:4 237:1
**economic**
25:2 32:8,9 56:19 80:15 82:16,22 83:1,6,12 86:16 87:5 88:8 90:8 97:22 100:13 101:18 102:7,8 110:18 118:5 124:4,21 156:15 163:21 174:11 178:6 213:1 239:16
**economics**
39:7 100:22 101:7 108:22 240:1
**economist**
239:10
**economists**
117:1
**editorialize**
73:7
**educational**
34:22 39:4
**effect**
81:1 112:17 171:11 173:9,11,23 174:1,19 175:6 188:18,19 189:10 195:12 202:21 227:20
**effects**
190:13 235:16 236:10
**efforts**
77:21
**eight**
216:14,21 220:14 251:13
**either**
26:19 28:20 103:5 168:1 175:22 192:2 221:13
**elaborate**
80:19
**electronically**
26:1 48:8 51:21 53:4 57:10 60:4 66:19 69:19 74:24 123:9 127:7 208:19 217:9 218:1 221:18 228:9 229:21 231:5 232:14
253:10
**element**
210:14
**elements**
64:2
**elicit**
147:19
**eligible**
58:21 66:11, 13,14
**eliminates**
212:2
**eloquently**
185:19
**emerge**
88:19 124:22
**emphasis**
113:7
**empir**
114:19
**empirical**
98:21 115:5 125:12,13 126:12,13 127:2,3 143:8 223:4 224:19 226:15 260:9
**employed**
31:11
**employee**
34:10 43:4
**encounter**
160:23 163:2
**encountered**
240:3,21 241:6
**end**
52:8 95:9 117:10,17,19 135:18,20 142:12 153:13 165:3 193:3 209:15 218:19 219:8 236:13 256:6

**ended**
170:22
**endorsement**
226:8
**ensure**
15:23 159:13 162:4 246:14
**entered**
31:24 32:16
**entire**
25:12 98:23 99:3 101:9 102:16 103:21 113:10 115:16,17 125:10
**entirely**
33:22 43:16 95:10 108:24 113:18,23 114:5,12 116:3 242:24
**entitled**
11:23 47:3 58:12 65:14, 19 69:10 102:21
**entry**
67:9
**environment**
201:22
**envision**
211:10
**equal**
175:22,23
**equation**
94:22 96:9, 12,14 97:9 98:6,8,10
**equations**
86:19 88:9 95:20,24 96:6
**es**
236:22
**essential**
159:10
**establish**
170:10 173:3 199:2 215:3
**established**
98:19 106:14 144:24 161:6 257:8
**establishing**
197:18
**estimate**
13:16 14:1, 4,6,8,10,22 16:2,6,12,14 39:5 182:5 226:14 236:22
**estimates**
9:17
**estimating**
60:21
**et**
57:2 237:2
**evading**
74:2
**evaluate**
147:1 149:5 150:23 151:5,15,17 152:11 227:6 244:23
**evaluating**
213:4 237:22
**evaluation**
143:18
**event**
110:19 111:8 112:1,5 118:4 172:14 212:22 213:24 259:9
**eventually**
82:6 85:1
**everybody**
86:7 91:20 102:23
**everyone**
192:23 242:22 243:9 244:10 270:8
**evidence**
80:16 83:16, 23 84:9,16, 19,20 85:3, 4,18 90:1 208:11 255:3
**exact**
19:14 33:24 35:2 41:5 97:10 101:8 139:11,23 149:22 155:3 162:8 172:22 182:12,18 183:11,22 193:2 196:5
**exactly**
42:12 43:19 74:18 95:22, 23 97:10,13, 16 116:5 141:13 144:23 147:15 176:12 179:17 181:8 182:1 192:19 193:24 200:3,20 230:9 237:6 248:15
**EXAMINATION**
7:19 264:8
**examined**
7:17
**examples**
131:21
**Excel**
27:1,3 127:9,17 128:8,24
**exchange**
42:4
**exchanged**
11:10 21:2
**excluded**
23:14 24:3 58:15
**exclusion**
25:3
**exclusive**
234:10
**exclusively**
92:3 132:10 234:3,17 235:15 236:9
**exclusivity**
32:10 33:18 269:4
**excuse**
7:10 8:16 123:14 173:1 174:15 213:19 215:11 230:3 246:7 262:11 267:22
**executing**
268:12
**exercise**
132:24
**exhaustive**
15:20 29:23
**exhibit**
25:24 27:23 28:9,18 45:9 48:7 51:20 53:3 57:9 60:3 65:10 66:18 69:18 74:23 75:5, 20,23 76:4 123:8 127:6 208:18 209:10,16 212:4,7,8 217:8,24 221:17 228:8 229:20 231:4 232:13 253:8,9

264:16 265:7 267:17
**exhibits** 252:19
**exist** 93:24 243:4, 8
**existed** 78:9
**existence** 39:18 256:19,24
**exists** 197:18
**expectation** 89:19
**expecting** 157:18
**expenses** 66:5
**exper** 83:2
**experience** 13:4,8 121:7 165:5
**experienced** 83:2,14 86:7 91:20,23 96:9 184:14 211:15
**experiment** 188:14,16,17 189:7 190:5, 6,8 202:16 247:4
**experiments** 191:10 195:19
**expert** 6:21 13:4, 14,15,21 15:1 17:12 22:6 54:21 55:11 56:1, 12 57:23 102:21 234:22
235:3,4
**experts** 67:12,14,17, 21,22 68:19
**explain** 78:3 93:4 103:17 149:22 155:1 159:19 173:7 195:5 200:7, 20 201:16,17 202:10 245:8 248:15 257:4
**explained** 78:23 81:5 100:20 134:22,23 211:22
**explanation** 91:4 193:21 194:4 228:3 229:19,24
**explicitly** 258:10 260:15
**expose** 145:24
**exposed** 99:18 164:22 188:12
**express** 89:22
**extensive** 121:7
**extent** 19:18 21:1, 3,17 32:6 33:21 36:11, 13 38:14 45:4 185:6 231:24 266:5
**extremely** 29:11 225:21

**F**

**facing** 192:10
**fact** 62:24 85:22 100:8 147:17 150:13 158:4 211:20,24 215:10 223:19,23 224:2 241:9 243:15 251:20 262:8 265:22
**factor** 174:16
**factors** 105:14 175:7
**facts** 35:12,18,24 36:9 37:8 38:8,14 39:23 40:8 41:9 42:1,8, 13 43:22 55:15 177:19 197:21 264:14 265:1,8,13
**failed** 30:17 31:6
**fair** 13:3,5 15:19 65:15 69:8 92:5 109:11 113:16 129:2,20 151:4 170:23 199:12 221:5 233:22 239:4,8,13, 20,22 247:13 256:18 257:14
**fairly** 94:16 121:7
155:7 161:8 169:18 223:12 252:16
**fall** 8:7 49:4 128:22 139:12
**false** 80:22 83:4 91:15 112:9 214:6,12
**familiar** 92:15 128:3 142:17 165:14,16 170:1 211:18 244:20 251:7 252:15
**fantastic** 269:6
**far** 119:6 121:12 130:9 240:16
**fashionable** 224:2
**fea** 194:14
**feasibility** 56:19 141:24 143:16 146:9 148:18 157:3,22 158:16,18, 20,22 163:17,18 164:9 168:17,21 172:10,19 177:14 179:16 197:13,22 199:3 221:3 222:13 241:2 257:6 268:19
**feasible** 84:3 90:8, 11,13,20,23

96:5 103:4 118:17 137:13 140:15 150:1 168:21 170:10,12 172:21 173:4 176:15 192:7 193:8 196:1 197:12,16,17 199:2

**feature**
107:12 118:6 160:1 162:18 163:1 165:11 170:18,24 175:9 193:16,19,22 194:4 204:9 211:7,11 223:2 225:14 226:24 233:23

**featured**
232:6

**features**
81:24 82:9 92:12 99:11 147:19 152:3,4 159:3,7,9,11 171:2 174:8, 12 175:13 184:4 187:12,17,21 188:16,19 189:8 190:11 194:17 201:18,19 202:21 203:15 204:9 211:13 223:6,7,9,11 227:13,19 229:5,8 232:9,12 233:24 237:9 246:16 247:4 248:14

**February**
6:2,4 27:20

**fee**
59:13

**feel**
56:5 90:17 150:6 162:7 176:9 189:23 257:7

**feels**
179:10

**felt**
25:6,11

**fencing**
73:8

**fiduciary**
121:15

**field**
87:13 132:11 141:11 175:21 178:15 192:22,23 198:16 236:21,23 237:3,11

**fielding**
192:22,24

**fifth**
246:3 254:2

**figure**
104:11,14 106:19 119:23 139:20 148:8 162:5 178:6 190:24 208:15

**figured**
105:21

**figuring**
116:18

**file**
25:14 26:22 27:1,11,21 76:2 127:19, 22 228:13

**filed**
75:4 123:21

**files**
26:17 27:10

**fill**
251:10

**filled**
136:1

**filling**
142:18 211:14

**final**
95:9 163:14

**Finalize**
62:24

**financially**
6:13

**find**
14:12 81:10 106:7 134:1, 23 137:8 198:22 207:4 209:12 213:24

**finding**
225:6

**fine**
27:2,4 133:24 198:4 201:6 203:18,21 210:13 228:14 233:21 261:12 263:5

**finish**
9:20 158:15 182:23 183:2,19 248:13 260:22 261:13,15, 16,22,24

**finished**
16:4 17:3 167:17 212:18 225:12 236:2 242:18

**firm**
182:3,8 243:1,2,22

**firms**
54:15 120:6 121:8 165:5 181:22 190:3 243:6,22

**firms'**
105:16 243:24

**first**
7:16 32:11, 12 33:1 49:3 53:19 61:17, 21,24 90:6 107:23 123:17 147:10 159:5 161:14 166:9,12 183:3 192:23 195:5 202:2 206:7 210:18,20 219:16 224:17 238:15,23 248:20 249:22 262:22

**five**
50:21 51:1,2 203:18,19, 20,21 233:17 264:1

**five-minute**
50:23 203:16 255:4

**flag**
223:23 225:10

**flat**
105:21

**flavor** 75:16 76:4,7 195:4,21
**flavors** 76:9,16
**fluctuated** 242:6,8,11
**focalism** 210:15,21 211:21,23 212:2
**focalize** 159:13
**focused** 47:16
**focusing** 254:1
**fold** 264:23
**folder** 264:23
**folks** 113:17 168:13
**follow** 33:5 106:4 107:23 138:6
**follow-up** 157:19,24 264:10
**following** 50:17 55:8, 22 126:11 205:5 219:17
**follows** 7:18 87:8 95:8 111:23 161:9 257:11
**font** 224:10
**foods** 178:24 179:4
**fool** 241:15
**footage** 25:9
**Footnote** 70:18,24 71:24 155:1, 2 181:1 248:17 249:1,5
**footnotes** 36:24 266:18
**forced** 246:22
**Forcing** 247:9
**forgive** 90:16
**forgotten** 128:21
**form** 13:6,10 14:2,20 15:3 16:3,22 17:15,18 18:15,24 19:8 23:16, 22 24:6,10 25:5,16,19 29:9 31:13, 18 32:1,18 33:4 34:17, 20,24 37:9 39:10 40:11, 19 42:5 46:16 48:19, 23 49:8 53:24 54:9 56:3 59:15 60:11,13,14, 17 62:15 64:19 65:2, 7,16,20 68:7 69:13 71:21 72:11 74:11 75:18,24 76:11 77:1, 6,23,24 78:4,6,22 79:12,21 81:8,18 83:8,24 85:13,19 87:3,17 88:5 90:15,24 92:8,17,23 93:21 95:3 96:24 101:20 102:12 103:14 105:7 106:10,21 107:20 108:17 110:15 111:15 113:19 114:1,14,18, 21 115:4,12 116:12 118:2 119:12,18 123:1 124:17 125:3 126:24 129:23 134:17 136:8 139:21 141:21 151:8,20 152:14 162:19,22 165:19 167:13 178:10 180:10 181:14 184:23 186:4,13 187:8 188:6 189:1,22 193:23 196:16 197:9 198:12 199:19 200:13,16 201:24 202:15 203:6 204:13 206:23 207:9,20 210:3,19 213:17 214:10,15 215:1,17 217:1 219:14 225:17 226:12 228:24 230:6,13,24 231:12,23 232:23 233:15 236:17 237:18 239:6 240:5,9,23 241:8,15 242:16 243:13 245:11 247:18 248:6 254:7,19 256:22 259:11,19 260:14 262:18 265:16 266:7,13 267:13 268:7,14,18 269:2 270:1
**formally** 95:22
**formation** 29:22
**formatted** 37:1
**formatting** 36:23 37:4 38:6 193:15 266:17,22
**formed** 18:18 28:21 39:21 102:19 105:17 213:18,20 214:4 269:8
**forming** 35:13,19 36:1,9 38:9 39:24 40:9 41:10 42:2,9

43:23 45:3, 16 49:11 84:12 112:2 137:12 222:12 234:17 264:15

**formulate**
63:21

**formulating**
241:4

**formulation**
134:7 248:1

**forth**
35:13 36:1 69:11 133:1 267:9

**Fortunately**
170:8

**found**
195:15

**founder's**
29:13

**four**
200:12 246:3

**four-challenge**
235:14 236:8

**fourth**
256:13

**frankly**
108:23 227:5

**frequencies**
232:9

**frequency**
229:14

**frequently**
97:15 162:10 237:12 254:21

**frequently-used**
232:1

**front**
28:14 52:2 66:22 70:3 129:15

133:7,8 142:5 143:17 179:6 232:18

**full**
30:8 101:13 124:2 125:16 126:17,23

**fully**
102:17 113:11 115:17

**fully-functioning**
86:5

**G**

**G-1**
153:10,12, 17,19 155:17 158:20

**G-2**
157:10 158:20

**G1**
64:6,17,21

**G2**
64:6,17,21

**gallon**
104:19,20

**gas**
104:20 105:2,10

**gasoline**
104:16,17,18

**gather**
264:2

**gave**
91:13 119:4 231:20

**general**
19:17 248:8, 9,12 252:7

**generally**
21:20 94:18, 24 260:21,24

**generally-accepted**
239:11,12,13

**generating**
75:22

**generic**
116:14 177:15 192:21

**geographic**
148:21

**gestures**
9:7

**getting**
115:22 116:2,4 200:23 227:22 241:16 265:24 266:18

**gigabytes**
27:6

**ginseng**
212:14 213:3

**give**
13:16 14:1,4 16:16 17:7 27:17 33:9 48:14 81:13, 20 85:20 126:23 132:3 145:11 153:15 154:16 198:2 202:24 204:23 205:13 251:11 263:20

**given**
131:11 171:14 173:2,6 178:23 181:10 186:7 191:1 198:15 224:21 249:6

**global**
29:11

**goal**
158:4 182:13 184:6

**goes**
51:12 86:17 96:22

**going**
11:10,19 22:12,15,16, 17 23:7 25:22 26:17, 22 27:8,17 28:3 30:21 32:5 33:21 35:15 37:10, 19 42:6 46:21 51:5 70:4,8 84:11,12 86:13 96:16 99:7,21 100:11 104:1,5,7,8, 12,16 106:4, 5 109:24 111:23 118:13 126:5 130:23 131:1 132:14,15, 17,22,24 133:3,20 135:2 137:14,17,20 138:9,12,18 139:15 142:16 143:18,23 144:1 145:14 157:23 159:7,8 160:23 166:15,19 168:13 169:5,6,23 170:24 171:3,21

172:4 176:9 179:8 181:7 182:6 184:12 185:17 188:22 189:3,7,10 190:11,14 192:9 193:5 195:19,22 196:11,13 197:7,15 199:9 200:10,11, 15,20 203:23 207:21 210:4 211:15 220:11 221:15 227:23,24 228:1,12 229:16,18 230:7,14 233:10 242:2 246:18 247:15 252:18 253:3,12,15 255:9,20 263:24 264:3,22 269:9 270:9, 13

**Gold**
136:14 187:23

**good**
6:17,20 7:21 15:22 58:14 109:22,23 174:13 225:6

**goods**
120:17 164:24 165:3,13 243:20

**graduate**
35:1

**great**
92:2,3 263:8

**green**
81:14 85:16 86:24 87:12 88:13 122:5 146:12 173:6 185:24 186:7 198:15 212:14 213:3

**grocery**
159:21 227:9 255:18

**group**
198:1

**Gu**
43:2,4,7,9, 13,21 44:3, 5,19,21,22 63:8,17 64:3

**Gu's**
43:6

**Guayaki**
155:17 156:9,16 161:11

**guess**
13:23,24 14:7,18 16:12,15 33:8 39:5 60:13,15 63:21,22 133:4 217:6 264:22

**guesses**
9:3

**guessing**
9:18 60:21

**gun**
89:20

**guys**
52:9

**H**

**half**
182:20

**handwriting**
70:8

**happen**
51:13 166:8 200:15

**happened**
24:9

**happy**
16:24 91:11 94:23 98:4 137:9 146:6 230:15 231:3,15,18

**hard**
109:6 133:10,11 169:19 188:3 190:17 209:11 222:23 235:7 240:15

**harder**
251:4

**harm**
83:11

**harmed**
109:4 215:6

**harms**
83:13

**hate**
109:2

**head**
10:15 13:20 41:19 54:2 71:18 78:8 154:14 164:7 166:11 256:1

**heading**
80:3

**health-conscious**
262:11

**healthcare**
262:10,11

**hear**
6:23 7:2 8:23 85:9 143:22 153:2,7 162:12 166:9 192:10 235:8 240:16

**heard**
71:9 108:10 116:8 166:13 197:21 211:7 235:9 245:2, 4 263:4

**hearing**
8:10

**hedonic**
235:22 236:20

**help**
22:23 42:21 51:15 226:22 237:9

**helped**
43:14 147:9

**helps**
47:15 211:10

**hence**
141:4

**hesitating**
22:11

**Hicks's**
238:11,16

**Hicksian**
238:24

**hidden**
90:18 224:15,21

**high**
117:10,19 191:2

**high-end**
117:9,19

**high-performing**
161:8
**higher**
86:4 105:1 190:23
**highest**
130:18
**highlighted**
139:2
**highlights**
225:6
**history**
15:12,14,23 16:24 17:10
**hitting**
138:21
**hold**
183:9,13 254:19 255:7 261:13,16
**home**
48:1
**hone**
195:9
**honest**
59:7 128:21
**honestly**
59:11
**hope**
27:9 148:6
**horizon**
250:23 252:6
**horizontal**
199:5
**horizontally**
198:20
**hot**
136:1
**hot-fill**
131:8
**hour**
12:12,16,19 182:20 185:9 227:23
**hours**
66:6,10
**huge**
163:13
**hundred**
39:7 178:20 234:6
**hundred-dollar**
148:17
**hypo**
243:3
**hypothetical**
104:6,8 105:3,9,19 106:6 107:6,22 108:2,5,14,15 118:24 215:13 217:3
**hypotheticals**
104:10

**I**

**i.e.**
91:17 242:23 250:2
**iced**
70:20 130:11,19 132:9 138:1 143:12 148:17 154:4 159:16,22 160:23 170:2 177:20 211:19 251:12 254:3
**idea**
15:22 25:17 190:23
**ideal**
176:18
**identical**
244:11
**identified**
72:7 216:14
**identifier**
71:13
**identifiers**
145:2
**identifies**
71:8
**identify**
15:11 85:2
**identity**
162:8 254:15
**III**
159:2
**III.B**
160:6 161:5
**Illinois**
6:1 47:23
**illustrating**
156:2
**illustration**
252:6
**illustrative**
250:23
**image**
172:11 197:16 211:9,21 222:6
**images**
45:19 170:11 196:23 211:2,4
**imagine**
190:6
**immediately**
54:17 250:21 269:10
**impact**
163:13,20 168:16 170:8 173:10,24 174:3 175:6 189:11 206:3,4 216:24 226:10,15 237:4
**impacts**
195:6
**imperfections**
237:11
**implement**
86:20 96:17 146:10 152:15 212:24 248:2,15 257:7 260:10
**implementation**
150:20
**implemented**
84:3 87:9 122:4
**implementing**
169:12 192:22
**importance**
161:24 187:19 223:14 262:7
**important**
141:6,14 142:22 148:8 159:14,20 160:4 162:6 163:3,4 164:8,17 165:11 173:18 174:9,16 211:4,24 223:11,18 224:20,23,24 225:1,7,23 226:1 227:12,14,19 229:8 246:15
**importantly**
26:19 161:23
**impressions**
46:23 47:3
**inaccurate**
16:16
**inadvertently**
15:24 17:11 22:8,11 23:4

**inappropriate** 247:1
**incarnation** 132:19 233:2
**incidence** 256:15 257:15,17
**include** 50:3 59:18 82:9 92:13 95:22 113:17,22 114:4,8 130:24 135:2,5 150:11 159:8,18 160:1,3,8, 10,14 161:15,17 162:18,24 168:15 174:12,17 176:17 177:21 178:8 179:5 182:10 184:13 185:20,21 190:11 195:1 216:15 223:10 226:24 227:15 232:12 247:2,23 248:16 250:17 258:8 267:24 268:11
**included** 49:23 50:14, 16,17,19 58:15 98:6 142:19 145:9 155:11 159:11 160:5 162:6 163:5, 8 164:19 167:1 179:3 184:8 194:17 195:13 213:16 217:5 219:18 224:22 226:16 227:13 229:6,12 233:24 246:7,13 247:15,21 248:11 260:19
**includes** 66:5 86:18 114:12 122:6 216:21 255:22 256:1
**including** 45:19 124:5 136:5 152:4 170:11 195:8 202:22 223:14 229:10
**inclusion** 111:19
**inclusive** 220:14
**inconsistent** 111:20
**incorrect** 65:17 123:2 196:18 234:1
**incorrectly** 267:15
**increase** 242:2
**incremental** 91:23 94:10, 12,14 96:15 101:2 112:20 119:21 122:9 171:5 191:20 206:14 208:6,12
**indeed** 7:7
**independent** 258:24 265:14
**independently** 220:21
**indicate** 64:20 73:12 81:9 85:12 120:18 135:2 155:7 171:7 192:2,8 202:2 220:10 243:5 248:10,20 249:22 262:3,4 267:21
**indicated** 11:2 16:23 39:20 43:16 44:1 45:10 53:13 61:19 63:24 68:18 86:21 97:8 122:2 127:1 142:19 147:14 148:4 154:22 156:6 159:18 166:12 168:18 170:11 174:4,14 175:1 176:10 180:13 185:2,9,18 189:3 193:7 196:22 199:24 200:4 202:5 209:4 229:7 248:24 249:11,14,20 250:1 268:15
**indicates** 132:11 172:7 175:23
**indicating** 171:13 173:8,22 206:10
**indication** 197:3
**indifferent** 115:19,24 116:7 242:24
**indiscernible** 104:14 167:16
**individual** 119:9 206:20 207:7
**industries** 200:2
**industry** 177:18 199:23 244:16 258:12,13,17
**infeasible** 177:20
**infer** 121:5 247:10
**inferred** 24:18
**inferring** 121:4
**infinitesimally** 245:15
**inflate** 91:16 233:23
**inflated** 85:24 102:24 215:7 216:3
**inflation** 118:14 241:10 254:4,11
**inflection** 170:22
**inform** 22:23 145:14 147:12

**information**
21:2 22:21 23:1 34:3 35:16 44:24 45:2,12,19, 21 77:22 78:4 92:22 93:7 129:1 137:11 140:3,6 142:6,7,13 167:1 172:20 174:18 177:5 181:17 186:1,5 193:1 204:21 205:11,15 211:17 216:6 221:6
**informed**
148:4 229:5, 13
**informs**
81:12
**ingredients**
241:7
**initial**
53:22
**initially**
118:10
**injuries**
124:4
**inseam**
223:23 225:20
**insert**
182:3 266:20
**inserted**
80:24 107:21
**insinuation**
219:3
**instance**
93:6 104:23 247:14 249:6
**instances**
89:9 249:16
**instruct**
19:21 21:4, 23 37:12,19 68:18 167:19
**instructed**
22:7 49:21 67:20 133:21 183:13
**instruction**
133:14
**instructions**
8:5,21
**instrument**
166:20,23 169:21 176:10,12 177:12 179:18 197:15 198:9
**intend**
84:22 148:16 171:4 173:10,24 185:3 204:9 247:23 252:9
**intended**
207:7
**intends**
124:10
**intention**
175:4
**interest**
190:7
**interested**
6:13 9:17 97:17 106:24 161:22 179:1 190:9 241:19
**interfere**
26:18
**internal**
87:19 120:14 131:7 208:8 258:1,2
**interpret**
178:15
**interrogatories**
7:17
**interrogatory**
263:13
**interrupt**
58:18 182:22,23 183:4,20 236:3,5 261:14
**interrupted**
177:1,3 183:17 235:24
**interrupting**
205:3
**intersection**
244:10,14
**intersects**
244:5
**introduced**
26:1 48:8 51:21 53:4 57:10 60:4 66:19 69:19 74:24 123:9 127:7 208:19 217:9 218:1 221:18 228:9 229:21 231:5 232:14 253:9
**Introduction**
123:23
**investor**
109:1
**invoice**
57:17 58:1 60:24 61:14 67:4
**invoices**
57:21 119:15
**invoked**
206:22,24
**involve**
116:17 125:8 269:15
**involved**
8:9 16:8,19 18:6 25:7 29:21 49:19 68:4,14 77:9 79:16 134:7 235:11
**involvement**
43:6 50:2,7, 9,10 75:22 76:15
**involves**
169:12
**involving**
16:8,19 77:10
**IR**
129:19
**IRI**
26:24 39:2 63:18 82:2 92:4,10,14, 15,18,20 93:11,17 120:15 128:3 129:20 136:20 142:6,8 154:5 159:2 160:6 163:6 164:14 166:1 175:18 181:1,4,11, 16,22 182:8 184:17 185:3,6,15 216:7,10,19, 23 217:5 219:17,24 220:4,7,13 229:15 232:8 236:21 255:15 258:24 259:1,4 266:22
**IRI-001**
128:8

**IRI-TYPE**
97:16
**Iron**
223:12
**irrelevant**
33:22 109:3 163:15
**irresponsible**
169:10
**isolate**
81:1 112:17 156:15 157:8 163:21 171:4 173:10,24 174:3,19 175:6 195:12 235:16 236:10 237:9 244:17
**isolating**
171:11 227:20
**isolation**
100:7
**issue**
24:20 50:22 51:11 73:1, 3,12,18,24 74:1 76:14 77:7 86:1 124:20 152:23 164:11 193:22 212:21 226:9 247:16
**issued**
35:14 36:2 57:22 67:4
**issues**
22:8 80:10, 12,18 81:4,5 240:3,20 241:6
**italics**
113:4,6
**items**
140:5 225:19

## J

**J-O-N**
29:15
**January**
78:17 79:2, 8,15
**JEAN**
7:15
**Jean-pierre**
6:10
**jeans**
223:22,24 224:1
**Jewel**
6:10
**jives**
138:7
**job**
119:23 157:7 225:6 265:17
**John**
6:18 167:19 238:10,16 255:5 269:8
**joined**
269:14
**Jon**
29:13,15
**journal**
253:23 258:18,20
**JP**
48:11 114:20
**JPD**
25:24 27:12 48:7,12 49:3 50:2,10 51:20,24 52:2,20,22 53:3,6,12 54:4 57:9,12 60:3,9,16 61:18,24 62:20 65:10, 18 66:18,23 68:24 69:11, 16,18,22,23 70:5,11 74:20,22,23 75:7,17,23 76:5,16,18 77:4,14,16, 18 78:12 110:7 123:8, 11,13 127:6, 9,12,15,18, 22 128:10 129:15 132:15 133:4,16,21 137:14 144:7 153:8 208:18,21 209:8 217:8, 11,17,24 218:6,9 219:21 220:8 221:17,20 228:8,11,16, 22 229:20, 23,24 230:4, 12 231:4,8, 10,22 232:13,16, 17,20 252:19,20 253:5,6,8,9, 13,18 255:16 256:9
**judgment**
263:16
**juice**
70:20 132:12
**juices**
132:10
**jump**
252:18
**jumped**
191:14
**jumping**
89:5,19
**June**
220:1

## K

**keen**
224:6
**keep**
47:15 48:5 138:23 185:16
**kept**
146:17 254:3,11
**key**
88:18,20 90:19 137:2 148:5 162:9 163:3 171:9 187:14 192:17 229:11
**kind**
20:10 33:5,6 148:15 155:6 225:5 232:22 243:2 249:3
**kindly**
230:17 232:24
**kinds**
25:13 78:8 141:9,10 145:12 149:20 229:3 232:6
**knew**
84:9
**know**
9:3,4 12:15 14:8,19,23 15:16 16:2, 6,18 19:20 20:12,14 21:4,19,20, 21 22:1,9,20 23:5,8 26:20

27:19 29:17, 19 30:4,9, 11,24 31:9 32:7,16,20, 21 33:11 34:20,22 35:6,7 38:19 39:4,15,16, 18 41:4,5 43:2,6,12,18 44:20 47:20 48:3 49:20 51:10,16,24 52:8 53:7,9, 15 58:15,21 59:3,16 60:16 62:10, 16,17 63:4, 12,14,20,23 64:2,9 65:1, 6,23 67:14 68:5,16 70:8 71:17 72:16 73:9 74:4,5, 10 75:21 76:1,2,9,21 77:4 79:3, 10,19 83:11 85:17 93:9, 19 94:5 95:12 96:20 104:3,5,9, 12,24 105:18,23 106:20 107:5 108:9 109:18 119:1 121:13 122:12,15 129:5 135:21 138:14 139:19 140:17 142:4 144:22 153:2 156:9 162:2 164:1,5 166:3 167:14 169:3,4 173:16 188:2,21 193:7 196:13 197:6 200:14,15 203:2 205:16 206:7,12 209:5 212:16,17 213:6,16 214:2 216:7 220:6 221:21 226:6,14 227:7 228:5 229:24 231:7,21 232:17 233:9 238:3 239:17,21 240:2,6,10, 14,19,20 241:5 242:4, 10,12 251:12 252:9,20 254:10,11, 18,20,24 255:2,14,17, 19,21 257:1, 2 258:19,20, 21 259:13 260:15 261:1,7 262:17 263:8,9 264:11 266:18 267:19 269:9

**knowledge** 63:22 67:19 68:22 136:2

**known** 169:11

**Kroger** 216:16 255:22

**L**

**L'ORÉAL** 23:20 24:5,7

**label** 117:24 135:19 167:3 175:17,18 176:5 178:5, 7 179:6,7 192:3 194:11 196:11 210:1,16,17 215:21 221:24 222:2,18 224:4 225:9, 15 226:18 227:11 228:17 229:2 230:10,11,19 232:4 233:3 259:22

**labeled** 64:16 177:21 178:9 179:5, 20,21 180:2

**labeling** 117:23 124:7 125:2 212:23 223:13,14 232:1

**labels** 45:15,19 83:4 86:2 111:21 168:12,16 177:24 178:1,23 179:3 192:5 195:15,22 196:20 222:8 227:24 229:3,13,18 230:21 232:5,7 233:16 234:17 254:23 259:23

**labor** 41:5

**language** 25:13 234:16 245:16

**large** 26:17 29:11 119:8 121:8 131:2

**largely** 185:7 255:21

**larger** 224:9

**largest** 136:17

**late** 256:2 263:1

**lawyers** 54:21 55:11 56:1

**layout** 198:8,10

**leading** 155:17 157:11

**Leaf** 136:15

**learn** 100:21 124:19 131:1 141:3 145:20 147:21,23 152:2,5 176:19 184:6 187:18 188:18 189:9 190:13 193:4 195:11 202:21

**learner** 46:11 47:12

**learning** 130:24 246:15

**leave** 74:19 168:1, 3

**left-hand** 222:3,21,22

**legal**
6:11 102:20, 21 239:15,24
**lemonade**
132:12
**letters**
225:2
**level**
92:22 93:2, 14 94:22 96:10,19,22 97:11 102:16 117:9 136:22,23 145:23 154:11,24 155:1 156:5, 7 160:18,19 180:23 181:12
**levels**
150:8 154:12 155:9 160:1 201:18,19 204:9
**Lexecon**
33:18 269:4
**libel**
234:24 235:2,9
**lie**
105:21
**light**
81:14 85:16 86:24 87:12 88:13 89:17 122:5 173:6 185:24 186:7 198:15 244:6
**limit**
114:11
**line**
116:9,17,19, 20,22,24 117:8,20 118:22 119:2,4,5,6, 12,13 137:18 141:10 143:10 145:4 165:2,4 205:22,24 227:12 260:22
**lines**
139:13
**lips**
153:6
**Lipton**
136:15
**list**
15:20 29:23 63:1,3,18 65:5 66:5 72:8 76:13 144:13 163:5,11 165:2 187:23 218:19 224:13 233:7 246:23,24 265:15 268:9
**listed**
71:1 121:14, 15 135:22 155:21 171:2 222:8 233:6 256:5 268:17
**listen**
109:19
**listing**
144:16
**literature**
97:22 98:17, 20,23 101:7 223:16 227:3
**litigated**
97:15
**litigation**
21:21 32:14
**little**
6:24 7:1,2,4 14:13 20:9 52:8,9 73:8 86:14 90:17 175:20,21 196:24 200:23,24
**LLC**
29:2,8,18,20 30:5,12 31:2,8,12, 17,24 32:17 33:3,15 34:15
**location**
148:21 149:14,23 150:16
**locations**
150:15,18 152:17
**logo**
167:8 169:22
**logos**
168:19 170:11
**long**
12:11,13,15 34:13,19 39:9,12,14, 17 47:19 107:22 182:19 227:18 229:9 263:8 264:11
**longer**
191:2 203:17
**look**
15:18 34:3 56:16 60:20 70:11 104:19 117:14 119:15 127:16 133:16,20 135:13 141:6,7 143:17 150:14 157:10 159:15 164:23 165:2 169:3,5 170:5 171:8 176:12 181:24 191:5 199:1,13 210:24 222:7 226:21 238:9 241:17 250:21 257:14 258:1
**looked**
55:14 128:5, 21 141:8 162:15 213:9 232:2 255:15
**looking**
9:3,4 13:24 15:16 16:1 42:13 69:1 75:19 77:4 78:14 82:18 111:10 115:11 127:14 129:1 133:12,19 161:7 173:12 194:1 199:15 210:5 217:16 219:20 229:13,14 232:1 244:14 250:10
**looks**
128:1,5 182:17 241:18 253:20
**lost**
78:1 93:12 112:13
**lot**
105:14 161:9 163:6 198:20 223:19 253:24
**lots**
106:24 225:18

**louder**
8:24
**low**
117:10,17
**low-end**
117:11,18
**lower**
91:21 117:11
215:4,20,24
216:2
**lunch**
104:2,4
**Ly-dell**
235:11
**Lytle**
234:21,22
235:2,6,11

**M**

**madam**
37:24 55:5,
20 126:8
155:14
156:23
183:15
**made**
46:7 74:12
97:20 160:21
177:23
178:21
182:24 184:3
196:7,8,10,
19 215:21
219:2,10
220:15
222:11
225:19
258:3,8
**magnitude**
84:5,8
125:13
126:14
127:2,3
256:15 257:2
260:8
**main**
34:11 143:4
174:7 265:17
**maintain**
118:22
241:10
**major**
233:23
**make**
14:16 29:24
30:17 36:17
46:3 49:10,
23 61:9
73:17 99:17
101:8,11,12
102:15
103:21
104:2,7
106:20
109:6,20
110:12
111:6,12
112:11
113:3,12
115:10 116:6
118:5,17,22
120:16
121:2,12
135:15 141:9
143:6 148:9
149:16
150:16 152:9
154:17,20
157:20
159:11
160:3,9
161:20
162:2,3,7,16
163:8
164:18,22
167:22
169:17
174:6,7,12,
17 175:24
177:5,11,19
184:12 185:7
186:9 187:13
190:12
194:18
195:2,10
200:5 202:11
222:14
225:24 227:9
238:21 239:1
244:1 248:18
251:18
252:13 253:6
257:12
261:19 262:1
**makes**
177:12
252:24
**making**
36:23 93:13
120:17
159:21 183:5
201:6,21
218:24
224:6,16
236:14
**manner**
36:19 54:20
55:10,24
**manual**
177:8
**manufacturer**
95:6 98:22
118:18
**manufacturers**
94:3,13,15
97:14,18,21
**manufacturers'**
94:4
**mar**
120:5
**March**
138:3 142:3
**margin**
245:21
**marginal**
121:4,5
122:8,12,17
245:3,4,8,9,
13,14,20
**mark**
25:22 70:5
127:16,18
252:21
**marked**
127:12 220:8
**market**
8:17 85:1
86:6 88:3,
10,14 93:23
94:1 100:4,
8,22 104:24
105:5
106:13,15,
22,23
107:14,15
109:7,9
117:18,19
120:4,8,10,
21 121:21
122:21,22,24
123:5 141:2
189:20
208:3,9
210:8 215:3,
9,19 216:4
235:16
236:10
237:16,19,24
238:2,4,5,7,
9,14,19
239:4,8,14,
20,22 242:4,
7,21,22
243:2,3,5,6,
7,17,22
244:2,5,8,
10,13 257:11
258:24
260:6,17
268:13
**marketing**
182:3 199:22
**marketplace**
88:17,19
99:10,15,23
120:6,23
122:7

124:14,15, 21,23 136:9 199:8,17 201:21
**markets** 155:4,5 243:3,19
**marking** 70:9
**markup** 94:19
**massive** 26:22 27:4
**mat** 22:8
**match** 141:13 147:16 148:15
**matches** 145:17
**Mate** 155:17 156:9,16 161:11
**material** 156:22 194:22
**materials** 10:6 45:5, 23,24 48:20 49:12,16,21, 24 50:8 57:2 63:9,14 64:15 87:23 89:17 139:23 218:12 219:8 233:7 241:24 258:7 264:18 265:6,15
**math** 94:16 95:19, 24 96:18 97:12 98:18
**matter** 8:14 15:21 19:22 21:18 23:11,20 24:7,20 25:7,21 28:16,22 34:12 68:12, 14 73:13 74:7 89:6,20 90:7 94:16 95:19 96:18 97:12 98:18 105:17 107:9 110:14 140:20 141:1 145:16 146:2 148:12 157:1 162:9 174:20 176:19 184:1 211:12 226:1 246:24 247:19 270:3
**matters** 13:5,9 15:10,11 17:1,11 18:17 32:14 57:22 61:13 140:24 145:22 147:24 197:19 236:19 253:15 269:14,18
**maximization** 121:9
**maximize** 120:22 121:16
**MC** 63:9,12 64:7,24 65:4
**MCU** 62:24 63:3
**mean** 14:22 15:5 16:11 27:9 29:18 31:10 33:8 34:6 40:12 44:11 46:4 47:13 49:1 58:10, 24 63:21 64:18,24 72:4,13,21 82:24 83:1, 9,18,19 90:11,23 91:3 94:14 97:1 99:14 100:5 101:22 105:13 106:11 107:6 109:1 112:14,16 114:11 116:11,13,14 125:15 126:3,16 130:16 131:14,15 134:13 136:13 144:11 151:10 159:1 165:9 178:5, 6,8 180:21, 23 181:3 182:18 183:11,22 184:20 188:7 191:18 220:4 223:21 224:3 229:1 238:4 242:7,10 245:6 246:18 247:20 254:10 255:1 257:16,17,19 258:23 265:9
**meaning** 32:20 135:3 185:3 214:4 247:20 255:18
**meaningful** 251:11
**means** 14:14,18 47:14 62:17 63:12,20 65:6 67:14 72:5,14 86:6 99:16 100:6 108:21 119:10 144:11 164:24 178:20 181:4 183:24 194:13 200:10 203:13 208:14 219:8,11,13 224:6 231:17 240:7 243:16 249:5
**meant** 90:14 151:12 176:21 205:13 224:18 237:21
**measure** 56:19 110:18 182:14 222:13
**measures** 103:20 211:23 238:11 243:23
**measuring** 191:19
**mechanically** 203:13
**mechanism** 106:17,18
**meet** 10:9
**meeting** 10:22,24 11:5,6 12:11,13,15,

18,22 36:21 46:1,7
**meetings** 40:5
**megabytes** 27:5
**Melissa** 6:20 50:23 51:10 167:23 203:19
**member** 38:22 40:24 65:13 86:2 91:22
**members** 29:7,18 59:8,12 83:2,21 84:15 85:23 102:21 110:16 113:17 213:20 215:11 250:17
**Membership** 32:17
**memory** 23:6,8 52:20 132:9 139:8 234:9
**mental** 46:23 47:3
**mention** 145:13
**mentioned** 33:1 38:6,14 42:17 44:18 163:12 171:18 208:1 253:19 265:4
**menu** 117:14
**merchandise** 94:2 95:5
**mere** 211:23
**merger** 97:14,18 98:12 269:21
**merits** 231:1,14 268:5
**met** 10:8,11 11:3,4 35:8
**Meta** 269:20
**method** 24:23 84:2, 3,14 87:9,10 90:19,20 100:16,21 101:3,4,6, 16,17 102:5 103:8,11 111:24 122:3,4 131:8 137:13 143:16 157:3 158:22 163:18 164:9 173:3 182:7 184:9 197:12,18,19 241:2,4 244:14 257:5,6,8 258:11 264:19 268:20
**methodological** 20:20
**methodology** 80:16 86:18 87:8 90:9 91:2 121:3 124:12,19,24 125:5 139:23 140:15 158:20 190:2 200:22 206:13 208:17 213:1 215:3 221:1 236:18 237:14 238:17 239:2,18 244:4,9 260:10,12
**methods** 101:19,21 103:2 105:12 221:3 258:11
**Meyers** 67:23 68:2,6
**microphone** 240:17
**microphones** 6:7
**million** 106:6,8
**mind** 20:11 33:6 104:10 218:11 238:13 239:24
**minimize** 129:6 132:19 133:5
**minor** 233:24
**minute** 129:4 209:14
**minutes** 50:21 51:1,2 109:16,17, 18,20 203:17 228:12 264:1
**mischaracterizes** 181:14 196:16 214:11,16
**misleading** 80:22 83:4 86:1 91:15, 18 112:9 124:6 125:2 212:23 216:5
**misled** 83:14 84:13 85:23 110:16,20 112:1,3,15 213:19,20,21 214:1
**mispronounced** 34:7
**misremembering** 44:2
**misrepresent** 108:4
**misrepresented** 104:24
**misrepresenting** 61:10
**missed** 151:2
**missing** 63:9,14
**misspeaking** 154:18
**misstates** 197:10
**mistake** 219:3
**mistaken** 59:10 136:1 140:1 250:13
**misunderstand** 145:18
**misunderstanding** 56:5 61:22 126:1 210:21 257:12
**misunderstood** 21:15 130:4 219:1
**mixed** 182:4

**mode**
36:18
**model**
126:22
151:5,10
182:4 238:17
243:11
244:3,16
**models**
102:11
**moderates**
191:8
**modification**
64:14
**modified**
64:5,17,21
179:13
**modify**
89:16 90:2
141:15
**moment**
23:24 27:17
44:18 48:14
81:20 87:18
110:6 111:17
114:6 131:11
134:4 135:13
143:19
154:16 161:7
194:7 200:21
205:21 213:9
216:11
217:13,15
220:12
**moments**
267:7
**Monet**
105:23
106:5,7,9
108:11,12,
16,18 109:3
**money**
115:11
121:12
**Monster**
162:17,18
163:11
164:1,5
**month**
8:8 53:23
**months**
250:19,20
251:17,23
252:2,6,7
**morning**
6:17,20,22
7:21 144:24
**motion**
75:5 123:20
**mouth**
249:3
**move**
61:13 73:7
157:23
160:20 228:6
253:15
**moved**
104:3
**moving**
127:9 153:6
157:16
197:24
**MSRP**
241:11,19
242:2
**muddled**
9:13,22
**muffled**
7:1
**multi**
206:21
**multi-outlet**
216:20
217:22
219:5,18
220:3
**multiple**
11:11 156:6
183:17 196:4
203:9
**multiples**
131:16
**multiplication**
24:15 25:1
**music**
8:16,17
**mute**
143:18

**N**

**name**
6:10 7:6,8,
22 8:13
10:14 18:6
29:13,15
34:7 43:1
127:19,22
156:17
162:18
165:10
166:14,15,
17,24 167:4,
9 168:13
169:6 193:16
203:14
223:11 225:3
237:4
**named**
68:14
**names**
166:4
**national**
24:19,21
136:22,23
141:7,8
154:11
155:5,24
156:5 157:12
160:15,18
**nationally**
137:1 163:7
**natural**
162:8 163:9
195:18
234:15
**nature**
237:8
**navigate**
128:24
**necessarily**
100:2 210:10
211:9
225:16,18
268:11
**necessary**
77:22 94:7
95:15 96:4
119:20
122:17,19,
20,21 131:4,
5,12 137:11
140:12
141:23
147:14
149:21
150:20
152:20 155:8
157:3 160:9
161:18
162:23,24
167:7 170:3
182:12
185:20
187:15 193:9
196:24
211:17
220:24 228:5
257:20
268:18
**need**
9:6 15:18
17:5 26:18,
22 47:19
51:16 66:12
95:6 98:15
119:15
122:15 141:4
142:20
144:24 150:9
159:5 160:8
174:10,19
190:18
191:21
204:21
205:11

218:10 221:5 226:23 227:15 228:3 229:19 238:2 239:7 245:18 268:2
**needed** 25:11 88:10
**needs** 184:8 228:13
**never** 61:20 63:24 68:8,20 184:5 211:6 237:3
**news** 18:7 25:7,9, 12,13
**Nielsen** 181:23
**no-purchase** 246:6,12,19 247:2,21,23 248:2,10,16
**non-diet** 175:8 176:3, 16 179:13 193:17 223:7
**Non-verbal** 9:7
**nonprofit** 121:13
**note** 6:6 192:14 219:17 250:22 253:2
**notes** 46:3,5,12,18 47:6,8 138:2 142:3
**notice** 28:4 48:4 224:4,18 226:17
**noticed** 193:14
**November** 28:15 62:23 63:8,17 64:3 65:4
**nuance** 249:1
**number** 14:9,10 17:7 24:16,24 25:1 45:1 69:10 116:15 120:6 131:10 137:21 138:7 139:6 144:17 145:3 149:10 153:15 180:16 220:17,19 257:1 268:22
**numbers** 9:16 139:9 143:13 154:21 212:10 254:15
**Nutramax** 235:2,4,6 236:23
**nutrition** 177:24 178:1,5,22 179:2,3,6,7
**nutritional** 115:2

**O**

**O-R-S-Z-A-G** 29:16
**ob** 41:11
**object** 28:3 32:6 33:21 37:7, 10 69:13 114:20 189:1 244:1
**objected** 11:11
**objection** 9:12 11:9 13:6,10 14:2,20 15:3 16:3,22 17:15,18 18:15,24 19:2,8,18 20:8,16 21:1,6 23:16,22 24:6,10 25:5,16,19 29:9 31:13, 18 32:1,18 33:4 34:17, 20,24 35:15 36:12 38:1, 10 39:10,19 40:2,11,19 41:13 42:5 43:24 44:6 45:4 46:14, 20 48:19,23 49:8 53:24 54:9,23 56:3,24 59:15 60:11, 17 62:15 64:19 65:2, 7,16,20 68:7 71:21 72:11 74:11 75:18, 24 76:11,23 77:6,24 78:6,22 79:12,21 81:8,18 83:8,24 85:19 87:3, 17 88:5 90:15,24 92:6,17,23 93:21 95:3 96:24 101:20 102:12 103:14 105:7 106:10 107:20 108:17 111:15 113:19 114:1,14,18, 21 115:4,12 116:12 118:2 119:18 123:1 124:17 125:3,11 126:24 129:23 134:17 136:8 139:21 141:21 149:8 151:8,20 152:14 156:20 157:6 161:13 162:19,22 165:19 167:13 178:10 179:23 180:10 181:14 184:23 186:4,13,19, 23 187:8 188:6 189:22 193:23 196:16 197:9 198:12 199:19 200:13,16 202:15 203:6 204:13 206:23 207:9,20 210:3,19 213:17 214:10,15 215:1,17 217:1 225:17 226:12 228:24 230:6,13,24 231:12,23

232:23 233:15 236:15,17 237:18 239:6 240:5,9,23 241:8 242:16,19 243:13 245:11 247:18 248:6 249:9 252:4 254:7,19 256:22 259:11,19 260:14 261:3 262:18 265:16 266:7,13 267:13 268:7,14 269:2 270:1

**objections**
28:4

**objects**
9:11

**observation**
128:20

**observed**
24:18 162:10

**obtain**
77:22 94:2 127:4

**obtained**
35:3 265:2

**obviously**
104:8 159:17 161:21 257:11

**occasion**
167:6

**occasionally**
166:8

**occurrence**
257:17

**October**
67:9

**odd**
105:14

**offer**
15:6 19:6 80:14 86:15 87:5 88:7

**offered**
15:9,21 17:2,8 19:5, 9 23:11,13 84:14 111:19 158:2 234:2

**offering**
103:2

**office**
47:24 48:1

**officially**
49:15

**offline**
255:22

**okay**
7:2,5,8 8:20,24 9:1, 4,5,9,10,13, 14,18,19 13:1 14:15, 17,18,24 21:7 24:12 26:4,16 27:3,4,10, 11,12,15,20, 22 28:13 30:20,21 33:13 37:15 38:21 47:17, 20,21 48:10 50:20,21,24 51:2,16 52:1 53:2 57:13, 20 58:4,8,9 59:23 60:2 61:7,16,17 62:6,8,22 63:7 65:18 66:21 69:3, 8,15,21 70:4,5,11, 12,14 72:16 73:6 74:21 75:2 78:13 80:8 82:15, 21 89:1 90:5 92:1 93:11, 12 99:6 100:16 104:6,7,10, 11,22 105:20 106:6 107:7 108:7 109:12,17 110:5,8 113:1,16 114:10 120:3 123:3,7,12, 24 127:11,23 128:15 129:4 130:5,8,13 132:18,21,22 133:17,19 134:1,4 137:14,16, 19,22,23 138:12 139:3,7 140:2,8,9 143:24 144:6,9 145:7 146:15 153:6,9,11 154:3 158:14,24 162:15 166:10,21 170:14,16 173:21 177:3 180:20 183:8,11 187:5 188:11 191:16 193:21 198:3 201:8,14 203:16,17,22 207:14,15 209:2,5,16, 17 210:18 212:9 213:15 217:20,22 218:5,6,8, 14,24 219:15,23 221:22,24 222:9,17,24 223:1 227:22,24 228:4,6,15, 20 229:17,19 230:3 231:9 232:19 233:9,20 235:10,11 246:2,5,17 249:3,15 250:7,15 253:12,14, 16,17 255:6 256:10,12 257:19 263:8

**oligopoly**
120:4,9,19 121:8 243:16

**omit**
233:22

**once**
25:21 58:11 68:13 74:12 82:10 85:15 87:4 152:15 164:3 184:24 189:23 196:3 198:14 225:9 231:13 260:10

**one**
15:24 17:11 34:21 42:4 48:14 51:3 52:6 55:3 71:17 81:20 90:1 104:11 105:21,22 108:21 109:10 121:7 124:11 128:2,19 129:9,10

132:1,3
134:4 135:12
136:2 139:24
141:13 152:8
160:4,11
161:17
162:20
163:10,11
165:13,22
167:14
169:13
175:13,17
176:6 184:8
186:21
187:1,13,21
190:18 192:6
193:7 194:7
195:24
196:13
197:6,19
198:2,8
199:14,21
200:2,6,12,
21 202:24
203:12
212:15
213:4,9,10,
13 214:2
216:11,22
217:13,15
218:16 219:5
220:6,12
224:17 226:5
228:4,5
229:1 230:18
231:19 235:4
236:24
238:7,16
243:1,21
246:3,22,23
247:1
251:16,24
254:1 255:7
262:5 263:20

**one-hundred**
264:21

**ones**
89:22 157:12
159:16
164:19 224:7
229:12 232:3
258:3,5

**ongoing**
89:2,4,13

**online**
212:5 255:18
256:1

**open**
26:5,11,12,
15 27:11
48:5 57:12
60:6 133:21
209:2

**opened**
129:9

**opening**
26:8

**opining**
120:9 234:21
235:13

**opinion**
15:6,21
16:20 17:2,
8,24 18:19,
22 19:1,5,6,
9 20:20
23:10,13
24:3 67:18
80:14 84:5,
12 85:13
86:15 87:5
88:7 90:2
102:19,20
103:3 105:17
106:21
110:15
111:19 112:2
115:7 120:8
137:12
140:14 147:6
148:23
163:16
180:1,11
197:22
204:12
206:18
212:20,21
213:18,20,22
222:13 234:2
268:6

**opinions**
15:9 17:13
19:19,20
28:16,21
35:13,19
36:1,9 37:9
38:9 39:24
40:9 41:10
42:2,9 43:23
45:3,16
49:11 61:10
77:14,18,23
78:5 87:24
89:7,22,24
90:1 92:12
141:17,23
143:16 147:5
148:19
149:12
152:20
156:8,12
157:21
158:13,14,
18,21 164:8
168:22,24
170:9 179:10
218:17
219:14 221:3
223:9 234:17
257:5 264:15
266:3
267:16,17,18
268:3,18

**opportunity**
165:24
246:14

**opposed**
41:20 172:10
210:16 225:9
266:1

**opposing**
89:23

**optimal**
254:9

**option**
247:3 249:6,
16

**oral**
7:17

**order**
19:20 110:21
118:22
119:13
122:22,23
147:23 150:9
174:4 187:14
190:12 221:6
241:10,21
255:19
266:19

**orders**
155:4

**organization**
29:11

**orientation**
199:5

**oriented**
198:19,20

**Orme**
199:24

**Orszag**
29:13,16
269:8

**ounces**
118:16,17

**outcome**
6:13

**outcomes**
106:22

**outlets**
255:18,21

**outline**
82:1

**outputs**
243:24

**outside**
62:13 185:8,
11 265:2,6,
10

**overinflate**
247:10

**overload**
26:20
**overlooked**
17:11
**overpaid**
86:3 102:24
215:7,22
**owner**
30:2 31:8,10
**owners**
29:18,19
30:4,12 31:1

**P**

**pace**
254:3,11
**pack**
130:17
131:10 135:6
171:14,15
173:10
174:15,17,21
175:3,5
193:16
207:23
208:1,13
223:11 229:8
241:12
**pack-size**
131:12
**package**
170:15,17,23
171:4,5,8,20
172:1,2,20
173:8,19,22
193:17 197:2
224:18
**packaged**
164:24
165:3,12
178:24 179:4
**packages**
196:20
**packaging**
191:22
240:4,7,8,
11,22 241:1,
3,16
**packet**
187:24
**packs**
130:9
131:10,22
206:20,21
**page**
27:23 58:5,6
62:7,20 63:5
65:9 67:6
69:1 80:4
82:20 103:16
123:22
133:12,18
134:3
153:12,15,18
170:13
191:15
212:3,6,10,
13 216:13
219:16
248:17
250:6,13
**paid**
58:12 86:4
95:13 103:12
105:4 108:12
113:9 124:6
125:1,10
126:22,23
147:16 216:3
237:15,23
238:18
239:3,19
**pain**
129:6 190:24
**painting**
109:4
**Palmer**
226:4
**panel**
179:6,7
**paper**
46:6,9
**papers**
98:24 99:2
265:9
**Par**
81:23
**paragraph**
70:13 78:11,
24 79:24
80:4,13,19
81:1,23
82:8,19
85:12 86:15
88:24 90:4
99:5 100:11
103:16,19
110:6 112:7,
23 120:2
121:17 124:2
130:6 135:2,
12,14,20
154:22
157:15
158:23
159:6,19
165:1 170:13
174:14,15
184:16
185:18
194:8,9,13,
23 201:1,8,
15 204:4,8
216:12 219:4
220:12,17,
19,20 248:7
249:12,19,21
250:10,12,15
254:2,6
255:20
256:6,8,10
267:21,22
**parallel**
106:20 109:7
**pardon**
85:8
**part**
30:7,10
38:24 41:3
43:14 95:9
102:23 123:4
125:5 138:23
144:21 145:8
148:22
150:21 167:1
170:6 173:21
192:21
199:20
200:19
204:10
206:13
212:17
223:21
228:16,17
229:13
234:14
238:23
**partial**
125:10
**partially**
95:4 145:14
229:5
**participant**
188:8
**participants**
166:16 169:7
176:4 186:18
188:4 195:23
202:8
**participate**
251:19 252:3
**participating**
188:9
**particular**
18:20 22:3
53:9 56:20
57:15 70:16
77:5 80:13
147:2
149:23,24
152:19 190:8
194:14,15
197:2 199:11
211:12 212:1
216:1 220:3
222:6 226:5
229:6 243:2
245:21 270:3
**parties**
6:6

**partly**
237:12
**partner**
59:3,4
**partners**
29:2,3,7,18, 20 30:5,10, 12 31:2,8, 11,17,24 32:17 33:3, 15,19 34:11, 13,15,18 39:14,17 54:15,17 57:18 62:12, 14 66:11 67:5,16 68:5,16 75:22 88:2
**Partnership**
31:23
**parts**
159:14
**party**
6:12
**passage**
219:23 226:21
**past**
13:14 227:7 251:2
**paste**
194:24
**patience**
263:9,22
**Paul**
53:15
**pause**
28:23 52:6 114:20
**pay**
96:23 97:3 102:9,15 103:18 105:1 106:9 108:15 112:24 115:16 125:7 145:12 214:9,23 215:16
**paying**
143:11
**payment**
101:10 105:12
**Peak**
136:14 187:23
**peer-reviewed**
98:20
**peg**
103:8,10,11
**pending**
47:20 201:5
**penny**
107:10
**peop**
147:23
**people**
29:21 51:14 84:13 101:11,12 102:18 105:5 111:1,8 112:1,3,15 113:20,22,24 114:2,5,7,9 115:1,7 125:17 126:18 141:4 143:8,11 145:12,24 147:16 148:15,16 149:20 156:4 159:20 160:22 163:2 165:11 169:17,19 172:14 174:16 177:6,24 178:2 184:5, 6,13 185:15 187:19 188:9 190:20 195:9,10 198:18 199:12 203:13 211:14 213:24 223:5 224:1 250:24 251:6 252:7, 8,12,14
**people's**
130:24 131:1 147:19,21,24 161:22 188:20
**Pepsi**
98:13
**percent**
31:22 39:7 58:11,12,13, 17,23 59:1, 13,19 65:14, 19 69:10 130:10,19 178:20 234:6 264:21
**percentage**
58:16,19,21 66:6,14
**percentile**
189:17,18
**perfect**
243:20
**perfectly**
242:15,21 243:4
**perform**
81:7 88:10
**performed**
81:17 265:20
**period**
69:4 78:16 79:1,4,10, 14,17,19 128:19 140:19 142:10,11,21 144:10 147:3 149:1,14,24 150:4 151:1, 7,19 152:13 154:6 206:11 240:4,22 241:7 242:6
**periods**
150:14,19 152:18
**permiss**
233:5
**permissible**
233:12
**permitted**
20:4
**person**
12:20 35:9 68:3 214:8, 23 215:14,16 245:12 249:16 251:18
**person's**
43:1 159:15
**persons**
114:10,12,13
**pertained**
36:13
**pertaining**
35:12
**Ph.d.**
7:15 39:6
**phase**
176:20,21,23 177:4 268:5
**photos**
209:17
**physical**
45:11,23 47:10 70:3 133:20
**physically**
47:22 70:4 127:17
**Picasso**
106:8 108:13,19

109:2
**pick**
6:7 150:15
**picked**
134:23 162:9
**picking**
165:11,12
**PIERRE**
7:15
**pilot**
169:12,14,24 170:7 176:20,21,23 177:4,9 192:20 196:4 198:17,21
**piloting**
172:14,23,24 176:14
**pink**
18:7,22 19:6,17 20:24 22:5 23:23 25:3, 15
**place**
6:5 22:11 81:10 134:23 147:11 218:11 222:4,5
**plaintiff**
16:9,21 107:3 214:18 263:4
**plaintiffs**
6:21 53:20 54:20 55:10, 24 56:11 70:16 80:23 112:10 123:21 124:3 209:18 214:3 263:10
**plaintiffs'**
54:21 55:11 56:1,11

261:6,7 262:13,17
**plan**
139:23 248:14 251:18 252:2
**planned**
177:24
**plausibility**
185:8
**played**
270:3
**playing**
267:5
**please**
6:6 9:20 12:1,15 14:5 19:4 27:19 31:4 34:4 35:22 38:1 42:15 48:3,6 53:6 55:6,19 59:22 60:10 62:6 63:5 66:16 74:20 78:11 79:23 80:1 88:24 90:4 93:4 99:5 114:24 120:1,2 125:22 126:8 139:14 143:24 145:3 148:24 153:16 155:13 157:15 158:23 167:20,22 175:12 180:19 209:10 218:4 219:17 221:20 228:7 229:16,24 231:7 232:17 240:18 244:21

245:24 256:7 259:14 263:20
**plenty**
109:21
**point**
8:22 34:11 47:18 67:22 70:10 91:11 93:1,6,17 94:3 111:17 113:7,9 118:16 150:10 156:11,14 163:2,15 178:22 179:24 182:13 184:3 190:24 218:10 222:4,5 224:14,16 226:23 244:9 251:6 268:19
**point-of-sale**
82:1 98:13 267:19 268:4
**policy**
62:18
**popular**
199:22
**portion**
31:19,21 59:13,17 64:10 65:21, 23 206:15
**portions**
66:13,14
**position**
30:22
**possibility**
259:20 260:5
**possible**
106:15 148:14 149:16 167:10,11

169:9 170:4 174:6 176:11 247:5 268:4
**potential**
116:15 259:3,5
**potentially**
89:24 90:2 105:12 115:6 142:24 176:17 227:10 258:23 259:2 260:1,2,3
**power**
120:7,18
**practice**
121:10 149:20 184:11 210:24 211:19 227:1
**pre-test**
192:20 198:17
**pre-tested**
196:3
**pre-testing**
177:10 192:24
**precedent**
229:10
**precise**
17:7 20:1 135:16
**precisely**
243:8,9
**predicts**
260:7
**prefer**
84:2 110:17 247:8
**preference**
161:22
**preferences**
131:1 147:22,24

152:3,5 182:15
**preferred** 202:2,4 248:21,23 249:13,23 250:1
**preferring** 257:5 258:11
**preliminary** 55:2
**prem** 214:9
**premium** 24:15 25:1 86:8,10 91:5,17,19 94:8,19,21 95:16,21 96:6,7,9,13 97:11 98:1, 7,11,16 100:16 101:1,16 102:8,23 104:18,21 105:2,4 106:9,12 107:5,17 108:15 117:7,9 118:1 119:11 124:6,10 125:1,6,18 126:20 186:12,15 206:19 207:4,7,17 208:2,12,15 214:9,24 215:16 221:10 235:18 236:12,22
**prepackaged** 159:22
**preparation** 36:7 42:22
**prepare** 10:2,17 11:8,22 46:2,8,13
**prepared** 10:24
**preparing** 10:20 47:4
**preprint** 166:5
**preprinted** 165:15
**present** 10:19,22,23 11:6,23 40:4 107:16 172:20 175:2 187:17 200:8
**presentation** 192:14
**presented** 166:16 167:3 169:6,7 171:15 172:4 174:21 176:4 177:6 186:18 191:24 192:19 196:14 201:23 202:7
**presenting** 133:2 167:8 168:19 171:24 172:3 198:17 200:6
**preservative** 77:11,13 117:24 209:24 214:21
**preservatives** 80:21 111:22 112:8 131:9 135:10,19 191:12,17,21 192:3 193:4, 12 194:11 195:10,12 196:9 214:5 223:15 224:12 225:3 262:8
**presumably** 89:5 241:22, 23
**presume** 64:13
**presumes** 80:21 112:8
**presumption** 111:3,6,13 112:12
**pretty** 98:2 141:10 149:21 160:7 177:9 267:5
**prevailed** 86:5
**prevailing** 243:7
**prevalent** 160:7
**previous** 30:8 31:5 40:14 61:5 108:1,5 111:18 174:15 218:16 219:1 230:8,9,15, 18 233:1,3 244:7
**price** 24:4,5,15 25:1 81:2 86:4,8,10 91:5,17,19, 24 94:5,8, 10,12,14,18, 19,21 95:1, 7,8,9,10,16, 21,23 96:6, 7,9,13,14,15 97:7,11 98:1,6,11,16 99:22 100:2, 16 101:1,2, 16 102:8,23, 24 105:3,17 106:16,17 107:4,5,16, 17 108:15,24 112:18,20 116:18 117:2,10,12, 22 118:1,8, 11,18,23 119:2,11,13, 22 124:5,10 125:1,6,10, 18 126:20,22 134:12,13 135:8 136:5 137:24 138:8 139:9,16 140:10,17 141:1,2,5,19 142:13 143:1 144:11 145:9,10,16, 23 146:11, 12,13,23 147:2,6 148:1,2,3,6 149:2,11 150:4,7,12, 24 151:5,17 152:1,4,7,8, 11 159:10 161:24 165:15 166:5 180:19,21,22 181:12,23 182:2,9,15 183:24 184:2,7 185:20,21 186:11,15, 20,21 187:1, 20 188:20,21 189:4,20,21 190:9,18,19 191:2 193:17 202:5,22 206:2,15,16,

18 207:4,6, 17 208:2,4, 6,12,13,15 214:9,23 215:3,7,9, 16,19,24 216:2,3 221:10 227:21 229:8 235:18 236:12,22 237:2 238:22 241:11,17,24 243:8,9,22, 23 244:18,21 248:24 249:14 250:1 254:2,9,14, 21,22

**priced**
107:13 117:13

**prices**
85:24 88:19 91:17,21 94:18 95:6 96:17 99:12 100:23 106:13 118:20 119:10,24 120:22 121:16 124:22 128:4 134:14,16,18 137:1 140:23,24 141:4,9,10 142:14,17, 19,21,23 143:4,7 145:12,15, 21,24 146:4 147:13,15,20 148:4,5,8,14 149:6,16,19, 20,23 150:9, 10,17 152:17,24 156:3 161:4 165:24 181:2,6,9,18 182:12,18 183:11,23 184:5,10,12 185:4,7,15, 16,22 186:17 187:2,12,16 189:3,4,8 190:23 259:8,16,23 260:4,8 267:8

**pricing**
44:24 45:1, 12 88:18 97:20 98:22 106:16 109:8 116:9,20,22, 24 117:17,20 119:4,5,6,12 120:7,18 141:15 161:5 205:22,24

**primarily**
36:4 270:2

**primary**
165:6

**principal**
90:6

**principle**
93:22

**print**
225:21

**printed**
165:21,22

**prior**
13:3,8 15:7 16:7 54:8, 13,17,19 55:9,16,23 56:10,21 57:5 224:20

**private**
6:8

**probably**
9:15 13:23 15:22 17:10 25:17 49:14 54:10 104:5 107:3 125:16 126:17 147:9 174:24 185:12 224:21 234:6 242:2 264:24

**problem**
27:7,9 96:1 97:16

**problems**
240:24

**proceed**
31:7 47:17 52:10

**process**
159:15 227:14

**processing**
36:4

**produced**
28:23 61:4 128:9 216:19 218:21 219:15 220:13 267:20

**product**
24:16 45:15 71:6,8,13 72:14 73:4 75:16 76:4, 7,16,18,21 81:24 86:7, 8,10 96:23 97:2 99:11, 21 105:4 107:8,9 113:17,21,23 114:3,5,8,9, 11,12,13 115:2,3,8 116:19,22,24 117:8,9,11, 12,20,21 118:6,23 119:5,12 126:4 128:20 137:1 144:13,14 145:2,18 146:12 150:5,24 151:6,17 152:11 159:3,16 165:15 166:6 167:4,8 171:14 176:2 177:21 178:7,8 179:5,20,21 180:9 181:10 186:22 187:24 188:22 189:5,16 190:21 191:4,9 192:2 193:11 196:7 197:3 199:14 200:7 201:20,23 202:2,4 203:4,5,15 210:1 211:5 212:1 213:15 214:3,6,7, 21,22 215:15,19,22 216:2 223:17 226:2,3,11, 24 237:16, 20,24 238:19 239:4,19 241:17,21 243:16 244:2,8,11 247:5 248:5, 21,24 249:7, 13,17,23 250:1,2,18 259:18 262:9

**product's**
237:16,24 238:19 239:4,20
**production**
45:7
**products**
70:17,22 71:1,20 72:1,6,10, 19,21,24 73:1,2,12,18 74:7 75:11 76:10,14,22 81:3 83:5 86:11 88:23 91:20 95:14 99:11,19,20 100:1,10 102:19 105:16 108:20 111:20,22 112:18 115:21 116:18,19 117:4,5,14 119:2,7 122:11 124:5,20 125:14 126:15 135:21 137:2 140:18 144:16,21 145:8,13 146:5 147:19 149:2,6 156:10 170:2 171:7 178:3, 16 180:3,14, 16 186:2 187:17 188:13 189:9,13 195:16,18 198:5,18 199:10,16 200:11 202:7,11,13, 18,19 203:9, 10 206:1,9, 21 207:8,18 208:16 210:2 211:15 212:15,17, 20,22 213:4, 13,19,23 215:4,6 229:14 232:7 235:18 236:12 242:5 243:6,10 246:23 251:7,16,22, 24 252:15 259:10
**profiles**
201:23 247:5,6,8
**profit**
67:23 120:16,17 121:8
**profits**
31:16 120:22 121:16,17,22 122:1
**program**
82:10 173:4 177:4 196:3 198:15
**programmed**
87:13 166:22 167:12 176:11 177:11 192:17 196:2 198:13,14 204:8 257:9
**programming**
168:18 176:13
**programming-type**
179:19
**prominently**
229:4 232:7 254:16
**pronounce**
7:5 43:1
**pronounced**
235:10
**pronouncing**
43:3
**properly**
117:16 177:6
**proportion**
208:4
**proposal**
124:9
**propose**
92:13 111:23 124:24 151:5,15,16 152:10 173:3 178:22 244:17,23
**proposed**
80:20 81:14 87:10 90:18 94:20 101:6 112:8 122:3 125:5 140:16,20 141:24 142:11 150:23 196:23 208:16 212:24 215:2 223:7 237:7 260:12
**proposing**
101:18 102:5 112:4 126:22 143:7 170:17 207:6,17 220:24
**prosed**
208:16
**protective**
19:19
**proud**
223:22
**prove**
84:9 96:8 223:17
**provenance**
76:1 223:17
**provide**
14:22 16:20, 24 18:22 22:22 30:8 34:3 43:15 45:8 47:2 49:13 54:7, 11,21 55:11 56:1,10 65:14 89:7, 21 90:21,22 94:22 95:24 124:10 125:1 137:9 146:6 172:15 179:9 181:11 211:17 248:24 265:13
**provided**
26:1 29:3 42:8 45:6,22 48:8 49:13 51:21 53:4 57:10 60:4 66:19 69:19 72:8,9 74:24 87:20,22 95:20 96:7, 12 97:9 123:9 127:7 176:16 181:5,6,17 206:10 208:19 217:9 218:1 221:18 223:13 227:2 228:9 229:21 231:5 232:14 253:10 265:3,11,21

**provides**
29:3 92:21 181:17 266:15
**providing**
16:9 17:12, 24 35:17 47:4 54:18 67:17
**psychology**
227:8
**publications**
99:4
**publicly**
121:14,15
**published**
98:24
**pur**
187:13
**purchase**
99:18 103:24 148:9 159:21 161:20 162:3 174:9 187:10,13 188:20 201:22 202:4 227:14,19 247:8,15 248:23 249:13,24 250:3 251:8, 14,16,18 252:9,16
**purchased**
63:15 114:3 211:19 250:18,19 251:9,24 252:8,13
**purchases**
124:4 214:20
**purchasing**
63:9 162:1
**pure**
136:15 242:22
**purely**
96:4 152:23 170:9
**purpose**
117:4 141:3 145:19 147:21 159:6 161:19 162:5 177:2 187:15 188:17 198:6
**purposes**
70:11 130:24 147:8 148:11 149:15 152:18,23 155:11 156:2 157:2 174:19 185:23 191:19 197:18 198:7 220:23 228:2 248:3 250:23 252:21
**push**
260:2
**put**
35:15 57:7 59:21 64:15 66:15 70:7 77:21 113:6 141:5 143:18 146:17 178:22 179:18 184:10 187:10 190:18 195:19,22 196:11 223:6,7 249:2 260:7 262:21 265:23
**putting**
21:5

## Q

**qualification**
171:3
**qualified**
250:17 252:3 268:24
**qualify**
59:3 155:3
**qualitatively**
155:6
**qualities**
117:12
**quality**
174:13 241:21
**quantify**
174:10
**quantitative**
98:21
**quantities**
9:16 124:22 181:8 182:2
**quantity**
119:11 172:7 243:6
**question**
8:23 9:2,21 11:16 12:2 13:12 15:19 16:5 17:6,19 19:4,13 20:1,18,22 21:8,14,16 22:3,12,14, 15,17,18,19 28:8 30:14, 22 31:6 32:22 35:20 37:23 38:1, 3,4,18 39:13 41:24 42:13 47:20 50:3, 12,15 53:11 55:5,20 56:5,8,20 58:14 60:8, 15 61:19,22, 23 62:1,17 71:23 72:9 73:16,22 74:3 78:2 86:13,14 90:18 93:5, 10 95:18 111:12 112:11 114:21,23 115:5 121:24 125:12,13 126:12,13 127:2,3 134:15 151:3,22 153:3 154:8 156:21 157:17,19 158:5 159:24 162:17 164:4 167:20 169:2 170:5,19,21 171:19 172:9 176:24 183:10,18,20 187:10 188:3,24 190:19 198:3 200:18 201:4,5,7,11 202:6 204:14 205:2 207:10,14 212:18 213:2,15 214:12 215:19 217:7 218:15 219:1 223:4 224:20 225:5,12 226:15 228:21 230:8,22 231:1,14 233:2,13,17, 21 236:6

239:23 240:19 242:18 244:6 245:22 249:20 250:2 252:11 256:24 257:13 259:13 260:9 261:4

**question's**
150:6

**questioning**
152:21 190:17

**questions**
11:13 132:23 168:9 169:22 197:13 198:1 212:13 226:22 228:6 229:17,18 264:1,11 270:5

**quick**
7:11 104:2,4

**quicker**
73:8

**quickly**
48:14

**quite**
29:21 98:19 116:13 147:17 152:16 178:2 181:20

**quote**
64:4 188:18 235:13 236:8,13 261:11

**quoted**
261:10

**R**

**raise**
241:24

**randomize**
188:16

**randomized**
188:13 203:10

**randomizing**
189:8 202:17,18 247:4

**range**
147:12 148:3,5,14 149:16 156:4 185:11

**rank**
144:14 155:4

**ranked**
136:12

**ranking**
267:8

**rate**
224:19

**rates**
8:15

**re-present**
133:3

**reach**
67:20 98:21

**read**
47:14,15 55:7,13,21 56:8 78:14, 15 125:22,24 126:8,10 143:3 155:13,15 156:24 162:23 173:14 177:8 182:15 185:19 205:2,4 248:22 253:22 261:6,8 263:11,13,18

**reader**
194:20 224:17

**reading**
138:4 200:24 249:19 263:19

**ready**
85:15 86:23 87:11 88:12 122:4

**real**
147:16

**real-world**
210:8

**realignment**
259:8 260:7, 9

**realistic**
149:18 159:12 160:3 161:21 162:4 163:4,9 164:23 174:6 190:12

**realities**
99:10,15 199:8,10

**reality**
99:23 143:8 199:18 200:4 201:21 260:17

**realize**
157:23

**realm**
184:14 185:8,15,17 192:16

**reason**
26:7 66:8 72:20 73:14, 20,23 113:8 133:2 154:13 158:3 179:9 199:20 225:21
267:14

**reasonable**
9:17 14:10 16:1,5,13, 14,15 80:22 112:9

**reasons**
165:22

**reassemble**
25:12

**rebuttals**
89:21

**rec**
83:12

**recall**
8:9 10:13,14 13:20 16:14 17:24 24:3,9 41:19 43:8 44:18,23 46:18 52:5, 11,17,22 53:13,19,21, 23 55:2 59:11,17 71:18 74:18 75:8 77:12, 20 78:7,10 128:1,6 135:24 139:11 144:23 154:14 156:11 166:11 234:21 235:13,21 240:24 241:24 247:3 251:13 255:24 263:19 265:21,24 269:15

**receive**
31:15,16,19, 22 35:11,23 42:3 77:23

78:5 116:1 168:14 264:14,18
**received** 27:21 35:18 57:1 103:13 258:7 265:8, 15
**receiving** 52:17 101:13 103:23
**recent** 142:9,10 143:5
**recently** 251:8 252:8, 13
**recess** 51:7 110:2 144:3 204:1 255:11 264:5
**recollection** 12:10 59:6 132:8 135:24 136:17 168:8
**record** 6:3,6,15 9:13,21 21:6 35:16 51:5,8 55:7,21 108:3 109:24 110:3 125:24 126:10 130:2 133:19 143:21,22 144:1,4 155:15 156:24 167:21,23 168:2,5,7 203:23 204:2 205:4 214:11,16 219:24 234:7 255:8,9,12 261:19 262:1 264:3,6 270:9
**recorded** 6:9
**recording** 6:5
**recordings** 25:9
**records** 255:17 257:23,24
**red** 224:10
**reduce** 241:12,20
**reduced** 118:16
**redundant** 194:14
**refer** 10:16 82:16 92:24 110:9 111:2 135:9, 18 140:3 194:11 218:9 222:7 230:14 258:12 262:16
**reference** 37:3 70:15 140:4 262:6
**referenced** 33:16 75:15 99:1 110:13 112:22 128:8 129:21 130:13 160:15 217:12 218:22 219:12 222:1 259:8 261:9
**references** 36:24 223:13 227:2 266:19
**referencing** 89:12
**referred** 75:10 217:20
258:6 262:15
**referring** 44:9,13 58:4,22 84:20 127:19 131:23 138:15 166:4 204:15 218:17 225:11 234:24 257:24 262:15
**refers** 64:9 65:4 90:6 226:3
**reflect** 93:20 142:3 156:3
**reflected** 76:16
**reflects** 93:14 138:3
**refrain** 167:20
**refresh** 139:8
**refreshes** 52:20
**refund** 115:11 124:5,10 125:1,8,9,16 126:5,17,23 127:2
**refusal** 32:11,12 33:2
**regard** 11:21 52:13 56:12 61:15 88:22 89:12 101:22 129:2 169:5 212:21
**regarded** 42:18
**regarding** 37:13,20 38:10,13 40:2 41:13 42:6 157:22
**region** 136:21
**regular** 104:20,22 105:1 175:24 176:1
**regularly** 147:17 160:22
**reiterate** 252:5
**reiterating** 182:19,21
**related** 6:12 11:12 22:9 37:11, 13,18,21 40:3 42:7 45:19
**relates** 35:17
**relating** 125:13 126:13
**relative** 148:9
**relevant** 78:16 79:1, 14 130:22 141:12 147:8 154:8,13 156:17 241:1
**reliability** 176:22 266:24
**reliable** 174:5
**reliance** 152:22
**relied** 45:13 49:11 148:22

154:15 218:19,22 219:5,8 220:7 228:18 231:18,22 232:10,11 242:1 262:3 265:10,24

**Religion**
223:22

**rely**
46:12,21 47:4 84:16 92:10,12,14 147:10,11 148:11 149:13 185:6,14 219:13 222:6,11 228:17,22 229:1 230:4, 11 231:10,15 232:4,20 241:2 258:9 259:3 262:4

**relying**
108:22

**remain**
149:12

**remains**
254:14

**Remarked**
253:8

**remarking**
253:5,6

**remember**
18:4,6,23 19:10,14,16 20:5,23 22:4,24 23:19,21 25:4 33:24 35:2 36:6 49:3 50:1,11 52:23 61:18 62:4 64:22 95:4 137:21 158:17 168:16 195:7 205:22,24 223:21 224:14 234:8 235:19 236:7,14 251:1,5 256:2 264:21 269:13,17

**remembered**
235:23

**remembering**
128:16 269:20

**remind**
66:13

**remote**
8:22

**remotely**
6:1 25:24 48:7 51:20 53:3 57:9 60:3 66:18 69:18 74:23 123:8 127:6 208:18 217:8,24 221:17 228:8 229:20 231:4 232:13 253:9

**removed**
140:2,5

**removing**
259:17

**rendered**
57:18 61:1 67:5

**rendering**
232:20

**reopening**
219:3

**repeat**
19:3 37:24 38:2,4 55:5, 20 82:18 86:14 88:6 91:4,12 154:24 183:20 194:22 230:15,17 233:1,11,14

**repeated**
225:13 230:16

**rephrase**
13:7 56:9 151:13 214:13 228:20

**rephrasing**
214:14

**replica**
171:16

**replicated**
139:24

**replication**
154:19,21

**report**
10:6 12:4,6, 8 15:17,18 19:16 28:15, 20 29:6 35:14 36:2, 7,10,16,23 37:9,11,14, 19,21 38:13, 15,16 39:3 40:3,10 41:3,10,14, 22,24 42:8, 19,23 43:15, 23 45:11,12, 16,18,20 47:10 49:5,6 52:13,19 62:24 64:6, 18,21 67:11 69:24 70:1 71:19 72:10, 12 75:16 77:16 78:23 79:11 80:5 81:6,9,20 84:19,21 86:17 87:24 88:4 89:22 90:19 92:4, 11 97:24 99:1 101:5 102:13 103:17 106:12,24 108:22 110:6,22 118:19 125:4 126:7 128:9, 10,11 129:5, 18,21 130:6, 22 133:5,11, 16 134:5 135:9 140:4, 5 146:4 147:2,8,11, 12 149:5 152:10,19 153:13,18 154:17 156:12 157:21 158:18 163:16 166:5 168:22 170:9 173:1,2 193:15 194:7,18 195:5 200:7, 18,19 201:15 211:22 213:5,22 216:11,24 217:12,20 218:9,11,18, 19 219:2,13 220:10,23,24 221:15 222:1,5,7,12 226:22 228:2,17,23 230:4,12 231:11 232:21 236:7 244:17,23

245:24
247:22
248:13 250:6
251:15
256:7,9
257:4 258:6
259:9 261:9
262:5 264:15
265:5,7
266:3,4,17
268:3,10
**reported**
6:1 36:5
154:11
155:18
216:23 232:8
**reporter**
6:16 7:10
26:2 37:24
38:2 48:9
51:22 53:5
55:6,7,20,21
57:11 60:5
66:20 69:20
75:1 123:10
126:8,10
127:8 155:14
156:23
183:16 205:4
208:20
217:10 218:2
221:19
228:10
229:22
230:17 231:6
232:15
233:1,11,14
236:4 253:1,
2,11
**reporting**
135:7 145:10
219:18
**reports**
38:11 42:14
266:16
**represent**
75:4 123:19
128:7 154:3
193:3 195:19
196:5 212:13
213:2 221:24
**representation**
111:21
**represented**
18:16,17
54:4 57:17
60:24 61:2,
3,4,8,14
67:3 68:8,20
74:6,8 75:14
107:11 128:8
178:4,17
180:6,14,17
216:10
220:15
**representing**
6:21 61:12
102:13 193:3
**represents**
60:16 70:17
130:18
193:12
**reputed**
135:7
**request**
28:24 45:6
48:18,20,22
49:7 134:11
266:20
**requested**
36:15 39:3
42:20 64:13,
15 78:8
94:23 96:2
98:5 134:10
265:18
266:23
**requesting**
194:21
**requests**
28:2,11
**require**
106:21
221:10
**required**
24:15
**requires**
246:22
**requiring**
26:7 32:14
**reread**
30:16 31:4
44:15
**rerecord**
25:12
**resale**
109:3
**research**
92:18 199:22
223:10 227:7
252:3
**researchers**
258:24
**reserve**
90:2 270:12,
14
**reserving**
89:16,23
**residence**
47:24
**resolved**
25:21
**resource**
106:23
**resources**
258:12,13
**respect**
9:2 28:9
38:15 41:22
44:17,24
50:2 52:19
68:11 79:7
93:11 126:21
128:10 158:7
233:2 234:19
263:10
**respective**
135:6
**respond**
22:3 48:21
49:1,6,17
118:11 184:6
**responded**
28:4 49:15
**respondent**
159:12 162:4
167:1
185:12,14
195:16 203:3
213:19 227:6
247:6 249:6,
17
**respondents**
148:7 149:18
164:20 170:1
171:13,21
173:22 174:8
177:12
178:15
188:11,21
189:19 192:1
193:2,5
196:6,15,19
198:7,21
201:24
202:1,3,10
203:3 207:3
211:6,10
215:10,11
248:4,20,22
249:12,22,24
250:9
**responding**
49:19 50:2,
7,10 242:19
**response**
11:2 28:24
30:16 45:6
97:9 143:1
169:21
179:10
201:24 244:7
245:15
259:16,21
260:4
**responses**
28:5 45:8
52:12,18
89:7,8,9

251:11 252:14
**responsible** 97:6
**responsive** 28:2,10,18
**restate** 108:8 259:14
**restroom** 264:2
**result** 83:14 91:16 124:6 125:2 217:5 243:21 247:7
**results** 100:12 141:17 163:14,20 170:6
**retail** 92:22 93:2, 8,14 94:17, 21 95:6 96:17,19,21 97:17,19 98:14,18,21 118:18 126:21 139:16 141:19 142:13 146:23 147:2,6 149:2,6 180:23 181:12 201:22 255:21
**retailer** 95:11 96:23 97:4,7 216:20
**retailer's** 95:7
**retailers** 94:1 95:1,5, 13 165:23 216:15,21 219:17 220:14
**retailers'** 216:23
**retained** 54:20 55:10, 17,24 57:3, 23
**retainer** 54:4 55:16 56:22 57:6
**retainers** 55:4
**retaining** 54:5
**rethink** 87:19
**retrospective** 101:10 103:20 115:13
**reveal** 106:19
**revenues** 181:7 182:1
**review** 15:23 27:18 48:15 56:15 57:21 59:6 64:7 89:8,23 134:6 139:22 154:17 270:11,13
**reviewed** 10:6 55:14 56:21 62:24 87:20 134:8 204:18 205:7,18 208:7 222:1 229:2 262:20,23
**reviewing** 49:3,6 52:11,18 56:18 57:4 262:16
**revision** 195:1
**revisit** 112:22
**right** 8:2 9:22,23 14:17,19 28:14 32:11, 12 33:1 34:8 56:8 65:22 70:6 72:2 77:17 84:18 89:16,23 90:2 92:22 93:8,9,15 96:23 97:4,5 104:18 111:14 113:18 114:4 128:15 129:7 132:14,21 133:3,16 135:16 138:4 139:8 144:11 153:24 154:20 155:22,23 156:1,5 164:24 189:2 193:16,19 195:7 199:17 200:23 205:15 212:7 213:14 219:20 224:3 228:20 256:9 268:17
**right-hand** 212:10
**rivals** 120:16 260:2,3
**Robert** 6:17 53:15
**role** 43:6 95:23 179:1 270:2
**room** 168:1
**roughly** 130:10,19
**round** 55:3
**rounds** 169:14
**routinely** 165:5 181:22
**row** 158:4
**royalties** 8:14
**royalty** 8:15
**run** 122:15 186:6 192:18,19
**running** 185:24
**Ryan** 10:11 40:23, 24 41:16,17, 20,21 42:17 59:10,12,18 265:13,21 266:1,2,5,11 269:15,16,19
**Ryan's** 265:17

## S

**S-K-U** 71:10
**Sadly** 253:22
**sale** 93:1,7,18 94:3 120:17, 22 122:10 163:2 182:13
**sales** 24:19,21 92:22 93:7, 14,20 118:1

128:4 129:2 138:3 142:3 181:12 186:1,3,5,9, 11,14 204:11,16, 17,24 205:6, 17 216:8,23 219:24 220:8 221:2,4,13 237:2 255:18,19 256:1

**Sam's**
216:17 255:23

**sample**
169:15 192:24 198:17 250:8,16,17

**save**
26:8

**Sawyer**
18:7

**saying**
7:6 92:3 104:9 114:7 138:23 160:24 181:13 183:3 208:5 217:2 235:19 236:7 249:5 257:7 261:12

**says**
58:2 62:9,24 63:8,17 67:9 69:4 70:20, 24 71:24 72:12 80:3 104:17,18 112:7 124:2 127:18 137:24 139:16 140:6 153:17 181:1 182:11

184:16 213:10,11 219:16 222:2,18 224:3 226:17 248:19 250:22 252:20 253:24 257:20

**scarce**
106:22

**scenario**
116:1 118:23 126:4 205:13 245:18,19

**scenarios**
109:7 116:7 119:24

**scheme**
224:15

**scope**
231:17

**screen**
51:12 132:17 133:23 138:14 143:17 144:7 252:12

**screening**
106:18 252:11

**seal**
22:21 260:24

**sealing**
261:2

**second**
52:6 62:6 82:19 120:20 124:1,2 153:17 158:3 164:13 171:17 173:21 184:16 185:18 209:6 254:13 255:7 263:20

**second-degree**
117:2

**section**
81:22,23 82:1,8 103:16 141:15 159:2 160:6 161:5 194:9,18

**secured**
264:23

**see**
27:13 52:9 58:2,7 63:1, 10,18 64:7 65:11 67:12 69:6 70:18, 22 71:2 75:17 76:3, 4,6,7,18 78:17 79:8 80:10 82:16, 22 83:16 90:9 99:12 100:14,16 104:17 110:9 111:3 113:14 118:19 120:15,23 121:18 124:7 125:5 127:13,14,18 130:11,14,20 137:8 138:9, 13,14,16,18, 22,24 139:1, 4,5,17 140:7,8 142:23 144:7,13,14, 18 145:4,5, 24 146:16,22 149:3,18,20 150:9 153:14,24 155:2,16 162:11 164:14

165:3,7 172:1 175:8 178:3,14 184:18 191:5 199:14 208:22,23 209:3,4,19, 21 212:9 217:12,14 219:19,23 221:21 222:2,3,19, 23 228:11,19 229:3,24 231:7 246:8, 11 254:4 256:16 260:11

**seeing**
53:7,13 61:18 62:4 129:7,8 143:8 148:15 161:10 164:21 184:15

**seek**
11:19 77:22 124:3

**select**
117:15 142:14 246:22

**selected**
72:17 73:9, 21 74:4,5,10 76:22 79:10 143:5

**selection**
160:24 161:1

**sell**
94:2,6 117:15 161:8 163:6 166:6 206:1

**selling**
121:12 134:24

164:14 242:22 244:10
**semantic** 226:8
**sending** 132:16
**sense** 73:17 118:5 145:11 149:19 152:9 177:12 185:4,15 186:9 222:10 232:6 238:21 239:1 244:1 252:24 253:6
**sensitive** 6:7 141:4 145:20 187:18,19
**sensitivities** 182:15
**sentence** 82:19 90:6 100:3 111:3, 10 112:7 113:2,3 120:20 124:1,2 135:14 164:12,13 173:8,14,16, 17,18,19 182:11 185:18 216:13 246:4 247:14 248:18 249:11 250:21 254:13 256:13 257:20
**separate** 114:15 155:8 178:4 179:7
**separately** 173:11 174:1 175:7
**September** 54:6,8,19 55:9,23 56:10
**series** 128:2,17 228:6
**serve** 117:5
**served** 13:13,14 52:12,19
**services** 16:9 54:5,7, 11,21 55:12 56:2,11,12 57:18 59:14 60:24 61:15 67:5
**serving** 117:17,18 180:8
**set** 35:13 36:1 69:11,14 103:5 107:4, 5 119:24 121:15 128:17 145:14 155:6 171:2 200:5, 8,20 202:3, 11,12,13 203:9,10 212:11 246:7,13 247:16 248:11,21 249:23
**sets** 120:21 160:21 164:22
**setting** 245:7
**settings** 246:21
**seven** 251:12
**several** 40:4 41:18 87:21 122:2 158:3 162:6 201:22 257:22 269:4,18
**shaped** 225:10
**share** 130:18 132:15,17 264:23 266:16
**shared** 129:10 133:22 264:23
**sharing** 62:12 123:11 137:15 144:6
**shelf** 94:11 95:9 180:19,21,22 193:17 199:15
**shelves** 161:10
**shop** 251:16
**shopped** 250:19 251:24
**shopping** 99:23 160:23 164:21 184:15 199:13,15 227:9
**short** 25:11 146:1 155:10 245:21
**shortly** 49:4
**shot** 203:1
**show** 48:11 94:17 95:19 98:4 103:3 108:3 118:19 123:13 132:17 133:3 147:18 149:10 169:15,22 172:6,10 174:22 177:24 187:5 188:4 189:5, 19 190:19 191:21 192:5 197:12 203:3,9 208:21 210:7,15 211:9,20 227:24 247:6 253:12
**showed** 142:11 181:19 256:4
**showing** 27:12 103:4 154:4 168:12 210:16 217:11 221:20 223:14
**shown** 186:22 187:24 188:22 195:22 198:6 202:11,18,19 223:10 253:4
**shows** 161:3 189:21
**shrinkflation** 241:14

**side**
51:12 100:4 198:6 259:21
**sign**
270:12
**signed**
54:12 269:3
**significance**
234:18
**signing**
33:17,20
**similar**
149:19 155:7 199:16 236:21
**similarly**
195:15
**simple**
183:10
**simplistic**
96:21
**simply**
98:6 163:16 169:17 172:8 219:7
**simulate**
199:8
**simulation**
85:1 88:4, 10,15 100:22 121:21 122:7,21,24 123:5 124:14,16,21 136:9 208:3 257:11 260:6 268:13
**simultaneously**
200:10 202:8
**single**
128:20 130:9,17 131:22 132:4,6 152:8 163:1 190:18 200:7 206:19,20 207:7,18,22 243:21
**singles**
138:18 206:19
**sir**
6:23 7:6 10:3 12:1,15 13:12 17:3 25:23 26:6, 24 27:13 28:9 29:14 33:13,23 34:4 37:22 39:4 40:23 42:15 47:7, 17 48:22 51:4,24 52:2 53:8,12 54:5 56:8 57:7 58:1 60:7 61:13 62:21 63:5 66:16, 23 67:7 69:14,22,23 70:13 74:2 75:17 76:4 82:12 90:4 123:13 127:13,18 128:7 129:16,24 133:24 146:17,22 154:1 155:17 158:15 169:1 170:13,19 173:20 191:12 208:21 209:3 217:11,14 218:4 221:21 227:24 230:1,23 232:18 233:12,22 235:23 256:7
**sit**
30:4,24 43:12 65:22 169:4
**situation**
108:21
**size**
75:17 76:18 118:16 131:10 135:7 146:5 170:15,17,23 171:4,5,14, 21 172:1,2, 12,20 173:8, 10,20,22 174:15,17,21 175:3,7 190:4 193:17 207:23 208:14 223:11 229:9 241:12,16
**sizes**
76:21 171:8, 15 175:5 187:24 208:1
**sketched**
88:9
**skipping**
252:19
**SKU**
71:9,14 144:17,20,24
**slight**
155:3
**slime**
18:7,22 19:6,17 20:24 22:5 23:24 25:3, 15
**small**
119:9 120:6 169:15 180:16 225:21 245:15
**Snapple**
136:15
**so-called**
68:19 160:2
**sold**
24:17 70:21 117:21 130:11,20 131:16 132:10 151:18 152:12 171:8 182:2 206:21 207:18 243:1,7 259:10
**solely**
152:7
**solution**
237:11
**somebody's**
150:10
**someone's**
185:11
**something's**
14:8
**Sophie**
10:14 38:17, 19,22 44:17 62:23 67:10
**Sophie's**
10:14
**sort**
203:12 247:24 252:10
**sought**
78:4
**sound**
119:12 170:20
**sounded**
114:6 170:20
**sounds**
20:19 21:7 111:16 151:21

210:20 239:15
**source** 128:13 138:1 265:2,8
**sources** 257:22 268:16
**spans** 78:17 79:2, 15
**speak** 11:7 40:15 68:19 168:7, 21 172:18 177:14 179:16 197:13 199:3
**speaking** 22:11 94:24 133:14 162:16 166:19 167:21 168:4 260:21
**speaks** 168:20 184:2
**specific** 14:9 20:10 36:22 42:21 78:8 145:17 164:10 176:1 183:24 184:7 185:20 186:21 187:1 189:4,5 198:18 204:23 205:13 207:1 216:20 218:10 229:2,15 230:10,19 232:4 245:19 258:14,22
**specifically** 13:18 17:9, 20 77:12
103:19 128:2 135:15 138:15 221:2 223:15
**speed** 26:19
**spell** 29:14
**spend** 106:5
**spent** 56:17 158:19
**spirit** 194:23 234:15
**spoke** 10:7,17 11:22,24 12:3,6,7 41:12,16 201:14
**spoken** 40:17
**spot** 81:21 135:16
**spreadsheet** 127:10,14, 15,17 128:22 129:1 133:22 267:6
**spreadsheets** 181:19
**staff** 10:7,9,17, 20,24 11:3, 6,7,8,13,22 12:3,18 29:4 31:19 32:15 34:12 38:22 40:24 46:1,7 59:1,2,4,12 65:13 69:9 134:9 267:2 268:22
**stage** 84:1 111:24 159:8 172:14
173:1,3 175:16 176:15 177:10,23 192:24 196:4 197:8,11 198:21 199:1 204:15 258:10
**stages** 196:4
**stamp** 58:1,4 62:21 69:2
**stamped** 63:6 67:6 218:6
**stand** 61:11 62:3
**standard** 97:19 109:8 121:9,10 169:19 177:7,9 190:2 252:16
**standardizing** 64:7,24
**stands** 71:6 224:11
**start** 7:21 74:14 164:12 263:7
**started** 53:19 74:13 173:13 201:14
**starters** 254:18
**starting** 81:23 82:8 201:15 216:14
**starts** 70:15 89:2 103:16 246:4 254:2
**state** 6:14 99:18 137:7 141:13 154:12,24 155:9 156:7 160:19 187:13 193:11
**state-wide** 137:4
**stated** 49:11 160:12 225:8
**statement** 61:5 107:21 111:7,18 151:3 170:21 182:24 183:1,5 210:15 214:5 236:14 244:18
**states** 24:21 64:4 158:18 160:20 163:7 252:1
**stating** 163:16
**station** 105:2,10
**steal** 97:1
**steer** 95:9
**Stemwedel** 10:11 11:5 34:6,9,10 35:12,24 36:3,18 37:5 38:7,24 43:17 49:21 50:8 269:5, 11
**step** 169:11
**steps**

139:12
**stop**
168:1,4
**stopped**
73:8
**store**
96:22 99:23
117:14
**stores**
93:8 94:11
219:19
255:18
**straightforwa rd**
94:17 98:4,
9,19 137:6
155:10
161:16
163:12
168:17 169:2
172:19
179:14
194:24 199:4
**strange**
121:11
**streaming**
8:17
**streamline**
249:4
**street**
104:20
253:23
**strike**
23:12 30:10
34:14 39:11,
12 54:16,18
69:5 75:13,
23 99:7
103:9 146:12
151:15
171:19
221:15 236:6
245:1 258:22
261:4
**struggling**
104:14
**studies**
211:3
**study**
130:23
131:12
156:18 170:1
179:4 223:21
250:18 252:3
**studying**
100:6 179:1
190:14 211:5
**stuff**
46:9 117:18,
19 121:12
138:14
154:10
194:23
**Sub**
161:1 193:22
**subcategory**
132:11
**subject**
19:19 253:5,
6 255:5
**submission**
49:5
**submitted**
28:15 123:20
**Subparagraph**
79:24
**subscribe**
253:21
**subsequent**
82:7
**subset**
146:5
**substance**
204:5
**substantial**
154:16
**substantiates**
225:5
**substitutable**
99:24 100:1
**substitute**
163:10
**substitutes**
88:21,22
**substitution**
100:10
**subtle**
224:16
**successful**
150:20
**sued**
214:4
**suf**
116:5
**suffer**
107:19
**sufficient**
89:24 186:1,
3 204:18
205:8,18
**sufficiently**
170:1 247:9
**suggest**
61:8 208:11
256:5
**suggested**
118:18
**suing**
214:19
**sum**
204:5
**summarize**
82:6 159:7
**summarized**
12:7 36:16
**summarizes**
28:16 77:18
204:8
**summary**
263:16
**Sunday**
253:22
**Supernatural**
269:21
**supervised**
67:12
**supervision**
134:9
**suppliers**
119:16
**supply**
100:4 107:1
241:22
242:5,7,11,
12,17,20
243:5,8,11,
17,19,23
244:4,7,15
259:21
**support**
6:11 10:7,9
29:4 31:20
32:15 43:15
82:4 83:20
123:20
266:15
**suppose**
8:1 92:16
147:4 259:6
**sur**
169:4
**surcharge**
91:19 102:22
**surcharged**
216:3
**sure**
9:1 11:9
12:3 14:3,9,
13,16 16:11
17:22 19:23
22:2,13
24:14 30:17
31:10 32:22
33:5,8 36:24
39:7 40:15
43:16 46:20
49:23 61:9
70:7 85:21
91:8 98:2
106:11
107:23
116:10
125:21 132:2
133:15
135:15 141:9
143:6 146:7

149:16 151:2,9 154:17,20 157:14,18,20 160:9 162:11,16 164:18,22 169:17 174:7,13 177:5,11 178:20 184:12 185:7 194:19 195:10 218:24 222:14,16 225:24 234:6 237:20 238:13 248:18 252:13,23 255:7 257:12 259:12,15 261:7,18,19, 23 262:1 263:3

**surely**
244:16

**surplus**
238:11

**survey**
82:10 84:23, 24 87:1,7, 12,16 99:17 135:3 142:15,20,23 145:15,17,19 147:13,15 148:2,3,7 149:17 153:1 156:3 159:4, 9 160:2,3, 11,14 161:16,20 162:5 163:9 164:9,19,20, 23 166:16, 20,22 167:12 168:14,18 169:3,5,7, 12,14,17,21 170:5,18 171:1,13,22 172:8 173:5 175:10 176:4,10,18, 22 177:5,10, 15 178:23 179:17,18 182:13 184:9,13 185:21 186:18 187:2,5,9 188:4,10,23 192:17,22 193:1,6 195:11,17 196:2,3 198:5,8,14 199:1,2,7,9 200:12 201:16,18, 20,24 202:7 203:2 204:6, 8,10 210:8,9 225:14 226:1,10 232:12 233:23,24 248:4 251:6, 10,19 252:14 257:10 268:12

**surveys**
88:1 142:18 177:8 211:14

**suspect**
230:20 238:3

**sustain**
118:17 215:9 241:19

**sustained**
216:4

**swear**
6:16 7:11

**Swedell**
34:5

**sweetening**
180:4

**switch**
269:10

**switched**
33:18

**switching**
269:9

**sworn**
7:14,17

**synonym**
90:21

**synthetic**
226:18

**systems**
62:13

**T**

**table**
64:4,11,14 130:13 132:23 133:4,8 134:3,5,6,8, 10,11 135:7, 22 137:7,18, 24 138:3 140:1,5 142:3,4,8 144:9 146:7 147:11,12 148:4,12,22 149:13,15 152:22 153:10,12,18 154:3,9,19, 20,21 155:12,21,24 160:16 161:2,3,4,7 185:5 189:14 191:13 264:17

**tables**
36:15 38:5 39:2 42:22 128:11 129:5 154:15 158:21 161:6 266:20,22

**tactile**
46:11 47:12

**tagged**
143:7

**take**
6:5 30:22 47:19 50:20, 23 51:17 66:6 87:18 104:2 109:11 143:21,23,24 169:14 177:4 198:1 201:2, 3 203:1,16 228:12 236:4 255:4 259:22 269:19

**taken**
51:7 110:2 144:3 204:1 211:22 255:11 264:5

**takers**
243:23

**takes**
236:21

**taking**
118:6 195:17

**talk**
82:9 83:10 143:20 183:15 216:9 245:14 248:8 261:11

**talked**
11:24

**talking**
27:5 112:23 151:11 153:4 162:12,14 168:2

205:22,24 219:4 245:14 255:5,15 262:6,7,13 264:17
**talks**
113:3
**tallboy**
254:3
**target**
186:18 188:4,7 195:23
**targets**
187:23
**task**
119:21 159:12 161:20 162:8 167:2 172:15,17 173:2 199:6 202:1,9,10 248:19 249:21,22
**tasked**
109:9
**tasks**
41:6 43:10,18 149:18 162:3 163:8 169:18,20 174:6 177:13 187:2 188:12,13 198:23 200:20 202:20
**taxing**
227:5
**tea**
70:20 130:11,20 132:12 138:1,13,16 143:12 146:12,13 148:17 154:4 159:16 170:2 176:1 212:14 213:3 254:3
**teaches**
191:3,7
**team**
18:7 25:12 29:4,11 39:1 41:7 43:9,14 49:9,18,22 59:8 82:4,5 146:7 265:19 266:17,21 269:12
**teas**
132:10 159:23 160:23 177:20 211:19 251:12
**technical**
50:22 51:11,14
**technically**
130:4
**techniques**
199:22
**techy**
128:23
**telephone**
40:16
**television**
25:7
**tell**
8:23 24:12 29:10,22 48:17 52:20 54:3 60:9,20,23 66:3 67:3 75:12 80:19 81:13 119:3,6 123:13 138:7 143:3 148:1 166:17 172:2,8 186:20 192:18 197:2 208:3 209:12 218:4 228:11 245:20 249:4
**telling**
171:23
**tells**
251:21
**ten**
22:24 199:24 203:17,20
**tend**
160:6,19 161:8 171:7 232:6
**tended**
229:4 232:9
**term**
71:5 84:18 116:8,14 117:1 179:8,10,11 239:15,16,24 240:1 244:20,22 245:2,4
**terms**
8:4 50:7 138:8 176:3 195:1
**terrestrial**
8:16
**test**
92:13 115:9 131:1 135:4 143:9 145:15,23 147:13 148:10,14,16 149:22 150:7,17 152:3 159:3,9 160:14 170:24 171:14 175:2 176:21 182:12 184:1,2,4 185:10 190:11,23 198:16 204:9
**testable**
115:6
**tested**
141:9 153:1 202:21 224:23
**testified**
7:18 11:21 18:12 37:18 46:2 50:6 70:1 73:20
**testify**
19:21 42:6
**testifying**
42:11
**testimony**
15:12,14,23 16:24 17:10,13 19:1 21:22 35:16 46:22 47:5 62:5 181:15 196:17 197:10 205:23 234:7 236:5 261:6,8
**testing**
169:13 170:2,7 171:10 175:9 191:19 211:12 251:7
**text**
197:17
**textbook**
120:19 143:3 149:21 162:3,24
**thank**
48:6 51:18 106:2 109:23 168:6 203:22 250:5 263:22,23

270:6,7,8
**Thanks**
264:13
**theoretical**
243:3
**theoretically**
185:21
243:16
**theory**
106:16
184:10
**thing**
33:13 47:11
56:14 107:23
108:19
142:22 143:4
159:20
161:15
171:17 188:2
190:7 194:15
227:12
228:21 235:9
243:17 250:3
**things**
28:21 36:24
47:15 73:7
102:1
116:14,15
122:6 152:8
159:22
160:4,11
163:3
169:13,24
170:3
172:12,20
187:20
190:14 193:2
199:3 218:16
224:17
225:1,7
227:11
228:19
229:3,15
232:11
248:16 254:1
265:10
**think**
18:18 22:19
30:3 39:6
50:20 56:9
57:4 58:13
83:11 86:12,
21 104:1
108:10
112:22
117:20
123:16,18
132:13
140:3,4
147:9,10
150:14 159:5
163:19
182:16 183:2
189:6 190:16
195:11
210:14
225:13,22
226:13
231:19 234:5
237:10
238:23 239:8
244:11
247:19,24
248:21 256:4
257:2,11
259:13,15
261:10
262:24
263:21
267:14
**thinking**
56:18 161:5
241:16
252:10
**third**
153:18
155:17
161:12 165:2
256:13
**thought**
30:14 44:1
59:7 62:3
80:5 89:18
107:10
108:12
115:21
116:2,4
123:3,17
129:8,12
140:11
151:10
170:22 203:7
219:2,22
235:10
251:8,12,21
**three**
155:4 200:11
246:3 254:1
**THURSDAY**
6:2
**time**
6:14 8:6,22
9:11 22:10,
13 47:18
49:3 51:6,9
53:19 56:17
61:17,21,24
64:13 78:16
79:1,14,17,
19 81:13
84:4 88:6,11
89:8,14
96:1,4 98:6
102:2 103:2,
24 109:19
110:1,4
115:6 128:2,
17,19 133:14
140:19
142:18 143:6
144:2,5,10
149:1,14
158:19
166:9,12,23
169:10,11,19
170:4 173:5
180:12
181:5,20
188:3 190:17
201:24
203:3,17,23
204:3 208:14
217:3 225:22
234:16
250:22 252:6
254:9
255:10,13
262:22
264:4,7
267:4 270:10
**times**
108:13 122:2
156:6 158:3
165:18,20
183:18
233:17
253:18,21,22
**today**
28:1,10 29:1
47:5,10,11
122:3 255:3
267:7
**told**
30:23 50:13
98:3 203:8
**Tom**
10:11 11:5
34:5,6,9,10
36:3,21
38:24 40:5
41:6,18,20
43:9,16
49:21 269:5,
9,11
**top**
10:15 13:20
41:19 54:1
71:18 78:7
127:16,18
134:24
137:24
153:14
154:4,14,23
160:18
162:20
164:7,13
166:11
216:13,14
255:21,24
**top-selling**
135:6 137:5
175:3

**topic**
11:19
**tort**
239:12
**total**
24:16,24
58:2,13,22
65:11 66:2
103:20 181:7
243:5,24
**totally**
14:17 108:20
128:21 263:7
**track**
78:1 181:2
220:3,4
**trade**
88:2 160:12
258:17,20
267:24
**trades**
208:9
**trading**
203:13
**traffic**
105:11
**trailblazing**
262:10
**transcript**
9:8 183:16
270:11
**transcripts**
262:3 263:11
**transmission**
264:20
**Travis**
6:10 26:13
**treatment**
188:18,19
189:9 190:13
202:21
**Tree**
219:19
**trouble**
200:24
**true**
69:12 110:23
207:16,19,21
223:21,22
**trust**
268:24
**Truthful**
91:9
**try**
8:4,23
104:2,7,13
106:18
109:13 141:8
142:16
184:12
185:16
228:21
234:8,9
236:22
241:15
250:24
253:15
**trying**
18:5 20:22
23:3 26:7
51:14 61:13
112:13
134:22
142:14
163:21
167:22
226:21 249:2
256:23
260:22
261:14
269:13
**turn**
15:14 16:24
24:24 27:22
52:7,24 67:6
101:1 145:13
187:18
188:17 189:9
200:19 201:8
202:20 210:5
260:3
**turns**
104:20
108:13 116:3
**TV**
25:11
**twice**
55:17 108:14
225:9,14
**two**
12:12,16,19
13:21 17:11,
17 24:2,21
67:22 81:5
97:18 100:13
101:15,17
104:10
105:15 116:7
150:15
154:12,15
155:9 163:7
198:3 213:12
221:14
228:18 246:3
254:1
**two-minute**
143:24
**type**
77:3 169:23
172:12
181:23 237:2
**types**
77:5 117:6
**typical**
145:11 174:7
**typically**
56:16 94:2
99:24 116:24
159:15,19
165:10
206:15
229:11
250:24

**U**

**U.S.**
6:11 130:11,
20 138:1
154:23,24
**ubiquitous**
178:24
**ubiquitously**
177:17
223:12
**ultimately**
49:14
172:13,23
224:22
232:10 260:7
**unable**
26:11
**unanswerable**
239:23
**unchanged**
148:19
149:12
168:23 169:1
**uncommon**
97:21 211:1
**undelivered**
103:22
113:12
**underlying**
161:23
**underneath**
138:2
**understand**
9:18,24
13:12 14:17
16:17 20:22
21:10 31:5
37:15 41:23
48:17 58:10
61:23 70:24
71:22 72:1,
14 73:22
74:1 78:24
79:13 90:23
97:20 112:6,
14 121:23
126:3 134:12
167:11
169:17,18
172:15 193:2
196:12
198:22
207:10

211:10 216:18 217:3 240:15,19 250:5 256:23 259:12 263:9
**understanding** 20:17 24:13 39:1 49:9 52:14 59:5 72:5,18 73:11 76:12 107:2 108:1 118:13 151:22 165:21 169:20 172:16 178:16 188:3 193:24 217:4,6 220:12 267:23
**understood** 9:19 49:18 61:11 128:23 177:6 256:3
**undesirable** 247:9
**undifferentiated** 243:10
**uniquely** 71:7 72:7
**unit** 122:10
**United** 160:20
**units** 207:7
**Universal** 71:6
**universe** 268:11
**University** 35:2
**unquote** 188:18
**unredacted** 123:19
**unstandard** 196:24
**unusual** 179:2 227:4
**UPC** 71:4,5,6,15 72:7,15 75:12,15 144:21 145:1 212:15
**UPCS** 71:1,20 72:1,10,17 73:9,11,21 74:4,10 75:10
**updated** 63:18 64:4,11
**upload** 48:3 230:2
**uploading** 50:22 60:1 66:17 69:16 74:22 218:3
**upper** 212:10 222:21,22
**upstream** 96:10 97:20
**user** 95:9 234:10
**UTC** 6:4 51:6,9 110:1,4 144:2,5 203:24 204:3 255:10,13 264:4,7 270:10
**utilize** 268:12
**utilized** 42:9

**V**

**vague** 168:8
**valuable** 238:8
**value** 103:8,11 104:24 105:4 107:12,19 108:16,23 109:3 114:13 115:2,7 118:5,7 127:4 131:8 135:4 157:8 171:5 174:11 178:6 191:3,7,8,20 211:11 214:23 223:3,5 233:23 237:16,19,24 238:2,4,5,7,14,19 239:4,8,14,20,22 244:17,21,24 246:15 247:10 260:23
**values** 131:2
**variable** 161:19
**variables** 184:7
**variants** 254:22
**variation** 142:23
**variations** 155:3
**varied** 201:19
**varies** 140:23
**various** 180:1 219:9
**vary** 135:3 140:24 141:5 143:4 148:2 150:9 175:4 187:1,16 189:4 190:7,15,18 208:13
**varying** 148:3,6
**venued** 8:18
**verbal** 9:9
**verbally** 9:6
**verify** 48:15 220:21
**version** 117:8 176:1
**versions** 119:7 193:5
**versus** 16:12 39:5 131:13 132:12 179:12 187:20 191:6 224:13 243:1
**vertical** 199:4
**vertically** 198:19
**video** 6:4,9 8:21 51:5,8 109:24 110:3 144:1,4 203:23 204:2 255:9,12 264:3,6 270:9

**videographer**
6:3,11 26:13,14 51:5,8 74:22 109:24 110:3 144:1,4 203:23 204:2 255:9,12 264:3,6 270:9
**view**
133:22 181:11 262:9
**viewed**
165:6
**violating**
34:2
**Visconi**
6:18 26:3 27:5 60:1 66:17 69:16 109:14 127:9 129:7,9,14, 18 132:16 133:7,10 146:19 162:13 167:16,22 168:3,6
**visible**
224:7
**visual**
193:8 211:17
**visuals**
168:19 172:16 193:10
**volume**
243:24
**volume-weighted**
181:9
**volunteering**
228:4
**Vultaggio**
242:1 262:5
**Vultaggio's**
261:11

**W**

**W-2**
31:15
**wait**
9:12,20 43:3
**waiting**
157:24 201:12 230:2
**Wal-mart**
216:15 255:22
**Walgreens**
216:16 255:23
**Wall**
253:23
**want**
12:14 14:16 16:15 17:10 22:22 23:4 26:18,20 32:21 35:21 37:23 42:10 47:2,22 51:13 61:9 63:22 91:7 95:22 102:3 106:5 109:19 110:5 121:12 134:1 138:24 143:9,21 147:13 154:20 157:16,20 159:18 160:9 174:3,5 176:24 184:2,11 190:19 203:17,19 205:13 212:6 222:14 230:16 242:10 247:2 249:3 251:5 252:21 257:12 261:24 262:17
**wanted**
51:10 146:3 150:16 162:16 163:10 164:18 185:22 194:1 233:9 269:10
**warrant**
89:9
**water**
180:5,6,18
**way**
9:13,21 31:6 51:24 77:21 91:7 98:12 118:24 133:9 139:15 143:10 149:13 154:16 172:6,22 174:7 176:6, 17,18 177:11 185:8,10 192:6,7,9, 11,12,13 193:2,7 195:24 196:5,8,13 197:4,6,15 208:5 220:6 224:7 235:15 236:9 248:1 252:10 266:14
**ways**
100:14 101:15,17 128:24 172:21 180:1 198:17 208:9 231:17 238:6,12
**Web6**
8:14
**website**
29:24 30:3, 23 258:15
**week**
10:7 11:3
**weekly**
128:4
**Weiner**
6:20 11:9,17 13:6,10 14:2,11,20 15:3 16:3,22 17:15,18 18:15,24 19:8,18 20:8,16 21:1,17 22:20 23:16, 22 24:6,10 25:5,16,19 26:9 27:1 28:3,7,23 29:9 30:6,13 31:3,13,18 32:1,3,5,18 33:4,21 34:17,20,24 35:6,15 36:12 37:7, 10,17 38:10 39:10,19 40:2,11,19 41:11,13 42:5 43:24 44:6 45:4,17 46:14,16,20 47:2 48:19, 23 49:8 51:1,16 52:6 53:24 54:9, 23 56:3,13, 24 59:15 60:11,17 62:15 64:19 65:2,7,16,20

68:7 69:13
71:21 72:11
73:10,15
74:11,16
75:18,24
76:11,23
77:1,6,24
78:6,22
79:12,21
81:8,18
83:8,24
85:7,19
87:3,17 88:5
90:15,24
92:6,8,17,23
93:16,21
95:3 96:24
101:20
102:12
103:14 105:7
106:10
107:20
108:17
109:16,22
111:15
113:19
114:1,14,18,
20 115:4,12
116:12 118:2
119:18 123:1
124:17
125:3,11
126:24
129:23
134:17 136:8
139:21
141:21
143:20 149:8
151:8,20
152:14
153:15,20,22
156:20 157:6
161:13
162:19,22
165:19
167:13,19,24
168:4,11
178:10
179:23
180:10
181:14
182:22
183:9,13
184:23
186:4,13,19,
23 187:8
188:6 189:1,
22 193:23
196:16
197:9,24
198:4,12
199:19
200:13,16
201:4 202:15
203:6,21
204:13
206:6,23
207:9,20
210:3,19
213:17
214:10,15
215:1,17
217:1 225:17
226:12
228:24
230:6,13,24
231:12,23
232:23
233:4,6,9,15
236:1,3,15,
17 237:18
239:6 240:5,
9,23 241:8
242:16
243:13
245:11
247:18 248:6
249:9 252:4,
20 253:1,7
254:7,19
255:7 256:22
259:11,19
260:14 261:3
262:18,20
263:24 264:9
266:2,10,24
267:16
268:9,21
269:22
270:5,11,13

**well-accepted**
227:1

**well-established**
97:22 107:1

**well-founded**
245:23

**well-known**
159:14

**went**
139:12 242:9
267:6

**whispering**
6:7

**white**
145:4,7
224:10

**wholesale**
94:18,22
95:7,8,23
96:10,15
97:11 98:1,
10,11,16
117:22

**wholesalers**
119:14

**wide**
200:2

**widget**
107:10,11,
13,18

**willingness**
102:9,15
103:18
112:23
115:16 125:7

**willingness-to-pay**
101:3,4,17
103:7,11
113:10

**Winnetka**
47:23

**withdraw**
207:13
233:21

**witness**
6:16,24 7:4,
7,14,16
11:21 13:4
14:3,12,21
15:4 16:23
17:16,19
18:16 19:3,
9,23 20:9,17
21:7 22:1
23:17,23
24:7,11
25:6,17,20
26:4,11,16
27:3,7 28:6,
8 29:10
30:7,14
31:4,14,19
32:2,4,8,19
33:5 34:18,
21 35:1,7
36:13 37:22
38:12 39:20
40:4,12
41:12,16
44:1,7
45:10,18
46:15,17
48:10,20,24
49:9 51:2
54:1,10
55:13 56:4,
14 57:1,12
59:17,23
60:2,6,12,18
62:16 64:20
65:3,8,17,21
66:21 68:8
69:15,21
71:22 72:13
73:11,16
74:12,17,21
75:2,19
76:1,12,24
77:2,7 78:1,
7,23 79:13,
22 81:9,19
83:9 84:1

85:8,20
87:4,18 88:6
90:16 91:1
92:7,9,18,24
93:17,22
95:4 97:1
101:21
102:13
103:15 105:8
106:11
107:21
108:18
109:12,17,21
111:16
113:20
114:2,19,23
115:5,13
116:13 118:3
119:20 123:2
124:18
125:4,12
127:1,11
132:18,21
133:13
134:18 136:9
139:22
141:22 149:9
151:9,21
152:15
156:21
157:1,7
161:14
162:23
165:20
167:15
178:11
179:24
180:11
181:16
182:23
183:2,7,14,
17 184:24
186:5,14,20,
24 187:9
188:7 189:2,
23 193:24
196:18
197:11
198:13
199:20
200:17
201:8,10
202:16
203:7,18
204:14
205:12
206:7,24
207:10,21
210:4,20
213:18
214:17
215:2,18
217:2 225:18
226:13 229:1
230:7,14
231:1,13,24
232:24
233:10
236:2,4,18
237:19 239:7
240:6,10,24
241:9 243:14
245:12
247:19 248:7
249:11 252:5
253:4 254:8,
20 256:23
259:12,20
260:15
262:19,24
263:23
265:17
266:8,14
267:14
268:8,15
269:3 270:2,
8

**wondering**
15:15 61:21

**word**
16:13 90:13
139:2 178:3
224:9 226:7
231:15

**words**
157:2 183:16
185:13 212:7
215:8 243:22
247:16 249:3

**work**
31:14 38:23
53:20 54:15
56:17 65:18
66:7 69:9,11
150:9 210:4,
12 238:11
266:8,10
267:1,4,12,
15 269:1,11,
19,23,24

**worked**
268:21
269:13,16,18

**working**
36:3 39:1,9
54:13 74:13,
14 121:8
269:5

**works**
30:1 95:23

**world**
106:12
115:20,22
116:2 147:16
215:22 239:1

**worth**
106:8 108:9,
14

**write**
46:6 47:15
80:13 103:19
115:14,15
194:24
266:16

**written**
44:4,10 46:9
52:11,18

**wrong**
69:1 92:1,21
96:20 132:9
196:12 207:5
244:16 249:4
269:23

**wrote**
72:2 78:15
79:11 115:15
266:4

## Y

**Yang**
38:17,19,22
39:23 40:8
44:17 62:23
67:10

**yeah**
14:8 26:9
27:5 38:19
48:6 51:4,
18,23 60:9
109:18 140:3
161:3 173:14
198:2 222:22
240:14
253:3,4,20
256:9 263:6
268:15
270:13

**year**
8:11,12
29:12 33:19
34:21 39:21
53:21 74:18
146:19,20
147:2
148:13,20
200:1

**years**
17:12 22:24
150:14
199:24
251:2,13
269:5

**Yerba**
155:17
156:9,16
161:11

**yesterday**
10:8 11:3,5
12:17 61:4

**York**
8:19 79:7,15
141:20

143:14
148:24
149:1,7
150:5,12
153:14 155:5
157:11,18
158:7 162:21
253:18,21

**Yulu**
43:2,4,6,7,
9,12,21
44:3,5,19,
21,22 59:10,
12,18 63:8,
17 64:3

**Z**

**zero**
175:23
177:22
178:9,21
180:3,5,14,
16 212:14
213:3,11
257:1

**Zoom**
12:21 13:2
36:20,21
40:17 41:17
42:18