# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AHMED ASHOUR, JOY BROWN, and CRYSTAL TOWNES, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ARIZONA BEVERAGES USA LLC, HORNELL BREWING CO., INC., BEVERAGE MARKETING USA, INC., ARIZONA BEVERAGES HOLDINGS LLC, and ARIZONA BEVERAGES HOLDINGS 2 LLC,<br><br>Defendants. | Case No. 1:19-cv-07081-(AT) (OTW) |

**EXPERT REPORT OF DR. RAN KIVETZ**

**CONFIDENTIAL**

# TABLE OF CONTENTS

**INTRODUCTION AND SUMMARY OF CONCLUSIONS ............................................ 10**

Understanding of Key Allegations and Issues in this Litigation .................................... 10

Summary of Key Conclusions .......................................................................................... 12

Opinion A: My Two Empirical Consumer Materiality Surveys Demonstrate that the Challenged Claim is *Not* a Common (Causal) Material Factor in Consumers' Purchase Decisions and Did *Not* Cause the Putative Class Members to Pay Any Price Premium .......................................................................................... 12

Opinion B: The Dubé Proposed Conjoint Survey is Underspecified, and the Limited Information that *is* Provided Indicates that the Survey Cannot be Relied on to Derive an Alleged Price Premium Attributable to the Challenged Claim ........... 14

**A. TWO EMPIRICAL CONSUMER MATERIALITY SURVEYS DEMONTRATE THAT THE CHALLENGED CLAIM IS *NOT* A COMMON (CAUSAL) MATERIAL FACTOR IN CONSUMERS' PURCHASE DECISIONS AND DID *NOT* CAUSE THE PUTATIVE CLASS MEMBERS TO PAY ANY PRICE PREMIUM.......................................................................................................... 19**

A.1. Surveys' Methodology ............................................................................................ 19

A.1.1. *General Experimental Design* ............................................................................. 19

A.1.2. *Consumer Universe and Participant Screening Procedure* ................................ 21

A.1.3. *Main Questionnaire (Stimuli and Questions)* ..................................................... 24

A.1.4. *Control Stimuli* ................................................................................................... 32

A.1.5. *Pretest and Additional Quality Checks* .............................................................. 36

A.2. Surveys' Findings .................................................................................................... 36

A.2.1. *Choice Considerations in the Product Category (Q.1/Q.2)* ................................ 37

A.2.2. *Purchase Likelihood (Q.5A/B)* ............................................................................ 39

A.2.3. *Purchase Reasons (Q.6/Q.7)* .............................................................................. 41

A.2.4. *Willingness to Pay (WTP) (Q.8)* ......................................................................... 46

A.2.4. *Survey Conclusions* ............................................................................................. 47

**B. EVALUATION OF THE DUBÉ PROPOSED CONJOINT SURVEY .................... 48**

B.1. Overview of the Dubé Proposed Conjoint Survey ................................................. 49

B.2. The Dubé Proposed Conjoint Survey is Dramatically Underspecified and Incomplete, Omitting Crucial Design and Analysis Details ................................ 52

B.3. The Dubé Proposed Conjoint Survey Would Deviate from Marketplace Conditions Through its Artificial Display of Attributes, Including Failing to

Show Any Packaging, Omitting Numerous Attributes and Claims, and Singling Out the Challenged Claim ........ 54

B.3.1. *The Dubé Proposed Conjoint Survey Will Not Show the Challenged Claim in the Context of Any Packaging* ........ 57

B.3.2. *The Dubé Proposed Conjoint Survey Will Misrepresent the Appearance and Prominence of Product Aspects (Including the Challenged Claim), Which Will Result in an Invalid Price Premium Estimate* ........ 64

B.3.3. *The Dubé Proposed Conjoint Survey Will Omit Numerous Relevant Attributes, Claims, and Product Aspects that Consumers Could or Would Likely Rely on in Reality* ........ 70

B.4. The Dubé Proposed Conjoint Survey's Repeated Stimuli Presentation Will Exacerbate its Leading Nature, Further Contributing to Inflated and Invalid WTP Estimates ........ 77

**EXHIBIT LIST**

Exhibit A: Curriculum Vitae of Dr. Ran Kivetz

Exhibit B: List of Cases in Which Dr. Ran Kivetz Provided Sworn Testimony in Deposition and/or Trial During the Past Four Years

Exhibit C: Documents Relied on by Dr. Kivetz in Connection with Preparation of this *Expert Report*

Exhibit D: Kivetz Materiality Survey (Iced Tea California Survey)

Exhibit D.1: Survey Screener and Main Questionnaire (Iced Tea)

Exhibit D.2: Survey Screenshots (Iced Tea)

Exhibit D.3: Screenshots of the Front, Back, Sides, Top, and Bottom of the "Test" and "Control" AriZona Packages (Iced Tea)

Exhibit D.4: Package Flats Used to Create the 360-Degree Image of the "Test" and "Control" AriZona Packages (Iced Tea)

Exhibit D.5: Distribution of Participants by Age and Gender (Iced Tea)

Exhibit D.6: Tables of Results and Coding (Iced Tea)

Exhibit D.7: Raw Data for the Survey (Iced Tea)

Exhibit D.8: Summary of In-Store Iced Tea Prices at Major Retailers in California

Exhibit E: Kivetz Materiality Survey (Juice Drink New York Survey)

Exhibit E.1: Survey Screener and Main Questionnaire (Juice Drink)

Exhibit E.2: Survey Screenshots (Juice Drink)

Exhibit E.3: Screenshots of the Front, Back, Sides, Top, and Bottom of the “Test” and “Control” AriZona Packages (Juice Drink)

Exhibit E.4: Package Flats Used to Create the 360-Degree Image of the “Test” and “Control” AriZona Packages (Juice Drink)

Exhibit E.5: Distribution of Participants by Age and Gender (Juice Drink)

Exhibit E.6: Tables of Results and Coding (Juice Drink)

Exhibit E.7: Raw Data for the Survey (Juice Drink)

## ASSIGNMENT AND QUALIFICATIONS

1. My name is Dr. Ran Kivetz. I have been asked by counsel for the Defendants, AriZona Beverages USA LLC, Hornell Brewing Co., Inc., Beverage Marketing USA, Inc., AriZona Beverages Holdings LLC, and AriZona Beverages Holdings 2 LLC ("AriZona"), to:

(*i*) evaluate whether the challenged "No Preservatives" claim (the "challenged claim" or the "challenged 'no preservatives' claim") appearing on the packaging of the at-issue AriZona products (the "Products") was a common causal factor driving consumers' decisions to purchase and/or pay an alleged price premium for the Products across the putative class; and

(*ii*) evaluate the November 14, 2025 Expert Report of Jean-Pierre Dubé (the "Dubé Report"), submitted on behalf of the Plaintiffs,[1] regarding a choice-based conjoint survey he proposes to conduct (the "Dubé Proposed Conjoint Survey").

2. As part of my work in this matter, I conducted two empirical consumer materiality surveys to determine, among other things, whether the challenged claim—which appeared on the back or side panels of the Products[2] during the putative class periods—commonly caused putative class members to purchase, and/or to pay to pay a higher price (*i.e.*, an alleged price premium) for, these Products.[3]

3. I am a tenured, chaired Professor of Marketing at Columbia University Business School. A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.

4. I earned a Ph.D. in Business from Stanford University, Graduate School of Business; a Master's degree in Psychology from the Stanford University Psychology Department; and a Bachelor's degree from Tel Aviv University with majors in Economics and Psychology.

5. My field of expertise encompasses consumer psychology and behavior; survey methods, including conjoint analysis; marketing management; behavioral economics; human

---

[1] I understand that the only claims that currently remain in this matter are those that relate to the two named Plaintiffs Ahmed Ashour and Crystal Townes. *See* March 28, 2025 Opinion and Order ("March 28, 2025 Order"), p. 26.

[2] The Plaintiffs challenge over a dozen products marketed and sold under the "AriZona" brand name that displayed "No Preservatives" on the labeling while containing citric acid, including AriZona Green Tea with Ginseng and Honey and AriZona Fruit Punch Fruit Juice Cocktail; *see* March 19, 2021 Second Amended Complaint ("Complaint"), ¶ 2 & Exhibit A.

[3] *See, e.g., id.*, ¶¶ 8 – 9, 49, & 52. *See also* November 17, 2025 Memorandum of Law in Support of Plaintiff's Motion for Class Certification ("Class Certification Motion"), pp. 1 & 9.

judgment, perception, and decision making; the marketing of high-technology products; consumer and sales incentives; advertising; and branding. Most of my research has focused on buyers' purchase behavior; survey design; and the effect of product characteristics (*e.g.*, brand, features, quality, price), the competitive context, and marketing activities (*e.g.*, promotions, incentives, loyalty programs, advertising, branding) on purchase decisions and perceptions.

6. I have received multiple research awards and nominations, including: (*i*) the "*Ferber Award*" from the Association for Consumer Research, which is the largest association of consumer researchers in the world; (*ii*) the "*Best Competitive Paper Award*" from the Society of Consumer Psychology, which is the premier association of consumer psychologists in the world; (*iii*) the "*Early Contribution Award*" from the Society of Consumer Psychology; (*iv*) five finalist nominations, for the 2016, 2011, 2009, 2007, and 2005 "*O'Dell Award*," given to the *Journal of Marketing Research* (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years; (*v*) two finalist nominations for the 2007 and the 2005 "*Green Award*," given to the *Journal of Marketing Research* article published in the prior year that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing"; (*vi*) three finalist nominations for the awards for the "*Best Article*" published in the *Journal of Consumer Research* between 2002 and 2005, between 2006 and 2009, and between 2011 and 2014; (*vii*) having my research selected by *The New York Times* in its *Annual Year in Ideas* as one of the "Best Ideas in 2006"; (*viii*) being rated as the fourth most prolific scholar in the leading marketing journals during 1982 – 2006;[4] and (*ix*) being ranked by the American Marketing Association as one of the Top 50 most productive scholars in the premier marketing journals during 2009–2013 and during 2010–2014.

7. At Columbia University, I have taught MBA and Executive MBA courses on Marketing Strategy and Management, Customer Centricity and Innovation, High-Technology Marketing and Entrepreneurship, and Marketing of a Nation, covering topics such as developing

---

[4] Seggie, Steven H. and David A. Griffith (2009), "What Does It Take to Get Promoted in Marketing Academia? Understanding Exceptional Publication Productivity in the Leading Marketing Journals," *Journal of Marketing,* 73(1), 122 – 132.

marketing strategies, buyer behavior, customer segmentation, customer acquisition and retention, competitive strategies, branding, pricing, advertising, sales promotions, and behavioral economics. In addition to teaching MBA and Executive MBA courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets. I also have taught in various executive education programs, including programs for senior executives, programs for marketing managers in high-technology companies, programs for marketing managers in pharmaceuticals, programs in entrepreneurship, programs on marketing and innovation, and programs on customer centricity.

8. I have taught several doctoral courses at Columbia University. One doctoral course, titled "Bridging Behavioral Economics and Marketing Science," examines human judgment and decision making and its application to marketing science. The course focuses on understanding, predicting, and quantitatively modeling (including by employing conjoint analysis models) different phenomena and biases in judgment and decision making. A second doctoral course deals with consumer behavior, covering topics such as the processes underlying choices and judgments, and their influence on purchase decisions, attitudes, and persuasion. I have guided and supervised numerous Ph.D. students in their research. I have also served as the advisor for multiple Ph.D. students who are or were professors at such institutions as University of Chicago Booth School of Business, Harvard Business School, National University of Singapore (NUS), Tsinghua University, and The Wharton School at the University of Pennsylvania.

9. I have conducted, supervised, and evaluated thousands of marketing research surveys, including many related to consumer behavior and decision making, conjoint analysis, likelihood of consumer deception or confusion, sales promotions, marketing strategies, branding, trademark/trade dress, patents, antitrust, and advertising-related issues.

10. I have designed conjoint studies and have published scholarly peer-reviewed research on conjoint analysis methods; routinely teach conjoint analysis to MBA, executive MBA, and PhD students at Columbia University; and have evaluated and analyzed dozens of conjoint surveys.

11. I have served on the editorial boards and as a frequent reviewer for leading journals in our field, such as the *Journal of Marketing Research*. I have served as a Guest Editor for the *Journal of Marketing Research* and as a Guest Associate Editor for *Marketing Science* and *Management Science*. I have served on the editorial board of, and received the "*Outstanding Reviewer Award*" from, the *Journal of Consumer Research*. I have also served on the editorial boards of the *Journal of Consumer Psychology,* the *International Journal of Research in Marketing*, *Marketing Letters*, and *Applied Economics Research Bulletin*. I am a frequent reviewer of articles submitted to journals in our and other fields, such as marketing, psychology, decision making, and economics. As a reviewer, I am asked to evaluate the research of scholars wishing to publish their articles in leading scholarly journals.

12. I have worked as a consultant for companies and organizations on a variety of topics, including strategy, marketing, consumer behavior and perception, promotions, branding, advertising, and incentives. Additionally, I have served as an expert in litigation and adversarial proceedings, including in front of the National Advertising Division of the Better Business Bureaus National Programs ("NAD"), involving various marketing and buyer behavior issues, false advertising, market surveys, patent infringement, trademark and trade dress related matters, branding, retailing, promotions, and other areas. I have also been invited to present at the annual NAD Law Conference, and I have served as an expert witness for the Federal Trade Commission.

13. My opinions and testimony have been favorably cited and relied upon by courts across the United States.[5] A list of cases in which I provided sworn testimony at trial and/or by deposition during the past four years is included in Exhibit B.

[5] *See, e.g., Masimo Corporation et al. v. Apple Inc.*, 8:20-cv-00048-JVS (C.D. Cal., May 4, 2023, Order Granting-In-Part and Denying-In-Part Apple's Rule 50(a) Motion and Denying Plaintiffs' Rule 50(a) Motion) (citing to my testimony as evidence that the Plaintiffs' alleged business and marketing trade secrets were generally known prior to the alleged misappropriation at issue); *California v. Kohl's Department Stores, Inc. et al.*, No. BC643037 (Cal. Superior Court L.A. Cnty Jul. 13, 2021) (noting, *e.g.*, that: "As carefully reviewed by Kohl's rebuttal expert, Ran Kivetz, Ph.D., who the Court found highly competent and entirely credible based on his outstanding academic credentials, his thorough research into Dr. Compeau's reports and his appearance and candor while testifying[.]"; and "[t]he Court accepts as entirely credible and supported by sound scientific analysis, the conclusion of Dr. Kivetz, that none of the articles referenced in Dr. Compeau's reports provide valid scientific evidence for [Dr. Compeau's] opinion [.]"); *Yates et al. v. Traeger Pellet Grills, LLC*, 2:19-CV-00723-DAK-CMR (D. Utah, July 1, 2024) (denying summary

14. The total cost of this *Expert Report*, including, but not limited to, my two empirical consumer materiality surveys, as well as my evaluation of the Dubé Report and the Dubé Proposed Conjoint Survey, is $180,000. My compensation does not depend in any way on my opinion or the outcome of this matter.

15. My analyses are based on, *inter alia*, the two empirical consumer materiality surveys that I conducted in this matter; the brands, products, packaging, marketing, and websites relevant to the market for ready-to-drink beverages (including iced tea and juice drinks); existing scientific research and treatises regarding survey design, consumer behavior, and decision making; general principles of marketing and psychology; various documents produced by the parties in this litigation; and various publicly available websites and sources. In conducting my analysis, I reviewed certain documents referenced herein and/or listed in Exhibit C.[6] I also held two conference calls with Don Vultaggio, co-founder and chairman of AriZona Beverage Company.[7]

---

judgment on materiality and noting that: "While Plaintiffs have evidence of materiality from past Traeger studies, Traeger has submitted evidence of lack of materiality. Traeger's expert witness, Dr. Kivetz, conducted two consumer surveys with over 800 participants on precisely this question. The surveys conclusively showed that the challenged claims were not material to the buying decisions of consumers."); *Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F.Supp.2d 1009, 1019 (N.D. Illinois, 2013) (upholding the methodology, questions, and coding of my survey and denying Bissell's motion to exclude my expert report); *Flodin v. Central Garden & Pet Co.*, 21-cv-01631-JST, 2024 WL 4565340, at *10 (N.D. Cal. Oct. 23, 2024) (quoting my testimony in denying motion for class certification); Pretrial Conference in *Beef Products, Inc., et al. v. American Broadcasting Companies, Inc., et al.*, No. 12-292 (Union Cnty Cir. Court, First Judicial Circuit, S.D. 2017) (denying motion to exclude my testimony); *Elizabeth J. VanCleave and Katherine Hassan v. Abbott Laboratories*, Case No. 19CV345045 (Superior Court of the State of California, County of Santa Clara, February 13, 2026), Order on After Court Trial on Remaining Causes of Action (citing to my surveys and rebuttal testimony; *e.g.*, "This lack of materiality [of the challenged claims] is confirmed by the two empirical consumer surveys conducted by Abbott's expert, Dr. Ran Kivetz […]"; "By contrast, the surveys run by Abbott's expert, Dr. Kivetz, which used images of actual PediaSure products from the marketplace, establish that the back-level Challenged Statements, like the front-label statements discussed above, are not material to consumers"); *Huggins, Tiffany et al. v. Abbott Laboratories*, Case No. 1:25-cv-02460 (N.D. Ill., April 15, 2026)("By contrast, Abbott's position is bolstered by the unchallenged report of its expert, Dr. Ran Kivetz, who conducted a survey in which respondents compared unaltered Similac labels to Similac labels omitting health-related claims. […] Neither group reported receiving any messages about heavy metals. […] That survey properly addresses the messaging that consumers received from Similac packaging, unlike Klein's more ambiguously worded questions.").

[6] I received research assistance from support staff at my direction and guidance.

[7] Interviews held on July 10, 2026 and July 30, 2026, with outside counsel for AriZona present. David Menashi (Vice Chairman, Arizona Beverage Company) and Abid Rizvi (CEO, Arizona Beverage Company) were also present during these interviews.

16. I have personal knowledge of the matters set forth in this report and, if called to testify at a hearing or trial in this matter, would so state. Any, and all, of the opinions expressed herein are held to a reasonable degree of professional certainty. The information on which I relied consists of the type of information that is reasonably relied upon in my field of expertise.

## INTRODUCTION AND SUMMARY OF CONCLUSIONS

17. In the interest of brevity and organization, I set forth in this executive summary my understanding of the allegations in this matter and my key conclusions. The scientific analyses and substantiation from which I derived these conclusions are set forth in the remainder of my report (Sections A and B).

### Understanding of Key Allegations and Issues in this Litigation

18. The products at issue in this matter are certain iced tea and juice drink products made by AriZona.[8] These Products displayed the challenged "no preservatives" claim during the relevant time period, while containing the ingredient citric acid (*see, e.g.*, Figure 1 below).

(*Continues on next page*)

[8] I understand that the specific AriZona products at issue include: AriZona Iced Tea with Lemon Flavor; AriZona Green Tea with Ginseng and Honey; AriZona Arnold Palmer Life – Half Iced Tea, Half Lemonade; AriZona Zero Calorie Iced Tea with Peach Flavor; AriZona Grapeade; AriZona Iced Tea with Raspberry Flavor; AriZona Southern Style Real Brewed Sweet Tea; AriZona Arnold Palmer Zero – Half Iced Tea, Half Lemonade; Golden Bear Lemonade Life (Strawberry); AriZona Decaf – Zero Green Tea with Ginseng; AriZona Kiwi Strawberry Fruit Juice; AriZona Watermelon Fruit Juice; AriZona Fruit Punch Fruit Juice; AriZona Much Mango Fruit Juice; AriZona Rx Energy Herbal Tonic; AriZona Zero Green Tea with Ginseng; and any other AriZona product representing that it contains "no preservatives" while containing citric acid. *See* Complaint, ¶ 2. *See also* November 17, 2025 Declaration of Melissa S. Weiner in Support of Plaintiffs' Motion for Class Certification & Motion to File Documents Under Seal ("Weiner Declaration"), Exhibits 9 – 21 ("Product Labels").

**Figure 1: Front View of an At-Issue AriZona Iced Tea Product as Shown in Class Certification Motion** [9]




19. According to the Plaintiffs, the challenged "no preservatives" claim is allegedly deceptive and misleading because the at-issue products contain the ingredient, citric acid, which purportedly "acted as a preservative."[10] Consequently, according to the Plaintiffs, the challenged claim purportedly misled the putative class members into purchasing and/or paying a price premium for these Products:[11]

> Defendants' labeling and marketing of the Products as containing "No Preservatives" is a material factor influencing consumer purchase decisions.
>
> **Had Plaintiffs and the Classes known the truth about the Products, they would not have purchased the Products and/or would not have paid the prices they paid for the Products**. [Emphasis added]

---

[9] Class Certification Motion, p. 12.
[10] *Id.*, p. 1.
[11] Complaint, ¶¶ 40 – 41. *See also* Class Certification Motion, p. 9.

20. The Plaintiffs seek to certify the following classes:[12]

> **California Class:** All persons who purchased Defendants' Products within the State of California for personal use from January 1, 2017 to January 1, 2023.
>
> **New York Class:** All persons who purchased Defendants' Products within the State of New York for personal use from January 1, 2019 to January 1, 2023.

I will refer to these proposed classes collectively as the "putative class" and the two proposed class periods as the "putative class periods."

21. In his declaration submitted on behalf of the Plaintiffs, Dr. Dubé *proposes* to conduct a choice-based conjoint (*i.e.*, "CBC") analysis "to measure the impact of the Challenged Claim and other product features on consumer demand for the Class Products."[13]

## <u>Summary of Key Conclusions</u>

22. Based on the materials on which I have relied, the scientific analyses I have conducted (including, in particular, the results of my two empirical consumer surveys in this litigation), and my background and expertise, my professional opinion is that (*i*) the challenged "no preservatives" claim is *not* a common (causal) material factor in consumers' decisions to purchase the AriZona products at issue; and (*ii*) the Dubé Proposed Conjoint Survey is fatally flawed in its design and methodology and cannot be used to derive any reliable conclusions about the materiality of or any alleged price premium arising from the challenged claim. I summarize my opinions and conclusions below.

### <u>Opinion A: My Two Empirical Consumer Materiality Surveys Demonstrate that the Challenged Claim is *Not* a Common (Causal) Material Factor in Consumers' Purchase Decisions and Did *Not* Cause the Putative Class Members to Pay Any Price Premium</u>

- My consumer surveys followed a standard scientific methodology to directly test the materiality, if any, of the challenged "no preservatives" claim on consumers' likelihood of purchasing, and willingness to pay for, the Products.
    - Both of my surveys used a gold standard, well-accepted "test-control" experimental design to investigate whether displaying the challenged "no preservatives" claim on the Products' packaging has a common, material effect on consumers' likelihood of purchasing, and willingness to pay for, these Products.[14]

[12] Class Certification Motion, p. 20.
[13] Dubé Report, ¶ 22.
[14] One survey (the Kivetz Iced Tea California Survey) tested the AriZona Green Tea with Ginseng and Honey product among a representative sample of participants recruited from California, and a second

My surveys also examined consumers' reasons for (or against) purchasing the Products, as well as consumers' considerations when buying in the product category in general.

- In each survey, approximately half of the participants were randomly assigned to the "*test group*" and were shown an original, allegedly deceptive AriZona iced tea or juice drink product package that displayed the challenged "no preservatives" claim (located on the back panel). The remaining half of the participants were randomly assigned to the "*control group*" and were shown a revised package that was identical to the test package, *except* that the challenged "no preservatives" claim was removed.
- Prior to encountering the (test vs. control) stimulus, participants were asked two open-ended questions about what their considerations are when deciding which iced product or juice drink product to buy.
- After examining a realistic three-dimensional, 360-degree image of an AriZona (test or control) iced tea or juice drink product package as they would normally do when considering buying such a product in the marketplace, participants were asked a standard (closed-ended) purchase likelihood question, followed by (open-ended) questions about their purchase explanations, and (in the Iced Tea California Survey) a willingness to pay (WTP) question.

- The results of my two materiality surveys demonstrate that ***the challenged "no preservatives" claim does <u>not</u> materially affect, let alone in a common way, consumers' purchase decisions or willingness to pay.*** The lack of materiality of the challenged "no preservatives" claim necessarily means that its associated price premium is ***<u>zero</u>***, because a positive price premium cannot be attributed to a claim that is immaterial to consumers.
  - ***Choice considerations.*** Only three (3) out of 410 participants (0.7%) in the Iced Tea California Survey and 12 out of 414 participants (2.9%) in the Juice Drink New York Survey mentioned anything related to "no preservatives" as a consideration when buying in the category. Instead, participants identified a myriad of other factors, including most commonly brand equity/recognition, price/value, taste/flavor, sweetness and sugar content/type, and other ingredients (unrelated to preservatives or additives).[15]
  - ***Purchase likelihood.*** There was *no* statistically significant difference between test and control participants in the likelihood of purchasing the AriZona product they examined.[16] Thus, the challenged "no preservatives" claim had *no* effect on,

---

survey (the Kivetz Juice Drink New York Survey) tested the AriZona Fruit Punch Fruit Juice Cocktail product among a representative sample of participants recruited from New York. In addition to the relevant age, gender, and state criteria, as well as other standard criteria, qualified participants had to indicate that they, at the time of survey administration: (*i*) had purchased iced tea in the past three (3) months (among those taking the Iced Tea California Survey) or had purchased juice drink in the past three (3) months (among those taking the Juice Drink New York Survey); and (*ii*) expected to purchase iced tea (among those taking the Iced Tea California Survey] or a juice drink (among those completing the Juice Drink New York Survey) during the next three (3) months. *See* Subsection A.1.2 for details.

[15] *See* Subsection A.2.1 of this *Expert Report* for detailed findings.

[16] For example, in the Iced Tea California Survey, 72.2% of test group participants, who considered an original, allegedly deceptive AriZona package with the challenged "no preservatives" claim, answered

and is therefore neither a common nor material factor in, consumers' purchase decisions regarding the Products.

- ***Purchase reasons.*** Participants' explanations also indicate that consumers purchase the Products for a variety of reasons *unrelated to* the challenged "no preservatives" claim, with considerable variation (differences) arising across consumers.[17] Among those in the test group, extremely few participants in both surveys—between 1.0% and 2.9%—mentioned anything related to "no preservatives" as a reason to purchase the Products. Instead, participants identified a myriad of other factors, including brand equity/recognition, taste/flavor, price/value, packaging, and more.[18]
- ***Willingness to pay (WTP).*** Contrary to what the Plaintiffs' theory would predict, participants' average WTP for the AriZona product they examined was *not* statistically significantly higher in the test group ($2.05) compared to in the control group ($2.04).[19] Hence, the presence of the challenged "no preservatives" claim made no difference to how much consumers were willing to pay for the Products.

## Opinion B: The Dubé Proposed Conjoint Survey is Underspecified, and the Limited Information that *is* Provided Indicates that the Survey Cannot be Relied on to Derive an Alleged Price Premium Attributable to the Challenged Claim

### *The Dubé Proposed Conjoint Survey is Dramatically Underspecified and Incomplete, Omitting Crucial Design and Analysis Details*

- The Dubé Report fails to adequately specify crucial details regarding how the Dubé Proposed Conjoint Survey will be designed, including details that pertain to the sampling procedure (*e.g.*, nationwide vs. state-specific; time horizon to be asked in the key screening questions; sample size); the exact set of brands that will be used; the number of choice tasks; the number of "profiles" (*i.e.*, configurations representing iced tea/juice products) per choice task; and, most importantly, how the product attributes (and their levels) will actually be presented, displayed, and/or explained to participants (including whether any visual imagery will be shown and what instructions or descriptions will accompany each attribute).
- This lack of sufficient disclosure means that there is no way to fully evaluate how Dr. Dubé will address the multiple potential biases that can arise from his proposed survey.

---

that they either "definitely would buy this product" or "probably would buy this product." A statistically equivalent proportion, 72.7% of control group participants, who considered an otherwise identical package but with the challenged "no preservatives" claim removed, provided the same answers. *See* Subsection A.2.2 of this *Expert Report* for detailed findings.

[17] *See* Subsection A.2.3 of this *Expert Report* for detailed findings.

[18] *See ibid*. For example, participants in the Iced Tea California Survey most commonly mentioned: brand equity/ recognition (43.4%); taste/flavor (42.4%); other ingredients (20.5%); and packaging (16.1%). Participants in the Juice Drink New York Survey most commonly mentioned: price/value (41.1%); brand equity/ recognition (37.2%); and taste/flavor (33.3%).

[19] *See* Subsection A.2.4 of this *Expert Report* for detailed findings.

***The Dubé Proposed Conjoint Survey Would Deviate from Marketplace Conditions Through its Artificial Display of Attributes, Including Failing to Show Any Packaging, Omitting Numerous Attributes and Claims, and Singling Out the Challenged Claim***

- Dr. Dubé's proposed conjoint survey sharply deviates from marketplace conditions and will induce severe demand effects and focalism biases. This is because the conjoint task will artificially and inappropriately focus participants' attention on the "No Preservatives" claim (relative to the focus this claim would receive in the real world), suggesting to them that this claim is an important purchase factor.
- Despite the importance of packaging appearance and the visual appeal of AriZona products in particular, Dr. Dubé will not show participants any packaging, and will instead present product "profiles" that deviate dramatically from how consumers would or could ever encounter and buy iced tea or juice drink products at the store. By presenting a "No Preservatives" label claim outside the context of an actual, realistic package, the Dubé Proposed Conjoint Survey will simultaneously deprive participants of information that can influence preferences while distorting their comprehension and valuation of this claim.
- The Dubé Proposed Conjoint Survey will misrepresent the appearance and prominence of relevant product aspects by concealing from participants the location as well as prominence (or lack thereof) of different label representations and claims. In reality, the challenged "no preservatives" claim never appeared on the packaging front (and instead appeared on the back and side panels, in relatively smaller font and frequently less conspicuous locations, such that many consumers may never even have noticed the claim). However, Dr. Dubé's survey will effectively, and artificially, force *all* participants to pay attention to this claim.
    - In fact, the proposed survey would illogically estimate the *same* price premium for a "No Preservatives" claim regardless of where, how prominently, or how many times it appeared on the package.
- Dr. Dubé's limited set of only five (non-price) attributes and label statements does not in fact include "the most salient drivers of consumers' choice processes in the real world,"[20] because it *excludes*—without justification—numerous (non-challenged) relevant iced tea or juice drink attributes, representations, and claims that are plausible and likely differentiators and purchase motivators for consumers in the real world. Omitting relevant information severely distorts marketplace conditions and invalidates the resulting survey-based estimates.
    - Contrary to the Dubé Report's claim, the mere inclusion of brand in a CBC survey does *not* appropriately account for relevant attributes omitted.

***The Dubé Proposed Conjoint Survey's Repeated Stimuli Presentation Will Exacerbate its Leading Nature, Further Contributing to Inflated and Invalid WTP Estimates***

- Although Dr. Dubé fails to disclose the number of choice tasks and the specific language that will be used in the procedure and questions of his proposed survey, the repeated

[20] Befurt, Rene, Niall MacMenamin, and Aylar Pour Mohammed (2023), "Use of Conjoint Analysis in Litigation," in *The Cambridge Handbook of Marketing and the Law*, Gersen, Jacob E. and Joel H. Steckel (eds.), New York, NY: Cambridge University Press, p. 230.

stimuli presentation in his proposed survey will render the survey's purpose and hypotheses obvious to participants.

- The proposed conjoint task will expose participants to both hypothetical iced tea or juice drink profiles *with* the challenged "no preservatives" claim as well as profiles *without* the challenged claim. This "within-subjects" design will overly sensitize participants to the challenged claim across the repeated conjoint tasks, thereby guaranteeing participants' attention to, and upward-biasing the associated price premium estimate for, this claim.

(*Continues on next page*)

## A. TWO EMPIRICAL MATERIALITY SURVEYS DEMONSTRATE THAT THE CHALLENGED "NO PRESERVATIVES" CLAIM IS *NOT* A COMMON (CAUSAL) MATERIAL FACTOR IN CONSUMERS' PURCHASE DECISIONS AND DO *NOT* CAUSE THE PUTATIVE CLASS MEMBERS TO PAY ANY PRICE PREMIUM

23. The Plaintiffs allege that the challenged "no preservatives" claim on the Products' packaging (commonly) misled the putative class members into buying, and/or paying an alleged price premium for, the Products.[21] Thus, a key question in this litigation is whether or not the challenged claim is a *common, material factor* that affected consumers' purchase decisions regarding the Products.

24. Accordingly, I examined three related questions: (*i*) What are the considerations that drive consumers to purchase within the relevant product category (*e.g.*, iced tea and juice drinks)?; (*ii*) What is the effect of the challenged "no preservatives" claim on consumers' likelihood of purchasing, as well as willingness to pay for, the Products?; and (*iii*) What are consumers' reasons and motivations for purchasing the Products?

25. To address these questions, I designed and conducted two empirical surveys using California and New York consumer samples that tested two different at-issue products, depicted in Figures A1a and A1b below:

- AriZona Green Tea with Ginseng and Honey (the "Iced Tea California Survey");[22] and
- AriZona Fruit Punch Fruit Juice Cocktail (the "Juice Drink New York Survey").[23]

---

[21] *See, e.g.*, Complaint, ¶¶ 40 – 41; Class Certification Motion, p. 9.

[22] I tested the AriZona Green Tea with Ginseng and Honey (23 oz. can) product because I understand that this was a top-selling product in California during the putative class period. The same IRI data used by Dr. Dubé in his report shows that AriZona Green Tea with Ginseng and Honey (23 oz. can) was the #1 seller in terms of dollar sales ($100,953,442) and unit sales (125,303,060) in CA during the putative class period; *see* EX_0009_Jean-Pierre_Dube,_Ph.D._021926.xlsx. Moreover, named Plaintiff, Mr. Ahmed Ashour, purchased this product in California during the relevant period; s*ee, e.g.*, Ashour Deposition, pp. 95 & 136.

[23] I tested AriZona Fruit Punch Fruit Juice Cocktail (20 oz. bottle) because it was a top-selling product during the putative class period that is not iced tea and that comes in a different container/form (bottle instead of can). The IRI data set used by Dr. Dubé in his report shows that among AriZona canned and bottled juice drinks, AriZona Fruit Punch Fruit Juice Cocktail (20 oz. bottle) was the #3 best seller in terms of dollar sales ($3,923,077) and #2 best seller in terms of unit sales (4,160,874) in NY during the putative class period; *see* EX_0009_Jean-Pierre_Dube,_Ph.D._021926.xlsx. In addition, named Plaintiff, Ms. Crystal Townes, testified that she purchased this product in a bottle that she estimated to be 24 oz. in New York; *see* Townes Deposition, pp. 29, 32, 33, 41, 48, & 141 – 142; *see also id*., p. 125 (admitting that the fruit punch product she purchased "might have been a 20-ounce").

**Figure A1a: AriZona Green Tea with Ginseng and Honey (23 fl. oz. Can)**




**Figure A1b: AriZona Fruit Punch Fruit Juice Cocktail (20 fl. oz. Bottle)**




26. The results of these two surveys, which followed well-established survey standards, unequivocally demonstrate that the challenged "no preservatives" claim does *not* commonly affect consumers' purchase decisions or willingness to pay with respect to the Products. More specifically: (*i*) the challenged claim does *not* materially increase consumers' likelihood of purchasing, or willingness to pay for, the Products; accordingly, the challenged claim did not cause the putative class members to pay *any* alleged price premium for these Products; and (*ii*) consumers purchase the Products for a variety of reasons *unrelated to* the challenged claim (*i.e.*, unrelated to the concept of no preservatives), with considerable variation (or differences) arising across consumers; and (*iii*) consumers consider a variety of factors (again unrelated to the challenged claim) when deciding which iced tea or juice drink products to buy in general.

## A. TWO EMPIRICAL CONSUMER MATERIALITY SURVEYS DEMONSTRATE THAT THE CHALLENGED CLAIM IS *NOT* A COMMON (CAUSAL) MATERIAL FACTOR IN CONSUMERS' PURCHASE DECISIONS AND DID *NOT* CAUSE THE PUTATIVE CLASS MEMBERS TO PAY ANY PRICE PREMIUM

### A.1. Surveys' Methodology

#### A.1.1. *General Experimental Design*

27. Each of my surveys employed a gold standard (cause-effect) experimental design that followed well-established survey standards.[24] Such an experiment allows measuring the purchase likelihood (or other outcome variable of interest) of an at-issue product among "***test group***" participants, who are shown an original, allegedly deceptive product stimulus (*i.e.*, an AriZona iced tea or juice drink package with the challenged "no preservatives" claim), compared to "***control group***" participants, who are shown a corresponding package in which the alleged deception has been "cured" (*i.e.*, by removing the challenged claim from the package). The inclusion of a control condition accounts for, or "nets out," survey "noise."

28. The type of "purchase likelihood" materiality experiments that I conducted in this matter are well-accepted in the field and routinely used in academic, industry, and litigation settings, including in the thousands of market research studies that that my colleagues and I have conducted over the past 30 years. For example, consistent with the surveys I conducted here and in hundreds of other studies, Professor Steckel and his colleagues provide the following exemplar of a purchase likelihood materiality survey in a recent textbook, *The Cambridge Handbook of Marketing and the Law*:[25]

---

[24] *E.g.*, *Manual for Complex Litigation* (2004), Federal Judicial Center, Fourth, Section 11.493, p. 103; Diamond, Shari S. (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Federal Judicial Center. This experimental design has been used in countless consumer research studies, including in the many hundreds of academic, consulting, and litigation studies that I have conducted. I am not an attorney and do not offer any legal opinions; however, I find it helpful to refer to legal authorities, as well as prior court opinions, to illustrate some considerations and principles that have come up in connection with the design and evaluation of consumer surveys and that are applicable to proposed conjoint surveys like the Dubé Proposed Conjoint Survey in this matter.

[25] O'Laughlin, Laura and Catherine Tucker (2023), "The Purchase Funnel and Litigation," in *The Cambridge Handbook of Marketing and the Law*, Gersen, Jacob E. and Joel H. Steckel (eds.), New York, NY: Cambridge University Press, p. 19. *See also, e.g.*, Steckel, Joel H., Rebecca Kirk Fair, Kristina Shampanier, and Anne Cai, "Choice Experiments: Reducing Complexity and Measuring Behavior Rather than Perception," in *The Cambridge Handbook of Marketing and the Law*, Gersen, Jacob E. and Joel H.

> An expert at this stage might conduct a survey experiment to **isolate the effect of the at-issue label and packaging on the purchase** of Yogi Green Tea Kombucha. After screening for qualified past and prospective purchasers, the expert would randomly assign respondents to two experimental groups. One group, the [test] group, would view the original Yogi Green Tea Kombucha packaging, and the other group, the [control] group, would view the same package but with an alteration that tests the allegations of the case. […] Both groups of respondents would then be asked about their likelihood of purchasing the tea product. In a properly designed experiment among the relevant population, **any significant difference between groups would demonstrate the impact of the at-issue claim on consumers' purchase intent. Conversely, such a study could show that the at-issue claim is not at all material to consumers' decisions**, which may aid an argument about what drives the purchase decisions of the "reasonable consumer." [Emphases added]

29. As the authors observe, such experimental designs are capable of assessing the materiality (or lack thereof) of an at-issue claim, as well as whether or not that claim commands any alleged price premium.[26]

30. My two materiality surveys were conducted in a double-blind manner: Participants and the survey panel firm were unaware of the purpose of the survey and the identity of their sponsor. Similarly, the two independent coders who classified participants' verbatim (open-ended) responses were "blind" to the purpose and sponsor of each survey, as well as to the condition (test or control) to which participants were randomly assigned.

---

Steckel (eds.), New York, NY: Cambridge University Press, p. 212 ("In an experiment in which the dependent measure is likelihood of purchase (e.g. on a 0–10 scale), we would compare the mean likelihood of purchase between the two groups and assess whether there is a statistically significant difference," and noting that "Experiments using likelihood of purchase as the dependent measure have been accepted by courts."). *See also, e.g., Yates et al. v. Traeger Pellet Grills, LLC*, 2:19-CV-00723-DAK-CMR (D. Utah, July 1, 2024) (denying summary judgment on materiality and noting that: "While Plaintiffs have evidence of materiality from past Traeger studies, Traeger has submitted evidence of lack of materiality. Traeger's expert witness, Dr. Kivetz, conducted two consumer surveys with over 800 participants on precisely this question. The surveys conclusively showed that the challenged claims were not material to the buying decisions of consumers."); *Elizabeth J. VanCleave and Katherine Hassan v. Abbott Laboratories and Does 1 – 5*, No. 19-CV335045 (Superior Court of the State of California for the County of Santa Clara, January 2, 2025) (in which the Court accepted my two materiality surveys testing the effect of certain challenged claims on the PediaSure Grow & Gain and SideKicks products, and the jury ultimately found that none of the challenged claims were material).

[26] Steckel et al. (2023), pp. 212 & 216 ("For example, if there is no statistically significant difference in the share, the at-issue attribute, product feature, trademark, or product claim **has no material impact on consumer choice** (and, as a corollary, the **price premium on the at-issue attribute is zero**). […] If one finds a result with no statistical significance, the choice experiment has essentially killed two birds with one stone: The results imply **lack of materiality and thus no liability, as well as zero damages**. [Emphases added]. *See also, e.g., id.*, p. 218.

31. The surveys' screener and main questionnaire are attached as Exhibits D.1 (Iced Tea California Survey) and E.1 (Juice Drink New York Survey). Screenshots of each survey are presented in Exhibits D.2 and E.2. Images of both the test and control stimuli used in each survey from multiple angles are shown in Exhibits D.3 and E.3. The package flats used to create the 3-dimensional, 360-degree images of the test and control stimuli are shown in Exhibits D.4 and E.4.

**A.1.2. *Consumer Universe and Participant Screening Procedure***

32. Participants in both surveys were members of the Veridata Insights online panel, a leading, reputable, and highly experienced market research firm and supplier of online samples. The use of Internet survey instruments and panels is a well-accepted and standard survey procedure.

33. The Iced Tea California Survey was administered in July of 2026 with a sample of 410 participants, and the Juice Drink New York Survey was also administered in July of 2026 with a sample of 414 participants. Both surveys in this matter were independent of each other and had a combined total of 824 (unique, or unduplicated) participants. Such a sample (whereby each survey included over 200 participants in the test group and over 200 participants in the control group) is sufficiently large to adequately represent the relevant consumer universe, as well as to detect differences, if any exist, between the test and control groups' responses.[27]

34. To properly construct the relevant universe for my surveys, I employed "screening quotas" using "click balancing" by screening for qualified participants in proportion to the known

[27] Typically, for a survey conducted for purposes of litigation, an expert should make sure that in each condition (test and control) there are at least 100 respondents. *See, e.g.*, Jay, E. Deborah (2013), "Ten Truths of False Advertising Surveys," *The Trademark Reporter*, 103(5), 1116 – 1171. The criterion for judging the adequacy of a sample size is the *confidence interval* of the sample's estimate (*e.g.*, the CI of the percentage of customers who provide a particular response). The 95% confidence interval of a percentage of consumers (*e.g.*, who have a particular purchase likelihood) based on a sample of respondents means that there is a 95% likelihood that the actual percentage of consumers in the entire population who have the same purchase likelihood lies within that confidence interval. The confidence interval is narrower when the estimate's standard error is smaller, and the standard error is smaller when the sample size is larger. *See, e.g.*, Kaye, David H. and David A. Freedman (2000), *Reference Guide on Statistics*, in *Reference Manual on Scientific Evidence*, Federal Judicial Center, p. 119). My professional opinion, having conducted and evaluated many surveys in the context of litigation, is that a sample size of over 400 participants in each survey is highly sufficient and that the resulting 95% confidence intervals (CIs) are narrow enough to reach reliable conclusions from the results of each of the surveys' questions.

California-specific (in the Iced Tea California Survey) or New York-specific (in the Juice Drink New York Survey) age and gender distribution, based on the relevant corresponding demographics brackets according to the U.S. census.[28]

35. To qualify for participation in the main questionnaire, participants in each survey had to meet the following screening criteria, which also included multiple quality assurance checks:[29]

(*i*) they passed a reCAPTCHA test at the beginning of the survey screener;[30]

(*ii*) they selected a gender that matched with the gender recorded in the panel data;[31]

(*iii*) they reported their age as 18 years or older (*i.e.*, either 18 – 44 or 45 or older), and that their age matched with the age recorded in the panel data;[32]

(*iv*) they selected a U.S. state of residence that matched with the state recorded in the panel data, and specifically California in the California-specific survey and New York in the New York-specific survey;[33]

(*v*) they were completing the survey on their desktop computer, laptop computer, or smartphone (as opposed to a tablet, cell phone, or other mobile device), and the device selected matched with the actual device they were taking the survey on;[34]

(*vi*) those who normally wear eyeglasses or contact lenses when using the computer or smartphone indicated that they would wear their glasses or contact lenses, respectively, for the remainder of the survey;[35]

(*vii*) for participants completing the Iced Tea California Survey, they had purchased a bottle, can, or jug of iced tea in the <u>past</u> three (3) months; for participants completing the Juice Drink New York Survey, they had purchased a bottle, can, or jug of juice drink in the <u>past</u> three (3) months;[36]

(*viii*) For participants completing the Iced Tea California Survey, they expected to purchase a bottle, can, or jug of iced tea during the <u>next</u> three (3) months; for

[28] The relevant age brackets were 18 – 44 and 45 or older.
[29] *See also* Exhibits D.1 and E.1 of this *Expert Report*.
[30] *See, e.g.*, Exhibits D.1 & E.1, p. 2 (S.2). A "reCAPTCHA" is a standard challenged-response test used to screen out survey respondents who are not human (*i.e.*, "bots").
[31] *See ibid.* (S.3).
[32] *See ibid*. (S.4).
[33] *See id.,* p. 3 (S.5).
[34] *See ibid.* (S.6).
[35] *See ibid*. (S.7A/B & S.8A/B).
[36] *See id.*, p. 4 (S.9). The flanking items in this screening question for both surveys consisted of: "A bottle, can, or jug of milk" and "A bottle, can, or jug of water"; participants could also select "None of the above" or "Don't know."

participants completing the Juice Drink New York Survey, they expected to purchase a bottle, can, or jug of juice drink during the next three (3) months;[37]

(*ix*) they passed three quality-assurance attention checks in which they were asked to:

- select a particular response (*i.e.*, one of five possible responses, randomized across participants) to a list of options;[38]
- type the one of five randomly selected words (*i.e.,* "reader," "writer," "teacher," "student," or "speaker") in the box next to an "Other" option;[39]
- select a particular response (*e.g.*, "East," one of five possible responses) indicating which direction is the opposite of the direction given (*e.g.*, "West");[40]

(*x*) they, or anyone living in their household, did not work for any of the following: a marketing consulting firm; a marketing research firm; an advertising agency or public relations firm; a TV or radio station; a magazine or newspaper;

- among those completing the Iced Tea California Survey, a company that manufactures, sells, or distributes iced tea products;[41]
- among those completing the Juice Drink New York Survey, a company that manufactures, sells, or distributes juice drink products;[42]

(*xi*) they did not participate in any other market research survey about iced tea beverages or juice drinks during the past three (3) months (among those completing the Iced Tea California Survey and Juice Drink New York Survey, respectively);[43] and

(*xii*) they agreed with a statement indicating that during the survey they did not open another internet browser, site, or tab; only reviewed materials that were part of this survey; and answered the survey questions without stopping in the middle and did not consult any source of information (including any websites, AI tools, books, or another person) about this survey.[44]

---

[37] *See ibid*. (S.10). Similarly, the flanking items in this screening question for both surveys consisted of: "A bottle, can, or jug of milk" and "A bottle, can, or jug of water"; participants could also select "None of the above" or "Don't know."

[38] *See* Exhibit D.1, pp. 4 – 5 (S.11-1, S.11-2, S.11-3, S.11-4, & S.11-5). The list of options consisted of "Extremely Important," "Very Important," "Somewhat Important," "Not At All Important," and "Don't Know."

[39] *See id*., p. 6 (S.12). The other options consisted of "Extremely Important," "Very Important," "Somewhat Important," "Not At All Important," "Other," and "Don't Know."

[40] *See, e.g., id*., pp. 12 – 13 (Q.9-1, Q.9-2, Q.9-3, & Q.9-4). The other options consisted of the three other directions and "Don't Know."

[41] *See id*., p. 13 (Q.10).

[42] *See* Exhibit E.1, p. 13 (Q.9).

[43] *See* Exhibit D.1, p. 13 (Q.11A/B) & Exhibit E.1, p. 13 (Q.10A/B).

[44] *See, e.g.* Exhibit D.1, p. 14 (Q.12A/B).

**A.1.3.** ***Main Questionnaire (Stimuli and Questions)***

36. *Introductory instructions*. It is well-known that survey participants often provide answers even when they do not know the answer, based on their best guesses.[45] To address this issue, it is a standard survey procedure to explicitly instruct participants not to guess. Accordingly, at the beginning of the main questionnaire, participants in each survey were shown the following instructions:[46]

> On the next screens, we will ask you some questions about iced tea products. For each question, if you don't know or don't have an answer, please don't guess. Just indicate that you "don't know" or "don't have an answer" by selecting, or typing in, the words "don't know" and then continue to the next question. There are no right or wrong answers.

37. *Choice considerations.* Participants were first asked two open-ended questions, Questions 1 and 2, (each on a separate screen) about their most important considerations when deciding which iced tea products to buy in the Iced Tea California Survey and which juice drink products to buy in the Juice Drink New York Survey. In the Iced Tea California Survey, participants were asked:[47]

> Q.1. Today we are interviewing people about iced tea products.
>
> In general, what are your most important considerations when deciding which iced tea product to buy? Please type your answer below. Please be specific and include details.

---

[45] *See, e.g.*, Diamond (2011), pp. 388 – 390.

[46] *See,* Exhibit D.1, p. 7 (I.2). In the Juice Drink New York Survey, participants were instructed: "On the next screens, we will ask you some questions about juice drink products. For each question, if you don't know or don't have an answer, please don't guess. Just indicate that you "don't know" or "don't have an answer" by selecting, or typing in, the words "don't know" and then continue to the next question. There are no right or wrong answers." *See* Exhibit E.1, p. 7 (I.2).

[47] *See, e.g.*, Exhibit D.1, p. 7 (Q.1 & Q.2). While answering Question 2, participants saw both Question 1 and their (uneditable) answer they previously provided to Question 1 on the same screen. Question 2 could be left blank. In the Juice Drink New York Survey, mentions of "iced tea products" were replaced with "juice drink products."

Q.2. Any other considerations when deciding which iced tea product to buy? Please type your answer below. Please be specific and include details.

| |
|---|
| |

38. *Stimuli presentation.* In each survey, participants who were randomly assigned to the test group viewed an original, allegedly deceptive AriZona product package (sold in the actual marketplace during the putative class periods) that displayed the challenged "no preservatives" claim. By contrast, participants who were randomly assigned to the control group viewed a revised, otherwise identical package except that the challenged claim was removed.

39. Prior to viewing the stimulus, all participants read the following instructions:[48]

> On the next screen, we will show you a package of iced tea. After you have viewed the package, we will ask you some questions.
>
> Please examine the package, just as you would if you were considering buying such a product. Take as much time as you would normally do when considering buying such a product.
>
> (Please continue when you are ready.)

On the next screen, participants were presented with either the test or control AriZona product package to which they were randomly assigned.

40. The 360-degree interface allowed participants to examine the package from all sides and angles, similar to how consumers could view or interact with the package while shopping at the store. Specifically, participants could, if they chose to, rotate the package image in any direction[49] to view other sides of the package. Participants could also click (or press with their finger on the phone screen or computer trackpad) the two buttons appearing below the package image: (*i*) a "plus" sign (zoom in) button that enlarged the package image with each click; (*ii*) a "minus" sign (zoom out) button that reduced the package image with each click;[50] and, for those

[48] *Ibid*. In the Juice Drink New York Survey, the single mention of "a package of iced tea" was replaced with "a juice drink package."

[49] For participants completing the survey from a laptop or desktop, a mouse cursor appeared as an open hand when hovering over the image and turned into a closed hand when clicking down on (*i.e.*, "grabbing") the image.

[50] As the instructions indicated, in addition to clicking the plus and minus sign buttons on the bottom, participants could also enlarge or reduce the image size by either pinching in or pinching out with two fingers, or by using their mouse scroll wheel.

taking the survey on a laptop/desktop, (*iii*) a "compass" sign button that moved the package image horizontally or vertically (without rotating the package). All participants were shown the following instructions, which were displayed immediately above the 360-degree interface:[51]

> ***<u>Please read the following instructions CAREFULLY!</u>***
>
> *Please maximize your screen, if you haven't done so already.*
>
> *Below is a package of iced tea (it may take a moment for the image to load).*
>
> *<u>To rotate the image and view the package from other sides, including the information on the back,</u>* ***click and hold down the cursor*** *over the image, and* ***drag the cursor*** *in the direction of the desired rotation (i.e., left, right, up, or down). Releasing the click will pause the rotation of the image.*
>
> *<u>To move the entire package image</u> to the left, right, top, or bottom of the screen (***without rotating the package***), click the "***compass***" to turn it on, (you should see a yellow background), then hold down the cursor over the package and drag the package image in the direction of the desired movement. Clicking on the "compass" button again will turn it off, (you should see a white background). Now you can* ***rotate*** *the package again.*
>
> *<u>At any point, if you wish to make the package</u>* ***<u>larger or smaller</u>****, you can use one of these methods:*
>
> - ***pinch in*** *or* ***pinch out*** *with two fingers on your computer trackpad;* ***<u>OR</u>***
> - *click the* ***(plus sign)*** *or* ***(minus sign)*** *buttons below the package image;* ***<u>OR</u>***
> - ***scroll up*** *or* ***scroll down*** *using the scroll wheel on your mouse.*
>
> (Please continue when you are ready.)

41. Figures A2a and A2b below depict the front and back labels (respectively) of the "test" (allegedly deceptive) AriZona Green Tea with Ginseng and Honey package when viewed as a three-dimensional, 360-degree image in the survey interface. Figures A3a and A3b depict corresponding views of the "test" AriZona Fruit Punch Fruit Juice Cocktail package. These screenshots are sample static images, but participants were able to rotate, zoom, and move the

---

[51] *See, e.g.*, Exhibit D.1, p. 8 (I.4). The sentences "*Please maximize your screen, if you haven't done so already.*" and "***scroll up*** *or* ***scroll down*** *using the scroll wheel on your mouse.*" were omitted for participants completing the survey from a smartphone device. Moreover, participants completing the survey from a smartphone device received the additional instruction "*You can use your finger to rotate the image.*" at the end of the paragraph beginning with "<u>To rotate the image and view the package from other sides</u>…" as well as the modified instruction "pinch in or pinch out with two fingers on your phone screen."

package image in any direction and manner they wished, just as they could in the marketplace. Exhibits D.3 and E.3 show the test and control packages from multiple angles (front, back, sides, top, and bottom).

42. Participants were allowed to advance to the next screen in the survey only after twenty (20) seconds had elapsed, after which they were asked whether they were able to clearly view the package.[52] Then, participants were conservatively (*i.e.*, "erring" in favor of the Plaintiffs) presented with the package image for a second time and were told that they will see "the back of the package [they] just examined."[53] The image loaded with the *back label* as the default view (where the "no preservatives" claim appeared). Again, participants could view and freely interact with (*e.g.*, zoom in and rotate) the package as a three-dimensional, 360-degree image (*e.g.*, from all angles). Participants were allowed to advance in the survey after at least ten (10) seconds had elapsed, and after indicating that they were able to clearly view the back of the package.[54] They then were told that they would be asked "a few questions about the product that you just examined."[55]

43. Except for the three-dimensional packages shown to participants, the surveys' test and control conditions were identical in all aspects, including the surveys' procedure and questions.

(*Continues on next page*)

[52] *See ibid.* (Q.3A/B: "Were you or weren't you able to clearly view the package?"). The order in which the two answer choices appeared in Question 3 was rotated across participants, such that half of the participants saw "Yes, I was" as the first option, followed by "No, I wasn't" (Q.3A), while the remaining half saw the options in the reverse order (Q.3B). Those who indicated that they were not able to clearly view the package were terminated from the survey.
[53] *See id.*, p. 9 (I.5).
[54] *See ibid.* (Q.4A/B). Those who indicated that they were not able to clearly view the back of the package were terminated from the survey.
[55] *Id.*, p. 10 (I.6).

**Figure A2a: Front View of "Test" (*i.e.*, Allegedly Deceptive) AriZona Green Tea with Ginseng and Honey**




**Figure A2b: Rotated Back View of "Test" (*i.e.*, Allegedly Deceptive) AriZona Green Tea with Ginseng and Honey**



**Figure A3a: Front View of "Test" (*i.e.*, Allegedly Deceptive) AriZona Fruit Punch Fruit Juice Cocktail**




**Figure A3b: Rotated Back View of "Test" (*i.e.*, Allegedly Deceptive) AriZona Fruit Punch Fruit Juice Cocktail**



44. *Purchase likelihood.* After the stimuli presentation, participants were asked a key, standard closed-ended purchase likelihood question (Q.5). At any time while answering Question 2, participants could click on a link to view the 360-degree image again, which would open a pop-up window on the same screen (with the same ability to interact with the stimulus as when they viewed it initially). For the Iced Tea California Survey, Question 5 read as follows:[56]

Q.5. Now, here is the first question.

This question has six answer choices, which are shown on the screen below.

Please read the entire question before answering.

Assume that the price of the can of iced tea that you just examined is comparable to the price of other cans or bottles of iced tea available in stores. If you were at the store thinking of buying iced tea and you saw the product that you just examined, how likely would you be to buy this product?

Would you say that you *definitely would buy this product, probably would buy this product, may or may not buy this product, probably would not buy this product, definitely would not buy this product, or don't know*?

*If you would like to view the package again, please click* ***here****.*

(Please select an answer.)

- o Definitely would buy this product
- o Probably would buy this product
- o May or may not buy this product
- o Probably would not buy this product
- o Definitely would not buy this product
- o Don't know

For the Juice Drink New York Survey, participants were asked the same purchase likelihood question, except that they were instructed to assume that the price of the juice drink product they just examined—which stated $1.00 directly on the label—is $1.00.[57]

[56] *See* Exhibit D.1, pp. 10 – 11 (Q.5A/B). The first five answer choices in Question 5 were rotated, such that half of the participants in each condition saw the order of answer choices shown below (Q.5A; affirmative purchase options listed first), while the remaining half saw the options in reverse order (*i.e.*, Q.5B; negative purchase options listed first).

[57] *See* Exhibit E.1, pp. 10 – 11 (Q.5A/B). The $1.00 price is based on the price that appeared on the label of the at-issue AriZona Fruit Punch Fruit Juice Cocktail products sold in the marketplace during the putative class period. *See* Exhibit E.4.

45. *Purchase reasons.* Participants who selected any of the other answers except for "Don't know" in Question 5 were asked two standard open-ended questions about the reasons for their purchase likelihood:[58]

Q.6. What makes you say that you **(INSERT ANSWER FROM Q.5A/Q.5B)**? Please type your answer below. Please be specific and include details.

| |
|---|
| |

Q.7. Any other reason or reasons why you **(INSERT ANSWER FROM Q.5A/Q.5B)**? Please type your answer below. Please be specific and include details.

| |
|---|
| |

46. *Willingness to Pay (WTP).* Participants in the Iced Tea California Survey were also asked a standard "willingness to pay" (WTP) question (Q.8).[59] Specifically, they were informed about the typical price range for a 16 – 24 oz. can or bottle of iced tea,[60] and were then asked to indicate the highest price they would be willing to pay for the specific product that they just saw. At any point while answering Question 8, participants could click on a link to view the 360-degree package image again, which would open a pop-up window on the same screen (with the same ability to interact with the stimulus as when they viewed it initially). Participants could

[58] *See, e.g.*, Exhibit D.1, p. 11 (Q.6 & Q.7). While answering Question 7, participants saw both Question 6 and their (uneditable) answer they previously provided to Question 6 on the same screen. Question 7 could be left blank.

[59] *See id.*, p. 12 (Q.8). Participants in the Juice Drink New York Survey proceeded directly to the survey's conclusion section and were not asked a WTP question (because the Fruit Punch Fruit Juice Cocktail they examined was pre-priced at $1.00).

[60] I determined the typical price range based on a systematic analysis of current (at the time of survey administration) in-store prices for a single-pack iced tea product sold at major grocery stores, pharmacies, convenience stores, and discount retailers in California. The data indicated a typical price range a 16 – 34 oz. can or bottle of iced tea is $0.69 to $2.89 in California. *See* Exhibit D.8 for a comprehensive tabulation of prices recorded.

either type in a price (using the dollars and cents fields),[61] or they could select "Don't know." The willingness to pay Question 8 read as follows:

> Q.8. Typical prices of a 16 – 24 oz. can or bottle of iced tea range <u>between $0.69 and $2.89</u>.
>
> Considering again the **can of iced tea you just examined, <u>what is the highest price you would pay for the product you just saw</u>**? Enter the price in U.S. dollars and cents.
>
> *If you would like to view the package again, please click **<u>here</u>**.*
>
> ________ dollars and ________ cents
>
> ___ Don't know **[single response]**

47. *<u>Survey end.</u>* Finally, participants were asked a series of additional quality assurance questions, after which they were thanked.[62]

**A.1.4. *Control Stimuli***

48. Most surveys involve a level of "noise," whereby some responses are obtained due to factors that are irrelevant to the issue being studied, such as guessing behavior, "yea-saying," preexisting beliefs, or advertising/packaging elements that are not at issue. Thus, it is important to include a control that accounts for such survey "noise."[63]

49. The control stimuli were designed to eliminate the purported packaging misrepresentation (*i.e.*, the challenged "no preservatives" claim) alleged by the Plaintiffs. If the Plaintiffs are correct that the challenged "no preservatives" claim on the Products' packaging is a material factor that commonly affects purchase decisions and commands an alleged price premium, then a significantly higher percentage of participants should indicate that they would definitely or probably purchase the AriZona beverage product in the test group (in which they viewed an original AriZona package displaying the challenged "no preservatives" claim)

---

[61] If a participant did not type in a whole number between 0 and 99 in the "dollars" or "cents" field, then the participant would see the following error message: "Please type in a whole number (no decimals) between 0 and 99." Participants could leave the "cents" field blank, but they had to enter a value in the "dollars" field. *See, e.g.*, Exhibit D.1, p. 12.

[62] *See, e.g.*, *id*., pp. 12 – 14. Participants who did not pass the quality assurance questions (Q.9, Q.10, Q.11A/B, and Q.12A/B) were terminated from the survey.

[63] *See also, e.g.*, Diamond (2011).

compared to in the control group (in which they viewed a revised package *without* the challenged claim). Moreover, participants randomly assigned to the test group should on average report a statistically significantly higher willingness-to-pay (WTP) for the AriZona iced tea product they saw compared to participants assigned to the control group. A substantial proportion of test group participants would also be expected to mention aspects related to the challenged "no preservatives" claim (*e.g.*, the product containing no preservatives) both as a reason to purchase the AriZona product they examined and as a consideration when purchasing in the product category in general.

50. Conversely, to the extent that the challenged claim is *not* a material factor that commonly affected (*i.e.*, increased) purchase likelihood and WTP, then participants in the test group should *not* report statistically significantly higher purchase intentions and WTP than those in the control group. Nor would participants be expected to frequently mention the product containing "no preservatives" as a reason for buying AriZona products in particular or as a consideration for buying iced tea and juice drinks in general.

51. In both surveys, I constructed a proper control by first removing the challenged "no preservatives" claim from the back panels of the AriZona Green Tea with Ginseng and Honey and the AriZona Fruit Punch Fruit Juice Cocktail packages, and then re-centering the remaining text in the box (*i.e.*, "Artificial Color" and "Artificial Flavor"). Figures A4a and A5a below reproduce the back panel of the test package used in the Iced Tea California Survey and Juice Drink New York Survey respectively, and Figures A4b and A5b reproduce the back panel of the respective control package. I use red and yellow ovals to highlight the presence (vs. absence) of the challenged "no preservatives" claim.

(*Continues on next page*)

**Figure A4a: "Test" (*i.e.*, Allegedly Deceptive) Iced Tea Package (Back)**




**Figure A4b: "Control" (*i.e.*, Revised) Iced Tea Package (Back)**



**Figure A5a: "Test" (*i.e.*, Allegedly Deceptive) Juice Drink Package (Back)**




**Figure A5b: "Control" (*i.e.*, Revised) Juice Drink Package (Back)**



**A.1.5.** ***Pretest and Additional Quality Checks***

52. After launching each survey, I first verified the quality of the data and programming logic based on a small sample of participants (*i.e.*, what is typically referred to as a "soft launch," or sometimes "pretest," in the industry). For each survey, upon finding no errors in the data collection or programming of the questionnaire, I instructed the survey panel company to resume data collection.

53. In addition to the multiple quality assurance measures implemented in the survey and by the survey panel (*see, e.g.*, Subsection A.1.2), the data were also reviewed for any indications of irregularities based on length of interview (LOI) or gibberish responses. Participants who spent less than two minutes or more than 60 minutes or who provided "gibberish" responses were excluded from each survey's sample.

**A.2. <u>Surveys' Findings</u>**

54. I analyzed the entire set of answers for each participant in each survey. As is standard practice when quantitatively summarizing and analyzing data obtained from such surveys, I conducted statistical hypothesis testing to assess whether an observed difference in the dependent variable of interest (here, purchase likelihood and WTP) is likely to represent a genuine effect beyond what would be expected due to random chance—that is, to assess whether a result is "***statistically significant***."[64]

55. That is, when interpreting a difference in purchase likelihood between the test and control groups, it is necessary to determine, from a statistical perspective, whether such a

[64] In statistical hypothesis testing, statistical significance is a measure of the likelihood that a study's result would have occurred under the "null hypothesis" (*i.e.*, under the default position that no association exists between or among specified groups/variables beyond that due to random chance). When a result has statistical significance or is "statistically significant," the researcher can reliably conclude that such a result is unlikely to occur just by chance. The standard in consumer behavior, marketing, communications, economics, psychology, and other scientific research is that a statistic is considered statistically significant when its corresponding $p$-value is smaller than a significance level of .05 (*i.e.*, a less than 5% probability of a difference this large occurring by chance). When the $p$-value of an observed effect (or observed difference) falls *below* the significance level threshold (typically below .05), the researcher can reject the null hypothesis (*i.e.*, of no effect) and conclude that because the result is unlikely to have occurred by chance, the effect exists among (and generalizes to) the population being studied. On the other hand, **when the $p$-value exceeds the significance level threshold (*e.g.*, when $p > .05$), the researcher cannot reject the null hypothesis, meaning that any observed differences are highly consistent with random chance alone without any systematic effect or relationship between the studied variables**.

difference (*i*) reflects a true difference (or effect) due to the at-issue variable (*i.e.*, the presence vs. absence of the challenged "no preservatives" claim); or, instead, (*ii*) reflects only random variability due to *sampling error*. Sampling error refers to the fact that the specific sample used in a survey is itself a source of variability in the estimate derived from that survey;[65] as a result, there will always be *some* degree of uncertainty about (or variation around) the survey's estimate. In other words, even when a challenged claim makes *no* true difference for (or has no actual "effect" on) consumer choices in the real world (among the relevant consumer population), some difference will be observed by chance alone due to the survey's inherent sampling error.

56. Because the "reasons" questions (Q.6 & Q.7) were open-ended (*i.e.*, participants typed in their responses without being given any answer choices), I developed a coding frame with different response categories. Two independent coders classified participants' verbatim responses to the above-mentioned questions into the various categories outlined in my coding frame. These coders were "blind" to (unaware of) the purpose and sponsor of the survey (and to the condition to which participants were randomly assigned).

57. Exhibits D.6 and E.6 provide tables with the coding results of participants' open-ended verbatim responses in the Iced Tea California Survey and the Juice Drink New York Survey, respectively. Exhibits D.7 and E.7 attach the respective surveys' raw data.

**A.2.1. *Choice Considerations in the Product Category (Q.1/Q.2)***

58. Recall that prior to seeing an AriZona product package, participants were first asked to list their considerations when deciding which iced tea to buy in the Iced Tea California Survey and which juice drink to buy in the Juice Drink New York Survey.[66] As the coded results

---

[65] This is because a survey (which draws a sample that by definition is much smaller than the relevant consumer universe it is representing) can only provide an *estimate* of some investigated characteristic of the population rather than exactly measure that characteristic in the population. The estimate generated from the survey data depends on the specific sample of participants who answered the questions; if a different sample of individuals were to answer the questions instead, the survey would almost certainly yield a different estimate due to sampling error. *See, e.g.*, McCall, Robert B. (2001), *Fundamental Statistics for Behavioral Sciences, 8th Edition*, Belmont, CA: Wadsworth/Thomson Learning.

[66] Question 1 asked: "In general, what are your most important considerations when deciding which [iced tea / juice drink] product to buy?"; Question 2 asked: "Any other considerations when deciding which [iced tea / juice drink] product to buy?"; *see, e.g.*, Exhibit D.1, p. 7.

tabulated in Table 1 of Exhibits D.6 and E.6 indicate, and as summarized below in Tables A1a and A1b, participants provided a variety of considerations when buying in the category for each of the respective surveys. Specifically, participants in the Iced Tea California Survey most commonly mentioned such considerations as: taste/flavor (69.0% of all participants); price/value (46.3%); sweetness/sugar content/type (37.3%); brand equity/recognition (36.3%); other ingredients (unrelated to "additives" or "preservatives"; 22.0%); and multiple other aspects unrelated to "no preservatives."[67] Similarly, participants in the Juice Drink New York Survey most commonly mentioned aspects such as: taste/flavor (63.8%); price/value (46.9%); sweetness/sugar content/type (30.9%); other ingredients (29.0%); and brand equity/familiarity (27.3%).[68]

**Table A1a: Top Considerations When Buying Iced Tea (Q.1/Q.2) in the Iced Tea California Survey**

| Q.1: *In general, what are your most important considerations when deciding which iced tea product to buy?*<br>Q.2: *Any other considerations when deciding which iced tea product to buy?* | **Total**<br>*N* = 410 |
|---|---|
| **Taste/Flavor** | **69.0%** (283) |
| **Price/Value** [69] | **46.3%** (190) |
| **Sweetness / Sugar Content/Type** [70] | **37.3%** (153) |
| **Brand Equity/Recognition** | **36.3%** (149) |
| **Other Ingredients** | **22.0%** (90) |
| **Packaging** [71] | **17.8%** (73) |

[67] *See* Exhibit D.6, Table 1 for a full tabulation of participants' answers to Q.1 and Q.2.
[68] *See* Exhibit E.6, Table 1 for a full tabulation of participants' answers to Q.1 and Q.2.
[69] *E.g.*: "(Good/low) Price/cost / Inexpensive" (42.7%).
[70] *E.g.*: "Sweetness Level / Sugar Content/Type (Unspecified) (Subnet)" (24.9%); "Sweet / Some/More Sugar (Subnet)" (6.6%); "Less Sweet / Low Sugar/HFCS (Subnet)" (8.0%).
[71] *E.g.*: "Packaging Appearance (Subnet)" (3.7%); "Packaging Material/Form (Subnet)" (5.6%); "Packaging Size/Quantity (Subnet)" (10.2%).

**Table A1b: Top Considerations When Buying Juice Drinks (Q.1/Q.2) in the Juice Drink New York Survey**

| Q.1: *In general, what are your <u>most important considerations</u> when deciding which juice drink product to buy?*<br>Q.2: *Any other considerations when deciding which juice drink product to buy?* | **Total**<br>*N* = 414 |
|---|---|
| **Taste/Flavor** | **63.8%** (264) |
| **Price/Value** | **46.9%** (194) |
| **Sweetness / Sugar Content/Type** | **30.9%** (128) |
| **Other Ingredients** | **29.0%** (120) |
| **Brand Equity/Recognition** | **27.3%** (113) |

59. Notably, only 3 out of 410 participants (*i.e.*, 0.7% of participants) in the Iced Tea California Survey mentioned the product having no preservatives as a consideration when deciding which iced tea to buy,[72] and only 12 out of 414 participants (*i.e.*, 2.9% of participants) in the Juice Drink New York Survey did so with respect to considerations when buying in the juice drink category.[73] These results therefore indicate that contrary to the Plaintiffs' theory, a lack of preservatives is *not* an important or general consideration for consumers when they decide which iced tea or juice drink to buy.

**A.2.2. *Purchase Likelihood (Q.5A/B)***

60. Table A2 below shows the percentages (and numbers) of participants who selected various answer choices in Question 5, the key (closed-ended) purchase likelihood question, for each of the two surveys.[74]

[72] *See* Exhibit D.6, Table 1.
[73] *See* Exhibit E.6, Table 1. Although I understand that the Plaintiffs' allegations center around the presence of "preservatives," *not* "additives," I also note that *very few* participants mentioned "no additives" as a consideration: only 5 out of 410 participants (1.2%) in the Iced Tea California Survey, and only 17 out of 414 participants (4.1%) in the Juice Drink New York Survey.
[74] Question 5 asked: "Assume that the price of the [can of iced tea / juice drink product] that you just examined is [comparable to the price of other cans or bottles of iced tea available in stores / $1.00]. If you were at the store thinking of buying [iced tea / a juice drink] and you saw the product that you just examined, how likely would you be to buy this product?" The order of the first five answer choices for Question 5 were rotated, such that half the participants in each condition (test and control) saw the "positive" or affirmative options first (*i.e.*, Definitely would buy this product, Probably would buy this

**Table A2: Percent of Participants Selecting Various Answer Choices in the Purchase Likelihood Question (Q.5) Reported in the Kivetz Materiality Surveys** [75]

| | **Iced Tea (California)**   | | **Juice Drink (New York)**   | |
|---|---|---|---|---|
| | **Test** *(Challenged Claim **Present**)* (*n* = 205) | **Control** *(Challenged Claim **Absent**)* (*n* = 205) | **Test** *(Challenged Claim **Present**)* (*n* = 207) | **Control** *(Challenged Claim **Absent**)* (*n* = 207) |
| Definitely would buy this product | 47.8% (98) | 47.8% (98) | 42.0% (87) | 36.2% (75) |
| Probably would buy this product | 24.4% (50) | 24.9% (51) | 23.2% (48) | 24.6% (51) |
| May or may not buy this product | 11.7% (24) | 12.7% (26) | 10.6% (22) | 14.0% (29) |
| Probably would not buy this product | 6.3% (13) | 7.3% (15) | 13.0% (27) | 14.5% (30) |
| Definitely would not buy this product | 9.3% (19) | 7.3% (15) | 11.1% (23) | 10.6% (22) |
| Don't know | 0.5% (1) | 0.0% (0) | 0% (0) | 0% (0) |
| **Definitely/probably would buy** | **72.2% (148)** | **72.7% (149)** | **65.2% (135)** | **60.9% (126)** |

61. As shown in Table A2, consumers' purchase intentions were similar, as a statistical matter, across test and control group participants for each of the two surveys. In the Iced Tea California Survey, 72.2% and 72.7% of test and control group participants,

---

product, etc.; Q.5A), while half saw the "negative" options first (*i.e.*, Definitely would not buy this product, Probably would not buy this product, etc.; Q.5B). *See* Exhibits D.1 and E.1, pp. 10 – 11.

[75] *See also* Table 2 of Exhibits D.6 and E.6.

respectively, answered that they "definitely would buy" or "probably would buy" the AriZona iced tea product they examined. This –0.5% difference between the test and control groups in the percent of participants who indicated a "top 2" purchase likelihood is ***not statistically significant, meaning it is statistically indistinguishable from zero***. Specifically, a $\chi^2$ ("chi-squared" or "chi-square") statistical test[76] comparing these proportions yields a $\chi^2$ statistic (with one "degree of freedom" or "*df*") with a *p*-value greater than 0.91 (*i.e.*, $\chi^2 = .01$, $df = 1$, $p > .91$, *n.s.*). Consequently, the isolated variable being investigated (here, the presence vs. absence of the challenged "no preservatives" claim) does not have a causal effect on, and therefore is *not material to*, consumers' likelihood of purchasing the at-issue AriZona iced tea product.

62. A similar and consistent pattern of results was found in the Juice Drink New York Survey. Specifically, 65.2% and 60.9% of test and control group participants, respectively, answered that they "definitely would buy" or "probably would buy" the product they examined. This 4.3% difference between the test and control groups in the percent of participants who indicated a "top 2" purchase likelihood is statistically indistinguishable from zero ($\chi^2 < .84$, $df = 1$, $p > .35$, *n.s.*). Hence, the challenged claim does *not* cause consumers to be more likely to purchase the at-issue AriZona juice drink product.

63. Taken together, the above results and analyses unequivocally demonstrate that the challenged "no preservatives" claim did *not* (commonly) increase consumers' (or the putative class members') likelihood of purchasing the Products.

**A.2.3. *Purchase Reasons (Q.6/Q.7)***

64. In the present matter, it is standard and informative to examine the explanations that participants provided for their purchase decisions. Table 3 of Exhibits D.6 and E.6 contain the coding of the participants' verbatim responses to open-ended Questions 6 and 7 ("What makes you say that you **(INSERT ANSWER FROM Q.5A/Q.5B)**?" and "Any other reason or reasons why you **(INSERT ANSWER FROM Q.5A/Q.5B)**?").

---

[76] A $\chi^2$ test is a statistical test that is commonly used to assess whether any differences (of any size) observed between sets of data with categorical (binary) variables are due to chance or rather due to a relationship (or effect) between the variables being investigated.

65. As the coded results tabulated in Table 3 of Exhibits D.6 and E.6 indicate, and as summarized below in Tables A3a and A3b, participants provided a variety of reasons in favor of purchasing the Products—the vast majority of which did *not* relate to anything about preservatives or the lack thereof. Specifically, in the Iced Tea California Survey, test group participants most commonly mentioned such positive purchase reasons as: brand equity/recognition ("Like/love AriZona (products)"; 43.4% of participants in the test group); taste/flavor (*e.g.*, "Good taste/flavor / Delicious", "Like the honey/ginseng (taste/flavor)"; 42.4%); packaging (*e.g.*, "Like the packaging (design) / Package is appealing/attractive/eye-catching"; 16.1%); price/value (*e.g.*, "(Always) Good/low price/cost / Inexpensive/affordable / Price has stayed the same"; 13.2%); and multiple other positive reasons that are *not* related to the concept of "no preservatives" or the amount of preservatives.[77]

66. For example, verbatim responses like the following were counted as providing a "brand equity/recognition" reason (among other reasons) for purchasing the product in Questions 6 and 7 of the Iced Tea California Survey:[78]

- ID #38: "I love this product and have had it many times in the past. Always high quality and a low price."; "Always has a fresh taste"
- ID #49: "I'm already familiar with this brand and flavor, it's something I already enjoy it would be an easy choice"; "No"
- ID #142: "I love arizona tea. I have experience with arizona drinks. I have tried green tea before."; "I love the design of the can."
- ID #163: "Because it's actually my go to for tea beverages and I'm actually drinking the same one now but in the bottle..."; "I love that ginseng flavor with the honey...and love how you can also serve cold.grew up drinking a t Arizona and still do"
- ID # 236: "It generally has the best price and I've had this brand previously and like it"; "It's inexpensive"
- ID #284: "i like the brand and how the can looks"; "i like the taste."
- ID #362: "I love Arizona iced tea it is one that I usually reach for when I buy iced tea"; "The price is really good for the product that you get"

[77] *See* Exhibit D.6, Table 3.

[78] All verbatim responses by participants (including any grammar, spelling, punctuation, and formatting errors) appear as they were typed by the survey participants. *See* Exhibit D.7 for the raw verbatim responses.

**Table A3a: Top Purchase Reasons (Q.6/Q.7) in Favor of Purchasing the AriZona Iced Tea Product in the Iced Tea California Survey**

| Q.6: *What makes you say that you (INSERT ANSWER FROM Q.5A/Q.5B)?*<br>Q.7: *Any other reason or reasons why you (INSERT ANSWER FROM Q.5A/Q.5B)?* | **Test**<br>(*Challenged Claim **Present***)<br>*n* = 205 | **Control**<br>(*Challenged Claim **Absent***)<br>*n* = 205 |
|---|---|---|
| **Brand Equity/Recognition** | **43.4%** (89) | **44.9%** (92) |
| **Taste/Flavor** | **42.4%** (87) | **41.0%** (84) |
| **Other Ingredients** | **20.5%** (42) | **14.6%** (30) |
| **Packaging** | **16.1%** (33) | **9.8%** (20) |
| **Price/Value**[79] | **13.2%** (27) | **12.2%** (25) |

67. A similar and consistent pattern of results was found in the Juice Drink New York Survey, with test group participants most commonly mentioning such positive purchase reasons as: price (41.1% of test group participants); brand equity/recognition (37.2%); taste/flavor (33.3%); and multiple other positive reasons unrelated to "no preservatives" or the amount of preservatives.[80]

68. Given that the AriZona Fruit Punch product shown to participants displayed a price of $1.00 on the label, it is unsurprising that the most common reason in favor of purchasing the product referred to the price or value. Several participants also specifically associated a low price and affordability with the AriZona brand; for example:[81]

- ID #23: "I grew up on the Arizona drink brand and love this flavor. It reminds me of high school."; "PRICE! Always the price with Arizona. It was a cheap, flavorful, thirst-quenching beverage."
- ID #129: "Arizona fruit punch is literally my favorite drink so me already knowing what drink it is. I already know that the drink is good so I would most definitely buy it again."; "For the price of the drink, it's really good and it has a lot of juice inside of it just for a dollar so I think it's worth the price"

[79] *E.g.*: "(Always) Good/low price/cost / Inexpensive/affordable / Price has stayed the same" (6.3% vs. 8.8%); "Good value" (3.4% vs. 1.5%).
[80] *See* Exhibit E.6, Table 3.
[81] All verbatim responses by participants (including any grammar, spelling, punctuation, and formatting errors) appear as they were typed by the survey participants. *See* Exhibit E.7 for the raw verbatim responses.

- ID #156: "I would buy this Arizona fruit juice because is this something for me on the go and I can pair this with other foods that I like to eat"; "It's something that's very affordable for just about anybody especially now in this economy"
- ID #157: "I mean it's a dollar. Arizona has always been a good drink drink at a good price. I just don't want the high fructose corn syrup in it."; "I've had it before so I know that it taste good"
- ID #220: "1$ and the fact that it's an Arizona drink. Saved me when I was young and saves me even at my age of 30."; "The brand and the cost to size ratio. It's difficult to find a 1$ drink."
- ID #281: "I love this drink, it's flavorful and its price is outstanding"; "It's a good deal for a good drink"
- ID #346: "Because I definitely HAVE bought it. They have since raised to $1.25 in a lot of places, but that's still far and beyond cheaper than anything else out there. 7/11 has their own brand and it's double the price of Arizona."; "Because Arizona has been $1 for my entire life. They were so good to keep it at $1 for so long. I can't even be upset it went up $.25."
- ID #383: "For a dollar cost, my standards can be lower and just enjoy the sugary sweet flavor"; "I know this brand well and drink it often when needing something late a night"
- ID #407: "I buy this all the time and I absolutely love it."; "Its cheap. You can't beat paying only $1 for a drink"

**Table A3b: Top Purchase Reasons (Q.6/Q.7) in Favor of Purchasing the AriZona Juice Drink Product in the Juice Drink New York Survey**

| Q.6: *What makes you say that you (INSERT ANSWER FROM Q.5A/Q.5B)?*<br>Q.7: *Any other reason or reasons why you (INSERT ANSWER FROM Q.5A/Q.5B)?* | **Test**<br>(*Challenged Claim **<u>Present</u>***)<br>*n* = 207 | **Control**<br>(*Challenged Claim **<u>Absent</u>***)<br>*n* = 207 |
|---|---|---|
| **Price/Value** | **41.1%** (85) | **31.9%** (66) |
| **Brand Equity/Recognition** | **37.2%** (77) | **31.4%** (65) |
| **Taste/Flavor** | **33.3%** (69) | **31.4%** (65) |

69. Notably, participants' explanations of their purchase decisions indicate that the challenged "no preservatives" claim is *not* a common, material factor in consumers' decisions to purchase the Products.

70. ***First***, only six (6) test group participants (*i.e.*, 2.9%) in the Iced Tea California Survey and only two (2) test group participants (*i.e.*, 1.0%) in the Juice Drink New York Survey

mentioned no preservatives or anything related to preservatives as a positive reason for purchasing the product they examined.[82]

71. The percentage of participants who mentioned "no preservatives" did not differ, as a statistical matter, between the test and control groups in either survey (*e.g.*, 2.9% [test] vs. 0.5% [control][83] in the Iced Tea California Survey; 1.0% [test] vs. 0% [control][84] in the Juice Drink New York Survey).

72. Moreover, although I understand that the Plaintiffs' allegations surround the issue of "preservatives," not "additives," *very few* participants mentioned "no additives" (*i.e.*, only a single test group participant in each survey did so) as a positive reason for purchasing the AriZona product they examined.[85]

73. ***Second***, among those in the control group—who examined a revised AriZona package *without* the challenged "no preservatives" claim—*not a single* participant in either survey provided a (negative or neutral) reason against buying the "control" product due to concerns that the product contains or may contain preservatives.[86] Moreover, no control group participants in the Iced Tea California Survey mentioned citric acid as a (negative or neutral) reason against buying the control product, while only a *single* participant in the control group of the Juice Drink New York Survey provided a (negative or neutral) reason against buying the product due to concerns that the product contains citric acid.

74. These results further suggest that the challenged "no preservatives" claim is neither a common nor a material factor in consumers' purchase decisions—and therefore causes no common "injury."

75. ***Finally***, as mentioned earlier, participants provided a myriad of considerations—which varied across participants—for and against purchasing the Products. The observed

[82] *See* Exhibits D.6 (Table 3) and E.6 (Table 3).
[83] Fisher's $p = .12$, *n.s.*
[84] Fisher's $p = .50$, *n.s.*
[85] *See* Exhibits D.6 (Table 3) and E.6 (Table 3).
[86] *See* Exhibits D.6 (Table 4) and E.6 (Table 4).

variation in purchase motivations across participants is diametrically opposed to the notion that the challenged "no preservatives" claim is a common purchase motivator classwide.

**A.2.4. *Willingness to Pay (WTP) (Q.8)***

76. The Iced Tea California Survey included a final substantive question, which asked about willingness to pay (WTP).[87] As can be seen in Table A4 below, and consistent with consumers' purchase likelihoods, participants' stated WTP demonstrates that they are *not* willing to pay more for the Products when the challenged "no preservatives" claim is present (*i.e.*, in the test group) compared to when it is absent (*i.e.*, in the control group).

**Table A4: Average WTP (Q.5) in the Kivetz Iced Tea California Survey**

| **Test**<br>*(Challenged "No Preservatives" Claim **Present**)*<br>($n$ = 205)<br> | **Control**<br>*(Challenged "No Preservatives" Claim **Absent**)*<br>($n$ = 205)<br> |
|---|---|
| $2.05 | $2.04 |
| $t(389) = .08$, $p > .93$, *n.s.* | |

77. In particular, in the Iced Tea California Survey, participants' average WTP for the AriZona package was $2.05 (SD = $0.99) in the test group versus $2.04 (SD = $0.88) in the

[87] The Juice Drink New York Survey did not ask a willingness-to-pay question; instead, the price that was printed on the bottle itself (*i.e.*, $1.00) was provided to participants in the purchase likelihood question. *See* Exhibit E.1.

control group.[88] This difference in WTP between the test and control groups is *statistically indistinguishable from zero* ($t(389) = .08$, $p > .93$, *n.s.*).

78. Overall, consistent with the findings for consumers' purchase likelihoods (*see* Subsection A.2.2), the Iced Tea California Survey shows that the challenged "no preservatives" claim does *not* (materially) increase consumers' WTP for the at-issue AriZona product. Consequently, and necessarily, the challenged "no preservatives" claim could not have caused the putative class members to pay any alleged price premium (*i.e.*, the alleged price premium due to the challenged claim is ***0%***).

**A.2.4. *Survey Conclusions***

79. It is important to note that the type of cause-effect ("test-control") experimental design that I used was designed to directly assess the *materiality* (or lack thereof) of a claim at issue to consumers. To the extent that an experiment or survey like the one I conducted detects no statistically significant difference between the test and control conditions—which signifies a *lack of materiality* of the isolated variable at issue—then this necessarily also means that the alleged price premium is ***zero***, because a positive "price premium" cannot be attributed to a claim that is immaterial to consumers.[89]

80. Consider, for example, in the Iced Tea California Survey, the –0.5 percentage point difference in the proportion of participants in the test group (*i.e.*, 72.2%) versus control group (*i.e.*, 72.7%) who indicated that they definitely or probably would buy the AriZona iced tea product. The fact that this –0.5 percentage point difference was statistically indistinguishable from zero

[88] In analyzing WTP for the Iced Tea California Survey, I first excluded 10 outliers based on a standard cutoff of two standard deviations below and above the average in each condition. The findings and conclusions remain the same regardless of whether the outliers are included in or excluded from the analysis.

[89] To the extent that a positive "price premium" for the claim at issue were to exist in reality, then the materiality survey should detect a statistically significant difference between the test and control conditions (but would not be able to quantify the magnitude of that "price premium"). *See also, e.g.*, Steckel et al. (2023), pp. 212 ("[…] if there is no statistically significant difference in the share, the at-issue attribute, product feature, trademark, or product claim has no material impact on consumer choice (and, as a corollary, the price premium on the at-issue attribute is zero)") & 216 ("If one finds a result with no statistical significance, the choice experiment has essentially killed two birds with one stone: The results imply lack of materiality and thus no liability, as well as zero damages.").

means that one cannot somehow conclude that consumers are more likely to buy the Products when the challenged "no preservatives" claim is absent; and it certainly cannot be translated into a price premium of –0.5% or any other price premium or discount. Instead, the only scientifically valid interpretation of this finding is that the presence of the challenged "no preservatives" claim made no difference whatsoever to consumers' purchase likelihoods or willingness to pay (WTP) with respect to the Products, and therefore commanded *no* price premium.

81. Overall, the findings from both of my materiality surveys—which, unlike the Dubé Proposed Conjoint Survey (as I discuss next), used a proper, non-leading test-control design with realistic stimuli displaying the full at-issue packaging—are clear: ***The challenged "no preservatives" claim did not affect (or increase) putative class members' likelihood of purchasing, or willingness to pay (WTP) for, the Products***. Accordingly, the challenged claim ***did not cause putative class members to pay any alleged price premium***.

## B. EVALUATION OF THE DUBÉ PROPOSED CONJOINT SURVEY

82. It is important to emphasize that the two empirical consumer surveys I conducted, which followed standard principles of survey design, unambiguously demonstrate a *lack* of common materiality in this litigation. That is, my surveys' results show that the challenged "no preservatives" claim as displayed on the Products' packaging does *not* exert *any* common, material effect on consumers' purchase decisions regarding these Products. This absence of materiality means that the putative class members would have been *equally* likely to purchase (and would have paid the same price for) AriZona products even had the challenged "no preservatives" claim been removed from the label. Therefore, ***as a threshold matter, my surveys show that the challenged "no preservatives" claim did not cause the putative class members to pay any alleged "price premium" (i.e., the alleged "price premium" is zero) and did not cause them to suffer any monetary loss (or "injury") classwide.***

83. In addition to the severe flaws in the Dubé Proposed Conjoint Survey (as set forth in Subsections B.2 to B.4), I also note that Dr. Dubé's survey also does not and cannot, by its inherent design, test the materiality (or lack thereof) of the challenged "no preservatives" claim.

This is because Dr. Dubé's proposed survey approach does not come close to following the standard design of a materiality survey,[90] and would instead force participants to focus on (and make tradeoffs among) a narrow, unrealistic, and biased subset of attributes and claims (one of which is the challenged claim). Consequently, unlike my empirical surveys, Dr. Dubé's proposed conjoint survey cannot examine the critical threshold issue of whether the challenged "no preservatives" claim exerts a material (causal) effect on consumers' purchase decisions.

84. Next, I provide an overview of the Dubé Proposed Conjoint Survey before evaluating it in light of fundamental principles of survey design.

### B.1. <u>Overview of the Dubé Proposed Conjoint Survey</u>

85. By its description, the Dubé Report attempts to analyze whether consumers are willing to pay a higher price (*i.e.*, an alleged "price premium"[91]) for the at-issue AriZona products under the "what-if scenario" of "removing the Challenged Claim from the labels of the ClassProducts [*sic*]."[92] Specifically, Dr. Dubé's proposed methodology to calculate an alleged price premium consists of conducting a *choice-based conjoint ("CBC")* survey.[93] His intended

[90] In a proper, standard materiality survey—such as the two consumer surveys that I conducted in this litigation—one group of participants would indicate their likelihood of purchasing an at-issue AriZona product after being exposed to the challenged "no preservatives" claim (*i.e.*, on a product package), while a second group of participants would indicate their likelihood of purchasing the same product except with the alleged deception removed (*e.g.*, by removing the challenged claim).

[91] Dubé Report, ¶ 9 ("Therefore, I will use the same methodology in this case to determine the price premium associated with the alleged misrepresentation as I have used with consulting clients to help them price their products, and as is typically used in peer-reviewed, academic research.")

[92] *Id.*, ¶ 80 ("Conjoint Analysis is ideally-suited to this damages measurement task. Rao notes that a 'significant advantage of the method has been its ability to answer various 'what if' questions using market simulators… based on the results from a conjoint study for hypothetical or real choice alternatives.' In this case, the what-if scenario consists of removing the Challenged Claim from the labels of the ClassProducts [*sic*].").

[93] *See, e.g., id.*, ¶¶ 22 & 59 – 77. Conjoint analysis is a survey-based statistical method that can be used, where relevant, to quantify consumers' valuation of different attributes of a product or service. Modern conjoint analyses predominantly employ a *choice-based conjoint (CBC)* approach. A proper (*i.e.*, valid and reliable) CBC study requires not only careful design and sophisticated econometric modeling, but also necessitates sufficient consideration of the methodological challenges that may arise given the particular facts of a case (*e.g.*, the products, packaging, and challenged claim at issue). *See also, e.g.*, Orme, Bryan K. (2010), *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research (2nd Ed.)*, Madison, WI: Research Publishers LLC; Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi (2014b), "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, 12(4), 421 – 456, p. 432 ("Practitioners of conjoint have long been aware that conjoint is appealing because of its simplicity and low cost but that **careful studies make all the**

analysis plan would use the CBC survey's data to estimate how much consumers would be willing to pay for iced tea and juice drink products that display the challenged "no preservatives" claim as compared to those without the challenged claim.[94] Dr. Dubé proposes two damages models—what he calls the "Price Premium" method and the "Willingness-to-Pay" method—that would take as input an alleged price premium estimated from his conjoint analysis.[95]

86. Dr. Dubé states that he will sample consumers who are "U.S. adults over 18 years old"[96] who report that "within the last 12 months they shopped for or purchased the Class Products or one of the competing brands"[97] and/or "within the next 12 months they plan to purchase the Class Products or one of the competing brands."[98] He then states that because consumers throughout the U.S. are likely to have similar preferences for iced tea and "no preservatives," he will "likely" use a nationwide sample of participants.[99] The Dubé Report does not specify how many participants will be recruited for the proposed survey.

---

**difference between realistic predictions of demand and useless results**.); McCullough, Dick (2002), "A User's Guide to Conjoint Analysis," *Marketing Research*, 14(2), 18 – 23, p. 19 ("Conjoint analysis addresses big issues with specific answers. As a result, **when it fails, it often fails spectacularly**."); Befurt et al. (2023), pp. 221 & 235 ("Conjoint analysis is a method that requires careful survey design and data analytics to provide reliable results. Furthermore, while conjoint analysis can be helpful for understanding consumer behavior, decision-making drivers, and consumers' valuations of products and product attributes, the method itself is **not automatically the best methodology** for all scenarios in which a researcher seeks to understand consumer purchase decisions. […] If these [method-specific guidelines and] standards are ignored, the validity of conjoint surveys becomes questionable and may lead to outcomes that **neither the academic research community nor courts are willing to accept**" [emphases added]).

[94] *See, e.g.*, Dubé Report, p. 88, Appendix F.2 ("As before, let $\boldsymbol{X}^B$ denote the product features under the but-for scenario, when the **Challenged Claim has been removed** from the Class Product's label. $\boldsymbol{X}^B$ is identical to $\boldsymbol{X}^A$ except for the Challenged Claim on the label of the Class Product. One can use the pricing model to determine the new equilibrium prices in the product category but for the Challenged Claim on the labels of the Class Products."); ¶ 36 ("WTP captures three ways that Class Members are affected by the **removal of the Challenged Claim** from the labels of the Class Products.") [Emphases added].

[95] *Id.*, ¶ 23.

[96] *Id.*, ¶ 44.

[97] *Id.*, ¶ 46.

[98] *Ibid*. The Dubé Report also states, however, that a 12-month time horizon is "for illustrative purposes" and that "[a] different time horizon could easily be accommodated in the survey, as could a different time horizon for backward-looking versus forward-looking purchase intentions"; *ibid*.

[99] *Id.*, ¶ 44 ("It is **likely that consumers throughout the U.S.—including in California and New York—have similar preferences for iced tea and, importantly, for 'no preservatives.' Therefore, I will likely use a sample of U.S. adults** over 18 years old and then screen on whether they have previously purchased or plan to purchase one of the Class Products or competing beverages in the

87. According to Dr. Dubé, his survey's participants will be asked to make a series of choices, the exact number of which is unspecified.[100] For each of these choice tasks, participants will be shown an unspecified number of hypothetical "profiles" (*i.e.*, product configurations representing iced tea or juice products) and be asked to choose a product that they prefer.[101]

88. Dr. Dubé proposes to present participants with the following *tentative* attributes and levels in his proposed CBC task:[102]

- **Brand Name** (Pure Leaf, AriZona, Lipton Gold Peak, Snapple, or Brisk);
- **Package Size** (Arizona 23oz, Brisk 33oz, Gold Peak 18oz, Pure Leaf 18oz, Lipton 20oz, or Snapple 16oz);
- **Diet** (Diet or Non-diet);
- **Shelf-Price** (ranging from $0.88 to $2.40);
- **Challenged Claim** ("No Preservatives" or No Claim); and
- **"Distractor" Claims** ("No Artificial Color, "No Artificial Flavor," or No Claim)

Although the Dubé Report does not specify how exactly information about these attributes will be displayed to participants in the survey, presumably such information would be presented using textual descriptions (without any imagery).[103]

---

category. However, I can easily survey only California or New York consumers should that be necessary.") [Emphasis added].

[100] *Id.*, ¶ 59 ("The proposed Conjoint Analysis consists of a choice-based conjoint survey (hereafter 'CBC') and analyzing the survey results. CBC proceeds by asking the consumers in the survey sample to respond to a sequence of choice tasks.").

[101] *Id*, ¶ 70 ("The levels of these features will be varied in the survey to create product configurations (or profiles). […]").

[102] *Id.*, ¶ 68.

[103] *Id.*, ¶ 70 ("Varying the labelling claims and prices in the survey will isolate their respective effects. Any other product features that are not varied will be controlled for in the 'brand' effect, including the actual role of the brand name and any other packaging features or product perceptions."); *see also id.*, ¶ 73 ("Similarly, for the competing brands and styles, **we only need to vary the price charged**. The effect of all **other features on the competitor products' packaging will be controlled for by their respective 'brand' effects, which will therefore account for such factors as competitors' labeling claims, brand, logo, imagery and other packaging features**.") [Emphasis added].

89. After collecting data from his proposed CBC survey, Dr. Dubé writes that he will use the random coefficients logit model for "the analysis of consumer demand for iced tea and juice products"[104] and a Hierarchical Bayes algorithm to "measure the model parameters."[105]

90. According to Dr. Dubé, his conjoint methodology allows for computing "class-wide damages due to the challenged claim."[106]

### B.2. The Dubé Proposed Conjoint Survey is Dramatically Underspecified and Incomplete, Omitting Crucial Design and Analysis Details

91. Before evaluating the Dubé Proposed Conjoint Survey in detail, it is important to note that a survey report should provide complete and detailed information on all relevant survey characteristics, including (in the case of a proposed survey) a clear accounting of the specific sampling approach, methodology, stimuli, procedures, and analyses that will be used. According to Professor Diamond:[107]

> The completeness of the survey report is one indicator of the trustworthiness of the survey and the professionalism of the expert who is presenting the results of the survey.

92. By contrast, the Dubé Report fails to adequately specify crucial details regarding how the Dubé Proposed Conjoint Survey will actually be designed and is consistently ambiguous and vague with respect to the survey's design.

93. ***First***, Dr. Dubé's proposed sampling plan is not well-defined, despite the fact that there is nothing preventing him from defining one. He proposes using a nationwide sample of participants using the following justification:[108]

> It is likely that consumers throughout the U.S.—including in California and New York—have similar preferences for iced tea and, importantly, for "no preservatives." Therefore, I will likely use a sample of U.S. adults over 18 years old and then screen on whether they have previously purchased or plan to purchase one of the Class Products or competing beverages in the category.

[104] *Id.*, ¶ 78.
[105] *Id.*, ¶ 79.
[106] *Id.*, p. 15.
[107] *Id.*, p. 415.
[108] *Id.*, ¶ 44.

The Dubé Report then immediately hedges this proposed sampling approach by stating "I can easily survey only California or New York consumers should that be necessary."[109]

94. Similarly, Dr. Dubé articulates that "sample members would be qualified to participate in the research study if they indicate that:"[110]

> a) within the last 12 months they shopped for or purchased the Class Products or one of the competing brands; and/or,
>
> b) within the next 12 months they plan to purchase the Class Products or one of the competing brands.

The Dubé Report then refers to the 12-month time horizon as being only for "illustrative purposes" and that "[a] different time horizon could easily be accommodated in the survey."[111]

95. ***Second***, and more importantly, the Dubé Report neglects to clarify exactly how the *product attributes (and their levels) will be presented, displayed, and/or explained to participants*, including whether any visual imagery will be shown and whether (and if so, what) instructions or descriptions will accompany each attribute. As I later discuss in Subsection B.3, to the extent that Dr. Dubé intends to present only text-based information, the survey will induce severe demand and focalism biases by presenting stimuli in a decontextualized, unrealistic, and inaccurate manner.

96. In fact, even the non-price attributes (and their levels) disclosed in the Dubé Report (*i.e.*, Brand Name, Package Size, Diet/Non-Diet, Challenged Claim, "Distractor" Claims)[112] are apparently tentative and subject to change, with Dr. Dubé stating that "It would be straightforward to change the set of brands included in the study if needed"[113] and "[I]f any new evidence is presented to challenge my choices of tested features, it will be straightforward to accommodate these changes into the survey."[114] As I explain in the next subsection, implementing a realistic

[109] *Ibid.*
[110] *Id.*, ¶ 46.
[111] *Ibid.*
[112] *Id.*, ¶ 68.
[113] *Ibid.*
[114] *Ibid.* *See also* FN 70 ("The current design is based on those documents obtained from Defendants reviewed thus far. Should new evidence arrive during the continued discovery process, it would be straightforward to modify the proposed set of product features when I conduct the survey.").

representation of iced tea and juice drink attributes and features (including those of AriZona) into a conjoint survey is anything but "straightforward to accommodate."

97. ***Third***, Dr. Dubé provides little to no information about other aspects of his proposed survey, including the estimated sample size, the number of choice tasks, the number of "profiles" to be shown in each choice task, the order in which the attributes will be presented to participants, the instructions participants will read, and the wording of the questions that participants will be asked to answer. Such insufficient disclosure means that there is no way to fully evaluate how Dr. Dubé will address the multiple potential biases that can arise from his proposed survey.

### B.3. The Dubé Proposed Conjoint Survey Would Deviate from Marketplace Conditions Through its Artificial Display of Attributes, Including Failing to Show Any Packaging, Omitting Numerous Attributes and Claims, and Singling Out the Challenged Claim

98. A key and fatal methodological flaw that Dr. Dubé's proposed conjoint survey suffers from is its complete disassociation from anything consumers would or even could realistically encounter in the marketplace. A survey conducted for litigation, including a conjoint survey, should mirror as closely as possible essential characteristics of the marketplace.[115] Indeed, the purpose of a survey is to provide a reliable estimate of consumers' perceptions, purchase behaviors, and/or WTP in a relevant (real) marketplace. The selection of a suitable survey method should be based primarily on the marketplace-resemblance criterion, instead of choosing a particular method merely for convenience or because an alternative methodology might produce "unfavorable" results.

99. Failure to properly replicate marketplace conditions—for example, by inadequately or inaccurately (or not at all) representing the at-issue product packaging in a conjoint survey—can

[115] *See also, e.g.*, McCarthy, J. Thomas (2007, 2025), *McCarthy on Trademarks and Unfair Competition* (*McCarthy*), §32:163; Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds), Chicago, IL: American Bar Association, pp. 243 – 259; Winer, Russell (1999), "Experimentation in the 21st Century: The Importance of External Validity," *Journal of the Academy of Marketing Science,* 27(3), 349 – 358.

induce severe ***demand effects***[116] and ***focalism***,[117] such that participants are led to focus on specific aspects and to select the "expected" (or obvious) answers. In the context of this litigation, this means that a survey whose stimuli deviates from what consumers would encounter in the marketplace would yield biased estimates that are unrepresentative of consumers' true incremental WTP, if any, for the at-issue AriZona products (*e.g*., compared to the same products if the alleged deception was "cured," such as by removing the challenged claim from the labeling).

100. A CBC task can be invalid by inducing a "focalism" bias, such as by artificially requiring participants to consider and choose among product "profiles" and attributes (or claims): (*i*) that participants would *not* otherwise consider; and (*ii*) that exclude information about relevant other product attributes and claims.[118] The concern with focalism is supported by research on

---

[116] "*Demand effects*" (also referred to as "demand characteristics") refer to the phenomenon whereby survey participants use cues provided by the survey's questions, answer choices, and/or stimuli to figure out the purpose of the study and provide the answers expected by the researcher. *See, e.g.*, Orne, Martin T. (1962), "On the Social Psychology of the Psychological Experiment," *American Psychologist*, 17(11), 776 – 783; Darley, William K. and Jeen-Su Lim (1993), "Demand Artifacts in Consumer Research: An Alternative Perspective," *Journal of Consumer Research*, 20(3), 489 – 495; *see also* Simonson and Kivetz (2012). The participants then tend to provide (what they perceive as) the expected answers, to make sure that the results "come out right." Courts have recognized the importance of demand effects, and such problems have contributed to the criticism and rejection of surveys. *See, e.g.*, *In Re: KIND LLC "Healthy and All Natural Litigation,"* 15-md-02645 (NRB) (S.D.N.Y. Sep. 2022); *Simon Property Group L.P. v. MySimon, Inc*., 104 F. Supp. 2d 1033, 2000, U.S. Dist. S.D. Indiana; *Kargo Global, Inc. v. Advance Magazine Publishers, Inc*., "Opinion & Order," No. 06 Civ. 550 (U.S. SDNY; Aug. 2007); *Government Employees Insurance Company v. Google Inc., et al.,* East. Dist. of Virginia, 2005 U.S. Dist. LEXIS 18642, 77 U.S.P.Q.2D (BNA) 1841; *THOIP v. The Walt Disney Co. et al*., OPINION AND ORDER (No. 08 Civ. 6823, S.D. NY, Feb. 2010).

[117] Research in psychology indicates that when survey participants are manipulated to focus on specific aspects, such aspects receive more attention and weight than they do under real marketplace conditions. Diverse lines of research have provided evidence for such a **"focusing illusion"** or **"focalism" bias**, which causes survey participants to focus too much on the information that is presented to them and not enough on the effects of other (less salient or unavailable) information. *See, e.g.*, Schkade, David and Daniel Kahneman (1998), "Does Living in California Make People Happy? A Focusing Illusion in Judgments of Life Satisfaction," *Psychological Science*, 9(5), 340 – 346; Kahneman, Daniel, Alan B. Krueger, David Schkade, Norbert Schwarz, and Arthur A. Stone (2006), "Would You Be Happier If You Were Richer? A Focusing Illusion," *Science,* 312(5782), 1908 – 1910; Wilson, Timothy D., Thalia Wheatley, Jonathan M. Meyers, Daniel T. Gilbert, and Danny Axsom (2000), "Focalism: A Source of Durability Bias in Affective Forecasting," *Journal of Personality and Social Psychology*, 78(5), 821 – 836; *see also* Kivetz, Ran and Itamar Simonson (2000), "The Effects of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427 – 448 (this article was a finalist for the 2005 *O'Dell Award* for the article that has had the greatest impact on the marketing field in the previous five years).

[118] *See also, e.g.*, "Order After Court Trial on Remaining Causes of Action et al.," *In re: Elizabeth J. VanCleave et al. v. Abbott Laboratories et al.*, Case No.: 19CV345045, ¶ 110 (*e.g.*, noting that

conjoint analysis; in fact, simply mentioning an attribute or claim in the conjoint task can make it appear important, even if this attribute is actually ignored in consumers' actual choices in the marketplace. For example, Professor Huber writes:[119]

> **Simply mentioning an attribute increases its importance, raising the specter of attributes appearing important that otherwise would be ignored in the market choices**. One way to limit this problem is to load the task with enough attributes so the unimportant ones are ignored in the task process. This task simplification screening is particularly strong in full-profile ratings and choices. [Emphasis added]

101. In fact, Dr. Dubé himself recognizes the threat of focalism and demand effects as biases that can arise in conjoint analysis, and cites to my coauthored treatise chapter[120] on demand effects:[121]

---

"Moreover, Mr. Gaskin **limited the number of labeling statements that participants could view, which had the potential effect of focusing participants on the Challenged Statements**, thereby over-emphasizing their importance. See id. at 2686:6–18 (Kivetz) (explaining that surveys that 'force[] the participants to focus only on a small set of features or attributes or marketing claims and ignore[] other features' may artificially inflate the value of importance by "narrowing the field for consideration for participants"); *Oracle America, Inc. v. Google Inc.*, 2012 WL 850705 (N.D. Cal. Mar. 13, 2012) (noting that "Dr. Shugan's own focus-group research discovered 39 features that real-world consumers said they would have considered when purchasing a smartphone, including battery life and cellular network (Shugan Rpt Exh. 1). But instead of testing 39 features in his conjoint analysis, Dr. Shugan selected seven features to be studied, three of which were covered by the patented functionality. **It is highly likely that study participants would have placed greater importance on a feature like startup time if it were shown with six other features as opposed to 38 other features**" [emphasis added]); *In re: Fluidmaster, Inc., Water Connector Components Products Liability Litigation*, 2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) (*e.g.*, "By selecting these four non-price attributes **without determining if they play an important role in real-world consumers' preferences, Dr. Pittaoulis's survey potentially elevates the two attributes linked to Plaintiffs' damages claims and inflates respondents' WTP estimate for these attributes**. […] Asking an unrepresentative group of purchasers to artificially assign values among an arrangement of potentially unimportant attributes that fails to approximate real-world purchasing decisions does not seem designed to produce a reliable WTP estimate that can be used to calculate classwide damages" [emphasis added]); *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, No. 10-cv-10578 (E.D. Mich. Oct. 14, 2016) (*e.g.*, "Visteon's pre and post-Daubert hearing briefing makes clear, and it is undisputed, that Dr. Steckel's study did not attempt to determine a real world price for the four patented features, and **did not endeavor to value any non-patented features or to determine the value of the four patented features) relative to the multitude of non-patented features in the accused devices**. […] Thus, the only 'value' expressed in Dr. Steckel's economic values is the relative value of the four asserted patented features to one another. **Dr. Steckel's conjoint results express nothing about the value of the four patented features relative to other important features of the accused devices**" [emphases added]).

[119] Huber, Joel (1997), "What We Have Learned from 20 Years of Conjoint Research," *Research Paper Series*, Sequim, WA: Sawtooth Software, Inc., p. 10.

[120] Simonson and Kivetz (2012).

[121] Dubé Report, ¶ 63.

> Conjoint Analysis is prone to such focalism bias when the survey fails to include important purchase-drivers as additional tested features. In particular, when respondents are only presented with minor product features in the survey, they may overweight them in their responses relative to the weight they would assign to real-world purchase decisions. Focalism bias can also lead to a *demand effect* if a respondent uses the inflated importance of a key feature as a cue to the purpose of the survey and the "correct" answers to the survey questionnaire. [Italics in the original; FNs omitted]

102. Dr. Dubé then asserts that he will take "multiple steps to ensure that the inclusion of the 'No preservatives' feature in the survey will not suffer from focalism bias";[122] such steps seemingly consist of (*i*) pointing to selected AriZona internal marketing documents and three general academic articles that supposedly "confirm"[123] the importance of the "No Preservatives" claim;[124] and (*ii*) varying "additional features and the prices, all of which are important to beverage consumers […]."[125]

103. However, these "steps" that Dr. Dubé plans to take are in fact *not* sufficient to "avoid focalizing the 'No Preservatives' claim";[126] to the contrary, the Dubé Proposed Conjoint Survey will induce severe demand and focalism biases by presenting stimuli and attributes in a completely ***decontextualized, unrealistic, and inaccurate manner***, while omitting multiple relevant attributes and representations on which consumers are likely to rely in the real world. Such a presentation is diametrically opposed to the fundamental survey principle that a challenged claim should be evaluated in the context in which it appears and in which consumers encounter that representation (*e.g.*, on a product package). I detail these severe deviations from marketplace conditions below.

### B.3.1. *The Dubé Proposed Conjoint Survey Will Not Show the Challenged Claim in the Context of Any Packaging*

104. Although the Dubé Proposed Conjoint Survey's entire purpose is to measure a price premium attributable to a *label* claim that appears on the at-issue AriZona product

[122] *Id.*, ¶ 64.
[123] *Id.*, ¶¶ 65 & 66.
[124] My review of these documents and articles cited by Dr. Dubé indicates that none of these sources "confirm" the importance of the challenged "no preservatives" claim to consumers (in the context of AriZona's iced tea and juice drink products).
[125] Dubé Report, ¶ 67.
[126] *Ibid*.

*packaging*, Dr. Dubé does not specify in his report whether he will show participants any packaging.[127] Instead, the product "profiles" in the survey will deviate dramatically from how consumers would ever encounter and buy iced tea or juice drink products at the store. Figures B1a and B1b juxtapose an actual AriZona product—specifically, a 23oz can of AriZona Green Tea with Ginseng and Honey—that participants in one of my materiality surveys examined (Figure B1a) with an example of how this product would approximately "appear" to the Dubé Proposed Conjoint Survey's participants in the CBC task (Figure B1b).

(*Continues on next page*)

[127] Note that when asked at his deposition for details regarding how his proposed conjoint task would be presented to participants, including whether participants would see an actual label, Dr. Dubé did not commit to a procedure. For example, he testified that presenting a "logo of the product" with the brand name "would be possible" (Dubé Deposition, p. 167); that "[y]ou could show someone an image or you could describe in detail the container type and its size. These are all things that would ultimately be determined after the piloting stage […]" (*id.*, p. 172); that "you indicated one way that this could be done with a visual, that's feasible certainly, but it may not be necessary. Most conjoints don't use visuals, most conjoints might just state that this is a no – this product represents itself as having no preservatives" (*id.*, p. 193); and that "It would be feasible to use an image. It would also be feasible to use text" (*id.*, p. 197). However, such an underdeveloped, "wait and see" approach—one which treats a text-only survey and an image-based survey as essentially interchangeable—is unscientific, as it leaves unresolved critical design decisions such as how the choice task will be displayed to participants, whether and how imagery will be shown, and which product claims and characteristics will be represented. These decisions are not minor issues to be handwaved away and worked out at a later stage; they fundamentally change what participants see, how they are likely to react to the stimuli, and ultimately the conjoint study's measurements and findings. Leaving such questions to be settled only after unspecified "piloting" provides no assurance that the resulting survey will overcome the serious flaws and problems identified in this *Expert Report*.

**Figure B1a: Front and Back Views of "Test" AriZona Green Tea with Ginseng and Honey in the Kivetz Iced Tea California Survey** [128]




**Figure B1b: AriZona "Profile" As Described in the Dubé Report** [129]

| | |
|---|---|
| Brand: | AriZona |
| Package Size: | 23oz |
| Diet/Non-Diet: | Non-Diet |
| Label Claims: | No Preservatives |
| | No Artificial Color |
| | No Artificial Flavor |
| Shelf-Price: | $2.40 |

105. As the contrast between Figures B1a and B1b makes clear, the impoverished way in which the Products will be characterized and presented to participants in the Dubé Proposed Conjoint Survey is far from how consumers shopping for iced tea and juice drinks at the store

[128] Image not to scale. My 360-degree interface allowed participants to examine the package from all sides and angles, similar to how consumers could view the package in the marketplace.

[129] The Dubé Report does not even show any sample images of how his proposed CBC choice task will appear to participants. Instead, the report only broadly describes the proposed CBC choice task in terms of the attributes and levels. *See* Dubé Report, ¶¶ 68 – 70. It is also not clear how the "Challenged Claim" and "Distractor Claims" attribute will be presented to participants, as presumably Dr. Dubé will not describe the "No Preservatives" claim as being the "challenged claim" nor the "No Artificial Color" and "No Artificial Flavor" claims as being "distractor claims." The $2.40 price is displayed as an example of one of the price points (ranging between $0.88 and $2.40; *see id.*, ¶ 68) that participants in Dr. Dubé's proposed survey could see for an AriZona "profile" in the choice task—despite the fact that a $2.40 price tag for a single AriZona 23oz beverage would be considerably (and implausibly) more expensive than the typical retail price of such products—which is instead $0.99 for a 23oz can, as the Dubé Report itself noted; *see id.*, ¶ 58 & Table 9 (showing a median price of $0.99 and a *75th percentile* price of $1.18).

would encounter these products. Consistent with academic literature[130] and the results of my empirical surveys,[131] the overall visual appeal of AriZona packaging (including its shape, colors, images, and overall "look and feel") is a prominent factor likely to drive many consumers' purchase decisions.

106. In the case of AriZona in particular, the aesthetics of the product packaging—which feature bold, bright, high-contrast colors and artwork (*see* Figure B2a below)—has been described by industry observers as "vibrant," "eye-catching," and "iconic,"[132] and is a clear differentiator in the marketplace (*see* Figure B2b below, depicting AriZona vs. the five competitor brands that Dr. Dubé plans to include in his survey). Indeed, Dr. Dubé himself acknowledged the design of AriZona's packaging as a differentiator, noting that "AriZona's brand manual describes its mission is 'to bring our customers great-tasting products, using top-quality ingredients, **presented in uniquely designed packing**.'"[133] Yet, the Dubé Report fails to confirm whether *any* imagery will be shown to participants in the proposed conjoint survey.

[130] The importance of packaging appeal and product appearance/design in customers' perceptions and purchase decisions, as well as in brand differentiation and positioning, is well-documented in academic literature. *See, e.g.*, Winer, Russ and Ravi Dhar (2011), *Marketing Management* (4th ed.), Upper Saddle River, NJ: Pearson Prentice Hall; Creusen, Marielle E. H. and Jan P. L. Schoormans (2005), "The Different Roles of Product Appearance in Consumer Choice," *Journal of Product Innovation Management*, 22(1), 64 – 81; Bloch, Peter H. (1995), "Seeking the Ideal Form: Product Design and Consumer Response," *Journal of Marketing*, 59(3), 16 – 29; Underwood, Robert L. and Noreen M. Klein (2002), "Packaging as Brand Communication: Effects of Product Pictures on Consumer Responses to the Package and Brand," *Journal of Marketing Theory and Practice*, 10(4), 58 – 68; Peter, J. Paul and Jerry C. Olson (2008), *Consumer Behavior and Marketing Strategy* (8th ed.), Boston, MA: McGraw-Hill/Irwin. In many cases, packaging (part of the *Product* and *Promotion* elements of the marketing mix) forms a crucial aspect of the product's marketing, branding, and positioning. Indeed, two of the primary objectives of the product's packaging and labeling are to identify the brand and to convey descriptive and persuasive information; Kotler, Philip and Kevin L. Keller (2009), *Marketing Management*, 13th Ed., Upper Saddle River, NJ: Pearson Prentice Hall, p. 339.

[131] Participants in my materiality surveys mentioned the visual appeal and packaging appearance as a reason to buy the AriZona products (*e.g.*, 16.1% of test group participants in the Iced Tea California Survey cited packaging appearance as a positive purchase reason).

[132] Pace, Gina (2021), "How AriZona Is Staying Relevant Through New Products And Iconic Graphic Design," *Forbes*, https://www.forbes.com/sites/ginapace/2021/08/27/how-arizona-is-staying-relevant-through-new-products-and-iconic-graphic-design/; Peterson-Withorn, Chase (2017), "Inside Arizona Iced Tea: How Don Vultaggio Beat Snapple, Became A Billionaire And Nearly Lost It All," *Forbes*, https://www.forbes.com/sites/chasewithorn/2017/10/17/inside-arizona-iced-tea-how-don-vultaggio-beat-snapple-became-a-billionaire-and-nearly-lost-it-all/?sh=14876a968fd0.

[133] Dubé Report, ¶ 68 (pp. 31 – 32). Emphases added.

**Figure B2a: Example of AriZona Packaging Design (Collection of AriZona Cans)** [134]




[134] *See* https://www.reddit.com/r/mildlyinteresting/comments/eg13co/my_arizona_can_collection/.

**Figure B2b: AriZona Green Tea with Ginseng and Honey and Competing Brands of Iced Tea** [135]




107. When a study only shows participants a written list of product descriptions (or displays a truncated, distorted, and/or unrealistic visual representation of the product), the salient

[135] Images not to scale. Dr. Dubé proposed the five brands depicted here as competitor brands in his proposed conjoint survey (*i.e.*, Gold Peak, Pure Leaf, Snapple, Lipton, and Brisk). Figure B2b shows specifically the following competitor products: Gold Peak Black Sweet Tea Bottle (18.5 fl oz), Pure Leaf Real Brewed Tea Sweet Tea (18.5 fl oz), Snapple Peach Tea Juice Drink (16 fl oz), and Lipton Green Tea Citrus Iced Tea Drink (16.9 fl oz), and Brisk Lemon Iced Tea (1 Liter).

visual and textual cues that consumers use in their purchasing decisions are artificially excluded and distorted, inflating the measured importance of the tested (and focused on) attribute or statement. For example, academic writing on conjoint analysis has found that estimates from conjoint surveys can be highly sensitive to "image realism."[136] A recent chapter from the *Cambridge Handbook of Marketing and the Law* notes:[137]

> [F]or many product categories a reliable conjoint survey should at least in part create a realistic decision-making setting. Researchers have added realism to their studies by, for example, using images or video, or allowing for interaction with the stimuli to better understand characteristics such as start-up times on electronic devices. [FN omitted]

108. Similarly, in the matter of *In Re: Elizabeth J. VanCleave et al. v. Abbott Laboratories et al.*,[138] the court criticized as unreliable a conjoint survey conducted by the plaintiff's expert (a survey which I critiqued). That survey, which is similar in design to the Dubé Proposed Conjoint Survey in the present litigation, presented the at-issue products in a decontextualized and unrealistic manner (as Dr. Dubé will do here); as the court observed, however, such a depiction cannot be used to draw conclusions about whether a statement at issue is material (or not material) in the real world:[139]

> The Court cannot draw such a conclusion from Mr. Gaskin's conjoint survey. First, **unlike consumers who encounter the At-Issue Products in the real world (or in Dr. Kivetz's surveys), participants in Mr. Gaskin's survey did not view labeling statements on products as they appear in the marketplace, but instead in plain columns that featured all of the labeling statements in the same size and font.** This makes it impossible to draw conclusions as to whether consumers encountering PediaSure products in the real world (where the statements appear in different sizes and in different fonts on different areas of the PediaSure label) would

---

[136] *See* Hauser, John R., Felix Eggers, and Matthew Selove (2019), "The Strategic Implications of Scale in Choice-Based Conjoint Analysis," *Marketing Science*, 38(6), 1059 – 1081. For example, the authors of this article write: "Our results suggest that when equilibrium prices are used to replace WTP calculations, equilibrium-price estimates are extremely sensitive to craft. **Image realism**, incentive alignment, and likely other seemingly minor craft investments have impacts in the range of tens to hundreds of millions of dollars" (emphasis added); p. 1075; *see also* p. 1059 ("We demonstrate empirically that **image realism** and incentive alignment affect scale sufficiently to change strategic decisions and affect patent/copyright valuations by hundreds of millions of dollars [emphases added]").
[137] Befurt et al. (2023), p. 232.
[138] *See* "Order After Court Trial on Remaining Causes of Action et al.," *In re: Elizabeth J. VanCleave et al. v. Abbott Laboratories et al.*, Case No.: 19CV345045.
[139] *Id.*, ¶ 110.

have found the Challenged Statements important to their purchase decisions. [FN omitted; emphases added]

109. Importantly, it is well-established that consumers form perceptions of a challenged claim (if they even pay attention to the claim) in the *context* in which it appears.[140] By presenting "No Preservatives" outside the context of an actual, realistic package, the Dubé Proposed Conjoint Survey will simultaneously deprive participants of information that can influence preferences while distorting their comprehension and interpretation of this claim. Further, by repeatedly focusing participants on this claim across an unspecified number of conjoint choices, the survey virtually *guarantees* participants' attention to, and measured WTP for, this attribute level.

### B.3.2. *The Dubé Proposed Conjoint Survey Will Misrepresent the Appearance and Prominence of Product Aspects (Including the Challenged Claim), Which Will Result in an Invalid Price Premium Estimate*

110. The Dubé Proposed Conjoint Survey will also distort the way in which various product attributes—including (most importantly) the challenged "no preservatives" claim—appear in the marketplace, which will conceal from participants multiple aspects that distinguish among different iced teas or juice drinks. There is no indication from the Dubé Report that any of the attribute levels of the proposed CBC task (*i.e.*, the levels for "Brand Name," "Package Size," "Diet or Non-Diet," "Challenged Claim," and "Distractor Claims") will be presented in a way that accurately reflects how they appear on the actual products.

111. Notably, a presentation format that does not depict the correct proportion of the challenged claim relative to other attributes will artificially equate them, leading participants to

[140] The importance of analyzing consumer perceptions of advertising claims in the full context in which the claims appear is underscored by seminal research in cognitive psychology and decision making. For example, research indicates that human perception is dependent on the *general context* provided by words and/or visual stimuli, which drive people's interpretations. *See, e.g.*, Anderson, John R. (1985), *Cognitive Psychology and Its Implications*, New York, NY: W.H. Freeman and Company. Context is also critical in determining consumer perceptions of product offerings, as demonstrated in the widely-cited phenomenon of "context effects." *See, e.g.*, Kivetz, Ran, Oded Netzer, and V. Srinivasan (2004a), "Alternative Models for Capturing the Compromise Effect," *Journal of Marketing Research*, 41(3), 237 – 257 (Lead article; *Finalist*, 2009 *William O'Dell Award; Finalist*, 2005 *Paul Green Award*); Simonson, Itamar and Amos Tversky (1992), "Choice in Context: Tradeoff Contrast and Extremeness Aversion," *Journal of Marketing Research*, 29(3), 281 – 295; Kivetz, Ran, Oded Netzer, and V. Srinivasan (2004b), "Extending Compromise Effect Models to Complex Buying Situations and Other Context Effects," *Journal of Marketing Research*, 41(3), 262 – 268.

overweigh the challenged "no preservatives" claim relative to how consumers would weigh it in the real world. As Figure B3 below shows, during the putative class periods, the challenged "no preservatives" claim in actuality never appeared on the front of the Products' packaging but rather on the back or side panels, in relatively small font and frequently toward the lower half of the panel.[141] To the extent that Dr. Dubé's proposed survey will merely describe each of the attribute levels in the same plain typeface and font, the survey will *distort* how consumers would encounter the challenged claim by inaccurately presenting it as if it were comparable in size, location, typeface, and prominence to other, more conspicuous product aspects and statements to which consumers would be exposed to in reality.

(*Continues on next page*)

[141] *See* Weiner Declaration, Exhibits 9 – 21 ("Product Labels"). *See also* Vultaggio Deposition, p. 79 ("Our no preservatives was always on the side.").

**Figure B3: Examples Showing Location of "No Preservatives" Claim on Various At-Issue AriZona Products (Reproduced from Complaint)** [142]




[142] Second Amended Complaint, Exhibit A, pp. 27 – 28 & 32. These images from the SAC are truncated and do not fully display all sides of the products. I added red ovals to highlight the challenged claim.

112. Artificially equating the less conspicuous challenged "no preservatives" claim appearing on the back/side panel (a claim that may have otherwise gone unnoticed by many consumers in the actual marketplace) with more prominent elements, such as the "AriZona" brand name (which stretches vertically or horizontally in prominent letters either on the principal display panel[143] or immediately to its left), is particularly problematic given that the products at issue are affordable, repeat-purchase consumer packaged goods (CPGs).

113. For the product categories at issue in this matter (*i.e.*, iced tea and juice drinks), customer retention and repeat purchases, often driven by brand loyalty, are key determinants of firms' performance and sales.[144] The importance of brand—which Dr. Dubé also acknowledged[145]—is also underscored by academic research showing that in purchase decisions involving consumer packaged goods (CPGs), brand name is a highly prominent attribute and sometimes a dominant choice heuristic.[146] Further, research using eye-tracking methodologies demonstrates that consumers pay a great deal of attention to brand name information and do so under conditions of both high and low time pressure.[147] Thus, whereas consumers in the

---

[143] As the FDA states, the front label, or *principal display panel* (PDP), of packaged food packages—which must include the product identity and net quantity of contents—is most likely to be shown and examined by consumers "under customary conditions of display for retail sale." *See, e.g.*, https://health.ri.gov/publications/requirements/FoodLabelingForPackagedFood.pdf; https://www.fdareader.com/blog/2018/12/12/principal-display-panel; 21 CFR 101.1, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/CFRSearch.cfm?fr=101.1.

[144] *See also, e.g.*, Kivetz, Ran and Itamar Simonson (2002a), "Earning the Right to Indulge: Effort as a Determinant of Customer Preferences Toward Frequency Program Rewards," *Journal of Marketing Research*, 39(2), 155 – 170. This article was a finalist for the 2007 *William O'Dell Award*, given to the *Journal of Marketing Research* (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years. *See also* Gupta, Sunil and Donald R. Lehmann (2005), *Managing Customers as Investments*, Philadelphia, PA: Wharton School Publishing.

[145] Dubé Report, ¶ 68 ("A vast empirical literature in quantitative marketing published in peer-reviewed, academic journals has analyzed the strong role of brand as a driver of consumer purchase decisions in consumer packaged goods (CPG) categories like the one in this case. In my professional experience with CPG firms, brand is routinely viewed as the primary determinant of consumer choices" [FN omitted]).

[146] *See*, *e.g.*, Aaker, David A. (1991), *Managing Brand Equity*, New York, NY: Free Press; Hoyer, Wayne D. and Steven P. Brown (1990), "Effects of Brand Awareness for a Common Repeat-Purchase Product," *Journal of Consumer Research,* 17(2), 141 – 198; Keller, Kevin Lane (2008), *Strategic Brand Management*: *Building*, *Measuring*, *and Managing Brand Equity*, Upper Saddle River, NJ: Pearson Prentice Hall.

[147] Pieters, Rik and Luk Warlop (1999), "Visual Attention During Brand Choice: The Impact of Time Pressure and Motivation," *International Journal* of *Research in Marketing*, 16, 1 – 16.

marketplace may base their purchase decision primarily or entirely on the AriZona brand name, the overall packaging aesthetic, and the price—without ever turning to view the back or side of the package—Dr. Dubé's Proposed Conjoint Survey will *presume* (indeed, will force) attention to the challenged claim, leading participants to overweigh "no preservatives" more than they otherwise would when shopping for iced tea or juice drink products at the store.

114. Further, as Figure B4 below illustrates, many non-challenged packaging statements and representations (*e.g.*, "Green Tea With GINSENG and HONEY"; "AN AMERICAN COMPANY,"; "REAL BREWED"; "Great Hot!"; "ANTIOX VITAMIN C FORTIFIED"; the Nutrition Facts panel, including information about calories and other ingredients; an image of the U.S. with the US flag; and more)—which will not even be shown to participants in the Dubé Proposed Conjoint Survey—are also likely more prominent and conspicuous than the challenged claim, yet will not be represented as such to participants (in fact, will not be represented at all).

(*Continues on next page*)

**Figure B4: Three Views of AriZona Green Tea with Ginseng and Honey (23oz) Can** [148]




115. Overall, Dr. Dubé's proposed conjoint survey will not account for the relative prominence or placement of different packaging representations and claims, thereby presenting a distorted characterization of the product "profiles" to his participants. In fact, under this approach, Dr. Dubé would illogically estimate the *same* price premium for a "No Preservatives" claim regardless of how it hypothetically appeared on the AriZona packaging—for example, in the largest font displayed three times on the principal display panel or in the smallest font displayed only once on the back panel.

[148] I added red ovals to denote the challenged claim (which the Dubé Proposed Conjoint Survey attempts to test) and blue rectangles to denote claims that are likely more prominent than the challenged claim on the front and back labels.

### B.3.3. *The Dubé Proposed Conjoint Survey Will Omit Numerous Relevant Attributes, Claims, and Product Aspects that Consumers Could or Would Likely Rely on in Reality*

116. Because participants' choices and valuations are sensitive to both how many and which attributes are included in a conjoint task, the choice of attributes and claims is crucial. Leading authorities on conjoint analysis, including an authority cited by Dr. Dubé,[149] have widely recognized the importance of selecting realistic stimuli and including important features, stating: "Defining proper conjoint attributes and levels is arguably the most fundamental and critical aspect of designing a good conjoint study."[150]

117. Although a proper conjoint survey need not (and cannot) include every possible feature, authorities in conjoint analysis agree that features which are *most relevant* to accurately simulating the market and consumers' real-world choices (*e.g.*, the most important attributes and representations) must be included. Excluding from a conjoint survey attributes and representations that are valuable to consumers yields biased and invalid estimates of the overall market value of the product and of any alleged "price premium" for specific product attributes or packaging claims. As Befurt and colleagues (2023) caution in their chapter on conjoint surveys used in litigation:[151]

> The selection of product attributes should **include the most salient drivers of consumers' choice processes in the real world**. That is, "the menus of products and their descriptions [should be] designed to realistically mimic a market experience." In fact, a frequent critique leveled against conjoint surveys is the **risk of bias arising from turning respondents' attention toward attributes that stand out from more typical, realistic, and salient decision-making drivers**. […] [Emphases added]

118. Thus, while it may be reasonable to omit certain *non*-important attributes, the logistical benefits of including fewer attributes *cannot* justify the exclusion of important

---

[149] Dr. Dubé repeatedly cites Bryan Orme, the president of Sawtooth Software; *e.g.*, Dubé Report, ¶ 60 (FN 52), 67 (FN 68), ¶ 74 (FN 77), &¶ 79 (FN 84).

[150] Orme, Bryan (2002), "Formulating Attributes and Levels in Conjoint Analysis," *Research Paper Series*, Sequim, WA: Sawtooth Software, Inc., p. 1. *See also* Green, Paul E., and V. Srinivasan (1978), "Conjoint Analysis in Consumer Research: Issues and Outlook," *Journal of Consumer Research*, 5(2), 103 – 123; Green, Paul E., Abba M. Krieger, and Pradeep Bansal (1988), "Completely Unacceptable Levels in Conjoint Analysis: A Cautionary Note," *Journal of Marketing Research*, 25(3), 293 – 300.

[151] Befurt et al. (2023), p. 230. *See also, e.g.*, Huber (1997), p. 10.

attributes, which fundamentally biases the results. Indeed, as one conjoint analysis guide notes:[152]

> Clients often want to know "Which attributes are most important?" but CA [conjoint analysis] can only answer this with regard to the relative utilities of the attributes and features tested. Including (or omitting) a very popular or unpopular level on one attribute will alter the "importance" of every other attribute!"

Nor can simply adding a small handful of additional attributes correct the underlying bias. If the set of relevant and important attributes that typically characterizes the products at issue is too large to be realistically included in the CBC survey, then the appropriate course of action would be to consider an alternative survey methodology altogether, rather than (as Dr. Dubé plans to do) deploy a survey whose design is fatally flawed.

119. The product "profiles" in Dr. Dubé's Proposed Conjoint Survey will each display ***only four*** attributes (excluding price, and assuming that the "Challenged Claim" and "Distractor Claims" will be represented under one attribute): Brand Name, Package Size, Diet or Non-Diet, and "[Label] Claims."[153] Dr. Dubé states that he based his attribute and attribute level selection "on [his] extensive experience with consumer purchase behavior in the CPG industry and Defendants' own marketing research into the beverage category."[154] However, he fails to provide sufficient detail or explanation of what specific criteria he used in determining which attributes and attribute levels to ultimately include and, importantly, exclude. Beyond a lack of justification and disclosure, the set of attributes and levels in the Dubé Proposed Conjoint Survey (particularly the "[label] claim" attribute) inappropriately omits numerous packaging features and representations without justification, as I detail below.

120. ***First***, Dr. Dubé's limited set of attributes and label statements does not include (as Befurt and colleagues prescribe) "the most salient drivers of consumers' choice processes in the real world,"[155] because it clearly excludes *numerous* (non-challenged) relevant iced tea or juice

[152] Chapman, Chris (2013), "9 Things Clients Get Wrong About Conjoint Analysis," in Orme, Bryan (ed.), *Proceedings of the 2013 Sawtooth Software Conference*, Dana Point, CA.
[153] *E.g.*, Dubé Report, ¶ 68. Again, the Dubé Report provides no clarification as to how what he calls the attributes currently titled "Challenged Claim" and "Distractor Claims" will be explained or represented to participants.
[154] *Id.*, ¶ 67.
[155] Befurt et al. (2023), p. 230.

drink attributes, representations, and claims (including the packaging appearance and appeal as a whole) that are plausible differentiators and purchase motivators for consumers in the real world. These omissions will, contrary to the Dubé Report's assertion, lead participants to focus their attention on the challenged "no preservatives" claim in the proposed CBC task more than they would otherwise have in reality.

121. As indicated in Figures B5a and B5b below, the Dubé Proposed Conjoint Survey as described in the Dubé Report will prevent participants from seeing a wide range of *non*-challenged label statements and representations (many of which are prominently displayed in actuality), including, but not limited to:

- *any* depiction of the visual appearance of the packaging (*e.g.*, the design, layout, formatting, colors, aesthetics, imagery, shape/contour,[156] and "look and feel" of the packaging and bottle/can);
- *any* depiction of the size and location of different label statements and imagery;
- the appearance of the AriZona name and logo;
- the flavor/product identity statement (*e.g.*, "Green Tea with Ginseng and Honey," "Fruit Punch Fruit Juice Cocktail"), along with the imagery of the drink itself matching the flavor (*e.g.*, cherry blossoms, 綠茶 ["green tea" in traditional Chinese script], images of different fruits, stylized Southwestern skull-and-feather graphic);
- the statement "ANTIOX VITAMIN C FORTIFIED";
- the entire Nutrition Facts Panel (*e.g.*, showing information such as 100 calories per serving, 25g of sugar per serving, 18 mg (20%) Vitamin C per serving, etc.);
- the named ingredients list, along with its disclosure of citric acid;

and, for the AriZona Green Tea with Ginseng and Honey 23 oz. can, additional representations and aspects like:

- the statement "Enjoy America's best selling ready-to-drink green tea! AriZona Green Tea…Where great taste and goodness 'naturally' come together. Green tea for its health benefits and nature's natural sweetener, honey.";
- the statement "Real Brewed" appearing multiple times around the neck of the can;

[156] Note that Dr. Dubé plans to keep fixed a single size for each brand (*e.g.*, 23oz for AriZona, 33oz for Brisk, etc.), and will apparently *not* vary either the size or form/container type/shape (*e.g.*, can, plastic bottle, etc.) across product "profiles" in his survey. *See* Dubé Report, ¶ 68 (p. 30). However, consumers in the real world can and do make tradeoffs among features like package size and container type/shape, and their preferences toward a particular beverage (including an AriZona beverage) may depend to a considerable degree on such factors, which will be omitted from the Dubé Proposed Conjoint Survey.

- the statement "Great Hot!" in a pink-and-gold oval;
- the statement "An American Company" next to "AriZona" in large letters;
- imagery of the continental U.S. with the American flag inside;

and, for the AriZona Fruit Punch Fruit Juice Cocktail 20 oz. bottle, additional representations and aspects such as:

- the statement "Great Buy! $1.^{00}" appearing on a red ribbon immediately to the left of the "AriZona" brand name on the front;
- the statement "Contains 10% Juice" above the Nutrition Facts panel;
- *any* depiction of the actual beverage (*i.e.*, fruit juice or liquid), which is visible through the transparent plastic bottle.

(*Continues on next page*)

**Figure B5a: Front, Side, and Back Views of an AriZona Green Tea with Ginseng and Honey (23oz) Can**



**Figure B5b: Front, Side, and Back Views of an AriZona Fruit Punch Fruit Juice Cocktail (20 oz) Bottle**




122. The Dubé Proposed Conjoint Survey will completely ignore and omit—and thus will prevent participants from considering in their CBC choices—all of these factors. Critically, the (non-challenged) attributes, benefits, and representations outlined above differentiate among iced tea and juice drink products and are clearly visible or accessible to consumers—both repeat and first-time purchasers of AriZona—during the purchase decision process in the actual marketplace. Omitting such information from the conjoint task will therefore severely distort marketplace conditions and invalidate any price premium estimates derived from the survey.

123. ***Second***, the Dubé Report purports to address omitted product attributes by asserting that "Any other **product features that are not varied will be controlled for in the**

**'brand' effect**, including the actual role of the brand name and any other packaging features or product perceptions."[157] The mere inclusion of brand in a CBC survey in no way appropriately accounts for omitted attributes, including because: (*i*) while brand may be correlated with certain unobserved features, it cannot serve as a direct measure of specific product characteristics and cannot reliably or fully capture the effect of these characteristics when they are omitted; (*ii*) some attributes can affect preferences and choices independent of brand; (*iii*) consumers vary in what aspects they associate or do not associate with a given brand; and (*iv*) first-time purchasers of AriZona (who are included in the putative class definition and for whom the Plaintiffs seek damages) are less likely than repeat-purchasers to have formed specific impressions or associations with the brand.

124. Nor would explicitly instructing participants to hold constant all other attributes not shown in the conjoint task reflect reality. In the actual marketplace, trading off the attributes specified in the conjoint against other aspects (which are omitted from the proposed conjoint survey) is an important part of consumers' purchase decisions. Thus, excluding these aspects from the proposed conjoint survey deviates from marketplace conditions and induces a focalism bias that leads to an overestimation of consumers' purported willingness to pay for the challenged claim.

125. ***Overall***, the Dubé Proposed Conjoint Survey will test consumers' valuations of the challenged "no preservatives" claim using a highly artificial, decontextualized task that fails to present participants with *any* stimulus that approaches a commercially viable and realistic iced tea or juice drink product package. By omitting numerous relevant features, representations, and claims—which Dr. Dubé has *not* empirically shown to be unimportant to consumers—the proposed conjoint survey will essentially place "blinders" on participants by constraining the factors they can weigh in their choices, while artificially highlighting and forcing participants to focus on a narrow set of factors (including a "No Preservatives" label claim). Such an artificial, decontextualized choice task essentially presumes, without evidence, that all consumers uniformly paid attention to a relatively less conspicuous claim that appeared on the back or side

[157] Dubé Report, ¶ 72. Emphasis added.

of the package. This assumption is not empirically grounded and, if anything, is inconsistent with the results of my materiality surveys, in which *very few* participants even mentioned the challenged claim in their purchase reasons.

126. Dr. Dubé's proposed survey, which does not even remotely mirror consumers' marketplace experiences, is thus fundamentally invalid and unreliable, and will fail to predict or quantify actual consumer preferences or WTP. The choices that the Dubé Proposed Conjoint Survey's participants will face are akin to a scenario in which prospective car purchasers are asked to choose among different car models but are informed only about the cars' brands, prices, miles per gallon, and whether or not each car has a cupholder. When forced to make tradeoffs among such a limited, non-representative attribute set, it is not surprising that a consumer would suddenly attach considerable "value" for having a cupholder—even though that consumer may not have otherwise thought or cared about a cupholder. Such a "cupholder effect" would not reflect consumers' actual valuation of this feature in the real world; it would instead be an artifact of the "tunnel vision" and focusing illusion created by presenting consumers with a highly constrained and unrealistic choice task.

### B.4. The Dubé Proposed Conjoint Survey's Repeated Stimuli Presentation Will Exacerbate its Leading Nature, Further Contributing to Inflated and Invalid WTP Estimates

127. Although Dr. Dubé fails to disclose the number of choice tasks and the specific language that will be used in the procedure and questions of his proposed survey, the repeated stimuli presentation in his proposed survey will render the survey's hypotheses obvious to participants. In particular, the Dubé Proposed Conjoint Survey will expose participants to *both* iced tea or juice drink profiles *with* the challenged "no preservatives" claim as well as profiles *without* the challenged claim. This "within-subjects" design[158] will overly sensitize participants

[158] A within-subjects design is a research design in which participants provide a response to an outcome variable or measure (*e.g.*, choice of an iced tea or juice drink) while being exposed to different *levels* of a tested variable (*e.g.*, whether a certain claim, such as "No Preservatives," is present vs. absent on a label). By contrast, in a "between-subjects" design, different groups of participants would be exposed to just one level of a variable. For example, in my materiality surveys, one group of participants indicated their likelihood of purchasing an at-issue AriZona product that displays the challenged claim, while a second

to the challenged claim across the repeated conjoint tasks, thereby guaranteeing participants' attention to, and upward-biasing the associated price premium estimate for, this statement. Over the course of multiple repetitive choices, participants could easily infer that if a "No Preservatives" claim were not important, then why would the researcher create a survey that: (*i*) highlights this same claim over and over, and (*ii*) focuses on a narrow set of attributes at the expense of many other attributes, features, and representations (which consumers would encounter and rely on when purchasing in the category)?

128. One major drawback of such a within-subjects design is that it reveals to participants the factor being investigated and the research hypothesis.[159] Indeed, there is no doubt that such a design would make it obvious to participants that the survey is testing their beliefs, at least in part, about the importance and desirability of certain attributes and levels, including specifically "no preservatives." This, in turn, is likely to lead participants to guess the "expected answers" and respond according to their lay theories about this topic—namely, that a product labeled as "No Preservatives" is better than one without—as opposed to exhibiting their true preferences, choices, and WTP or valuation in the actual marketplace.

129. Overall, based on my various analyses set forth in this *Expert Report*, my professional opinion is that the Dubé Proposed Conjoint Survey is fatally flawed and is not based on scientific methodologies that are reasonably relied upon in this field of expertise. As such, any conclusions that Dr. Dubé or the Plaintiffs would seek to draw from such a proposed survey would be unsubstantiated and would *not* provide reliable and valid estimates of any alleged price premium attributable to the challenged "no preservatives" claim. Nor can Dr. Dubé's proposed conjoint analysis be used to estimate (in any reliable and valid way) damages classwide.

130. I understand that discovery is ongoing and, therefore, reserve the right to supplement and/or revise my opinion and this *Expert Report* in response to any further information provided by the parties and/or in light of additional documents or testimony, which

---

(separate) group of participants indicated their likelihood of purchasing an otherwise identical product, except with the alleged deception "cured" (*e.g.*, with the challenged claim removed).

[159] *See*, *e.g.*, Kahneman, Daniel and Amos Tversky (1996), "On the Reality of Cognitive Illusions," *Psychological Review*, 103(3), 582 – 591; Kivetz and Simonson (2000).

may be brought to my attention after the date of my signature below. This *Expert Report* is to be used only for the purpose of this litigation and may not be published, distributed, or used for any other purpose without my prior written consent.

| | |
|---|---|
| August 31, 2026 | |
| Date | Dr. Ran Kivetz, Ph.D. |

# EXHIBIT A: CURRICULUM VITAE OF DR. RAN KIVETZ

*Academic Curriculum Vitae*

Graduate School of Business, Columbia University, 665 West 130th St., NY, NY 10027
Tel : (212) 854-4555 | e-mail : rk566@columbia.edu

**Education:**

Ph.D., Stanford University, Graduate School of Business
Marketing, September 1996 – June 2000

M.A., Stanford University, Department of Psychology
Psychology, June 2000

B.A., Tel Aviv University
Economics and Psychology, June 1995

**Academic Employment:**

Philip H. Geier, Jr., Professor of Marketing, Columbia University Business School, 2008 – present

Professor of Business, Columbia University Business School, 2006 – 2008

Sidney Taurel Associate Professor of Business, Columbia University Business School, 2004 – 2006

Associate Professor, Columbia University Business School, 2003 – 2004

Assistant Professor, Columbia University Business School, 2000 – 2003

**Publications:**

Barnett, Jonathan M. and Ran Kivetz (2026), "Resilience Through Innovation: Why Israel's Tech Ecosystem Endures," *AEI Economic Perspectives*, 1-16.

Weiss, Liad and Ran Kivetz (2019), "Opportunity Cost Overestimation," *Journal of Marketing Research*, 56(3), 518-533.

Simonson, Itamar and Ran Kivetz (2018), "Bringing (Contingent) Loss Aversion Down to Earth – A Comment on Gal & Rucker's Rejection of "Losses Loom Larger Than Gains," *Journal of Consumer Psychology*, 28(3), 517-522.

Kivetz, Ran, Rachel Meng, and Daniel He (2017), "Hyperopia: A Theory of Reverse Self-Control," in *Handbook of Self-Control in Health and Well-Being*, de Ridder, Denise, Marieke Adriaanse, and Kentaro Fujita (eds), Routledge.

Kivetz, Ran and Yuhuang Zheng (2017), "The Effects of Promotions on Hedonic versus Utilitarian Purchases," *Journal of Consumer Psychology*, 27(1), 59-68.

Keinan, Anat, Ran Kivetz, and Oded Netzer (2016), "The Functional Alibi," *Journal of the Association for Consumer Research*, Special Issue on the Science of Hedonistic Consumption, 1(4), 479-496. (Lead article)

**Publications:** (continued)

Rom Schrift, Ran Kivetz, and Oded Netzer (2016), "Complicating Decisions: The Work Ethic Heuristic and the Construction of Effortful Decisions," *Journal of Experimental Psychology: General*, 145(7), 807-829. (Lead article)

Sela, Aner, Itamar Simonson, and Ran Kivetz (2013), "Beating the Market: The Allure of Unintended Value," *Journal of Marketing Research*, 50(6), 691-705.

Gershoff, Andrew, Ran Kivetz, and Anat Keinan (2012), "Consumer Response to Versioning: How Brands' Production Methods Affect Perceptions of Unfairness," *Journal of Consumer Research*, 39(2), 382–398.

Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, Shari S. and Jerre B. Swann (eds), Chicago, IL: American Bar Association, pp. 243-259.

Keinan, Anat and Ran Kivetz (2011), "Productivity Mindset and the Consumption of Collectable Experiences," *Journal of Consumer Research*, 37(6), 935-950. (*Winner*, 2011 *Ferber Award*)

Schrift, Rom, Oded Netzer, and Ran Kivetz (2011), "Complicating Choice," *Journal of Marketing Research*, 48(2), 308-326. (*Winner*, 2010 *Best Competitive Paper Award*, *Society of Consumer Psychology*)

Urminsky, Oleg and Ran Kivetz (2011), "Scope Insensitivity and the 'Mere Token' Effect," *Journal of Marketing Research*, 48(2), 282-295.

Levav, Jonathan, Ran Kivetz, and K. Cecile Cho (2010), "Motivational Compatibility and Choice Conflict," *Journal of Consumer Research*, 37(3), 429-442.

Keinan, Anat and Ran Kivetz (2008), "Remedying Hyperopia: The Effects of Self-Control Regret on Consumer Behavior," *Journal of Marketing Research*, 45(6), 676-689.

Kivetz, Ran, Oded Netzer, and Rom Schrift (2008), "The Synthesis of Preference: Bridging Behavioral Decision Research and Marketing Science," *Journal of Consumer Psychology*, 18(3), 179-186.

Keinan, Anat and Ran Kivetz (2008), "When Virtue Is a Vice," *Harvard Business Review*, July-August.

Kivetz, Ran, "Farsightedness (2007)," in *International Encyclopedia of the Social Sciences*, 2nd Edition, Darity Jr., William (ed.), Detroit: Macmillan/Thomson Gale.

Kivetz, Ran, Oleg Urminsky, and Yuhuang Zheng (2006), "The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," *Journal of Marketing Research*, 43(1), 39-58. (*Finalist*, 2011 *William O'Dell Award*; *Finalist*, 2007 *Paul Green Award*)

**Publications:** (continued)

Kivetz, Ran and Anat Keinan (2006), "Repenting Hyperopia: An Analysis of Self-Control Regrets," *Journal of Consumer Research*, 33(2), 273-282. (*Finalist*, 2009 *Best Article Award* for a paper published in *JCR* in 2006)

Kivetz, Ran, and Yuhuang Zheng (2006), "Determinants of Justification and Self-Control," *Journal of Experimental Psychology: General*, 135(4), 572-587.

Rottenstreich, Yuval, and Ran Kivetz (2006), "On Decision Making without Likelihood Judgment," *Organizational Behavior and Human Decision Processes*, 101(1), 74-88.

Kivetz, Ran (2005), "Promotion Reactance: The Role of Effort-Reward Congruity," *Journal of Consumer Research*, 31(4), 725-736. (*Winner*, 2005 *Ferber Award*)

Kivetz, Ran, Oded Netzer, and V. Srinivasan (2004), "Alternative Models for Capturing the Compromise Effect," *Journal of Marketing Research*, 41(3), 237-257. (Lead article) (*Finalist*, 2009 *William O'Dell Award*; *Finalist*, 2005 *Paul Green Award*)

Kivetz, Ran, Oded Netzer, and V. Srinivasan (2004), "Extending Compromise Effect Models to Complex Buying Situations and Other Context Effects," *Journal of Marketing Research*, 41(3), 262-268.

Kivetz, Ran (2003), "The Effects of Effort and Intrinsic Motivation on Risky Choice," *Marketing Science*, 22(4), 477-502.

Kivetz, Ran and Itamar Simonson (2003), "The Idiosyncratic Fit Heuristic: Effort Advantage as a Determinant of Consumer Response to Loyalty Programs," *Journal of Marketing Research*, 40(4), 454-467.

Kivetz, Ran and Itamar Simonson (2002b), "Self-Control for the Righteous: Toward A Theory of Pre-Commitment to Indulgence," *Journal of Consumer Research*, 29(2), 199-217. (*Finalist*, 2005 *Best Article Award* for a paper published in *JCR* in 2002)

Kivetz, Ran and Itamar Simonson (2002a), "Earning the Right to Indulge: Effort as a Determinant of Customer Preferences Toward Frequency Program Rewards," *Journal of Marketing Research*, 39(2), 155-170. (*Finalist*, 2007 *William O'Dell Award*)

Kivetz, Ran and Itamar Simonson (2000), "The Effects of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427-448. (*Finalist*, 2005 *William O'Dell Award*)

Kivetz, Ran (1999), "Advances in Research on Mental Accounting and Reason-Based Choice," *Marketing Letters*, 10(3), 249-266.

**Work Under Review or Under Revision in Peer-Reviewed Journals:**

Kivetz, Ran and Rachel Meng, "Circular Self-Rewards vs. Cash (Dis)Incentives: Motivating Effort, Goal Pursuit, and Positive Habits."

Pocheptsova, Anastasiya, Ran Kivetz, and Ravi Dhar, "Consumer Decisions to Rent versus Buy."

**Manuscripts in Preparation:**

Danziger, Shai, Liat Hadar, Ran Kivetz, and Itzhak Gnizy, "Price Quote Format and Inferred Artisanship and Marketing Orientation."

He, Daniel and Ran Kivetz, "Being in the Moment: The Effects of Ephemeral Communication in Social Media."

Shamis, Asaf and Ran Kivetz, "From Colonialism to Networked Colonialism: Personalized Networked Communications and Habermas's Theory of Modern Society."

**Working Papers:**

"Democracy between Private Space, Public Space, and Cyberspace," with Asaf Shamis.

"The Behavioral Economics of Incentives."

"Exercising Self-Control Through Self-reward," with Rachel Meng.

**Selected Research-In-Progress:**

"The Surprising Robustness of Prospect Theory in the Long Run."

"The Effects of Reward Programs," with Ricardo Montoya and Oded Netzer.

"The Bounded Rationality of Effort-Reward Choices: When Principles Overshadow Expectancies," with Oleg Urminsky.

"The Intersection of Behavioral Economics and Political Science."

"A Republic of Selfies: Personalizing Public Messages in Digital Media," with Asaf Shamis & Daniel He.

"Tie Signaling in Social Media," with Daniel He.

"Consumer Search."

**Academic Honors and Awards:**

Finalist, 2016 William O'Dell Award for the Journal of Marketing Research article published in 2006 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Faculty Fellow of the Institute for Social and Economic Research and Policy, 2002-2015

Ranked by the American Marketing Association as one of the Top 50 most productive scholars in the premier marketing journals during 2010–2014

Finalist, 2014 Best Article Award for the Journal of Consumer Research article published in 2011

Ranked by the American Marketing Association as one of the Top 50 most productive scholars in the premier marketing journals during 2009-2013

Finalist, 2011 William O'Dell Award for the Journal of Marketing Research article published in 2006 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Winner of the 2010 Best Competitive Paper Award granted by the Society of Consumer Psychology

Rated as the fourth most prolific scholar in the leading marketing journals during 1982-2006 (Seggie, S. H. and D. A. Griffith, 2009; "What Does It Take to Get Promoted in Marketing Academia? Understanding Exceptional Publication Productivity in the Leading Marketing Journals," Journal of Marketing, 73(1), 122-132.)

Finalist, 2009 William O'Dell Award for the Journal of Marketing Research article published in 2004 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice."

Finalist, 2009 Best Article Award for the Journal of Consumer Research article published in 2006

Winner of the 2007 Early Contribution Award from the Society of Consumer Psychology

Finalist, 2007 William O'Dell Award for the Journal of Marketing Research article published in 2002 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Finalist, 2007 Paul Green Award for the Journal of Marketing Research article published in 2004 that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing"

Winner of the 2005 Ferber Award granted to the "best interdisciplinary dissertation article published in the latest volume of the Journal of Consumer Research"

**Academic Honors and Awards:** (continued)

Finalist, 2005 William O'Dell Award for the Journal of Marketing Research article published in 2000 that "made the most significant long-term contribution to marketing theory, methodology, and/or practice"

Finalist, 2005 Best Article Award for the Journal of Consumer Research article published in 2002

Finalist, 2005 Paul Green Award for the Journal of Marketing Research article published in 2004 that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing."

Winner of the 2005 Columbia Business School Dean's Award for Innovation in the Curriculum

Lang Faculty Research Fellowship in Entrepreneurship, 2005

Lang Faculty Research Fellowship in Entrepreneurship, 2004

Outstanding Reviewer Award, Journal of Consumer Research, 2003-2004

Invited as Faculty Presenter, 2004 Association for Consumer Research Doctoral Symposium

Young Scholars Program, Marketing Science Institute, 2003

Research Grant, Columbia Center for Excellence in E-Business, 2003

Seed Grant, Institute for Social and Economic Research and Policy, 2001

Doctoral Consortium Fellow, American Marketing Association, 1999

Ph.D. Merit Award, Stanford Graduate School of Business, 1999

Graduate Fellow and Grant, Stanford Center on Conflict and Negotiation, 1997-1998

Jaedicke Award Scholar (in recognition of outstanding academic performance), Stanford Graduate School of Business, 1996-1997

Dean's Honor List with Distinction, Faculty of Social Sciences (Economics), Tel Aviv University, 1995

*****************

**Teaching:**

Winner of the Columbia Business School 2005 Dean's Award for Innovation in the Curriculum

*Ph.D. Courses*

Bridging Behavioral Economics with Marketing Science (Fall 2023)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Economics with Marketing Science (Spring 2022)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Economics with Marketing Science (Fall 2019)
Student Evaluation 4.9 on 5-point scale

Bridging Behavioral Economics with Marketing Science (Spring 2018)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Economics with Marketing Science (Spring 2016)
Student Evaluation 4.2 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2013)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2011)
Student Evaluation 4.7 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2008)
Student Evaluation 5.0 on 5-point scale

Bridging Behavioral Decision Research with Marketing Science (Spring 2005)
Student Evaluation 4.8 on 5-point scale

Consumer Behavior – I (Fall 2005)
Student Evaluation 4.7 on 5-point scale

Multidisciplinary Approaches to Human Decision Making (Spring 2004)

Bridging Behavioral Decision Research with Marketing Science (Spring 2003)
Student Evaluation 4.8 on 5-point scale

Multidisciplinary Approaches to Human Decision Making (Spring 2002)

Totally Eclectic Seminar in Marketing (Spring 2001)
Student Evaluation 6.2 on 7-point scale

**Teaching:** (continued)

*High-Technology Entrepreneurship (Executive MBA Elective)*

Spring 2026 (1 section) – co-taught with Gary Singer

Student Evaluation 4.5 on 5-point scale

Spring 2025 (1 section) – co-taught with Gary Singer
Student Evaluation 4.7 on 5-point scale

Spring 2024 (1 section) – co-taught with Gary Singer
Student Evaluation 4.4 on 5-point scale

**Teaching:** (continued)

Spring 2023 (1 section) – co-taught with Gary Singer
Student Evaluation 4.5 on 5-point scale

Spring 2019 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2018 (1 section)
Student Evaluation 4.6 on 5-point scale

Spring 2017 (1 section)
Student Evaluation 4.5 on 5-point scale

*High-Technology Entrepreneurship (Executive MBA & MBA Elective)*

Spring 2016 (1 section)
Student Evaluation 4.6 on 5-point scale

Spring 2009 (Master Class: 1 section)
Student Evaluation 4.7 on 5-point scale

Spring 2008 (Master Class: 1 section)
Student Evaluation 4.4 on 5-point scale

*High-Technology Marketing and Entrepreneurship (Executive MBA Elective)*

Spring 2008 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2006 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2005 (1 section)
Student Evaluation 4.9 on 5-point scale

Spring 2004 (1 section)
Student Evaluation 5.0 on 5-point scale

Spring 2003 (1 section)
Student Evaluation 5.0 on 5-point scale

Spring 2001 (1 section)
Student Evaluation 6.5 on 7-point scale

*High-Technology Marketing and Entrepreneurship (MBA Elective)*

Spring 2007 (1 section)
Student Evaluation 4.3 on 5-point scale

Spring 2006 (1 section)
Student Evaluation 4.5 on 5-point scale

Spring 2004 (1 section)

**Teaching:** (continued)

*High-Technology Marketing and Entrepreneurship (MBA Elective)*

Student Evaluation 4.9 on 5-point scale

Spring 2003 (1 section)
Student Evaluation 4.4 on 5-point scale

Spring 2002 (1 section)
Student Evaluation 6.4 on 7-point scale

Spring 2001 (1 section)
Student Evaluation 6.4 on 7-point scale

*Marketing Strategy and Management (Core Executive MBA Course)*

Spring 2026 (2 sections)
Student Evaluations 4.2 and 4.2 on 5-point scales

Spring 2024 (2 sections)
Student Evaluations 4.2 and 3.9 on 5-point scales

Fall 2023 (2 sections)
Student Evaluations 4.7 and 4.5 on 5-point scales

Spring 2023 (2 sections)
Student Evaluations 4.1 and 4.3 on 5-point scales

Fall 2022 (2 sections)
Student Evaluations 4.4 and 4.3 on 5-point scales

Spring 2022 (2 sections)
Student Evaluations 4.3 and 4.2 on 5-point scales

Spring 2021 (2 sections)
Student Evaluations 4.1 and 4.1 on 5-point scales

Fall 2020 (2 sections)
Student Evaluations 4.0 and 3.7 on 5-point scales

Spring 2020 (2 sections)
Student Evaluations 3.8 and 3.7 on 5-point scales

Fall 2019 (1 section)
Student Evaluation 4.9 on 5-point scale

**Teaching:** (continued)

Spring 2019 (2 sections)
Student Evaluations 4.2 and 3.2 on 5-point scales

Fall 2018 (1 section)
Student Evaluation 4.8 on 5-point scale

Spring 2016 (1 section)
Student Evaluation 5.0 on 5-point scale

**Teaching:** (continued)

Spring 2012 (2 sections)
Student Evaluations 4.7 and 4.9 on 5-point scales

*Marketing Strategy (Core MBA Course)*

Fall 2023 (3 sections)
Student Evaluations 4.2, 3.9, and 4.0 on 5-point scales

Fall 2013 (3 sections)
Student Evaluations 4.1, 3.8, and 4.1 on 5-point scales

Fall 2012 (3 sections)
Student Evaluations 3.9, 3.1, and 3.2 on 5-point scales

Fall 2011 (3 sections)
Student Evaluations 4.4, 3.8, and 4.1 on 5-point scales

Fall 2010 (3 sections)
Student Evaluations 4.5, 3.7, and 4.2 on 5-point scales

Fall 2009 (3 sections)
Student Evaluations 4.4, 4.3, and 4.2 on 5-point scales

*Marketing Management (Undergraduate Course)*

Fall 2019 (1 section)
Student Evaluations 4.3 on 5-point scale

Spring 2019 (1 section)
Student Evaluations 4.4 on 5-point scale

Fall 2018 (1 section)
Student Evaluations 4.7 on 5-point scale

Spring 2017 (1 section)
Student Evaluations 4.8 on 5-point scale

Spring 2014 (1 section)
Student Evaluations 4.7 on 5-point scale

*The Marketing of a Nation: Israel (Master Class)*

Spring 2009 (1 section)
Student Evaluation 4.8 on 5-point scale

*Columbia Business School Global Immersion Program*

Global Immersion Israel: Leadership & Innovation (March 2018)

*Columbia Business School Executive Education Program*

Design Your Innovation Blueprint (March 2017)
Innovate on Demand (November 2014; November 2015)
Innovation and Entrepreneurship (IE) @Columbia (February 2013; February 2014)
Columbia Senior Executive Program (May 2010; October 2010; May 2011; July 2012)

**Teaching:** (continued)
Marketing and Innovation (June 2013; June 2014; November 2014)
Customer Centricity (May 2010; September 2010; October 2011; February 2012)
New Product Development and Innovation (October 2002; June 2003)
Marketing Management: Strategies, Processes & Tools for Today's Challenges (Sep. 02; Apr. '03)
Marketing Management (April 2002)
Marketing Management in the New Economy (April 2001)

**Main Advisor for:**

Daniel He, Assistant Professor at the National University of Singapore (NUS)

Anat Keinan, Associate Professor at Boston University (formerly Associate Professor at Harvard Business School)

Rachel Meng

Rom Schrift, Associate Professor at Indiana University (formerly Assistant Professor at Wharton; co-advisor with Oded Netzer)

Oleg Urminsky, Full Professor at Chicago Booth School of Business

Yuhuang Zheng, Associate Professor at Tsinghua University

**Doctoral Committee Member for:**

Tamar Avnet, University of Toronto

Josko Brakus, University of Rochester

Cecile Cho, University of California Riverside

Yael Karlinsky-Shichor, Northeastern University

Yaoli Mao, Autodesk, Inc.

Valentina Melnyk, Tilburg University

Anirban Mukhopadhyay, Hong Kong University of Science and Technology (HKUST)

Qitian Ren, Chinese University of Hong Kong (Shenzhen)

Aner Sela, University of Florida

Kavita Srivastava, Indian Institute of Technology

Liad Weiss, University of Wisconsin – Madison

*****************

**Conference Publications:**

Danziger, Shai, Liat Hadar, Ran Kivetz, and Itzhak Gnizy (2019), "Price Quote Format and Inferred Artisanship and Marketing Orientation," special session paper presented at Society for Consumer Psychology Conference (SCP), Savannah, GA.

He, Daniel and Ran Kivetz (2017), "Technology-Driven Consumption," special session presented at Society for Consumer Psychology Conference (SCP), San Francisco, CA.

He, Daniel and Ran Kivetz (2016), "Ephemeral Messaging: Intimacy, Spontaneity, and Creativity in Fleeting Experiences," competitive paper presented at Association for Consumer Research Conference (ACR), Berlin, Germany.

Meng, Rachel and Ran Kivetz (2016), "Motivating Choices and Performance: Beyond Monetary Incentives," Association for Consumer Research Conference (ACR), Berlin, Germany.

He, Daniel and Ran Kivetz (2015), "Tie Signaling," in *NA – Advances in Consumer Research* Volume 43, eds. Kristin Diehl and Carolyn Yoon, Duluth, MN: Association for Consumer Research.

Netzer, Oded, Ran Kivetz, and Rom Schrift (2015), "Complicating Decisions: the Effort-Outcome Link and the Construction of Effortful Decision Processes," in *NA – Advances in Consumer Research* Volume 43, eds. Kristin Diehl and Carolyn Yoon, Duluth, MN: Association for Consumer Research.

Weiss, Liad and Ran Kivetz (2014), "Following-Through Opportunities: the Effects of Incidental Versus Inherent Choices," in *NA – Advances in Consumer Research* Volume 42, eds. June Cotte and Stacy Wood, Duluth, MN: Association for Consumer Research.

Simonson, Itamar, Aner Sela, and Ran Kivetz (2013), "Beating the Market: Competitive Mindset and the Allure of Unintended Value," in *NA – Advances in Consumer Research* Volume 41, eds. Simona Botti and Aparna Labroo, Duluth, MN: Association for Consumer Research.

Weiss, Liad and Ran Kivetz (2011), "When Not Redeeming a Coupon Feels Like Missing More Than Its Value," in *E – European Advances in Consumer Research* Volume 9, eds. Alan Bradshaw, Chris Hackley, and Pauline Maclaran, Duluth, MN: Association for Consumer Research.

Schrift, Rom, Ran Kivetz, and Oded Netzer (2011), "Creating the Illusion of Choice Through Selective Information Search and Retrieval," in *NA – Advances in Consumer Research* Volume 39, eds. Rohini Ahluwalia, Tanya L. Chartrand, and Rebecca K. Ratner, Duluth, MN: Association for Consumer Research.

Schrift, Rom, Oded Netzer, and Ran Kivetz (2010), "Complicating Choice," in *NA – Advances in Consumer Research* Volume 37, eds. Margaret C. Campbell, Jeff Inman, and Rik Pieters, Duluth, MN: Association for Consumer Research.

**Conference Publications:** (continued)

Sela, Aner, Itamar Simonson, and Ran Kivetz (2010), "Negative Effects of Explicit Customization on Perceptions of Opportunity," in *NA – Advances in Consumer Research* Volume 37, eds. Margaret C. Campbell, Jeff Inman, and Rik Pieters, Duluth, MN: Association for Consumer Research.

Keinan, Anat, Ran Kivetz, and Oded Netzer (2009), "Functional Alibi," in *NA – Advances in Consumer Research* Volume 36, eds. Ann L. McGill and Sharon Shavitt, Duluth, MN: Association for Consumer Research.

Kivetz, Ran and Anat Keinan (2009), "Hyperopia: A Theory of Reverse Self-Control," in *NA – Advances in Consumer Research* Volume 36, eds. Ann L. McGill and Sharon Shavitt, Duluth, MN: Association for Consumer Research.

Zheng, Yuhuang and Ran Kivetz (2009), "The Differential Promotion Effectiveness on Hedonic Versus Utilitarian Products," in *NA – Advances in Consumer Research* Volume 36, eds. Ann L. McGill and Sharon Shavitt, Duluth, MN: Association for Consumer Research.

Pocheptsova, Anastasiya, Ran Kivetz, and Ravi Dhar (2008), "Consumer Decisions to Rent Vs. Buy," in *NA – Advances in Consumer Research* Volume 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research.

Keinan, Anat and Ran Kivetz (2008), "Productivity Mindset and the Consumption of Collectable Experiences," in *NA – Advances in Consumer Research* Volume 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research.

Levav, Jonathan, Ran Kivetz, and Cecile Cho (2008), "Too Much Fit? How Regulatory Fit Can Turn Us Into Buridan's Asses," in *NA – Advances in Consumer Research* Volume 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research.

Keinan, Anat and Ran Kivetz (2007), "Remedying Hyperopia: the Effects of Self-Control Regret on Consumer Behavior," in *NA – Advances in Consumer Research* Volume 34, eds. Gavan Fitzsimons and Vicki Morwitz, Duluth, MN: Association for Consumer Research.

Urminsky, Oleg and Ran Kivetz (2007), "Scope Insensitivity in the Service of the Rational Self: the 'Mere Token' Effect," in *NA – Advances in Consumer Research* Volume 34, eds. Gavan Fitzsimons and Vicki Morwitz, Duluth, MN: Association for Consumer Research.

Zheng, Yuhuang and Ran Kivetz (2007), "Effort, Excellence and Income Stinginess: How Do People Justify Self-Gratification?," in *E – European Advances in Consumer Research* Volume 8, eds. Stefania Borghini, Mary Ann McGrath, and Cele Otnes, Duluth, MN: Association for Consumer Research.

Kivetz, Ran and Drazen Prelect (2006), "Goal Distance and Consumer Choice," in *NA – Advances in Consumer Research* Volume 33, eds. Connie Pechmann and Linda Price, Duluth, MN: Association for Consumer Research.

**Conference Publications:** (continued)

Kivetz, Ran and Klaus Wertenbroch (2006), "Emerging Perspectives on Self-Control," in *NA – Advances in Consumer Research* Volume 33, eds. Connie Pechmann and Linda Price, Duluth, MN: Association for Consumer Research.

Chernev, Alexander and Ran Kivetz (2005), "Goals and Mindsets in Consumer Choice," in *NA - Advances in Consumer Research*, eds. Gita Menon and Akshay Rao, Volume 32, Provo, UT: Association for Consumer Research.

Kivetz, Ran, Oded Netzer, and V. Srinivasan (2002), "Alternative Models for Capturing the Compromise Effect," in *NA – Advances in Consumer Research*, ed. Punam Anand Keller and Dennis Rook, Volume 30, Provo, UT: Association for Consumer Research.

Kivetz, Ran (2001), "Consumer Preferences Towards Frequency Programs," in *NA – Advances in Consumer Research* Volume 28, eds. Mary C. Gilly and Joan Meyers-Levy, Valdosta, GA : Association for Consumer Research.

Kivetz, Ran and Michal Strahilevitz (2001), "Factors Affecting Consumer Choices Between Hedonic and Utilitarian Options," in *NA – Advances in Consumer Research* Volume 28, eds. Mary C. Gilly and Joan Meyers-Levy, Valdosta, GA : Association for Consumer Research.

Kivetz, Ran (2000), "Hedonic and Utilitarian Motivations in Consumer Choice," in *NA – Advances in Consumer Research* Volume 27, eds. Stephen J. Hoch and Robert J. Meyer, Provo, UT: Association for Consumer Research.

Kivetz, Ran (1999), "Advances in Research on Mental Accounting and Reason-Based Choice," in HEC Symposium on *Advances in Choice Theory*, Conference Summary, Report No. 99-121, Gilles Laurent (ed.), Marketing Science Institute.

Chakravarti, Agnish, Susan Chiu, Ran Kivetz, and Itamar Simonson (1999), "Regret and Self-Congratulation From the Head and From the Heart," Advances in Consumer Research, ed. Eric J. Arnould and Linda M. Scott, Volume 26, Provo, UT: Association for Consumer Research.

**Selected Conference Presentations:**

"Self-Rewards and Cash (Dis)Incentives," with Rachel Meng, Marketing Analytics Symposium, Sydney, Australia, February 2020.

"Change – Attention – Shift," with Rachel Meng, 11th Triennial Invitational Choice Symposium, May – June 2019.

"Self-Rewards and Cash (Dis)Incentives," 4th Coller Conference on Behavioral Economics, Tel Aviv, Israel, June 2019.

"Self-Rewards and Cash (Dis)Incentives" with Rachel Meng, INFORMS Marketing Science Conference, Rome, Italy, June 2019.

**Selected Conference Presentations:** (continued)

"Technology-Driven Consumption," with Daniel He, Society for Consumer Psychology Conference (SCP), San Francisco, CA, 2017.

"The Consumption of Digital Live Content: How Live Streaming Enhances Engagement in Uninteresting Content," with Daniel He and Jonathan Hurwitz, Association for Consumer Research Conference (ACR), San Diego, CA, 2017.

"The Compensation-Driven Nature of Monetary Rewards," with Rachel Meng, Society for Consumer Psychology Conference (SCP), San Francisco, CA, 2017.

"Ephemeral Messaging: Intimacy, Spontaneity, and Creativity in Fleeting Experiences," with Daniel He, Association for Consumer Research Conference (ACR), Berlin, Germany, 2016.

"Motivating Choices and Performance: Beyond Monetary Incentives," with Rachel Meng, Association for Consumer Research Conference (ACR), Berlin, Germany, 2016.

"Consumer Decisions to Rent versus Buy," with Anastasiya Pocheptsova and Ravi Dhar, Association for Consumer Research Conference, Berlin, Germany, 2016.

"Motivating Choices and Performance: Beyond Monetary Incentives," with Rachel Meng, Society for Judgment and Decision Making, Boston, Massachusetts, 2016.

"Opportunity Cost Overestimation in Choices among Opportunities versus Alternatives," with Liad Weiss, Society for Judgment and Decision Making, Boston, Massachusetts, 2016.

"Consumer Behavior in Social Media" with Daniel He, Association for Consumer Research Conference, New Orleans, LA, October 2015.

"Illusions of Preference Construction," with Rom Schrift and Oded Netzer, Association for Consumer Research Conference, New Orleans, LA, October 2015.

"Creating the Illusion of Choice through Selective Information Search and Retrieval," with Rom Schrift and Oded Netzer, Association for Consumer Research Conference, St. Louis, MO, October 2011.

"Seeing-Through Opportunities: The Effects of Incidental versus Inherent Choices" with Liad Weiss, Judgment and Decision Making Conference, Seattle, WA, November 2011.

"The Effects of Reward Programs" with Ricardo Montoya and Oded Netzer, INFORMS Marketing Science Conference, Rice University, Houston, TX, June 2011.

"Complicating Choice," with Rom Schrift and Oded Netzer, Society for Consumer Psychology Conference, St. Pete Beach, FL, February 2010.

"Complicating Choice," with Rom Schrift and Oded Netzer, Judgment and Decision Making Conference, Boston, MA, November 2009.

**Selected Conference Presentations:** (continued)

"Using Survey Controls Effectively," NAD Annual Conference: What's New in Comparative Advertising, Claim Support and Self-Regulation?, New York, NY, October 2009.

"Complicating Choice," with Rom Schrift and Oded Netzer, Association for Consumer Research Conference, Pittsburgh, PA, September 2009.

"Hyperopia: A Theory of Reverse Self-Control," with Anat Keinan, Association for Consumer Research Conference, San Francisco, CA, October, 2008.

"The Functional Alibi," with Anat Keinan and Oded Netzer, Association for Consumer Research Conference, San Francisco, CA, October 2008.

"The Impact of Marketing Promotions on Hedonic versus Utilitarian Purchases," with Yuhuang Zheng, Association for Consumer Research Conference, San Francisco, CA, October 2008.

"The Functional Alibi," with Anat Keinan and Oded Netzer, 11th Biennial Behavioral Decision Research in Management Conference, San Diego, CA, April 2008.

"From Diligence to Hindrance," with Rom Schrift and Oded Netzer, Marketing in Israel Conference, Tel Aviv University, Tel Aviv, Israel, December 2008.

"Hyperopia," University of Pennsylvania (Wharton), Philadelphia, PA, June 2007.

"Consumer Decisions to Rent versus Buy," with Anastasiya Pocheptsova and Ravi Dhar, Association for Consumer Research Conference, Memphis, TN, October 2007.

"Productivity Mindset and the Consumption of Collectable Experiences," with Anat Keinan, Association for Consumer Research Conference, Memphis, TN, October 2007.

"Too Much Fit? How Regulatory Fit Can Turn Us into Buridan's Asses," with Jonathan Levav and K. Cecile Cho, Association for Consumer Research Conference, Memphis, TN, October 2007.

"Remedying Hyperopia: The Effects of Self-Control Regret on Consumer Behavior," with Anat Keinan, 10th Biennial Behavioral Decision Research in Management Conference, Los Angeles, CA, June 2006.

"Scope Insensitivity and The Mere Token Effect," with Oleg Urminsky, 10th Biennial Behavioral Decision Research in Management Conference, Los Angeles, CA, June 2006.

"Hyperopia: A Theory of Reverse Self-Control", Symposium on "Self-Control Processes: New Theoretical and Empirical Directions," Society for Personality and Social Psychology Annual Meeting, Palm Springs, California, 2006.

**Selected Conference Presentations:** (continued)

"The Psychology of Rewards: Principles of Expectancies?," with Oleg Urminsky, Judgment and Decision Making Conference, Toronto, Canada, November 2005.

"Repenting Hyperopia: An Analysis of Self-Control Regrets," with Anat Keinan, Judgment and Decision Making Conference, Toronto, Canada, November 2005.

"Goal Distance and Consumer Choice" (Session Co-Chair), and "The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," with Oleg Urminsky and Yuhuang Zheng, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"Emerging Perspectives on Self-Control" (Session Co-Chair), and "Determinants of Justification and Self-Control," with Yuhuang Zheng, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"Repenting Hyperopia: An Analysis of Self-Control Regrets," with Anat Keinan, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"Inducing Hyperopia through Inconsequential Early Rewards: A Consumer-Welfare-Enhancing Violation of the Invariance Axiom," with Oleg Urminsky, Association for Consumer Research Conference, San Antonio, Texas, October 2005.

"The Effects of Effort and Intrinsic Motivation on Risky Choice," INFORMS Marketing Science Conference, Emory University, Atlanta, GA, June 2005.

"The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," with Oleg Urminsky and Yuhuang Zheng, INFORMS Marketing Science Conference, Emory University, Atlanta, GA, June 2005.

"The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," with Oleg Urminsky and Yuhuang Zheng, Judgment and Decision Making Conference, Minnesota, November 2004.

"The Effects of Effort and Intrinsic Motivation on Risky Choice," Judgment and Decision Making Conference, Minnesota, November 2004.

Invited to present in session on "Goals, Impulses, and Self-Control," Association for Consumer Research Doctoral Symposium, Portland, Oregon, October 2004.

Discussion Leader for special session on "Simple Payments and Complex Rewards…," Association for Consumer Research Conference, Portland, Oregon, October 2004.

"Promotion Reactance: The Role of Effort-Reward Congruity," Association for Consumer Research Conference, Portland, Oregon, October 2004.

**Selected Conference Presentations:** (continued)

"Principles or Probabilities: When Value Overshadows Expected Value," with Oleg Urminsky, Association for Consumer Research Conference, Portland, Oregon, October 2004.

"How do Promotion Programs Affect Consumers' Purchase Decisions: A Behavioral Perspective," with Yuhuang Zheng, INFORMS Marketing Science Conference, Erasmus University, Rotterdam, The Netherlands, June 2004.

Discussion Leader for special session on "Understanding the Evaluation of Future Events," Association for Consumer Research Conference, Toronto, Canada, October 2003.

"Consumer Self-Control and Time-Discounting," with Oleg Urminsky, Judgment and Decision Making Conference, Vancouver, Canada, November 2003.

"Mindsets of Decision Making," with Yuval Rottenstreich, Judgement and Decision Making Conference, Vancouver, Canada, November 2003.

"Consumer Self-Control and Time-Discounting," with Oleg Urminsky, Association for Consumer Research Conference, Toronto, Canada, October 2003.

"The Effects of Effort and Intrinsic Motivation on Risky Choice," Marketing Science Institute Young Scholars Program, Park City, UT, March 2003.

"Does the End Justify the Means? The Impact of Effort on Preferences toward the Certainty and Magnitude of Rewards," Association for Consumer Research Conference, Atlanta, GA, 2002.

"Alternative Models for Capturing the Compromise Effect," with Oded Netzer and V. Srinivasan, Association for Consumer Research Conference, Atlanta, GA, October 2002.

"Alternative Models for Capturing the Compromise Effect," with Oded Netzer and V. Srinivasan, Marketing Science Conference, Alberta, Canada, June 2002.

"Self-Control for the Righteous: Toward a Theory of Pre-Commitment to Indulgence," with Itamar Simonson, Four School Seminar, New York University, May 2002.

"Self-Control for the Righteous: Toward a Theory of Luxury Pre-commitment," with Itamar Simonson, Judgment and Decision Making Conference, Orlando, FL, November 2001.

"The Influence of Hedonic Concreteness on Mood Regulation versus Mood Congruency," with Yifat Kivetz, Association for Consumer Research Conference, Austin, TX, October 2001.

"Self-Control for the Righteous: Toward a Theory of Luxury Pre-commitment," with Itamar Simonson, UC Berkeley Choice Symposium, Monterey, CA, June 2001.

"Consumer Preferences Towards Frequency Programs" (Session Chair), and "The Effects of Effort and Idiosyncratic Fit on Preference Towards Frequency Programs," with Itamar Simonson, Association for Consumer Research Conference, Salt Lake City, Utah, October 2000.

**Selected Conference Presentations:** (continued)

"Consumer Choices between Hedonic and Utilitarian Options" (Session Co-Chair), and "Earning the Right to Indulge: Effort as a Determinant of Customer Preferences Towards Frequency Program Rewards," with Itamar Simonson, ACR Conference, Salt Lake City, Utah, October 2000.

"Hedonic and Utilitarian Motivations in Consumer Choice" (Session Chair), and "The Joyless Consumer: Using Self-Control Strategies to Increase Hedonic Consumption," with Itamar Simonson, Association for Consumer Research Conference, Columbus, Ohio, October 1999.

"The Effects of Incomplete Information on Consumer Choice," with Itamar Simonson, Association for Consumer Research Conference, Columbus, Ohio, October 1999.

"Regret and Self-Congratulation From the Head and From the Heart," with Chakravarti, Agnish, Susan Chiu, and Itamar Simonson, Association for Consumer Research Conference, Montreal, Canada, October 1998.

"Intransitive Consumer Choice: The Effects of Incomplete Information," with Itamar Simonson, HEC Choice Symposium, Groupe HEC, Jouy-en-Josas (Paris), France, July 1998.

"Intransitive Consumer Choice: The Effects of Incomplete Information," with Itamar Simonson, INFORMS Israel, Tel Aviv, Israel, June 1998.

"Intransitive Consumer Choice: The Effects of Incomplete Information," with Itamar Simonson, Boulder-Colorado Behavioral Decision Theory Camp, Boulder, Colorado, October 1997.

"The Psychology of Versioning: Counterfactual Thinking as a Determinant of Fairness Perceptions and Choice," with Andrew Gershoff, ACR Conference, Toronto, Canada, October 2003.

**Selected Invited Talks:**

Vienna University of Economics and Business, June 2024

INSEAD – France, June 2024

Arison School of Business, The Interdisciplinary Center Herzliya (IDC). November 2022

Marketing Analytics Symposium – Sydney (MASS), February 2020

11th Triennial Invitational Choice Symposium, May-June 2019

4th Coller Conference on Behavioral Economics, June 2019, Tel Aviv

"Marketing Israel," Israeli-American Council.

Licensing Executives Society (LES) 2012 Winter Meeting. March 2012

American Bar Association Section of Antitrust Law. November 2010

**Selected Invited Talks:** (continued)

Tel Aviv University, Recanati Graduate School of Business Administration. August 2010

The 2009 NAD Annual Conference: What's New in Comparative Advertising, Claim Support and Self-Regulation? October 2009

New York University psychology department. March 2009

Israel Business Conference. December 2008

Stanford University, Graduate School of Business, marketing department. October 2008

Olin Business School at Washington University. May 2008

Duke University marketing department. April 2008

Yale University marketing department. April 2007

MIT marketing department. September 2006

University of Chicago marketing department. January 2006

Arison School of Business, The Interdisciplinary Center Herzliya (IDC). January 2006

Tilburg University, Faculty of Economics and Business Administration and Tias Business School, Marketing Research Camp. December 2005

Northwestern University (Kellogg), Marketing Research Camp. September 2005

Stanford University, Graduate School of Business, marketing department. May 2005

University of Pennsylvania (Wharton), Philadelphia PA. November 2004

University of Florida marketing department, Winter Research Retreat. March 2004

Marketing Modellers Group, New York. March 2004

Center for the Decision Sciences, Columbia University. April 2003

Young Scholars Program, Marketing Science Institute. March 2003

MIT marketing department. February 2003

University of Chicago marketing department. January 2003

School of Business, Rutgers University – Camden Campus. November 2002

Arison School of Business, The Interdisciplinary Center Herzliya (IDC). June 2002

Social Psychology Network, Columbia University. May 2002

Center for the Decision Sciences, Columbia University. April 2002

NYU marketing department. March 2002

**Selected Invited Talks:** (continued)

UC Berkeley marketing department. November 2001

2001 UC Berkeley Invitational Choice Symposium. June 2001

University of Texas at Austin, marketing research camp. April 2001

MIT marketing department. April 2001

Center for the Decision Sciences, Columbia University. February 2001

Northwestern University, Evanston Illinois. December 1999

Duke University, Durham NC. November 1999

University of Chicago, Chicago Illinois. November 1999

Cornell University, Ithaca NY. November 1999

Dartmouth College, Hanover, New Hampshire. November 1999

University of California, Berkeley, Berkeley CA. October 1999

Yale University, New Haven Connecticut. October 1999

University of Pennsylvania (Wharton), Philadelphia PA. October 1999

Columbia University, New York NY. October 1999

University of Southern California, Los Angeles CA. October 1999

Stanford University Psychology Department, Stanford CA. November 1998

1998 Groupe HEC Invitational Choice Symposium. July 1998

Boulder-Colorado Behavioral Decision Theory Camp, Boulder, Colorado. October 1997.

*****************

**External Professional Activities & Service:**

Guest Editor:

*Journal of Marketing Research*

Guest Area/Associate Editor:

*Marketing Science*
*Management Science*
*Association for Consumer Research*

Reviewer:

*Journal of Marketing Research, Marketing Science, Marketing Letters, Quantitative Marketing and Economics, Applied Economics Research Bulletin, Journal of Experimental Psychology: General, Psychological Science, Journal of Consumer Research, Journal of Consumer Psychology, Journal of Marketing, International Journal of Research in Marketing, Organizational Behavior and Human Decision Processes, Journal of Behavioral Decision Making, Journal of Service Research, Journal of Economic Psychology, Association for Consumer Research, Society for Consumer Psychology, Behavioral Decision Research in Management Conference, National Science Foundation.*

Intel Science Talent Search, Advisor for:

Gregg Gefen, Great Neck North High School (Semi-finalist, 2002)

Jukay Hsu, Stuyvesant High School (Semi-finalist, 2001)

*****************

**Internal Professional Activities & Service:**

Service to University:

M.S. in Entrepreneurship & Innovation Working Group, 2016

Co-chair of the Provost's Faculty Advisory Committee on Entrepreneurship, 2013-2014

Faculty Fellow of the Institute for Social and Economic Research and Policy (ISERP), 2002-2015

Guest Speaker, Columbia University & Columbia Business School Chicago Alumni Clubs

Panel Discussant, "The Psychology of Money," Columbia University Annual Alumni and Development Officers Retreat, July 15, 2009

Panel Discussant, "The Psychology of Money," GSAS Conversations with Alumni, Columbia University Graduate School of Arts and Sciences, April 20, 2009

Service to Business School:

Member of the Marketing Division Senior Faculty Recruiting Committee, 2018 – 2022

Junior Faculty Research Liaison Committee, 2015 – 2019

Columbia Business School's Conflict of Interest and Conflict of Commitment Policy Review Committee, 2017

Strategy Creation Committee, 2013 – 2014

Core-Coordinator Committee, 2012 – 2014

Committee on the Structure of the Core, 2012

Faculty Committee on the Core Curriculum, 2011-2012

Committee on Enhancing the Effectiveness of the Core Curriculum, 2011

Faculty Ad-Hoc Committee on Columbia Business School Budget Guidelines, 2009

Columbia Business School Green Committee, 2009

Project Adviser for MBA and Executive MBA Independent Projects, 2002-present

MBA Admissions Committee, 2002 – 2006

Finance (Real Estate) Division Faculty Search Committee, 2003-2004

Management Division Faculty Search Committee, 2001-2002

Student Faculty Academic Affairs Committee (SFAAC), 2000-2001

*****************

**Internal Professional Activities & Service:** (continued)

Service to Marketing Division:

Chair of the Marketing Division Communications and Outreach Committee, 2019 – 2020, 2023 – 2024

Member of the Marketing Division Faculty Recruiting Committee, 2020 – 2023

Member of the Marketing Division Senior Faculty Recruiting Committee, 2018 – present

Junior Faculty Research Liaison for the Marketing Division, 2015 – 2019

Member of the Marketing Division Faculty Recruiting Committee, 2016 – 2018

Member of the Marketing Division Ph.D. Committee, 2016 – 2018

Chair of the Marketing Division Faculty Recruiting Committee, 2015

Coordinator of the Marketing Strategy Core Course, 2011 – 2014

Chair of the Marketing Division Ph.D. Committee, 2011 – 2013

Co-chair of the Marketing Division Faculty Recruiting Committee, 2010

Member of the Marketing Division Faculty Recruiting Committee, 2002 – 2008

Chair of the Marketing Division Ph.D. Committee, 2006 – 2007

Member of the Marketing Division Ph.D. Committee, 2004 – 2006

Various Sub-committees, 2007 – present

Organizer of Columbia Marketing Research Camp, 2001 and 2002

**Selected Media Reports of Dr. Kivetz's Research (research covered by hundreds of print, electronic, and broadcast media outlets):**

"Losses. Loom. Large. And That, in Short, Explains Your Loss Aversion," *Marketplace*, November 10, 2020.

"Why We're All So Worried About Having Too Little Time," *TIME*, January 30, 2020.

"Use this Simple Psychological Trick if Productivity Culture has Made it Impossible for You to Relax," *Fast Firm*, October 7, 2019.

"Five Below is a Wonderland of Things No One Needs. It's Also One of the Most Successful Retailers in America," *Washington Post*, December 20, 2018.

"New Research From Columbia Business School Sheds Light On Factors Affecting Luxury Versus Practical Purchases," *Markets Insider*, November 15, 2017.

"The Psychology Behind Spending Big," *BBC News*, October 9, 2017.

"There's Power in All Those User Reviews," *The New York Times*, December 7, 2013.

**Selected Media Reports of Dr. Kivetz's Research:** (continued)

"A Closet Filled With Regrets," *The Wall Street Journal*, April 17, 2013.

"Why We Blunder When We Buy," *Chicago Tribune*, July 22, 2011.

"The Business of Weird: Why People Pay for Bizarre Experiences," *TIME*, November 22, 2010.

"The New Abnormal," (Cover Story), *Bloomberg Businessweek*, August 2, 2010.

"Reward, Regret and Consumer Behaviour," *ABC Radio National (Australia)*, July 12, 2010.

"To Achieve Your Goals, Focus on Reasons," *U.S. News & World Report*, July 1, 2010.

"Can a Vacation Help Boost Your Portfolio?" *SmartMoney*, June 25, 2010.

"Reasons—and Ways—to Splurge This Summer," *U.S. News & World Report*, June 23, 2010.

"Field Guide To The Tightwad: Saving Spree," *Psychology Today*, January 1, 2010.

"Club Class," *The Wall Street Journal*, December 3, 2009.

"Don't Work All the Time — You'll Live to Regret It," *Wired Magazine*, July 15, 2009.

"When the Bride Says I Do – to Cash," *The Globe and Mail*, July 9, 2009.

"It Makes Them Sick to Spend – Literally," *The Globe and Mail*, June 8, 2009.

"The Gift-Card Economy," *The Atlantic*, May, 2009.

"Technology Can Save You From Yourself," *Marketplace Public Radio*, April 17, 2009.

"Regret Saving Money," *CNN*, March 26, 2009.

"Oversaving, a Burden for Our Times," *The New York Times*, March 23, 2009.

"Are You a Victim of Saver's Remorse?" *The New York Times*, March 23, 2009.

"Giving in to Temptation," *CNN*, September 20, 2008.

"Splurge Now, Feel Great Later," *ABC News*, July 2008.

"Splurging is Good for Your Health," *The Wall Street Journal*, July 2008.

"Putting a Price on Rewards," *U.S. News & World Report*, June 24, 2007.

"Incentives – Naughty But Nice," *Management Today*, April 1, 2007.

"Hyperopia," *The New York Times*—one of the "Best Ideas in 2006"—Annual Year in Ideas.

**Selected Media Reports of Dr. Kivetz's Research:** (continued)

"Delaying Pleasure Results in Regret," *United Press International*, June 27, 2006.

"Why Cash Incentives Fail," *SalesForceXP*, Feature Story, September Issue, 2005.

"Professors Discover Why Business Loyalty Programs Work," *Sacramento Business Journal*, 8.16.2004.

"An Economics Problem: Joyless Consumers," by Peter Martin, *THE AGE*, January, 2004, Australia.

"Consumers Work Hard for Loyalty Programs", *Newswise*, August 16, 2004.

"Studies Question Value of Mass Customization, Find Consumers Work Hard for Loyalty Programmes," *MadeForOne*, August 23, 2004.

"Consumers Prefer Loyalty Programmes that 'Fit'," *The Wise Marketer*, December 10, 2003.

"Indulgence," *Radio National*, with Geraldine Doogue, March 2, 2003, Australia.

"Betty Crocker Coupon Program Spry After More than 70 Years," by Karren Mills, *Dow Jones Interactive*, February 23, 2002.

"Once a Loyalty Craze, S&H Tries to Remake Magic in Digital Age," by Justin Pope, *The New York Times*, November, 2001.

"Earning the Right to Indulge: Guilt about Consuming Luxury Items Plays an Important Role in Consumer Preference Toward Rewards," *Stanford Business Magazine*, August 14, 2001.

"Study: Luxury Rewards Evoke Consumer Guilt," by Kimberly Hill, *CRM Daily*, August 1, 2001. Also reported in *E-Commerce Times*, *Yahoo! News*.

"Stanford Business School Research Shows Guilt Plays a Role in What Loyalty Program Rewards Consumers Choose," *Transport News*, July 27, 2001. Also reported in *Business Wire*, *Yahoo! Finance*, *Sharper Media*, *The Timeshare Beat*.

"Consumers Still Buy When Info Incomplete," *Marketing News*, October 9, 2000.

**Professional Affiliations:**

American Marketing Association

Association for Consumer Research

International Trademark Association

Society for Consumer Psychology

Society for Judgment & Decision Making

**EXHIBIT B: LIST OF CASES IN WHICH DR. RAN KIVETZ PROVIDED SWORN TESTIMONY IN DEPOSITION AND/OR TRIAL DURING THE PAST FOUR YEARS**

- *Anne De Lacour, Andrea Wright, and Loree Moran v. Colgate-Palmolive Co., and Tom's Of Maine Inc.*, Case No. 16 Civ. 08364 (RA) (AJP) (S.D. Cal.)
- *Cat Brooks and Rasheed Shabazz v. Thomson Reuters Corporation*, Case No. 3:21-cv-01418-EMC (N.D. Cal.)
- *Elizabeth J. VanCleave and Katherine Hassan v. Abbott Laboratories*, Case No. 19CV345045 (Superior Court of the State of California, County of Santa Clara)
- *Masimo Corporation and Cercacor Laboratories, Inc. v. Apple Inc.*, Case No. 8:20-cv-00048-JVS-JDE (C.D. Cal.)
- *In Re: Folgers Coffee Marketing Litigation*, Case No. 4:21-2984-MD-C-BP (W.D. Mo.)
- *District of Columbia v. Beech-Nut Nutrition Company*, Case No. 2021 CA 001292 B (Superior Court of the District of Columbia, Civil Division)
- *Carrum Technologies, LLC v. Ford Motor Company*, Case No. 1:18-cv-01647-RGA (D. Del.)
- *Maker's Mark Distillery, PBC v. Spalding Group, Inc., et al.*, Case No. 3:19-CV-14-GNS-LLK (W.D. Ky.)
- *Delta Air Lines, Inc. v. Marriott International, Inc. et al.*, Case No. 1:20-CV-01125-ELR (N.D. Ga.)
- *Anthony Bush v. Rust-Oleum Corporation*, Case No. 3:20-CV-03268-LB (N.D. Cal.)
- *The PNC Financial Services, Inc. v. Plaid Inc.*, Case No. 2:20-cv-1977 (W.D. Pa.)
- *Illinois Tool Works Inc. v. J-B Weld Company, LLC*, Case No. 3:19-cv-01434-JAM (D. Conn.)
- *Marie Falcone v. Nestlé USA, Inc.*, Case No. 3:19-CV-00723-L-DEB (S.D. Cal.)
- *Swartz v. Dave's Killer Bread, Inc. and Flowers Food, Inc.*, Case No. 4:21-cv-10053-YGR (N.D. Cal.)
- *Doniece Drake and Deborah Bowling v. Bayer Healthcare LLC*, Case No. 3:22-cv-01085-MMA-JLB (S.D. Cal.)
- *Charlotte Willoughby et al. v. Abbott Laboratories*, Case No. 4:21-cv-01631-JST (N.D. Cal.)

- *Aaron Brand and John Flodin v. Central Garden & Pet Company, Breeder's Choice Pet Foods, Inc., and Does 1 – 50*, Case No. 4:21-cv-01631-JST (N.D. Ill.)
- *Alpenspruce Education Solutions Inc. v. Cascade Parent Limited and Parallels Inc.*, Case No. 2:23-cv-0092-MJP (W.D. Wash.)
- *Federal Trade Commission v. Amazon.com, Inc., et al.*, Case No. 2:23-cv-0932-JHC (W.D. Wash.)
- *Mikhail Gershzon, Kristin Della, and Jill Lienhard v. Colgate-Palmolive Company*, Case No. 3:23-cv-04086-JCS (N.D. Cal.)
- *Minnesota Teamsters Service Bureau v. GoodRx, Inc.*, Case No. 27-cv-24-9554 (Minn. Dist. Ct. 4th Dist.)
- *Joanne Noriega v. Abbott Laboratories*, Case No. 23-CV-0414 (PAE) (S.D. N.Y.)
- *Claudia Newton and Brandy Leandro v. R.C. Bigelow, Inc. and Does 1-10*, Case No. 2:22-cv-05660-LDH-SIL (E.D. N.Y.)
- *Lori Ostenfeld et al. v. The Laundress, LLC*, Case No. 1:22-cv-10667-JMF (S.D. N.Y.)
- *Pacira Biosciences, Inc. v. Nephron Sterile Compounding Center, LLC et al.*, Case No. 3:23-cv-05552-CMC (D. S.C.)
- *Kevin Brnich Electrical LLC et al. v. Siemens Industry, Inc.*, Case No. 1:22-cv-01229-MHC (N.D. G.A.)
- *The Bert and Annette Mullens Foundation v. GoodRx, Inc. and MedExpress Urgent Care Arkansas, P.A.*, Case No. 58-CV-24-317 (Cir. Ct. Pope County, Ark. Civil Div.)
- *Novo Nordisk Inc. v. Eli Lilly and Company and Lilly USA, LLC*, Case No. 3:26-cv-09027 (D. N.J.)

## EXHIBIT C: DOCUMENTS MADE AVAILABLE TO DR. KIVETZ IN CONNECTION WITH PREPARATION OF THIS *EXPERT REPORT*

In addition to academic research and articles, publicly-available websites, and other materials specifically referred to in the enclosed *Expert Report*, I received documents produced in this action, and other documents, including without limitation the following:

**Filed Documents**

- November 17, 2025 Memorandum of Law in Support of Plaintiffs' Motion for Class Certification
  - Declaration of Melissa S. Weiner in Support of Plaintiffs' Motion for Class Certification & Motion to File Documents Under Seal (with Exhibits)
  - Declaration of Carlos F. Ramirez in Support of Plaintiffs' Motion for Class Certification
- March 28, 2025 Opinion and Order
- March 19, 2021 Second Amended Class Action Complaint (with Exhibit A)

**Expert Reports**

- November 14, 2025 Expert Report of Jean-Pierre Dubé (with Appendices A – H)
- November 16, 2025 Expert Report of J. Joseph Cronin, Jr., Ph.D.

**Deposition Transcripts**

- February 19, 2026 Deposition Transcript of the Deposition of Jean-Pierre Dubé
- November 10, 2023 Deposition Transcript of the Deposition of Don Vultaggio (30(b)(6) on behalf of AriZona)
- April 8, 2022 Deposition Transcript of the Deposition of Crystal Townes
- January 26, 2021 Deposition Transcript of the Deposition of Ahmed Ashour

**Bates-Stamped and Other Documents**

- "EX 0009 Jean-Pierre Dube, Ph.D. 021926.xlsx"
- DESI012908
- DESI013853
- DESI17046
- DESI15607
- DESI17050

# EXHIBIT D: KIVETZ MATERIALITY SURVEY (ICED TEA CALIFORNIA SURVEY)

# EXHIBIT D.1: SURVEY SCREENER AND MAIN QUESTIONNAIRE (ICED TEA)

# ICED TEA CA SURVEY (#40100)

## SPECS

Two cells:

**Cell 1**: Package A (*See* Appendix 1)
**Cell 2**: Package B (*See* Appendix 2)

Use click balancing

California

**Global Programmer Instructions:**

Do not enable use of browser's "BACK" button to view prior survey screens.

Require responses to all questions unless otherwise specified.

Display one question per screen unless otherwise specified.

Parenthetical instructions such as "(Please select an answer.)" should appear in smaller font (on its own line) and in a grey color. Regular instruction text, questions, and answer choices should appear in larger, black font.

Left-justify instructions on screen unless otherwise indicated.

Order rotation of affirmative vs. negative answer choices (*e.g.*, "Yes, I do" and "No, I don't") should be the same within respondents (*e.g.*, the same respondent should see the same ordering of affirmative and negative answer choices across all questions).

Do not show any progress bar.

©Kivetz & Associates, Ltd. 2026
Confidential

---

**ICED TEA CA SURVEY (#40100)**

**SCREENER**

***{PROGRAMMER:***

- ***Randomly assign respondents to one of the two "A" vs. "B" orders:***
  - ***"A" Series: affirmative options presented first, followed by negative options***
  - ***"B" Series: negative options presented first, followed by affirmative options***
- ***For questions that include an "A" and "B" version, respondents in "A" series will only see "A" questions, while respondents in "B" series will only see "B" questions.}***

(I.1)
Today we are conducting a survey and we would like to ask you a few brief questions. We are doing this for research purposes only and are only interested in your opinions, which will be kept anonymous. The results of this study will not be used to try to sell you anything.

During the survey, please do not use your browser's *FORWARD or BACK* buttons. Instead, please always use the button below to move through the survey. Please maximize your screen and then simply click on the "NEXT" button at the bottom of the page to continue.

(Please continue when you are ready.)

***{PROGRAMMER: Insert Google reCAPTCHA.}***
(S.2)

***{PROGRAMMER: INSERT RE-CAPTCHA.}***

***{PROGRAMMER: GENDER MUST MATCH PANEL DATA TO QUALIFY AND CONTINUE}***
(S.3)
What is your gender? (Please select an answer.)

1: Male
2: Female

***{PROGRAMMER: AGE MUST MATCH PANEL DATA TO QUALIFY AND CONTINUE}***
***{PROGRAMMER: IF RESPONSE = 1 ('Under 18'), TERMINATE.}***
(S.4)
Which of the following groups listed below includes your age? (Please select an answer.)

1: Under 18
2: 18-44
3: 45 or older

***{PROGRAMMER: STATE MUST MATCH PANEL DATA TO QUALIFY AND CONTINUE}***
***{PROGRAMMER: IF CALIFORNIA IS NOT SELECTED, TERMINATE.}***
(S.5)
What is your state of residence? (INSERT DROP DOWN LIST) (Please select an answer.)

***{PROGRAMMER: DEVICE MUST MATCH PANEL DATA TO QUALIFY AND CONTINUE}***
(S.6)
Which one of the following devices are you using right now to take this survey? (Please select an answer.)

1: Desktop computer—***Programmer, continue with S.7***
2: Laptop computer—***Programmer, continue with S.7***
3: Tablet (such as an iPad, Android tablet, etc.)—***Programmer, terminate interview***
4: Smartphone—***Programmer, continue with S.7***
5: Cell phone (not a smartphone)—***Programmer, terminate interview***
6: Other mobile device—***Programmer, terminate interview***

***{PROGRAMMER: Pipe in selected answer (in bolded font and all lower-case letters) from S.6 where indicated.}***
(S.7A)
Do you normally wear eyeglasses or contact lenses when using your **(INSERT ANSWER FROM S.6)**? (Please select an answer.)

1: Yes—***Programmer, continue with S.8A***
2: No—***Programmer, skip to S.9***

(S.7B)
Do you normally wear eyeglasses or contact lenses when using your **(INSERT ANSWER FROM S.6)**? (Please select an answer.)

2: No—***Programmer, skip to S.9***
1: Yes—***Programmer, continue with S.8B***

***{PROGRAMMER: IF RESPONSE 2 ('NO') IS SELECTED, TERMINATE.}***
(S.8A)
Would you please wear your eyeglasses or contact lenses for the remainder of this survey? (Please select an answer.)

1: Yes—***Programmer, continue with S.9***
2: No—***Programmer, terminate interview***

(S.8B)
Would you please wear your eyeglasses or contact lenses for the remainder of this survey? (Please select an answer.)

2: No—***Programmer, terminate interview***
1: Yes—***Programmer, continue with S.9***

©Kivetz & Associates, Ltd. 2026
Confidential

***{PROGRAMMER: IF RESPONSE 2 ('A BOTTLE, CAN, OR JUG OF ICED TEA') IS NOT SELECTED, TERMINATE.}***
***{PROGRAMMER: Randomize response options 1 – 3.}***
(S.9)
In the past three (3) months, which of the following items, if any, did you personally purchase? (Please select all that apply.)

1: A bottle, can, or jug of milk
2: A bottle, can, or jug of iced tea—***Programmer, continue with S.10***
3: A bottle, can, or jug of water
4: None of the above **[single response]**
5: Don't know **[single response]**

***{PROGRAMMER: IF RESPONSE 2 ('A BOTTLE, CAN, OR JUG OF ICED TEA') IS NOT SELECTED, TERMINATE.}***
***{PROGRAMMER: Randomize response options 1 – 3 based on the randomized order of response options in S.9.}***
(S.10)
During the next three (3) months, which of the following items, if any, do you think that you personally will purchase? (Please select all that apply.)

1: A bottle, can, or jug of milk
2: A bottle, can, or jug of iced tea—***Programmer, continue with S.11***
3: A bottle, can, or jug of water
4: None of the above **[single response]**
5: Don't know **[single response]**

***{PROGRAMMER: Randomly present one of the below questions (S.11-1, S.11-2, S.11-3, S.11-4, S.11-5).}***
***{PROGRAMMER: IF RESPONSE 1 ('EXTREMELY IMPORTANT') IS NOT SELECTED, TERMINATE.}***
(S.11-1)
This question is different from most questions and is intended for quality control purposes. To verify that you have read this question carefully, please select the first response ("Extremely Important") from the list below. (Please select an answer.)

1: Extremely Important—***Programmer, continue with S.12***
2: Very Important
3: Somewhat Important
4: Not At All Important
5: Other: ________
6: Don't Know

©Kivetz & Associates, Ltd. 2026
Confidential

***{PROGRAMMER: IF RESPONSE 2 ('VERY IMPORTANT') IS NOT SELECTED, TERMINATE.}***
(S.11-2)
This question is different from most questions and is intended for quality control purposes. To verify that you have read this question carefully, please select the second response ("Very Important") from the list below. (Please select an answer.)

1: Extremely Important
2: Very Important—***Programmer, continue with S.12***
3: Somewhat Important
4: Not At All Important
5: Other: ________
6: Don't Know

***{PROGRAMMER: IF RESPONSE 3 ('SOMEWHAT IMPORTANT') IS NOT SELECTED, TERMINATE.}***
(S.11-3)
This question is different from most questions and is intended for quality control purposes. To verify that you have read this question carefully, please select the third response ("Somewhat Important") from the list below. (Please select an answer.)

1: Extremely Important
2: Very Important
3: Somewhat Important—***Programmer, continue with S.12***
4: Not At All Important
5: Other: ________
6: Don't Know

***{PROGRAMMER: IF RESPONSE 4 ('NOT AT ALL IMPORTANT') IS NOT SELECTED, TERMINATE.}***
(S.11-4)
This question is different from most questions and is intended for quality control purposes. To verify that you have read this question carefully, please select the fourth response ("Not At All Important") from the list below. (Please select an answer.)

1: Extremely Important
2: Very Important
3: Somewhat Important
4: Not At All Important—***Programmer, continue with S.12***
5: Other: ________
6: Don't Know

***{PROGRAMMER: IF RESPONSE 5 ('DON'T KNOW') IS NOT SELECTED, TERMINATE.}***
(S.11-5)
This question is different from most questions and is intended for quality control purposes. To verify that you have read this question carefully, please select the sixth response ("Don't Know") from the list below. (Please select an answer.)

1: Extremely Important
2: Very Important
3: Somewhat Important
4: Not At All Important
5: Other: ________
6: Don't Know—***Programmer, continue with S.12***

***{PROGRAMMER: IF CORRECT RANDOMIZED WORD (NOT CASE-SENSITIVE) IS NOT ENTERED IN RESPONSE 5 ("OTHER"), TERMINATE.}***

(S.12)

Please type the word **(RANDOMIZE:** "reader" / "writer" / "teacher" / "student" / "speaker"**)** (without quotation marks) in the box next to the "Other" option below.

1: Extremely Important
2: Very Important
3: Somewhat Important
4: Not At All Important
5: Other: ________—***Programmer, continue with S.13 (if correct word entered)***
6: Don't Know

***{PROGRAMMER: IF RESPONSE 1 ("YES, […]") IS NOT SELECTED IN S.14A/B, TERMINATE.}***

(S.13A)

Thank you for participating in this study. It is very important that, during this survey, you do not search for any information on the internet, you do not open another internet browser, site, or tab, and you do not review any materials that are not part of this survey. Also, please complete this survey without stopping in the middle, and make sure not to consult any source of information (including any websites, AI tools, books, or another person) about this survey.

*Do you or don't you agree to follow these instructions?* (Please select an answer.)

1: Yes, I agree to follow these instructions
2: No, I do not agree to follow these instructions—***Programmer, terminate interview***

(S.13B)

Thank you for participating in this study. It is very important that, during this survey, you do not search for any information on the internet, you do not open another internet browser, site, or tab, and you do not review any materials that are not part of this survey. Also, please complete this survey without stopping in the middle, and make sure not to consult any source of information (including any websites, AI tools, books, or another person) about this survey.

*Do you or don't you agree to follow these instructions?* (Please select an answer.)

2: No, I do not agree to follow these instructions—***Programmer, terminate interview***
1: Yes, I agree to follow these instructions

# ICED TEA CA SURVEY (#40100)

## MAIN QUESTIONNAIRE

***{PROGRAMMER: Randomly assign to cell:***
- ***Cell 1: Package A (see Appendix 1)***
- ***Cell 2: Package B (see Appendix 2).}***

(I.2)
On the next screens, we will ask you some questions about iced tea products. For each question, if you don't know or don't have an answer, please don't guess. Just indicate that you "don't know" or "don't have an answer" by selecting, or typing in, the words "don't know" and then continue to the next question. There are no right or wrong answers.

(Please continue when you are ready.)

(QUESTION 1)
Today we are interviewing people about iced tea products.

In general, what are your most important considerations when deciding which iced tea product to buy? Please type your answer below. Please be specific and include details.

| |
|---|
| |

***{PROGRAMMER: Keep on-screen Q.1 (uneditable) when asking Q.2, so that respondents can see Q.1 and their responses to Q.1. Omit the instructions "Today we are interviewing […]" and Please type your answer below […]" when showing Q.2. Grey out the text box showing respondents' typed responses to Q.1.}***
***{PROGRAMMER: Q.2 can be blank.}***
(QUESTION 2)
Any other considerations when deciding which iced tea product to buy? Please type your answer below. Please be specific and include details.

| |
|---|
| |

(I.3)
On the next screen, we will show you a package of iced tea. After you have viewed the package, we will ask you some questions.

Please examine the package, just as you would if you were considering buying such a product. Take as much time as you would normally do when considering buying such a product.

(Please continue when you are ready.)

***{PROGRAMMER: Need to expose participant to I.4 for a minimum of 20 seconds before allowing participant to continue to next screen.}***
***{PROGRAMMER: Do NOT show paragraph beginning "To move the entire package image […]" if response to S.6 = 4 ('Smartphone').}***
(I.4)
***Please read the following instructions CAREFULLY!***

**[IF S.6 = "Desktop computer"/"Laptop computer":]** *Please maximize your screen, if you haven't done so already.*

*Below is a package of iced tea (it may take a moment for the image to load).*

*To rotate the image and view the package from other sides, including the information on the back,* ***click and hold down the cursor*** *over the image, and* ***drag the cursor*** *in the direction of the desired rotation (i.e., left, right, up, or down). Releasing the click will pause the rotation of the image.* **[IF S.6 = "Smartphone":]** *You can use your finger to rotate the image.*

*To move the entire package image to the left, right, top, or bottom of the screen (**without rotating the package**), click the "**compass**" to turn it on, (you should see a yellow background), then hold down the cursor over the package and drag the package image in the direction of the desired movement. Clicking on the "compass" button again will turn it off, (you should see a white background). Now you can **rotate** the package again.*

*At any point, if you wish to make the package **larger** or **smaller**, you can use one of these methods:*

- ***pinch in** or **pinch out** with two fingers on your* **[INSERT BASED ON DEVICE:** *computer trackpad / phone screen***]**; ***OR***
- *click the* ***(plus sign)*** *or* ***(minus sign)*** *buttons below the package image* **[IF S.6 = "Desktop computer"/"Laptop computer":]**; ***OR***
- **[IF S.6 = "Desktop computer"/"Laptop computer":]** ***scroll up** or **scroll down** using the scroll wheel on your mouse.*

(Please continue when you are ready.)

***{PROGRAMMER: Insert appropriate package for cell assigned to:***
- ***Cell 1: Package A***
- ***Cell 2: Package B}***

***{PROGRAMMER: ½ THE RESPONDENTS IN EACH CELL WILL ANSWER Q.3A AND ½ WILL ANSWER Q.3B}***
(QUESTION 3A)
Were you or weren't you able to clearly view the package? (Please select an answer.)

1: Yes, I was—***Programmer, continue with I.5***
2: No, I wasn't—***Programmer, terminate interview***

(QUESTION 3B)
Were you or weren't you able to clearly view the package? (Please select an answer.)

2: No, I wasn't—***Programmer, terminate interview***
1: Yes, I was—***Programmer, continue with I.5***

***{PROGRAMMER: Need to expose participant to I.5 for a minimum of 10 seconds before allowing participant to continue to next screen. The default view of the package when loaded will show the BACK label.}***
***{PROGRAMMER: Do NOT show paragraph beginning "To move the entire package image […]" if response to S.6 = 4 ('Smartphone').}***
(I.5)
***Please read the following instructions CAREFULLY!***

*Now, you will see the* ***back of the package you just examined*** *(it may take a moment for the image to load).*

*To rotate the image (and view the package from other sides),* ***click and hold down the cursor*** *over the image, and* ***drag the cursor*** *in the direction of the desired rotation (i.e., left, right, up, or down). Releasing the click will pause the rotation of the image.* **[IF S.6 = "Smartphone":]** *You can use your finger to rotate the image.*

*To move the entire package image to the left, right, top, or bottom of the screen (****without rotating the package****), click the "****compass"*** *to turn it on, (you should see a yellow background), then hold down the cursor over the package and drag the package image in the direction of the desired movement. Clicking on the "compass" button again will turn it off, (you should see a white background). Now you can* ***rotate*** *the package again.*

*At any point, if you wish to make the package* ***larger*** *or* ***smaller****, you can use one of these methods:*

- ***pinch in*** *or* ***pinch out*** *with two fingers on your* **[INSERT BASED ON DEVICE:** *computer trackpad / phone screen***]**; ***OR***
- *click the* ***(plus sign)*** *or* ***(minus sign)*** *buttons below the package image* **[IF S.6 = "Desktop computer"/"Laptop computer":]**; ***OR***
- **[IF S.6 = "Desktop computer"/"Laptop computer":]** ***scroll up*** *or* ***scroll down*** *using the scroll wheel on your mouse.*

(Please continue when you are ready.)

***{PROGRAMMER: Insert appropriate package (with default view showing package BACK) for cell assigned to:***
- ***Cell 1: Package A***
- ***Cell 2: Package B}***

(QUESTION 4A)
Were you or weren't you able to clearly view the back of the package? (Please select an answer.)

1: Yes, I was—***Programmer, continue with I.6***
2: No, I wasn't—***Programmer, terminate interview***

(QUESTION 4B)
Were you or weren't you able to clearly view the back of the package? (Please select an answer.)

2: No, I wasn't—***Programmer, terminate interview***
1: Yes, I was—***Programmer, continue with I.6***

(I.6)
We would like to ask you a few questions about the product that you just examined.
(Please continue when you are ready.)

***{PROGRAMMER: If response to Q.5A/B = 5 ('Definitely would buy this product'), 4 ('Probably would buy this product'), 3 ('May or may not buy this product'), 2 ('Probably would not buy this product'), or 1 ('Definitely would not buy this product'), ask Q.6; if response to Q.5A/B = 0 ('Don't know'), skip to Q.8.}***
***{PROGRAMMER: For Q.5A and Q.5B: Bold and underline the linked word "here" where indicated, which will open a pop-up window showing (Cell 1: Package A / Cell 2: Package B) product. The cursor should change from a pointer to a hand/finger to indicate that the word "here" is hyperlinked. Clicking on an "X" on the top right of the pop-up window will close the pop-up.}***
(QUESTION 5A)
Now, here is the first question.

This question has six answer choices, which are shown on the screen below.

Please read the entire question before answering.

Assume that the price of the can of iced tea that you just examined is comparable to the price of other cans or bottles of iced tea available in stores. If you were at the store thinking of buying iced tea and you saw the product that you just examined, how likely would you be to buy this product?

Would you say that you *definitely would buy this product, probably would buy this product, may or may not buy this product, probably would not buy this product, definitely would not buy this product, or don't know?* (Please select an answer.)

*If you would like to view the package again, please click **here**.*

5: Definitely would buy this product

4: Probably would buy this product

3: May or may not buy this product

2: Probably would not buy this product

1: Definitely would not buy this product

0: Don't know

(QUESTION 5B)
Now, here is the first question.

This question has six answer choices, which are shown on the screen below.

Please read the entire question before answering.

Assume that the price of the can of iced tea that you just examined is comparable to the price of other cans or bottles of iced tea available in stores. If you were at the store thinking of buying iced tea and you saw the product that you just examined, how likely would you be to buy this product?

Would you say that you *definitely would not buy this product, probably would not buy this product, may or may not buy this product, probably would buy this product, definitely would buy this product, or don't know?* (Please select an answer.)

*If you would like to view the package again, please click* ***here***.

1: Definitely would not buy this product

2: Probably would not buy this product

3: May or may not buy this product

4: Probably would buy this product

5: Definitely would buy this product

0: Don't know

***{PROGRAMMER: Pipe in answer from Q.5A/Q.5B in bold lower-case letters.}***
(QUESTION 6)
What makes you say that you **(INSERT ANSWER FROM Q.5A/Q.5B)**? Please type your answer below. Please be specific and include details.

| |
|---|
| |

***{PROGRAMMER: Keep on-screen Q.6 (uneditable) when asking Q.7, so that respondents can see Q.6 and their responses to Q.6. Omit the instructions "Please type your answer below […]" for Q.6. Grey out the text box showing respondents' typed responses to Q.6.}***
***{PROGRAMMER: Q.7 can be blank.}***
(QUESTION 7)
Any other reason or reasons why you **(INSERT ANSWER FROM Q.5A/Q.5B)**? Please type your answer below. Please be specific and include details.

| |
|---|
| |

***{PROGRAMMER: If respondent does not type a whole number between 0 and 99 in the "dollars" field, then show error message: "Please type in a whole number (no decimals) between 0 and 99."}***
***{PROGRAMMER: Respondent can leave "cents" field blank. If respondent does not leave "cents" field blank and does not type a whole number between 0 and 99 in the "cents" field, then show error message: "Please type in a whole number (no decimals) between 0 and 99."}***
***{PROGRAMMER: If respondent types into a response field, grey out the "Don't know" box.}***
***{PROGRAMMER: For Q.8: Bold and underline the linked word "here" where indicated, which will open a pop-up window showing (Cell 1: Package A / Cell 2: Package B) product. The cursor should change from a pointer to a hand/finger to indicate that the word "here" is hyperlinked. Clicking on an "X" on the top right of the pop-up window will close the pop-up.}***
(QUESTION 8)
Typical prices of a 16 – 24 oz. can or bottle of iced tea range between $0.^69^ and $2.^89^.

Considering again the **can of iced tea you just examined**, **what is the highest price you would pay for the product you just saw**? Enter the price in U.S. dollars and cents.

*If you would like to view the can again, please click **here**.*

1: ______ dollars and ______ cents
2: Don't know **[single response]**

***{PROGRAMMER: Randomly present one of the below questions (Q.9-1 / Q.9-2 / Q.9-3 / Q.9-4).}***
***{PROGRAMMER: IF RESPONSE 3 ('SOUTH') IS NOT SELECTED, TERMINATE.}***
(QUESTION 9-1)
Which of the following four directions is the opposite of North? (Please select an answer.)

1: North
2: East
3: South—***Programmer, continue with Q.10***
4: West
5: Don't know

***{PROGRAMMER: IF RESPONSE 4 ('WEST') IS NOT SELECTED, TERMINATE.}***
(QUESTION 9-2)
Which of the following four directions is the opposite of East? (Please select an answer.)

1: North
2: East
3: South
4: West—***Programmer, continue with Q.10***
5: Don't know

***{PROGRAMMER: IF RESPONSE 1 ('NORTH') IS <u>NOT</u> SELECTED, TERMINATE.}***
<u>(QUESTION 9-3)</u>
Which of the following four directions is the opposite of South? (Please select an answer.)

1: North—***Programmer, continue with Q.10***
2: East
3: South
4: West
5: Don't know

***{PROGRAMMER: IF RESPONSE 2 ('EAST') IS <u>NOT</u> SELECTED, TERMINATE.}***
<u>(QUESTION 9-4)</u>
Which of the following four directions is the opposite of West? (Please select an answer.)

1: North
2: East—***Programmer, continue with Q.10***
3: South
4: West
5: Don't know

***{PROGRAMMER: IF RESPONSE 7 ('NONE OF THESE') IS <u>NOT</u> SELECTED, TERMINATE.}***
<u>(QUESTION 10)</u>
Do you, or does anyone living in your household, work for any of the following? (Please select all that apply.)

1: A marketing consulting firm
2: A marketing research firm
3: An advertising agency or public relations firm
4: A company that manufactures, sells, or distributes iced tea products
5: A TV or radio station
6: A magazine or newspaper
7: None of these **[single response]**—***Programmer, continue with Q.11***

***{PROGRAMMER: ½ THE RESPONDENTS IN EACH CELL WILL ANSWER Q.11A AND ½ WILL ANSWER Q.11B.}***
***{PROGRAMMER: IF RESPONSE 1 ('YES') IS SELECTED, TERMINATE.}***
<u>(QUESTION 11A)</u>
Besides this survey that you are completing now, have you participated in any other market research survey about iced tea beverages during the past three (3) months? (Please select an answer.)

1: Yes—***Programmer, terminate interview***
2: No—***Programmer, continue with Q.12A***

<u>(QUESTION 11B)</u>
Besides this survey that you are completing now, have you participated in any other market research survey about iced tea beverages during the past three (3) months? (Please select an answer.)

2: No—***Programmer, continue with Q.12B***
1: Yes—***Programmer, terminate interview***

***{PROGRAMMER: ½ THE RESPONDENTS IN EACH CELL WILL ANSWER Q.12A AND ½ WILL ANSWER Q.12B}***

<u>(QUESTION 12A)</u>

Please carefully read the following paragraph:

During this survey, I did not open another Internet browser, site, or tab. I only reviewed materials that were part of this survey. I answered the survey questions without stopping in the middle and I did <u>not</u> consult <u>any</u> source of information (including any websites, AI tools, books, or another person) about this survey.

*Do you or don't you agree with the above paragraph?* (Please select an answer.)

1: Yes, I do agree with the above paragraph
2: No, I do <u>not</u> agree with the above paragraph—***Programmer, terminate interview***

<u>(QUESTION 12B)</u>

Please carefully read the following paragraph:

During this survey, I did not open another Internet browser, site, or tab. I only reviewed materials that were part of this survey. I answered the survey questions without stopping in the middle and I did <u>not</u> consult <u>any</u> source of information (including any websites, AI tools, books, or another person) about this survey.

*Do you or don't you agree with the above paragraph?* (Please select an answer.)

2: No, I do <u>not</u> agree with the above paragraph—***Programmer, terminate interview***
1: Yes, I do agree with the above paragraph

<u>(I.7)</u>

Thank you very much. Those are all of our questions.

©Kivetz & Associates, Ltd. 2026
Confidential

**APPENDIX:**
**CELL 1: PACKAGE A**

**<u>NOTE</u>: The following image is for illustration purposes only. Survey participants will see a package appearing on the screen, with the option to enlarge and rotate within a 360-degree view.**



**APPENDIX 2:**
**CELL 2: PACKAGE B**

**<u>NOTE</u>: The following image is for illustration purposes only. Survey participants will see a package appearing on the screen, with the option to enlarge and rotate within a 360-degree view.**



# EXHIBIT D.2: SURVEY SCREENSHOTS (ICED TEA)

# Survey Screenshots

## Iced Tea California Survey

## Desktop/Laptop View

©Kivetz & Associates, Inc. 2026

# Screener

Today we are conducting a survey and we would like to ask you a few brief questions. We are doing this for research purposes only and are only interested in your opinions, which will be kept anonymous. The results of this study will not be used to try to sell you anything.

During the survey, please do not use your browser's *FORWARD or BACK* buttons. Instead, please always use the button below to move through the survey. Please maximize your screen and then simply click on the "NEXT" button at the bottom of the page to continue.

(Please continue when you are ready.)

NEXT »

I'm not a robot

reCAPTCHA

NEXT »


Select all images with
motorcycles
NEXT »
VERIFY

What is your gender?

(Please select an answer.)

- Male
- Female

NEXT »

Which of the following groups listed below includes your age?

(Please select an answer.)

- Under 18
- 18-44
- 45 or older

NEXT »

What is your state of residence?

(Please select an answer.)

Select one...

- Select one...
- Alabama
- Alaska
- Arizona
- Arkansas
- California
- Colorado
- Connecticut
- Delaware
- District of Columbia
- Florida
- Georgia
- Hawaii
- Idaho
- Illinois
- Indiana
- Iowa
- Kansas
- Kentucky
- Louisiana

NEXT »

Which of the following devices are you using right now to take this survey?

(Please select an answer.)

- Desktop computer
- Laptop computer
- Tablet (such as an iPad, Android tablet, etc.)
- Smartphone
- Cell phone (not a smartphone)
- Other mobile device

NEXT »

Do you normally wear eyeglasses or contact lenses when using your desktop computer?

(Please select an answer.)

- Yes
- No

NEXT »

Would you please wear your eyeglasses or contact lenses for the remainder of this survey?

(Please select an answer.)

- Yes
- No

NEXT »

In the past three (3) months, which of the following items, if any, did you personally purchase?

(Please select all that apply.)

- [ ] A bottle, can, or jug of water
- [ ] A bottle, can, or jug of milk
- [ ] A bottle, can, or jug of iced tea
- [ ] None of the above
- [ ] Don't know

NEXT »

During the next three (3) months, which of the following items, if any, do you think that you personally will purchase?

(Please select all that apply.)

- [ ] A bottle, can, or jug of water
- [ ] A bottle, can, or jug of milk
- [ ] A bottle, can, or jug of iced tea
- [ ] None of the above
- [ ] Don't know

NEXT »

This question is different from most questions and is intended for quality control purposes. To verify that you have read this question carefully, please select the first response ("Extremely Important") from the list below.

(Please select an answer.)

- Extremely Important
- Very Important
- Somewhat Important
- Not At All Important
- Other:
- Don't Know

NEXT »

Please type the word "writer" (without quotation marks) in the box next to the "Other" option below.

- Extremely Important
- Very Important
- Somewhat Important
- Not At All Important
- Other: ______
- Don't Know

NEXT »

Thank you for participating in this study. It is very important that, during this survey, you do not search for any information on the internet, you do not open another internet browser, site, or tab, and you do not review any materials that are not part of this survey. Also, please complete this survey without stopping in the middle, and make sure not to consult any source of information (including any websites, AI tools, books, or another person) about this survey.

*Do you or don't you agree to follow these instructions*?

(Please select an answer.)

- Yes, I agree to follow these instructions
- No, I do not agree to follow these instructions

NEXT »

# Main Questionnaire

# Cell 1: “Test” Package

On the next screens, we will ask you some questions about iced tea products. For each question, if you don't know or don't have an answer, please don't guess. Just indicate that you "don't know" or "don't have an answer" by selecting, or typing in, the words "don't know" and then continue to the next question. There are no right or wrong answers.

(Please continue when you are ready.)

NEXT »

Today we are interviewing people about iced tea products.

In general, what are your most important considerations when deciding which iced tea product to buy?

Please type your answer below. Please be specific and include details.

NEXT »

In general, what are your <u>most important considerations</u> when deciding which iced tea product to buy?

Test response

Any other considerations when deciding which iced tea product to buy?

Please type your answer below. Please be specific and include details.

NEXT »

On the next screen, we will show you a package of iced tea. After you have viewed the package, we will ask you some questions.

Please examine the package, just as you would if you were considering buying such a product. Take as much time as you would normally do when considering buying such a product.

(Please continue when you are ready.)

NEXT »

***<u>Please read the following instructions CAREFULLY!</u>***

*Please maximize your screen, if you haven't done so already.*

*Below is a package of iced tea (it may take a moment for the image to load).*

*<u>To rotate the image and view the package from other sides, including the information on the back</u>, **click and hold down the cursor** over the image, and **drag the cursor** in the direction of the desired rotation (i.e., left, right, up, or down). Releasing the click will pause the rotation of the image.*

*<u>To move the entire package image</u> to the left, right, top, or bottom of the screen (**without rotating the package**), click the "**compass**" to turn it on, (you should see a yellow background), then hold down the cursor over the package and drag the package image in the direction of the desired movement. Clicking on the "compass" button again will turn it off, (you should see a white background). Now you can **rotate** the package again.*

*<u>At any point, if you wish to make the package **larger** or **smaller**</u>, you can use one of these methods:*

- ***pinch in** or **pinch out** with two fingers on your computer trackpad; **<u>OR</u>***
- *click the **(plus sign)** or **(minus sign)** buttons below the package image; **<u>OR</u>***
- ***scroll up** or **scroll down** using the scroll wheel on your mouse.*

(Please continue when you are ready.)






NEXT »


Nutrition Facts
Approx. 2 servings per container
Serving size 12 fl oz (355mL)
Per serving Per container
Calories 100 200
Total Fat 0g 0% 0g 0%
Sodium 0mg 0% 0mg 0%
Total Carb. 26g 9% 50g 18%
Total Sugars 25g 49g
Incl. Added Sugars 25g 50% 48g 96%
Protein 0g 0g
Vitamin C 18mg 20% 34mg 40%
NO PRESERVATIVES ARTIFICIAL COLOR ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about AriZona call 1 800 832 3775
SHAKE WELL
REFRIGERATE AFTER OPENING


100% NATURAL
緑茶
AriZona
GREEN TEA
With GINSENG and HONEY
Enjoy America's best selling
ready-to-drink green tea!
AriZona Green Tea...Where great taste
and goodness "naturally" come together
Green tea for its health benefits
and nature's natural sweetener, honey.

Were you or weren't you able to clearly view the package?

(Please select an answer.)

- Yes, I was
- No, I wasn't

NEXT »

***<u>Please read the following instructions CAREFULLY!</u>***

*Now, you will see the **<u>back of the package you just examined</u>** (it may take a moment for the image to load).*

*<u>To rotate the image (and view the package from other sides)</u>, **click and hold down the cursor** over the image, and **drag the cursor** in the direction of the desired rotation (i.e., left, right, up, or down). Releasing the click will pause the rotation of the image.*

*<u>To move the entire package image</u> to the left, right, top, or bottom of the screen (**without rotating the package**), click the "**compass**" to turn it on, (you should see a yellow background), then hold down the cursor over the package and drag the package image in the direction of the desired movement. Clicking on the "compass" button again will turn it off, (you should see a white background). Now you can **rotate** the package again.*

*<u>At any point, if you wish to make the package **larger** or **smaller**</u>, you can use one of these methods:*

- ***pinch in** or **pinch out** with two fingers on your computer trackpad; **<u>OR</u>***
- *click the **(plus sign)** or **(minus sign)** buttons below the package image; **<u>OR</u>***
- ***scroll up** or **scroll down** using the scroll wheel on your mouse.*

(Please continue when you are ready.)




Nutrition Facts
Approx. 2 servings per container
Serving size 12 fl oz (355mL)
Calories 100 200
Total Fat 0g 0% 0g 0%
Sodium 0mg 0% 0mg 0%
Total Carb. 26g 9% 50g 18%
Total Sugars 25g 49g
Incl. Added Sugars 25g 50% 48g 96%
Protein 0g 0g
Vitamin C
NO
PRESERVATIVES
ARTIFICIAL COLOR
ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about
AriZona call 1 800 832 3775
SHAKE WELL
Great Hot!


Total Fat 0g 0% 0g 0%
Sodium 0mg 0% 0mg 0%
Total Carb. 26g 9% 50g 18%
Total Sugars 25g 49g
Incl. Added Sugars 25g 50% 48g 96%
Protein 0g 0g
Vitamin C 18mg 20% 34mg 40%
Not a significant source of saturated fat, trans fat, cholesterol, dietary fiber, vitamin D, calcium, iron and potassium.
* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.
INGREDIENTS: PREMIUM BREWED BLEND OF GREEN TEAS USING FILTERED WATER, HIGH FRUCTOSE CORN SYRUP (GLUCOSE-FRUCTOSE SYRUP), HONEY, CITRIC ACID, NATURAL FLAVORS, ASCORBIC ACID (VITAMIN C), GINSENG ROOT EXTRACT.
MFD. FOR ARIZONA BEVERAGES USA LLC
WOODBURY, NY 11797 USA
©2019 BEVERAGE MARKETING USA, INC.
NO PRESERVATIVES
ARTIFICIAL COLOR
ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about
AriZona call 1 800 832 3775
Great Hot!
ANTIOX
VITAMIN C
FORTIFIED


REAL BREWED
Nutrition Facts
Approx. 2 servings per container
Serving size 12 fl oz (355mL)
Calories 100 200
NO
SHAKE WELL

NEXT »

Were you or weren't you able to clearly view the back of the package?

(Please select an answer.)

- ◯ Yes, I was
- ◯ No, I wasn't

NEXT »

We would like to ask you a few questions about the product that you just examined.

(Please continue when you are ready.)

NEXT »

Now, here is the first question.

This question has six answer choices, which are shown on the screen below.

Please read the entire question before answering.

Assume that the price of the can of iced tea that you just examined is comparable to the price of other cans or bottles of iced tea available in stores. If you were at the store thinking of buying iced tea and you saw the product that you just examined, how likely would you be to buy this product?

Would you say that you *definitely would buy this product, probably would buy this product, may or may not buy this product, probably would not buy this product, definitely would not buy this product, or don't know*?

*If you would like to view the package again, please click **here**.*

(Please select an answer.)

- Definitely would buy this product
- Probably would buy this product
- May or may not buy this product
- Probably would not buy this product
- Definitely would not buy this product
- Don't know

NEXT »




close

×




close


Calories
100
200
Total Fat
Sodium
Total Carb.
Total Sugars
Protein
Vitamin C
100%
NATURAL
TEA
NO
PRESERVATIVES
ARTIFICIAL COLOR
ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about
AriZona call 1 800 832 3775
SHAKE WELL
REFRIGERATE AFTER OPENING

close

What makes you say that you **definitely would buy this product**?

Please type your answer below. Please be specific and include details.

NEXT »

What makes you say that you **definitely would buy this product**?

Test response

Any other reason or reasons why you **definitely would buy this product**?

Please type your answer below. Please be specific and include details.

NEXT »

Typical prices of a 16 – 24 oz. can or bottle of iced tea range between $0.[69] and $2.[89].

Considering again the **can of iced tea you just examined, what is the highest price you would pay for the product you just saw**? Enter the price in U.S. dollars and cents.

*If you would like to view the package again, please click **here**.*

[ ] dollars and [ ] cents

[ ] Don't know

NEXT »




close


REAL BREWED REAL BREWED
Nutrition Facts
Approx. 2 servings per container
Serving size 12 fl oz (355mL)
Calories 100 200
100% NATURAL
NO
SHAKE WELL

close

×




close

Which of the following four directions is the opposite of West?

(Please select an answer.)

- North
- East
- South
- West
- Don't know

NEXT »

Do you, or does anyone living in your household, work for any of the following?

(Please select all that apply.)

- ☐ A marketing consulting firm
- ☐ A marketing research firm
- ☐ An advertising agency or public relations firm
- ☐ A company that manufactures, sells, or distributes iced tea products
- ☐ A TV or radio station
- ☐ A magazine or newspaper
- ☐ None of these

NEXT »

Besides this survey that you are completing now, have you participated in any other market research survey about iced tea beverages during the past three (3) months?

(Please select an answer.)

- Yes
- No

NEXT »

Please carefully read the following paragraph:

During this survey, I did not open another Internet browser, site, or tab. I only reviewed materials that were part of this survey. I answered the survey questions without stopping in the middle and I did not consult any source of information (including any websites, AI tools, books, or another person) about this survey.

*Do you or don't you agree with the above paragraph?*

(Please select an answer.)

- Yes, I do agree with the above paragraph
- No, I do not agree with the above paragraph

NEXT »

*Thank you very much. Those are all of our questions.*

# Cell 2: “Control” Package

On the next screens, we will ask you some questions about iced tea products. For each question, if you don't know or don't have an answer, please don't guess. Just indicate that you "don't know" or "don't have an answer" by selecting, or typing in, the words "don't know" and then continue to the next question. There are no right or wrong answers.

(Please continue when you are ready.)

NEXT »

Today we are interviewing people about iced tea products.

In general, what are your <u>most important considerations</u> when deciding which iced tea product to buy?

Please type your answer below. Please be specific and include details.

NEXT »

In general, what are your <u>most important considerations</u> when deciding which iced tea product to buy?

Test response

Any other considerations when deciding which iced tea product to buy?

Please type your answer below. Please be specific and include details.

NEXT »

On the next screen, we will show you a package of iced tea. After you have viewed the package, we will ask you some questions.

Please examine the package, just as you would if you were considering buying such a product. Take as much time as you would normally do when considering buying such a product.

(Please continue when you are ready.)

NEXT »

***<u>Please read the following instructions CAREFULLY!</u>***

*Please maximize your screen, if you haven't done so already.*

*Below is a package of iced tea (it may take a moment for the image to load).*

*<u>To rotate the image and view the package from other sides, including the information on the back</u>, **click and hold down the cursor** over the image, and **drag the cursor** in the direction of the desired rotation (i.e., left, right, up, or down). Releasing the click will pause the rotation of the image.*

*<u>To move the entire package image</u> to the left, right, top, or bottom of the screen (**without rotating the package**), click the "**compass**" to turn it on, (you should see a yellow background), then hold down the cursor over the package and drag the package image in the direction of the desired movement. Clicking on the the "compass" button again will turn it off, (you should see a white background). Now you can **rotate** the package again.*

*<u>At any point, if you wish to make the package **larger** or **smaller**</u>, you can use one of these methods:*

- ***pinch in** or **pinch out** with two fingers on your computer trackpad; **<u>OR</u>***
- *click the **(plus sign)** or **(minus sign)** buttons below the package image; **<u>OR</u>***
- ***scroll up** or **scroll down** using the scroll wheel on your mouse.*

(Please continue when you are ready.)





緑茶
Green Tea
With GINSENG
and HONEY
23 FL OZ - 680ml


Nutrition Facts
Approx. 2 servings per container
Serving size 12 fl oz (355mL)
Per serving
Per container
Calories 100 200
Total Fat 0g 0% 0g 0%
Sodium 0mg 0% 0mg 0%
Total Sugars 25g
Incl. Added Sugars 25g 50%
Protein 0g 0g
Vitamin C 18mg 20%
NO ARTIFICIAL COLOR ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about
AriZona call 1 800 832 3775
SHAKE WELL
REFRIGERATE AFTER OPENING


100%
NATURAL
緑
茶
AriZona
GREEN TEA
With GINSENG and HONEY
Enjoy America's best selling
ready-to-drink green tea!
AriZona Green Tea...Where great taste
and goodness "naturally" come together.
Green tea for its health benefits
and nature's natural sweetener, honey.
Great
Hot!

NEXT »

Were you or weren't you able to clearly view the package?

(Please select an answer.)

- ◯ Yes, I was
- ◯ No, I wasn't

NEXT »

***<u>Please read the following instructions CAREFULLY!</u>***

*Now, you will see the **<u>back of the package you just examined</u>** (it may take a moment for the image to load).*

*<u>To rotate the image (and view the package from other sides)</u>, **click and hold down the cursor** over the image, and **drag the cursor** in the direction of the desired rotation (i.e., left, right, up, or down). Releasing the click will pause the rotation of the image.*

*<u>To move the entire package image</u> to the left, right, top, or bottom of the screen (**without rotating the package**), click the "**compass**" to turn it on, (you should see a yellow background), then hold down the cursor over the package and drag the package image in the direction of the desired movement. Clicking on the "compass" button again will turn it off, (you should see a white background). Now you can **rotate** the package again.*

*<u>At any point, if you wish to make the package **larger** or **smaller**</u>, you can use one of these methods:*

- ***pinch in** or **pinch out** with two fingers on your computer trackpad; **<u>OR</u>***
- *click the (**plus sign**) or (**minus sign**) buttons below the package image; **<u>OR</u>***
- ***scroll up** or **scroll down** using the scroll wheel on your mouse.*

(Please continue when you are ready.)




Nutrition Facts
Approx. 2 servings per container
Serving size 12 fl oz (355mL)
Per serving Per container
Calories 100 200
Total Fat 0g 0% 0g 0%
Sodium 0mg 0% 0mg 0%
Total Carb. 26g 9% 50g 18%
Total Sugars 25g 49g
Incl. Added Sugars 25g 50% 48g 96%
Protein 0g 0g
Vitamin C 18mg 20% 34mg 40%
NO ARTIFICIAL COLOR ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about AriZona call 1 800 832 3775
SHAKE WELL


Total Fat 0g 0% 0g 0%
Sodium 0mg 0% 0mg 0%
Total Carb. 26g 9% 50g 18%
Total Sugars 25g 49g
Incl. Added Sugars 25g 50% 48g 96%
Protein 0g 0g
Vitamin C 18mg 20% 34mg 40%
Not a significant source of saturated fat, trans fat, cholesterol, dietary fiber, vitamin D, calcium, iron and potassium.
* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.
INGREDIENTS: PREMIUM BREWED BLEND OF GREEN TEAS USING FILTERED WATER, HIGH FRUCTOSE CORN SYRUP (GLUCOSE-FRUCTOSE SYRUP), HONEY, CITRIC ACID, NATURAL FLAVORS, ASCORBIC ACID (VITAMIN C), GINSENG ROOT EXTRACT.
MFD. FOR ARIZONA BEVERAGES USA LLC WOODBURY, NY 11797 USA
©2019 BEVERAGE MARKETING USA, INC.
NO ARTIFICIAL COLOR ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about AriZona call 1 800 832 3775
Great Hot!
ANTIOX
FORTIFIED
and HONEY

NEXT »


REAL BREWED
Nutrition Facts
Serving size 12 fl oz (355mL)
Calories 100 200
NO ARTIFICIAL COLOR ARTIFICIAL FLAVOR
SHAKE WELL

Were you or weren't you able to clearly view the back of the package?

(Please select an answer.)

- ◯ Yes, I was
- ◯ No, I wasn't

NEXT »

We would like to ask you a few questions about the product that you just examined.

(Please continue when you are ready.)

NEXT »

Now, here is the first question.

This question has six answer choices, which are shown on the screen below.

Please read the entire question before answering.

Assume that the price of the can of iced tea that you just examined is comparable to the price of other cans or bottles of iced tea available in stores. If you were at the store thinking of buying iced tea and you saw the product that you just examined, how likely would you be to buy this product?

Would you say that you *definitely would buy this product, probably would buy this product, may or may not buy this product, probably would not buy this product, definitely would not buy this product, or don't know*?

*If you would like to view the package again, please click **here**.*

(Please select an answer.)

- Definitely would buy this product
- Probably would buy this product
- May or may not buy this product
- Probably would not buy this product
- Definitely would not buy this product
- Don't know

NEXT »




close




close


Calories 100 200
Total Fat
Sodium
Total Carb.
Total Sugars
Incl. Added Sugars
Protein
Vitamin C
NO
ARTIFICIAL COLOR
ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about
AriZona call 1 800 832 3775
SHAKE WELL
REFRIGERATE AFTER OPENING

close

What makes you say that you **definitely would buy this product**?

Please type your answer below. Please be specific and include details.

Test response

NEXT »

What makes you say that you **definitely would buy this product**?

Test response

Any other reason or reasons why you **definitely would buy this product**?

Please type your answer below. Please be specific and include details.

NEXT »

Typical prices of a 16 – 24 oz. can or bottle of iced tea range between $0.69 and $2.89.

Considering again the **can of iced tea you just examined, what is the highest price you would pay for the product you just saw**? Enter the price in U.S. dollars and cents.

*If you would like to view the package again, please click* ***here***.

[ ] dollars and [ ] cents

[ ] Don't know

NEXT »




close


REAL BREWED
REAL BREWED
Nutrition Facts
Calories 100 200
100%
NATURAL
AriZona
GREEN TEA
Great Hot!
NO
SHAKE WELL

close




close

Which of the following four directions is the opposite of West?

(Please select an answer.)

- North
- East
- South
- West
- Don’t know

NEXT »

Do you, or does anyone living in your household, work for any of the following?

(Please select all that apply.)

- ☐ A marketing consulting firm
- ☐ A marketing research firm
- ☐ An advertising agency or public relations firm
- ☐ A company that manufactures, sells, or distributes iced tea products
- ☐ A TV or radio station
- ☐ A magazine or newspaper
- ☐ None of these

NEXT »

Besides this survey that you are completing now, have you participated in any other market research survey about iced tea beverages during the past three (3) months?

(Please select an answer.)

- ◯ Yes
- ◯ No

NEXT »

Please carefully read the following paragraph:

During this survey, I did not open another Internet browser, site, or tab. I only reviewed materials that were part of this survey. I answered the survey questions without stopping in the middle and I did not consult any source of information (including any websites, AI tools, books, or another person) about this survey.

*Do you or don't you agree with the above paragraph?*

(Please select an answer.)

- ◯ Yes, I do agree with the above paragraph
- ◯ No, I do not agree with the above paragraph

NEXT »

*Thank you very much. Those are all of our questions.*

# Survey Screenshots

## Iced Tea California Survey

## Smartphone View

©Kivetz & Associates, Inc. 2026

# Screener


2:48
sw2.decipherinc.com
Today we are conducting a survey and we would like to ask you a few brief questions. We are doing this for research purposes only and are only interested in your opinions, which will be kept anonymous. The results of this study will not be used to try to sell you anything.
During the survey, please do not use your browser's FORWARD or BACK buttons. Instead, please always use the button below to move through the survey. Please maximize your screen and then simply click on the "NEXT" button at the bottom of the page to continue.
(Please continue when you are ready.)
NEXT »


2:48
sw2.decipherinc.com
I'm not a robot
reCAPTCHA
NEXT »


2:48
sw2.decipherinc.com
What is your gender?
(Please select an answer.)
Male
Female
NEXT »


2:48
sw2.decipherinc.com
Which of the following groups listed below includes your age?
(Please select an answer.)
Under 18
18-44
45 or older
NEXT »


2:49
sw2.decipherinc.com
What is your state of residence?
(Please select an answer.)
✓ Select one...
Alabama
Alaska
Arizona
Arkansas
California
Colorado
Connecticut
Delaware
District of Columbia
Florida
Georgia


2:49
sw2.decipherinc.com
Which of the following devices are you using right now to take this survey?
(Please select an answer.)
Desktop computer
Laptop computer
Tablet (such as an iPad, Android tablet, etc.)
Smartphone
Cell phone (not a smartphone)
Other mobile device
NEXT »


2:49
sw2.decipherinc.com
Do you normally wear eyeglasses or contact lenses when using your smartphone?
(Please select an answer.)
No
Yes
NEXT »


sw2.decipherinc.com
Would you please wear your eyeglasses or contact lenses for the remainder of this survey?
(Please select an answer.)
No
Yes
NEXT »


2:49
sw2.decipherinc.com
In the past three (3) months, which of the following items, if any, did you personally purchase?
(Please select all that apply.)
A bottle, can, or jug of milk
A bottle, can, or jug of water
A bottle, can, or jug of iced tea
None of the above
Don't know
NEXT »


2:49
sw2.decipherinc.com
During the next three (3) months, which of the following items, if any, do you think that you personally will purchase?
(Please select all that apply.)
A bottle, can, or jug of milk
A bottle, can, or jug of water
A bottle, can, or jug of iced tea
None of the above
Don't know
NEXT »

2:50

sw2.decipherinc.com

This question is different from most questions and is intended for quality control purposes. To verify that you have read this question carefully, please select the first response ("Extremely Important") from the list below.

(Please select an answer.)

- Extremely Important
- Very Important
- Somewhat Important
- Not At All Important
- Other:
- Don't Know

NEXT »

2:50

sw2.decipherinc.com

Please type the word “speaker” (without quotation marks) in the box next to the “Other” option below.

- Extremely Important
- Very Important
- Somewhat Important
- Not At All Important
- Other:
- Don't Know

NEXT »

2:50

sw2.decipherinc.com

Thank you for participating in this study. It is very important that, during this survey, you do not search for any information on the internet, you do not open another internet browser, site, or tab, and you do not review any materials that are not part of this survey. Also, please complete this survey without stopping in the middle, and make sure not to consult any source of information (including any websites, AI tools, books, or another person) about this survey.

*Do you or don't you agree to follow these instructions*?

(Please select an answer.)

- No, I do not agree to follow these instructions
- Yes, I agree to follow these instructions

2:50

sw2.decipherinc.com

search for any information on the internet, you do not open another internet browser, site, or tab, and you do not review any materials that are not part of this survey. Also, please complete this survey without stopping in the middle, and make sure not to consult any source of information (including any websites, AI tools, books, or another person) about this survey.

*Do you or don't you agree to follow these instructions*?

(Please select an answer.)

- No, I do not agree to follow these instructions
- Yes, I agree to follow these instructions

NEXT »

# Main Questionnaire

# Cell 1: “Test” Package

2:50

sw2.decipherinc.com

On the next screens, we will ask you some questions about iced tea products. For each question, if you don't know or don't have an answer, please don't guess. Just indicate that you "don't know" or "don't have an answer" by selecting, or typing in, the words "don't know" and then continue to the next question. There are no right or wrong answers.

(Please continue when you are ready.)

NEXT »

2:50

sw2.decipherinc.com

Today we are interviewing people about iced tea products.

In general, what are your most important considerations when deciding which iced tea product to buy?

Please type your answer below. Please be specific and include details.

NEXT »


2:51
sw2.decipherinc.com
In general, what are your most important considerations when deciding which iced tea product to buy?
Test response
Any other considerations when deciding which iced tea product to buy?
Please type your answer below. Please be specific and include details.
1


2:51
77
sw2.decipherinc.com
buy?
Test response
Any other considerations when deciding which iced tea product to buy?
Please type your answer below. Please be specific and include details.
NEXT »
1

sw2.decipherinc.com

On the next screen, we will show you a package of iced tea. After you have viewed the package, we will ask you some questions.

Please examine the package, just as you would if you were considering buying such a product. Take as much time as you would normally do when considering buying such a product.

(Please continue when you are ready.)

NEXT »

2:51

sw2.decipherinc.com

***Please read the following instructions CAREFULLY!***

*Below is a package of iced tea (it may take a moment for the image to load).*

*To rotate the image and view the package from other sides, including the information on the back, **click and hold down the cursor** over the image, and **drag the cursor** in the direction of the desired rotation (i.e., left, right, up, or down). Releasing the click will pause the rotation of the image. You can use your finger to rotate the image.*

*At any point, if you wish to make the package **larger** or **smaller**, you can use one of these methods:*

2:51

sw2.decipherinc.com

- ***pinch in** or **pinch out** with two fingers on your phone screen; **OR***
- *click the + **(plus sign)** or − **(minus sign)** buttons below the package image.*

(Please continue when you are ready.)




2:52

sw2.decipherinc.com




NEXT »


2:52
sw2.decipherinc.com
Nutrition Facts
Approx. 2 servings per container
Serving size 12 fl oz (355mL)
Calories 100 200
Total Fat
Sodium
Total Carb.
Total Sugars
Incl. Added Sugars
Protein
Vitamin C
NO PRESERVATIVES ARTIFICIAL COLOR ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about AriZona call 1 800 832 3775
NEXT »


2:52
sw2.decipherinc.com
REAL BREWED
Nutrition Facts
Approx. 2 servings per container
Serving size 12 fl oz (355mL)
Calories 100 200
NO
NEXT »


2:52
sw2.decipherinc.com
Were you or weren't you able to clearly view the package?
(Please select an answer.)
No, I wasn't
Yes, I was
NEXT »

2:53
sw2.decipherinc.com

***<u>Please read the following instructions CAREFULLY!</u>***

*Now, you will see the* ***<u>back of the package you just examined</u>*** *(it may take a moment for the image to load).*

*<u>To rotate the image (and view the package from other sides)</u>,* ***click and hold down the cursor*** *over the image, and* ***drag the cursor*** *in the direction of the desired rotation (i.e., left, right, up, or down). Releasing the click will pause the rotation of the image. You can use your finger to rotate the image.*

*<u>At any point, if you wish to make the package</u>* ***<u>larger</u>*** *<u>or</u>* ***<u>smaller</u>****, you can use one of these methods:*

2:53
sw2.decipherinc.com

- ***pinch in*** *or* ***pinch out*** *with two fingers on your phone screen;* ***<u>OR</u>***
- *click the* (+) ***(plus sign)*** *or* (−) ***(minus sign)*** *buttons below the package image.*

(Please continue when you are ready.)




2:53
sw2.decipherinc.com




NEXT »


2:53
sw2.decipherinc.com
Calories 100 200
NO PRESERVATIVES ARTIFICIAL COLOR ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about AriZona call 1 800 832 3775
SHAKE WELL
REFRIGERATE AFTER OPENING
NEXT »


2:55
sw2.decipherinc.com
Green
NEXT »


2:55
sw2.decipherinc.com
Were you or weren't you able to clearly view the back of the package?
(Please select an answer.)
No, I wasn't
Yes, I was
NEXT »


2:55
sw2.decipherinc.com
We would like to ask you a few questions about the product that you just examined.
(Please continue when you are ready.)
NEXT »

2:55

sw2.decipherinc.com

Now, here is the first question.

This question has six answer choices, which are shown on the screen below.

Please read the entire question before answering.

Assume that the price of the can of iced tea that you just examined is comparable to the price of other cans or bottles of iced tea available in stores. If you were at the store thinking of buying iced tea and you saw the product that you just examined, how likely would you be to buy this product?

Would you say that you *definitely would not buy this product, probably would not buy this product, may or may not buy this product, probably would buy this*

2:56

sw2.decipherinc.com

*would not buy this product, probably would not buy this product, may or may not buy this product, probably would buy this product, definitely would buy this product, or don't know?*

*If you would like to view the package again, please click **here**.*

(Please select an answer.)

- Definitely would not buy this product
- Probably would not buy this product
- May or may not buy this product
- Probably would buy this product
- Definitely would buy this product
- Don't know

NEXT »


2:56
sw2.decipherinc.com
would not buy this product,
Green Tea
With GINSENG
and HONEY
close


sw2.decipherinc.com
would not buy this product,
REAL BREWED
Nutrition Facts
Calories 100 200
NO
SHAKE WELL
close


sw2.decipherinc.com
would not buy this product,
Sodium 0mg 0% 0mg 0%
Total Carb. 26g 9% 50g 18%
Total Sugars 25g 49g
Incl. Added Sugars 25g 50% 48g 96%
Protein 0g 0g
Vitamin C 18mg 20% 34mg 40%
Not a significant source of saturated fat, trans fat, cholesterol, dietary fiber, vitamin D, calcium, iron and potassium.
INGREDIENTS: PREMIUM BREWED BLEND OF GREEN TEAS USING FILTERED WATER, HIGH FRUCTOSE CORN SYRUP (GLUCOSE-FRUCTOSE SYRUP), HONEY, CITRIC ACID, NATURAL FLAVORS, ASCORBIC ACID (VITAMIN C), GINSENG ROOT EXTRACT.
MFD. FOR ARIZONA BEVERAGES USA LLC
WOODBURY, NY 11797 USA
©2019 BEVERAGE MARKETING USA, INC.
Great Hot!
NO PRESERVATIVES
ARTIFICIAL COLOR
ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about
AriZona call 1 800 832 3775
ANTIOX
0 13008 75642
close

2:57

sw2.decipherinc.com

What makes you say that you **definitely would buy this product**?

Please type your answer below. Please be specific and include details.

NEXT »

2:57

sw2.decipherinc.com

What makes you say that you **definitely would buy this product**?

Test response

Any other reason or reasons why you **definitely would buy this product**?

Please type your answer below. Please be specific and include details.

2:57

sw2.decipherinc.com

**product**?

Test response

Any other reason or reasons why you **definitely would buy this product**?

Please type your answer below. Please be specific and include details.

NEXT »

sw2.decipherinc.com

Typical prices of a 16 – 24 oz. can or bottle of iced tea range between $0.69 and $2.89.

Considering again the **can of iced tea you just examined, what is the highest price you would pay for the product you just saw**? Enter the price in U.S. dollars and cents.

*If you would like to view the package again, please click **here**.*

[ ] dollars and [ ] cents

[ ] Don't know

NEXT »


2:58
sw2.decipherinc.com
Green Tea
With GINSENG
and HONEY
close


sw2.decipherinc.com
REAL BREWED
AriZona
close


2:58
sw2.decipherinc.com
REAL BREWED
Nutrition Facts
Calories 100 200
100% NATURAL
AriZona
GREEN TEA
Great Hot!
NO
close


2:58
sw2.decipherinc.com
Which of the following four directions is the opposite of South?
(Please select an answer.)
North
East
South
West
Don't know
NEXT »


2:58
sw2.decipherinc.com
Do you, or does anyone living in your household, work for any of the following?
(Please select all that apply.)
A marketing consulting firm
A marketing research firm
An advertising agency or public relations firm
A company that manufactures, sells, or distributes iced tea products
A TV or radio station
A magazine or newspaper
None of these
NEXT »

2:58

sw2.decipherinc.com

Besides this survey that you are completing now, have you participated in any other market research survey about iced tea beverages during the past three (3) months?

(Please select an answer.)

- No
- Yes

NEXT »

2:59

sw2.decipherinc.com

Please carefully read the following paragraph:

During this survey, I did not open another Internet browser, site, or tab. I only reviewed materials that were part of this survey. I answered the survey questions without stopping in the middle and I did <u>not</u> consult <u>any</u> source of information (including any websites, AI tools, books, or another person) about this survey.

*Do you or don't you agree with the above paragraph?*

(Please select an answer.)

- No, I do <u>not</u> agree with the above paragraph
- Yes, I do agree with the above paragraph

2:59

sw2.decipherinc.com

During this survey, I did not open another Internet browser, site, or tab. I only reviewed materials that were part of this survey. I answered the survey questions without stopping in the middle and I did <u>not</u> consult <u>any</u> source of information (including any websites, AI tools, books, or another person) about this survey.

*Do you or don't you agree with the above paragraph?*

(Please select an answer.)

- No, I do <u>not</u> agree with the above paragraph
- Yes, I do agree with the above paragraph

NEXT »


sw2.decipherinc.com
Thank you very much. Those are all of our questions.

# Cell 2: “Control” Package

sw2.decipherinc.com

On the next screens, we will ask you some questions about iced tea products. For each question, if you don't know or don't have an answer, please don't guess. Just indicate that you "don't know" or "don't have an answer" by selecting, or typing in, the words "don't know" and then continue to the next question. There are no right or wrong answers.

(Please continue when you are ready.)

NEXT »

sw2.decipherinc.com

Today we are interviewing people about iced tea products.

In general, what are your most important considerations when deciding which iced tea product to buy?

Please type your answer below. Please be specific and include details.

NEXT »


3:14
sw2.decipherinc.com
In general, what are your most important considerations when deciding which iced tea product to buy?
Test response
Any other considerations when deciding which iced tea product to buy?
Please type your answer below. Please be specific and include details.


3:14
72
sw2.decipherinc.com
buy?
Test response
Any other considerations when deciding which iced tea product to buy?
Please type your answer below. Please be specific and include details.
NEXT »

3:14

sw2.decipherinc.com

On the next screen, we will show you a package of iced tea. After you have viewed the package, we will ask you some questions.

Please examine the package, just as you would if you were considering buying such a product. Take as much time as you would normally do when considering buying such a product.

(Please continue when you are ready.)

NEXT »

3:14

sw2.decipherinc.com

***Please read the following instructions CAREFULLY!***

*Below is a package of iced tea (it may take a moment for the image to load).*

*To rotate the image and view the package from other sides, including the information on the back*, ***click and hold down the cursor*** *over the image, and* ***drag the cursor*** *in the direction of the desired rotation (i.e., left, right, up, or down). Releasing the click will pause the rotation of the image. You can use your finger to rotate the image.*

*At any point, if you wish to make the package* ***larger*** *or* ***smaller****, you can use one of these methods:*

3:14

sw2.decipherinc.com

- ***pinch in*** *or* ***pinch out*** *with two fingers on your phone screen;* ***OR***
- *click the ⊕* ***(plus sign)*** *or ⊖* ***(minus sign)*** *buttons below the package image.*

(Please continue when you are ready.)




3:14

sw2.decipherinc.com




NEXT »


3:15
sw2.decipherinc.com
Nutrition Facts
Approx. 2 servings per container
Serving size 12 fl oz (355mL)
Calories 100 200
NO ARTIFICIAL COLOR ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about AriZona call 1 800 832 3775
NEXT »


sw2.decipherinc.com
REAL BREWED
Nutrition Facts
Approx. 2 servings per container
Serving size 12 fl oz (355mL)
Calories 100 200
NO
NEXT »


3:15
sw2.decipherinc.com
Were you or weren't you able to clearly view the package?
(Please select an answer.)
No, I wasn't
Yes, I was
NEXT »
1

3:15

sw2.decipherinc.com

***<u>Please read the following instructions CAREFULLY!</u>***

*Now, you will see the **<u>back of the package you just examined</u>** (it may take a moment for the image to load).*

*<u>To rotate the image (and view the package from other sides)</u>, **click and hold down the cursor** over the image, and **drag the cursor** in the direction of the desired rotation (i.e., left, right, up, or down). Releasing the click will pause the rotation of the image. You can use your finger to rotate the image.*

*<u>At any point, if you wish to make the package **larger** or **smaller**</u>, you can use one of these methods:*

3:15

sw2.decipherinc.com

- ***pinch in** or **pinch out** with two fingers on your phone screen; **<u>OR</u>***
- *click the + **(plus sign)** or − **(minus sign)** buttons below the package image.*

(Please continue when you are ready.)




3:15

sw2.decipherinc.com




NEXT »


3:16
sw2.decipherinc.com
Nutrition Facts
Approx. 2 servings per container
Serving size 12 fl oz (355mL)
Calories 100 200
NO ARTIFICIAL COLOR ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about AriZona call 1 800 832 3775
SHAKE WELL
REFRIGERATE AFTER OPENING
NEXT »


sw2.decipherinc.com
AriZona
Green
NEXT »


3:16
sw2.decipherinc.com
Were you or weren't you able to clearly view the back of the package?
(Please select an answer.)
No, I wasn't
Yes, I was
NEXT »


3:16
sw2.decipherinc.com
We would like to ask you a few questions about the product that you just examined.
(Please continue when you are ready.)
NEXT »


3:16
sw2.decipherinc.com

Now, here is the first question.

This question has six answer choices, which are shown on the screen below.

Please read the entire question before answering.

Assume that the price of the can of iced tea that you just examined is comparable to the price of other cans or bottles of iced tea available in stores. If you were at the store thinking of buying iced tea and you saw the product that you just examined, how likely would you be to buy this product?

Would you say that you *definitely would not buy this product, probably would not buy this product, may or may not buy this product, probably would buy this*


3:17
sw2.decipherinc.com

*would not buy this product, probably would not buy this product, may or may not buy this product, probably would buy this product, definitely would buy this product, or don't know?*

*If you would like to view the package again, please click* ***here***.

(Please select an answer.)

- Definitely would not buy this product
- Probably would not buy this product
- May or may not buy this product
- Probably would buy this product
- Definitely would buy this product
- Don't know

NEXT »


3:17
sw2.decipherinc.com
would not buy this product,
Green Tea
With GINSENG
and HONEY
close


sw2.decipherinc.com
would not buy this product,
REAL BREWED
Nutrition Facts
Calories 100 200
NO ARTIFICIAL COLOR ARTIFICIAL FLAVOR
drinkarizona.com
SHAKE WELL
close


sw2.decipherinc.com
would not buy this product,
Sodium 0mg 0% 0mg 0%
Total Carb. 26g 9% 50g 18%
Total Sugars 25g 49g
Incl. Added Sugars 25g 50% 48g 96%
Protein 0g 0g
Vitamin C 18mg 20% 34mg 40%
Not a significant source of saturated fat, trans fat, cholesterol, dietary fiber, vitamin D, calcium, iron and potassium.
INGREDIENTS: PREMIUM BREWED BLEND OF GREEN TEAS USING FILTERED WATER, HIGH FRUCTOSE CORN SYRUP (GLUCOSE-FRUCTOSE SYRUP), HONEY, CITRIC ACID, NATURAL FLAVORS, ASCORBIC ACID (VITAMIN C), GINSENG ROOT EXTRACT.
MFD. FOR ARIZONA BEVERAGES USA LLC WOODBURY, NY 11797 USA
©2019 BEVERAGE MARKETING USA, INC.
Great Hot!
NO ARTIFICIAL COLOR ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about AriZona call 1 800 832 3775
ANTIOX
close


3:18
sw2.decipherinc.com
What makes you say that you **definitely would buy this product**?
Please type your answer below. Please be specific and include details.
NEXT »


sw2.decipherinc.com
What makes you say that you **definitely would buy this product**?
Test response
Any other reason or reasons why you **definitely would buy this product**?
Please type your answer below. Please be specific and include details.


68
sw2.decipherinc.com
Test response
Any other reason or reasons why you **definitely would buy this product**?
Please type your answer below. Please be specific and include details.
NEXT »

3:19

sw2.decipherinc.com

Typical prices of a 16 – 24 oz. can or bottle of iced tea range between $0.69 and $2.89.

Considering again the **can of iced tea you just examined, what is the highest price you would pay for the product you just saw**? Enter the price in U.S. dollars and cents.

*If you would like to view the package again, please click **here**.*

[ ] dollars and [ ] cents

[ ] Don't know

NEXT »


3:19
sw2.decipherinc.com
Green Tea
With GINSENG
and HONEY
close


sw2.decipherinc.com
REAL BREWED
AN AMERICAN COMPANY
AriZona
close


sw2.decipherinc.com
REAL BREWED
Nutrition Facts
Calories 100 200
100% NATURAL
AriZona
GREEN TEA
with GINSENG and HONEY
NO
close


3:20
sw2.decipherinc.com
Which of the following four directions is the opposite of West?
(Please select an answer.)
North
East
South
West
Don't know
NEXT »


3:20
sw2.decipherinc.com
Do you, or does anyone living in your household, work for any of the following?
(Please select all that apply.)
A marketing consulting firm
A marketing research firm
An advertising agency or public relations firm
A company that manufactures, sells, or distributes iced tea products
A TV or radio station
A magazine or newspaper
None of these
NEXT »

3:20

sw2.decipherinc.com

Besides this survey that you are completing now, have you participated in any other market research survey about iced tea beverages during the past three (3) months?

(Please select an answer.)

- No
- Yes

NEXT »

3:20

sw2.decipherinc.com

Please carefully read the following paragraph:

During this survey, I did not open another Internet browser, site, or tab. I only reviewed materials that were part of this survey. I answered the survey questions without stopping in the middle and I did not consult any source of information (including any websites, AI tools, books, or another person) about this survey.

*Do you or don't you agree with the above paragraph?*

(Please select an answer.)

- No, I do not agree with the above paragraph
- Yes, I do agree with the above paragraph

3:20

sw2.decipherinc.com

During this survey, I did not open another Internet browser, site, or tab. I only reviewed materials that were part of this survey. I answered the survey questions without stopping in the middle and I did not consult any source of information (including any websites, AI tools, books, or another person) about this survey.

*Do you or don't you agree with the above paragraph?*

(Please select an answer.)

- No, I do not agree with the above paragraph
- Yes, I do agree with the above paragraph

NEXT »


3:20
sw2.decipherinc.com
Thank you very much. Those are all of our questions.
1

**EXHIBIT D.3: SCREENSHOTS OF THE FRONT, BACK, SIDES, TOP, AND BOTTOM OF THE "TEST" AND "CONTROL" ARIZONA PACKAGES (ICED TEA)**

**Test AriZona Package**

***Front***



***Back***


REAL BREWED
REAL BREWED
Nutrition Facts
Approx. 2 servings per container
Serving size 12 fl oz (355mL)
Per serving
Per container
Calories 100 200
% DV*
% DV*
Total Fat 0g 0% 0g 0%
Sodium 0mg 0% 0mg 0%
Total Carb. 26g 9% 50g 18%
Total Sugars 25g 49g
Incl. Added Sugars 25g 50% 48g 96%
Protein 0g 0g
Vitamin C 18mg 20% 34mg 40%
Not a significant source of saturated fat, trans fat, cholesterol, dietary fiber, vitamin D, calcium, iron and potassium.
* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.
INGREDIENTS: PREMIUM BREWED BLEND OF GREEN TEAS USING FILTERED WATER, HIGH FRUCTOSE CORN SYRUP (GLUCOSE-FRUCTOSE SYRUP), HONEY, CITRIC ACID, NATURAL FLAVORS, ASCORBIC ACID (VITAMIN C), GINSENG ROOT EXTRACT.
MFD. FOR ARIZONA BEVERAGES USA LLC
WOODBURY, NY 11797 USA
©2019 BEVERAGE MARKETING USA, INC.
Great Hot!
NO
PRESERVATIVES
ARTIFICIAL COLOR
ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about
AriZona call 1 800 832 3775
ANTIOX
3010513L19 55724
6 13008 75642 0
SHAKE WELL
REFRIGERATE AFTER OPENING
AN AMERICAN COMPANY

***Right and Left Sides***






***Top***


Nutrition Facts
CA CRV
OR 10¢
CTRV
DF 82
485
REAL BREWED
REAL BREWED

***Bottom***



<u>**Control AriZona Package**</u>

***Front***



***Back***


REAL BREWED
REAL BREWED
AN AMERICAN COMPANY
Nutrition Facts
Approx. 2 servings per container
Serving size 12 fl oz (355mL)
Per serving
Per container
Calories 100 200
% DV*
% DV*
Total Fat 0g 0% 0g 0%
Sodium 0mg 0% 0mg 0%
Total Carb. 26g 9% 50g 18%
Total Sugars 25g 49g
Incl. Added Sugars 25g 50% 48g 96%
Protein 0g 0g
Vitamin C 18mg 20% 34mg 40%
Not a significant source of saturated fat, trans fat, cholesterol, dietary fiber, vitamin D, calcium, iron and potassium.
* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.
INGREDIENTS: PREMIUM BREWED BLEND OF GREEN TEAS USING FILTERED WATER, HIGH FRUCTOSE CORN SYRUP (GLUCOSE-FRUCTOSE SYRUP), HONEY, CITRIC ACID, NATURAL FLAVORS, ASCORBIC ACID (VITAMIN C), GINSENG ROOT EXTRACT.
MFD. FOR ARIZONA BEVERAGES USA LLC
WOODBURY, NY 11797 USA
©2019 BEVERAGE MARKETING USA, INC.
Great Hot!
NO
ARTIFICIAL COLOR
ARTIFICIAL FLAVOR
drinkarizona.com
For more info. about
AriZona call 1 800 832 3775
VITAMIN C
ANTIOX
FORTIFIED
3010513L19 55724
6 13008 75642 0
SHAKE WELL
REFRIGERATE AFTER OPENING

***Right and Left Sides***



***Top***



***Bottom***



**EXHIBIT D.4: PACKAGE FLATS USED TO CREATE THE 360-DEGREE IMAGE OF THE "TEST" AND "CONTROL" ARIZONA PACKAGES (ICED TEA)**

REAL BREWED REAL BREWED REAL BREWED REAL BREWED REAL BREWED REAL BREWED

# AriZona®

AN AMERICAN COMPANY

# Green Tea

With GINSENG and HONEY

23 FL. OZ. - 680ml Ⓤ

100% NATURAL

緑茶

## AriZona®

## GREEN TEA

With GINSENG and HONEY

***Enjoy America's best selling ready-to-drink green tea! AriZona Green Tea...Where great taste and goodness "naturally" come together. Green tea for its health benefits and nature's natural sweetener, honey.***



## Nutrition Facts

Approx. 2 servings per container

**Serving size 12 fl oz (355mL)**

| | Per serving | | Per container | |
|---|---|---|---|---|
| **Calories** | **100** | | **200** | |
| | | % DV* | | % DV* |
| **Total Fat** | 0g | **0%** | 0g | **0%** |
| **Sodium** | 0mg | **0%** | 0mg | **0%** |
| **Total Carb.** | 26g | **9%** | 50g | **18%** |
| Total Sugars | 25g | | 49g | |
| Incl. Added Sugars | 25g | **50%** | 48g | **96%** |
| **Protein** | 0g | | 0g | |
| Vitamin C | 18mg | 20% | 34mg | 40% |

Not a significant source of saturated fat, trans fat, cholesterol, dietary fiber, vitamin D, calcium, iron and potassium.

* The % Daily Value (DV) tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice.

INGREDIENTS: PREMIUM BREWED BLEND OF GREEN TEAS USING FILTERED WATER, HIGH FRUCTOSE CORN SYRUP (GLUCOSE-FRUCTOSE SYRUP), HONEY, CITRIC ACID, NATURAL FLAVORS, ASCORBIC ACID (VITAMIN C), GINSENG ROOT EXTRACT.

MFD. FOR ARIZONA BEVERAGES USA LLC
WOODBURY, NY 11797 USA
©2019 BEVERAGE MARKETING USA, INC.

Great Hot!

NO PRESERVATIVES
ARTIFICIAL COLOR
ARTIFICIAL FLAVOR

drinkarizona.com
For more info. about AriZona call 1 800 832 3775

VITAMIN C ANTIOX FORTIFIED

AN AMERICAN COMPANY ★ FAMILY OWNED & OPERATED ★

301051 3L19 55724

0 13008 75642 6

**SHAKE WELL**
REFRIGERATE AFTER OPENING